UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

PERSONAL SERVICES CONTRACTOR          )
ASSOCIATION,                          )
                                      )
                                      )
                    Plaintiff,        )          Case No. 1:25-cv-469
                                      )
v.                                    )
                                      )
DONALD TRUMP, *et al.*,               )
                                      )
                    Defendants.       )
_____  )


**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER**


The United States Agency for International Development (USAID)—a

Congressionally-established agency, providing critical worldwide humanitarian

assistance with funds appropriated by Congress for that purpose—is suffering an

onslaught of unconstitutional and illegal attacks from the Executive and from DOGE,

summarily dismissing its workers, contractors, grantees, and beneficiaries, and creating

a global humanitarian crisis.

From Defendant Trump's Executive Order instituting a "90-day pause" in foreign

aid funding (Exhibit A) to Defendant State Department's and Secretary Rubio's Stop-

Work memo and orders to the USAID workforce (the Stop-Work ALDAC, Exhibit B), to

Defendants' steps to evacuate USPSCs and other USAID employees from overseas posts

chaotically, Defendants are deliberately dismantling USAID's infrastructure. And they

are doing this in violation of, among others:

- **Separation of Powers**: the President has no authority to abolish, move, or consolidate USAID without Congressional authorization.

- **The Impoundment Control Act**, 2 U.S.C. § 681: the Executive cannot refuse to disburse Congressionally appropriated funds for the purposes they were appropriated for.

- **The Anti-Deficiency Act,** 31 U.S.C. § 1512: the Executive can create reserves of funds only for the specific purpose and only under certain circumstances not present here.

- **The Administrative Procedure Act**: when agencies take action (including by shuttering their operations, refusing to disburse appropriated funding, or making it impossible to fulfill their statutory obligations by terminating workers) that do not match and are wildly disproportionate to their justifications (aligning foreign aid with policy goals), they act arbitrarily, capriciously, in abuse of their discretion, and otherwise not in accordance with law. And,

- **The Take Care Clause**: The President is obligated to "take care" to execute the law. The President has no authority to ignore or unilaterally amend the law, including appropriations statutes. Congress controls "the purse." With Executive Order 14169 (the Foreign Assistance EO), the President has unconstitutionally usurped Legislative authority and the power of the purse, which the Constitution confer exclusively on Congress.

As this brief shows, Plaintiff is likely to prevail on the merits of every one of these

claims.

But time is of the essence.

2

The harm to USAID's USPSCs is increasingly irreparable, and they remain in a precarious position despite two temporary restraining orders. First, Judge Nichols entered a temporary restraining order reinstating USAID employees placed on administrative leave, restoring their access to email, payment and security notification systems, and barring their evacuation from their posts overseas. ECF # 15 in Case. No. 1:25-cv-352-CJN. However, the TRO does not expressly protect USPSCs, and the government has apparently interpreted at least the first two provisions (barring forced leave and requiring the restoration of communications systems and payments) to not protect USPSCs. ECF # 35-1 ¶ 19. *But see* Exhibit G ¶ 5 (paystub indicated that USPSC was, in fact, placed on administrative leave). Similarly, Judge Ali has entered a temporary restraining order restarting work and the flow of funds under "any contracts" in existence with USAID as of January 19, 2025. ECF # 21 in Case No. 1:25-cv-402-AHA. However, the government has acted as if that order does not apply to USPSCs and their contracts. *So far, no temporary restraining order expressly protects USAID's personal service contractors (USPSCs)*. As this motion was being finalized, counsel learned that notices of contract termination were being distributed to dozens, possibly hundreds, of PSCs.

There are roughly 1,110 USPCs. Approximately 46% of them are stationed overseas. To protect their identities and insulate them from retaliation, USPSCs are represented in this case by the PSC Association. Established in 1999 as an employee

resource group for U.S. citizen personal services contractors (USPSCs) employed by USAID, today the PSC Association has an active membership in the hundreds and operates as a voluntary association independent from USAID. It brings this action and the request for immediate relief on behalf of its members.

