# EXHIBIT C

## Case No. 1:25-cv-469

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERSONAL SERVICES CONTRACTOR ASSOCIATION, ) ) ) )<br><br>*Plaintiff*, )<br> )<br>v. )<br> )<br>DONALD TRUMP, et al., )<br> )<br>*Defendants*. )<br> ) | Case No. 1:25-cv-469 |

### THIRD DECLARATION OF JANE DOE

I, Jane Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration.

2. I submitted previous declarations in the related case of *American Foreign Service Association v. Trump*, No. 1:25-CV-352; ECF Nos. 9-10, 24-16. Those declarations are attached as Exhibits 1 and 2, and I re-assert and incorporate them by reference here. Those declarations detail the severe harm caused to U.S. Personal Services Contractors (PSCs) at USAID due to the agency shutdown, including abrupt loss of access to safety and security resources overseas, financial distress, and the failure of USAID leadership to provide clear guidance. They also provide background on the work and role of USPSc. This declaration provides additional updated information and refutes certain claims made in Defendants' filings in No. 1:25-CV-352, with a focus on those directly impacting PSCs.

Responding to Claims Made by Deputy Administrator Pete Marocco

3.  Deputy Administrator Pete Marocco filed a declaration in Case No. 1:25-CV-352, ECF 35-1, which is attached as Exhibit 3. Mr. Marocco asserts that USAID personnel on administrative leave remain under Chief of Mission (COM) authority and continue to have access to security resources and emergency communications, including the SAFE Alert system and SCRY Panic app. Exh. 3, ¶ 3. However, this claim does not reflect operational realities, including as it applies to USPSCs.

4.  Though some PSCs' accounts were restored after the TRO was issued in No. 1:25-CV-352, many PSCs remain completely locked out of their email and other USAID systems. Others have reported being locked out of essential security communication platforms since system deactivation on February 2, 2025. USAID missions have had to implement ad-hoc solutions, such as manually setting up SAFE notifications on personal devices, an unreliable workaround, and a violation of the principle that all official business should utilize government-furnished equipment.

5.  Additionally, not all USAID missions have access to or use the SCRY Panic App. Moreover, even where available, not all staff were briefed on its use before being locked out of USAID systems. Notwithstanding claims of "robust" security (Exh. 3, ¶ 5), PSCs at high-risk posts, including Kyiv and Jerusalem, reported to me a loss of access to emergency support.

6.  Further, my USAID PSC colleagues have been frustrated that the Defendants

in Case 1:25-CV-352 claimed that USAID employees have the "choice" to stay at post beyond the 30-day evacuation period, see Case 1:24-CV-352, ECF # 20 at 17-18, but failed to clarify that this option would come at a significant personal cost.

7. Claims that waivers delaying evacuations may be granted "on a case-by-case basis" have not been meaningful. Defendants have not provided guidance on who qualifies for an exemption, the approval process, or the expected timeline for processing waivers. The Defendants have also not indicated where PSCs posted overseas will ultimately be relocated to in the United States, meaning they cannot begin the search for housing, and those with children cannot start the process of enrolling them in new schools. Further, PSCs have not been given clarity regarding their future employment status, which creates additional challenges for finding housing without the guarantee of continued income.

8. PSCs who would choose to remain at post beyond 30 days will no longer receive what they had before: housing, cost-of-living allowances, and security coverage through the U.S. Embassy. PSCs staying at post would also lose their diplomatic status and immunities, which is a significant status change. Diplomatic status provides important protections in countries where Americans may be targets. There are real risks for PSCs who decide to stay at post. But many of them feel they do not have a "choice." Because of dependents' schooling, familial visa constraints, or personal medical circumstances, PSCs

may need to stay, making their decision to stay more involuntary and not a choice.

9. Further, despite Morocco's claims of progress in resolving financial disruptions (Ex. 3 ¶ 17), USAID's financial systems, including Phoenix and GLAAS, have been inaccessible since early February 2025. I have read the declaration from Walter Doe, attached as Exhibit 4, and confirm that his account of payment issues is consistent with the experiences reported by PSCs at USAID. As a result:

10. Overseas PSC colleagues have reported that USAID-leased residences have faced service disruptions due to unpaid invoices. One colleague shared a USAID mission management notice on February 14, 2025, warning of potential electricity and water cutoffs because utility bills cannot be paid. Another colleague reported her home running on a generator due to unpaid electricity invoices.

11. Reimbursements for both official work travel and personal insurance to which PSCs are contractually entitled remain unpaid. PSCs are owed thousands of dollars–in clear violation of the Prompt Payment Act.

12. The transition for PSCs posted overseas from the General Schedule to the Foreign Service pay scale under AAPD 25-02 has not been fully applied because contracts cannot be modified during the foreign assistance freeze, which is costing some affected PSCs approximately $3,000 per month.

Updates or Additional Harms since Previous Declarations:

13. Numerous domestic and overseas PSCs remain locked out of their email and other USAID systems and have been unable to regain access. As a result, affected personnel cannot complete time-sensitive, work-related administrative tasks, including payroll, contract inquiries, and security-related communications.

14. Several PSCs I know have received unexplained and inconsistent termination letters, while others have been informed secondhand through supervisors of impending contract termination. This lack of direct communication has left many PSCs in a prolonged state of uncertainty, leading to confusion among my colleagues about whether they should remain at post or make immediate plans to depart. Such action also creates further confusion, as it is our understanding that communications regarding contract actions should only come directly from a PSC's Contracting Officer (CO).

15. Additionally, there is ongoing confusion regarding protections extended to PSCs. This lack of clarity has created uneven implementation across U.S. diplomatic posts, leaving some PSCs protected while others remain vulnerable to termination or exclusion from employment benefits.

16. While forced repatriation is ostensibly on hold under the TRO in *American Foreign Service Association v. Trump*, No. 1:25-CV-352, many PSCs remain very uncertain about what would happen if their contract were terminated. My colleagues are grappling with the fact that a 15-day termination notice

for an overseas PSC is simply not enough time to wrap up a life and leave in an orderly fashion. This situation will create significant tension between the AIDAR Appendix D provisions for travel and transportation and the reality of getting people home under such constrained timelines.

