**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PERSONAL SERVICES CONTRACTOR
ASSOCIATION,

      Plaintiff,

v.

DONALD TRUMP, *et al.*,

      Defendants.

Civil Action No. 1:25-cv-469

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR
A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION .............................................................................................................1

BACKGROUND ..............................................................................................................2

I.      STATUTORY BACKGROUND ............................................................................3

II.     FACTUAL BACKGROUND ...................................................................................5

III.    THE INSTANT ACTION.........................................................................................6

LEGAL STANDARD ......................................................................................................6

ARGUMENT....................................................................................................................7

I.      PLAINTIFF IS NOT LIKELY TO PREVAIL ON THE MERITS OF ITS
        CLAIMS. ..................................................................................................................8

        A.      Plaintiff Has Not Established Subject-Matter Jurisdiction Over Its Claims ...........8

                1.      PSCs Must Pursue the Contractual Claims Advanced Here
                        Through Established Agreement-Specific Procedures. .............................9

                2.      Plaintiff Lacks Article III Standing to Assert Claims of PSCs. ...............13

        B.      Plaintiff Is Not Likely to Prevail on Its Constitutional Claims. ..........................15

                1.      The Separation of Powers Claims Fail Because the President's
                        Powers in the Realm of Foreign Affairs Are Vast and Generally
                        Unreviewable. .......................................................................................15

                2.      Plaintiff's Take Care Clause Claim Additionally Fails Because the
                        Take Care Clause Cannot be Used to Obtain Affirmative Relief. ...........17

        C.      Plaintiff Is Not Likely to Prevail on Their Administrative Procedure Act
                Claims.................................................................................................................19

                1.      Plaintiff Does Not Allege Any Agency Action Beyond Its
                        Contract-Specific Grievances.................................................................20

                2.      The APA Does Not Provide a Cause of Action Because an
                        Alternative Adequate Remedy is Available to Plaintiff. .........................22

                3.      Defendants Have Not Acted Contrary to Law. .......................................23

                4.      Defendants Have Not Acted Arbitrarily and Capriciously.......................26

II.    PLAINTIFF FAILS TO DEMONSTRATE THAT IRREPARABLE HARM
       WOULD RESULT IN THE ABSENCE OF A TEMPORARY RESTRAINING
       ORDER. ................................................................................................................28

III.   THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST)
       DOES NOT FAVOR A TEMPORARY RESTRAINING ORDER. ...............................32

IV.    ANY TEMPORARY RESTRAINING ORDER SHOULD BE NARROWLY
       TAILORED. ............................................................................................................34

CONCLUSION ........................................................................................................................39

## TABLE OF AUTHORITIES

**CASES**

*A & S Council Oil Co. v. Lader*,
  56 F.3d 234 (D.C. Cir. 1995) ...................................................................................... 11, 31

*Adams v. Vance*,
  570 F.2d 950 (D.C. Cir. 1978) ........................................................................................ 7, 17

*Air Transp. Ass'n of Am. v. Reno*,
  80 F.3d 477 (D.C. Cir. 1996) ............................................................................................ 14

*Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) .................................................................................. 31

*Alabama-Coushatta Tribe of Tex. v. United States*,
  757 F.3d 484 (5th Cir. 2014) ............................................................................................ 22

*Alexander v. Trump*,
  753 F. App'x 201 (5th Cir. 2018) ...................................................................................... 20

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ..................................................................................................... 15, 16

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  968 F. Supp. 2d 38 (D.D.C. 2013) .................................................................................... 31

*Am. Whitewater v. Tidwell*,
  770 F.3d 1108 (4th Cir. 2014) .......................................................................................... 20

*Ancient Coin Collectors Guild v. CBP*,
  801 F. Supp. 2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012) ..................... 21, 27

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) .......................................................................................................... 36

*Baker v. Carr*,
  369 U.S. 186 (1962) .......................................................................................................... 18

*Bancoult v. McNamara*,
  445 F.3d 427 (D.C. Cir. 2006) .......................................................................................... 17

*Boaz Hous. Auth. v. United States*,
  994 F.3d 1359 (Fed. Cir. 2021) ........................................................................................ 12

*Boivin v. U.S. Airways, Inc.*,
  297 F. Supp. 2d 110 (D.D.C. 2003) .................................................................................. 30

iii

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) .................................................................................22

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ................................................. 28, 29, 30

*Chi. & S. Air Lines v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948) ...........................................................................17, 19

*Church v. Biden,*
    573 F. Supp. 3d 118 (D.D.C. 2021).....................................................29

*City of New Haven v. United States,*
    809 F.2d 900 (D.C. Cir. 1987) .............................................................24

*Clinton v. Jones,*
    520 U.S. 681 (1997) ..............................................................................19

*Cobell v. Norton,*
    391 F.3d 251 (D.C. Cir. 2004) ...............................................................6

*Coggeshall Dev. Corp. v. Diamond,*
    884 F.2d 1 (1st Cir. 1989)...............................................................11, 12

*Collins v. Yellen,*
    594 U.S. 220 (2021) ..............................................................................13

*Crowley Gov't Servs., Inc. v. GSA,*
    38 F.4th 1099 (D.C. Cir. 2022) ...........................................................11

*Dabney v. Reagan,*
    542 F. Supp. 756 (S.D.N.Y. 1982) .....................................................23

*Dai Glob. v. Adm'r of USAID,*
    945 F.3d 1196 (Fed. Cir. 2019)............................................................10

*Dalton v. Specter,*
    511 U.S. 462 (1994) ........................................................................18, 19

*Davis v. Pension Ben. Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ...........................................................33

*Detroit Int'l Bridge Co. v. Canada,*
    189 F. Supp. 3d 85 (D.D.C. 2016) ......................................................21

*DHS v. New York,*
    140 S. Ct. 599 (2020).............................................................................35

*Doe 2 v. Trump*,
   319 F. Supp. 3d 539 (D.D.C. 2018)................................................................38

*Elm 3DS Innovations LLC v. Lee*,
   No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016)............................................22

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ........................................................................15, 35

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ........................................................................*passim*

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ........................................................................19

*Fund for Animals v. Frizzell*,
   530 F.2d 982 (D.C. Cir. 1975) ........................................................................32

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ........................................................................22

*Gen. Land Off. v. Biden*,
   722 F. Supp. 3d 710 (S.D. Tex. 2024)........................................................................24

*Gill v. Whitford*,
   585 U.S. 48 (2018) ........................................................................13, 35

*Gordon v. Holder*,
   632 F.3d 722, 394 U.S. App. D.C. 158 (D.C. Cir. 2011) ........................................................................6

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ........................................................................36

*Gulf Oil Corp. v. Brock*,
   778 F.2d 834 (D.C. Cir. 1985) ........................................................................34

*Gulf Oil Corp. v. Dep't of Energy*,
   514 F. Supp. 1019 (D.D.C. 1981) ........................................................................30

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ........................................................................17

*Heckler v. Chaney*,
   420 U.S.  (1985) ........................................................................16

*Hi-Tech Pharmacal Co. v. FDA*,
   587 F. Supp. 2d 1 (D.D.C. 2008) ........................................................................28, 32

v

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ........................................................................................33

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003)................................33

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ...............................................................................13, 14

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ...................................................................11

*Johnson v. Eisentrager*,
  339 U.S. 763 (1950) .................................................................................17

*Kim v. FINRA*,
  698 F. Supp. 3d 147 (D.D.C. 2023), *appeal dismissed*,
  2025 WL 313965 (D..C. Cir. Jan. 27, 2025)....................................................33, 34

*Lee v. United States*,
  127 Fed. Cl. 734 (2016) ...........................................................................9

*Lewis v. Casey*,
  518 U.S. 343 (1996) .................................................................................35

*Long Term Care Pharm. All. v. UnitedHealth Group, Inc.*,
  498 F. Supp. 2d 187 (D.D.C. 2007)............................................................12

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) .......................................................21

*Louisiana v. United States*,
  948 F.3d 317 (5th Cir. 2020)....................................................................22

*Lujan v. Nat'l Wildlife Fed'n.*,
  497 U.S. 871 (1990) .................................................................................21

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................................................19

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .................................................................................36

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)..............................................................18, 19

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993) .................................................................................12

