# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-00352-CJN |
| PRESIDENT DONALD TRUMP, *et al.*, | |
| Defendants. | |

## DECLARATION OF PETE MAROCCO

I, Pete Marocco, pursuant to 28 U.S.C. 1746, hereby declare as follows:

1.     I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2.     Since Thursday, January 30, 2025, I have performed the duties and functions of both Deputy Administrators of the United States Agency for International Development ("USAID" or the "Agency"). I manage the day-to-day operations at USAID including personnel matters and operations. Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State.  Previously, I served as a United States Marine and as a Deputy Assistant Secretary at both the Department of State and the Department of Defense.  Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

1

3.      On January 20, 2025, President Trump issued an Executive Order—"Reevaluating and Realigning United States Foreign Aid"—directing a 90-day pause in foreign development assistance, to allow for an "assessment of programmatic efficiencies and consistency with United States foreign policy." *See* Executive Order, *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), attached as Exhibit A.  Further, on January 24, 2025, Secretary of State Rubio, consistent with that Executive Order, directed a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." *See* Secretary of State ALDAC re *Executive Order on Review of Foreign Assistance Programs*, 25 STATE 6528 (Jan. 24, 2025), attached as Exhibit B.

4.      In both my role as the Director of Foreign Assistance, which oversees USAID's delivery of foreign aid, and now in my role managing USAID's operations, my primary focus has been to develop a tracking system to achieve greater accountability of USAID's human resources and capital outlays across its global footprint.  Accountability and effective controls are essential to ensuring that the aforementioned directives of the President and Secretary are fully and faithfully followed across USAID's operations and that USAID's programs further, rather than undermine, the foreign policy and national interests of the United States.

5.      To that end, beginning shortly after the President's Executive Order directed the 90-day foreign assistance pause on January 20, 2025, I made numerous requests for information about USAID's operations, programs, and compliance with the President's directives.  In both of my roles, I have consistently found USAID's senior staff were unwilling or unable to provide basic compliance and oversight information.  For example, senior professionals in the Agency's Bureaus and finance, legal, and human capital groups were not able to identify who, when, and why dozens of specific multi-million-dollar payments were approved or disbursed in the days following the

2

President's and Secretary's directives to pause most USAID disbursements and programs. Agency senior staff were not able to explain whether the Agency's payments system contained any controls to ensure compliance with these directives and, if so, how those processes worked. After the Secretary approved waivers to permit specific programs or activities to continue, Agency staff have been consistently unable to identify which specific payments were affected by the waivers and should be released for disbursement. Last week, it took more than two days for Agency senior staff to produce a list of overseas personnel and their physical location despite repeated and direct requests.

6. This lack of clear or timely information sharing caused grave concern about whether USAID was faithfully following the President's and Secretary's directives. Those concerns were amplified when, in the days just before and following Secretary Rubio's directive, Agency leadership became aware that a group of USAID employees were not complying with the President's Executive Order and Secretary's order and continued to permit new funding obligations paused by those directives. In the days following the Secretary's order, USAID leadership conducted a review of Agency operations and identified certain employees who were responsible, directly or indirectly, for permitting the unauthorized flow of funds in violation of these Presidential and Secretarial directives.

7. Moreover, the noncompliance identified by Agency leadership raised serious, systemic concerns about the management and processes governing USAID. As articulated by Secretary Rubio, and consistent with the views of the President, USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of the programs funded by USAID neither substantially benefited the American people, nor reflected the priorities of the President and Secretary. Many of USAID's programs substantially overlap, conflict, or duplicate

3

functions at the Department of State, which often leads to discord in the President's ability to carry out foreign relations with one voice. Furthermore, many of USAID's pre-existing programs were in conflict with the directives and priorities of the President and Secretary, and therefore were inconsistent with the public interest and foreign policy judgments of the Executive Branch. Given the scale of these programs, an *ad hoc* review of these conflicting programs would unduly burden the execution of the President's other foreign policy priorities. A blanket pause with a waive-in process was the more efficient and effective path.

