UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERSONAL SERVICES ) <br> CONTRACTOR ASSOCIATION ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DONALD TRUMP, et al., ) <br> ) <br>     Defendants. ) | Case No. 1:25-cv-469-CJN |

PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR A TEMPORARY RESTRAINING ORDER

Carolyn E. Shapiro*
Schnapper-Casteras PLLC
200 E. Randolph St., Ste 5100
Chicago, IL 60601
cshapiro@schnappercasteras.com
773-520-7533

*pro hac vice pending,
*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.*

Marni Willenson
D.C. USDC Bar No. IL0011
Illinois Bar No. 6238365
Willenson Law, LLC
3420 W. Armitage Ave., Ste 200
Chicago, IL 60647
marni@willensonlaw.com
312-546-4910

Joshua Karsh*
Mehri & Skalet PLLC
1237 Judson Ave.
Evanston, IL 60202
jkarsh@findjustice.com
773-505-7533

*pro hac vice pending,
*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.*

## Table of Contents

**Current Conditions** ................................................................................................................ 1

**The Standard for Injunctive Relief** ..................................................................................... 3

**The Gravamen of this Case** ................................................................................................. 4

**Irreparable Harm** ................................................................................................................. 6

**Likelihood of Success** ........................................................................................................... 8

**Balancing the Equities** ....................................................................................................... 10

**CONCLUSION** ................................................................................................................... 11

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Andrade v. Lauer*,
    729 F.2d 1475 (D.C. Cir. 1984) ................................................................................................6

*Axon Enterprise, Inc. v. Federal Trade Comm'n*,
    598 U.S. 175 (2023) ..................................................................................................................7

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ..................................................................................................................7

*Califano v. Sanders*,
    430 U.S. 99 (1977) ....................................................................................................................7

*Carr v. Saul*,
    593 U.S. 83 (2021) ....................................................................................................................7

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ..............................................................................................................4, 7

*Colorado River Water Conservation Dist. V.. United States*,
    424 U.S. 800 (1976) ..................................................................................................................6

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dept. of Safety & Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024) ....................................................................................................3

*Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ..................................................................................................................7

*Gordon v. Holder*,
    721 F.3d 638 ............................................................................................................................9

*Gundy v. United States*,
    588 U.S. 128 (2019) ..................................................................................................................3

*House v. Burwell*,
    185 F. Supp.3d 165 (D.D.C. 2016) ...........................................................................................7

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ..................................................................................................9

*Marbury v. Madison*,
    5 U.S. 137 (1803) ....................................................................................................................11

*Miller v. City of Milwaukee*,
   272 U.S. 713 (1927) ..................................................................................................5

*Roe v. Shanahan*,
   359 F. Supp.3d 382 (E.D. Va. 2019) ........................................................................2

*Sampson v. Murray*,
   415 U.S. 61 (1974) ....................................................................................................2

*Together Emps. v. Mass Gen. Brigham Inc.*,
   32 F.4th 82 (1st Cir. 2022) ........................................................................................3

*United States v. Nixon*,
   418 U.S. 683 (1974) ..................................................................................................8

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..................................................................................................4

*Zivotofsky v. Clinton* (*Zivotofsky I*),
   566 U.S. 189 (2012) ..................................................................................................8

*Zivotofsky v. Kerry* (*Zivotofsky II*),
   576 U.S. 1 (2015) ......................................................................................................3

**Statutes**

Affordable Care Act, ....................................................................................................7

Contract Disputes Act, 41 U.S.C. § 601 *et seq.* ...........................................................7

Line Item Veto Act .......................................................................................................7

**Other Authorities**

https://www.devex.com/news/devex-dish-despite-waivers-kids-malnutrition-care-
   held-up-by-us-aid-freeze-109432 ............................................................................6

https://www.nytimes.com /2025/ 02/07/us/ politics/usaid-trump.html .........................6

Kyle Cheney at https://bsky.app/profile/ kyledcheney.bsky.social/
   post/3lizdmgtk7c2i ...................................................................................................6

11A Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. Apr. 2021
   update) .....................................................................................................................3

