# EXHIBIT 5

**25-cv-469-CJN**

**Motion for Leave to File**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ | ) |
| PERSONAL SERVICES | ) |
| CONTRACTOR ASSOCIATION, | ) |
|  | ) |
| *Plaintiff*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| DONALD TRUMP, et al., | ) |
|  | ) |
| *Defendants.* | ) |
| _____ | ) |

## SIXTH DECLARATION OF JANE DOE

I, Jane Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration.

2. I have previously filed declarations in *Personal Services Contractor Association v. Trump*, Case No. 1:25-cv-469-CJN, ECF Nos. 6-5 & 10-2 (as well as an additional one with this motion), and in the pending case of *American Foreign Service Association v. Trump,* 1:25-cv-00352-CJN, ECF # 9-10, 24-16, also attached as exhibits to1:25-cv-469-CJN, ECF No. 6-5. I am a Personal Services Contractor (PSC) at USAID based in Washington, D.C.

3. USAID Deputy Administrator Pete Marocco claimed that firing U.S.-based Personal Services Contractors (PSCs) was necessary because USAID's focus is on "insecure places in the world." This rationale is indefensible. USAID's response relies on an interconnected global team, with Washington-based staff providing critical policy guidance, award management, coordination,

and oversight functions that directly enable overseas operations. Teams in the U.S. are especially essential for areas that are off-limits for U.S. personnel to travel to, such as parts of Syria, Yemen, and Afghanistan, where security conditions make it impossible for American staff to operate on the ground. For all countries, both insecure and relatively safer, these US-based teams ensure continuity in programming, coordinate with implementing partners and provide necessary technical support. The decision to eliminate domestic PSCs does not align with USAID's operational reality and suggests a pretext for indiscriminate dismissals. Just because I work in the United States does not mean I am not working in an insecure context—if anything, my role is even more critical precisely because the regions I support are often too dangerous for direct engagement.

4. Marocco further claimed that PSCs were not placed on administrative leave. In reality, USAID's handling of administrative leave has been chaotic and inconsistent. Some PSCs, including myself, were explicitly told we were not on administrative leave, only to later be paid as if we were. I can provide my earnings statement upon request to validate this statement. Others received no communication and remain in limbo, with some still receiving pay and others not. The lack of clear guidance has created widespread uncertainty.

5. In my opinion, Pete Marocco, Secretary Rubio, and other political appointees, along with DOGE, have deliberately created chaos to dismantle USAID. Their objective seems to be destroying the agency entirely, and they have

made no effort whatsoever to understand how the agency functions in the process.

6.  Further, ongoing USAID systems lockouts have left many of these PSCs, along with countless others–including direct hires who are again re-losing access alongside the immediate termination notices–unable to conduct even the most basic offboarding tasks, verify their leave balances, or perform handover. Without email or records access, they are also unable to officially communicate with USAID payroll and contracting officials regarding outstanding compensation and reimbursements. This widespread denial of access has made it effectively impossible for many terminated staff to resolve essential administrative matters. These abrupt dismissals compound the disruptions for remaining staff attempting to assist with offboarding tasks and essential information sharing.

Indiscriminate Award Terminations

7.  On Friday, January 31, at the very outset of the mass implementing partner award termination campaign, USAID political leadership issued an email requiring AORs, like myself, to keyword search partner awards for "DEIA and Environmental Justice" language. This directive demonstrated a complete lack of understanding of standard industry terminology. For example, 'dietary' or 'nutritional diversity' appears in nearly every humanitarian food assistance award because, as any parent knows, a well-rounded diet is essential to a child's health. Even in the most food-insecure

regions, humanitarian actors strive to provide diverse food options, as a diet consisting solely of rice is nutritionally insufficient—a concept even someone with even the most rudimentary understanding of nutrition would grasp.

8.  Similarly, in humanitarian contexts, the term 'equity' overwhelmingly refers to ensuring marginalized groups—most often women and children—are included in decision-making processes for their communities. Equity in humanitarian response is essential to delivering aid effectively; failing to consider it risks implementing programs that do not reach intended beneficiaries or that further isolate already vulnerable populations. The fact that USAID leadership failed to recognize these basic humanitarian principles before issuing this directive further underscores their fundamental misunderstanding of the agency's work. The inclusion of terms such as "diversity, equity, and inclusion" in humanitarian project documents–especially when taken out of context in a sentence–do not automatically constitute political advocacy—they more often reflect evidence-based development and humanitarian practices aligned with international best practices. This approach to award termination or partial stoppage was thoughtless and callous.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2025.

_____ /s/ Jane Doe