<pre>
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    * * * * * * * * * * * * * * *   )
      PERSONAL SERVICES CONTRACTOR    )    Civil Action
 4    ASSOCIATION,                    )    No. 25-00469
                                      )
 5                    Plaintiff,      )
                                      )
 6       vs.                          )
                                      )
 7    DONALD TRUMP, et al.,           )    Washington, D.C.
                                      )    March 5, 2025
 8                    Defendants.     )    2:04 p.m.
                                      )
 9    * * * * * * * * * * * * * * *   )

10

11          TRANSCRIPT OF TELEPHONIC MOTION HEARING ON
                   TEMPORARY RESTRAINING ORDER
12          BEFORE THE HONORABLE CARL J. NICHOLS
                 UNITED STATES DISTRICT JUDGE
13

14
      APPEARANCES:
15
      FOR THE PLAINTIFF:       CAROLYN E. SHAPIRO, ESQ.
16                             RACHAEL YOCUM, ESQ.
                               SCNAPPER-CASTERAS, PLLC
17                             200 East Randolph Street
                               Suite 5100
18                             Chicago, Illinois 60601

19                             JOSHUA KARSH, ESQ.
                               MEHRI & SKALET, PLLC
20                             2000 K Street, Northwest
                               Suite 325
21                             Washington, D.C. 20006

22                             MARNI JOY WILLENSON, ESQ.
                               WILLENSON LAW, LLC
23                             3420 Armitage Avenue
                               Suite 200
24                             Chicago, Illinois 60647

