```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
```

```
PERSONAL SERVICES CONTRACTOR          Civil Action
ASSOCIATION,                          No. 1:25-469

         Plaintiff,

     vs.                              Washington, D.C.
                                      March 6, 2025
DONALD J. TRUMP, et al.,

         Defendants.                  10:06 a.m.
_____/
```

```
   TRANSCRIPT OF CONTINUED TELEPHONIC MOTION HEARING
         ON TEMPORARY RESTRAINING ORDER
      BEFORE THE HONORABLE CARL J. NICHOLS
            UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

**For the Plaintiff:**      **Carolyn E. Shapiro**
                            **Rachael Yocum**
                              SCNAPPER-CASTERAS, PLLC
                              200 East Randolph Street, Ste 5100
                              Chicago, Illinois 60601

                            **Joshua Karsh**
                              MEHRI & SKALET, PLLC
                              2000 K Street, NW, Suite 325
                              Washington, D.C. 20006

                            **Marni Joy Willenson**
                              WILLENSON LAW, LLC
                              3420 Armitage Avenue, Suite 200
                              Chicago, Illinois 60647

```
APPEARANCES, CONT'D:


For the Defendants:      Michael P. Clendenen
                         Lauren Wetzler
                           1100 L Street, NW
                           Washington, D.C. 20005



Reported By:             LORRAINE T. HERMAN, RPR, CRC
                           Official Court Reporter
                           U.S. District & Bankruptcy Cts.
                           333 Constitution Avenue NW
                           Washington, D.C. 20001
                           lorraine_herman@dcd.uscourts.gov



*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.
```

**P R O C E E D I N G S**

    **DEPUTY CLERK:** This is civil matter 25-0469, *Personal Services Contractor Associates versus Donald J. Trump, et al.*

    Counsel, please state your appearance for the record, beginning with the plaintiff.

    **MS. SHAPIRO:** Good morning, Your Honor. This is Carolyn Shapiro for the plaintiff.

    **MR. KARSH:** Good morning, Your Honor. Also Joshua Karsh for the plaintiff.

    **THE COURT:** Good morning.

    **MS. YOCUM:** Good morning, Your Honor. Rachael Yocum for the plaintiff.

    **THE COURT:** Also good morning.

    **MR. CLENDENEN:** Good morning, Your Honor. Michael Clendenen for the defendants. Also on the line is [indiscernible] --

    **THE COURT:** Good morning, Counsel. We are here on the continued TRO hearing from yesterday. As I said, I wanted to reflect on a few things, which I've done and I am prepared to decide the TRO motion orally today. So I'm going to just jump right into it.

    Plaintiff Personal Services Contractor Association, PSCA, seeks a TRO that would, in short, keep or return USAID workers who are employed as personal service

1    contractors, or PSCs, to the terms and conditions of hire
2    that they enjoyed on January 19, 2025.
3           Because I summarized many of the facts underlying
4    this case in the Opinion I issued in the related case *AFSA*
5    *v. Trump*, No. 25-cv-352, which sought essentially the same
6    relief but as to USAID direct hires rather than PSCs, which
7    I will not recite those facts here in great detail.  Still,
8    I think it is helpful to lay out some of the relevant events
9    at least briefly.
10          Upon taking office on January 20, 2025, President
11   Trump issued an Executive Order that mandated a 90-day pause
12   in United States foreign development assistance pending
13   reviews for, quote, programmatic efficiency and consistency
14   with United States foreign policy, end quote.
15          The Order also directed that, at the end of the
16   90-day period, quote, responsible department and agency
17   heads, end quote, should, quote, make determinations  ... on
18   whether to continue, modify, or cease each foreign
19   assistance program based upon the review recommendations,
20   end quote.
21          Secretary of State Marco Rubio then issued a
22   memorandum that paused all foreign assistance programs
23   funded by the Department of State and USAID, with exceptions
24   for foreign financing for Israel and Egypt, emergency food
25   assistance, legitimate expenses incurred prior to the date

1  of the memorandum and, quote, salaries and related
2  administrative expenses, including travel, for U.S. direct
3  hire employees, personal services contractors and locally
4  employed staff, end quote.  Secretary Rubio later also
5  waived the pause as to, quote, life-saving humanitarian
6  assistance during the period of review, end quote.
