## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| PERSONAL SERVICES CONTRACTOR ASSOCIATION, <br>　　No address | ) ) ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 25-cv-469 (CJN) |
| DONALD TRUMP, President of the United States of America, <br>　　1600 Pennsylvania Avenue NW <br>　　Washington, DC 20050 | ) ) ) ) ) | |
| UNITED STATES DEPARTMENT OF STATE, <br>　　2201 C Street NW, Washington, DC 20520 | ) ) ) | |
| UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, <br>　　1300 Pennsylvania Ave. NW <br>　　Washington, DC 20523 | ) ) ) ) ) | |
| MARCO RUBIO, Secretary of State and Acting Administrator of the United States Agency for International Development, <br>　　2201 C Street NW, Washington, DC 20520 | ) ) ) ) ) | |
| JEREMY LEWIN, Deputy Administrator and Chief Operating Officer of the United States Agency for International Development <br>　　1300 Pennsylvania Ave. NW <br>　　Washington, DC 20523 | ) ) ) ) ) ) | |
| OFFICE OF MANAGEMENT AND BUDGET, <br>　　725 17th Street NW, Washington, DC 20503 | ) ) ) | |
| RUSSELL VOUGHT, Director, Office of Management and Budget, <br>　　725 17th Street NW, Washington, DC 20503 | ) ) ) ) | |
| UNITED STATES DOGE SERVICE f/k/a UNITED STATES DIGITAL SERVICE, <br>　　1650 17th St. NW, Washington, DC 20006 | ) ) ) ) | |

U.S. DOGE TEMPORARY SERVICE a/k/a the )
"DEPARTMENT OF GOVERNMENT )
EFFICIENCY," )
    1650 17th St. NW, Washington, DC 20006 )
     )
DEPARTMENT OF GOVERNMENT EFFICIENCY, )
    1650 17th St. NW, Washington, DC 20006 )
     )
UNITED STATES DEPARTMENT OF THE )
TREASURY, )
    1500 Pennsylvania Ave. NW )
    Washington, DC 20220 )
     )
and )
     )
SCOTT BESSENT, Secretary of the Treasury, )
    1500 Pennsylvania Ave. NW )
    Washington, DC 20220 )
     )
                  *Defendants.* )
_____ )

## AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.  NATURE OF THIS ACTION

    **1.**    This action seeks to enjoin Defendants from dismantling the United States Agency for

International Development (USAID) and from impounding tens of billions of dollars in foreign

assistance funds appropriated by Congress to USAID.

    **2.**    This action asks for relief:

    **(a)**    Declaring Defendants' actions in dismantling USAID and impounding billions

of dollars in funds appropriated to USAID, without Congressional authorization, ultra vires,

arbitrary, capricious, and in violation of the Constitution, the Impoundment Control Act of 1974,

the Anti-Deficiency Act, and the Administrative Procedure Act.

2

**(b)**    Enjoining Defendants to apportion to USAID the full amount of funds that Congress appropriated to USAID and maintain that apportionment to USAID so that all funds can be obligated by USAID for spending for contracts, grants, awards, and projects overseen by USAID, and for USAID's operations, per Congress's SFOPS 2024 and 2025 and additional budgetary appropriations to USAID.

**(c)**    Enjoining Defendants to operate, maintain, and restore public online access to apportionment data, associated footnotes, and written explanation, including the Public Apportionments Database, enabling the public to confirm OMB's apportionments of appropriated funds to USAID. See generally 31 U.S.C. §§ 716 and 1513.

**(d)**    Enjoining Defendants to develop and file a plan showing how they will timely obligate the full amount of SFOPS Title II and III and all other funds that Congress has appropriated to USAID and maintain staff levels at USAID adequate to obligate all funds appropriated by Congress to USAID and to oversee and administer USAID-funded foreign assistance awards and to carry out all other statutorily mandated USAID activities.