## STATEMENT OF FACTS

USAID is a federal agency headquartered in Washington, DC, with responsibility for international development and humanitarian assistance. At the direction of Congress (not the President), it disburses billions of dollars of foreign assistance every year (billions that constitute, however, less than 1.5% of the federal budget). https://www.pewresearch.org/short-reads/2025/02/06/what-the-data-says-about-us-foreign-aid/.

USAID was established in 1961 to implement components of the Foreign Assistance Act of 1961 (FAA, P.L. 87-195). Subsequently, section 1413 of the Foreign Affairs Reform Restructuring Act of 1998 (Division G of P.L. 105-277) established USAID as an "independent establishment," 5 U.S.C. § 104, outside of the State Department. 22 U.S.C. § 6563. Today, USAID is a Congressionally created agency. Presidential authority to reorganize it expired in 1999. Today, the President has no authority to abolish, move, or consolidate USAID without Congressional authorization.

Congress appropriates funds for USAID programs and operations in annual State, Foreign Operations and Related Programs (SFOPS) appropriations. Nearly all USAID

programs are authorized through the Foreign Assistance Act. To use funds appropriated to USAID for purposes not specified in SFOPS appropriations, which have the force of law, the Administration is required to notify and consult Congress in advance. (FY 2024 SFOPS; § 7063 of Division F of P.L. 1818-47).

On January 20, 2025, President Trump issued EO 14169 (the Foreign Assistance EO), purporting to "pause" all United States foreign development assistance for 90 days, with the added proviso that expenditures "may resume" only if the Director of the OMB—defendant Russell Vought—says so. Exhibit A.

Four days later, on January 24, 2025, the Secretary of State issued a communique to all diplomatic and consular missions—known as an "ALDAC"—implementing the Foreign Assistance EO. *See* Exhibit B. Secretary Rubio's ALDAC ordered that "effective immediately," "no new obligations" shall be made for foreign assistance; that contracting officers should issue "stop-work orders" for all existing foreign assistance awards; and that the federal government would "suspend" review of all proposals for new foreign assistance, grants, subgrants, contracts, or subcontracts. As a result, according to USAID's Inspector General, "all USAID programs were suspended, including those with funds already obligated and disbursed." https://oig.usaid.gov/node/7439 [https://perma.cc/9X7M-MDEC] (last visited February 18, 2025).

The result of the EO, the ALDAC, and the stop-work orders implementing them has been mayhem. The EO, the ALDAC, and the stop-work orders are preventing the PSC Association's members from carrying out the work for which their positions were created and exist and from overseeing often lifesaving humanitarian relief, including not only medicine, medical services, food, and shelter but also counter-narcotics, anti-human trafficking, and counter-terrorism operations to gather intelligence on Al Qaeda, and including programs purportedly covered by Secretary Rubio's waiver. https://www.justsecurity.org/106919/stopped-security-assistance/. *See*, *e.g.*, Exhibit L ¶¶ 18-19 (describing how "pause" on all foreign aid prevented the USPSC and USAID from responding to "the horrors unfolding" in the DRC when M23 rebels took control of the city of Goma); Exhibit K ¶ 2 (describing termination of USPSC contract whose work focused on USAID-humanitarian programs that should be covered by the waiver).

Because of stop-work orders, more than 500,000 metric tons of American farmers' food commodities valued at more than $340 million are stranded at U.S. ports, in transit, and in warehouses, at risk of spoilage, unanticipated storage needs, and diversion. https://oig.usaid.gov/node/7439 [https://perma.cc/9X7M-MDEC] (last visited February 18, 2025). Meanwhile, in South Sudan, 60 percent of the population is extremely food insecure, and one in four children under five is suffering from severe acute malnutrition, see https://www.unicefusa.org/stories/situation-grows-increasingly-desperate-children-south-sudan, while in the Democratic Republic of Congo, 4.5 million

children under the age of five are facing acute malnutrition.

https://www.who.int/emergencies/disease-outbreak-news/item/2024-DON547#

[https://tinyurl.com/yv4chyk9]. Non-governmental organizations across the world have

begun "shutting doors, sending staff home and turning away their dependents." Laura

Kelly & Nathaniel Weixel, *Chaos and Uncertainty Swirl Around Trump's Foreign Aid Freeze*,

The Hill (Jan. 30, 2025), https://thehill.com/homenews/administration/5114561-trump-

rubio-foreign-aid-freeze/.