17. One colleague told me the Consulate where he works couldn't process export documentation in less than 15 days. If his contract is terminated, he will likely have to leave his personal property behind for others to manage onward packing and shipping arrangements.

18. In practice, this approach is not just unworkable—it is also deeply wasteful. Rushed departures will lead to avoidable costs, abandoned property, and logistical chaos, all of which could be mitigated with a more reasonable approach to repatriation timelines. Agency leadership also confirmed that in their experience they allotted 30 days for overseas termination with repatriation, given the complexity and pressure on Embassy infrastructure.

19. Further, my colleagues also report that PSCs based overseas continue to lack access to key communication platforms needed for emergency coordination and security notifications, creating operational challenges. They are also confused about whether they have been placed on administrative leave despite not receiving any formal communication from their CO about being in such status.

20. Further, many PSCs have long been concerned about the public availability of their personal information—including full names, addresses, and phone numbers—on federal reporting systems such as the Federal Procurement Data

System (FPDS) and USAspending.gov, which is a reality of the PSC contracting mechanism despite a history of efforts to protect personally identifiable information (PII) through waivers. However, the situation has become significantly more alarming with the recent use of this data by the DOGE website, which, as of February 17, began publishing details of terminated PSC contracts. This has resulted in exposing PSCs' identities, locations, and employment statuses in a way that creates serious safety risks. Recognizing the severity of this issue and fearing for my personal safety and privacy rights, I took action by formally requesting a safety exemption that my personal Unique Entity Identifier (UEI) be replaced with a generic UEI in Global Acquisition and Assistance System (GLAAS), in line with the FAR exception contained in ADS 302mbj. I also requested the removal of my previously published personal information from these systems. I have been advised that the freeze on all PSC contract actions will not allow my Contracting Officer or the Office of Acquisitions and Assistance (OAA) to process this request, leaving me at risk.

21. The abrupt publicization of PSC contract terminations on DOGE's website represents an unprecedented new threat to our personal security, and it is unacceptable that individuals should have their personal details weaponized in this way. DOGE's website encourages viewers to draw inflammatory conclusions about these contracts, calling cancellation "savings" and "fraud detection/deletion." Immediate steps are needed to prevent further harm and

ensure PSCs are not put at risk simply for doing their jobs or having entered into contracts in good faith.

22. Further, many PSCs who were required to cover official work-related costs upfront remain unable to submit travel vouchers and other reimbursement claims through normal channels due to system lockouts.

23. Those who have successfully submitted vouchers are facing indefinite delays in processing due to frozen financial systems, with no updates on when payments will be disbursed. Some of these outstanding reimbursements amount to thousands of dollars in personal expenses incurred for official duties.

24. One colleague of mine reported her experience that "reimbursement workarounds," guidance instructing PSCs to submit paperwork via third-party proxies and/or help desks, have proven ineffective. In one case, her simple submission of a process that typically requires 20 minutes took 12 days to resolve, with over 8 hours of effort expended by four individuals.

25. Additionally, PSCs do not receive federal employee benefits such as group health or life insurance. Instead, they receive partial reimbursements against their contracts for their self-paid plans via the submission of an SF-1034. I do not know of any PSC that has received an SF-1034 reimbursement for benefits claimed after January 24, 2025.

26. I am personally owed approximately $2200.00, $1400.00 of which was requested over 30 days ago, a clear violation of the Prompt Payment Act. Some

of my colleagues are owed significantly higher amounts, and one colleague expressed severe anxiety about carrying these balances on his credit card with no known relief date.

27. A majority of PSCs are on contracts with a maximum period of performance of five years and thus reapply for the same or different positions every few years in order to maintain continuous employment and/or to advance to positions with greater responsibilities and higher salaries. PSCs with pending new contracts intended to start after January 24, 2025, have not received those new contracts despite being selected through extensive competitive processes and completing substantial amounts of paperwork necessary to execute those contracts. This creates uncertainty over future employment opportunities and has caused financial loss for those eligible for a substantial salary increase under their new contract.

28. Further, many PSCs have contacted the Association seeking clarity on their status, with no official answers available.

29. A PSC on a Diversity, Equity, Inclusion, and Accessibility (DEIA) contract reported: "I haven't received a termination letter but also haven't been paid this pay period, and I am not sure what to do next. Any information you can provide would be greatly appreciated."

30. A pregnant PSC reported: "I am being denied the ability to apply for Paid Parental Leave, and my OB Medevac [obstetric medical evacuation] request is being delayed, among so many other little details that I'm sure you are living

through."

31. Finally, since the February 3 system lockouts, a climate of paranoia and fear has developed within USAID, making it difficult for PSCs to communicate and coordinate on available resources.

32. Many PSCs have expressed concerns about retaliation for seeking clarity on their contract status, termination notices, or reimbursement claims. Some have stated they feel unsafe discussing their employment situation.

33. The lack of official guidance has fueled speculation and misinformation, further heightening anxiety among PSCs. Without a clear line of communication from USAID or the Department of State, PSCs are left to navigate an uncertain and chaotic situation alone.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 18, 2025.

_____ /s/ Jane Doe

# EXHIBIT 1

# TO

# JANE DOE'S DECLARATION

# OF FEBRUARY 18, 2025

# EXHIBIT I

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civil Action No. 1:25-CV-352 |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**DECLARATION OF JANE DOE**

I, Jane Doe, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.       I am a U.S. Personal Services Contractor at USAID.

**My position at USAID and the nature of my work**

3.      I am a USAID Personal Services Contractor (PSC) who has worked with the organization for five years. Currently, I serve as a Senior Humanitarian Assistance Officer, but I have previously held multiple leadership positions, including Planning Coordinator and Deputy Leader for Planning on the ███ Disaster Assistance Response Team (DART). My work has spanned high-risk humanitarian responses, including ███ and ███, where I have managed complex operations, coordinated with interagency and international partners, and led strategic planning

efforts. My role requires me to take on significant leadership and oversight responsibilities that directly impact USAID's ability to deliver life-saving assistance in conflict zones and disaster-affected areas.