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1866) ................................................................*passim*

*Morrison v. Olson*,
   487 U.S. 654 (1988) ................................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................20

*Munaf v. Geren*,
   553 U.S. 674 (2008) ..................................................................................7

*Nat'l Mining Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011) ..................................................30, 31

*Nat'l Treasury Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ...............................................................38

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ........................................................37, 38

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ................................................................................37

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................7, 32

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ..................................................................................21

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009) ..................................................................20

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ..............................................................14

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ...............................................................22

*Postal Police Officers Ass'n v. United States Postal Serv.*,
   502 F. Supp. 3d 411 (D.D.C. 2020) .........................................................6

*Printz v. United States*,
   521 U.S. 898 (1997) ................................................................................19

*Pub. Citizen v. Stockman*,
   528 F. Supp. 824 (D.D.C. 1981) .............................................................24

*Rick's Mushroom Serv. v. United States*,
  521 F.3d 1338 (Fed. Cir. 2008) ............................................................10

*Safari Club Int'l v. Jewell*,
  47 F. Supp. 3d 29 (D.D.C. 2014) ...................................................30, 31

*Sampson v. Murray*,
  415 U.S. 61 (1974) .........................................................................29, 30

*Schneider v. Kissinger*,
  412 F.3d 190 (D.C. Cir. 2005) ...............................................................17

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) .................................................................7

*Sibley v. Obama*,
  810 F. Supp. 2d 309 (D.D.C. 2011) .........................................................7

*Sierra Club v. Peterson*,
  228 F.3d 559 (5th Cir. 2000) .................................................................22

*Slattery v. United States*,
  635 F.3d 1298 (Fed. Cir. 2011) .............................................................13

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ...............................................................37

*Tenet v. Doe*,
  544 U.S. 1 (2005) ...................................................................................37

*Thurston v. United States*,
  696 F. Supp. 680 (1988) ........................................................................26

*Tolliver Group, Inc. v. United States*,
  20 F.4th 771 (Fed. Cir. 2021) ................................................................12

*Totten v. United States*,
  92 U.S. 105 (1876) .................................................................................37

*Trauma Serv. Grp. v. United States*,
  104 F.3d 1321 (Fed. Cir. 1997) .............................................................10

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
  No. 23-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025) ..........................14

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ...............................................................................35

*Trump v. Sierra Club*,
　140 S. Ct. 1 (2019) ............................................................................................24

*Tulare Cnty. v. Bush*,
　306 F.3d 1138 (D.C. Cir. 2002) .......................................................................20

*Turlock Irrigation Dist. v. FERC*,
　786 F.3d 18 (D.C. Cir. 2015) ...........................................................................15

*U.S. ex rel. McLennan v. Wilbur*,
　283 U.S. 414 (1931) .........................................................................................38

*U.S. v. Intrados/Int'l Mgmt. Group*,
　277 F. Supp. 2d 55 (D.D.C.2003) ....................................................................10

*United Aeronautical Corp. v. U.S. Air Force*,
　80 F.4th 1017 (9th Cir. 2023)...........................................................................10

*United States v. Curtiss-Wright Exp. Corp.*,
　299 U.S. 304 (1936) ....................................................................................16, 17

*United States v. Kellogg Brown & Root Servs., Inc.*,
　856 F. Supp. 2d 176 (D.D.C. 2012)..................................................................10

*United States v. Winstar Corp.*,
　518 U.S. 839 (1996) .........................................................................................12

*Va. Petroleum Jobbers Ass'n v. FPC*,
　259 F.2d 921 (D.C. Cir. 1958) .........................................................................30

*Versata Dev. Corp. v. Rea*,
　959 F. Supp. 2d 912 (E.D. Va. 2013) ...............................................................22

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
　714 F.3d 186 (4th Cir. 2013).......................................................................21, 22

*Watkins v. Westinghouse Hanford Co.*,
　12 F.3d 1517 (9th Cir.1993)..............................................................................12

*Wilbur v. U.S. ex rel. Kadrie*,
　281 U.S. 206 (1930) .........................................................................................38

*WildEarth Guardians v. Jewell*,
　738 F.3d 298 (D.C. Cir. 2013) .........................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008) ...............................................................................................7

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ........................................................ 29, 30, 31

*Worthy v. Herter*,
   270 F.2d 905 (D.C. Cir. 1959) ........................................................ 17

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999) ........................................................ 29

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ........................................................ 16

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ........................................................ 15

**STATUTES**

2 U.S.C. § 683 ........................................................ 23

2 U.S.C. § 684 ........................................................ 24

5 U.S.C. § 104 ........................................................ 4

5 U.S.C. § 702 ........................................................ 11

5 U.S.C. § 704 ........................................................ 20, 22

5 U.S.C. § 706 ........................................................ 20, 23

22 U.S.C. §§ 2151 *et seq.* ........................................................ 3

22 U.S.C. § 2151b ........................................................ 3

22 U.S.C. § 2151t ........................................................ 36

22 U.S.C. § 2291 ........................................................ 3

22 U.S.C. § 2346 ........................................................ 3, 4

22 U.S.C. § 2347 ........................................................ 3

22 U.S.C. § 2348 ........................................................ 3

22 U.S.C. § 2349aa ........................................................ 3

22 U.S.C. § 2381 ........................................................ 4

22 U.S.C. § 2382 ........................................................ 3

22 U.S.C. § 2763 .................................................................................................................3

22 U.S.C. § 6563 .................................................................................................................4

22 U.S.C. § 6592 .................................................................................................................4

28 U.S.C. § 1491 ...............................................................................................................10

41 U.S.C. § 605 .................................................................................................................10

41 U.S.C. §§ 7101–09 .........................................................................................................9

41 U.S.C. § 7102 ...........................................................................................................9, 10

41 U.S.C. § 7103 .........................................................................................................10, 12

41 U.S.C. § 7104 .................................................................................................10, 11, 12

41 U.S.C. § 7105 .........................................................................................................10, 11

Foreign Assistance Act of 1961,
    Pub. L. No. 87-195, 75 Stat. 424 ...............................................................................3

Migration and Refugee Assistance Act of 1962, (MRAA),
    Pub. L. No. 87-510, 76 Stat. 121 (codified as amended at 22 U.S.C. § 2601(c)(1))..................3

Impoundment Control Act,
    Pub. L. No. 93-344, 88 Stat. 297 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*) .....23

Support for East European Democracy ("SEED") Act of 1989,
    Pub. L. No. 101-179, 103 Stat. 1298 ..........................................................................3

Foreign Affairs Reform and Restructuring Act of 1998,
    Pub. L. No. 105-277, 112 Stat. 2681 (1998)...............................................................23

Further Consolidation Appropriations Act,
    Pub. L. No. 118-47, 138 Stat. 460 (2024)...................................................................23

**U.S. CONSTITUTION**

U.S. Const. art. II, § 3 ...............................................................................................17, 18, 19

**REGULATIONS**

*Administration of Foreign Assistance & Related Functions*,
    Exec. Order No. 10,973, 26 Fed. Reg. 10,469 (Nov. 3, 1961) ...................................4

*Reevaluating and Realigning United States Foreign Aid*,
    Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025)...................4, 15, 27, 33

**OTHER AUTHORITIES**

H.R. Rep. No. 93-658, 93d Cong., 1st Sess. 41 (1971) ...............................................................24

Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel,
    Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally
    Impacted Schools, 1 Supp. Op. O.L.C. 303 (1969)..................................................................16

Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025),
    http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause ....................5, 27

## INTRODUCTION

Just days ago, this Court declined to issue preliminary injunctive relief to two labor unions representing employees of the United States Agency for International Development (USAID) who challenged the alleged "dismantling" of USAID.  Mem. Op., ECF No. 49, *Am. For. Serv. Ass'n v. Trump et al.*, No. 1:25-cv-352 (D.D.C. Feb. 21, 2025) ("*AFSA* Order").  The Court concluded that the employees would not suffer irreparable harm, that the Court likely lacked subject-matter jurisdiction because their claims in district court were precluded by an exclusive remedial scheme, and that the balance of hardships and public interest factors did not weigh against denying preliminary injunctive relief.  The instant case differs in only one respect.  Here, the Plaintiff is the Personal Service Contractor Association (PSCA), an association whose members are personal service contractors (PSCs) for USAID rather than direct hire employees.  Because they have a contractual relationship with USAID, a different remedial scheme deprives this Court of jurisdiction:  Under the Contract Disputes Act, after exhausting their administrative remedies, Plaintiffs would have to seek relief for their claims in the Court of Federal Claims or the Civilian Board of Contract Appeals, not this Court.  In all other material respects, the cases are the same.  As such, the Court should deny Plaintiff's request for a temporary restraining order (TRO), just as it denied preliminary injunctive relief in *AFSA*.