8.     In light of these problems, on January 30, President Trump directed Secretary of State Rubio to perform the functions and duties of the Administrator of USAID in an acting capacity; the prior Acting Administrator returned to his prior position as Chief Information Officer. Several days later, Secretary Rubio sent a letter to Congress, formally notifying them consistent with applicable law, including sections 7063 and 7015 of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), of "our intent to initiate consultations with you regarding the manner in which foreign aid is distributed around the world through [USAID]," including the review and potential reorganization of USAID and the potential absorption by the Department of State of certain bureaus, offices, and missions of USAID. *See* February 3, 2025 Letter to the Chairs and Ranking Members of the House Committee on Foreign Affairs, the Senate Committee on Foreign Relations, and the House and Senate Committees on Appropriations, attached at Exhibit C. The letter further stated that Secretary Rubio had delegated to me the duties of Deputy Administrator of USAID, "to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.*

9.      The first step of this review, in essence, involved the majority of USAID pausing a substantial portion of its ongoing work—going "pencils down"—so that the Secretary and USAID leadership could gain control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States.  The pause of ongoing work and use of paid administrative leave have enabled Agency leadership to begin a thorough review of USAID's operations and align its functions to the President's and Secretary's priorities, without continued noncompliance by former Agency leadership and management undermining those priorities.  Pausing a majority of USAID's work was, and remains, necessary to continue this thorough review into the noncompliance issues first identified, as well as to continue to examine USAID's processes and the manner by which USAID funds its programs.  Only by engaging in this audit and review, could the Agency leadership and the Secretary ensure that USAID's funding decisions aligned with the foreign policy priorities of the United States.  This audit and review would have been ineffective and would have been inconsistent with the public interest if USAID's then extant operations remained unchecked.  Indeed, our experience with widespread noncompliance with initial stop-work directives raised serious doubt about whether Agency leadership would have received necessary information in a timely manner and also whether directives of Agency leadership would be promptly and faithfully complied with.  Instead, the best course was an across-the-board pause, where Agency leadership could then determine on a more targeted basis which programs continued to make sense for the American people, and which did not.

10.     At the time the general pause on foreign aid was issued, Secretary Rubio issued four waivers for: foreign military financing for Israel and Egypt, emergency food assistance,

related administrative expenses, and legitimate expenses incurred before the pause went into effect. In the days following the general pause on foreign aid, Secretary Rubio adopted a waiver process to ensure that important aid programs within the national interest would be able to continue during the period of review. For instance, on January 28, Secretary Rubio issued an emergency humanitarian waiver for life-saving humanitarian assistance programs. Along with this general waiver, the State Department is also issuing case-by-case waivers, based on specific programs. Consistent with this approach to foreign assistance administered by the State Department, a similar pause and waiver process applies to USAID's operations to ensure they too are aligned with the President's and Secretary's priorities. And the humanitarian waiver just noted (among others) applies in full measure to USAID programs.

11.    There are 4,765 direct hire full-time equivalent employees at USAID. The Agency identified an initial set of 58 employees who were placed on paid administrative leave on Monday, January 27, 2025. This group included senior staff who engaged in noncompliance vis-à-vis the funding pause and stop-work orders or other acts of insubordination or questionable contracting practices or who were charged with managing and administering initiatives no longer deemed to be in the national interest (*e.g.*, DEI programs). On Saturday, February 1, 2025, an additional 57 employees were placed on administrative leave, many of whom engaged in similar acts of insubordination, deceit, or non-compliance with Executive Orders or Agency leadership directives.

12.    Agency leadership ultimately determined that the placement of a substantial number of USAID personnel on paid administration leave was the only effective way to pause operations, faithfully implement the pause, and conduct a full and unimpeded audit of USAID's operations and programs, consistent with the President's and Secretary's directives. Accordingly, on Monday, February 3, 2025, USAID placed an additional 606 employees on paid administrative

leave; on Tuesday, February 4, 2025, another 1,416 employees were placed on paid administrative leave. As of February 7, 2025, before this Court issued the temporary restraining order, approximately 2,140 total USAID U.S. direct hires were on paid administrative leave. To the best of my knowledge, none of these employees were located in high-risk countries, such as Syria.