**Current Conditions**

1.  Responding to this motion, Defendants have filed a declaration from Pete Marocco, the Deputy Administrator of USAID. That declaration, executed on February 10, 2025, and originally filed in *American Foreign Service Association v. Trump ("AFSA")*, Case No. 1:25-cv-352-CJN, Mr. Marocco represents that USAID has "a careful plan to implement a safe and orderly process of repatriating USAID workers stationed abroad," which will include considering case-by-case exceptions" and "extensions" for "*employees*" posted overseas who "may not be in a position to leave their Post *within 30 days*." ECF 13-1 ¶¶ 19, 26. Candor would have required saying more. In a subsequent declaration in that case, also discussing repatriation plans but executed on February 14, 2025, Mr. Marocco laid out USAID's preparations for direct hire employees, but expressly excluded USPSCs from those plans, No. 1:25-cv-352-CJN, ECF 35-1 ¶¶ 19, and implicitly did the same in a declaration filed on February 21, 2025, describing possible repatriation plans should the court lift the TRO that was then in place, No. 1:25-cv-352-CJN, ECF 45-1.

2.  The situation for USPSCs is in chaos. Hundreds of USPSCs have received 15-day termination notices, and Defendants have indicated their intention to terminate the entire USPSC workforce. ECF # 10-2. Contrary to Mr. Marocco's claim that USAID has terminated USPSCs only in "high- and middle-income countries," ECF No. 13-2, ¶ 4, some of the USPSCs who have received termination notices are currently in places like Mogadishu, where the impending termination will create significant safety risks. ECF No. 14, Exh. 12 ¶¶ 4-5. Nor are high- and middle-income countries devoid of security and safety concerns. The State Department warns, for example, that Americans should "[e]xercise increased caution in South Africa due to crime, civil unrest, and kidnapping." Some overseas USPSCs, including those in dangerous places, have

been cut off from access to email and USAID systems. ECF No. 14 Exh. 1 ¶¶ 7-8, Exh. 6 ¶ 27; Exh.12 ¶¶ 6-12.

3.  Some overseas USPSCs who have not received termination notices have no idea when or if such a notice might come, and despite repeated requests, they have been given no reassurances that there will be even the possibility of compassionate extensions. JAY DOE.

4.  If the Court has been reassured by Mr. Marocco's vows that the Government will take care of direct-hire employees, offering to repatriate them in a safe and orderly fashion, Defendants have made *no* such commitments about USPSCs, although USPSCs are also employees. See also ECF No. 13 n.1 (hinting that the government may contest whether PSCs are even "employees of USAID").

5.  Defendants' abandonment of USPSCs posted overseas is no small matter. There are USPSC families with mothers in the third trimester of pregnancy. Some of them cannot board a plane, much less in 15 days. ECF No. 6-7 ¶¶ 4-5 (Henry Doe). There are USPSCs, who have received termination notices, stranded in dangerous areas like Mogadishu. ECF 14-1 Exh. 12. There are USPSCs and family members in the midst of medical treatment that will be completely disrupted, with potentially serious health consequences, if they are abruptly required to leave. ECF No. 14 Exh. 6 ¶¶ 16-19. USPSCs and their families may find themselves without health insurance because often the insurance they carry is only valid overseas. ECF No. 14, Exh. 3 ¶ 5. There are families overseas with young, school-aged children who must be abruptly pulled out of school—without knowing when or where their next classrooms will be. ECF No. 14, Exh. 1 ¶ 9.

6.  Normally, repatriation is an extended process. Preparations begin months in advance. ECF No. 14, Exh. 9 ¶¶ 6-7. Abrupt repatriation is unrealistic, unnecessary, and inhumane. People need to move out of their housing, which in some cases, may require then to break leases in

countries where doing so has serious financial consequences. They will have to sell their cars, some in countries where they need government permission to do so, Whatever the trustworthiness of the Government's representations as applied to USAID direct-hire employees overseas, the Government has given *no* such assurances about repatriating *USPSCs* posted overseas. And while USAID's direct-hire employees have been placed on administrative leave and given 30 days' notice to repatriate, USPSCs either have been or are at imminent risk of receiving termination notices with only 15 days' notice.