25
</pre>

```
 1      APPEARANCES, CONT'D:

 2      FOR THE DEFENDANTS:      MICHAEL P. CLENDENEN, ESQ.
                                 LAUREN WETZLER, ESQ.
 3                               UNITED STATES DEPARTMENT OF JUSTICE
                                 1100 L Street, Northwest
 4                               Washington, D.C. 20005

 5      REPORTED BY:            LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 6                              United States District Court for the
                                  District of Columbia
 7                              333 Constitution Avenue, Northwest
                                Room 6706
 8                              Washington, D.C. 20001
                                (202) 354-3269

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          THE COURTROOM DEPUTY:  Good afternoon, your Honor.

 2    This is civil case year 2025-469, Personal Services

 3    Contractor Association versus President Donald Trump, et al.

 4          Counsel, please introduce yourselves for the

 5    record, beginning with the Plaintiff.

 6          MS. SHAPIRO:  This is Carolyn Shapiro for

 7    Plaintiff.

 8          THE COURT:  Good afternoon.

 9          MR. KARSH:  Good afternoon, your Honor.  Joshua

10    Karsh for the Plaintiff.

11          MS. WILLENSON:  Marni Willenson for the Plaintiff.

12          MR. CLENDENEN:  Good afternoon, your Honor.  Mike

13    Clendenen from the Department of Justice for the Defendants.

14    And also on the line just listening is Lauren Wetzler from

15    the Department of Justice.

16          THE COURT:  Okay.  Good afternoon, everyone.

17          This is obviously a hearing on Plaintiff's motion

18    for a temporary restraining order.  We are proceeding

19    telephonically.  One thing I would ask is before someone

20    begins speaking, if you could just reintroduce yourself so

21    that I and the court reporter know who's speaking.

22          In terms of how I intend to proceed today, I want

23    to treat this as a typical oral argument; that is to say, I

24    will hear first from the Plaintiffs on their motion,

25    anything they'd like to argue.  Then I'll turn it over to

1    the Government for its opposition.  And then I'll allow

2    Plaintiffs a short rebuttal.

3          I don't have a specific time in mind.  But as

4    people know, I have a relatively decent amount of

5    familiarity with the general issues in this case.

6          One other note:  Just so that people are aware of

7    what I've done to prepare for this hearing, in addition, of

8    course, to everything I reviewed in the *AFSA* case, to

9    include case law and the like, here I've reviewed the

10    parties' various briefs and the very many declarations

11    submitted by both sides, including declarations submitted by

12    Plaintiffs in the last day or two.  So I've reviewed all of

13    the most recently filed materials, so I have a pretty good

14    handle on the facts.

15          So with that, we'll begin with Plaintiffs.  Who's

16    going to take the lead this afternoon?

17          MS. SHAPIRO:  This is Carolyn Shapiro for the

18    Plaintiffs, your Honor.

19          THE COURT:  Okay.  Ms. Shapiro.

20          MS. SHAPIRO:  Good afternoon.  And may it please

21    the Court.

22          Twelve days ago, this Court vacated the TRO it had

23    granted in *AFSA versus Trump* and declined to issue a

24    preliminary injunction.  We urge you to come to a different

25    conclusion today and grant our TRO for four important

1  reasons:

2    First, the destruction of USAID has progressed and

3  is now imminent.

4    Second, not only does that destruction itself

5  present irreparable constitutional harms, but the direct

6  irreparable harms to our client's members, the Personal

7  Service Contractors, who are being terminated and do not

8  have civil service protections, are much more immediate and

9  severe than the harm to the unions' members as of twelve

10  days ago.

11    Third, in part because of those factual

12  differences and in part because of differences in the

13  statutory structure, the type of jurisdictional concern that

14  led you to find that the *AFSA* Plaintiffs did not have a

15  likelihood of success on the merits is not present here.  To

16  the contrary, this Court has jurisdiction.

17    And, fourth, the Defendants' unconstitutional and

18  illegal actions to destroy USAID and impound appropriated

19  funds mean that the public interest and balance of equities

20  weigh in favor of preliminary relief.  As a matter of law,

21  the government never has an interest in pursuing

22  unconstitutional conduct.

23    First, the destruction of USAID is now imminent.

24  Defendants have been claiming that the review of foreign aid

25  was ongoing.  But on February 26th, Mr. Marocco stated in

1    his declaration, which you can find as the sixth declaration

2    in the PDF binder we filed today at ECF 21, that review is

3    now complete and Defendants are terminating more than 92

4    percent of USAID's contract and awards.  That's about 5,800

5    in all.

6           Defendants are also terminating the majority of,

7    and possibly all, PSCs with fifteen days' notice, some of

8    which, without action by this Court, those notices are

9    expiring for many even as we speak.

10          Defendants are also decimating USAID's direct

11   hires by placing them on administrative leave and announcing

12   a RIF.

13          Defendants are not paying implementing partners,

14   including for lifesaving humanitarian aid that is supposedly

15   subject to the waiver.  This week, we filed an internal

16   document, which you can find at ECF 19-1, that shows that

17   for the Bureau of Global Health, not a single payment has

18   been made under the waiver.

19          And all of that is on top of kicking USAID out of

20   its headquarters, taking down its websites and announcing on

21   social media that USAID is being shut down.

22          It is hard to imagine a clearer case of the

23   executive unilaterally dismantling a congressionally created

24   agency.  And the speed with which they are acting appears to

25   be designed to make the destruction a *fait accompli* and to

1    evade judicial review, which itself creates immediate

2    irreparable harm.

3          Defendants are trying to make it impossible for

4    USAID to resume its functions.  If the Court does not grant

5    the immediate preliminary relief, they may succeed.

6          The Defendants are also unconstitutionally and

7    illegally refusing to spend duly appropriated funds.  The

8    2024 Appropriations Act expressly prohibits using funds from

9    organizations and agencies without detailed consultation

10   with Congress, and it provides for the expenditure of

11   billions of dollars in foreign aid that Defendants are

12   impounding.

13         In fact, the Defendants are touting their refusal

14   to spend money that Congress appropriated so that they can

15   report it as what they call savings.  The Defendants are

16   claiming an after-the-fact line-item veto even more extreme

17   than the line-item veto the Supreme Court struck down in

18   *Clinton versus City of New York*.

19         All of this violates the Take Care Clause, the

20   separation of powers, involves *ultra vires* action; it

21   violates the Impoundment Control Act, the Anti-Deficiency

22   Act and the APA.

23         The Defendants' response to all of this is

24   shocking.  They say that the president's powers in foreign

25   affairs are vast and unreviewable.  Cases like *Youngstown*

1      and *Zivotofsky* certainly say otherwise.

2             So does Article I, Section 8, of the Constitution,

3      which empowers Congress to legislate in numerous areas

4      related to foreign affairs.

5             But more to the point, there is no foreign affairs

6      exception as to who holds the power of the purse.  It is

7      Congress.  It is always Congress.

8             The speed with which Defendants -- and wantonness

9      with which Defendants are acting is also arbitrary and

10     capricious.  On February 26th, when Mr. Marocco reported

11     that the review of all foreign spending was complete, he