7       On January 30th, 2025, President Trump appointed
8  Secretary Rubio as the Acting Administrator of USAID.  Four
9  days later, the Secretary sent a letter to members of the
10 Congressional Committees on Foreign Relations, Foreign
11 Affairs, and Appropriations informing them that Peter
12 Marocco had been delegated the duties of Deputy
13 Administrator of USAID and would, quote, begin the process
14 of engaging in a review and potential reorganization of
15 USAID's activities to maximize efficiency and align
16 operations with the national interest, end quote.
17      USAID has approximately 1,230 personal services
18 contractors, or PSCs, stationed in both the U.S. and
19 overseas.  PSCs serve as technical advisors across USAID and
20 provide flexibility to rapidly respond to developmental
21 needs and critical staffing gaps.
22      On February 2, 2025, USAID approved the
23 termination of 791 PSCs stationed in high- and middle-income
24 countries like the U.S., Moldova and Thailand.  According to
25 Deputy Administrator Marocco, those contracts, quote, appear

1    to be inconsistent with the mission of USAID, end quote,
2    which is to, quote, assist primarily in low-income
3    countries, end quote.  Those are quotes from the Second
4    Marocco Declaration, Paragraph 4, ECF No. 13-2.
5           As of February 23rd 2025, 493 termination notices
6    had been issued, 35 contracts were determined to be no
7    longer active, for example, because the PSC resigned or
8    moved positions, and 286 are under review.  As required by
9    their contracts, PSCs who are terminated are being given 15
10   days' advance notice.
11          Again, the PSCA seeks a TRO that would "protect"
12   its PSC members from these changes at USAID.
13          To obtain a TRO -- and this is a quote from
14   *Chaplaincy of Full Gospel Churches vs. England*, 454 F.3d
15   290, 297; that's the D.C. Circuit 2006 -- quote, the moving
16   party must show, one, a substantial likelihood of success on
17   the merits; two, that it would suffer irreparable injury if
18   an injunction were not granted; three, that an injunction
19   would not substantially injure other interested parties; and
20   four, that the public interest would be furthered by the
21   injunction, end quote.
22          Where, as here, the requested temporary relief
23   would run against the government, "the final two factors --
24   balancing the equities and public interest merge, end quote.
25          I will now discuss how each of the TRO factors

1     applies here.  I will start with irreparable harm.

2              As in *AFSA,* because irreparable harm is the

3     touchstone of preliminary injunctive relief and the PSCA's

4     allegations of irreparable harm necessarily inform the

5     relief that I could conceivably order at this time, it is

6     helpful to begin the analysis with this factor.

7              The standard for irreparable harm is high.  That

8     is recognized by many courts, to include *Hi-Tech Pharmacal*

9     *Company vs. FDA*, 587 F.Supp. 2d 1, 11, which is a D.D.C.

10    case 2008.  To meet it, a plaintiff must demonstrate that it

11    faces injuries that are, quote, certain, great, actual and

12    imminent, end quote, that same case, as well as, quote,

13    beyond remediation, end quote.  And that is from *Chaplaincy*

14    *of Full Gospel Churches vs.  England,* 454 F.3d 290, 297;

15    that's a D.C. Circuit case from 2006.

16             The PSCA argued in its reply brief that the

17    gravest imminent irreparable harm in this case flows not

18    from changed employment conditions and their follow-on

19    effects, but from the harm to our constitutional democracy,

20    end quote, if USAID eventually ceases to exist.

21             But it is not clear how alleged harms to our

22    constitutional democracy affect plaintiff's members in

23    particular, as needed to surmount the ban on generalized

24    litigating grievances.  And it remains the case that the

25    President and Secretary of State have not placed a blanket

1     pause on USAID's spending.  Instead, the government has
2     reiterated   that its current actions *vis à vis* USAID are
3     taken with an eye toward reviewing the agency's operations.