**(e)**    Restraining Defendants, their agents, and those acting in concert with them from taking steps to suspend, eliminate, consolidate, or downsize USAID, its workforce, or contracts, grants, awards, programs, projects, or activities, or to transfer, integrate, or subsume any of these to other parts of the federal government without Congressional authorization.

**(f)**    Restraining Defendants from enforcing and giving effect to termination notices sent to USAID personal services contractors (USPSCs) on or after January 20, 2025 until Defendants have complied with (d) above.

**(g)**    Restraining Defendants from taking any steps to close USAID missions or other USAID facilities overseas or to repatriate USAID personnel from overseas to the United States until Defendants have complied with (d) above.

**(h)**    Enjoining Defendants to restore public and employee access to the website usaid.gov as that website and access to it were on January 19, 2025. And

**(i)**    Enjoining Defendants to cease disclosing USPSCs' personal identifying information on and remove that information from the DOGE website.

## II.  JURISDICTION AND VENUE

3.    This Court has jurisdiction over the parties and the claims asserted here under 28 U.S.C. § 1331 and 28 U.S.C. § 1361.

4.    Venue is proper in this district because a substantial part of the events giving rising to the claims here occurred in this judicial district. 28 U.S.C. § 1391(e).

## III.  PARTIES

5.    Plaintiff **Personal Services Contractor Association** (the PSC Association) is a voluntary association of U.S. citizen personal services contractors (UPSCs) currently or formerly employed by USAID. As of January 2025, USAID employed approximately 1,100-1,200 USPSCs, including hundreds of USPSCs stationed overseas. All USPSCs active as of January 31, 2025 have been granted automatic membership in the PSC Association, and membership is also open to former USPSCs who choose to join. Originally formed in 1999 as an employee resource group for USPSCs employed by USAID, today the group has a membership of more than 1,000, an active membership of more than 700, and operates as a voluntary association independent from USAID.

4

6.    Defendant **Donald Trump** is the President of the United States and issued Executive Orders 14169, "Reevaluating and Realigning United States Foreign Aid," and 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" and is sued here in his official capacity.

7.    Defendant **United States Department of State** is a federal agency headquartered in Washington, DC, with responsibility for United States foreign relations and foreign policy.

8.    Defendant **United States Agency for International Development** (**USAID**) is a federal agency headquartered in Washington, DC, with responsibility for international development and humanitarian assistance, created by President Kennedy in 1961 and later established as an independent agency by Congress in 1998.

9.    Defendant **Marco Rubio** is the Secretary of State and is the highest-ranking official within the Department of State and the Acting Administrator of USAID and highest-ranking official within USAID and is sued here in his official capacity.

10.    Defendant **Jeremy Lewin** is the Deputy Administrator for Policy and Programming and Chief Operating Officer of Defendant USAID and is sued here in his official capacity.

11.    Defendant **Office of Management and Budget (OMB)** is a federal agency headquartered in Washington, DC, with responsibility for overseeing the management of federal financial assistance.

12.    Defendant **Russell Vought** is the Director of OMB and the agency's highest-ranking official and is sued here in his official capacity.

13.    Defendant **United States DOGE Service,** f/k/a United States Digital Service (USDS), was launched on January 20, 2025 by Executive Order 14158. DOGE's stated purpose is to "implement the President's DOGE Agenda, by modernizing Federal technology and

5

software to maximize governmental efficiency and productivity." *Id*. at Sec. 1. "DOGE…shall terminate on July 4, 2026" but that termination "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id*. at Sec. 3(b). On information and belief, Defendant United States DOGE Service is in a transitional state and not fully formed, but there is a web of employees working at the direction of Elon Musk that is referred to as the **Department of Government Efficiency**, or DOGE. Defendants United States DOGE Service and Department of Government Efficiency, as well as the network of personnel working at the direction of Musk, are referred to collectively in this complaint as "DOGE."

14.    Defendant **U.S. DOGE Service Temporary Organization** is a subcomponent of USDS and a subcomponent of the Executive Office of the President.

15.    Defendant **United States Department of the Treasury** is a federal agency responsible for managing the federal government's finances.