For USPCs employed by USAID, too, the consequences have been calamitous. *See*

Exhibits C to O (declarations of USPCs).

## STANDARDS FOR A TEMPORARY RESTRAINING ORDER

To secure a temporary restraining order, "the moving party must show (1) a

substantial likelihood of success on the merits, (2) that it would suffer irreparable injury

if [an] injunction were not granted, (3) that an injunction would not substantially injure

other interested parties, and (4) that the public interest would be furthered by the

injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir.

2006); see *Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard

applies to both temporary restraining orders and to preliminary injunctions."). Where,

as here, the requested temporary relief would run against the government, "the final

two … factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*,

474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Here, all these factors favor Plaintiff.

## ARGUMENT

The day that he took office, President Trump issued an Executive Order mandating the cessation of the flow of congressionally appropriated funding and halting foreign assistance projects that Congress had chosen to authorize as a matter of national policy. This transgressed the separation of powers. And it also flouted the constitutional requirement that the Executive must take care to execute legislative policy. He and the other defendants have also moved to shut down an entire agency created by Congress. This too transgresses the separation of powers and the Take Care Clause. In the Further Consolidated Appropriations Act of 2024 (FCAA), Pub. L. No. 118-47, 138 Stat. 460 (2024), Congress allocated federal funds to foreign assistance work. In contravention of that appropriation, the President's Foreign Aid EO and Secretary Rubio's ALDAC unconstitutionally seize the power of the purse and the Legislature's role in making policy choices—as if the President were a CEO and Congress were his CFO. That is not how Articles I and II work. It is not within the Executive's authority to reject the policy goals that Congress has embraced.

There are no extenuating circumstances. The supposedly temporary nature of the funding freeze – a "pause" as the Foreign Assistance EO calls it—is a pretext.

Defendants' actions are not temporary or transitional. Elon Musk has declared USAID "beyond repair" and avowed that "We're shutting it down," and "It's time for it to die," while celebrating having spent the weekend "feeding USAID into the wood chipper." Defendant Vought has bragged that he wants federal workers "to be traumatically affected …. We want their funding to be shut down …We want to put them in trauma." The Defendants' aim is not to pause foreign aid. It is to devastate and eliminate it and the federal agencies, employees, and contractors who provide it.

Likewise, the Secretary of State's assurance that "waivers" are available for certain forms of "life-saving humanitarian assistance" is also pretext. As reported by USAID's Inspector General, who was terminated twenty-fours after issuing his report with these conclusions, USAID's capacity to implement waivers has been crippled by staffing reductions, confusion about the scope of humanitarian assistance waivers, and bans on communications between USAID staff and contractors about the waivers. According, again, to the OIG, these issues have not been obviated by court orders pausing additional staff reductions. https://oig.usaid.gov/node/7439 [https://perma.cc/9X7M-MDEC]. See also https://www.devex.com/news/the-mess-inside-rubio-s-lifesaving-waivers-109398 ("The mess inside [Secretary] Rubio's 'lifesaving' waivers") (last visited Feb. 17, 2025).