**My general experience of the USAID shutdown**

4.    Despite having dedicated my career to USAID, I now find myself completely uncertain about my employment status. My experience of the shutdown has been characterized by chaos, uncertainty, and fear.

5.    Late Sunday night, I was abruptly cut off from my USAID email and all related platforms. I received no warning, no stop-work order, no termination notice, and no administrative leave notification—nothing. I simply lost access.

6.    While colleagues who still had access to their accounts received an email at 12:42 AM informing them that the office was closed, I never received that message. I woke up on Monday morning with no guidance—unsure whether I should report to work or whether I even still had a job.

7.    Reaching out to colleagues and supervisors proved difficult, as our primary means of communication—email and Google Chat—were now inaccessible to me. To this day, I have received no official clarification on my employment status. This has left me in an impossible situation where I cannot apply for unemployment benefits, cannot seek independent legal recourse, and have no way of knowing whether I am on administrative leave like some of my colleagues.

8.    On the evening of February 4, colleagues with active USAID accounts informed me that they had received an official email confirming their placement on

2

paid administrative leave. Since I do not have access to my account, I do not know if I received this email and, therefore, whether I am also on administrative leave or if my contract has simply been terminated without notification.

9.      I do not know if I will be paid for last week's work as I do not have access to the time and attendance site to input my timesheet. My supervisor also does not have access to approve the timesheet. Direct hire colleagues were recommended to reach out to USAID HR for completion of their timesheet. As a PSC, I do not have a centralized resource to provide this service.

10.     I have attempted multiple avenues to clarify my status. I called the IT help desk, which was unable to provide any information. I contacted the HR help desk, which told me they could not assist. I wrote to my Contracting Officer, who has, to date, not responded.

11.     I have dedicated my career to humanitarian assistance and believe deeply in USAID's mission. I have witnessed firsthand how USAID's work impacts lives around the world and strengthens America's global standing. However, the manner in which this shutdown has been carried out is shocking. It was executed by individuals who were neither vetted nor confirmed by Congress, individuals who do not understand the laws, rules, and regulations governing the U.S. Government. Their actions were not only reckless but also illegal, and they endanger the integrity of our institutions.

**The USAID shutdown has already harmed—and will continue to harm— me and other PSCs in the following ways**

12.     The USAID shutdown has caused significant harm to me and my

colleagues, both professionally and personally. The abrupt loss of access to work systems, financial uncertainty, and the spread of misinformation have created an environment of fear and instability. If the shutdown continues, these harms will only deepen, leaving many of us without income, legal protections, or the ability to return to our careers.

13.    **Personal Safety Risks:** The shutdown could have life-threatening consequences for PSC colleagues serving in high-risk locations. The abrupt shutdown of government devices and access was highly reckless to colleagues in active conflict zones, such as Ukraine and Somalia. Friends and colleagues lost access to the Embassy safety communication channels, and many could no longer use a safety app called "Scry Panic 2.0," which is installed on government-furnished equipment. In addition, many PSCs serving USAID abroad were unsure if they remained under U.S. chief-of-mission authority, which guarantees access to U.S. Government resources to ensure staff safety and accountability, including for emergency evacuations. U.S. Department of State officials, who were tasked with developing a plan to get USAID officials home, had no instructions or information on the next steps.

14.    Many USAID PSCs work in high-risk environments where access to security resources is critical. I have heard from overseas colleagues who have now lost access to Diplomatic Security systems, meaning they can no longer coordinate security protocols, evacuations, or emergency procedures. Without official communication from USAID leadership, these PSCs remain in dangerous locations without clarity on whether they still have institutional protection. Others fear that,

in the event of a medical emergency or security threat, they will be forced to rely on personal funds or external assistance, as USAID has not provided guidance on whether existing security protocols still apply to them.

15.     I have heard of PSC colleagues stationed at overseas posts who were blindsided by a general directive on the internet instructing USAID workers to return to the U.S. within 30 days. However, these colleagues have received no official communication, leaving them in limbo regarding whether this directive applies to them. One colleague stationed overseas with their spouse—who is 36 weeks pregnant—has been left without answers on whether they are required to evacuate. Returning to the U.S. at this stage in the pregnancy is medically unsafe, yet they have been given no guidance on their options or support.

16.     PSCs are also at increased risk of physical harm due to the threats, harassment, and misinformation that have accompanied the shutdown. The reckless rhetoric spread on social media and in political discourse has put USAID personnel at risk. I have heard from colleagues who have been labeled as criminals, supporters of terrorists, or Marxists—simply for doing their jobs.

17.     High-profile figures, including Elon Musk and his supporters, have fueled this misinformation, creating a hostile environment where USAID staff fear for their personal safety. With individuals involved in the January 6th insurrection now released, there is a heightened sense of danger that USAID employees could be targeted next. I have colleagues who no longer feel safe in their own homes, with some refusing to leave family members alone out of fear that someone radicalized by online

misinformation may try to harm them.

18.     Many of us are also deeply concerned that our personal information—home addresses, banking details, social security numbers, and phone numbers—has been compromised, significantly increasing the risk of harassment or identity theft. I learned that all of my personally identifiable information has likely been exposed to an unvetted and insecure source who may not hold a security clearance. This unauthorized access to sensitive data creates serious privacy and security concerns, and I have no clear recourse to address the potential risks. Without guidance from USAID or the federal government, I am left vulnerable to potential misuse of my information, including financial fraud, doxxing, or other forms of targeted harassment.

19.     **Loss of Employment Status & Work Access**: I lost access to my USAID email and all related platforms on Sunday night without warning. I received no official communication about whether I had been furloughed, terminated, or placed on administrative leave. Many PSC colleagues experienced the same sudden cutoff, leaving us unable to communicate with supervisors, access critical documents, or even confirm our employment status.