Like in *AFSA,* Plaintiff's motion for a temporary restraining order fails to establish a likelihood of success on the merits of its claims.  As an initial matter, Plaintiff has not demonstrated that this Court has subject-matter jurisdiction over its claims.  First, PSCA has not shown that its claims fall within an applicable waiver of sovereign immunity.  The Contract Disputes Act and the Tucker Act waive sovereign immunity for certain claims based on contract payment obligations, but those claims must be brought in the Court of Federal Claims or the Civilian Board of Contract

Appeals.  And Plaintiff cannot merely repackage the contract claims of its members as claims for injunctive relief falling within the APA's waiver of sovereign immunity.  Second, Plaintiff lacks associational standing because it has not shown that the asserted claims, which arise from particular contracts between the agencies and PSCs, can be adjudicated in the absence of those individual contractors.

In any event, even if Plaintiff's claims were proper in this Court, the claims are meritless on their own terms.  As for Plaintiff's constitutional claims, Plaintiff misses the mark because they raise purely statutory arguments.  Moreover, Plaintiff's Separation of Powers claim fails because the President's powers in the realm of foreign affairs are vast and generally unreviewable.  Plaintiff's Take Care Clause argument fails as that clause cannot be used to obtain affirmative relief.

Plaintiff's Administrative Procedure Act (APA) claims also do not establish a likelihood of success.  Principally, because Plaintiff's claims do not challenge any *agency* action, much less any *final* agency action, they cannot be brought under the APA.  Further, Plaintiff has another adequate remedy at law, and Plaintiff cannot demonstrate that Defendants have acted contrary to law, arbitrarily and capriciously, or exceeded their statutory authority.

Finally, although Plaintiff argues that its members will suffer irreparable harm, these fears are overstated, as the Court recently determined when considering similar contentions brought by direct-hire employees.  *AFSA* Order at 12.  And because the public has an interest in the President taking decisive action in the realm of foreign affairs, the public interest and balance of the equities tip in Defendants' favor.  As such, Plaintiff has not established the criteria necessary for this Court to enter the extraordinary remedy of a preliminary injunction.

# BACKGROUND

## I.    STATUTORY BACKGROUND

Under the statutory regime governing foreign assistance, and consistent with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance.  Many of the authorities provided under the Foreign Assistance Act of 1961 ("FAA"), Pub. L. 87-195, 75 Stat. 424 (22 U.S.C. § 2151 *et seq.*) and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine."  *See*, *e.g., id.* § 104(c)(1) (22 U.S.C. § 2151b(c)(1)) (health assistance); *id.* § 481(a)(4) (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-crime assistance); *id.* § 531 (22 U.S.C. § 2346) (assistance to promote economic or political stability); *id.* § 541(a) (22 U.S.C. § 2347) (International Military Education and Training assistance); *id.* § 551 (22 U.S.C. § 2348) (Peacekeeping Operations); *id.* § 571 (22 U.S.C. § 2349aa) (anti-terrorism assistance); *see also* Migration and Refugee Assistance Act of 1962, (MRAA), Pub. L. No. 87-510, § 2(c)(1), 76 Stat. 121 (codified as amended at 22 U.S.C. § 2601(c)(1)); Support for East European Democracy ("SEED") Act of 1989, Pub. L. No. 101-179, 103 Stat. 1298 (amending the FAA by inserting, inter alia, § 498b(i)); section 23(a) of the Arms Export Control Act (22 U.S.C. § 2763(a)).

The Secretary of State may exercise those authorities, including under delegations from the President.  For example, Section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . .  to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby."  22 U.S.C. § 2382(c). Executive Order

12163 (22 U.S.C. § 2381 note) delegated to the Secretary of State a range of functions related to foreign assistance, including most functions under the FAA, and the Secretary of State has further delegated a range of these functions to the Administrator of USAID.

President Kennedy in 1961 issued Executive Order 10973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development." Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). Congress later recognized USAID as an "independent establishment." *See* 22 U.S.C. § 6563; 5 U.S.C. § 104 ("For the purpose of this title, 'independent establishment' means (1) an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment . . . ."). Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592. And several types of foreign assistance are jointly administered by the Department of State and USAID. *See, e.g.*, *id.* § 6563; *id.* § 2346(b) (economic support funds).

Consistent with this authority, President Trump promptly acted to ensure that the United States's provision of foreign aid is aligned with American interests. Upon taking office on January 20, 2025, President Trump instituted a ninety-day pause in United States foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy. The President also directed reviews of each foreign assistance program by departments and agencies under guidelines provided by the Secretary of State, in consultation with the Director of OMB, with determinations on these reviews to be made within 90 days. *See* Exec. Order 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8,619 (Jan. 20, 2025). Consistent with that order, Secretary of State Marco Rubio directed a pause on foreign assistance programs funded by or through the Department

and USAID.  U.S. Dep't of State, Mem. 25 STATE 6828 (Jan. 24, 2025) (2025 Mem.), ECF No. 6-4.  Secretary Rubio also approved waivers of the pause, including waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, legitimate expenses incurred before the pause went into effect, and legitimate expenses associated with stop-work orders. *AFSA* Marocco Decl. 1 (Feb. 10, 2025) ¶ 10, attached hereto as Exhibit A.  The Secretary also approved a waiver of the pause for life-saving humanitarian assistance during the review.  *See* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.

## II.    FACTUAL BACKGROUND

On January 30, 2025, President Trump appointed Secretary Marco Rubio to act as the Acting Administrator of USAID.  *AFSA* Marocco Decl. 1 ¶ 8.  Secretary Rubio, in line with the views of the President, concluded that USAID's foreign assistance processes reflected signs of severe inefficiency, and that a substantial number of the programs funded by USAID neither substantially benefit the American people, nor reflect the priorities of the President and Secretary. *Id.* ¶ 7.  Thus, Secretary Rubio sent a letter to Congress on February 3, stating that Pete Marocco had been delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest."  *Id.* ¶ 8.

USAID has approximately 1,230 U.S. and Third Country Personal Services Contractors (collectively "PSCs").  Marocco Decl. (Feb. 24, 2025) ¶ 3, attached hereto as Exhibit B.  PSCs serve as technical advisors across USAID and provide flexibility to rapidly respond to development needs and fill critical staffing gaps.  *Id.*  On February 2, 2025, USAID approved the termination of 791 PSCs stationed in high- and middle-income countries like the United States,

Moldova, and Thailand. *Id.* ¶ 4. Because USAID's mandate is to assist primarily in low-income countries, the contracts approved for termination appeared to be inconsistent with the mission of USAID. *Id.* However, due to a miscommunication, the terminations did not begin until weeks later. *Id.* ¶ 5. PSCs are being given fifteen days of notice of their terminations, as required by their contracts. *Id.* ¶ 6. Currently, 493 termination notices have been issued, 35 contracts were determined to be no longer active (e.g. resigned, moved positions, etc.), and 286 contracts are still under review, which will be finalized as quickly as possible and either terminated or left unchanged. *Id.* ¶ 7.

## III.    THE INSTANT ACTION

Plaintiff PSCA avers that it is "a voluntary association of U.S. citizen personal services contractors (USPSCs) employed by USAID." Compl. ¶ 4. Plaintiff asserts that some of its members have been harmed by the termination of their personal services contracts. Plaintiff has moved for a temporary restraining order seeking provisional relief predicated on their contentions that the challenged Executive Order and Secretary Rubio's Memorandum, as well as USAID and State's implementing suspensions and terminations, violate the Constitution and the Administrative Procedure Act.