13.    Approximately 98% of the 2,140 employees on paid administrative leave as of February 7, 2025, were physically located within the Continental United States, with the remaining located in developed countries like the United Kingdom or Hungary where employees face little risk of physical danger and where USAID has little to no mandate. USAID did not intentionally place any employee in a high-risk location on paid administrative leave. Upon being informed that several employees might have temporarily been in high-risk locations, USAID immediately removed these employees from administrative leave and fully restored their preexisting access to all USAID and other government systems.

14.    As is customary, each of the employees placed on administrative leave had their access restricted to USAID digital systems, including their Agency-sponsored email accounts. Given the sensitivity of government information systems, the need to protect sensitive government information, to avoid the risk of data breach, and to maintain the integrity of the ongoing pencils down review, Agency leadership thought it prudent to restrict access for those employees temporarily removed from their regular duties by being placed on paid administrative leave. As noted, these were employees physically located in the United States or other safe, developed nations where restricting their access to USAID systems posed minimal risk of danger. I am unaware of any employee in a dangerous location such as Syria whose access was impacted.

15.    As part of this effort to pause work at USAID, Agency leadership also conducted a review of its employees to identify which employees were essential—*i.e.*, those who are

responsible for mission-critical functions, core leadership, and those who work on specially designated programs—and who should not be placed on administrative leave.

16.     Over the course of the last week, Agency leadership initially determined that approximately 611 employees qualified as essential to perform USAID's required duties and to facilitate orderly contingency and audit operations.  For example, many employees in the travel office were deemed essential because they would be responsible for helping USAID employees abroad come home to the United States, if they wished to do so.  Essential personnel also included subject matter experts from most parts of the Agency such as the regional bureaus; a large contingent of personnel administering and overseeing emergency humanitarian, food, and medical assistance; information systems managers; security officers; legal counsel; the Chief Human Capital Officer and other human resources employees, contracting officers and others.  The process of selection included senior political and career leaders who carefully contemplated an essential staff level.

17.     As part of its efforts to pause work and facilitate an audit of USAID's operations, the Agency had planned to place another approximately 2,014 employees, excluding those it had deemed as essential, on paid administrative leave beginning 11:59 p.m. on Friday, February 7, 2025.

18.     Following this Court's February 7, 2025 Order, however, the Agency has not placed any additional employees on administrative leave, and it reinstated all employees previously placed on any form of administrative leave.  Moreover, the Agency has restored access to email, payment, and security notification systems to those employees whose access was previously limited or shut off. During the pendency of the Court's February 7 Order, should Plaintiffs' counsel

identify specific employees without access these systems, USAID will diligently work to rectify any such inadvertent technical access limitation. *But see infra* ¶ 20.

19.     Before this Court's February 7 Order, USAID's website indicated that all non-essential employees would be placed on administrative leave that evening. After this Court's Order, however, the Agency removed that message from its website. Moreover, the Agency sent an email notice of the Order to all USAID employees.

20.     On Sunday, February 9, 2025, the Agency separately placed four individuals on paid investigative leave pending further inquiry into specific and serious acts of deceit, insubordination, and refusal to follow direct and lawful orders. These acts appeared to be intentional and directly related to the Agency's critical operations. If permitted to return to active duty, these senior employees present a grave risk to the Agency's ongoing operations, missions, and chain of command.

21.     In order for USAID to conduct the requisite and thorough internal review of its operations, it is imperative that this Court lift its TRO and permit the Agency to go forward with its "pencils down" approach.

22.     USAID has a careful plan to implement a safe and orderly process of repatriating USAID workers stationed abroad, for those who wish to return.