7. The consequences of a USPSC's inability to repatriate within 15 days, also never mentioned by Defendants, are significant. USPSCs stationed overseas travel on diplomatic visas. On the 15th day after their termination notice, their employment is not the only thing that will terminate. So will their diplomatic visas—and, therefore, their lawful status within the country where they are posted. They may need to leave and come back, perhaps in the midst of the personal chaos of the

8. Similarly, despite declarations showing that USPSCs have been doxed (ECF No. 6-5, ¶¶ 20-21, are living without electricity or running water (ECF No. 6-6, and, Mr. Marocco's declarations have addressed none of these issues.

## The Standard for Injunctive Relief

9. There is one standard for injunctive relief. It is the same for all cases. There is no special heightened standard for "government personnel cases." And *Sampson v. Murray*, 415 U.S. 61 (1974), is not to the contrary. "*Sampson* is … a relic." *Roe v. Shanahan*, 359 F. Supp.3d 382, 419 (E.D. Va. 2019). And in any event, as explained below, this case is about the structural guarantees of the Constitution, not about the government's discretion with respect to particular employment decisions.

10. In all cases, the measure of irreparable harm is whether a threatened injury is imminent and, if allowed to occur, would impair the court's ability to grant an effective remedy later, after a decision on the merits. *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dept. of Safety & Homeland Sec.,* 108 F.4th 194, 201 (3d Cir. 2024); *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022); 11A Wright & Miller, Federal Practice & Procedure § 2948.1 (3d ed. Apr. 2021 update). That test is completely satisfied here. If the destruction of USAID is not judicially stopped now, it will be too late. Like humpty dumpty, it won't be possible to put the pieces back together again later. ECF No. 14, Exh. 5.

### The Gravamen of this Case

11. Viewing this case as a dispute about employment or contractual rights is an error. This case was filed to try to restrain the Executive from (a) usurping the power of the purse by refusing to disburse money appropriated by Congress for specific, pre-ordained purposes, and (b) eliminating a Congressionally created agency, in both cases because the President (or Mr. Musk) does not approve. That's not how Articles I and II work. *Zivotofsky v. Kerry* (*Zivotofsky II*), 576 U.S. 1, 83–84 (2015) (Scalia, J., dissenting, joined by Robert, C.J., and Alito, J.) ("Acts of Congress made in pursuance of the Constitution are the 'supreme Law of the Land'; acts of the President (apart from treaties) are not. Art. VI, cl. 2").

12. If the Executive could refuse to execute duly enacted laws in its discretion, there would not be much point to having a Legislature. And if Congress could pass off or surrender its legislative power to the executive branch, "the entire structure of the Constitution … would make no sense." *Gundy v. United States*, 588 U.S. 128, 155 (2019) (Gorsuch, Roberts, and Thomas dissenting). Legislation would become "nothing more than the will of the current President." *Id.* The framers warned us against this. As Madison explained, "there can be no

4

liberty where the legislative and executive powers are united in the same person." The Federalist No. 47, at 302 (C. Rossiter ed. 1961) (Madison). [1]

**13.** This case is about enforcing the Constitution's vesting clauses (which give the power of the purse and the power to make laws exclusively to Congress) and its structural guarantee of separated powers. To be sure, this motion asks for jobs relief. But that is because an agency gutted of its employees won't be salvageable: a declaration, later, that USAID was unconstitutionally dismantled won't matter if there aren't employees left to revive the agency. This is not a "personnel" case. *Not one issue here turns* on any worker's terms of employment or contractual rights.[2] Assume for the sake of discussion that Defendants have violated the terms of no contracts by terminating USPSCs en masse and for convenience. Even if that were accurate (it is not), it is irrelevant. This case does not seek to enforce contract rights. The claim here is *not* that terminating USPSCs en masse and for convenience breaches contracts or constitutes a prohibited personnel practice. It is that by defying powers granted exclusively to Congress under Art. I and express statutes (the FY2024 FOPS and § 7063 of Division F of P.L. 1818-47) the Executive is conducting itself unconstitutionally, operating at "its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). It does not matter in

---

[1] Issuing executive orders may be the way that CEOs run corporations. But the President is not a CEO, the United States is not a business he owns or runs, and Congress is not his CFO. The President does not have royal prerogative. In our finely wrought system, Congress sets policy–makes the law, including creating agencies and outlining what they are tasked with doing. The President executes Congress's laws, with a limited and qualified power to nullify *proposed* legislation by veto but none to cancel duly enacted laws, including appropriations. *Clinton v. City of New York*, 524 U.S. 417 (1998).