12     said that Secretary Rubio had individually reviewed over

13     13,000 contracts and awards at USAID and the State

14     Department and made individual determinations about each of

15     them, in just over a month.  The timing and numbers alone

16     should raise eyebrows.

17            But in addition, Defendants have identified no

18     criteria that they applied in this speed-of-light review.

19     And the terminations, which were done en masse and without

20     the legally required involvement of contracting and

21     agreement officers, were done so arbitrarily that contracts

22     for basic operational needs like telephone service were

23     terminated and had to be reinstated.

24            The review at USAID did not involve career staff,

25     like PSCs, who are the experts on what the contracts and

1    grants do or require and how the money is spent.

2         This is in stark contrast to the way normal

3    assessments of contract termination and changed agency

4    priorities operate.  In fact, it is even in contrast to what

5    Mr. Marocco says happened in the State Department, where

6    career staff was involved and a much smaller percentage of

7    grants and contracts were terminated, more evidence of

8    Defendants' targeting USAID in particular.

9         Defendants' decision-making about the PSCs

10    themselves is arbitrary and capricious.  The Defendants

11    appear to have no idea what PSCs do.  On February 25th, in

12    the fourth document in ECF 21-1, Mr. Marocco explained that

13    791 PSCs were being terminated because they were in, quote,

14    "high- and middle-income countries," unquote, including in

15    Washington, D.C., and since, quote, "USAID's mandate is to

16    assist primarily in low-income countries, that these

17    contracts appear to be inconsistent with the mission of

18    USAID."

19         That assertion is a complete non sequitur.  Staff

20    in the U.S. are essential to the oversight and logistics and

21    management of contracts and awards in low-income countries.

22         In fact, as one PSC explained at ECF 15-6,

23    challenging locations for aid delivery require even more

24    support from here.

25         And it's -- well, PSC terminations are arbitrary

1    and capricious because even for contract and award

2    termination, PSCs are necessary.  The Federal Acquisition

3    Regulations that apply to USAID pursuant to 2 CFR 700.2

4    incorporate mandatory wind-down procedures.  PSCs who are

5    agreement officers, contract officers, agreement officer

6    representatives and contract officer representatives are

7    necessary to do that work.  Now, there is much more evidence

8    of Defendants' unconstitutional and illegal intent and

9    actions.

10           But I will move on now to talk about the second

11    big reason that the Court should reach a different

12    conclusion today about this Plaintiff than it did twelve

13    days ago about the unions and their members.

14           The harms to PSCs are much more severe and

15    irreparable than the harms to the unions' members that were

16    before you then.  The direct hires in that case were placed

17    on paid administrative leave, and the government represented

18    that those posted overseas would retain access to security

19    and safety infrastructure and would likely be given a choice

20    about when to return to the United States.

21           In contrast, Defendants have made no assurances to

22    PSCs, either here or overseas, and are issuing terminations

23    with only 15 days' notice.

24           PSCs face a long list of severe and irreparable

25    personal consequences.  And you know, as you've read our

1    declarations, but I'll give you a few examples:  A PSC

2    stranded --

3            THE COURT:  Your brief, though, Ms. Shapiro, your

4    reply brief at Pages 6 to 7, one could say it focuses

5    primarily on what you call the greatest imminent irreparable

6    harm; that is, the harm to our constitutional democracy,

7    which isn't really suffered by any particular PSC in a way

8    that's more concrete than any person in the United States.

9            Do you agree, though, that to the extent that the

10   PSCs' members of the Plaintiff have standing, that that

11   standing relates to their harm that they would suffer as

12   contractors whose contract terms are changed by the

13   government?

14           MS. SHAPIRO:  No.  I would not agree with that.  I

15   do not agree that it has to do with their contract terms

16   being changed by the government.  They --

17           THE COURT:  So what is the injury in fact that the

18   PSCs suffer that gives them Article III standing here or

19   that they may imminently suffer?

20           MS. SHAPIRO:  Well, I think there are two ways to

21   think about it.  First, they are personally suffering

22   injuries of the sort that are laid out in our declaration.

23   But --

24           THE COURT:  Don't those -- sorry, Ms. Shapiro.

25   But don't those injuries arise from the fact that the

1    government is changing the terms of the relationship between

2    the PSCs and the government as contractors?

3          MS. SHAPIRO:  No.  The PSCs have standing, just as

4    the Plaintiff in *Andrade versus Lauer* had standing.  In that

5    case, D.C. Circuit rejected the argument that it was a RIF

6    that was causing the injury to the Plaintiff.  The

7    Plaintiffs were saying it was an Appointments Clause

8    violation.

9          It's the same here.  The violation is very

10   analogous to an Appointments Clause violation because what

11   we have is the government -- or the Defendants are taking

12   actions that they are not constitutionally empowered to

13   make.  It happens with -- that the structure of the

14   Constitution is there in fact and [indiscernible].  But it's

15   also the case that not everybody can sue when those

16   protections are violated.  But people sue in a variety of

17   different contexts when they have been subjected to

18   decision-making in violation of those structural guarantees.

19         THE COURT:  Does the government have as a general

20   matter the contractual right to terminate a PSC with 15

21   days' notice?

22         THE COURT REPORTER:  Ms. Shapiro, before you

23   answer, I'm sorry to interrupt.  Are you perhaps using a

24   speakerphone?  It's very difficult to understand you.

25         MS. SHAPIRO:  I'll take it off speaker.  Is this

1    better?

2              THE COURT REPORTER:  Yes.  Thank you.

3              MS. SHAPIRO:  Sure.

4              Yes.  The contracts do provide that people can be

5    terminated on 15 days' notice.  But we are not suing on

6    contracts; we are suing because the decisions are being made

7    in ways and by people who are not empowered to make those

8    decisions.

9              THE COURT:  Right.  I understand that.  I was

10   asking just a factual question of whether the government has

11   the contractual right, putting aside whether it's exercised

12   properly, the contractual right to at least in many

13   circumstances terminate PSC relationships with 15 days'

14   notice.

15             MS. SHAPIRO:  It may.  But that's not relevant to

16   the considerations here.  The considerations here are

17   whether the Defendants are making -- are empowered to make

18   the decisions that they're making.  It's actually very much

19   like *Youngstown* in that sense, where the president ordered

20   the secretary of commerce to seize the steel mills.  And the

21   Court concluded that he just did not have the power to do

22   that.

23             THE COURT:  Who was the plaintiff in *Youngstown*

24   who had Article III standing?

25             MS. SHAPIRO:  The plaintiff in *Youngstown* was the

1     steel mills.

2          THE COURT:  Right.  Right.  But here, the

3     Plaintiffs here have to have an injury in fact.

4          MS. SHAPIRO:  Yes.

5          THE COURT:  And it seems to me that the most

6     obvious injury in fact is the termination or other change in

7     the relationship with the government that leads to financial

8     and other consequences.  At least that's the most direct way