4            Even though the PSCA's reply brief focuses on that
5     claimed irreparable harm, its opening brief and declarations
6     identify other potential "harms and threats of harm" that
7     PSCs face from the government's actions with respect to
8     USAID.  The PSCA says that those harms are "identical to
9     those impacting direct hires," which were at issue in the
10    *AFSA* case.
11           Specifically, the PSCA points to:  The possibility
12    that its members will face safety risks due to losing access
13    to USAID communication and security tools while overseas;
14           The possibility that the funding pause will delay
15    payment of overseas PSCs' authorized living expenses,
16    including causing them to lose critical utilities like water
17    and electricity;
18           The risk of familial and medical disruptions due
19    to expedited evacuations of PSCs stationed abroad; PSCs'
20    loss of goodwill with USAID implementing partners who are no
21    longer receiving agency funds;
22           And general reputation damage to PSCs, both
23    because of President Trump's negative statements about USAID
24    and because DOGE, D-O-G-E, allegedly has published personal
25    identifying information about PSCs on its website.

1           Because of the same reasons I explained in my
2  *AFSA* Opinion, none of these alleged harms meet the high
3  standard needed to warrant preliminary relief.  *Hi-Tech*, 587
4  F.Supp. 2d at 11.
5           Beginning with PSCs' loss of communication tools
6  and utilities while overseas, the PSCA has not demonstrated
7  any such harm is "certain" or "imminent."  The PSCs whose
8  contracts have been or are being terminated, are in
9  high-income and middle-income countries, it appears unlikely
10 physical harm would result were those PSCs cut off from
11 government communication or security systems as a result of
12 their terminations.  To the extent that PSCs are also
13 concerned about pre-termination lapses in access, the
14 government has credibly attested that that will not occur.
15          And as the PSCA's affiant acknowledges in a
16 declaration, the non-payment of allowable living expenses is
17 merely an unintended consequence, quote/unquote, of the
18 funding freeze, because Secretary Rubio specifically
19 exempted the administrative expenses of PSCs from the 90-day
20 pause.  The PSCA has not pointed to any member who faces
21 personal present, personal danger of unintended consequence,
22 which appears to be resolved soon.  For that last point, I
23 am citing both Exhibit J, Paragraph 7 and Exhibit D,
24 Paragraphs 3 through 5 of the declarations there.
25          As for disruptions that the PSCA's members might

1  face as a result of departing their posts earlier than
2  anticipated, that is within the 15-day pretermination
3  windows afforded them, the PSCA has not demonstrated an
4  imminent risk of irremediable harm from any expedited
5  departures.
6       Any economic harm from early departure from post,
7  such as breaking a lease or being unable to sell a car, is
8  not irreparable because affected PSCs could seek "adequate
9  compensatory relief at a later date."  Citing there *Full*
10 *Gospel Churches* 454 F.3d at 297.
11      And although the PSCA flags the possibility that
12 pregnant members or members with upcoming in-country medical
13 procedures could be forced to evacuate on timelines that
14 could disrupt their care, the PSCA has not identified anyone
15 who is indeed in that situation and being forced to depart
16 post.  Moreover, the government attested at yesterday's
17 hearing that it would work to resolve any such situation in
18 individual circumstances should it arise.
19      Finally, the PSCA's various allegations regarding
20 loss of goodwill and reputational damage do not amount to a
21 "great" harm of the kind warranting injunctive relief.  Here
22 I am relying on *Sampson v. Murray*, 415 U.S. 61, at 91-92.
23 And while the PSCA alleges that its members face a risk of
24 doxxing, that danger is too hypothetical to support a TRO,
25 especially where PSCA affiants acknowledge that the personal

1    data of USAID PSCs has been available on certain government
2    databases for some time.
3            For all these reasons, I conclude that the PSCA
4    has not established that its members would suffer imminent
5    irreparable harm as a result of the government's challenged
6    actions absent a TRO.
7            Turning now to likelihood of success on the
8    merits.  As in *AFSA*, the PSCA asserts that its members
9    challenge the wholesale dissolution of USAID, as opposed to
10   the dissolution of their contracts, in particular, or the
11   changes to the terms of the contracts.