16.    Defendant **Scott Bessent** is the Secretary of the Treasury, sued here in his official capacity.

## IV.  FACTS

### A.    The U.S. Agency for International Development (USAID)

17.    USAID was established in 1961 to implement components of the Foreign Assistance Act of 1961 (FAA, P.L. 87-195). Subsequently, section 1413 of the Foreign Affairs Reform Restructuring Act of 1998 (Division G of P.L. 105-277) established USAID as an "independent establishment," 5 U.S.C. § 104, outside of the State Department. 22 U.S.C. § 6563. USAID is a Congressionally created agency. Presidential authority to reorganize USAID expired in 1999. Today, the President has no statutory or constitutional authority to abolish, move, or consolidate USAID without Congressional authorization.

**18.** Congress appropriates funds for USAID programs and operations in annual State, Foreign Operations and Related Programs (SFOPS) appropriations statutes (and in other appropriations statutes). SFOPS allows USAID to spend program funds in ways not specified in very limited amounts (generally no more than 10 percent) or under very limited circumstances that are not present. (FY 2024 SFOPS; § 7019 of Division F of P.L. 118-47, 138 Stat. 771-72). Nearly all USAID programs are authorized through the Foreign Assistance Act.

## B. <u>USAID Personal Services Contractors (USPSCs)</u>

**19.** U.S. citizen personal services contractors (USPSCs) perform inherently governmental functions for USAID. They are U.S. Government employees, a status recognized by the Federal Acquisition Regulations, among other sources. 48 C.F.R. 37.104.

**20.** USPSCs fill numerous roles that are essential to USAID's operations, including acting as contracting or agreement officers (COs and AOs) and contracting and agreement officer's representatives (CORs and AORs).

**21.** As of January 19, 2025, USAID employed approximately 1,100-1,200 USPSCs, hundreds of whom were stationed overseas.

**22.** As of January 19, 2025, USPSCs made up a majority of the staff in USAID's Bureau for Humanitarian Assistance, which oversees aid that includes food, water, shelter, emergency healthcare, sanitation and hygiene, and critical nutrition services.

**23.** As of January 19, 2025, USPSCs also made up a substantial portion of the staff of USAID's Office of Transition Initiatives, which promotes peace and democracy, including in countries transitioning from authoritarianism to democracy or from violence to peace.

**24.** Many USPCs have long tenures, even decade(s)-long careers as USPSCs for USAID, performing the same critical work as USAID "direct-hire" civil service employees.

**25.** USAID Acquisition Regulations (AIDAR) specifically provide that "U.S. citizen personal services contractors (USPSCs) *may be delegated or assigned any* authority, duty, or responsibility delegable to U.S. citizen direct-hire employees." AIDAR Appendix D, § 4(b) (emphasis added).

**26.** USPSCs fill numerous roles that are essential to USAID's operations.

**C.    Executive Order 14169 (the Foreign Assistance EO)**

**27.** On January 20, 2025, President Trump issued EO 14169, the Foreign Assistance EO, purporting to "pause" all United States foreign development assistance for 90 days, with the added proviso that expenditures "may resume" only if the Director of the OMB—defendant Russell Vought—says so.[1]

**28.** Four days later, on January 24, 2025, the Secretary of State issued a communique to all diplomatic and consular missions—known as an "ALDAC"—implementing the Foreign Assistance EO. The ALDAC ordered that "effective immediately," "no new obligations" shall be made for foreign assistance; that contracting officers should issue "stop-work orders" for all existing foreign assistance awards; and that the federal government would "suspend" review of all proposals for new foreign assistance, grants, subgrants, contracts, or subcontracts. As a result, according to USAID's Inspector General, "all USAID programs were suspended, including those with funds already obligated and disbursed." https://oig.usaid.gov/node/7439 [https://perma.cc/9X7M-MDEC] (last visited February 18, 2025).

---

[1] Foreign aid distributed through USAID represents the majority of the money the federal government spends on foreign aid every year, but foreign aid represents a small fraction of the total federal budget – less than 1.2% of the total federal budget. https://www.pewresearch.org/short-reads/2025/02/06/what-the-data-says-about-us-foreign-aid/ (last visited February 18, 2025).