Without prior consultation with Congress, defendants have, *among other things*: (1) precipitously frozen billions in Congressionally appropriated funding; (2) moved

toward their goal of shrinking a USAID workforce of more than 10,000 by ninety

percent and absorbing the remnants into the State Department; (3) removed the metal

letters spelling "U.S. Agency for International Development" from the agency's

headquarters and evicted the agency from its headquarters,

https://www.pbs.org/newshour/politics/trump-administration-takes-usaid-off-its-

building-lease; (4) barred USAID employees, including USPSCs, from entering

headquarters, https://abcnews.go.com/US/wireStory/usaid-staffers-turned-offices-after-

court-suspends-leave-118654540; (5) issued precipitous evacuation orders for USAID

employees, including USPSCs; (6) locked USAID workers, including USPSCs, out of

their U.S. Government email accounts and other computer systems; (7) ceased

payments for overseas employees' rent and utilities, including USPSCs' rent and

utilities, placing them at risk of eviction and the inability to care for their families; (8)

ceased reimbursing USAID employees, including USPSCs, for thousands of dollars of

already incurred covered expenses; (9) risked medical care for employees and their

family members, including pregnant women in the third trimester of their pregnancies;

and (10) devastated humanitarian assistance worldwide. See Exhibits C through O.

## I.     Plaintiff is likely to succeed on the merits.

Although Plaintiff "need only show likelihood of success on one claim," *Kirwa v.*

*U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) (quoting *McNeil-PPC, Inc. v.*

*Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995)), here Plaintiff can show a likelihood

of success as to all of them.

**A. Plaintiff is likely to prevail on its constitutional claims.**

Plaintiff is likely to prevail on its claim that the Foreign Assistance EO and the shuttering of USAID violate both Separation of Powers and the Take Care Clause.

1. *Defendants' actions overstep the bounds of Executive power and usurp Congressional power, violating the Separation of Powers that the Constitution establishes.*

Federal spending is Congress's domain. Congress has "exclusive power over the federal purse." *U.S. Dept. of Navy v. Federal Labor Relations Authority,* 665 F.3d 1339, 1346 (D.C. Cir. 2012). "The power over the purse was one of the most important authorities allocated to Congress." *Id.* It is "a bulwark of the Constitution's separation of powers." *Id.*

In a corporation, the CEO may override the CFO's choices of where to direct money. But the President is not a CEO, and Congress is not the President's CFO. The Executive and the Legislature are each limited to the powers vested in them by Articles I and II. Unless Congress has allowed it by statute, the President has no constitutional authority to withhold or redirect appropriated funds. Even if there are overwhelming "policy reasons … for wanting to spend less than the full amount appropriated by Congress for a particular project or program," say, foreign assistance, "even the President does not have unilateral authority to refuse to spend the funds. *In re Aiken County,* 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). The 2024 Appropriations

Act directs USAID to spend appropriated funds on foreign assistance and allows the

Executive no discretion to freeze funds, much less to discontinue foreign assistance. The

Foreign Assistance EO flagrantly oversteps the Executive's powers, usurps Congress's

exclusive power over the purse. It violates the Constitution's deliberate and careful

delineation and separation of Legislative power from Executive power.

> **2.   *President Trump's actions, by disregarding Congressional directives that have the force of law, violate the Take Care Clause.***

Under Article II of the Constitution, it is the President's "constitutionally

appointed duty to 'take care that the laws be faithfully executed.'" *Morrison v. Olson*, 487

U.S. 654, 690 (1988) (quoting art. II, § 3). The President is not a lawmaker. The President

must carry out the laws, including appropriations statutes, faithfully executing those

laws in the manner "prescribed by Congress,: not "a manner prescribed by the

President." *Youngstown Sheet & Tube co. v. Sawyer*, 343 U.S. 597, 587-88 (1952). The

Federal Assistance EO is a dereliction of the President's duty to faithfully execute the

2024 Appropriations Act, which directs USAID to spend appropriated funds on foreign

assistance, and to oversee, rather than to destroy, a congressionally created agency, *see*

P.L. 105-277, Div. G, § 1413; 5 U.S.C. § 104; 22 U.S.C. § 6563. The Federal Assistance EO

is also in violation of the Impoundment Control Act of 1974, 2 U.S.C. § 681, and the

Anti-Deficiency Act (31 U.S.C. § 1512(c)(1)). On the facts here, the President's violation

of separation of powers is correspondingly a violation of the Take Care Clause.

### B. Plaintiff is likely to prevail on its APA claims.

The Administrative Procedure Act (APA) provides that a "reviewing court shall

hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That test is

met here.