20.     **Financial Harm**:. As PSCs, we are personally liable for many upfront costs, including health and life insurance payments, travel expenses for temporary duty (TDY) assignments, and work-related language training. Under normal circumstances, these expenses are reimbursable under the terms of my contract.

21.     However, since the freeze on foreign assistance and the shutdown of

USAID operations, I and many of my colleagues have been unable to process thousands of dollars in reimbursement claims. I have heard of PSC colleagues who have incurred substantial out-of-pocket costs from diplomatic travel—covering hotels, meals, and transportation—who now have no way of knowing if they will ever be reimbursed. USAID still owes some of my colleagues thousands of dollars in reimbursements for travel or health care expenses, but they cannot claim these funds or even confirm when they might be paid due to payment systems being shut down under the Foreign Aid freeze.

22.     With contracting and payroll teams unable or unwilling to process pending claims, thousands of dollars in reimbursements remain unpaid. This is particularly damaging to PSCs stationed overseas, where diplomatic travel costs and emergency preparedness expenses are high. Colleagues who relied on USAID for financial stability are now forced to absorb these costs personally, further exacerbating their financial distress.

23.     Many PSCs are also currently not receiving income. I have heard from colleagues who have not been paid for multiple pay periods in 2024 and have received no response from payroll regarding their missing salaries. Many of these colleagues are overseas and gave up stable jobs with health insurance and retirement benefits to take on PSC roles, only to now find themselves in a war zone with uncertain income, housing, or medical coverage.

24.     One colleague, a senior humanitarian PSC based in East Africa, has gone unpaid for consecutive pay periods, leaving them struggling to meet financial

obligations. This also puts them at risk of filing incorrect taxes, as they have no way of accurately reporting their income. Meanwhile, another colleague has household effects in storage valued at $3,000 that they are entitled to retrieve, but due to the shutdown, the individuals responsible for processing these requests have been furloughed, leaving their property in limbo.

25.     Many PSCs had contracts set to be renewed in 2025 or 2026, providing expected job security. However, with the administration's actions, these renewals are unlikely to move forward, leaving us and our families without future income. I have heard from colleagues who had planned their careers, housing, and family decisions around their anticipated contract renewals, only to now face complete financial uncertainty.

26.     Moreover, with no clear timeline for resolution, PSCs risk long-term unemployment. Additionally, these large-scale staffing and funding cuts will likely drive thousands of PSC staff into a job market that is greatly constricted due to the agency's dismantling, rendering future job prospects uncertain. Some of my colleagues are pregnant or have children about to enter college, but without income, they are now unsure if they can afford essential items or tuition. Others do not own homes or have significant savings and risk losing their housing.

27.     Finally, many of us have worked for years to accumulate paid time off (PTO) for critical life events, such as family planning. Now, even receiving a payout for this accrued leave is uncertain. A colleague who spent years saving their PTO for family planning is now left in a situation where they do not even know if they will be

8

compensated for the leave they rightfully earned. Other PSC colleagues currently on parental leave could lose this benefit immediately upon termination of their contract, causing significant financial hardship. Furthermore, PSCs who have gradually accrued compensatory time—which can be used in lieu of PTO—will forfeit said time without any payout if their contracts are suddenly terminated, losing dozens of hours in leave earned from overseas travel and other duties.

28.     **Disruption of Essential Benefits & Liabilities**: Many PSCs rely on USAID systems to access health insurance information, payroll and tax information, and security resources. Without access to these systems, some colleagues cannot verify whether their health insurance is still active or adjust their payroll settings, such as stopping automatic 401(k) contributions in anticipation of lost income.

29.     The USAID shutdown also prevents PSCs from seeking unemployment benefits. PSCs do not receive the same employment protections as direct-hire staff, and because we cannot confirm our employment status, we are unable to apply for unemployment benefits. Many of us are also struggling to seek independent legal recourse, as there has been no formal documentation of termination or stop-work orders.

30.     I know of a colleague whose contract was set to be renewed for another year. Despite being in good standing and meeting all performance requirements, their contract modification was delayed multiple times. They returned their signed contract renewal on January 27, but later that day, the contracting team was abruptly told to stop working. As a result, the renewal was never finalized, and the

9

colleague never received any official notice of termination or administrative leave.

31. They have been left entirely in limbo—without employment, without access to health insurance reimbursements, and without clarity on whether they are even entitled to administrative leave or unemployment benefits. They had been refinancing their home and planning to start a family, all based on their expected income and benefits. Now, they face financial and personal upheaval with no clear recourse.

32. **Exposure to Legal Liability:** I am an Agreement Officer Representative (AOR) managing a variety of multimillion dollar grants to USAID partners. Per instructions from USAID leadership, I have been explicitly prohibited from communicating with these implementing partners since January 23, 2025. Following this directive, my access to USAID systems was revoked without cause on February 6, 2025.

33. This has effectively rendered me unable to fulfill my oversight responsibilities as outlined in the legally binding AOR Letters I have signed. Significant, undocumented changes have occurred across these awards due to ongoing disruptions to grant implementation—including partial Stop Work Orders, DEIA activity cancellations, and lapses in payment reimbursements.

34. Without proper oversight and reporting to the designated Agreement Officers, USAID is in direct violation of its grant management obligations. I am also unable to report instances of fraud, waste, and abuse as required under my oversight responsibilities for these programs, further compounding the lack of accountability

10

and compliance with federal regulations.

35.    These actions constitute an intentional and fraudulent obstruction of federal oversight processes. There is growing concern among program staff, most of which in my bureau are PSCs, that implementing partners could seek legal recourse directed at their AOR for failure to adhere to USAID contracts.

36.    **Personal & Professional Harm**: The negative press surrounding USAID in the past week, along with misinformation and inflammatory rhetoric from political figures, has made PSCs feel targeted and harassed. I have felt the weight of this hostility, as it created a sense of professional uncertainty and reputational damage. USAID staff—especially PSCs—have been unfairly portrayed in political discourse, further isolating us and making it more challenging to seek external support or new employment opportunities.