### LEGAL STANDARD

A temporary restraining order "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Postal Police Officers Ass'n v. United States Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief. *See*, *e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723–24, 394 U.S. App. D.C. 158 (D.C. Cir. 2011) (applying

preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is an "extraordinary and drastic remedy" that should "never [be] awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted). To warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Injunctive relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

## ARGUMENT

Plaintiff has failed to meet its burden to demonstrate any of the requirements to obtain a temporary restraining order: (1) it has not shown there is a likelihood of success on the merits on any of its constitutional or statutory claims because the Court lacks subject-matter jurisdiction to hear those claims, and it is unlikely to succeed on the merits; (2) it has not demonstrated irreparable harm because all of Plaintiff's alleged harms are redressable through monetary payments; and (3) the balance of equities and public interest tip in favor of Defendants because the public has an interest in ensuring that the executive is allowed to take decisive action in the realm of foreign

affairs.  For any one of these reasons, the Court should deny Plaintiff's motion for a temporary restraining order.

## I.  PLAINTIFF IS NOT LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS.

Plaintiff's motions for a temporary restraining order fails to establish a likelihood of success on the merits of its claims.  Plaintiff has not demonstrated that this Court has subject-matter jurisdiction to reach the merits of its claims because (1) the PSCs that have contracts with USAID have not shown that their contractual disputes with those agencies may be heard in this Court, rather than in the Court of Federal Claims (or, as applicable, the Civilian Board of Contract Appeals), and (2) the sole Plaintiff here, an association, has not shown that the asserted claims, which arise from particular contractual relationships between the agencies and PSCs, can be adjudicated in the absence of those PSCs.  In any event, even if Plaintiff had met its burden to establish subject-matter jurisdiction, its constitutional claims fail because (1) they raise purely statutory arguments, (2) the President's powers in the realm of foreign affairs are vast and generally unreviewable, and (3) the Take Care Clause cannot be used to obtain affirmative relief.  Moreover, Plaintiff's APA claims also do not establish a likelihood of success.  Plaintiff's claims do not challenge any final *agency* action and thus cannot be brought under the APA.  Further, PSCs have another adequate remedy at law, and Plaintiff cannot demonstrate that Defendants have acted contrary to law or arbitrarily and capriciously or exceeded their statutory authority.  For these reasons, the Court should deny Plaintiff's request for a temporary restraining order.

### A.  Plaintiff Has Not Established Subject-Matter Jurisdiction Over Its Claims

Plaintiff seeks a temporary restraining order that would, *inter alia,* "[r]eturn USAID workers employed as personal service contractors . . . to the terms and conditions of employment they enjoyed on January 19, 2025."  Pl.'s Mot. at 1.  In other words, Plaintiff seeks to unwind the termination of the PSCs' contracts with USAID.   But PSCA has not shown that this Court has

subject-matter jurisdiction over its claims.  *First*, Plaintiff has not demonstrated that this Court—as opposed to the Court of Federal Claims or the Civilian Board of Contract Appeals—has subject matter jurisdiction over Plaintiff's claims.  *Second*, as an *association*, the sole Plaintiff (PSCA) lacks Article III standing to litigate the asserted injuries, where those injuries purportedly arise from contractual relationships between PSCs and USAID, and cannot be adjudicated in the absence of the PSCs whose contracts define the parties' relationship.  Because Plaintiff cannot surmount those threshold obstacles of subject-matter jurisdiction, Plaintiff fails to show likelihood of success on the merits, and the Court should deny preliminary injunctive relief.

### 1. PSCs Must Pursue the Contractual Claims Advanced Here Through Established Agreement-Specific Procedures.

Plaintiff fails to satisfy its burden to establish that this Court has subject-matter jurisdiction over its claims.  Plaintiff seeks to have any termination-of-contract notices sent to PSCs rescinded. TRO Motion at 1.  As discussed below, this Court lacks subject-matter jurisdiction to hear many disputes involving federal contracts.  Whether PSCs' claims would fall into that category hinges on the precise terms of their contracts.  Yet Plaintiff does not attach those contracts or even quote the provisions of those documents.  It is Plaintiff's burden to establish this Court's jurisdiction.  In light of those omissions, the proper remedy is dismissal of the case, not granting a temporary restraining order.

First and foremost, Plaintiff fails to establish that its claims will not ripen into the type of disputes that can *only* be brought through the procedures of the Contract Disputes Act, 41 U.S.C. §§ 7101–09 ("CDA"), and over which this Court would lack subject-matter jurisdiction.  The CDA applies to certain types of contracts with the Federal Government, including contracts for "the procurement of services[.]"  41 U.S.C. § 7102(a)(2); *see, e.g.*, *Lee v. United States*, 127 Fed. Cl. 734, 736 (2016) (personal service contract dispute heard in the Court of Federal Claims).

Categorization as a contract for purposes of the CDA hinges not on the label the parties assigned to the document but rather on the terms of the document itself and the context in which the award arose. "[A]ny agreement can be a contract . . . provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997); *cf. Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343–44 (Fed. Cir. 2008) (special government cost-share agreement fell outside CDA because it did not provide substantive right to recover money damages).

The CDA provides a procedure for resolving any "claim by a contractor . . . relating to a [procurement] contract." 41 U.S.C. § 7103(a)(1); *see also* 41 U.S.C. § 7102(a)(1) (defining covered contracts); *see, e.g.*, *Dai Glob. v. Adm'r of USAID*, 945 F.3d 1196, 1199–200 (Fed. Cir. 2019). "The CDA serves two related functions. First, it establishes an administrative system for disputes relating to federal procurement contracts . . . Second, it waives sovereign immunity over actions 'arising under' that administrative system and vests exclusive jurisdiction over such claims in only two venues: (1) the Court of Federal Claims, 28 U.S.C. § 1491(a)(2); 41 U.S.C. § 7104(b)(1), and (2) agency board of contract appeals. 41 U.S.C. §§ 7104(a), 7105." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023). Under the CDA, the "contractor [must] take recourse against the government's alleged breach by submitting *a written claim to the contracting officer* for a final decision prior to commencing suit." *United States v. Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d 176, 183 (D.D.C. 2012) (quoting *U.S. v. Intrados/Int'l Mgmt. Group*, 277 F. Supp. 2d 55, 63 (D.D.C.2003) (citing, *inter alia*, 41 U.S.C. § 605(a), now 41 U.S.C. § 7103(a)(1)) (emphasis added).

After a properly submitted CDA claim has been exhausted, the proper forum is either the Civilian Board of Contract Appeals, which has jurisdiction to decide any appeal from a decision of a contracting officer on a contract made by USAID or the Department of State (*see* 41 U.S.C. § 7105(e)(1)(B)), or the United States Court of Federal Claims, 41 U.S.C. § 7104(b).   In that regard, the D.C. Circuit has "recognized a congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes," such that "the Claims Court has exclusive jurisdiction except to the extent that Congress has granted any other court authority to hear the claims that may be decided by the Claims Court."  *See A & S Council Oil Co. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (cleaned up); *cf. Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1109 (D.C. Cir. 2022) (keeping jurisdiction in district court where plaintiff did not have a contract with the government but instead asserted tortious interference by the government agency with plaintiff's contract with another party).

To attempt to avoid the jurisdictional bar of the CDA, Plaintiff depicts its claims as ones for injunctive relief under the APA.  The APA waives sovereign immunity for claims "seeking relief other than money damages" from acts of agencies.  *See* 5 U.S.C. § 702.  But Plaintiff's superficial effort to invoke the APA fails.  Even where "plaintiffs cloak the[ir] claims in" APA "language," such claims likely "are in fact contract claims covered by" the CDA, which "provides the exclusive avenue for relief for all such contract claims against the United States."  *A & S Council Oil Co.*, 56 F.3d at 236.  When assessing whether the CDA governs, "plaintiffs' labelling is of little importance," given that "a plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions rather than breach of contract."  *Id.* at 241 (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)); *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 4 (1st Cir. 1989) ("this is an action for breach of

contract, irrespective of how it is packaged"); *see also Long Term Care Pharm. All. v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187, 194 (D.D.C. 2007) ("court must look to the 'substance of the remedy sought . . . rather than the label placed on that remedy'") (quoting *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1528 n.5 (9th Cir.1993))); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993))).