23.     Those employees who are abroad, or "at Post," were given, and will be provided with, a choice to either stay at Post, or return to the United States. Leadership wanted to provide this option to these employees so that they would not fear being accused of abandoning their assignment by returning to the United States. But if an employee chooses to stay at Post, he or she will be entitled to all of the benefits previously available, so long as he or she remains on paid

administrative leave.  If an employee chooses to return to the United States, the Agency will coordinate and financially cover that return for the employee and his or her family.

24.    As noted, I am not aware of any instance where any USAID employee in a high-risk country has been cut-off from their USAID digital systems while in the field, nor restricted in their access to any embassy or government safe space.  Nor have I, or any senior leader I am aware of, issued any type of "evacuation" order to force a USAID employee to leave their post because of the pause and review, as alleged by Plaintiffs.

25.    By requiring that employees make a voluntary decision about their desire to return to the United States within 30 days, that 30-day deadline balances the need to afford employees time to order their affairs and consider their needs, with the Agency's interest in coordinating and managing its staff as well as the Agency's duty to guard against waste, fraud, and abuse. Additionally, I carefully considered, along with the leadership of the Department of State and other USAID leaders, additional circumstances that might warrant special attention, time, resources, an exception, or an extension.  Consistent with the choice offered to these employees, there have been no forced or attempted evacuations of any USAID employee at Post related to the subject leave and no directive that they must return to the United States. *See* USAID Website as of February 7, 2025, FAQ 1, attached as Exhibit D.

26.    The Agency also understands that certain employees may not be in a position to leave their Post within 30 days.  Accordingly, the Agency has also made clear that it will consider case-by-case exceptions and offer extensions based on personal or family hardship, mobility or safety concerns, or other reasons.  For example, the Agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. Additionally, the Department of State has initiated a coordination support team (CST) of

at least 40 staff (and growing) to support travel, logistics or other requests inside the Department's operations center to be prepared and available in the event of a large voluntary movement.

27.     When an employee is placed on paid administrative leave, he or she may lose access to certain USAID systems—the rationale for which is to ensure the person is on bonafide leave, to maintain the security of internal systems, and to ensure that the "pause" on Agency operations can truly go into effect.  USAID presently has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post.  Allowing employees on administrative leave to continue accessing USAID systems would create serious security and foreign policy risks.

28.     As part of pausing existing activities, the Agency has generally paused all expenditures in connection with foreign aid, save for those programs with approved waivers or exceptions.  That is so for both new programs (as discussed in Secretary Rubio's directive) as well as existing ones (as later determined by Agency leadership).  As for the latter, the United States typically has the right under any grant or contract to terminate assistance in the event that such program is no longer in the national interest.  I am personally aware of no instances where an individual employee of USAID would be liable in a personal capacity for the United States terminating a grant, contract, or similar program—as alleged by Plaintiffs.

29.     USAID's pause on funding is also not categorical.  Rather, the Agency has engaged in a robust process to grant prompt and warranted clarifications of waivers and exceptions from this pause, where the national interest warrants.  For example, the leadership of the U.S. President's Emergency Plan for AIDS Relief (PEPFAR) requested a waiver to prevent a wide spread of HIV and continue life-saving care.  We quickly met with their team who thanked us for the pause and review, because as they described, the program suffered from serious lack of reform and oversight

filled with programs that have nothing to do with HIV. We were able to quickly provide clarification of a limited waiver and per direct reports from the leadership, the necessary program has continued. In contrast to the Plaintiff's allegations regarding essential assistance in Gaza, we were able to identify and quickly clarify a waiver for an authorized program. That limited waiver, which was consistent with the Agency's priorities, is in contrast to an effort by one USAID employee who broke the chain of command, did not communicate with her immediate USAID supervisor, and attempted to obligate or authorize the expenditure of nearly a half a billion dollars in assistance in a manner that was inconsistent with the President's and Secretary's priorities. It is this sort of noncompliance and apparent evasion of Agency processes and policy direction that resulted in placing this employee on administrative leave to permit review of those and other actions.

30.    As noted above, on February 3, Secretary Rubio began a consultative process with the Congress regarding the future of USAID. *See* Exhibit C. Those discussions remain productive and ongoing.