[2] Because no individual contract rights are in issue here, the absence of individual PSCS is irrelevant. Cf. Govt. Opp. Mem. at 2, 8, 9, 14 (ECF No. 13) (contending that Plaintiff lacks associational standing because "the asserted claims, which arise from particular contracts between the agencies [sic] and PSCs, can[not] be adjudicated in the absence of the individual contractors.")

5

the slightest whether USPSCs would otherwise have enforceable rights to continued employment. Terminating them is the consequence of dismantling a Congressional created agency, something the Executive has no constitutional authority to do, and "[i]t is a familiar principle that conduct which in usual situations the law protects … become[s independently] unlawful when part of a scheme to reach a prohibited result." *Miller v. City of Milwaukee*, 272 U.S. 713, 715 (1927) (Holmes, J.).

### Irreparable Harm

14. There's no doubt that the irreparable harm that necessitates expedited injunctive relief here includes mitigating the severe hardships being inflicted on USPSCs and particularly on USPSCs overseas. But the gravest imminent irreparable harm flows not from "changed employment conditions and their follow-on effects" (2/21/25 Mem. Op. at 16, in *AFSA*) but from the harm to our constitutional democracy. As the Defendants' attempt to make the destruction of USAID a *fait accompli*, they render the possibility of deferred judicial relief potentially ineffectual. The Executive is seizing and Congress' control of the purse and policymaking authority. And if the judiciary does not expeditiously fulfill its constitutional role as a check and balance, the result soon will be what may "justly be pronounced the very definition of tyranny," the "accumulation of all powers, legislative, executive, and judiciary, in the same hands," preserving no room for individual liberty. Federalist No. 47 (Madison).

15. The proximity of this harm is not conjectural. Defendants' march toward a *fait accompli* is not tentative. Defendants did not merely "pause" foreign assistance funding. That's a pretense. Just yesterday, Judge Ali put this question to a DOJ lawyer: "I don't know why I can't get a straight answer from you. Are you aware of an unfreezing of the disbursement of funds for those contracts and agreements that were frozen before Feb. 13 [twelve days ago]?" And the

Government's answer was: "I'm not in a position to answer that." Case No. 1:25-cv-402-AHA, ECF 37 (transcript, as quoted by Politico reporter Kyle Cheney at https://bsky.app/profile/ kyledcheney.bsky.social/ post/3lizdmgtk7c2i); see also *id.,* ECF Nos. 36–36-5. Similarly, Defendants' self-vaunted "waivers" for "life-saving humanitarian" assistance are illusory. They're a mirage. ECF No. 14-1, Exh.2 ¶ 18 ("I am currently aware off only one single invoice that has been paid to an implementing partner since January 24, 2025, across the entire Agency"); https://www.devex.com/news/ devex-dish-despite-waivers-kids-malnutrition-care-held-up-by-us-aid-freeze-109432.

16.     And Defendants' claim to be "reviewing" USAID's future is pretext. Defendants have evicted the agency from its headquarters. Elon Musk has declared the agency "beyond repair" and avowed that, with the President's agreement, "We're shutting it down," and "It's time for it to die." Musk has boasted about "feeding USAID into the wood chipper." And on Feb. 7, 2025, President Trump blasted on Truth Social: "CLOSE IT DOWN!" https://www.nytimes.com /2025/ 02/07/us/ politics/usaid-trump.html.