9     in which the Plaintiffs here or the members of the

10    Plaintiffs are injured.

11         Do you agree with that?

12         MS. SHAPIRO:  No.  The Plaintiffs and their -- its

13    members are injured by the decisions being made in an --

14    unconstitutionally.  Just like in *Free Enterprise* and *Axon*,

15    the Court said that the harm to the plaintiffs in those

16    cases was being subjected to adjudication by an

17    unconstitutionally constituted board or a commission.

18         It's no different here.  The harm to our

19    Plaintiffs, to our Plaintiff, is that they are being

20    subjected to unconstitutionally -- structurally

21    unconstitutional decision-making.

22         Again, this is just like *Andrade versus Lauer*, 729

23    F.2d 1475, where -- which was about a RIF, in some ways very

24    similar actually to our circumstances.  The Court said that

25    the fact that it was about a RIF did not mean that the

1    district court was deprived of jurisdiction, because the

2    actual claim had to do with an Appointments Clause

3    violation.

4          THE COURT:  This is as much just my trying to

5    understand things.  I'm not trying to make a point here.  So

6    if you had an individual PSC who said that the government

7    had unlawfully terminated her agreement with the government,

8    in whatever way one can imagine, didn't provide adequate

9    notice or the termination wasn't justified -- I'm trying to

10   get at a hypothetical.  We're talking about not the current

11   situation, but a single PSC in a very sort of -- specific to

12   that PSC decision.

13         In your view, how would and/or where would the PSC

14   bring a claim for that allegedly unlawful termination?  And

15   what would the nature of that claim be?

16         MS. SHAPIRO:  Well, I think it actually depends on

17   the nature of the claim.  There would be some claims that go

18   to the contract dispute -- to the contract dispute as a

19   process.  But there might be some claims that would be

20   handled otherwise, perhaps through the EEOC or other fora.

21         Not every time that there's a dispute between a

22   PSC and the government over how the PSC is being treated is

23   it necessarily a contract claim.  And it's -- as it is not

24   here.

25         THE COURT:  Can you think of any circumstances in

1    this situation I've just described where the PSC would

2    likely be able to go to federal court in the first instance

3    seeking an injunction or just to litigate the propriety of

4    that change in the contractual relationship?

5            MS. SHAPIRO:  It's hard for me to imagine a

6    situation that is analogous to this one.  I can't tell you

7    there are no other such situations.  But if you have a

8    single PSC who says, Well, I'm being terminated because the

9    president is -- and the Defendants are unconstitutionally

10   not spending the money that Congress has appropriated and

11   destroying my agency, that wouldn't apply to a single PSC.

12           This is a situation where the nature of the harm

13   goes far beyond something that applies to a single

14   individual.

15           THE COURT:  I understand that we're not talking

16   about a claim like this one.  I'm just asking about in the

17   run-of-the-mill case, where a PSC says that the government

18   acted unlawfully as to that PSC's contractual relationship

19   with the government, was discriminated against, terminated

20   unlawfully, asked to come back from foreign service too

21   quickly.  Anything like that?  Can you conceive of claims in

22   that context that would be litigable in the first instance

23   in federal court?

24           MS. SHAPIRO:  I don't have an immediate example

25   for you.  But I think the question is going to be whether --

1  whether Congress intended for this particular claim to go

2  through the Contracts Dispute Act process.  Is the claim

3  collateral to the contract?  Is the claim outside the

4  expertise of the agency?  The kind of questions that *Thunder*

5  *Basin* further put forth.  I can't tell you that there's

6  never going to be a PSC -- an individual PSC who can or

7  can't come up with one of those claims.  But that's just

8  completely not our situation.

9          THE COURT:  Okay.  Sorry.  I kind of got us off on

10  a few questions.  Do you want to keep going with your

11  irreparable harm?

12          MS. SHAPIRO:  Sure.

13          I think I was about to talk about the reasons that

14  the -- some of the reasons the PSCs have Article III

15  standing and how they suffer severe and irreparable harm

16  that was different from the harm that was before you twelve

17  days ago in the *AFSA* case.

18          THE COURT:  Yes.

19          MS. SHAPIRO:  I'll just give you a few examples.

20  Sorry.  Go ahead.

21          THE COURT:  No.  Please.  I agree.

22          MS. SHAPIRO:  We have a declaration from a PSC in

23  Mogadishu, a high-threat post, with a termination date of

24  March 10th that is going to lose her housing, access to the

25  government's security apparatus and diplomatic status.

1      We have a PSC whose spouse is in the 36th week of

2   pregnancy, unable to board a plane.

3      We have another PSC whose wife is in the midst of

4   a complex and lengthy series of serious medical procedures.

5      We have many PSCs, including the one I just

6   mentioned, where remaining in country after termination

7   would expose them to sanctions from that country's

8   government because they're required to exit while still on a

9   diplomatic visa.

10      In general, PSCs overseas will face loss not only

11   of their jobs, but their housing, security and their

12   diplomatic protections, all on two weeks' notice.  They may

13   find themselves facing significant legal liabilities related

14   to breaking leases.

15      And some, including those who have served our

16   country overseas for decades, have no home here.  Their

17   children will be uprooted, and many of them will find

18   themselves without health insurance that covers them in the

19   United States.

20      But I want to emphasize that the irreparable harms

21   are not limited to overseas PSCs.  We have submitted

22   declarations from a PSC now facing losing custody of her

23   child in ongoing disputed divorce proceedings because she

24   doesn't have a job or a home; PSCs being doxed by having

25   their personal information posted by DOGE after being

1    terminated; PSCs in extreme financial distress because USAID

2    has stopped reimbursing them for already incurred expenses.

3          On top of these crises, these PSCs also face

4    irreparable harm again because, unless the Court acts now,

5    an order restoring them to their positions at the end of

6    this case would likely come too late.  The agency will no

7    longer exist.

8          I want to turn --

9          THE COURT:  If there's no injunction as to the

10   PSCs and it is later determined by me or Judge Ali or

11   someone else that the government's actions vis-à-vis USAID

12   are unlawful, wouldn't that mean that USAID would be

13   hypothetically at least reconstituted?  And why wouldn't it

14   be the case that the various positions that have been

15   eliminated would need to be restaffed?  Or at least why is

16   it so obvious that that's not the case?

17         MS. SHAPIRO:  We're in a situation that is

18   analogous -- I can only say it's analogous to Humpty Dumpty.

19   The staff will be scattered.  The agencies that are -- and

20   its partners will -- are going out of business.  The

21   building will be shut down.

22         It is -- it's one thing to say hypothetically,

23   Maybe later we could say some people should get their jobs

24   back.  But what's the claim here and what's happening here

25   and what the evidence shows -- and the Defendants do not

1    deny -- is that they are trying to destroy the agency.

2    Putting the agency back together after it is destroyed is

3    not going to be something that can happen through a couple

4    of court orders.

5    The way to prevent the irreparable harm that would

6    arise from that is to grant preliminary relief and in this