12           The reason that the PSCs are suffering or will
13   suffer Article III injury in fact, and the only reason that
14   they have identified potential imminent harm or possible
15   irreparable harm, is that they do have contractual
16   relationships with USAID that USAID is attempting to alter.
17           In short, the only reason plaintiff's members have
18   standing to bring their statutory and constitutional claims,
19   setting aside the narrower question of whether they have
20   demonstrated irreparable harm warranting a TRO on those
21   claims, is because of the injuries they will suffer as the
22   result of the government changing those contractual
23   relationships.
24           Thus, at least for TRO and preliminary relief
25   purposes, this case presents as essentially a federal

1  contract dispute, that is, a dispute about the government's
2  efforts to change the nature of its contractual
3  relationships with PSCs.  Plaintiff's efforts to broaden the
4  case into one about structural constitutional powers and
5  claimed harm of being subjected to unconstitutional
6  decisions doesn't work here because, at this juncture, its
7  members' Article III injuries, including, again, any alleged
8  irreparable injuries, are all directly traceable to their
9  contracts with USAID and wholly redressed by a decision
10 reinstating them.
11             This is critical because, under the Contract
12 Disputes Act, federal courts lack jurisdiction to adjudicate
13 certain types of federal contracts.  This particular federal
14 court lacks jurisdiction to adjudicate certain types of
15 cases involving federal contracts, including federal
16 contracts for the procurement of services.
17             As relevant here, that Act, quote, establishes an
18 administrative system for disputes relating to federal
19 procurement contracts, end quote.  And then, quote, vests
20 exclusive jurisdiction over claims in only two venues:  One,
21 at the Court of Federal Claims and, two, agency board of
22 contract appeals.  Before filing suit in either venue,
23 contractors must administratively exhaust by submitting a
24 written claim to the contracting officer for a final
25 decision.

1             Here, whether the claims of plaintiff's members
2    are, in fact, subject to the CDA's exclusive review scheme
3    depends on the precise terms of their contracts, which
4    plaintiff has not produced in this litigation.
5             The government argues, and PSCA has not really
6    rebutted the notion, that there are contracts here that are
7    subject to the CDA.  And, in any event, the PSCA cannot
8    avoid the jurisdictional bar of the CDA by cloaking its
9    claim in non-contractual language such as the Constitution
10   statutes or the APA.
11            Instead, determination of whether an action is at
12   its essence a contract action, subject to the CDA, depends
13   both on the source of the rights upon which the plaintiff
14   bases its claim and upon the relief sought (or appropriate).
15   Where plaintiff's members have Article III standing to sue
16   only because of their contractual relationships with USAID,
17   and expressly seek reinstatement of their contracts and/or
18   damages for unpaid contractual obligations, it appears
19   likely that their claims are at bottom contractual ones to
20   which the CDA will apply.
21            Indeed, the PSCA offered in its reply brief no
22   substantive argument in response to the government's
23   discussion of these points beyond simply asserting in that
24   reply that its constitutional claims are collateral to any
25   contract claims that could be brought under the CDA.  But

1    the PSCA, in its brief, made no effort to explain how that
2    is so, when its only theories of particularized irreparable
3    harm relate exclusively to contractual relationships between
4    its members and USAID.
5            To be sure, at yesterday's hearing, the PSCA
6    pointed me to *Crowley Government Services, Inc. versus GSA*
7    38 F.4th 1099, 1102, D.C. Circuit 2022, which held that a
8    plaintiff's claim against GSA for essentially tortiously
9    interfering with the plaintiff's DOD contract was not, at
10   its essence, a contractual claim over which the district
11   court lacked jurisdiction.
12           I am not persuaded that the logic of *Crowley*
13   applies here, where the PSCA has sued the contracting entity
14   itself, USAID, and it cannot be said that its asserted right
15   exists independently of the contract with USAID.