**29.**    The result of the EO, the ALDAC, and the stop-work orders was mayhem.

**30.**    The EO, the ALDAC, and the stop-work orders prevented the PSC Association's members from carrying out the work for which their positions were created and exist by law and from overseeing often lifesaving humanitarian relief, including not only medicine, medical services, food, and shelter but also counter-narcotics, anti-human trafficking, and anti-terrorism operations.

**D.    DOGE**

**31.**    President Trump created the United States DOGE Service in the Executive Office of the President on January 20, 2025, in one of his first acts as President. Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" 90 FR 8441 (2025). In pursuit of the stated mission "to implement the President's DOGE Agenda," the order:

> Creates DOGE teams within each federal agency, including an embedded "DOGE Team member" who can only be hired by the agency "in consultation with" the DOGE Administrator, *id.* at Sec. 3(c);

> Orders the DOGE Administrator to commence "a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote interoperability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization," *id.* at Sec. 4(a);

> Directs agency leaders to "take all necessary steps, in coordination with the [DOGE] Administrator and to the maximum extent consistent with law, to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems," *id.* at Sec. 4(b).

**32.**    Elon Musk reports directly to President Trump and often acts unilaterally in directing DOGE operations.

**33.**    DOGE has been instrumental in dismantling USAID.

**34.**     On January 24, Tom Krause, a DOGE team member implanted at the U.S. Treasury, directed then-acting Treasury Secretary David Lebryk, to halt USAID foreign aid payments through the Bureau of Fiscal Service (BFS) system.

**35.**     Two days later, on January 26, Matthew Graber, a top Treasury official, outlined the Trump administration's plans to utilize BFS to halt payments to USAID in an email to Daniel Katz, the chief of staff to Scott Bessent, the Treasury Secretary nominee.

**36.**     On January 27, DOGE froze payments through Phoenix, the USAID payment system.

**37.**     Starting January 28, DOGE accessed and began to take control of all USAID information technology systems and physical security and credentialing operations, including classified information in USAID's Sensitive Compartmented Information Facility (SCIF). To ensure DOGE's control, Elon Musk made direct calls to USAID's leadership and security officials demanding that DOGE team members receive unfettered access, threatening to call the U.S. Marshals service if DOGE team members were not granted full access. After USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill balked at giving DOGE unfettered access, they were placed on administrative leave.

**38.**     By February 1, DOGE personnel had secured root access to USAID computer systems and began terminating USAID employees' access to USAID systems. Hundreds of USAID employees, including USPSCs, abruptly lost access to systems, including their emails and essential security communications systems. Also on February 1, 2025, USAID.gov went offline, showing an error message that read "server IP address could not be found," and USAID's X and Instagram accounts were taken offline.

**39.**     DOGE and Musk have publicly announced their intent to dismantle and abolish USAID. Musk has boasted that agencies must be "deleted" (not merely "reorganized").

**40.**    On February 2, responding to an X post about how Mr. Vorhees and Mr. McGill had been placed on administrative leave for trying to protect USAID's systems from DOGE, Musk posted "USAID is a criminal organization. Time for it to die."

**41.**    In the wee hours of the morning on February 3, in an X Spaces Conversation with Vivek Ramswamy and Sen. Joni Ernst (R-IA), Musk said, "So to be clear, in shutting down, which we're in the process of doing, *shutting down* USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . . If you've got an apple that's got a worm in it, maybe you can take the worm out, but if you've got actually just a ball of worms, it's hopeless. And USAID is a ball of worms. There is no apple. And when there is no apple, you've just got to basically *get rid of the whole thing* . . . That is why *it's got to go, it's beyond repair*." (Emphasis added). And emphasizing the point again, Musk posted on X, "We spent the weekend feeding USAID into the wood chipper."