#### 1. *Defendants' actions are arbitrary and capricious.*

Secretary Rubio's Stop-Work Order ALDAC, and other actions effectuating the

President's Foreign Assistance EO, have been arbitrary and capricious.

The stated rationale for imposing a blanket freeze on virtually all foreign

assistance funding and operations is that Defendants want to review "whether the

foreign assistance policies and interests supported by appropriations are not duplicated,

are effective, and are consistent with President Trump's foreign policy." State

Department Memo. That rationale does not match and is wildly disproportionate to an

immediate freeze on billions of dollars in Congressionally appropriated aid, reversing

decades of policy embracing "soft power" through foreign aid, stranding UPSCs and

other USAID employees overseas, evicting USAID from its headquarters, locking

USPCs out of computer systems, and declaring that the USAID workforce of more than

10,000 should be shrunk by ninety percent, with the remnants absorbed in to the State

Department, despite Congress's creation of USAID as an independent entity.

In addition, Defendants have engaged in no reasoned consideration of alternatives.

*See Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be

regarded as rational, an agency must also consider significant alternatives to the course

it ultimately chooses."). Neither is there any evidence of their having considered

substantial reliance interests—not only of their employees but also of grantees,

contractors, and other partners, all of whom have relied on longstanding USAID and

State Department practices and policies, jettisoned by the Foreign Assistance EO and

Rubio's ALDAC. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("When an

agency changes course … it must be cognizant that longstanding policies may have

engendered serious reliance interests that must be taken into account."). Instead,

defendants have entirely overlooked, or purposefully ignored, "important aspect[s]" of

their actions, *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983)—aspects like the consequences, including the

consequences on USAID PSCs and their family members, of extreme actions like

freezing foreign aid or shuttering USAID, unprecedented actions neither required for

nor consistent with a policy "review." *See* Exhibit N ¶¶ 4-6 (responding to assertion that

"it was impossible to review existing programs without shutting everything down");

Exhibits N - O (describing irreparable harm to USPSCs and their families ).

14

It's hard to avoid the conclusion that havoc has been the point.

The Defendants' acts with respect to USAID since January 20, 2025 are quintessentially arbitrary, capricious, in abuse of their discretion, and contrary to law.

### 2. *Defendants' actions have been contrary to law.*

To begin with, Secretary Rubio's Stop-Work ALDAC memo purports to implement the Foreign Assistance EO, which violates the Constitution, thwarting rather than effectuating Congress' policy choice, choices that belong to the Legislative, not Executive, branch, and impounding appropriated funds, thus seizing control of "the purse," which the Constitution grants exclusively to Congress, not the Executive. And because the EO is thus unlawful and unenforceable, the Secretary's actions implementing it are necessarily unlawful too.

This brief has already addressed the President's violations of Separation of Powers and the Take Care Clause. Here we address the Impoundment Control Act. 2 U.S.C. §§ 682 et seq. Under that statute, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). The Act also permits the President to withhold or delay the obligation or expenditure of appropriated funds—but only for limited purposes, for a limited time, and after transmitting a special message to Congress. *Id.* § 684(a); see id. § 682(1). Neither the President nor any executive officer may defer obligation or expenditure of appropriated funds merely for policy reasons. *In*

*re Aiken County,* 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). Here, by refusing to spend

appropriated funds to "align[]" spending with President Trump's "policy agenda,"

Rubio Memo ¶ 3, Defendants have violated the Impoundment Control Act.

      *Second*, Defendants also have violated the appropriations statutes, including the

2024 Appropriations Act, which directs USAID and the State Department to spend

appropriated funds for particular foreign-assistance purposes. When Congress wants to

afford the executive branch discretion to spend less than the full amount appropriated,

Congress uses specific language—for example, that an agency is appropriated "sums

not exceeding" or "up to" an amount for a particular purpose. *See, e.g., CFPB v. Com.*

*Fin. Servs. Ass'n*, 601 U.S. 416, 432-33 (2024); *id.* at 442-43 (Kagan, J., concurring).