37.    **Legal & Contractual Uncertainty**: As PSCs, we have a more vulnerable employment status than direct hire colleagues, yet we regularly take on all of the same responsibilities. My colleagues and I all serve inherently governmental functions. As PSCs, we are potentially subject to contracts that require 15 days' written notice before termination (if performed by the government in good faith). However, given the lack of communication, whether this legal obligation will be honored remains unclear. If USAID chooses to disregard these contracts, it could set a precedent that PSCs can be fired at will. Many of us deeply fear long-drawn-out legal proceedings in the future to acquire what is owed to us under the terms of our contracts, whether it be health insurance reimbursement, travel reimbursement,

regular pay, or payout of accrued annual leave.

**The USAID Shutdown Is Damaging the Agency's Mission**

38.    **Damaged Relationships with Implementing Partners:** Under USAID leadership's directive, we have been forced to ignore our implementing partners, who rely on us for critical updates and program continuity. This has severely harmed professional relationships that take years to build and maintain, undermining trust in USAID and jeopardizing future humanitarian and development efforts. Our inability to provide guidance or acknowledge partner inquiries risks long-term damage to USAID's credibility as a reliable donor and technical partner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2025.

  /s/ Jane Doe
Jane Doe

**EXHIBIT 2**

**TO**

**JANE DOE'S DECLARATION**

**OF FEBRUARY 18, 2025**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
)
AMERICAN FOREIGN SERVICE )
ASSOCIATION, et al., )
)
              *Plaintiffs*, )    Civil Action No. 1:25-CV-352
)
        v. )
)
DONALD TRUMP, et al., )
)
              *Defendants*. )
_____ )

## FURTHER DECLARATION OF JANE DOE

I, Jane Doe, declare the following under penalties of perjury:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I submitted the Declaration of Jane Doe, Compl. Exh. I. I write to make further declarations as to the Personal Services Contractor Association (PSCA), of which I am an Executive Committee Member.

3.     U.S. Personal Services Contractors (PSCs) are just like direct-hires for virtually all purposes: If you were in the field with us, you would not know who was hired as a direct-hire and who was hired as a PSC. We work together, with direct hires, all as employees of U.S. Agency for International Development (USAID). However, we are not eligible for programs administered by the Office of Personnel Management (OPM), and if we are unjustly terminated, we are not eligible to appear before the Merit Systems Protection Board (MSPB).

4. The programs administered by OPM from which PSCs are statutorily excluded are Federal Employee Health Benefits (FEHB), Federal Employee Group Life Insurance (FEGLI), and retirement programs like Federal Employees Retirement System (FERS). To offer some measure of parity, the Agency for International Development Acquisition Regulation (AIDAR) generally provides for the partial reimbursement to PSCs, subject to annual limits, for individually purchased health and life insurance policies using their post-tax income. USAID has also established a 401(k) plan through which PSCs can make pre-tax contributions but without any matching by the Agency. OPM also manages an awards program for direct-hire personnel across the U.S. government; USAID has an additional awards program in which PSCs do participate.

5. USAID withholds federal and state income taxes for PSCs and issues W-2s.

6. PSCs and their authorized dependents who are posted overseas and PSCs who travel overseas on official business are issued Diplomatic Passports by the Department of State. PSCs posted abroad are also eligible for diplomatic titles.

7. The PSCA is an Employee Non-Labor Organization within the USAID. Established in 1999, the Association comprises PSCs employed by USAID both domestically and abroad. The PSCA, through an elected Executive Committee, advocates for equitable treatment of PSCs and direct-hire employees regarding benefits, entitlements, working conditions, and responsibilities, unless precluded by federal law or regulation.

2

8.      Per the Association's charter, all PSCs at USAID are automatically members of the PSCA. The PSCA, then, represents about 500 PSCs stationed overseas in countries ranging from Armenia to Zimbabwe, and around 600 stationed in the United States.

9.      The PSCA is governed by an Executive Committee consisting of up to seven individuals, elected from among its membership to serve one-year terms. I am one of those Executive Committee members.

10.      The PSCA operates under a formal charter, which establishes its mission, governance structure, and operational framework. The includes regular elections, member engagement, and formal processes for advocacy and policy recommendations to USAID leadership.

11.      Major policy shifts or structural changes within the Association, such as the establishment of new initiatives or councils, require approval through a General Assembly vote open to all members.

12.      The PSCA has consistently engaged in structured advocacy with USAID leadership, including the Administrator's Office, the Management Bureau and its Office of Acquisition and Assistance, the Office of General Counsel, and the Office of Human Capital and Talent Management, to address critical issues affecting PSCs. The Association has successfully advocated for numerous policy and regulatory changes over the years.

13.      The Association's Executive Committee also regularly disseminates information to its members via emails, informational briefings, a public website, and

3

other online resources, ensuring that PSCs remain informed of contractual rights and obligations and to provide updates on policy and regulatory developments.

14.     Throughout the year, the PSCA Executive Committee conducts surveys and solicits direct feedback from members to ensure that advocacy priorities align with the most pressing concerns of PSCs. This engagement allows the Executive Committee to effectively represent the collective interests of the membership when interfacing with USAID leadership.

15.     The Executive Committee regularly engages with individual PSC members through various channels to ensure timely communication and support. The Committee maintains an open email inbox where members can submit concerns and questions, responding to inquiries as they come in. When necessary, the Committee escalates issues to USAID leadership to advocate on behalf of PSCs. In addition, the Executive Committee regularly engages with the PSC Ombudsman in OAA to exchange information regarding key issues affecting PSCs.

16.     When PSCs engage with the Executive Committee, they do so with the understanding that the committee's members serve on a volunteer basis. The Executive Committee does its best to source recommendations based on documented past experiences, but its advice is neither legal nor binding in nature.