That principle controls here. Where claimants "simply seek to receive the amount [agency] promised," "true nature of" claim was for compensatory money damages and not equitable relief." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). For some of those claims Plaintiff must first obtain a final agency decision on their post-termination monetary claim, and it may also have access to judicial review. 41 U.S.C. §§ 7104(b)(1), 7103(g); *see Tolliver Group, Inc. v. United States*, 20 F.4th 771, 775–76 (Fed. Cir. 2021) ("[O]btaining a final decision on a claim is a jurisdictional prerequisite to adjudication of that claim in the Claims Court.").

And importantly, "damages are always the default remedy for breach of contract." *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996). "Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall*, 884 F.2d at 3. But by asking for a temporary restraining order to enforce the terms of their contracts, that is precisely the relief Plaintiff is requesting.

In short, Plaintiff cannot meet its burden to establish that its claims fall within an applicable waiver of sovereign immunity and that this Court has subject-matter jurisdiction. Although Plaintiff superficially invokes the APA, which waives sovereign immunity as to nonmonetary claims, Plaintiff's own TRO Motion show its claims seek contract-based remedies. Hence, the PSCs have not established that sovereign immunity is waived in this Court on their claims (rather

than in the Civilian Board of Contract Appeals or the Court of Federal Claims).[1]  As a result, Plaintiff cannot show a likelihood of success at the threshold.  This Court recently declined to issue a preliminary injunction in another case against related aspects of USAID and State's operations on the basis that it "likely lacks jurisdiction over plaintiffs' claims" because of alternative schemes for review.  *See AFSA* Order at 18.  The Court should do the same here.

### 2.  Plaintiff Lacks Article III Standing to Assert Claims of PSCs.

Plaintiff lacks Article III standing to challenge any agency acts implementing Executive Order 14,169 or Secretary Rubio's January 24, 2025 Memorandum, 25 STATE 6828 (Jan. 24, 2025), given Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).  Here, that is at most each PSC's "pocketbook injury" from individual contract-specific agency decisions, *Collins v. Yellen*, 594 U.S. 220, 243 (2021), and no more than that, *see Gill*, 585 U.S. at 72 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

Plaintiff PSCA is not itself a USAID contractor—instead, it is the members of this association that receive funding through their contracts.  The membership association has no Article III standing at all.  Such membership-based associations like Plaintiff can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or

---

[1] To the extent PSCs claim to be employees of USAID, *see, e.g.*, Compl. ¶ 14, this Court would lack subject-matter jurisdiction to hear their claims for the reasons set forth in *AFSA* Order at 16–24.  Moreover, even if the contracts at issue were determined not to be CDA contracts, any suit seeking more than $10,000 would still lie with the Court of Federal Claims.  The Tucker Act provides for judicial review of breach claims for express or implied contracts over $10,000 with the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by statute . . . ."  *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*).

"organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  PSCA fails on both counts.

*First*, as to *associational* standing: Precedent requires an organization to show that it has a member who would otherwise have standing to sue in his or her own right; that the interests the organization seeks to protect are germane to its purpose; and that neither the claim asserted nor the relief requested requires the participation of the individual member in the lawsuit.  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013); *Hunt*, 432 U.S. at 343.  Monetary relief typically violates the third prong of *Hunt*, because "damages claims are not common to the entire membership, nor shared by all in equal degree, and consequently there is simply no way the extent of the harm to [an organization's] members can be determined without individualized proof."  *See Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483–84 (D.C. Cir. 1996) (citation omitted).  "If such proof is required to resolve a claim—whether monetary or not—the member-participation prong is not satisfied." *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-2776, 2025 WL 27162 at *12 (D.D.C. Jan. 3, 2025).  Here, as explained in Point I.A.1, *supra*, no matter that they cloak their arguments in the garb of injunctive relief, Plaintiff fundamentally seeks to continue working under their contracts with USAID.  The real focus (rather than the rhetorical one) of the claims is a contract remedy, and the "extent of the harm" to the members of PSCA would hinge on "individualized proof."  Hence, PSCA lacks associational standing.

*Second*, as to *organizational* standing: PSCA does not attest that the challenged conduct has concretely injured the organization (as distinct from its members), and, importantly, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the

defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). PSCA does not claim that the pause in foreign aid injures the organization. *See id.* Nor does it claim that it is using its resources to counteract any purported harm from that pause. *See id.* For example, to allege an injury to its interest, an organization like PSCA "must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quotations omitted). As Plaintiff makes no such showing, the claims of PSCA fail for lack of Article III standing.

### B. Plaintiff Is Not Likely to Prevail on Its Constitutional Claims.

#### 1. The Separation of Powers Claims Fail Because the President's Powers in the Realm of Foreign Affairs Are Vast and Generally Unreviewable.

Plaintiff argues that Defendants violated the separation of powers because "the President has no constitutional authority to withhold or redirect appropriated funds." Pl.'s Mot. at 11. But the President's actions were in fact within his authorized discretion to take. *See infra* Section I.B.2. There can be no reasonable doubt that it is the President whose authority reigns principally in the realm of foreign affairs.

Under Article II of the Constitution, as well as powers conferred by Congress in the Foreign Service Reform and Restructuring Act of 1998, the President has broad authority to attend to the foreign affairs of the nation, including by determining how foreign aid funds are used. Giving aid to projects that are inconsistent with American values could actually destabilize foreign countries and our relations with those countries. *See* E.O. 14,169 § 1. While the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S.

396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)).  Thus, "in foreign affairs the President has a degree of independent authority to act."  *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (the President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635–36 & n.2 (the President can "act in external affairs without congressional authority").

Plaintiff's contention that the Executive Branch is infringing on Congress's power of the purse is misplaced.  That argument fails to account for the President's distinct interest in foreign affairs.  "[I]f a Congressional directive to spend were to interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority . . . over foreign affairs . . . a situation would be presented very different from [a domestic impoundment]."  Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Supp. Op. O.L.C. 303, 310–11 (1969) (Dec. 1, 1969).  But in any event, no impoundment has taken place.  *See infra* at Point I.C.3.  Defendants' actions not only fit comfortably within the Executive Branch's unique expertise and constitutional role as to foreign affairs but also dovetail with its unreviewable discretion not to take action.  *Cf. Heckler v. Chaney*, 420 U.S. 821 (1985).  It is precisely the sort of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to the contrary.

Plaintiff's request that this Court step in to supervise Defendants' foreign assistance operations in some sort of receivership arrangement would create a grave separation of powers problem.  Diplomacy and foreign relations fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations."

16

*Curtiss–Wright*, 299 U.S. at 319–20; *see Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *see Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches[.]"); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("It is settled that in respect to foreign affairs the President has the power of action and the courts will not attempt to review the merits of what he does.  The President is the nation's organ in and for foreign affairs.'').  As such, injunctive relief related to foreign affairs "deeply intrudes into the core concerns of the executive branch" and may be awarded only upon "an extraordinarily strong showing" as to each element.  *Adams*, 570 F.2d at 954–55. Plaintiff is not likely to prevail on its separation of powers claims where the relief it seeks would in reality result in a serious overstep of the judiciary into the exclusive domain of the Executive.

### 2. Plaintiff's Take Care Clause Claim Additionally Fails Because the Take Care Clause Cannot be Used to Obtain Affirmative Relief.

Plaintiff attempts to circumvent the limitations of the APA by asserting what can only be characterized as a broad programmatic attack against the President as well as the agency Defendants under the Take Care Clause, U.S. Const. art. II, § 3.  *See* Compl. ¶¶ 43–44 (Count II).

17

The Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. Plaintiff cannot prevail on its Take Care Clause claim because the Take Care Clause does not provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims. *See Dalton v. Specter*, 511 U.S. 462, 473 (1994). Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiff seeks to rely on violations of purported duties that are found nowhere in the statutes establishing USAID themselves, but rather, are based on Plaintiff's subjective views about how to best implement and administer USAID.

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President. U.S. Const. art. II, § 3. Inevitably, the laws that the President executes are those enacted by Congress. But no court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the way the President executes Congress's laws. Rather, as the Supreme Court has recognized, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character."). To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone. *Baker v. Carr*, 369 U.S. 186, 217 (1962) (Courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political

department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."); *Chi. & S. Air Lines*, 333 U.S. at 114 (refusing to review President's decision that "embod[ied] Presidential discretion as to political matters beyond the competence of the courts to adjudicate"); *Mississippi*, 71 U.S. (4 Wall.) at 499.