I declare under penalty of perjury under the laws of the United States that the information in this declaration is true and correct.

Peter Marocco

Deputy Administrator, USAID

February 10, 2025

12

EXHIBIT A

Federal Register / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents    8619

# Presidential Documents

Executive Order 14169 of January 20, 2025

## Reevaluating and Realigning United States Foreign Aid

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* The United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries.

**Sec. 2**. *Policy.* It is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States.

**Sec. 3**. (a) *90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy.* All department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order. The Office of Management and Budget (OMB) shall enforce this pause through its apportionment authority.

(b) *Reviews of United States foreign assistance programs.* Reviews of each foreign assistance program shall be ordered by the responsible department and agency heads under guidelines provided by the Secretary of State, in consultation with the Director of OMB.

(c) *Determinations.* The responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State.

(d) *Resumption of paused development assistance funding.* New obligations and disbursements of foreign development assistance funds may resume for a program prior to the end of the 90-day period if a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form. Additionally, any other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB.

(e) *Waiver.* The Secretary of State may waive the pause in Section 3(a) for specific programs.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02091
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT B

UNCLASSIFIED



| | |
|---|---|
| **MRN:** | [25 STATE 6828](25 STATE 6828) |
| **Date/DTG:** | Jan 24, 2025 / 241600Z JAN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | PREL, AID, EAID |
| **Subject:** | Executive Order on Review of Foreign Assistance Programs |

1. (U) Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, this ALDAC pauses all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID.

2. (U) Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy.  The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments.  Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

**ACTIONS TO BE TAKEN**

3. (U) Within thirty (30) days, the Director of the Policy Planning Staff (S/P) or its designate shall develop appropriate review standards and collaborate with the Director of the Office of Foreign Assistance (F), the Office of Budget and Planning (BP), the Office of Management and Budget (OMB), and/or other departments and agencies as appropriate to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository.

4. (U) Within eighty-five (85) days of this ALDAC, the government-wide comprehensive review of all foreign assistance shall be completed, and a report shall be produced to the Secretary of State for his consideration and recommendation to the President.

5. (U) In keeping with one voice of American foreign policy, the United States government, through any department, agency or entity, shall not provide foreign assistance funded by or through the Department and USAID without the Secretary of State's authorization or the authorization of his designee.

6. (U) All U.S. foreign assistance shall be aligned under the Secretary of State's coordination, direction, and supervision, as appropriate, consistent with section 622(c) of the Foreign Assistance Act of 1961 and section 1523 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) within 180 days.

7. (U) Effective immediately, Assistant Secretaries and Senior Bureau Officials shall ensure that, to the maximum extent permitted by law, no new

obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review.  For existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review.  Decisions whether to continue, modify, or terminate programs will be made following this review.

8. (U) Effective immediately, pending a review of foreign assistance programs:  no new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation or request for foreign assistance funding shall be published or processed by the Department, USAID, or other agencies implementing programs funded by the Department or USAID until each has been reviewed and approved by F as consistent with the President's policy; no further technical evaluation committees shall be convened; and there shall be no further funding obligated to awards and contracts or indefinite delivery /indefinite quantity (IDIQ) contracts.

9. (U) Effective immediately, I am suspending the review process for proposals for new foreign assistance grants, subgrants, contracts, or subcontracts.  No new funds shall be obligated for new awards or extensions of existing awards until each proposed new award or extension has been reviewed and approved by F as consistent with the President Trump's agenda.

10. (U) Within thirty (30) days of the issuance of the review standards in paragraph 4, every Bureau, agency office and entity providing any type of

foreign assistance shall produce to F for review a list of all active, pending, or proposed grants, subcontracts, contracts, or subcontracts, and provide a clear and concise statement explaining if and how the current or proposed use of obligated funds advances President Trump's policy.

11. (U) The spokesperson will also release a public statement to this effect.

12. (U) The Secretary of State has approved waivers of the pause under the Executive Order and this ALDAC, subject to further review, with respect to:

(a) foreign military financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer foreign military financing;

(b) emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;

(d) legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders; and

(e) exceptions to the pause approved by the Director of Foreign Assistance.