17.     Defendants have been open and unequivocal about their decision to destroy USAID, and the termination of PSCs is part and parcel of that.[3] Terminating PSCs will make it impossible

---

[3] Mr. Marocco's recent declaration is itself evidence of Defendants' disdain for USAID. He claims that USAID terminated only PSCs in "high- and middle-income countries" because "USAID's mandate is to assist in low-income countries and those contracts appear to be inconsistent with the mission of USAID." ECF No. 13-2, ¶ 4. This statement indicates that any "review" will be devoid of knowledge of actual facts. As one USPSC explains, "USAID's response relies on an interconnected global team, with Washington-based staff providing critical policy guidance, award management, coordination, and oversight functions that directly enable overseas operations. Teams in the U.S. are especially essential for areas that are off-limits for U.S. personnel to travel to, such as parts of Syria, Yemen, and Afghanistan, where security conditions make it impossible for American staff to operate on the ground. For all countries, both insecure and relatively safer, these US-based teams ensure continuity in programming, coordinate with implementing partners and provide necessary technical support. The decision to eliminate domestic PSCs does not align with USAID's operational reality and suggests a pretext

7

for the agency to maintain its relationships with its contractors and awardees because numerous PSCs are Agreement Officer Representatives (AORs) and Contracting Officer Representatives (CORs). AORs and CORs are highly trained and specialized, and their responsibilities simply cannot be handed off to other staff. ECF No. 14-1, Exhs. 5 and 11. And Defendants are both putting thousands of direct hires on administrative leave and laying off thousands through a RIF. They are refusing to spend foreign aid that Congress has appropriated. ECF 14, Exh. 2 ¶¶ 18, 22 ("I am currently aware off only one single invoice that has been paid to an implementing partner since January 24, 2025, across the entire Agency….It is my personal view and firm belief that the purported assistance review … is a complete and total farce.")  This is not a "pause" to evaluate and realign. It is the wanton destruction of an agency. That alone suffices to show irreparable harm.

### Likelihood of Success

**18.**  In *AFSA*, this Court treated subject matter jurisdiction as an element of likelihood of success on the merits (Mem. Op. at 16 –24) and concluded that jurisdiction  "likely" does not exist. That's an error. The judiciary has a "virtually unflagging obligation" to exercise the jurisdiction given to it. *Colorado River Water Conservation Dist. V.. United States*, 424 U.S. 800, 817 (1976). And that jurisdiction extends to adjudicating disputes about the Constitution's structural guarantees. Courts have performed this role before. See *Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984) (federal employees were not required to exhaust the administrative remedies available for nonconstitutional claims before bringing a constitutional challenge, in federal court, to the authority of those who ordered reduction in force); See also *Clinton v. City of*

---

for indiscriminate dismissals. Just because I work in the United States does not mean I am not working in an insecure context—if anything, my role is even more critical precisely because the regions I support are often too dangerous for direct engagement." ECF No. 14, Exh. 5 ¶ 4

*New York,* 524 U.S. 417 (1998) (President's exercise of power under Line Item Veto Act violated Presentment Clause); *Bowsher v. Synar,* 478 U.S. 714 (1986) (Congress cannot, consistent with separation of powers principles, reserve for itself the power to remove an officer charged with executing the laws except by impeachment); *House v. Burwell,* 185 F. Supp.3d 165 (D.D.C. 2016) (suit claiming that, absent a specific appropriation, cost sharing reduction payments paid to insurance companies as part of the Affordable Care Act violated the Appropriations Clause). And see *Carr v. Saul*, 593 U.S. 83 (2021) (holding that it was inappropriate to impose an issue-exhaustion requirement on claimants' constitutional challenges to the appointments of the administrative law judges who heard their benefits claims); *Califano v. Sanders*, 430 U.S. 99, 109 (1977) ("Constitutional questions obviously are unsuited to resolution in administrative hearing procedures ....").