7    case in particular, the TRO.

8    THE COURT:  I guess my question is:  What is the

9    irreparable harm that the Plaintiffs here would suffer if

10    hypothetically some period of time elapses between now and

11    the final adjudication on the merits of this case and

12    others; and at the end of that process it is determined

13    that -- or at the end of some process it is determined that

14    the actions as to USAID were unlawful; the Court orders that

15    it be restored in some respect and there are jobs then

16    available for someone?  But what's the irreparable harm from

17    that perhaps imperfect going-back-to-the-agency for your

18    client?

19    MS. SHAPIRO:  Well, I would point first to the

20    personal direct harm that they suffer that a TRO could and

21    should address, that those harms have nothing to do with

22    whether later the agency is put back together.

23    But again, it's -- irreparable harm is just like

24    the irreparable harm.  There are two types of other

25    irreparable harms.  One is the irreparable harm similar to

1    what the Court -- the Supreme Court described in *Axon* and

2    *Free Enterprise*, being subject to decision-making by an

3    entity that is unconstitutionally constituted or not

4    empowered to do so.

5            And the other irreparable harm is that it's

6    frankly Humpty Dumpty.  It is not plausible to take 10,000

7    people, scatter them to the winds, put the agencies that

8    they work with out of business and then say, Oops.  We

9    meant -- that was a mistake.  You can't put that back

10   together, certainly not in a timely or efficient way.

11           THE COURT:  Right.  And so what is the -- putting

12   aside the personal irreparable harm you identified at the

13   beginning, what is the irreparable harm from -- for your

14   clients for the Humpty Dumpty putting-back-together-again

15   that might result?

16           MS. SHAPIRO:  Well --

17           THE COURT:  What is the irreparable harm to your

18   client?

19           MS. SHAPIRO:  Yes.  They are losing their careers.

20   This is different than losing a job.  They are highly

21   trained and highly specialized.  And thousands of them are

22   going to be out of work at the same time in a situation

23   where the employers, again, because of the Defendants'

24   actions, are -- many of the nongovernmental employers are

25   going out of business.

1          We might have a parent that loses her child.  We

2     might have somebody who's stuck in Mogadishu.

3          THE COURT:  Right.  That goes back to the personal

4     circumstances that PSCs face currently.

5          MS. SHAPIRO:  Yes.  But I do want to just

6     reemphasize that there are harms to the PSCs from the

7     destruction of the agency that are personal to them in

8     addition to being subjected to this unconstitutional

9     decision-maker, as in *Free Enterprise* and *Axon*.  And it

10    might not be the normal type of irreparable harm, but it's

11    not compensable by money damages.

12          And the D.C. Circuit has said that under some

13    circumstances, where it's clear that even financial losses

14    are going to appear, if they're not realistically going to

15    be compensable later, that can be irreparable harm.  And

16    that's what's happening here.

17          THE COURT:  Thank you.

18          MS. SHAPIRO:  I'd like to focus just a little bit

19    more about why this Court has jurisdiction.

20          In addition to what we've just been discussing,

21    that for these reasons it's important that the Court grant

22    preliminary relief in a way that it might not have based on

23    the evidence available on February 23rd.  But I also want to

24    talk about the different statutory schemes that were at

25    issue in that case, in the union case, and here.

1          The union case involved elaborate civil service

2     and labor law structures and the Foreign Service Act, which

3     allows the review of any grievance that is, quote, "a source

4     of concern or dissatisfaction to a foreign service officer."

5     It's very broad, as you pointed out.

6          In contrast, the Contract Dispute Act is narrowly

7     focused on contract disputes.  And when courts decide

8     whether Congress has implicitly stripped their jurisdiction

9     by channeling cases to an agency forum, the Court's ultimate

10    question, as the Supreme Court explained in *Axon Enterprise*,

11    is always, quote, "how best to understand what Congress has

12    done."

13         Just as in *Axon*, Congress did not implicitly

14    route, quote, "fundamental, even existential," end quote,

15    questions about the structure of our constitutional system

16    to the Court of Federal Claims and the Civilian Board of

17    Contracts Appeals.  In fact, under the major questions

18    doctrine, Congress would have to speak very clearly before a

19    court can construe the CDA to do that.

20         And the claims here are precisely the kinds of

21    statutory and constitutional claims that the D.C. Circuit

22    held in *Crowley Government Services*, 38 F.4th 1099, are not

23    covered by the Contract Dispute Act.

24         As in *Crowley*, Plaintiff asserts on behalf of its

25    members a right to be free -- quote, "a right to be free

1   from government action beyond its constitutional -- beyond

2   its congressional authority," end quote.

3          THE COURT:  So one thing that is frustrating here,

4   for example, is that case you just cited is not in your

5   reply brief, and you don't make this argument in your reply

6   brief.  Not with that specificity.

7          MS. SHAPIRO:  That's correct, your Honor.  And I

8   apologize.  We had not found that case by then.  We did

9   share it with the Defendants before today's argument so that

10   they would know --

11          THE COURT:  But you didn't even make this

12   argument.  Putting aside the citation in the brief, you

13   didn't even make the argument that the Contract Disputes Act

14   has a narrower ambit than the employment cases I looked

15   at -- or employment cases and statutes I looked at in *AFSA*.

16   You didn't make that argument in your brief at all.

17          MS. SHAPIRO:  We certainly made the argument that

18   there is jurisdiction here.  And that --

19          THE COURT:  You did.  You did.  But you didn't --

20   but what you said was that this is a big-picture

21   constitutional claim that federal courts are always allowed

22   to look at and this is not the kind of claim that a court

23   should think would go to some other jurisdiction or

24   statutory scheme.  But you didn't say, for example, that the

25   Contract Disputes Act is a narrower regime or a different

1    regime or you didn't say anything about the Contract

2    Disputes Act vis-à-vis the employment statutes.

3            MS. SHAPIRO:  It's a TRO.  We're working as fast

4    as we can.  And we'd be happy to provide more briefing.  And

5    obviously, if the Defendants are going to respond in

6    writing, or today, the *Crowley* case has come up in Judge

7    Ali's courtroom.  So it's not complete -- complete news to

8    the Defendants as a general matter.

9            But I can say we're doing our best on a very

10   abbreviated timeline.

11           THE COURT:  Okay.  So your point is, I take it,

12   you disagree with the Government that these claims here

13   could be litigated in the Contract Disputes Act context

14   and/or that there is nothing to suggest that Congress

15   intended that they would be?

16           MS. SHAPIRO:  Yes.  We disagree on both of those

17   grounds.

18           THE COURT:  Okay.  And the cite for *Crowley* is 38

19   F.4th 1099?

20           MS. SHAPIRO:  Yes.

21           THE COURT:  Okay.

22           MS. SHAPIRO:  I'll just -- as in *Crowley*, the

23   contract claims are collateral to our constitutional claims.

24   And I would just reemphasize, as we've discussed before,

25   that nothing in our case turns on any provision of their

1      contract, nor do we seek any contract remedies.

2             Finally, as we explained in our reply brief, the