16           To be sure, I realize, as I noted before, that
17   plaintiff has disavowed making any direct contract claim but
18   to think about the remedy here, the remedy that would
19   redress their Article III injuries; that is to say, those
20   injuries that give me jurisdiction in the first place, would
21   be the restoration of their contracts and contractual rights
22   as they existed on January 19th, 2025; that is the remedy
23   that would redress the injury that creates Article III
24   standing here.  And, in my view, that means that the CDA
25   likely applies and, at a minimum, that the logic of *Crowley*

1    and its holding that the CDA did not apply to that dispute,
2    is not binding on me here.
3           In sum, in my view, I conclude that the PSCA has
4    not carried its burden of establish establishing the Court's
5    subject matter jurisdiction over the claims here, which
6    appear likely to be stripped and must be adjudicated
7    elsewhere by the Contracts Dispute Act.  As a result, PSCA,
8    in my view, has not established a likelihood of success on
9    the merits.
10          Turning to the last two factors, which merge, as I
11   said earlier, into one, essentially, this final factor,
12   final two factors requires me to weigh the hardship to the
13   PSCA if the TRO is not granted against the harm to the
14   government if it is, and the public's interest relatedly.
15          Because the PSCA has not carried its burden on
16   irreparable harm and likelihood of success there is no need
17   to balance hardships in detail.  The D.C. Circuit held that
18   in and among other cases, *Davis*, 571 F.3d 1288.  Regardless,
19   at least as the parties have briefed this issue, this
20   factor, at a minimum is in equipoise and perhaps favors the
21   government as well.
22          As I explained in the *AFSA* Opinion, the government
23   has articulated plausible harms that would occur if its
24   efforts with respect to USAID are not allowed to continue;
25   namely, that it would not be able to audit USAID in the

1	manner needed to ensure the agency is acting in national and
2	global interest.  In the context of this case, the
3	government has claimed that maintaining PSCs in middle- and
4	high-end countries is antithetical to the mission of USAID
5	and wasteful of American tax dollars.
6	            In response to these points, the PSCA asserts that
7	the equities and public interest favor a TRO because denying
8	preliminary injunctive relief would harm our constitutional
9	democracy by supposedly conferring on the executive vast and
10	generally unreviewable powers in the realm of foreign
11	affairs.
12	            But the merits question of what powers the
13	executive branch holds with respect to USAID is not directly
14	before the Court today.  Instead, the inquiry on this final
15	TRO factor is whether the balance of the equities and the
16	public interest favor an injunction before that merits
17	question can be answered.
18	            In my view, and for the very reasons I've
19	discussed in *AFSA*, it is impossible for me to conclude that
20	these final factors weigh heavily in favor of an injunction.
21	For all these reasons, I conclude that the PSCA has not
22	demonstrated its members will suffer irreparable injury
23	absent a TRO; that its claims are likely to succeed on the
24	merits; or that the balance of the hardships, or the public
25	interest, weigh heavily in favor of a TRO, I will deny the

1    PSCA's motion, which is ECF No. 6.

2           Ms. Shapiro, obviously I just announced the
3    decision.  Are there any topics I just announced that the
4    plaintiff would like to address today either by way of next
5    steps, the case more generally or any related issues?

6           **MS. SHAPIRO:**  Your Honor, I think we will want to
7    conference and absorb the opinion before we address those
8    issues.

9           **THE COURT:**  Okay.  Very well.

10          Does the government want to raise anything today
11   before we sign off and then wait for the parties to come
12   back for proposals of next steps?

13          **MR. CLENDENEN:**  No, Your Honor.

14          **THE COURT:**  Okay.  Thank you, all.

15          Ms. Shapiro, obviously in any event that the
16   plaintiff comes up with something it would like me to take
17   up either by way of scheduling, another motion and/or
18   anything like that, obviously I am here to accept any and
19   all filings.

20          I would generally though appreciate if you would
21   to the extent there is something that you would like to
22   propose that you meet and confer with the government and at
23   least get its views before I will wait to hear from the
24   parties thank you all.

25          **MS. SHAPIRO:**  Thank you, Your Honor.

1          (Proceedings concluded at 10:28 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# **C E R T I F I C A T E**

I, **Lorraine T. Herman, Official Court Reporter,** certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

    March 6, 2025           /s/  Lorraine T. Herman
      **DATE**                         **Lorraine T. Herman**