**42.**    On February 13, in a speech to the World Government Summit in Dubai, UAE, Musk said, "I think we do need to delete entire agencies as opposed to leave a part of them behind. … It's kind of like a weed, if we don't remove the roots of the weed, then it's easy for the weed to grow back." After the speech, Musk reposted on X a quote from his speech, "We need to delete entire agencies, as opposed to leave part of them behind," above an image of him speaking.

**E.    FINALITY**

**43.**    On March 24, 2025, the Trump Administration "updated" Congress that, among other things: (a) it had terminated 5,341 USAID awards; (b) reduced direct hire USAID employees on active duty from 4,717 to 869; and (c) it was impounding more than $35 billion in funds

appropriated to USAID, including more than $8 billion in unobligated funds for still active programs and more than $27 billion in unobligated funds attributable to terminated awards.

44.    On March 28, 2025, Defendant Lewin sent all USAID personnel notice that: (a) USAID will not "continue operating as an independent establishment"; (b) "substantially all non-statutory positions at USAID will be eliminated …. Within the next few minutes, USAID personnel will begin receiving RIF notices …. These notices will specify one of two final separation dates: July 1, 2025, or Sept. 2, 2025"; (c) "The remaining USAID personnel will then supervise the … decommissioning of USAID assets and the wind-down of the Agency's operations"; (d) "By July 1, 2025, the State Department will have assumed responsibility for USAID's remaining programming"; (e) "By September 2, 2025, the Agency's operations will have been substantially transferred to State or otherwise wound down"; and (f) USAID has performed its "Final Mission."

45.    As of the date of this complaint, Defendants have sent notices of termination to more than 99% of all USAID employees in the United States and overseas, including all USPSCs, terminating a global workforce of more than 12,000. The vast majority of employees notified of their terminations since March 28, have received termination dates of July 1, 2025. Defendants have communicated to USAID personnel that every position is being eliminated (a "100% RIF"), that the employees retained until September will off-board and shut down the agency, and that the intent is to close down all programmatic work by July 1. No USAID employees are being transferred to the State Department, even if they work on one of the few surviving programs.

46.    USAID leadership has communicated to personnel: "Congressional earmarks for programs will not be honored," "Come hell or high water, USAID will be fully integrated into

State by July," "Litigation is over; just get on with it"; and "USAID will be a test case for the State RIF to follow."

47.    Defendants have publicly announced that, not later than September 2, and more likely by July 1, 2025, they will have decommissioned all USAID assets and transferred the surviving remnants of USAID programs, personnel, and assets to the State Department, such that USAID will cease to exist as the "independent establishment" that Congress created. And they have terminated more than 86% of all USAID programs—in all, more than 5,300 grants, cooperative agreements, and contracts—overwhelmingly on the basis of a cursory review consisting of glancing at a spreadsheet containing a single line of data for each one, without looking at the contract, agreement, or award documents themselves or consulting with contracting or agreement officers responsible for overseeing the awards.

48.    Unless the Courts intervene, USAID will imminently cease to exist, as will the United States Government's capacity to maintain the congressionally created and funded programs USAID operates.

**F.    IRREPARABLE HARMS**

49.    Defendants' actions are causing, or will very imminently cause, irreparable harms, including, among many others, all of the following:

50.    <u>Irretrievably gutting a specialized workforce that would take years to reassemble if that gutting is not stopped now</u>. Carrying out USAID's mission requires a skilled, specialized, trained, workforce, experts across a wide range of fields—including water engineers, firefighters, infectious disease specialists and supply chain and logistical experts, among others. They must be available to rapidly deploy to some of the world's most challenging environments. (On February 6, 2023, a magnitude 7.8 earthquake struck south-central Turkiye. USAID had a team

on the ground in Turkiye in 24 hours and deployed more than 200 USAID personnel to Turkiye from around the world to provide search and rescue, emergency shelter, health services, food assistance, and other critical humanitarian aid). USAID's workforce has been assembled over the decades of USAID's existence. This workforce is not readily replaceable. See https://www. pewresearch.org/short-reads/2025/01/07/what-the-data-says-about-federal-workers/ ("The most highly educated federal agency, among those with at least 1,000 employees, isn't NASA or the National Science Foundation, but the U.S. Agency for International Development.") Without court intervention restoring the status quo ante, this highly skilled and trained team of specialists will scatter, and rebuilding it will take years.