Without that language, appropriations statutes are commands to obligate and spend the

full amount. *See, e.g., Train v. City of New York*, 420 U.S. 35 (1975) (rejecting the agency's

argument that it had discretion to spend less). Here, the relevant appropriations statute

does not give the Executive branch discretion to freeze foreign-assistance funding.

There is no constitutional or statutory authority for the Executive branch to freeze

foreign assistance funding wholesale or dismantle USAID.

      Finally, Defendants have violated the Anti-Deficiency Act, which allows for the

creation of funding reserves only in apportioning or reapportioning an appropriation. A

reserve may be established only "(A) to provide for contingencies; (B) to achieve

savings made possible by or through changes in requirements or greater efficiency of

operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1). None of those

circumstances are present here.

## II. Plaintiff's members are experiencing irreparable harm.

Plaintiff's members lives have been thrown into chaos, uncertainty, and as to

USPSCs stationed abroad, actual peril. They face all kinds of threats and losses—for

example, threats to and losses of:

(1) Essential communication tools and network access, endangering their
personal safety and security (*see, e.g.,* Exhibit J ¶¶ 2-6 (USPSCs stationed
abroad remain locked out of the systems used for safety alerts));

(2) Water, electricity, and eviction from their homes overseas, which embassies
normally provide for overseas USPSCs, but with funds frozen by the Foreign
Assistance EO and the ALDAC and no functional payment system operating,
embassies aren't paying these bills (*see, e.g.,* Exhibit J ¶ 7 (describing USAID
notice to employees at overseas regional mission, with subject "Potential
Effect of Funding Freeze on Mission Residences," explaining blocking of
payments for "critical utilities such as water and electricity" as "unintended
consequence" of the worldwide freeze on foreign aid); Exhibit D ¶¶ 3-5
(distress caused by potential loss of electricity essential to the care of USPSC's
one-year-old daughter);

(3) The risk of precipitous evacuation, regardless of family, health, or other
personal circumstances;

(4) Disrupted medevac arrangements for pregnant mothers in the third trimester
of their pregnancies;

(4) The trust and relationships that they have built with "implementing
partners" on the ground worldwide over decades; and

(5) Their reputations and good names, as the President and Elon Musk disparage
them and DOGE doxxes them, publishing their personally identifying
information on its website.

These and other harms are described and elaborated in the declarations of USPSCs that are Exhibits C to M to this motion, and in declarations filed in Case No. 1:25-cv-352-CJN.  Almost all of these harms and threats of harm are identical to those impacting USAID direct hires recognized by Judge Nichols in granting a TRO expressly protecting them, ECF # 15 in Case. No. 1:25-cv-352-CJN. The harms are identical because USPSCs, like direct hires, are employees of the U.S. government, and they work in the same settings, at the same mission posts overseas, and often doing the same work as direct hires. Exhibit C, Ex. 2 (USPSCs "are just like direct-hires for virtually all purposes: If you were in the field with us, you would not know who was hired as a direct-hire and who was hired as a PSC"); Exhibit M (describing assignments in Syria and Gaza); Exhibit L (describing assignment in the Democratic Republic of Congo); Exhibit  I ¶3 (describing assignments in Kabul, Turkey and Jordan); Exhibit F ¶3 (describing assignments in Afghanistan, Pakistan, Yemen, Libya, Syria, and Sudan). *See also* ECF # 36-1 in Case. No. 1:25-cv-352-CJN (Further Declaration of Raymond Chester) ("[M]any USPSCs serve overseas alongside AFSA members and are subject to the same security and family stability risks regarding precipitous actions to dissolve USAID.").