17.     Beginning on February 2, 2025, members of the Executive Committee were progressively locked out of their USAID email accounts, Google Drive, and other collaboration platforms. Hundreds of the Association's members similarly lost access to the USAID network. Specific to the needs of the Executive Committee, this abrupt

4

action resulted in the total loss of access to historical records, prior advocacy documentation, internal communications, and, most critically, its membership roster and listserv. Consequently, from February 3, 2025, onwards, the Executive Committee has been unable to formally and thoroughly consult the Association's membership on next steps, including possible legal action.

18. The forced, unannounced removal from USAID systems also meant that the Executive Committee faced great difficulty in re-establishing its operations in an external setting. Some Executive Committee members did not even have each other's personal contact information because all prior communication was conducted through government-provided platforms. It took several days for the Executive Committee to reconnect and determine how to re-establish its operations outside of USAID systems without access to its membership roster or other records. USAID's decision effectively cut off all avenues of communication between the Executive Committee and its members and preemptively halted any potential response from the Association.

19. Under normal circumstances, if PSCs were considering legal action or seeking collective legal representation, the Executive Committee would initiate a General Assembly vote to ensure full participation of its membership in determining the collective stance of the Association. Due to the abrupt USAID-imposed systems lockout, however, the Association lacks a mechanism to notify or convene members and thus cannot conduct a vote of its full membership.

20. Given the impact of USAID's actions on the workforce, I would have recommended that the PSCA formally join this litigation as a plaintiff. Because PSCs

are identically situated to USAID direct-hires in nearly all respects, including those relevant to this case, PSCs have the exact same interest in this litigation as their direct-hire colleagues represented by the American Foreign Service Association and the American Federation of Government Employees. The Association and its members have suffered the same harms, including loss of access to essential communication channels, loss of safety, and sudden changes to employment-related rights without consultation or recourse. USAID's actions have, therefore, directly prevented the PSCA from exercising its representative function.

21.     We are hamstrung: The Administration has cut off our way of communicating with each other. The PSCA exists to help protect and advocate for the rights of PSCs, ensuring that they receive fair and equitable treatment by the agency. The recent actions of the agency have severely curtailed the Association's ability to fulfill this mission, leaving PSCs vulnerable and without proper collective representation in this matter.

22.     I respectfully ask the Court to afford any such relief that it affords to direct-hire employees also to U.S. Personal Services Contractors.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2025.


/s/ Jane Doe_____

Jane Doe


6

**EXHIBIT 3**

**TO**

**JANE DOE'S DECLARATION**

**OF FEBRUARY 18, 2025**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, *et al.*, |
| Plaintiffs, |
| v. |
| PRESIDENT DONALD TRUMP, *et al.*, |
| Defendants. |

Civil Action No. 1:25-cv-00352-CJN

I, Pete Marocco, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this declaration.  This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2.      Since Thursday, January 30, 2025, I have performed the duties and functions of both Deputy Administrators of the United States Agency for International Development ("USAID" or the "Agency"). I manage the day-to-day operations at USAID including personnel matters and operations.  Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State.  Previously, I served as a United States Marine and as a Deputy Assistant Secretary at both the Department of State and the Department of Defense.  Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

3.      Under U.S. law and Presidential directive, all U.S. executive branch employees overseas on official business are under the authority of the Chief of Mission unless they meet

limited exceptions not applicable here.  Such executive branch employees are under the

direction, coordination, and supervision of the Chief of Mission.  *See* 22 U.S.C. § 3927.  Under

this authority, the Chief of Mission is responsible for the security of the executive branch

employees and their eligible family members.  Additionally, the Secretary of State maintains

security responsibility for these employees and their dependents, and also has responsibility to

develop policies and programs to provide for their safe evacuation when their lives are

endangered.  *See* 22 U.S.C. § 4802.

4.      Any USAID employee who is assigned to a post overseas would continue to fall

under the authority of the Chief of Mission until such time as they depart post either for their

new post of assignment or a designated location for separation.  This includes employees who

are on administrative leave.  The Chief of Mission in a given country will be responsible for

taking steps to ensure the safety of the individuals under his or her security responsibility.

5.      The Department of State, through Regional Security Officers (RSOs) overseas,

maintains robust and thorough security programs to protect these personnel and their families.

While the Department of State provides posts with standardized guidance for security programs,

at the direction of the Chief of Mission, security personnel manage locally tailored programs that

reflect each Mission's particular safety and security needs.

6.      Staff working at all diplomatic missions are protected through residential,

personal, and physical security programs.  In general, personnel worldwide are equipped with

two-way radios that connect to Post One for 24/7 communications in the event of an emergency,

or for conducting on the spot and regular safety checks with staff and their dependents.  Mission

staff are also required to prepare phone trees and mission directories for call down exercises that

include both personal and government phone numbers, email addresses, and other means of

communication such as private messaging apps.  Post also utilizes the SAFE Alert system which provides electronic messaging to staff with security and safety alerts.  SAFE is a cloud-based emergency notification system that empowers overseas Posts to report events and operational status using SMS, email, phone, and IM (via mobile app) – from the field. It pushes notifications to Department devices and, if opted, personal devices.  Each USAID Mission is equipped with "Go-Bags" for staff to use while going on field visits.  Each "Go-Bag" includes personal tracking locators, satellite phones, first aid kits, and basic survival equipment in the event the staff member becomes captured, lost, or injured.  Posts continue to provide the same security services that were in place before any direct-hire employees were placed on administrative leave in February 2025.

7.      The Department of State maintains USAID connectivity and access to Scry Panic and SAFE, and to otherwise ensure that USAID personnel, like all personnel, have access to communications needed for their security and safety.  When an emergency occurs, one of the top priorities of Department of State is determining the welfare of Mission personnel, family members, and other individuals affiliated with the Mission.  Two of the tools the Department uses to accomplish this are SCRY Panic and SAFE.  When a SCRY Panic user hits the panic button, the app can activate geospatial tracking and initiate a Diplomatic Security response.  It is a situational awareness application designed specifically for all Chief of Mission Personnel, including EFM and Locally Employed Staff. SAFE, Safety and Accountability For Everyone (SAFE) is the Department's enterprise solution for emergency notification and accountability.  In addition to general communications, security procedures and resources continue in full and without exception, regardless of leave status, for all personnel under Chief of Mission authority.