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials.  The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process.  *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring).  A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws.  To the extent Plaintiff seeks to challenge the other Federal Defendants' alleged attempt to undermine the statutes recognizing USAID, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiff.

### C. Plaintiff Is Not Likely to Prevail on Their Administrative Procedure Act Claims.

Under the APA, the Court may set aside an agency action if the Court finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Court's review is "ultimately narrow and highly deferential" and focused on "ensur[ing] that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (citations omitted). The agency need only "provide[] an explanation of its decision that includes a rational connection between the facts found and the choice made" to have its decision sustained. *Id.* (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)). A court "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiff's APA claims are not likely to succeed here because (1) Plaintiff does not allege any *agency* action, (2) an adequate alternative remedy is available to PSCs, (3) Defendants have not exceeded their statutory authority or acted contrary to law, and (4) Defendants have not acted arbitrarily and capriciously.

### 1. Plaintiff Does Not Allege Any Agency Action Beyond Its Contract-Specific Grievances.

Review under the APA is available only for "agency action." 5 U.S.C. § 704. Presidential actions are not agency actions reviewable under the APA. It is "well-settled" that Presidential action is not subject to review under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). Because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action." *Franklin*, 505 U.S. at 796; *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018).

Because an executive order is a presidential action, and not an agency action, Plaintiff's challenges to Executive Order No. ("EO") 14,169 under the APA are not reviewable. *See Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022) (citation omitted) (holding that a challenge to Executive Order No. 14,008 "cannot be reviewed under the APA because the President is not an agency"). Plaintiff's challenges to the implementation of the EO likewise fail. First, where the complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA. *See Ancient Coin Collectors Guild v. CBP*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under the APA); *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "several cases have concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA).

Second, regarding the contract-specific grievances for which Plaintiff has not shown subject-matter jurisdiction in this Court, Plaintiff does not even identify a concrete action that USAID has taken that could specifically be redressed by a federal court. A plaintiff must plead "an identifiable action or event." *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 899 (1990); *Norton v. S. Utah Wilderness All. ("SUWA")*, 542 U.S. 55, 62 (2004) (APA limits judicial review to "circumscribed, discrete agency actions"). These final agency actions must be "circumscribed [and] discrete." *SUWA*, 542 U.S. at 62 (2004). The APA does not provide for "general judicial review of [an agency's] day-to-day-operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army*

*Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (cited approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020)).  The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree."  *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)).

Here, Plaintiff does not challenge a discrete agency action.  Rather, Plaintiff complains of Defendants' "imposing a blanket freeze on virtually all foreign assistance funding and operations" and attempting to "dismantle USAID."  Pl.'s Mot. at 13, 16.  These are the exact types of broad programmatic challenge and supervision of an agency's day-to-day activities that courts have repeatedly ruled are impermissible under the APA.

### 2. The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy is Available to Plaintiff.

Review under the APA is available only where "there is no other adequate remedy in a court."  5 U.S.C. § 704.  The requirement that a plaintiff have "no other adequate remedy in court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).  As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'"  *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted).  Further, a remedy may be adequate even if "the arguments which can be raised [in the alternative proceeding] are not identical to those available in an APA suit."  *Elm 3DS Innovations LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016).  If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA.  *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 927 (E.D. Va. 2013) (dismissing

putative APA claim under Rule 12(b)(6) because decision at issue was not a final agency action and an alternative adequate remedy existed by way of appeal to the Federal Circuit).  As already described above in Point I.A.1, this is, in essence, a contract dispute, and given that the Contract Disputes Act provides specified remedies for such contractual claims, that statute remains potentially available to PSCs as an adequate alternative.  Plaintiff is therefore barred from bringing this as an APA claim.

### 3.  Defendants Have Not Acted Contrary to Law.

As explained above, the Court may set aside an agency action under the APA only if the Court finds that the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  Plaintiff argues that Defendants' actions violate the Impoundment Control Act, the 2024 Appropriations Act,[2] and the Anti-Deficiency Act. Pls.' Mot. for TRO at 15-17.  Each of these arguments fail.

*First*, Defendants' pause on foreign assistance does not violate the Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 297, 333 (1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*), or otherwise violate the FCAA, Pub. L. No. 118-47, 138 Stat. 460 (2024).  Under the Impoundment Control Act, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation.  2 U.S.C. § 683(b).  But the Impoundment Control Act enforces Congress's power over the purse in relation to the Executive.  *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982).  It provides for

---

[2] In various parts of the motion, Plaintiff refers to the "Consolidated Appropriations Act of 2024 (FCAA)," Pub. L. No. 118-47, 138 Stat. 460 (2024), and the "2024 Appropriations Act," *see* Pls.' Mot. for TRO at 12 (citing Pub. L. No. 105-277, Div. G, § 1413, which was the omnibus appropriations act for the fiscal year ending September 30, 1999). For purposes of this response, Defendants will address the FCAA, as the contemporary appropriations law.

enforcement by the Comptroller General (an official in the Legislative Branch), not for private enforcement.  Thus, that statute is generally not enforceable through an APA suit.  *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019).  Plaintiff appears to believe Defendants have violated laws that appropriate money to agencies for certain purposes. But Plaintiff does not claim that any statute requires Defendants to contract with PSCs specifically. And as the D.C. Circuit has explained, a pause does not qualify as an impoundment or a failure to make funds "available for obligation" under the statute.  *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 93-658, 93d Cong., 1st Sess. 41 (1971))).  Therefore, any challenge that Plaintiff might bring under the Impoundment Control Act is, at best, not ripe. Moreover, in any event, even if Plaintiff's Impoundment Control Act theory had merit, it still could not obtain the broad relief they seek here.  At most, Plaintiff would have established that the Executive Order or Secretary Rubio Memo constituted a deferral of budget authority for which the requisite "special message" was not communicated to Congress.  *See* 2 U.S.C. § 684.  In that scenario, the remedy would be a directive to communicate the special message—not a broad injunction interfering with the Executive's lawful discretion to review and reevaluate existing funding.

Second, Plaintiff argues that Defendants' actions violate the fiscal year 2024 appropriations act, "which directs USAID and the State Department to spend appropriated funds for particular foreign-assistance purposes."  Pls.' Mot. at 16.  But the appropriations acts grant the President

significant discretion in how to use these funds.  Secretary Rubio informed Congress on February 3, 2025, of his "intent to initiate consultations with [Congress] regarding the manner in which foreign aid is distributed around the world through [USAID]."  *AFSA* Marocco Decl. 1 ¶ 8 and Ex. C., Letter from Sec'y of State (Feb. 3, 2025) at 2, also available at *AVAC*, ECF No. 15-1.  And more specifically, Secretary Rubio noted that this review "may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees."  *Id.* at 3.  Defendants have made no final decision regarding reorganization and have simply paused foreign assistance to permit a review process to make those decisions.  And, in any event, the issue of whether Defendants appropriately used Congressionally allocated federal funds is a political question.  The provisions at issue are for the benefit of Congress, and it is up to Congress to determine whether they are satisfied—not the courts.  If not, Congress has constitutional tools at its disposal to push back on the Executive Branch.  But the federal courts have no role in that back-and-forth; and this Court should not inject itself, superintending Congress's judgment about the President's use of funds.  Instead, this is the precise sort of statutory condition that is not privately enforceable.

*Third*, Plaintiff argues that "Defendants have violated the Anti-Deficiency Act, which allows for the creation of funding reserves only in apportioning or reapportioning an appropriation."  Pl.'s Mot. at 16-17.  At the outset, Plaintiff does not cite any caselaw supporting its interpretation of the Anti-Deficiency Act, much less a case applying the Anti-Deficiency act in any analogous situation.  As explained, the President's actions are not "final agency action" for purposes of APA review, and in any event, the pause on foreign assistance does not create a

funding reserve in violation of the Anti-Deficiency Act. Even if the pause on foreign assistance was considered a funding reserve under the Anti-Deficiency Act, Plaintiff has not shown that an exception to the general rule does not apply, such as whether the reserve was established "to achieve savings made possible by or through changes in requirements or greater efficiency of operations" or "as specifically provided by law." And regardless, the Anti-Deficiency Act "explicitly sets forth procedures for reporting violations of the Act and enforcing its provisions." *Thurston v. United States*, 696 F. Supp. 680, 683 (1988). Given Plaintiff's conclusory treatment of the Act, and the apparent defects in their claim, Plaintiff has not established a likelihood of success on the merits.