DEFINITIONS

13. (U) Only for purposes of this ALDAC, foreign assistance means assistance funded from accounts in titles III and IV and from International

Organizations and Programs in the Department of State, Foreign Operations, and Related Programs Appropriations Acts.

| | |
|---|---|
| **Signature:** | RUBIO |

| | |
|---|---|
| **Drafted By:** | S/TT:Marocco, Peter |
| **Cleared By:** | S/TT:Holler, Daniel |
| | L:Visek, Richard |
| | L:Dorosin, Joshua |
| | S/TT:Anton, Michael |
| | C:Needham, Michael |
| **Approved By:** | S: Rubio, Marco |
| **Released By:** | POEMS_P:Acker, Vanessa G |
| **Info:** | IO COLLECTIVE *Immediate* |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**

# EXHIBIT C



**THE SECRETARY OF STATE**
**WASHINGTON**

February 3, 2025

The Honorable James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Jeanne Shaheen, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Brian Mast, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Gregory Meeks, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Tom Cole, Chairman
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Rosa DeLauro, Ranking Member
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Susan Collins, Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

The Honorable Patty Murray, Vice Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Chairman Risch, Mast, Cole, Collins, Ranking Members
Shaheen, Meeks, DeLauro, and Vice Chairwoman Murray:

Consistent with applicable law, including sections 7063 and 7015 of the
Department of State, Foreign Operations, and Related Programs
Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the
Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), this letter provides
notice and advises you of our intent to initiate consultations with you
regarding the manner in which foreign aid is distributed around the world
through the United States Agency for International Development ("USAID").
Current foreign assistance processes are severely inefficient and do not
substantially benefit the American people.  USAID has numerous conflicting,
overlapping, and duplicative functions that it shares with the Department of
State.  Additionally, USAID's systems and processes are not well synthesized,
integrated, or coordinated, and often result in discord in the foreign policy
and foreign relations of the United States.  This undermines the President's
ability to carry out foreign relations.

I have authorized Peter W. Marocco, the Director of Foreign Assistance, and the individual to whom I have delegated authority to perform the duties of the Deputy Administrator of USAID, to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest.  This review and potential reorganization will substantially further the foreign relations of the United States, and may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees.

The Department of State and other pertinent entities will be consulting with Congress and the appropriate committees to reorganize and absorb certain bureaus, offices, and missions of USAID.  Such consultation shall occur on behalf of the heads of such entities, as directed by the President.
In consultation with Congress, USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law.

Sincerely,

Marco Rubio
Secretary of State

EXHIBIT D

The Wayback Machine - https://web.archive.org/web/20250207001034/https://www.usaid.gov/



On Friday, February 7, 2025, at 11:59 pm (EST) all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs. Essential personnel expected to continue working will be informed by Agency leadership by Thursday, February 6, at 3:00pm (EST).

For USAID personnel currently posted outside the United States, the Agency, in coordination with missions and the Department of State, is currently preparing a plan, in accordance with all applicable requirements and laws, under which the Agency would arrange and pay for return travel to the United States within 30 days and provide for the termination of PSC and ISC contracts that are not determined to be essential. The Agency will consider case-by-case exceptions and return travel extensions based on personal or family hardship, mobility or safety concerns, or other reasons. For example, the Agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. Further guidance on how to request an exception will be forthcoming.

Thank you for your service.

**FAQs**

**1. If I am posted overseas and placed on administrative leave, am I required to return to the United States within the next 30 days?**

No. While USAID and the Department of State are preparing a plan under which USAID personnel posted overseas would be offered optional and fully reimbursed return travel to the United States within 30 days, personnel are not required to accept Agency-sponsored travel or to return to the United States within any specific deadline. Overseas USAID personnel retain the option to remain at their posts, even while placed on administrative leave and not working. Beyond 30 days, however, Agency funded and arranged return travel may not be available unless an individualized exception is sought and granted.