19. The constitutional challenges at the heart of this case are "collateral" to the subject of wholly separate contract claims under the Contract Disputes Act, in front of the Civilian Board of Contract Appeals, which the PSC Association is not currently bringing, and also wholly unrelated to the Board's expertise. This Court's jurisdiction over this case should not be in doubt. See *Axon Enterprise, Inc. v. Federal Trade Comm'n*, 598 U.S. 175 (2023) (determining that statutory review schemes set out in the Securities Exchange and Federal Trade Commission Acts did not displace district court's federal-question jurisdiction to adjudicate corporation's and CPA's constitutional claims); *Free Enterprise Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) (determining that Exchange Act's review scheme did not strip district court of jurisdiction over accounting firm's Article II challenge to the structure of the PCAOB).

20. This lawsuit presents a clash between Article I and Article II powers. The boundaries of both are a justiciable question, just as the clash between the Executive and Congress was justiciable in *Zivotofsky v. Clinton* (*Zivotofsky I*), 566 U.S. 189 (2012).

21. *Zivotofsky I* disproves Defendants' assertion that in clashes between Executive and Congressional authority in the area of foreign affairs "federal courts have no role." ECF 13 at 25. And similarly, *United States v. Nixon*, 418 U.S. 683 (1974), disproves Defendants' assertion that equitable and declaratory relief is categorically unavailable against the President. ECF No. 13 at 36 & n.3.

### Balancing the Equities

22. In *AFSA*, this Court concluded that "[w]here one side claims that USAID's operations are essential to human flourishing and the other side claims they are presently at odds with it, it simply is not possible for the Court to conclude, as a matter of law or equity, that the public interest favors or disfavors an injunction." 2/21/25 Memo. Op. at 25–26. We urge the Court to reconsider that position for two reasons. *First*, this case is not about balancing the value of USAID's operations (and this country's soft power), on the one hand, against the wisdom of the Executive's decision to reverse U.S. support for foreign assistance (a bipartisan policy embraced by Administrations from both parties for decades) on the other. Rather, the question is whether the harm to constitutional democracy attendant to not restraining the Executive—preliminarily, pending a decision on the merits—outweighs the burden on the Executive of deferring action (and imposing a short delay on its campaign to win judicial recognition of its self-declared "vast and generally unreviewable" powers in the realm of foreign affairs. ECF 13 at 2, 8, 15).[4] *Second*,

---

[4] Defendants' claims to exclusive and virtually unreviewable Executive discretion in the area of foreign relations are based on weak textual and structural arguments. Article I, Section 8 gives

10

the Court's conclusion turns a well-settled standard (and *Marbury v. Madison*) upside down: once a plaintiff shows a likelihood that a government defendant is violating the Constitution, it's axiomatic that the public interest and the balance of the equities favor a preliminary injunction. Government cannot prioritize any policy goal over the Constitution. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *Gordon v. Holder*, 721 F.3d 638, 653 ("obvious[ly,] enforcement of an unconstitutional law is always contrary to the public interest.") Ruling otherwise not only upsets settled law, it abdicates the judicial role that Chief Justice Marshall made such important efforts to establish. *Marbury v. Madison*, 5 U.S. 137 (1803).

## **CONCLUSION**

Plaintiff's motion for a TRO (ECF No. 6) should be granted in its entirety as to all USPSCs. In the alternative, it should be granted, in full, as to overseas USPSCs, including USPCs who are overseas on temporary duty.

---

Congress legislative authority related to U.S. foreign relations in fifteen of its eighteen clauses, including the Necessary and Proper Clause.

Dated: February 26, 2025

                                    Respectfully submitted,

                                   /s/ Marni Willenson

| Carolyn E. Shapiro* | Marni Willenson | Joshua Karsh* |
|---|---|---|
| Schnapper-Casteras PLLC | D.C. USDC Bar No. IL0011 | Mehri & Skalet PLLC |
| 200 E. Randolph St., Ste 5100 | Illinois Bar No. 6238365 | 1237 Judson Ave. |
| Chicago, IL 60601 | Willenson Law, LLC | Evanston, IL 60202 |
| cshapiro@schnappercasteras.com | 3420 W. Armitage Ave., Ste 200 | jkarsh@findjustice.com |
| 773-520-7533 | Chicago, IL 60647 | 773-505-7533 |
| | marni@willensonlaw.com | |
| *pro hac vice pending, | 312-546-4910 | *pro hac vice pending, |
| *Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.* | | *Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.* |