3      public interest and balance of equities weigh overwhelmingly

4      in favor of enforcing the structural guarantees of the

5      Constitution, particularly where, as here, Defendants are

6      trying to make their constitutional destruction of the

7      agency a *fait accompli.*

8             But if you want to weigh other equitable

9      considerations, I would refer you to the memo on the

10     national security implications of the failure to spend the

11     duly appropriated foreign aid at ECF 19-1, Page 19, evidence

12     that was also not before you twelve days ago.

13            This case is about fundamental separation of

14     powers principles designed to preserve liberty and it is

15     about basic rule-of-law principles that require government

16     action to be legally authorized and not arbitrary and

17     capricious.

18            What Defendants are doing to USAID is a shocking

19     and aberrational rejection of those principles.  We urge you

20     to grant our TRO motion.

21            THE COURT:  Thank you very much, Ms. Shapiro.

22            Who will be taking the lead for the Government?

23            MR. CLENDENEN:  Good afternoon, your Honor.  Mike

24     Clendenen.  I'll be speaking for Defendants.

25            THE COURT:  Good afternoon.

1          MR. CLENDENEN:  Good afternoon.  May it please the

2    Court.

3          Your Honor, the Court should deny the motion for a

4    TRO.  This case raises almost identical issues to the *AFSA*

5    case, which this Court denied preliminary injunction just a

6    week ago -- or two weeks ago.  Sorry.

7          The grounds for the Court denying that PI motion

8    in *AFSA* were primarily that the Plaintiffs had not

9    established irreparable harm and that it appeared that there

10   was likely not jurisdiction because there was a remedial

11   statutory structure in place for the Plaintiffs in that case

12   to bring their claims into a forum outside of the district

13   court.

14         Those are the exact same issues here with just a

15   couple of asterisks.  Specifically, when it comes to

16   jurisdiction, there's a different remedial structure in

17   place.

18         Based on the briefing, the Plaintiffs don't seem

19   to disagree that an individual PSC would have to bring a

20   claim for a dispute over their contract through the CDA,

21   which would have exclusive jurisdiction in the Court of

22   Federal Claims.  They just say that the Court should

23   nonetheless hear their claims because they packaged it in

24   this sort of APA constitutional way.  But that's exactly

25   what the Plaintiffs did in *AFSA,* and the Court did not

1      believe that that was likely to succeed on the merits.

2              And when it comes to irreparable harm, the

3      Plaintiffs themselves in their motion for TRO said that the

4      harms here are effectively identical to the harms suffered

5      by the direct-hire employees in *AFSA*.  And any attempts that

6      they have made to try to distinguish that really falls apart

7      on further consideration of pretty much all of the issues

8      that they've raised about individual PSCs who, you know,

9      might, you know, have issues based on the loss of their job

10     and having to come back from overseas.

11             Those are all the kinds of essentially economic

12     consequences that are not irreparable harm in the context of

13     a preliminary injunction and that this Court decided were

14     not the proper basis for a preliminary injunction in *AFSA.*

15             THE COURT:  Isn't there one fairly significant

16     difference between the PSCs and the direct-hire USAID

17     employees?  And I realize you may still have an argument

18     about whether the harm is irreparable.  But as I understand

19     it, whereas in the case of the direct-hire folks, at least

20     the most immediately challenged action was the placing of a

21     lot of them on administrative leave.  But that

22     administrative leave was paid, and so those people would

23     still be paid.  They'd still be compensated.  Presumably,

24     they'd be entitled to many of the benefits of being

25     employed.

1           Now, there are consequences that of course I care

2     very much about, especially for overseas employees, about

3     being placed on administrative leave.  But again, the leave

4     was paid.

5           Here, as I understand it, there's a large group of

6     PSCs; to be sure, perhaps in the less dangerous countries.

7     But they are PSCs who will be terminated, whose contracts

8     are -- or employment, depending upon how you think about

9     it -- will be terminated.  And so as I understand it, at

10    least, a good percentage of your PSCs will simply not be

11    compensated at all in the near future.  And it's at least

12    possible in my view that there's a different set of

13    immediate consequences that would flow from that.

14          You know, someone who's on paid administrative

15    leave can still presumably pay the mortgage, pay the car

16    bill, pay tuition and the like.  But someone who is going to

17    be terminated and is receiving no pay is at least in a sense

18    not able to pay for the kind of things in the very near term

19    that one needs to pay for to avoid potentially, at least,

20    irreparable harm.

21          So why isn't it that the harms here are actually

22    quite different from those in the *AFSA* case?

23          MR. CLENDENEN:  Your Honor, I believe everything

24    actually you said is accurate, at least as far as the

25    information we have in the record.

1          I will say that the PSCs, once they get their

2     termination notice, they still have 15 days after that,

3     during which period they are paid for any work that they do.

4     And then the government, you know, has to provide

5     transportation back to the United States, assuming they're

6     overseas by the end of that 15 days.

7          And I don't believe that that's really all that

8     different from a situation of the paid leave for the direct

9     hires.  It's just a question of, you know, the timing.  How

10    long are they going to be on paid leave before they're told

11    that they have to come back to the United States?  It might

12    be longer than 15 days, but it's still the same kind of

13    harm; it's just a question of when.

14         The other point I would like to make is, all of

15    the sorts of consequences that the Court is suggesting, even

16    if they're more imminent with regards to the PSCs, they're

17    still -- they still sound in economic harm, which is

18    compensable through monetary damages.  So it's not the basis

19    for a TRO or a preliminary injunction in district court.

20         THE COURT:  Do you know whether in a Contract

21    Disputes Act action if the PSC who prevails and establishes

22    that his or her termination was unlawful and that he or she

23    should have continued to get paid could recover from the

24    government other damages like cancellation of a lease, early

25    termination of certain contracts, the kinds of economic harm

1       identified in the -- or financial harm identified in the

2       declarations?  But there's always the question about whether

3       those harms or those damages are achievable against the

4       government.

5               MR. CLENDENEN:  Your Honor, as far as I'm aware,

6       if a PSC brought a claim for breach of contract in the Court

7       of Federal Claims, the waiver of sovereign immunity as to

8       whatever damages arise from that breach of contract would

9       apply.  I don't think that there's a specific exception that

10      they wouldn't be able to recover, you know, rent that wasn't

11      paid or something like that.

12              THE COURT:  Put differently, do you think that it

13      is the case that the waiver of sovereign immunity that would

14      apply would be for all breach-of-contract damages that would

15      normally be awardable against a private party?

16              MR. CLENDENEN:  As far as I know, your Honor,

17      that's correct.  I will say that the Plaintiffs didn't

18      suggest otherwise and they didn't raise that as an issue as