51.    Damaging and jeopardizing networks of relationships with local implementing partners, other U.S. government agencies, and other entitites built and maintained over decades. USAID's ability to respond to crises worldwide depends on a network of partners, throughout the world, carefully built over decades of collaboration. That network is eroding. Partner organizations, here and overseas, are growing increasingly wary of USAID and its reliability. Numerous partner organizations are going bankrupt. The longer the dismantling of USAID is allowed to continue, the harder it will be and the longer it will take to rebuild this network that is critical to USAID's foreign assistance programs. Partnerships and programs can only go so long without funding and stability.

52.    Eliminating complex systems and structures that can't easily be re-established. Once USAID is dismantled, there is no switch that can be flipped from "off" back to on to put it back together again. Institutional structures, systems, and operations are intricate. They take time to build—or rebuild. As an example, the first Trump Administration, acting *with* Congressional authorization, merged USAID's Offices for Food for Peace (FFP) and for Foreign Disaster

Assistance (OFDA)—to form the Bureau for Humanitarian Assistance (BHA). It took two years to create operational systems suitable for the new BHA, and nearly three years to staff that bureau with suitable personnel, even though FFP and OFDA were offices with complementary mandates. Rebuilding an entire agency after its dismantling will take much longer. Like Humpty Dumpty, once it takes a great fall, it cannot readily be put back together again. And the further and longer the courts allow the dismantling to progress, the harder it will be to re-establish any semblance of what USAID was before.

**53.**    Job losses. The "circumstances surrounding" the ongoing mass firings of USPSCs and the entire USAID workforce are a "genuinely extraordinary situation" that "so far depart[s] from the normal situation" as to justify preliminary injunctive relief. *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) ("We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found …. [W]e do not wish to be understood as foreclosing relief in the genuinely extraordinary situation.") Job losses for the entire workforce of USPSCs along with thousands of direct hire personnel and others will require USPSCs not just to find new jobs but to change fields and careers. USAID is by far the largest domestic employer in the humanitarian aid sector, and many other employers in the sector depend on contracts, grants, and awards from USAID; they will not be able to expand to fill the void caused by USAID's demise or replace the jobs lost.

**54.**    Invasion of privacy and loss of reputation as irreparable harm. USAID employees, including USPSCs, have been branded by Defendants as corrupt, as criminals, and as merchants of waste, fraud, and abuse—all of these charges false and amounting to defamation per se. Authoritarian regimes have cited Defendants' rhetoric to harass USAID staff and partners. In

addition, USPSCs' privacy and safety have been compromised: DOGE has begun publishing the

names and addresses of USPCs on the internet, putting these USPSCs at risk and causing them

fear not only for their reputations but for their safety. Here is an example of the personal

identifying information DOGE is posting:



(Counsel have redacted the USPSC's name and address from the screenshot above. DOGE did

not). Defendant Vought has bragged that he wants federal workers "to be traumatically affected

…. We want to put them in trauma."

    **55.**    <u>Morbidity and mortality</u>. It is estimated that, in just the next 12 months, Defendants'

actions—so far—will result in, among others: (a) between 12 and 18 million cases of malaria in

the next year that could have been prevented and as many as 166,00 deaths from malaria; (b)

more than 200,000 paralytic polio cases that could have been prevented; (c) 1 million children

who will suffer severe acute malnutrition; and (d) more than 11 million newborns who will not

receive critical postnatal care. See *Impact Metrics Dashboard* at

https://www.impactcounter.com/dashboard?view=table&sort= title&order=asc.