With respect to the inability to have access to reliable information about security and safety matters, which USPSCs experience just as direct hires do, Judge Nichols explained, "No future lawsuit could undo the physical harm that might result if USAID

employees are not informed of imminent security threats occurring in the countries to which they have relocated in the course of their service to the United States." ECF # 15 in Case. No. 1:25-cv-352-CJN at 3. Similarly, USPCSs overseas face the same harms from precipitous evacuation as direct hires. As Judge Nichols noted, unexpected and abrupt repatriation "disrupts long-settled expectations and makes it nearly impossible for evacuated employees to adequately plan for their return to the United States." *Id.*at 4. *See also, e.g.,* Exhibit L ¶¶ 31-38 (describing practical, financial, and emotional hardships caused by Defendants' actions). Indeed, many USPSCs reasonably expected to make their work for USAID their career. *Cf.* Exhibit I ¶¶ 2-4 (describing the decades-long careers of some USPSCs). Indeed, the reasonable expectations of most USPSCs meant that they continued working after a contract date had technically expired because the agency practice was to renew high-performing USPSCs who wanted to continue. One USPSC, for example, had been told their contract would be renewed, but because of the timing of the renewal date and Defendants' actions, they are now caught in limbo, employed under lapsed contracts. Exhibit L ¶¶ 4-12, 24-25; *see also,* Exhibit H ¶¶ 3-5; Exhibit F ¶ 7. Defendants' actions have betrayed the loyalty and dedication of these USPSCs.

In addition, some harms that were unclear when Judge Nichols issued the TRO, Case. No. 1:25-cv-352-CJN, ECF # 15, have only become increasingly severe, for both direct hires and USPSCs. For example, in concluding that AFSA and AFGE had not

established that the global funding freeze itself imposed irreparable harm on direct hires, Judge Nichols pointed to "significant factual questions about what the practical effect of that order is," noting the government's argument "that the order only prevents USAID from entering 'new obligations of funding.'" *Id*. at 6. Today, however, it is clear that one harm arising from that order is that the government is simply not paying its bills. USPSCs and direct hires alike are finding themselves facing potential eviction and loss of water and electricity. *See* Case. No. 1:25-cv-352-CJN, ECF # 36-3 ¶¶ 5, 9-14 (describing the reasons for and consequences of this failure to pay basic bills). One USPSC reported that the Embassy where he is posted "held a meeting with USAID personnel, confirming it could no longer pay rent or utilities," Exhibit D ¶ 5, and described the fear and anxiety accompanying that news, especially as the parent of a one-year-old child. *See also* Case. No. 1:25-cv-352-CJN, ECF # 36-2 ¶¶ 5-10, 14-15.

Among the other harms that have continued to worsen, for both USPSCs and direct hires, is the inability of the Defendants to appropriately arrange medevac procedures or other appropriate care for pregnant women in their third trimester. *See* Exhibit ¶ 4 (describing inadequacy of current plans).

And USPCSs are now threatened with an additional harm that direct hires are not facing—having their personal information appear on the DOGE website if and when their contracts are terminated or not renewed. One USPSC whose personal information actually appeared on that website described the consequences of that disclosure,

including the costs of various safeguards and insurance, the need to notify a former landlord of potential danger, and the anxiety stemming from being publicly identified with an agency that the President and Elon Musk are openly disparaging. *See generally* Exhibit K; *see also* Exhibit M (describing fear of doxxing). Another USPCS described the challenges and costs she incurred to protect herself from harm due to those improper disclosures, as well as her efforts to remove as much personal identifying information as possible from publicly available websites. Exhibit C, ¶ 20. This USPSC was told that "the freeze on all PSC contract actions will not allow my Contracting Officer or the Office of Acquisitions and Assistance (OAA) to process this request" to remove personal identifying information from government websites. *Id.* In other words, Defendants not only created a significant risk of harm, but they also made USPSC's attempts to mitigate that harm difficult, if not impossible.