8.      A recent example of the use of these communication systems is the Democratic Republic of Congo (DRC), where the U.S. Embassy in Kinshasa is currently on ordered departure because of political unrest.  Over 100 personnel, including dozens from USAID, were evacuated from Kinshasa starting on January 29, 2025.  All of these personnel were evacuated in keeping with established safety and security procedures and in the same manner as afforded to other U.S. government personnel.

9.      As the security situation in DRC deteriorated leading up to an ordered departure, USAID personnel - including those on temporary duty- were being contacted through the SAFE alert emails from Post as well as through messages in a WhatsApp group messaging platform. On-the-ground reports indicate that communications appeared to be going through without issue and regardless of administrative leave status, and staff or their dependents retained access to their phones to include the Scry Panic App.

10.      USAID staff posted to DRC were contacted through the DS Safe Alert system, as well as through phone trees, text messaging, and outside platforms such as WhatsApp group messaging. Cursory review showed that USAID personnel still had access to information provided via the Scry Panic app, regardless of their leave status, through other means of communication with Post.  Communication was clear, consistent, and without disruption which led to a successful evacuation.  All USAID employees and their family members from the DRC were welcomed by a USAID landing team at Dulles Airport in Dulles, Virginia, and were provided a host of necessities and care packages upon their arrival to the United States.   As a continued commitment to the safety and security of all USAID employees and their family members, USAID conducted a thorough review and immediate action was taken to rectify any telecommunication disruptions that may have impacted USAID personnel.

11. We plan to allow individuals who are placed on administrative leave in the future, and who remain at post, to retain access to communications systems that will ensure that they can be in contact with Mission security personnel, and to ensure that appropriate measures are in place so that USAID employees and their family members remain safe and secure. Examples of such measures include restrictions on travel to certain parts of a city or country, requirements to travel in armored vehicles, and curfews. Access to Department-issued mobile devices will facilitate continued connectivity to the DS SAFE Alert System, Whatsapp, Signal, and the Scry Panic App, and other messaging apps as needed, so that staff can continue to receive updates from and communicate updates to post. Chiefs of Mission are directed to issue clear policies and directives that are consistent with U.S. law and apply consistently across all agencies with employees under Chief of Mission authority.

12. When a U.S. executive branch employee is assigned overseas, the employee is eligible for allowances in accordance with U.S. law and as regulated by the Department of State Standardized Regulations (DSSR). The Secretary of State has delegated authority to establish the regulations and rates for overseas allowances consistent with the statutory authorities. Individual agencies may issue further guidelines within the scope of the regulations.

13. In accordance with DSSR 040i, an "employee" for purposes of the DSSR means an individual employed in the civilian service of a government agency (including ambassadors, ministers, and members of the Foreign Service of the United States under the Department of State); who is a citizen of the United States, officially stationed in a foreign area; who is receiving basic compensation; and who meets the eligibility requirements of DSSR subchapter 030 to receive allowances or applicable differential payments (additional monies over basic compensation for designated hardship posts).

14.     USAID employees assigned to an overseas post who are approved to remain at their post of assignment under U.S. orders, even while on administrative leave, and are receiving basic compensation, would continue to qualify for the allowances and differentials currently applicable to the employee (to include those relating to cost of living, education, hardship, danger).  Consistent with the DSSR, USAID would continue to fund the applicable allowances for each USAID employee until such time as the employee leaves the post under permanent change of station (PCS) orders for a new post of assignment or to the employee's selected location of separation.  Thus, if an employee currently qualifies for an education allowance, that allowance would continue while the USAID employee remains at post and is receiving basic compensation.  Likewise, if the employee qualifies for certain quarters allowances, including those relating to utilities, those too would continue.

15.     An employee who is directed to depart post and fails to do so, including those who choose to stay beyond the 30 day period to leave the country and who do not receive a waiver, would no longer be "officially stationed overseas" and would not meet the definition of employee under the DSSR as described above.  Such an employee would no longer qualify for allowances applicable to the assignment in a foreign location.  There may be some flexibility to allow children to continue in a school if the employee or post already paid for tuition through the current school year consistent with the authorized education allowance (see DSSR 270).  However, the family would be responsible for providing for their own housing and personal expenses, and would need to comply with applicable visa and related requirements. These individuals would therefore not qualify to receive the protections described in paragraph eleven above.

6

16.     When considering the transfer allowances available to an employee departing a post, either for their next post of assignment or to their selected location of separation, there are some statutory limitations on which  employees may receive the Home Service Transfer Allowance (HSTA), which covers the extraordinary, necessary, and reasonable expenses, not otherwise compensated for, incident to an employee establishing him or herself from an overseas post to a post of assignment in the United States.  As is the case for all U.S. government employees, employees on administrative leave would only be eligible to receive the HSTA consistent with 5 U.S.C. 5924(2)(B), if "*the employee agrees in writing to remain in Government service for 12 months after transfer, unless separated for reasons beyond the control of the employee that are acceptable to the agency concerned.*"  USAID has discretion to pay the HSTA for those separated involuntarily by the agency, but not for those who voluntarily separate.  This would include, for example, employees who voluntarily opted into the Deferred Resignation Plan.

17.     Due to changes in the process by which payments can be made and approved by the Agency over the past weeks, there have been delays in processing certain payments, including certain allowance payments to USAID employees.  However, USAID is working diligently to address these delays.  For example, on February 13, I approved access to the USAID system for processing outgoing payments for a number of USAID employees and lifted certain additional layers of review for certain routine payments to employees, including many allowance payments.  This will allow USAID to more expeditiously process payments using Title II funds, including many payments of allowances to employees, going forward.  Although these delays could continue to impact certain payments to employees in the immediate future, an employee's leave status would not itself impact the timing or eligibility for such payments.