*Fourth*, Plaintiff's contrary-to-law arguments cross-reference its Separation of Powers and Take Care Clause arguments. Pl.'s Mot. at 15 ("This brief has already addressed the President's violations of Separation of Powers and the Take Care Clause."). Plaintiff does not provide any independent APA-related arguments beyond their constitutional theories. But Defendants' actions do not violate the Separation of Powers or Take Care Clause for all of the reasons described above, *see supra* Point I.B, so these arguments likewise fail to support any claim for APA relief.

### 4. Defendants Have Not Acted Arbitrarily and Capriciously.

Plaintiff further argues that Defendants acted arbitrarily and capriciously, *first*, because the State Department memo's rationale that a funding pause is needed to determine "whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy," "does not match and is wildly disproportionate to an immediate freeze on billions of dollars in Congressionally appropriated aid." Pl.'s Mot. at 13. But the pause of foreign assistance was not comprehensive or undifferentiated: Secretary Rubio approved waivers, including waivers for foreign military financing for Israel and Egypt, emergency food assistance, certain administrative expenses, legitimate expenses incurred

before the pause went into effect, and legitimate expenses associated with stop-work orders, *AFSA Marocco Decl.* 1 ¶ 10, and a waiver on the pause for life-saving humanitarian assistance during the review, *see* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.    And PSC contracts have only been terminated in high- and middle-income countries like the United States, Moldova, and Thailand.  *See* Marocco Decl. ¶ 4, Ex. B.

And in any event, President Trump's Executive Order did explain that he had instituted a ninety-day pause in United States foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy and values to promote world peace.  *See* Exec. Order No. 14,169.  Moreover, Secretary Rubio similarly explained:

> Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy.  The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments.  Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

Sec'y of State Mem. ¶ 2, attached to *AFSA* Marocco Decl. 1 as Ex. B, also available at ECF No. 6-4.  That is more than enough explanation, particularly given that, as already explained, the President's powers in the realm of foreign affairs as they relate to funding for various State and USAID initiatives are vast.  *See supra* Section I.B.1.  Requiring a federal agency to articulate a rationale for its action— beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA.  *Franklin*, 505 U.S. at 800–01; *cf. Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 403 ("[T]he State Department and Assistant

Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA."), *aff'd*, 698 F.3d 171 (4th Cir. 2012)." These are not actions reviewable under the APA in the first place, much less are they arbitrary and capricious.

*Second*, Plaintiff wrongly argues that Defendants failed to consider alternative courses of action. Pl.'s Mot. at 14. President Trump and Secretary Rubio ultimately exercised their discretion to determine that it would not be possible to consider the consequences of various approaches in the absence of a temporary pause. Similarly, Plaintiff contends that Defendants failed to consider the "reliance interests" of contractors and other parties. *Id.* Plaintiff does not attach any of the relevant contracts, which by their terms might be for a limited duration and thus could not support a reasonable reliance on their continuation beyond that duration. And in any event, there is no evidence that Defendants did not consider the supposed reliance interests of PSCs, rather than that Defendants considered them and determined that they were outweighed by other policy considerations. That Plaintiff does not agree with Defendants' preferred policy approach does not mean that Defendants acted arbitrarily and capriciously in forming that policy. To put it succinctly, policy disagreements cannot form the basis of an APA arbitrary and capricious claim, and Plaintiff is therefore not likely to succeed on the merits.

## II. PLAINTIFF FAILS TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A TEMPORARY RESTRAINING ORDER.

Plaintiff has likewise failed to establish that it or its members will suffer irreparable harm absent a preliminary injunction. To demonstrate irreparable harm, Plaintiff must meet a "high standard"—they must show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297

(D.C. Cir. 2006).  Making that showing requires "proof" that the harm they identify "is certain to occur in the near future."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiff identifies three sources of irreparable harm:  Economic harms stemming from the termination of contracts, reputational harms, and additional harms related to the stop-work orders. *See* Pl.'s Mot. at 17.  None is sufficient to justify the extraordinary relief of a temporary restraining order.  Indeed, Plaintiff admits that the alleged harms to its members are "identical" to those harms "impacting USAID direct hires" at issue in *AFSA*, and this Court recently found that the *AFSA* plaintiffs could not demonstrate irreparable harm justifying a preliminary injunction.  *See AFSA* Order at 10–16.

At the outset, courts do not find irreparable harm where an ongoing, individualized review process could prevent the harm from transpiring at all.  Here, Defendants are reviewing individual funding instruments to determine which should be continued and which may properly be terminated.  Plaintiff thus cannot show "that [its members] will suffer immediate and significant hardship in the absence of immediate judicial intervention" based on the challenged actions. *Church v. Biden*, 573 F. Supp. 3d 118, 136 (D.D.C. 2021) (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 50 (D.C. Cir. 1999); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (holding that to be irreparable, the threatened injury must be "certain" and "actual" (citation omitted)).

As the Supreme Court has made clear, loss of employment is only irreparable in "genuinely extraordinary situation[s]."  *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).  Loss of income— even combined with "insufficiency of savings or difficulties in immediately obtaining other

employment . . . however severely they may affect a particular individual" does not qualify as such an extraordinary situation. *Id.*

The particular injuries that Plaintiff identifies do not meet the "high standard" for irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. First, Plaintiff identifies several harms that stem from the challenged actions. But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Id.* (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Rather, it is black-letter law that economic harm is generally not irreparable. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id.* (citation omitted), or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiff demonstrates "extreme hardship to the business" or a threat to the business's "very existence." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). PSCs may be forced to make difficult choices and lose profits in critical areas of their business without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock . . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."). And Plaintiff must document any claim that an alleged harm is a threat to the business's very existence with specific details. *See Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity

how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory). The exception does not apply to PSCs under the circumstances presented here. *See Wis. Gas Co.*, 758 F.2d at 674; *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 51–52.

The second exception, for monetary harms unrecoverable because a defendant enjoys sovereign immunity, likewise does not apply. As discussed above, Point I.A.1, *supra*, PSCs' economic injuries are reparable through the CDA channel for contract disputes concerning monetary payments. While the APA does not offer Plaintiff monetary damages, that does not mean that monetary relief is unavailable through other channels. Indeed, the recognized function of the CDA is to afford aggrieved contractors an opportunity to recover money damages. *See A & S Council Oil Co.*, 56 F.3d at 241 ("a single, uniquely qualified forum for the resolution of contractual disputes" (citation omitted)). Sovereign immunity is not an obstacle for monetary recovery on Plaintiff's claims because of those statutes. *See Safari Club Int'l*, 47 F. Supp. 3d at 37.

Plaintiff also claims harm to PSCs' "reputations and good names" because of Defendants' conduct, as well as a loss of "trust and relationship" with "implementing partners." Pls.' Mot. at 17. But "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and therefore recoverable. *Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d 674. When a harm is "based on independent market variables such as how [a company's] customers and/or retail consumers might react," that harm does not flow directly from the challenged action. *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013).

Here, it also requires speculation regarding those expected reactions, which may well be blamed on the Defendants rather than the PSCs. *Cf. AFSA* Order at 14 (noting that the Court did not "find it likely that a partner agency would attribute a contract modification, whether unlawful or not, to any USAID employee in his or her personal capacity").

Additionally, Plaintiff identifies other forms of harm—like security risks and harm to their members and families serving overseas. *See* Pl.'s Mot. at 17. But Plaintiff has not shown that the vague security risks they identify are "actual[] and imminent," *Hi-Tech Pharmacal Co.*, 587 F. Supp. 2d at 11; rather, they identify the *possibility* of such risk. This possibility is especially remote where, as here, the PSCs whose contracts are being terminated are in high-income and middle-income countries. Marocco Decl. ¶ 4, Ex. B. A mere possibility of harm is not enough to warrant injunctive relief.