19      to why they can't have their claims heard in the Court of

20      Federal Claims.  But as far as I know, your Honor, that's

21      correct.

22              THE COURT:  You heard Ms. Shapiro discuss the CDA

23      and the case *Crowley*.  Do you --

24              MR. CLENDENEN:  Yes, sir.

25              THE COURT:  Do you --

1          MR. CLENDENEN:  Your Honor, I did want to note,

2     actually, we cited that case in our brief.  So the fact that

3     Plaintiffs didn't bring it up in their reply is notable,

4     because it was already part of the record in this case.

5          But in our brief, we distinguished it on the

6     grounds that that was sort of a different situation, where

7     the plaintiff had a contract with a government agency and

8     they were suing a different entity, which coincidentally was

9     a different federal agency, on the grounds that they were

10    tortiously interfering with their contractual obligations.

11         So the Defendant in that case was not even the

12    party with which the Plaintiff had a contract.

13         THE COURT:  And I take it the D.C. Circuit held

14    there that that claim did not have to be channeled through

15    the Contract Disputes Act and into the Court of Federal

16    Claims or whatever the relevant --

17         MR. CLENDENEN:  Correct.  Yes.  The Court held

18    that jurisdiction was proper in the district court.

19         THE COURT:  And --

20         MR. CLENDENEN:  It's sort of an unusual fact.

21    That's not quite the same here.

22         THE COURT:  Sure.  Okay.

23         Ms. Shapiro pointed out that -- and the record

24    reflects -- that there are declarants here who have

25    pregnancies, including in the 36th week of pregnancy,

1    affected by termination notices, that there remain people in

2    relatively high-risk situations whose employment or contract

3    relationships -- again, I'm not trying to label it any

4    particular way -- but whose relationships with the

5    government might come to an end within 15 days, that that

6    puts people at risk with being overseas in a situation

7    without diplomatic or other cover and the like.

8            What's your response to that?

9            MR. CLENDENEN:  So a few responses, your Honor.

10           First, all of the PSCs who have been given a

11   termination notice, the government will provide them

12   transportation back to the United States within that 15

13   days.  If they choose not to take that -- you know, not to

14   take the government's offer for transportation and just stay

15   in the country, you know, that's a choice that they're

16   making.

17           That wouldn't apply for the most part for

18   high-risk places because, as we put in the declaration, the

19   terminations were supposed to be just for high- and

20   mid-income countries.  I think there's one instance of --

21   the PSC who's in Mogadishu might be sort of an exceptional

22   case.

23           I'm happy if Plaintiffs want to discuss that one

24   instance.  We can figure it out.  But I'm under the

25   impression that maybe this person is physically in Somalia,

 1      but they were a part of a larger group that's in a different

 2      country.

 3              And also, with regards to, you know, pregnant

 4      PSCs, as long as the 15-day period is still active, the

 5      government is under an obligation, you know, to provide any

 6      medevac.  And if there's special circumstances that perhaps

 7      we can talk about, we can figure it out.  It's a little hard

 8      to operate here because the Plaintiffs haven't actually

 9      given the names of any of these PSCs.  All the declarants

10      are pseudonyms.  You know, if there's any particular

11      emergency that the agencies are -- we're happy to work that

12      out on a case-by-case basis.

13              THE COURT:  Imagine we had a PSC who was in her

14      35th month of pregnancy and the PSC got a 15-day termination

15      notice and wanted to get continued medical assistance, for

16      lack of a better word, for some period of time beyond 15

17      days and actually thought that she was entitled to that by

18      the terms of her agreement with the government.

19              And the government didn't accommodate that PSC.

20      It didn't say, "We'll medevac you"; it didn't say, "We'll

21      take care of whatever concerns you might have."  The

22      government just said, "After 15 days, you're on your own."

23              Just talking about that one PSC, what forum would

24      that PSC have available to her from the government's

25      perspective if she wanted to ask a court to enjoin the

1    government either from the 15-day termination or to require

2    the government to provide her with at least medical

3    assistance thereafter?

4            MR. CLENDENEN:  Your Honor, I think, since it

5    sounds like it's a hypothetical, it's a claim that's arising

6    out of what the PSC thinks is a breach of contract, that the

7    government has a contractual obligation to do something that

8    they're not doing.

9            She would have to bring a claim in the first

10   instance in the Court of Federal Claims.  I'm not sure

11   exactly to what extent it's possible to raise, like, a

12   motion for TRO in the Court of Federal Claims.  In any

13   event, she would have to show that, you know, she's

14   suffering irreparable harm, you know, and it's not

15   compensable on the back end by monetary damages.  And

16   definitely it's possible that the government, you know,

17   might say that whatever health expenses she is incurring

18   could be back-paid on a successful contract claim here.

19           But I think if it's a claim that's arising out of

20   a breach of the PSC contract that it would have to be

21   challenged through the Court of Federal Claims first.

22           THE COURT:  Right.  Right.  I understand the

23   parties might have different views about the propriety of

24   injunctive relief and whether and to what extent the harm is

25   compensable and the like.

1        I just wonder fundamentally whether even in the

2    purely individual case of claimed imminent irreparable harm

3    relating to a pregnancy, whether -- if the PSC can't come

4    here, just the individual PSC can't come to federal district

5    court, where that individual PSC could in fact go.  And it

6    sounds like the government's position is the PSC would have

7    to go through the Contract Disputes Act or other sort of

8    channeled jurisdictional regime, but with an open question

9    about whether any of those forums could provide TRO or

10   preliminary injunctive relief.

11        Obviously, the Court of Federal Claims is

12   empowered to deal with bid protests, which often happen

13   exceptionally fast.  But I'm actually not sure whether the

14   Court of Federal Claims has jurisdiction to issue TROs or

15   PIs.

16        MR. CLENDENEN:  Your Honor, I'm sorry.  I don't

17   know that specific question either.

18        But, you know, I would again just say it sounds

19   like in this hypothetical that the relief that plaintiff is

20   seeking -- that she's asking for money from the government.

21   And I don't think that would necessarily be a basis for a

22   TRO even if the Court of Federal Claims had jurisdiction to

23   grant it.

24        THE COURT:  Thank you, counsel.  Anything you'd

25   like to add additionally before I turn it back to

1    Ms. Shapiro for rebuttal?

2         MR. CLENDENEN:  Just one point, your Honor.  In an

3    exchange with Plaintiff's counsel, you had asked if a PSC --

4    if there was a Plaintiff PSC that brought a claim, where the

5    claim would be brought.  The Plaintiff's answer, I think,

6    was it depends on the nature of the claim.

7         I just wanted to respond and say I think it really

8    more depends on the nature of the remedy that they're

9    seeking.  If the relief that they're seeking sounds in

10   economic harm, that they want their contract turned back on

11   or that they want monetary payments based on that, that they

12   would have to go through the CPA.  It can't be the case that