### G. **POST MORTEM**

**56.** On February 15, 2025, President Trump posted on Truth Social and on X, "He who saves his Country does not violate any Law":



**(Truth Social/@realDonaldTrump)**

**57.** Soon after, the official White House X account re-posted the same self-declaration that the President is above the law under a portrait of President Trump:



17

**58.** The President's declaration of his authority to act above the law is a translation of the French phrase "*Celui qui sauve sa patrie ne viole aucune loi*," reputedly spoken by Napoleon Bonaparte, who seized power in France through a coup in 1799 and then crowned himself Emperor.

## V.   CAUSES OF ACTION

<u>FIRST CAUSE OF ACTION</u>
**Separation of Powers**
(Against Defendant Trump)

**59.** The President is not a CEO. And Congress is not the President's CFO. That is not how Articles I and II work.

**60.** Presidential power is conferred, and limited, by Article II of the Constitution and by federal statutes. Congress, not the President, directs how federal funds must be spent, through appropriations that carry the force of law. The President is obligated to "take care" to execute the law and has no authority to ignore or amend the law, including appropriations statutes.

**61.** Congress controls the purse. U.S. Const. art. I. The President cannot abolish or ignore Congress's control of the purse, as if Congress were merely a paymaster or bursar. With the Foreign Aid EO, the President has unconstitutionally usurped Legislative Authority and the power of the purse that the Constitution gives exclusively to Congress.

**62.** The President also has no authority to eliminate agencies created by an act of Congress, as USAID was.

**63.** Because of the President's actions described above, the PSC Association and its members are suffering irreparable injuries and have no adequate remedy at law.

SECOND CAUSE OF ACTION

**Take Care Clause**
(Against Defendant Trump)

**64.**    Under the Constitution, the President is obligated to "take Care that the Laws be

faithfully executed." U.S. Const. art. II § 3.

**65.**    Through his actions described above, the President is flouting rather than faithfully

executing the law and is inflicting irreparable injury on the PSC Association's members, who

have no adequate remedy at law.

THIRD CAUSE OF ACTION

**Violation of the APA**
**(Arbitrary, Capricious & an Abuse of Discretion)**
(Against all Defendants except President Trump)

**66.**    Under the Administrative Procedure Act (APA), this Court may hold unlawful and set

aside final agency action for being "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C.

§ 706(2)(A).

**67.**    Defendants are (or lead) "agencies" under the APA, and their dismantling of USAID

and termination of federal foreign assistance, as alleged above, are "final" agency actions. These

actions are causing immediately devastating and potentially irreversible effects, with

consequences that may not be abated by future agency action. Pragmatically, if the lawfulness of

the Defendants' actions is not decided now, a later decision will be too late.

**68.**    Defendants have acted and are acting arbitrarily and capriciously and abusing their

discretion by dismantling and trying to eliminate USAID, by refusing to disburse

Congressionally appropriated foreign aid funds, and by terminating USAID contracts, grants, and

awards based on cursory reviews of spreadsheets containing a single line of data for each one.

Their stated justifications for these actions do not match and are wildly disproportionate to the

actions. They have not given reasoned consideration to less drastic alternatives. And they have failed to account for reliance interests. They did not consider the substantial reliance of the countless companies, organizations, and American farmers dependent on USAID contracts, many of whom are already being forced to shutter their businesses or furlough or fire staff. They did not consider the reliance of millions of recipients of USAID aid worldwide for necessary medicine, food, and lifesaving assistance. For many of them there will be immiseration, sickness, or death, ECF 19-1, Exh. C (Enrich Memo: "Consequences of Pausing Global Health Funding"). Nor did they consider the reliance of USPSCs and other employees who have devoted their careers to foreign aid. This group includes personnel who have lived outside the U.S. for years. When an agency changes course, as happened here, reliance interests "must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

<u>FOURTH CAUSE OF ACTION</u>

**Violation of the APA**
(**Not in Accordance with Law**)
(Against all Defendants except President Trump)

**69.** Under the Administrative Procedure Act (APA), this Court may hold unlawful and set aside final agency action for being "not in accordance with law." 5 U.S.C. § 706(2)(A).