Finally, even if the assault on USAID is ultimately overcome, each passing day is increasingly jeopardizing USPSCs' ability to resume foreign aid, maybe ever again, at levels qualitatively or quantitatively comparable to before. Indeed, even compliance with the purported waiver for particular life-saving assistance is impossible without the participation of numerous USPSCs who oversee that work while stationed here in the United States or overseas. One USPSC explains:

> Two waivers have been issued, one for emergency food assistance to continue, and the other for emergency medical services and other emergency subsistence activities to continue. However, the USAID/BHA staff who support this critical

21

programming, including those of my team, have also lost access to their systems, and are unable to provide ongoing support to UN and NGO programs, which includes the ability to keep funds flowing to these critical activities, leaving these organizations and staff in extremely dangerous situations. Waivers count for nothing if the people and systems that allow this work to go forward are unable to function.

Exhibit E ¶ 20.

Immediate relief is required to protect USPSCs. USAID is in chaos. It has not recovered from the events of early February, when it began conducting mass indiscriminate layoffs of both USPSCs and direct-hire employees. The payment system remains broken; USPSCs have thousands of dollars in unreimbursed expenses (*see, e.g.*, Exhibit L ¶ 30; Exhibit H ¶6; Exhibit G ¶7; Exhibit F ¶¶ 4-5), which they cannot continue to shoulder. USPSCs repatriated with little-to-no notice have been forced to abandon their property and pets, and others have no adequate housing or health insurance after their repatriation. Exhibit L ¶¶ 32-35. The continuing mass and indiscriminate layoffs will make it even harder for USAID to conduct basic activities, including repairing the broken payment system; restoring access to communication systems, including communication systems critical to the safety and security of USPSCs and their family members overseas; making tracking arrangements, including medevac procedures for pregnant USPSCs and their families; and distributing aid that is subject to waivers under the ALDAC. USPSCs also continue to suffer irreparable harm from the destruction of the entire sector in which they work.

In fact, just before midnight last night (February 18, 2025), while Plaintiff worked to finalize this filing, Defendants sent notices to over 100 USPSCs, giving them 15 days' notice of contract termination. The termination notices were generic—they did not even include the names of the USPSCs, let alone explain the termination of their individual contracts. This indiscriminate mass termination, conducted in furtherance of Defendants' unconstitutional attempt to dismantle USAID, occurred after Plaintiff sought agreement from DOJ to intervene in the AFSA "direct hire" litigation (Case No. 1:25-cv-352-CJN). Defendants refused to agree to the intervention, necessitating the filing of a separate lawsuit and motion for emergency relief—affording Defendants time to begin sending notices of mass termination before the Court could conduct a TRO hearing.

3. **The balance of equities and the public interest tilt overwhelmingly in Plaintiff's favor.**

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations … —that govern their existence and operations." *Id.*

23

(cleaned up). Axiomatically, a plaintiff likely to prevail on constitutional and statutory claims against a government defendant is serving the public interest.

## CONCLUSION

Judge Nichols has already entered a TRO expressly protecting USAID direct hires. Judge Ali has already entered a TRO protecting contracting partners and grant recipients. This Court should grant a TRO expressly protecting USPSCs, who work in the same settings as, face the same or greater perils as, and often do the same work as direct hires, and then set a briefing schedule, and a hearing (if necessary) on whether to convert the TRO to a preliminary injunction.

Dated: February 19, 2025                Respectfully submitted,


                                 /s/ Marni Willenson

Carolyn E. Shapiro*                Marni Willenson              Joshua Karsh*
Schnapper-Casteras PLLC            D.C. USDC Bar No. IL0011     Mehri & Skalet PLLC
200 E. Randolph St., Ste 5100      Illinois Bar No. 6238365     1237 Judson Ave.
Chicago, IL 60601                  Willenson Law, LLC           Evanston, IL 60202
cshapiro@schnappercasteras.com     3420 W. Armitage Ave.,       jkarsh@findjustice.com
312-520-7533                       Ste 200                      773-505-7533
                                   Chicago, IL 60647
*pro hac vice forthcoming,         marni@willensonlaw.com       *pro hac vice forthcoming,
Member of the Illinois bar with a D.C.   312-546-4910           Member of the Illinois bar with
practice limited to federal litigation. Not a                   a D.C. practice limited to
member of the District of Columbia bar.                         federal litigation. Not a
                                                                member of the District of
                                                                Columbia bar.