18.     Additionally, the Department has operationalized a Coordination Support Team with more than 40 active participants and more than 200 total standing by with communications about how they can support any USAID personnel and dependents who desire to return to the United States.

19.     The information provided in this declaration is applicable to direct-hire employees.  Personal Services Contractors were not placed on administrative leave.

I declare under penalty of perjury under the laws of the United States that the information in this declaration is true and correct.


/s/ Peter Marocco
Peter Marocco
PTFD Deputy Administrator, USAID
February 14, 2025

**EXHIBIT 4**

**TO**

**JANE DOE'S DECLARATION**

**OF FEBRUARY 18, 2025**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civil Action No. 1:25-CV-352 |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## DECLARATION OF WALTER DOE

I, Walter Doe, declare the following under penalties of perjury:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a member of the American Foreign Service Association.

3.      I have worked for USAID for over fifteen years. I currently serve overseas as a controller. In that role, I am responsible for disbursing payments to partners (like recipients of USAID grants), vendors (like cell phone companies and other local service providers) and USAID employees. Each overseas mission is assigned a controller who is trained, designated and formally appointed before being registered with the US Treasury.  Once designated, certifying officers are legally responsible for ensuring that payments comply with appropriation laws and other financial controls

4.      On January 20, based on the president's executive order on foreign financial assistance, I stopped certifying payments in compliance with the immediate pause on new disbursements. Certification is the step through which authorized payments are transmitted to the Treasury Department to be paid.

5.      On January 24, we received a State Department cable (25 STATE 6828) that "required the immediate issuance of stop-work orders" but also provided further instruction about the foreign assistance freeze, including a list of waivers. One of these waivers covered "salaries and related administrative expenses including travel for USAID employees, including their living and operating expenses (residential rent, communication, insurance, etc.). A second waiver allows payments for "legitimate expenses incurred prior to January 24 under existing awards or legitimate expenses associated with the stop-work orders." Pursuant to this directive, I began trying to certify certain approved payments (including for employee expenses) using our electronic payment system called Phoenix.

6.      However, shortly after beginning to attempt to certify payments again, I noticed that the Phoenix system wasn't functioning the way it had in the past. Previously, after certifying a payment, I would be able to track its progress from Phoenix via the Treasury Department to the bank for final disbursement, but starting around January 27, the initial certification step would work but then the payment would remain in my payment queue  and never finish processing.

7.       Over the next several days, I and the other controllers responsible for processing payments tried to determine what was happening. We repeatedly asked

our main counterpart in Washington, the Acting Deputy Controller, for updates and guidance only to be told repeatedly throughout the week of January 27 to "stay tuned for further updates" as he was working with the Office of the Administrator on solutions. On January 30, I emailed him with my concerns and advised that "whoever transmits the M/CFO batches to Treasury and State should understand that the certifying officers take responsibility for their payments." At this point I was growing concerned because invoices were passing their due dates and we were not able to pay them.

8.    Every single payment that I tried unsuccessfully to process after January 27 was for an expense incurred before January 20. Most of the payments I have been trying to process were for expenses incurred in November or December of 2024. These included large payments to partners who bill us every month for the work performed in the previous month, as well as smaller administrative items like cell phone and other utility payments, travel reimbursements, and rental payments.

9.    On February 3, the situation changed yet again. As of that date, every time I tried to hit the "certify" button to begin a disbursement, I received an error message stating that I did not have authority to proceed. I contacted Phoenix Security to inquire if there was a technical problem in the system and was told "on Friday January 31, we were instructed to remove the ability to certify payments." They did not indicate who instructed them, only stating "Unfortunately I am unable to reverse this decision."

10.    On February 5, all USAID controllers received another diplomatic cable

indicating that USAID personnel could no longer process payments themselves but must request approval from a Senior Bureau Officer before forwarding the payment packages for processing. However, as of February 11, nobody can agree on who is the appropriate SBO for USAID payments and the State Department hasn't processed a single payment based on the new procedure.

11.     As of February 9, when I try to log into Phoenix, I receive a new error message stating that my sign-in attempt has failed. I have even less access to Phoenix after the February 7 court order than I did before that date.

12.     I have been in touch with many colleagues and all report the same experience. To my knowledge, worldwide there are no USAID financial management personnel, including controllers, that can access Phoenix.

13.     I have not been able to process payments under any of the waivers included in the January 24 cable, including legitimate expenses incurred prior to January 24 under existing awards or those for employee operating expenses. Though the waivers exist on paper, in reality all USAID funds have remained frozen because of technological barriers added to the system, I don't know by whom. Phoenix will not let us disburse anything.

14.     After three weeks of nearly a complete freeze, we have pending payments to partners in the country where I serve amounting to $3.8 million including $1.3 million in overdue payments which are incurring interest per the Prompt Payment Act. We also have pending administrative payments of $0.2 million, including one residential lease for a colleague which expires on February 14

4

and two school tuition payments for children of American colleagues who serve here with me. Now that we are locked out of Phoenix, our voucher examiners can't even work on the payment requests that continue to come in from partners and vendors let alone make any effort to move them through the disbursement process.

15. We typically disburse $6-9 million per month for USAID activities "from the American people" in the country where I serve. These payments go to local NGOs and small businesses as well as US-based partners who have worked with us for many years. Due to uncertainty about the stop-work order and fear that payments may never resume, these partners have already laid-off staff and face potential bankruptcy. It is legally and morally wrong to continue withholding payments from partners who completed work in good faith in November and December. Furthermore, it is dangerous for the health and safety of my colleagues overseas to withhold payment for their housing, insurance, cell phones, and other basic needs. It is also worth noting that employees are owed for travel they completed before January 20, which contributes to their anxiety as they face an uncertain financial future.

I declare under penalty of perjury that the foregoing is true and correct.

        Executed on February 11, 2025.

                            /s/ Walter Doe
                            Walter Doe