Finally, Plaintiff's delay in filing a motion for a temporary restraining order undercuts any need for immediate relief. Plaintiff notes that some PSCs had access to USAID systems cut off as early as February 2, 2025, *see* Third Decl. of Jane Doe ¶ 4, but they did not file a motion for a temporary restraining order until February 19, 2025. *Cf. Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975). Even if Plaintiff could demonstrate some irreparable harm, the Court does not need to rush to issue relief based on the timing of Plaintiff's filing.

### III. THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A TEMPORARY RESTRAINING ORDER.

A temporary restraining order also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiff cannot establish the first two factors necessary to obtain a temporary restraining order, "it is clear they cannot make the corresponding strong showings [on the second two factors] required

to tip the balance in their favor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

But even if Plaintiff could satisfy one or both of those factors, the remaining factors weigh in Defendants' favor. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). The public has an interest in ensuring that tax dollars are not spent towards foreign aid projects that are not "aligned with American interests and in many cases antithetical to American values," and that "serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *See* Exec. Order No. 14,169, § 1, Reevaluating and Realigning United States Foreign Aid (Jan. 20, 2025). The government is thus undertaking a thorough review of USAID's operations in order to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda." State Dep't Memo, ECF No. 6-4. And it has determined that the best way to conduct that review is by first pausing a substantial portion of USAID's ongoing work, "consistent with the terms of the relevant award," and to make decisions "whether to continue, modify, or terminate programs . . . following this review." *Id.*

A temporary restraining order would displace and frustrate the President's decision and process about how to best address the threat to foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). To be

sure, Defendants are acting this quickly and decisively to ensure that "appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." State Dep't Memo, ECF No. 6-4.

By contrast, Plaintiff's members voluntarily entered contracts with USAID that they knew contained clauses or were controlled by relevant regulations and law that permitted Defendants to withdraw from them. Any pecuniary harm they now have allegedly suffered is because of them taking on that risk, and in any event, such pecuniary harm can later be remedied should they prevail on the merits.

Because the public has an interest in the executive branch effectuating foreign affairs, this final factor tips in favor of Defendants. At minimum, the harms to the public counterbalance any irreparable harm to Plaintiff, making a temporary restraining order improper. As this Court recognized in *AFSA* in declining to issue a preliminary injunction against a different aspect of USAID's and State's operations, "[w]here one side claims that USAID's operations are essential to human flourishing and the other side claims they are presently at odds with it, it simply is not possible for the Court to conclude, as a matter of law or equity, that the public interest favors or disfavors an injunction." *AFSA* Order at 25–26. The Court should accordingly deny Plaintiff's requested temporary restraining order. *See Kim*, 698 F. Supp. 3d at 172.

## IV. ANY TEMPORARY RESTRAINING ORDER SHOULD BE NARROWLY TAILORED.

For all the foregoing reasons, it would be inappropriate for the Court to issue any temporary restraining order in any form. However, should the Court choose to do so, "an injunction must be narrowly tailored to remedy the harm shown." *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985). Here, any temporary restraining order should apply no more broadly than to those PSCs' contract-specific terminations that are challenged.

34

Extending relief to individuals not properly before the Court would violate the teaching (note above in addressing Article III standing) that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73. A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id.*, 585 U.S. at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Indeed, nationwide injunctions "take a toll on the federal court system," and "prevent[] legal questions from percolating through the federal courts." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring).

The presence of an associational plaintiff (PSCA) does not change those principles and cannot justify awarding relief to nonparties to this case who are "not the proper object of th[e court's] remediation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996). Instead, at a minimum, equitable principles preclude granting relief to any member who has not been identified in Plaintiff's filings and agreed to be bound by the judgment. *Alliances*, 602 U.S. at 401–02 (Thomas, J., concurring) (noting that "[u]niversal injunctions" as a means of granting relief to an entire association's members are "legally and historically dubious" (citation omitted)). Moreover, providing relief to any *unidentified* members of the associational plaintiff in these circumstances undermines basic principles of preclusion and claim splitting. *See id.*, 602 U.S. at 402 (Thomas, J., concurring) (noting that broad associational standing "subverts the class-action mechanism" by allowing an organization to "effectively bring a class action without satisfying any of the ordinary requirements").

Any relief extending beyond the identified members of PSCA would also cause harm to the government and would be inconsistent with the teaching that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Any relief awarded therefore should be properly narrowed to address only the contract-specific decisions concerning each PSCs' contract—not to the conduct of any Defendants concerning other parties or other decisions. The burdens on Defendants that would result from overly broad relief are especially serious in these actions because the challenged foreign assistance funding determinations stem from the President's exercise of his Article II authorities over foreign affairs—authorities that Congress has confirmed, not undermined, through various provisions of the foreign assistance statutes conferring marked discretion on Executive Branch agencies in such funding determinations. *See, e.g.*, 22 U.S.C. § 2151t(a).

Moreover, the requested equitable and declaratory relief is categorically unavailable against the President, named as a Defendant. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). There is no such tradition of equitable relief against the President. To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866).[3] The Supreme Court reaffirmed that principle more recently in *Franklin*, 505

---

[3] Rejection of the demand for injunctive and declaratory relief against the President is correct whether viewed as a jurisdictional or merits determination. To be sure, D.C. Circuit and Supreme

U.S. at 800–01, where the Court declined to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President."    That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States").  On that point, Justice Scalia's separate opinion in *Franklin* is instructive:

> The apparently unbroken historical tradition supports the view, which I think implicit in the separation of powers established by the Constitution, that the principals in whom the executive and legislative powers are ultimately vested— *viz.*, the President and the Congress (as opposed to their agents)—may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary.  For similar reasons, I think we cannot issue a declaratory judgment against the President.

*Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive relief "are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers.  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  Although, for the reasons explained above, no relief at all is proper here, if the Court were to conclude otherwise, relief could only be directed at subordinate officials.  *See id.* ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of

---

Court precedent indicates that the restriction in *Mississippi* is jurisdictional.  The Supreme Court has repeatedly described the bar against suing the President for his official duties as jurisdictional in character.  *See Franklin*, 505 U.S. at 802–03 (quoting *Mississippi*, 71 U.S. (4 Wall) at 501).  And the D.C. Circuit has noted that "[w]ith regard to the President, *courts do not have jurisdiction to enjoin him*, . . . and have never submitted the President to declaratory relief."  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (emphasis added).  Moreover, even if that bar were to be classified as non-jurisdictional, it still would be a "threshold" basis for ending the case without further inquiry into the merits.  *Cf. Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) ("unique and categorical" rule of *Totten v. United States*, 92 U.S. 105 (1876), prohibiting suits based on covert espionage agreements, is sort of "threshold question" court may "resolve[] *before* addressing jurisdiction") (emphasis added).

government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party").

The narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here. Left unresolved by that decision was "whether a court can compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is left to discretion." *Mississippi*, 71 U.S. at 498. "It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." *Id.* Such a duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931) ("The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable." (citation omitted)). But the alleged acts of the President here in issuing the Executive Order cannot be characterized, as a matter of law, as "ministerial." Rather, the Executive Order entails an exercise of the President's discretion in supervising and directing the Executive Branch, and an injunction invalidating that order would countermand that discretion, not direct the President to carry out a "ministerial" task.

Nor could Plaintiff's invocation of the Declaratory Judgment Act warrant issuance of a declaration in lieu of an injunction. Compl., Prayer for Relief (C). The D.C. Circuit's observation that courts "have never submitted the President to declaratory relief," *Newdow*, 603 F.3d at 1013, built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief

38

against the President, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).  Declaratory relief is therefore unavailable for essentially the same reasons that any injunction would be unavailable against the President.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for a temporary restraining order.

Dated: February 24, 2025

Respectfully submitted,

ERIC HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

ALEXANDER K. HAAS
Director
Federal Programs Branch

LAUREN A. WETZLER
Deputy Director
Federal Programs Branch

*/s/ Michael P. Clendenen*
MICHAEL P. CLENDENEN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 305-0693
Email: michael.p.clendenen@usdoj.gov

*Counsel for Defendants*