13   they could bring it in district court under the APA, or the

14   APA says that there's no waiver of sovereign immunity for

15   monetary claims.

16        So I think you really need to look more at what it

17   is they're asking for for relief more so than just, what is

18   the claim?  Just because the Plaintiffs have said it's a

19   constitutional claim or, you know, a separation of powers

20   claim or something like that, that's not really -- that's

21   the question of whether or not it should be in district

22   court or the Court of Federal Claims.

23        THE COURT:  It is the case that if one were to

24   reach the statutory or constitutional claims here and were

25   to say that the government's actions vis-à-vis USAID are

1    unlawful that that -- and if the Court were to enjoin those

2    efforts, that would redress Plaintiff's various claimed

3    injuries, at least in the near term.

4        But what you're saying is that while that may not

5    be true, to the extent that those injuries are economic,

6    those economic injuries are -- or to the extent that those

7    injuries are economic and they are here, they have to go in

8    front of a different forum?

9        MR. CLENDENEN:  Yes.  Yes, your Honor.

10       THE COURT:  Okay.  Anything else, counsel, before

11   I turn back to Ms. Shapiro?

12       MR. CLENDENEN:  No, your Honor.

13       THE COURT:  Thank you.

14       Ms. Shapiro.

15       MS. SHAPIRO:  Yes.  Well, I'd like to start by

16   saying our claims are not economic.  Our claims are

17   constitutional and structural and the right to be free of

18   arbitrary and capricious decision-making.

19       We have no claim for money damages.  Our claim is

20   that the Plaintiff's members are entitled to have decisions

21   made about their contract and their agency by the

22   constitutionally appropriate decision-makers.  That is not

23   what's happening here.

24       It's very similar to *United States versus Gundy*,

25   where Justice Gorsuch talked about how when decisions are

1    made, it's important that they be made by the right

2    decision-maker for purposes of democratic accountability.

3    And that again is true here.

4            On some more specific points --

5            THE COURT:  I think that you are to some extent

6    misreading the discussion I just had with Government

7    counsel.

8            I get that your claims are the nature you just

9    described.  But there's the separate question of what the

10   injuries are.  And the injuries here, they're either at a

11   very high level an injury in the sense that, you know, the

12   government should not be acting unconstitutionally

13   generally.  There is a way of doing things that is the way

14   it's supposed to be.

15           Or it's more particularized.  And the more

16   particularized the injury that is alleged here, the more it

17   arises out of the contract relationship with the government.

18   That is the relationship most acutely injured through the

19   government's actions.  And I think that's what Government

20   counsel is getting at.

21           MS. SHAPIRO:  I don't think it's any different

22   than in *Axon* or *Free Enterprise* or *Andrade*.  I don't think

23   it's any different than cases involving Appointments Clause

24   challenges like *Seila Law*.  In all of these cases, people

25   have a personalized injury that nobody else has.

1    But in *Free Enterprise* and *Axon*, the Court says

2    part of that injury is actually having the adjudication take

3    place, having the decisions take place, by a

4    constitutionally improper actor.  That's exactly the same

5    thing here.

6    So yes.  It may cause these individual,

7    particularized injuries, which is part of why we think a TRO

8    is appropriate.  We have to be able to show that in part.

9    But the fundamental injury is that the

10   decision-makers that are acting are defying Congress's power

11   of the purse.  They are exercising what is essentially a

12   retroactive line-item veto saying, We just don't feel like

13   spending this money.  We don't feel like having this agency

14   anymore, even though Congress has said this agency exists

15   and the president does not have the power to abolish it.

16   THE COURT:  Right.  Okay.

17   MS. SHAPIRO:  I will add a more specific point.

18   The *Crowley* factors are certainly unusual.  The facts here

19   are unusual.  I don't think we've seen a case like this

20   before.  But the logic of *Crowley* applies exactly here.  It

21   says that what matters is whether or not the decision-maker

22   in question is authorized by law to make the decisions it's

23   making.  And if the claim is that it's not, then the case

24   does not go through the CDA process.  It goes to -- it can

25   go directly to district court.

1          I'd just like to just say a few things about the

2     individualized harms.  The government did make a variety of

3     commitments to direct hires during the *AFSA* litigation.

4     They have made, notably, absolutely no such representations

5     about how they might treat PSCs.  They say, for example,

6     Well, if they're still employed, they can have medevac.  But

7     people whose employment will end within 15 days, they may

8     not be able to -- and as you pointed out, of course, they

9     are not on paid leave.  They are being terminated.

10         I just want to emphasize, this is not a

11    taxpayer-type case.  This is a case where specific people

12    are being harmed in specific ways by unconstitutional

13    conduct.

14         Thank you, your Honor.

15         THE COURT:  Thank you.

16         I'm going to just put everybody on mute for a

17    minute or two, and then I'll come back and let people know

18    what my plan is.

19         Thank you.

20         (Brief pause in the proceedings.)

21         THE COURT:  Can everyone still hear me?  This is

22    Judge Nichols returning.

23         Can you hear me, Ms. Moore?

24         THE COURTROOM DEPUTY:  Yes, your Honor.

25         THE COURT:  Here's what I want to do:  Obviously,

1    as I said earlier, there were a couple arguments that I

2    thought were a little bit new to me argued today.  And I

3    want just a little bit of time to reflect on that and

4    perhaps review a case or two that was highlighted more today

5    than I thought it had been before.

6              So I'm going to take the TRO motion under

7    advisement.

8              My plan is to reconvene another telephonic

9    discussion/hearing either tomorrow or Friday, at which I

10   decide the TRO orally.

11             I'm not setting that time today because I want to

12   ensure that I have enough time to do what I just said I'd

13   like to do.

14             To the parties, what that means is that I will

15   have Ms. Moore communicate with you and ask you for your

16   availability at some time Thursday or Friday.  And then once

17   we land on a time that works for everyone, we'll do it and a

18   notice will go out on the public docket about when that

19   hearing will be.  Okay?

20             Ms. Shapiro, any questions about how I intend to

21   proceed?

22             MS. SHAPIRO:  No.  Thank you, your Honor.

23             THE COURT:  How about from the Government's

24   perspective?  Any questions about how I want to proceed?

25             MR. CLENDENEN:  No, your Honor.

```
1              THE COURT:  Okay.  Thank you, all.

2              So the matter is taken under advisement.  And as I

3      said, Ms. Moore will be in touch.  We'll calendar another

4      telephonic hearing, and I will at that next hearing decide

5      the TRO orally.

6              Thank you, all.

7              (Proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        **<u>CERTIFICATE</u>**

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10             Dated this 6th day of March, 2025.

11

12          <u>/s/ Lisa Edwards, RDR, CRR</u>
            Official Court Reporter
13          United States District Court for the
              District of Columbia
14          333 Constitution Avenue, Northwest
            Washington, D.C. 20001
15          (202) 354-3269

16

17

18

19

20

21

22

23

24

25