**70.** Defendants' actions, as described above, are not in accordance with law: they violate separation of powers, the take care clause, the APA, Congressional appropriations statutes (including FY 2024 SFOPS, §§ 7019 and 7063 of Division F of P.L. 118-47), the Impoundment Control Act of 1974 (2 U.S.C. § 681), and the Anti-Deficiency Act (31 U.S.C. § 1512(c)(1)).

FIFTH CAUSE OF ACTION

**Ultra Vires**
(Against all Defendants)

**71.** Plaintiff repeats and re-alleges all preceding paragraphs of this complaint, incorporating them into this cause of action.

**72.** Plaintiffs have a non-statutory right of action to declare unlawful and enjoin government action taken without lawful authority.

**73.** No statute, part of the Constitution, or other source of law authorizes Defendants' actions alleged above, including their unilateral dissolution of a Congressionally created agency and their impoundment of appropriated funds.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks the Court to:

**A.** Issue a preliminary and permanent injunction:

(a) Enjoining Defendants to apportion to USAID the full amount of funds that Congress appropriated to USAID and maintain that apportionment to USAID so that all funds can be obligated by USAID for spending for contracts, grants, awards, and projects overseen by USAID, and for USAID's operations, per Congress's SFOPS 2024 and 2025 and additional budgetary appropriations to USAID.

(b) Enjoining Defendants to operate, maintain, and restore public online access to apportionment data, associated footnotes, and written explanation, including the Public Apportionments Database, enabling the public to confirm OMB's apportionments of appropriated funds to USAID. See generally 31 U.S.C. §§ 716 and 1513.

(c) Enjoining Defendants to develop and file a plan showing how they will timely obligate the full amount of SFOPS Title II and III and all other funds that Congress has appropriated to USAID and maintain staff levels at USAID adequate to obligate all funds appropriated by Congress to USAID and to oversee and administer USAID-funded foreign assistance awards and to carry out all other statutorily mandated USAID activities.

(d) Restraining Defendants, their agents, and those acting in concert with them from taking steps to suspend, eliminate, consolidate, or downsize USAID,

its workforce, or contracts, grants, awards, programs, projects, or activities, or to transfer, integrate, or subsume any of these to other parts of the federal government without Congressional authorization.

(e)  Restraining Defendants from enforcing and giving effect to termination notices sent to USAID personal services contractors (USPSCs) on or after January 20, 2025, until Defendants have complied with (c) above.

(f)  Restraining Defendants from taking any steps to close USAID missions or other USAID facilities overseas or to repatriate USAID personnel from overseas to the United States until Defendants have complied with (c) above.

(g)  Enjoining Defendants to restore public and employee access to the website usaid.gov as that website and access to it were on January 19, 2025. And

(h)  Enjoining Defendants to cease disclosing USPSC's personal identifying information on and remove that information from the DOGE website.

**B.**  Declare unlawful Defendants' actions in dismantling USAID and impounding billions of dollars in foreign assistance funds appropriated to USAID—as ultra vires, unconstitutional, and a violation of the APA and the Impoundment Control and Anti-Deficiency Acts;

**C.**  Order Defendants to file status reports at regular intervals confirming their compliance with the Court's order(s) and judgment(s) in this case.

**D.**  Award Plaintiff its costs and reasonable attorneys' fees; and

**E.**  Grant any additional relief the Court deems just and proper.

Dated: April 17, 2025

Respectfully submitted,

_/s/ Marni Willenson_

Carolyn E. Shapiro
Schnapper-Casteras PLLC
200 E. Randolph St., Ste 5100
Chicago, IL 60601
cshapiro@schnappercasteras.com
312-520-7533

Marni Willenson
D.C. USDC Bar No. IL0011
Illinois Bar No. 6238365
Willenson Law, LLC
3420 W. Armitage Ave.,
Ste 200

Joshua Karsh
Mehri & Skalet PLLC
1237 Judson Ave.
Evanston, IL 60202
jkarsh@findjustice.com
773-505-7533

*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.*

Chicago, IL 60647
marni@willensonlaw.com
312-546-4910

*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.*