# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PERSONAL SERVICES CONTRACTOR ASSOCIATION,** | ) ) ) |
| *Plaintiff,* | ) )     **Case No. 1:25-cv-469-CJN** |
| **v.** | ) ) |
| **DONALD TRUMP, et al.,** | ) ) |
| *Defendants.* | ) ) |

## PLAINTIFF PSC ASSOCIATION'S MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

## Table of Contents

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

   I.   USAID's funding ........................................................................................ 3

   II.   Appropriation, apportionment, obligation, and expenditure of USAID funding............ 4

   III.   Impoundment ............................................................................................. 6

   IV.   A Chronology of the Disabling and Destruction of USAID ........................................... 7

   V.   Mortality and Morbidity ............................................................................. 17

ARGUMENT ......................................................................................................... 17

   I.   Plaintiffs are likely to succeed on the merits. ................................................ 18

      A.  This Court has jurisdiction over Plaintiff's claims ...................................... 18

         1.   Because Plaintiff's claims are based on the Constitution and the APA, not a contract with the Government, they are not claims that can be brought under the Contract Dispute Act and are not within the exclusive jurisdiction of the Court of Federal Claims................................................................................. 19

         2.   Because the declaratory and injunctive relief the PSC Association seeks is equitable, it lies beyond the CFC's power to grant, rendering jurisdiction proper in federal district court .......................................................... 20

         3.   In enacting the CDA and creating the CFC, Congress did not strip federal districts courts of jurisdiction to enjoin unconstitutional action by federal officials and therefore did not displace this Court's federal question  jurisdiction .................................................................................... 22

      B.  The PSC Association has standing both to bring the claims it is asserting and to pursue the relief it is seeking ........................................................................ 23

         1.   The PSC Association has organizational standing—based on direct injuries-in-fact compromising its purposes and mission .................................. 24

         2.   The PSC Association also has associational standing—based on its members' injuries-in-fact................................................................................. 25

3.  Article III standing's traceability and redressability requirements are likewise satisfied here: the injuries suffered by Association and its members are caused by Defendants' unlawful actions and will be redressed by the relief the Association seeks ................................................................................. 26

C.  Defendants have neither constitutional nor statutory authority to delay, cancel, or otherwise prevent the obligation or expenditure of appropriated funds, temporarily or permanently, and by doing that they have violated foundational constitutional principles ........................................................................................................... 29

D.  Defendants have neither constitutional nor statutory authority to eliminate USAID, a Congressionally created agency. .................................................................. 31

E.  Defendants' disabling and destruction of USAID and their impoundment of billions in appropriated funds are each "final" agency actions .................................... 32

F.  By disabling and destroying USAID and impounding billions in appropriated funds, Defendants have acted arbitrarily, capriciously, and contrary to law, violating the APA. ................................................................................................... 33

1.  Defendants' disabling and destruction of USAID is contrary to law. ............... 33

2.  Similarly, Defendants' disabling and destruction of USAID is arbitrary and capricious. ......................................................................................... 34

3.  Defendants' continuing impoundment of billions in appropriated funds is contrary to law ................................................................................... 36

4.  Defendants' continuing impoundment of billions in appropriated funds is also arbitrary and capricious. .............................................................. 36

G.  With or without APA claims, the PSC Association is likely to succeed on its wholly independent ultra vires claim. ...................................................................... 36

II.  Allowing the destruction of USAID to continue will cause irreparable harm that cannot be remedied at law ............................................................................................. 37

III.  The equities and the public interest decisively favor Plaintiff. ...................................... 42

IV.  The terms of the proposed preliminary injunction are tailored to Defendants' conduct, afford Defendants appropriate flexibility in determining how to comply, and are necessary to preserve the availability of effective final relief ........................... 43

CONCLUSION ................................................................................................................................ 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*,
   Case No. 25-cv-400 (AHA), 2025 WL 752378 (Mar. 10, 2025) ........................................4, 41

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) .................................................................................29, 32

*Am. Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) ...........................................................................................34

*Andrade v. Lauer*,
   729 F.2d 1475 (D.C. Cir. 1984) ...................................................................................26, 28

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ...........................................................................................................20

*Axon Enterprise, Inc. v. FTC*,
   598 U.S. 175 (2023) .............................................................................18, 21, 22, 23

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...........................................................................................................33

*Bond v. United States*,
   564 U.S. 211 (2011) ...........................................................................................................26

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) ...........................................................................................18, 21, 37

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ...........................................................................................................27

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ...............................................................................................................37

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) ..................................................................................43

*Carr v. Saul*,
   593 U.S. 83 (2021) .............................................................................................21, 22, 23

*Cemex, Inc. v. Dep't of the Interior*,
   560 F. Supp.3d 268 (D.D.C. 2021) ...................................................................18, 20, 21

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024)................................................................................4, 29

*City of Chicago v. Barr*,
   961 F.3d 882 (7th Cir. 2020) ..................................................................29

*Clinton v. City of New York*,
   524 U.S. 417 (1998)................................................................................31

*Collins v. Yellen*,
   594 U.S. 220 (2021)..........................................................................26, 28

*Colorado River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976)................................................................................19

*Crowley Gov't Servs., Inc. v. General Servs. Admin.*,
   38 F.4th 1099 (D.D.C. 2022) .............................................................19, 20

*Dellinger v. Bessent*,
   2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ............................................17

*Dep't of Educ. v. California*,
   No. 24A910 (April 4, 2025) (per curiam)................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020)......................................................................34, 35, 36

*Does 1–26 v. Musk*,
   Case No. 25-0462-TDC, 2025 WL 840574 (D. Md. Mar. 18, 2025) ............7, 13

*Equal Rights Ctr. v. Post Props., Inc.*,
   633 F.3d 1336 (D.C. Cir. 2011) ..............................................................25

*Fed. Express Corp. v. U.S. Dep't of Commerce*,
   39 F.4th 756 (D.C. Cir. 2022) .................................................................37

*Free Enterpr. Fund v. Public Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010)................................................................................22

*Freytag v. C.I.R.*,
   501 U.S. 868 (1991)................................................................................27

*Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ................................................................42

*Gundy v. United States*,
   588 U.S. 128 (2019)................................................................................27

*H&M Assocs., LLC v. United States*,
    165 Fed. Cl. 174 (2023) .................................................................................21

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977) .......................................................................29

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .......................................................................................25

*INS v. Chadha*,
    462 U.S. 919 (1983) .................................................................................26, 28

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) .......................................................................43

*Kendall v. United States*,
    37 U.S. 524 (1838) ...................................................................................30, 31

*Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*,
    56 F.3d 279 (D.C. Cir. 1995) .........................................................................21

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ...........................................................................24

*League of Women Voters of United States v. Newby*,
    671 Fed. Appx. 820 (D.C. Cir. 2016) .............................................................43

*LeBlanc v. United States*,
    50 F.3d 1025 (Fed Cir. 1995) .........................................................................20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .......................................................................................28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................23

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) .......................................................................................21

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
    121 F.4th 902 (D.C. Cir. 2024) ......................................................................32

*Megapulse, Inc. v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) .................................................................18, 19

*Morrison v. Olson*,
    487 U.S. 654 (1988) .......................................................................................27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins Co.*,
  463 U.S. 29 (1983)................................................................................34, 36

*Myers v. United States*,
  272 U.S. 52 (1926)...........................................................................27, 31, 34

*Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*,
  26 F.4th 960 (D.C. Cir. 2022).....................................................................36

*Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*,
  595 U.S. 109 (2022)................................................................................32, 34

*National Treasury Employees Union et al. v. Vought*,
  No. 25-cv-381-ABJ, 2025 WL 942772 (D.D.C. March 28, 2025) .........................24

*Nken v. Holder*,
  556 U.S. 418 (2009)....................................................................................42

*NLRB v. Noel Canning*,
  573 U.S. 513 (2014)....................................................................................27

*Open Cmtys. All. v. Carson*,
  286 F. Supp.3d 148 (D.D.C. 2017).............................................................43

*People for the Ethical Treatment of Animals v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015)..................................................................24

*Sampson v. Murray*,
  415 U.S. 61 (1974)......................................................................................38

*Selia Law, LLC v. CFPB*,
  591 U.S. 197 (2020)....................................................................................27

*TikTok Inc. v. Trump*,
  507 F. Supp.3d 92 (D.D.C. 2020) (Nichols, J.) ..................................38, 39

*Train v. City of New York*,
  420 U.S. 35 (1975)......................................................................................30

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992)....................................................................20

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016)....................................................................................33

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)........................................................................................17

*Youngstown Sheet & Tube v. Sawyer*,
    343 U.S. 579 (1952) .................................................................................32

*Zivotofsky ex rel. Zivotofsky v. Clinton (Zivotofsky I)*,
    566 U.S. 189 (2012) ...............................................................................27

*Zivotofsky ex rel. Zivotofsky v. Kerry (Zivotofsky II)*,
    576 U.S. 1 (2015) ...................................................................................27

**U.S. Constitution**

U.S. Const. art. I, § 8, cl. 1 ......................................................................30

U.S. Const. article I, § 8, cl. 18 ........................................................33, 35

U.S. Const. art I, §9 cl. 7 ........................................................................30

**Statutes**

2 U.S.C. §§ 681-688 .................................................................................30

5 U.S.C. § 104 .............................................................................................2

5 U.S.C. § 706 ...........................................................................................33

22 U.S.C. §2394 ..........................................................................................6

22 U.S.C. § 6601 .........................................................................................2

22 U.S.C. §6563 ..........................................................................................2

28 U.S.C. § 1331 ..........................................................................19, 23, 28

28 U.S.C. § 1491 .......................................................................................21

31 U.S.C. §§ 1301 .....................................................................................31

31 U.S.C. §§ 1512 .......................................................................................5

31 U.S.C. § 1513 ..........................................................................................4

31 U.S.C. § 1532 .......................................................................................31

31 U.S.C.§ 1552 ........................................................................................

41 U.S.C. § 7104 .......................................................................................19

41 U.S.C. § 7105 .......................................................................................19

Administrative Procedure Act (APA) .................................................................... *passim*

Antideficiency Act ....................................................................................................6

Civil Service Reform Act (CSRA) ........................................................................16

Contract Disputes Act (CDA) ....................................................................18, 19, 377

Foreign Assistance Act of 1961 (FAA) ................................................................2,5

Federal Information Security Management Act, Privacy Act .......................................13

Federal Information Technology Acquisition Reform Act.............................................13

Foreign Affairs Restructuring Act of 1998 (FARRA).................................2, 32, 34, 37

Impoundment Control Act of 1974 (ICA) .......................................................4, 6, 30

Sex Offender Registration and Notification (SORNA) ...............................................27

P.L. 119-4, Full Year Continuing Appropriations and Extensions Act, 2025
(CAEA) ................................................................................................3, 5

Pub. Law 117-103 ..................................................................................................5

Pub. L. 117-328......................................................................................................5

136 Stat. 49 ............................................................................................................5

138 Stat 460 (2024) ........................................................................................3, 33

**Other Authorities**

Executive Order 14169 .................................................................................7, 8, 34

Executive Order 14158 ....................................................................................7, 8

48 C.F.R. § 1.602-1................................................................................................5

48 C.F.R. § 700.1 ..................................................................................................5

12 U.S. Op. Off. Legal Counsel 128, 1988 WL 3910...............................................30

Gov. Accountability Office, *Office of Management and Budget—Withholding of
Ukraine Security Assistance,* B-331564 Matter of: Office of Management and
Budget-Withholding of Ukraine Security ..............................................................30

**Data**

Public Apportionments Database, https://apportionment-public.max.gov ...................................5

Impact Metrics Dashboard, https://www.impactcounter.com/dashboard?view ....................17, 42

USASpending.gov, *Agency for International Development (USAID), Overview,*
    https://www.usaspending.gov/agency/agency-for-international-
    development?fy=2025 ...................................................................................................4

https://foreignassistance.gov ...........................................................................................................4

**Media**

Jeff Stein, Isaac Arnsdorf, Jacqueline Alemany, *Senior U.S. official exists after
    rift with Musk allies over payment system,* https://www.washingtonpost.com/
    business/2025/01/31/elon-musk-treasury-department-payment-systems/ ..............................8

Anna Maria Barry-Jester and Brett Murphy, *In Breaking USAID, the Trump
    Administration May Have Broken the Law,*
    https://www.propublica.org/article/usaid-trump-musk-destruction-may-have-
    broken-law?utm_campaign=propublica ...................................................................................8

Victoria Elliott and Matt Giles, *Inside DOGE's Plan to Invade the Treasury—and
    Throttle USAID*< https://www.wired.com/story/elon-musk-doge-plan-
    treasury-usaid/ ........................................................................................................................8

Alex Gangitano, *Top Treasury official retires over DOGE request for access to
    payment systems,* https://thehill.com/ homenews/administration/5119996-
    david-lebryk-retirement-treasury-doge-musk/.........................................................................8

Andrew Roth, *Doge v. USAid: how Elon Musk helped his acolytes infiltrate the
    world's biggest aid agency, https://www.theguardian.com/us-
    news/2025/feb/05/musk-doge-takeover-usaid* .........................................................................9

Elon Musk, *Doge & Mars,* recording at:
    https://x.com/DOGE/status/1886284966855647234?lang=en ...............................................10

Rebecca Falconer, *Musk says Trump has "agreed" to shut USAID down,*
    https://www.axios.com/2025/02/03/usaid-musk-trump-agreed-shut-down ...........................10

https://www.instagram.com/60minutes/reel/DHBZn7pxISI/ .......................................................12

APnews, *Elon Musk calls for U.S. government to "delete entire agencies,"*
    https://apnews.com/video/elon-musk-calls-for-us-government-to-delete-
    entire-agencies-3de658921a1d4eab9c997c7c013a0bbd.........................................................12

Han Kiros, *"In Three Months, Half of Them Will Be Dead',* The Atlantic (Apr. 16, 2025), https://www.theatlantic.com/health/archive/2025/04/usaid-doge-children-starvation/682484/; ..............................................................................17, 42

Declan Walsh, *Trump's Aid Cuts Hit the Hungry in a City of Shellfire and Starvation*, New York Times ...........................................................................17, 42

Kristina Peterson, *RFK Jr. Plans to Reinstate Some Federal Workers, Programs,* https://www.wsj.com/us-news/rfk-jr-plans-to-reinstate-some-federal-workers-programs-ec215056?mod=us-news_lead_pos2 ........................................................35

Ryan Mac, Kate conger, Jack Ewing and Eric Lipton, *Slash First, Fix Later: How Elon Musk Cuts Costs*, New York Times (Nov. 16, 2024)......................................35

Pew Research, *What the data says about federal workers,* https://www.pewresearch.org/short-reads/2025/01/07/what-the-data-says-about-federal-workers/ ...................................................................................40

## INTRODUCTION

The case for preliminary relief here is quite different today than it was last month when the Court denied the motion for a temporary restraining order. In the interim, on March 28th, Defendants advised all USAID personnel that:

- USAID will not "continue operating as an independent establishment."

- "[S]substantially all non-statutory positions at USAID will be eliminated …. Within the next few minutes, USAID personnel will begin receiving RIF notices …. These notices will specify one of two final separation dates: July 1, 2025, or Sept. 2, 2025."

- "The remaining USAID personnel will then supervise the … decommissioning of USAID assets and the wind-down of the Agency's operations."

- "By July 1, 2025, the State Department will have assumed responsibility for USAID's remaining programming."

- "By September 2, 2025, the Agency's operations will have been substantially transferred to State or otherwise wound down."

- This marks "USAID's Final Mission."

Ex. 3. At this point, Defendants have issued termination notices to the entire global USAID workforce, terminating at least 12,000 people. Ex. 13 ¶ 32; Ex. 47; Ex. 92 at 3. By their own admission, Defendants are abolishing USAID. All USAID programmatic work will be shut down by July 1. Ex. 2 at 1; Ex. 13 ¶ 32. By September 2, they will have decommissioned all USAID assets and transferred any surviving remnants to the State Department. At the same time and again by their own admission, Defendants have impounded tens of billions of dollars that Congress appropriated to USAID for foreign aid, terminated at least 86% of all USAID programs (more than 5,300 awards), a number that continues to rise, and RIF'd "100% of the agency," eliminating "[e]very USAID position." Exs. 1, 2 (at 7–8), 3, 13 (¶ 32), and 16. Unless the judiciary intervenes, USAID will cease to exist.

Defendants are asserting unbounded theories of Presidential power, without precedent in our nation's history and without any statutory or constitutional basis. The PSC Association brings this motion for a preliminary injunction to stop the illegal dismantling and destruction of USAID.

The primary questions underlying this motion are legal not factual. It's not debatable that USAID is being shuttered and shattered. The live questions relate to jurisdiction (in this Court or the Court of Federal Claims); to Plaintiff's standing (to pursue structural constitutional rather than employment claims); and to the validity of Defendants' assertions of "vast and generally unreviewable" executive power to impound funds and unilaterally abolish a Congressionally created independent agency. ECF No. 13 at 2, 8, 15. This brief focuses on these issues.

## BACKGROUND

USAID is the "lead international humanitarian and development arm of the U.S. government." Ex. 46. The agency annually distributes billions of dollars to countries and people in need, managing programs that alleviate poverty, promote democracy and civil society, support economic growth, and provide specialized emergency assistance in the wake of natural disasters. Exs 5 at Ex. A, Ex. 40, Ex. 46. President Kennedy established USAID in 1961 to implement components of the Foreign Assistance Act ("FAA") of 1961. P.L. 87-195. In 1998, Congress made USAID an "independent establishment." Foreign Affairs Restructuring Act of 1998 ("FARRA"), Division G of P.L.105-277, 22 U.S.C. § 6353 ("there is within the Executive branch of Government the United States Agency for International Development"). See also 5 U.S.C. § 104 (defining "independent establishment").

FARRA gave President Clinton temporary authority to reorganize or abolish USAID. 22 U.S.C. §§ 6601, 6563. He chose not to, and Presidential authority to reorganize or abolish the agency expired in 1999. Today, the President has no authority to abolish or dismantle USAID—or

to merge its remnants into the State Department. Without an act of Congress, any action by Defendants to eliminate USAID is ultra vires and a violation of the separation of powers.

Congress has repeatedly barred the President from reorganizing, redesigning, eliminating, consolidating, or downsizing USAID without *prior* notification *and* consultation. In Section 7063(b) of its annual Further Consolidated Appropriations Acts ("FCAA"), Congress regularly prohibits transferring USAID's "authorities or responsibilities" to "another agency," including the State Department. 138 Stat 460 (2024) § 7063(b).

## I.    USAID's funding

Every year, Congress appropriates funds to USAID for its programs and operations. For Fiscal Year 2024, Congress appropriated more than $35 billion to USAID. Exs. 45, 46. Just last month, Congress enacted a continuing funding resolution, appropriating billions more to USAID. See P.L. 119-4, Full Year Continuing Appropriations and Extensions Act, 2025 ("CAEA") §§ 1101(a)(11) and (c) (2025).[1] See also Exs. 42, 43.

SFOPS bills—short for State, Foreign Operations, and Related Programs—provide the lion's share of USAID's funding. See FCAA 2024, div. F, titles II-III; CAEA 2025, div. F., titles II-III. See also Ex. 90. In addition, USAID receives more than $1.5 billion annually for Food for Peace and other food aid, funded by Agriculture appropriations. *Id*. at 8, 28. See also Ex. 41.

Congress mandates that USAID spend a large percentage of its funding in designated locations (for example, Ukraine) and for designated purposes (for example, global health). Congress appropriates around $10 billion each year to USAID for global health programs (including to combat HIV/AIDS and malaria and to promote child survival maternal health). It

---

[1] Sen. Rand Paul (R-KY) proposed cutting USAID funding by 83%. The Senate rejected his amendment on a bipartisan 27-73 vote. Ex. 42.

appropriates additional specific amounts annually for disaster assistance, transition initiatives ("to support transition to democracy and long-term development of countries in crisis"), economic resilience, and development programs. FCAA 2024, tit. III and §§ 7030(a)-(b) and 7060(b); FCAA 2024, Legis. Text & Expl. Stmt., at 1044-1049. See also Ex. 44.

Currently, Defendants are "impounding" (refusing to spend) tens of billions of dollars that Congress has appropriated to USAID. See Exs. 1 and 2. Defendants have unconstitutionally seized and commandeered Congress's exclusive "power of the purse," knowingly violating the Impoundment Control Act (ICA). See *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, Case No. 25-cv-400 (AHA), 2025 WL 752378 *15 (Mar. 10, 2025). See also *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024) ("Our Constitution gives Congress control over the public fisc[.]"); https://www.usaspending.gov/agency/agency-for-international-development?fy=2025 (showing more than $15 billion in impounded (unobligated) funding through February 27, *before* Defendants' mass termination of USAID awards); https://foreignassistance.gov/ (showing only $8.9 billion obligated for FY 2025 as of April 11, 2025) (last visited April 19, 2025).

Without judicial intervention, Defendants will continue to unconstitutionally impound tens of billions of dollars of FY2024 and FY2025 appropriations to USAID.

## II.    Appropriation, apportionment, obligation, and expenditure of USAID funding

Before USAID disburses foreign aid, funding for that aid must proceed through multiple statutorily required steps, including several that require engagement with Congress. Ex. 91.

*First*, Congress must appropriate money, enacting "budgetary authority."

*Second*, OMB must "apportion" Congress's appropriated funding consistent with Congress's funding directives. 31 U.S.C. § 1513(b). Exs. 86, 89, 91. OMB's apportionment

4

determines the rate at which agencies may "obligate" appropriated funds without creating deficiencies (deficits as a result of spending too much) or impoundments (the result of delaying or refusing to spend appropriated funds). 31 U.S.C. §§ 1512-13; Ex. 89. To strengthen oversight and prevent abuse, Congress mandated that OMB post its apportionment documents, including footnotes and written explanations, on a publicly accessible website. Pub. Law 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 25657 (Mar. 15, 2022); Pub. L. 117-328, div. E, tit. II, § 204, 136 Stat. 4459, 4667 (Dec. 29, 2022). OMB complied, creating an online Public Apportionments Database, https://apportionment-public.max.gov—until March 24, 2025, when the website went dark.

*Third*, after OMB apportions funds to USAID, the agency's Bureau for Resource Management works with the Office of Foreign Assistance Resources at State ("State/F") to allocate funds by country, sector, and activity, generating a detailed table of proposed spending allocations that must be reported to Congress. FAA § 653(a), 22 U.S.C. § 2413; Ex. 91. In addition, this reported data must conform with the "allocation tables" accompanying SFOPS. See Explanatory Statement, Division F, SFOPS 2024 (Mar. 18, 2024)[2]; FCAA § 7019; CAEA 2025 § 7019.

*Fourth*, after Congressional reporting is complete, funds are allocated to USAID bureaus and missions for "obligation." Ex. 91. To obligate funds, Contracting and Agreement Officers ("COs" and "AOs") solicit bids and enter into contracts, grants, cooperative agreements, and other award documents with "implementing partners." 48 C.F.R. § 1.602-1; 48 C.F.R. § 700.1. See generally, Ex. 40. COs and AOs are the officials who hold legal warrants to enter into, administer, and terminate awards on behalf of the government.

*Fifth* and finally, after COs and AOs have obligated funds to USAID's implementing partners,

---

[2] Available at https://docs.house.gov/billsthisweek /20240318/Division%20 F%20SFOPs.pdf.

the money is disbursed to pay for the humanitarian goods and services provided. USAID tracks these expenditures. It reports them in its financial systems (Phoenix and GLAAS). And it must report them to Congress. 22 U.S.C. §2394. Funds must be disbursed before they expire. Once they expire, they are "not available for obligation or expenditure for any purpose." 31 U.S.C. § 1552 ; Ex. 88.

### III.   Impoundment

To protect and enforce its control over the public fisc, Congress passed the Antideficiency and Impoundment Control Acts. As relevant here, the Antideficiency Act bars the Executive from "reserving" appropriated funds—with only three narrow exceptions, none of them applicable here and none of them allowing the Executive to refuse to spend appropriated funds based on policy disagreements with Congress (about, for example, whether foreign aid serves U.S. interests or USAID should cease to exist). 31 U.S.C. § 1512(c)(1)).

The Impoundment Control Act ("ICA") also restrains the Executive. Under the ICA, an "impoundment" is any executive branch action or inaction that temporarily or permanently withholds, delays, or precludes the obligation or expenditure of appropriated funds. The ICA defines two types of impoundments, both with conditions. GAO Principles of Federal Appropriations Law, pp. 2-47–2-48 (4th ed. 2016). First, Presidents may "defer"—that is, *temporarily* freeze appropriated funds—but only for narrow reasons, not including policy disagreements with Congress (for example, about whether or how foreign assistance funds should be spent), and only after notifying both houses of Congress. 2 U.S.C. § 684. Alternatively, Presidents may *propose* "rescission" legislation—to cancel an appropriation. But if Congress does not pass a rescission bill within 45 days, the President *must* immediately release the funds. Here, Defendants have not complied with the statutory process for either deferral or rescission. Yet they

have impounded tens of billions of dollars that Congress appropriated to USAID. Ex. 1; Ex. 2 at 6-8.

## IV.    A Chronology of the Disabling and Destruction of USAID[3]

### January 19, 2025

USAID had more than 13,000 employees, approximately two-thirds of them posted to overseas missions.[4] Ex. 92 at 3 Ex. 47; Ex. 48 at 2 (Feb. 10, 2025). That total included approximately 1,200 "personal service contractors" ("PSCs"), around 500 posted overseas. Ex. 35 ¶ 3; Ex. 1 ¶ 8. In addition, USAID administered more than 6,000 contracts, grants, and other awards. Ex. 36 ¶ 1; Ex. 1. See also Ex. 84 (Mar. 20, 2025) (announcing cancellation of 5,200 contracts).

### January 20, 2025

On his first day in office, foreshadowing the destruction of USAID, President Trump issued two Executive Orders, EO Nos. 14169 and 14158.

Executive Order 14169 (Ex. 37) required:

(a)    Immediately "pausing" "new obligations and disbursements" of "development assistance funds to foreign countries and implementing non-governmental organizations, international organizations and contractors," pending reviews for "programmatic efficiency" and "consistency with United States foreign policy"; and

(b)    Conditioning resuming paused funding and any new funding on approval by both the Secretary of State (or his designee) and the Director of OMB.

---

[3] *See also, Does 1–26 v. Musk*, Case No. 25-0462-TDC, 2025 WL 840574 **18–20 (D. Md. Mar. 18, 2025) (similarly chronicling the "[e]limination of USAID" and holding that "Taken together, these facts support the conclusion that USAID has been effectively eliminated").

[4] This total –13,0000– includes employees in all job categories (among them, direct hires, personal services contractors, foreign service nationals, and institutional support contractors).

Executive Order 14158 (Ex. 38):

(a)    Established a "Department of Government Efficiency" to implement the President's DOGE Agenda";

(b)    Embedded "a DOGE team of at least four employees" in each federal agency; and

(c)    Gave DOGE "full and prompt access" to "all" agency records, software and IT systems, to the maximum extent consistent with law.

### January 24, 2025

DOGE and Secretary of State Rubio swiftly implemented EOs 14169 and 14158. On January 24th:

(a)    Secretary Rubio issued an ALDAC—memo to **A**ll **D**iplomatic **A**nd **C**onsular posts— both: (a) pausing "all new obligations or funding" for foreign assistance programs by or through USAID, "pending a review"; and (b) ordering "stop-work orders" for all "existing foreign assistance awards." Ex. 39.

(b)    Concurrently, a DOGE team member at Treasury directed then-acting Treasury Secretary David Lebryk to halt all USAID foreign aid payments disbursed through the Bureau of Fiscal Services system. Lebryk said he did not have legal authority to stop those payments. Krause threatened him. Lebryk resigned. Exs. 49 and 50.[5] Treasury then started intercepting all USAID payments. *Id*. Although the EOs also applied to foreign assistance programs at State, DOGE and Treasury did not intercept them. *Id*.

---

[5] See https://www.wired.com/story/elon-musk-doge-plan-treasury-usaid/; https://thehill.com/homenews/administration/5119996-david-lebryk-retirement-treasury-doge-musk/; https://www.washingtonpost.com/business/2025/01/31/elon-musk-treasury-department-payment-systems/; https://www.propublica.org/article/usaid-trump-musk-destruction-may-have-broken-law?utm_campaign=propublica.

**January 24 & 26, 2025**

Jason Gray, then-Acting Administrator of USAID, directed COs and AOs to issue stop-work orders to all implementing partners, while promising "subsequent guidance" on "how USAID will review all programs." Ex. 59. Two days later, Gray issued an "FAQ" stating that the review was to "align our ongoing work with the America First agenda" and that results "will be communicated transparently." Ex. 60. No subsequent guidance was ever issued describing either the process or criteria used to terminate USAID awards. Ex. 13 ¶¶ 11, 14; Ex. 24 ¶¶ 22-50; Ex. 9 at 4.

**January 27-28, 2025**

COs and AOs issued stop-work orders to implementing partners worldwide. Ex. 19 ¶ 5; Ex. 27 ¶ 14 & Ex. A. Certifying officers worldwide noted payments would not go through Phoenix to the U.S. Treasury for disbursement. Ex. 28 ¶ 6 ; Ex. 29 ¶ 6. Defendants began terminating USAID personnel en masse. Ex. 7 at Ex. B; Ex. 17 ¶ 9.

**January 30, 2025**

By this date, DOGE had acquired root access to USAID systems and had shut down USAID's contract and awards data collection and management system (GLAAS). Ex. 24 ¶¶ 11–12.

**February 1, 2025**

By this date, a group of eight DOGE team members had forced their way into "every floor and door" of USAID headquarters and threatened to call U.S. Marshals if they were not provided access. Exs. 67 and 68. USAID's two top security officials were placed on leave for refusing access to the agency's Sensitive Compartmented Information Facility (SCIF). *Id.*[6] The same day, DOGE

---

[6] See also Andrew Roth, *Doge v. USAid: how Elon Musk helped his acolytes infiltrate the world's biggest aid agency* (Feb. 5, 2025), https://www.theguardian.com/us news/2025/feb/05/musk-doge-takeover-usaid.

shut down USAID's website and its X and Instagram accounts. Ex. 53; Ex. 17 ¶ 11; Ex. 77.

### February 2-3, 2025

Elon Musk boasted on his social media platform X that:

• "USAID is a criminal organization" and "Time for it to die." Ex. 75.

• "We spent the weekend feeding USAID into the wood chipper." Ex. 79. Rep. Marjorie Taylor Greene (R-GA.) replied, "I hope USAID is completely eliminated because Congress would never get rid of it on their [sic] own." *Id*. (reposting that 127 Republicans and 204 Democrats voted against defunding USAID in June 2024).

Musk also hosted the "First DOGE X Spaces Conversation" and described USAID's shutdown:

• "We're in the process of … shutting down USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . .[I]t's hopeless …. USAID is a ball of worms. There is no apple. And when there is no apple, you've just got to basically get rid of the whole thing . . . *That is why it's got to go*, it's beyond repair."

• "With regard to the USAID stuff, I went, went over it with [the President], you know, in detail, and he agreed … we should shut it down." "And I actually checked with him a few times [and] said 'are you sure? and he confirmed it.'" Ex. 76.[7]

Defendants approved the termination of 791 PSCs. Ex. 56.

### February 3, 2025

DOGE team member Gavin Klieger sent an email to all USAID personnel stating that USAID headquarters at the Ronald Reagan Building (RRB) "will be closed to Agency personnel" and not to report to work. Ex. 61. After Klieger sent his email, DOGE locked all or nearly all direct-hire personnel out of USAID systems. Ex. 34 ¶ 14; Ex. 9 at 15; Ex. 31 ¶¶ 5-6; Ex. 33 ¶ 3. PSCs, who were locked out of email on February 2, received text alerts on their personal phones that the RRB was closed. Ex. 62.

---

[7] Recording at: https://x.com/DOGE/status/1886284966855647234?lang=en. Reporting on the content: Ex. 77; Ex. 78; https://www.axios.com/2025/02/03/usaid-musk-trump-agreed-shut-down.

### February 3-4, 2025

Defendants placed 2,000 more direct hires on leave and barred them from USAID offices. Ex. 34 ¶¶ 11-12; Ex. 54. DOGE sent a text that the RRB would remain closed "until further notice." Ex. 63. By this date, Defendants had placed 2,140 (45% of all) USAID direct hires on leave. Ex. 34 ¶¶ 11-12. In an email with the subject line "The Path Forward," DOGE notified virtually the entire remaining direct-hire workforce that they would be placed on leave as of 11:59 p.m. on February 7. Ex. 55; Ex. 34 ¶¶ 11–12, 17.

### February 7, 2025

President Trump posted on Truth Social that "The Corruption" at USAID "IS AT LEVELS RARELY SEEN BEFORE. CLOSE IT DOWN!" Ex. 80. Defendants canceled USAID's leases, removed signs from buildings, and turned RRB over to Customs and Border Patrol. Exs. 51 and 52. DOGE posted "before-and-after" photos of the RRB on X with the caption: "Unburdened by what has been," and Musk retweeted those photos, boasting, "This building is now occupied by @CBP." Exs. 81 and 82.

### February 9, 2025

Defendants notified USAID employees that "the former USAID headquarters" and other USAID offices in the D.C. area "will remain closed until further notice." Ex. 64.

### February 10, 2025

USAID Inspector General Paul Martin issued a report documenting that because of Defendants' actions disabling and dismantling USAID, more than $489 million of food assistance—at ports, in transit, and in warehouses—was at risk of spoilage, unanticipated storage needs, and diversion. He also documented that "waivers" from the foreign assistance funding freeze, purportedly available for lifesaving humanitarian assistance, were "largely

nonoperational." Ex. 48 at 2. President Trump fired Martin the next day. https://www.instagram.com/60minutes/reel/DHBZn7pxISI/.

### February 8-February 26, 2025

USAID Senior Procurement Executive Jami Rodgers and Jeremy Lewin, a DOGE team member using an "@cfpb.gov" email, ordered USAID COs and AOs to immediately terminate large "tranches" of awards—without individualized reviews and using template language. Rodgers told COs and AOs that "action memos with documentation that can be used to support the terminations would be placed in shared drives." But no such "memos" or "documentation" were ever provided. Ex. 13 ¶¶ 11, 14; Ex. 24 ¶¶ 22-50; Ex. 9 at 4; Ex. 19 ¶¶ 7, 13-14. Rodgers directed COs and AOs to flag awards that were not subject to termination because of statutory mandates or because they were measures providing lifesaving assistance. COs and AOs flagged many such awards. Ex. 13 ¶¶ 10, 17 & Exs. B-C. Ignoring those flags, Defendants terminated many (likely hundreds or more) awards for mandated activities anyway—based on cursory, one-line reviews of a DOGE spreadsheet with bare-bones information. Ex. 9 ¶¶ 5-6.

### February 13, 2025

In a video call to the World Governments Summit in Dubai, Musk stated: "I think we need to delete entire agencies as opposed to leave a part of them behind. … It's kind of like a weed, if we don't remove the roots of the weed, then it's easy for the weed to grow back." Ex. 83.[8]

### February 18, 2025

By this date (and probably weeks earlier), USAID was no longer performing numerous IT-related statutorily required functions—including functions required by the Federal Information

---

[8] https://apnews.com/video/elon-musk-calls-for-us-government-to-delete-entire-agencies-3de658921a1d4eab9c997c7c013a0bbd.

Technology Acquisition Reform Act, Federal Information Security Management Act, Privacy Act, Section 508 of the Rehabilitation Act, E-Government Act of 2002, and Government Performance and Results Act. Ex. 30 ¶17; see also *Does 1-26*, 2025 WL 840574 *19.

### February 19, 2025

Defendants began terminating PSCs en masse with 15 days' notice. Ex. 35 ¶¶ 4-5; Ex. 56 ¶¶ 4-6; ECF Nos. 10, 10-1, 10-2. DOGE locked PSCs worldwide out of email and other USAID systems, including essential security communications tools for PSCs and family members overseas. Ex. 20 ¶ 6; Ex. 12 ¶ 4 & Ex. 1 ¶ 4; Ex. 21 ¶¶ 4-5; Ex. 22 ¶ 4; Ex. 23 ¶¶ 5, 7-8; Ex. 32 ¶¶ 4-5. PSCs whose contracts were terminated discovered that their personal information had been posted on the DOGE website. Ex. 12 at ¶ 20; ECF Nos. 6-13 (¶¶ 3, 8) and 6-15 (¶¶ 3-4).

### February 23, 2025

Defendants placed nearly all USAID direct-hire personnel worldwide on leave. Ex. 65. The Office of HIV/AIDS in the Global Health Bureau was reduced from 300 employees to 19. Ex. 9 at 16.

### February 26, 2025

Defendants reported to Judge Ali that they were terminating 5,800 of 6,300 USAID awards. Ex. 36 ¶ 1. Using a new email address, SPE@usaid.gov, DOGE and USAID sent generic award termination notices to implementing partners, bypassing the COs and AOs holding the warrants for those awards. Ex. 19 ¶ 8. The mass termination included all, or nearly all, USAID awards for global health assistance. Ex. 9 at 9.

### February 27-28, 2025

USAID staff were given 15 minutes to collect their personnel effects from the RRB. Ex. 66.

**March 2, 2025**

Nick Enrich, Acting Director of the Bureau of Global Health, released two memoranda documenting the sham waiver process for lifesaving humanitarian assistance (LHA) and the gutting of USAID personnel. Enrich was forced out the same day. Ex. 7; Ex. 9 at 1-2.

**March 10, 2025**

Marco Rubio posted on X that 5,200 USAID contracts would be terminated and thanked DOGE and Elon Musk. DOGE reposted Rubio's tweet. Ex. 84.

**March 15, 2025**

President Trump signed the Continuing Resolution passed by Congress, maintaining U.S. global health and all other USAID foreign assistance funding at FY 2024 levels. P.L. 119-4.

**March 24, 2025**

Paul D. Guaglianone, a senior State Department bureau official, emailed the House and Senate Appropriations Committees, attaching two letters addressed to Members of Congress. One, with the subject line "Update on USAID Financial and Personnel Status as of March 21, 2025," attached a spreadsheet of active and terminated USAID awards and a "Summary of USAID Program Status" showing 5,341 terminated awards, "representing a total estimated cost of $75.9 billion and unobligated savings [impounded funds] of $27.7 billion." Ex. 1.

**March 28, 2025**

Defendants announced the complete and final shutdown of USAID. The State Department (Paul Guaglianone) notified Congress that "substantially all USAID personnel will be separated from federal service," that the remnants of USAID will be merged into the State Department, and that Title II funds may be used for "reorganization." Jeremy Lewin sent an email titled "USAID's Final Mission" to all USAID personnel, announcing a RIF of the entire workforce, with

termination dates of July 1 and September 2, with workers retained to the later date only to "decommission USAID assets" and "wind-down ... the Agency's independent operations." The email also announced the cessation of all USAID programming by July 1. Ex. 3. After Lewin's email, RIF and termination notices went out to the entire workforce, including all PSCs not previously terminated. Most of the workforce, including all PSCs, were given a July 1, 2025 termination date. Ex. 3; Ex. 4; Ex. 11 at par. 16; Ex. 15 at par. 3; Ex. 13 at par. 32 & Ex. E.

### Throughout February and March 2025

House and Senate Members—including the ranking members of the House and Senate Foreign Affairs Committees and House and Senate Appropriations Committees—sent letters to President Trump, Secretary Rubio, and Pete Marocco. These letters both objected to the destruction of USAID and the impoundment of billions of dollars in USAID funding in violation of Congress' funding directives and documented that "no consultations or required notifications have occurred." Ex. 67-73. A March 27th letter to Rubio asked, "Do you intend to lawfully reprogram funds remaining from terminated programs and personnel?" Ex. 73. There is no public record of any response to any of these Congressional letters and demands for engagement.

### Since March 28, 2025

High-level USAID leadership shared widely with USAID personnel that:

- "Congressional earmarks for programs will not be honored."

- "Come hell or high water, USAID will be integrated fully into State by July."

- "Litigation is over; just get on with it."

- "USAID will be a test case for the State RIF to follow."

Ex. 15. Defendants notified all 5,000+ USAID Foreign Service Nationals that they will be terminated no later than August 15, 2025. Ex. 4. The Office of Human Capital and Talent Management informed employees:

- Every USAID position was being eliminated; 100% had already been RIF'd or will be.

- Employees retained to September are expected to close out, off-board, and shut down the agency.

- All programmatic work will end by July 1.

Ex. 13 ¶ 32. Meanwhile, additional USAID awards, including awards for lifesaving assistance, continue to be terminated over and above the 5,341 terminations announced to Congress. Ex. 16.

## IV.    The PSC Association

Originally formed in 1999 as an employee resource group for USAID PSCs, today the PSC Association has an active membership of more than 700 current and former PSCs and operates independently from USAID. The Association exists to protect the interests and vindicate the rights of its members, Ex. 11 ¶ 11, who are not unionized and generally not protected by the Civil Service Reform Act. The destruction of USAID is an existential crisis for the Association. When Defendants cut PSCs off from USAID communications channels in February, they impaired the Association's ability to communicate with its members and forced the Association to expend time and resources to rebuild its membership roster. The ensuing destruction of USAID has forced the Association to refocus from advocating for PSCs' rights as employees to defending members' rights during their terminations en masse and their repatriation. The dismantling of USAID has stretched the Association's resources to the breaking point as it counteracts USAID's destruction and responds to an unprecedented number of inquiries from members about what their rights are,

what steps they can take to protect their rights, and (for many) how and when they must repatriate. *Id*. ¶¶ 13-17.

## V.    Mortality and Morbidity

The human cost of Defendants' actions—impounding Congress's appropriations to USAID, terminating the agency's humanitarian assistance programs, and firing the staff who run them—is catastrophic. Defendants' actions since the end of January have already resulted in more than 200,000 deaths[9] and will continue to cause preventable death and suffering on a massive scale. According to reliable estimates and methodologies (and among many other consequences), Defendants' destruction of USAID will result in:

- Between 12 and 18 million cases of malaria in the next year that could have been prevented and as many as 166,000 deaths from malaria;

- More than 200,000 paralytic polio cases that could have been prevented;

- 1 million children who will suffer severe acute malnutrition; and

- More than 11 million newborns who will not receive critical postnatal care.

Ex. 8. One hundred human beings are dying every hour as a result of Defendants' actions.[10]

### ARGUMENT

The requirements for preliminary injunctive relief are familiar, requiring a plaintiff to show a likelihood of success on the merits, a likelihood of irreparable harm, and equities tipping in its favor. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Dellinger v. Bessent*, 2025

---

[9] Impact Metrics Dashboard at https://www.impactcounter.com/dashboard?view =table&sort = title&order=asc (Impact Metrics Dashboard) (last visited Apr. 20, 2025).

[10] *Id.* (sorted for Funding Source "USAID"). See also https://www.nytimes.com/2025/04/19/ world/africa/sudan-usaid-famine.html; Hana Kiros, *'In Three Months, Half of Them Will Be Dead'*, The Atlantic (Apr. 16, 2025), https://www.theatlantic.com/health/archive/2025/04/usaid-doge-children-starvation/682484/; Declan Walsh, *Trump's Aid Cuts Hit the Hungry in a City of Shellfire and Starvation*, New York Times (Apr. 19, 2025).

WL 559669 *3 (D.C. Cir. Feb. 15, 2025). The PSC Association's showing here meets all of these criteria.

## I.    Plaintiffs are likely to succeed on the merits.

### A.  This Court has jurisdiction over Plaintiff's claims.

In denying Plaintiff's motion for a temporary restraining order, this Court concluded that it likely lacked jurisdiction because Plaintiff's claims "appear likely to be stripped and must be adjudicated elsewhere by the Contracts Dispute Act." ECF No. 23, *Transcript of Cont'd Telephonic Mot. Hr'g on TRO*, Mar. 6, 2025, at 15:6-7. For three distinct reasons, that conclusion was error.

*First*, because this case is not "'at its essence' a contract action," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), it is not governed by the Contract Dispute Act ("CDA") and so should not be channeled to the Court of Federal Claims ("CFC"). The PSC Association's claims, which are based on the Constitution and the Administrative Procedure Act ("APA"), "stem from something more than just a contract," and they therefore belong where they are—"in federal district court." *Cemex, Inc. v. Dep't of the Interior*, 560 F. Supp.3d 268, 276 (D.D.C. 2021) (Nichols, J.) (internal quotation marks omitted).

*Second,* the CFC has no power to grant the equitable relief Plaintiff seeks. *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988). Accordingly, channeling claims for equitable relief to that court would border on the Kafkaesque. *Cf. Cemex*, 560 F. Supp.3d at 276 ("A different rule here might otherwise leave a litigant … with no forum to raise a colorable constitutional claim").

*Third,* the CFC is a specialized Article I tribunal. The Supreme Court has made clear that such tribunals do not have jurisdiction over the kinds of structural constitutional issues present here unless Congress intended that result. *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 186 (2023). And here, there is no discernible Congressional intent to strip federal district courts of jurisdiction

to enjoin illegal and unconstitutional action by federal actors. Accordingly, the federal question jurisdiction statute, 28 U.S.C. § 1331, confers jurisdiction on this Court, which has a "virtually unflagging obligation" to exercise it. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976).

> ### 1. *Because Plaintiff's claims are based on the Constitution and the APA, not a contract with the Government, they are not claims that can be brought under the Contract Dispute Act and are not within the exclusive jurisdiction of the Court of Federal Claims.*

The PSC Association's claims are "based on grounds other than a contractual relationship with the government." *Megapulse,* 672 F.2d at 968. They are neither justiciable under the Contract Dispute Act nor within the exclusive jurisdiction of the Court of Federal Claims.[11]

The Association's amended complaint asserts three types of claims: constitutional, APA, and ultra vires. The constitutional claims challenge the Executive's dismantling of USAID without Congressional authorization, its usurpation of Congress's power of the purse, and its impoundment of billions of dollars appropriated by Congress to USAID. The Association's APA claims allege that Defendants' actions have been arbitrary, capricious, and contrary to law—not contrary to contract. The Association's ultra vires claim asserts that Defendants have acted without lawful authority. None of these claims—constitutional, APA, or ultra vires—require construing or enforcing any contract with the Government. They are not "at their essence" contractual. They are not justiciable under the CDA and do not fall within the CFC's exclusive jurisdiction. *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099 (D.D.C. 2022). They belong in this Court.

---

[11] The CDA allows a government contractor to bring claims in either the CFC or the Civilian Board of Contract Appeals (CBCA). 41 U.S.C. § 7104(a), (b)(1). But the relief the CBCA can provide is identical to the relief available in the CFC. See 41 U.S.C. § 7105(e)(2). As a result, this brief does not separately address the CBCA.

Further, as this Court has acknowledged, *even when* claims "depend on the existence and terms of a contract with the government," they may still be heard "in federal district court" if—as here—they "turn[ ] on more than just contractual terms." *Cemex*, 560 F. Supp. 3d at 276. See also *Crowley*, 38 F.4th at 1107 ("'[T]he mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action … into one on the contract and deprive the court of jurisdiction it would otherwise have'") (quoting *Megapulse*, 672 F.2d at 967–68); *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed Cir. 1995) (holding that the CFC did not have jurisdiction over former federal employee's constitutional claims related to his termination). The fact that the Association's Article III injuries (discussed below) arise, as a factual matter, from its members' status as government employees, does not alter the essential nature of the Association's claims. "[E]ven when the claims depend on the existence and terms of a contract with the government," litigants "may bring statutory and constitutional claims in federal district court." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992).

In sum, because this case "involves claims based on the APA and the federal constitution, this Court may exert jurisdiction" regardless of whether "the case [also] involves a contract between a private party and the federal government." *Cemex*, 560 F. Supp.3d at 276 n.4.

> **2.  *Because the declaratory and injunctive relief the PSC Association seeks is equitable, it lies beyond the CFC's power to grant, rendering jurisdiction proper in federal district court.***

At its essence, this is an equitable action to enjoin unconstitutional action by government. As such, it draws on "a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 327 (2015). It falls squarely

within the jurisdiction of federal district courts. But by contrast, it is not within the CFC's

jurisdiction. *Bowen v. Massachusetts*, 487 U.S. 879 (1988).

In *Bowen*, the Supreme Court emphasized that "[w]e have stated categorically that the Court

of Claims has no power to grant equitable relief." *Id.* at 905 (internal quotation marks omitted).[12]

Accord: *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 326-27 (2020) (discussing

and quoting *Bowen*). It is not surprising, therefore, that, as the D.C. Circuit has put it, "Even where

a monetary claim may be waiting on the sidelines, as long as the plaintiff's complaint only requests

non-monetary relief that has considerable value .… we respect the plaintiff's choice of remedies

and treat the complaint as something more than artfully drafted effort to circumvent the jurisdiction

of the Court of Federal Claims." *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d

279, 284 (D.C. Cir. 1995). Accord: *Cemex*, 560 F. Supp.3d at 276 n.4 ("Cemex does not seek

money damages .… That fact further confirms that [this] Court may exercise jurisdiction").[13]

The CFC has no power to award the equitable relief the PSC Association is seeking.

Accordingly, channeling the Association's claims for equitable relief to that court would be

inefficient and perverse: "It makes little sense to require litigants to present claims to adjudicators

who are powerless to grant the relief requested." *Carr v. Saul*, 593 U.S. 83, 93 (2021). See also

*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 191 (2023) (finding district court jurisdiction where

requiring agency adjudication would make the plaintiffs' injuries "impossible to remedy").

---

[12] The CFC has limited equitable powers only in three contexts not present here: (1) bid protests, 28 U.S.C. § 1491(b); (2) as "an incident of and collateral to" a money judgment, 28 U.S.C. § 1491(a)(2); or (3) limited types of contract-specific claims submitted to contracting officers, 28 U.S.C. § 1491(a)(2). See *H&M Assocs., LLC v. United States*, 165 Fed. Cl. 174, 184 (2023).

[13] The Supreme Court's recent shadow docket opinion in *Dep't of Educ. v. California*, No. 24A910 (April 4, 2025) (per curiam), is not to the contrary. As described by the Supreme Court, the claims in that case were "to enforce a *contractual obligation to pay money*." *Id.* at 2 (emphasis added). There are no such claims in this case.

**3.** ***In enacting the CDA and creating the CFC, Congress did not strip federal districts courts of jurisdiction to enjoin unconstitutional action by federal officials and therefore did not displace this Court's federal question jurisdiction.***

In *Axon Enterprise, Inc.*, the Supreme Court emphasized that even where Congress has created "a comprehensive review process" (which is not the case here), district court jurisdiction is not necessarily displaced. Even a "comprehensive" scheme displaces jurisdiction only for claims "'*of the type Congress intended* to be reviewed within this statutory structure.'" *Id.* (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208 (1994)) (emphasis added). Because none of the PSC Association's claims are plausibly "of the type Congress intended to be reviewed" by the CFC, they belong in this court—as *Axon* demonstrates.

In *Axon,* the Supreme Court *rejected* channeling – by a vote of 8 to 1—in a case much like this one. The plaintiffs in *Axon* brought structural constitutional claims that presented "fundamental, even existential" questions. *Id.* at 180. They were not protesting the merits of an agency decision but the exercise of governmental power "by an illegitimate decisionmaker." *Id.* at 191. They were challenging *who* could constitutionally adjudicate enforcement proceedings against them—tenure-protected SEC administrative law judges or only judges directly accountable to the President. Here, the PSC Association's challenge is analogous: the Association is not challenging the merits of PSCs' terminations but who can constitutionally dismantle USAID and decide what money to spend on foreign aid—the Executive Branch or Congress.

As the *Axon* plaintiffs did, the PSC Association is thus raising "questions of administrative and constitutional law" that are "distant from the [non-Article III adjudicator's] competence and expertise." *Id.* at 194 (cleaned up). As in *Axon*, these claims do not belong before a specialized tribunal—not the Federal Trade Commission, as in *Axon,* and not the CFC here. See also *Free Enterpr. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010) ("Petitioner's constitutional claims are … outside the Commission's competence and expertise."); *Carr v. Saul,*

593 U.S. 83, 92 (2021) (rejecting administrative exhaustion requirements for "structural constitutional challenges" because such claims "usually fall outside the adjudicators' areas of technical expertise").

The CFC is a specialized Article I court, and the APA and structural constitutional issues the PSC Association is raising here are distant from the government contract issues, bid protests, and vaccine cases the CFC normally addresses. The CFC "knows a good deal about" some issues but "nothing special about … separation of powers" claims. *Axon*, 598 U.S. at 194. Like the agencies in *Axon*, in *Free Enterprise*, and in *Carr*, the CFC is "'ill suited to address structural constitutional challenges.'" *Id.* at 195 (quoting *Carr,* 593 U.S. at 92). Without clear statutory language stripping Article III courts of jurisdiction, there is no basis to conclude that APA and constitutional claims are "of the type" that Congress intended the CFC to address. *Id.* at 194-195. Without any such discernible intent, "it follows directly from 28 U. S. C. § 1331," that the PSC Association is "entitled to [its] day" in federal district court. *Axon*, 598 U.S. at 04–05 (Gorsuch, J., concurring).

## B.  The PSC Association has standing both to bring the claims it is asserting and to pursue the relief it is seeking.

The PSC Association has both associational and organizational standing to pursue both declaratory and injunctive relief. It alleged concrete injuries-in-fact (both to its members and itself), that are fairly traceable to Defendants' illegal and unconstitutional actions, and that are redressable by the relief the Association is seeking. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he irreducible constitutional minimum of standing contains three elements …. 'injury in fact,' … 'fairly traceable to the challenged action of the defendant,' … that … will be 'redressed by a favorable decision'").

1. ***The PSC Association has organizational standing—based on direct injuries-in-fact compromising its purposes and mission.***

The PSC Association exists to protect, and advocates for, the interests and rights of its members—who are neither unionized nor covered by the CSRA, the FSA, or the FSLMRS. Defendants' mass termination of all of the Association's members and their destruction of USAID are undermining the Association's ability to serve its "primary mission," creating Article III injury-in-fact. As the D.C. Circuit has held, actions that "make it more difficult" for an organization "to accomplish [its] primary mission … provide injury for purposes … of standing." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). *See also National Treasury Employees Union et al. v. Vought*, No. 25-cv-381-ABJ, 2025 WL 942772, * 15 (D.D.C. March 28, 2025) ("Given that the association's existence depends on the existence of an agency workforce, the actions by defendants to eliminate the [agency] would undoubtedly 'make it more difficult' for the association 'to accomplish [its] primary mission.' This is enough to demonstrate an injury in fact to support organizational standing.").

Defendants have also inflicted concrete injuries on the PSC Association because:

(1) Defendants' actions have denied the Association and its members access to USAID's communications channels and website—resources on which the Association and its members previously relied—thereby hindering the Association's ability to communicate effectively with its membership. This obstruction directly impairs the organization's core functions. See *League of Women Voters*, 838 F.3d at 9.

(2) Defendants' actions have strained the Association's resources to the breaking point. The Association has been forced to respond to an unprecedented number of inquiries from its members about their rights and status, while simultaneously mobilizing to oppose Defendants' efforts to destroy USAID—an existential threat to the Association itself. Ex. 11 at ¶ 17. See also *People for*

*the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1095 (D.C. Cir. 2015) (because PETA "has expended resources to counter [] injuries" it suffered to its ability to fulfill its mission, "it has established Article III organizational standing"); *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1336, 1140 (D.C. Cir. 2011).

### 2. *The PSC Association also has associational standing—based on its members' injuries-in-fact.*

In addition to having standing to pursue injuries to itself, The PSC Association also has standing to sue because (a) its members have suffered injuries entitling them to sue in their own right; (b) its members' interests, which the Association seeks to protect, are germane to the Association's purpose; and (c) neither the claims the Association is pursuing nor the relief it seeks on its members' behalf require the members to participate individually. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). These three factors are beyond legitimate dispute here.

*First*, Defendants have not denied, nor could they, that the PSC Association's members have suffered or will imminently suffer injury: all PSCs will be terminated by July 1 as part of USAID's closure and the impoundment of its funds. *Second*, the PSC Association's primary mission is to vindicate the rights and interests of its members. Protecting its membership by opposing Defendants' dismantling of USAID is central to the Association's purpose and operations. *Third*, the declaratory and injunctive relief that the Association seeks hinges on the lawfulness of Defendants' claims to "vast and generally unreviewable" executive power (ECF No. 13 at 2, 8, 15), not on the individual circumstances of the members, making it unnecessary for the members to participate individually in this case. Similarly, because this case does not involve contract claims, the specific terms of members' contracts and employment are irrelevant.

**3. *Article III standing's traceability and redressability requirements are likewise satisfied here: the injuries suffered by Association and its members are caused by Defendants' unlawful actions and will be redressed by the relief the Association seeks.***

It is well established that Plaintiffs with concrete injuries-in-fact arising from government action that violates separation of powers principles, the Appointments Clause, or other structural constitutional provisions have Article III standing to sue to enforce those protections. See *Bond v. United States*, 564 U.S. 211, 222–23 (2011) ("In the precedents of this Court, the claims *of individuals*—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances) (emphasis added); *INS v. Chadha*, 462 U.S. 919, 935–36 (1983) ("We must also reject the contention that Chadha lacks standing because a consequence of his prevailing will advance the interests of the Executive Branch in a separation of powers dispute with Congress, rather than simply Chadha's private interests").

In this Circuit, the leading case is *Andrade v. Lauer,* 729 F.2d 1475 (D.C. Cir. 1984), which closely mirrors this case. There, a group of federal employees challenged a RIF that had cost them their jobs. Like the PSC Association here, they alleged not breaches of contract or civil service protections but that their RIF had been ordered by officials acting without lawful authority. *Id.* at 1494-95. The D.C. Circuit upheld their standing, explaining that their job losses were fairly traceable to the constitutional violation they alleged —"having been fired by government officials who were constitutionally disqualified from exercising power over them"—and that those losses could be redressed by "a declaration and injunction against []officials] improperly exercising the powers of office against them." *Id.* at 1495. The same reasoning applies here.

A long line of Supreme Court cases, of which *Bond* and *Chadha*, *supra*, are only examples, confirms private parties' standing to vindicate the Constitution's structural guarantees. See *Collins*

*v. Yellen*, 594 U.S. 220 (2021) (shareholders of Fannie Mae and Freddie Mac challenging restriction on presidential removal power over the Director of the FHFA); *Selia Law, LLC v. CFPB,* 591 U.S. 197 (2020) (law firm asking to set aside agency's civil investigative demand on ground that the agency's leadership by a single Director removable only for cause violated the separation of powers); *Gundy v. United States*, 588 U.S. 128 (2019) (defendant convicted of a sex offense before enactment of the Sex Offender Registration and Notification Act challenging the Attorney General's application of that Act to him as violating the nondelegation doctrine); *NLRB v. Noel Canning*, 573 U.S. 513 (2014) (employee challenging an NLRB order because appointments to the Board violated the Recess Appointments Clause); *Zivotofsky ex rel. Zivotofsky v. Clinton (Zivotofksy I)*, 566 U.S. 189 (2012), and *Zivotofsky ex rel. Zivotofsky v. Kerry (Zivotofsky II)*, 576 U.S. 1 (2015) (citizen challenging whether Congress or the Executive decides whether Americans born in Jerusalem can elect to have "Israel" listed as their place of birth on passports); *Freytag v. C.I.R.,* 501 U.S. 868 (1991) (taxpayer challenging whether Congress's delegation to the Chief Judge of the Tax Court to appoint "special trial judges" violated separation of powers); *Morrison v. Olson*, 487 U.S. 654 (1988) (former government officials subpoenaed by the independent counsel challenging those subpoenas by challenging the independent counsel statute on appointment clause and separation of powers grounds); *Bowsher v. Synar*, 478 U.S. 714 (1986) (individual Congressmen, a federal employees union, and a union member challenging, on separation of power grounds, the constitutionality of a statute allowing Congress to remove Comptrollers General despite their exercise of executive power). See also *SEC v. Jarkesy¸*603 U.S. 109 (2024) (investment adviser and his firm challenging whether matters concerning private rights may be removed from Article III courts after Congress, through Dodd-Frank, had authorized the SEC to impose civil penalties through its own in-house proceedings); *Myers v. United States,* 272

U.S. 52 (1926) (postmaster's challenge to his removal by the President, seeking to enforce a law that postmasters could be removed only with Senate approval).

Given this substantial body of precedent, it would be a serious category error to analyze standing in this case as if it were limited to "the injuries [PSC Association members] will suffer as the result of the government *changing [their] contractual relationships*" with USAID. ECF No. 23 at 15:6-7. As *Andrade v. Lauer* demonstrates, standing here arises from the constitutional violations themselves, not merely from terminations of employment.

It would also be a mistake to conclude that, because the PSC Association's challenge here relies on structural constitutional principles and provisions and on statutes governing how the Executive Branch operates, the Association's members therefore have injuries no "more concrete *than any person in the United States.*" ECF No. 22, *Transcript of Telephonic Mot. Hr'g on TRO*, Mar. 5, 2025, at 11:8. That conclusion is incorrect and foreclosed by the Supreme Court's repeated rulings in cases where private citizens have successfully challenged injuries inflicted on them by the government by claiming violations of structural constitutional guarantees. As the Court explained in *Collins*, "the separation of powers is designed to preserve the liberty of all the people." *Collins*, 594 U.S. at 245. See also *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (noting that, even in statutory cases, declining to adjudicate claims on "prudential" grounds is in tension with a federal court's "virtually unflagging" obligation to "hear and decide cases within its [§ 1331] jurisdiction").

The teachings of *Collins* and *Chadha* apply to this case. The PSC Association and its members have suffered concrete injuries-in-fact (distinct from citizens and taxpayers)— specifically, the loss of their jobs. Their injuries-in-fact are traceable to Defendants' unconstitutional actions, including impounding funds and disabling and dismantling an agency

without statutory or constitutional authority. And their injuries-in-fact are redressable by a favorable judgment here.

**C.  Defendants have neither constitutional nor statutory authority to delay, cancel, or otherwise prevent the obligation or expenditure of appropriated funds, temporarily or permanently, and by doing that they have violated foundational constitutional principles.**

Congress funds USAID's operations and programs through Titles II through VI of SFOPS appropriations bills. Some of these appropriations, totaling billions of dollars, mandate spending for particular bureaus, such as Global Health, and some mandate spending specifically for particular purposes, such as combating HIV/AIDS, tuberculosis, or malaria, supporting maternal and child health or nutrition, or funding Transition Initiatives, democracy, or economic or migration and refugee assistance. See Cong. Research Service, R48231 at 14. The Executive Branch cannot unilaterally suspend, freeze, or redirect this Congressionally mandated spending.

Congress's power of the purse is foundational. While the Executive has significant powers over policy, "the power of the purse is not one of them." *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) (rejecting the Executive's attempt to impose conditions not authorized by Congress on local government units' use of appropriated funds). The President cannot "ignore statutory mandates or prohibitions [including appropriations statutes] merely because of policy disagreements with Congress" nor unilaterally "refuse to spend" the "full amount[s]" appropriated by Congress. *In re Aiken County*, 725 F.3d 255, 260 & n.1 (D.C. Cir. 2013) (Kavanaugh, J.). See also *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425-32 (2024). The Constitution exclusively grants the power of the purse to Congress, not the President. U.S. Const. art I, §9 cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause)." See also *Harrington v. Bush*, 553 F.2d 190, 194 (D.C. Cir. 1977) (describing Congress's "plenary power" to define the terms of appropriations).

An unbroken line of authority prohibits the executive from withholding appropriated funds through unilateral action. This prohibition against executive branch attempts to freeze, suspend, or cancel Congressionally appropriated funds dates back to at least 1838, when the Supreme Court unanimously rejected an attempt by the Postmaster General to withhold funding appropriated by Congress for a contract he deemed political patronage. *Kendall v. United States*, 37 U.S. 524, 525 (1838) (rejecting the argument that the Take Care Clause "implies a power to forbid" execution of laws). President Nixon claimed an implied constitutional right to do it. The Supreme Court roundly rejected his claim. *Train v. City of New York*, 420 U.S. 35, 41 (1975) (unanimously rejecting Nixon's claim of discretion to withhold funding for municipal sewer and water treatment projects after his veto failed). Congress has likewise been emphatic on this point, enacting the ICA to make the prohibition on the Executive's withholding of appropriated funds statutorily explicit. 2 U.S.C. §§ 681-688.

For decades, the Executive Branch has itself consistently rejected the notion that the President has constitutional authority to decline to spend appropriated funds, deeming it a proposition "supported by neither reason nor precedent." 119 Cong. Rec. S. 3808 (Daily ed. March 1, 1973) (reprinting a 1969 OLC memo by William Rehnquist). See also 12 U.S. Op. Off. Legal Counsel 128, 1988 WL 391011 (OLC memo concluding that "There is no textual source in the Constitution for any inherent authority to impound"); U.S. Gov't Accountability Off., B-331564, 2020 WL 241373 (GAO memo concluding that "The Constitution grants the President no unilateral authority to withhold funds from obligation," "[a]n appropriations act is a law like any other," and "once [an appropriations law is] enacted, the President must 'take care that the laws be faithfully executed'").

Congress, not the President, controls the amount, purpose, and timing of spending

appropriated funds. See generally 31 U.S.C. §§ 1301 and 1532. "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), including appropriations laws. Appropriations laws, like any other law, can be rescinded or repealed only through bicameralism and presentment procedures. *See Clinton*., 524 U.S. 417.

Simply put, it is a "core tenet of appropriations law" that appropriations must be carried out as Congress intended them, not as the President might reconceive them. *U.S. Dep't of Navy* v. Fed. Lab.. *Relations Auth.,* 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.). See also Gov. Accountability Office, *Office of Management and Budget—Withholding of Ukraine Security Assistance,* B-331564 at 7 (Jan. 16, 2020) ("While an "external factor causing an unavoidable delay" might justify a temporary deferral, delays for "reviews undertaken to ensure compliance with presidential policy prerogatives," by contrast, are impoundments with "no basis in law")

By impounding *tens of billions* in funds appropriated to USAID, a power grab without precedent in our nation's history, Defendants are flagrantly flouting the Constitution and the ICA. Worse, they are "assert[ing] a principle, which if carried out in its results to all cases falling within in it, would be clothing the President with a power to control the legislation of congress, " *Kendall*, 37 U.S. at 525, thereby creating an accumulation of so much power in the same hands as to constitute "the very definition of" tyranny. Federalist No. 47 (Madison).

### D.  Defendants have neither constitutional nor statutory authority to eliminate USAID, a Congressionally created agency.

USAID is an independent federal agency created by Congress. It is a creature of statute not Executive Order. Its existence, functions, and jurisdiction are determined by laws passed by Congress—not by decisions made by the President or the Executive Branch. *Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the

establishment of offices, the determination of their functions and jurisdiction"). See also *Nat'l Fed'n of Indep. Bus. v. U.S. Dep't of Labor*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute").

As the Supreme Court emphasized in *Youngstown Sheet & Tube v. Sawyer,* 343 U.S. 579, 585 (1952), Presidential "power, if any," always "must stem either from an act of Congress or from the Constitution itself." Presidents may not proclaim preferred policies "as rules of conduct to be followed." *Id*. at 588. Nor may they "ignore statutory mandates or prohibitions," including those found in appropriations laws, "merely because of policy disagreements with Congress." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.). See also *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 908-09 (D.C. Cir. 2024) ("an executive order is not 'law'" and rules and regulations must trace their authority to legislation). Defendants' disagreement with USAID's mission or levels of USAID funding provide no basis for dismantling USAID or impounding funds appropriated to USAID. They have no constitutional or statutory authority to dismantle or impound. Likewise, they have no authority to move or consolidate USAID. In fact, Congress regularly reaffirms this limit, including in § 7063 of SFOPS appropriations bills. See FCAA, Pub. L. 188-47 § 7063(a), 138 Stat 460 (2024).

In short, the Executive cannot unilaterally shutter or restructure USAID. Unless *Congress* decides otherwise, USAID must continue to exist, in practice and in name. U.S. Const. article I, § 8, cl. 18.

### E.  Defendants' disabling and destruction of USAID and their impoundment of billions in appropriated funds are each "final" agency actions.

Agency action is "final" and thus subject to review under the APA when it marks the consummation of the agency's decisionmaking process—i.e., it is not "tentative or interlocutory"—and is action "by which rights or obligations have been determined, or from which

legal consequences will flow." *U.S. Army Corps of Engineers v. Hawkes Co., Inc.,* 578 U.S. 590, 597 (2016); *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Both Defendants' destruction of USAID and their impoundment of funds appropriated to USAID meet this standard

There is nothing "tentative" here about the takedown of USAID. Rights and obligations have been determined, and significant legal consequences have resulted: Defendants have evicted USAID from its headquarters, canceled its lease, terminated roughly 86% of all USAID contracts and awards, and fired thousands of USAID direct-hire and personal service contractor employees. They have publicly celebrated "abolishing the agency," putting it "in the woodchipper," "delet[ing it]," closing it, and absorbing any remnants into the State Department.

### F. By disabling and destroying USAID and impounding billions in appropriated funds, Defendants have acted arbitrarily, capriciously, and contrary to law, violating the APA.

The APA requires courts to "hold unlawful and set aside" any "final agency action" that is "in excess of statutory jurisdiction, authority, or limitations," "contrary to constitutional right, power, privilege, or immunity," or "arbitrary, capricious, an abuse of discretion, or otherwise or not in accordance with law." The APA also empowers courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(10), 706(2)(A)–(C).[14] Defendants' disabling, dismantling, and destruction of USAID qualifies on all counts.

### 1. *Defendants' disabling and destruction of USAID is contrary to law.*

In disabling and destroying USAID, Defendants have unilaterally reorganized, redesigned, consolidated, downsized, and functionally eliminated USAID, including transferring its core authority and responsibilities to the State Department in violation of § 7063 of SFOPS

---

[14] Because the APA governs agency action, not Presidential action, the PSC Association has not brought APA claims against Defendant Trump. Accordingly, in this section of the brief, references to "Defendants" do not include the President.

appropriations bills, the APA, FARRA, and Article I of the Constitution. The power to establish federal agencies and determine their functions resides with Congress, not the President. *Myers*, 272 U.S. at 129; *NFIB v. DOL*, 595 U.S. at 117; U.S. Const. article I, § 8, cl. 18, The President is constitutionally obligated to "Take Care" that the laws are faithfully executed, including appropriations laws. No Defendant here has any lawful authority—statutory or constitutional—to reorganize, redesign, consolidate, downsize, or eliminate USAID.

### 2. *Similarly, Defendants' disabling and destruction of USAID is arbitrary and capricious.*

Agency action is arbitrary and capricious when it fails to examine all relevant factors or provide a reasoned explanation demonstrating a rational connection between the facts and the choice made. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins Co.*, 463 U.S. 29, 51 (1983); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), Defendants' actions fail these tests.

*First,* Defendants' actions freezing all spending and terminating employees en masse are so wildly disproportionate to their stated justifications (ensuring that USAID programs are "aligned with American interests") as to be arbitrary and capricious. A virtually blanket suspension of all Congressionally appropriated funds, subject to waivers that turned out to be a mirage—see Exs. 7 (at Ex. A) and 8 (at 2-14, 23-24)—followed by layoffs en masse, evicting USAID from its headquarters, and canceling its lease, are not remotely plausible precursors to "reevaluating" foreign aid. EO 14169. Nor have Defendants articulated what "American interests" are.

*Second*, there is no persuasive—if any—evidence that Defendants considered less drastic alternatives to firing the entire USAID workforce and canceling 86% of all USAID contracts and awards. And Defendants' cursory termination decisions—based on reviewing a spreadsheet with

a single line of data per award, and without speaking to anyone involved in administering these contracts and awards or looking at the contract and award documents themselves (Ex. 93 at ¶ 5)—do not bespeak "reasoned decisionmaking."

*Third,* there is also no evidence that Defendants accounted for reliance interests. Not the substantial reliance of the countless companies, organizations, and American farmers dependent on USAID contracts, many of whom will be forced to shutter their businesses or furlough or lay off staff. Not the reliance of millions of recipients of USAID aid worldwide for necessary medicine, food, and lifesaving assistance: for many of them there has already been immiseration, sickness, or death. ECF No. 19-1, Exh. C. And not the reliance of PSCs, including some who have lived outside the U.S. for years, see, e.g., Ex 20 and ECF Nos. 6-4, 6-15, 15-2, 20-4, 20-7, and are now abruptly losing their jobs, housing, and visa status. When an agency changes course reliance interests "must be taken into account." *Regents of the Univ. of Cal.*, 591 U.S. at 30. Here, they were not.

*Fourth,* Defendants have adopted a reckless standard—"shoot first, aim later"—under the rationale that if you don't have to restore 20% of what you cut, you didn't cut enough, epitomizing arbitrary and capricious agency action.[15] For example, on the basis of no more than a cursory review of a spreadsheet, with a single line of data per award, and in some cases without even knowing "the location of the project," Defendants: (a) haphazardly froze, reduced, or eliminated PEPFAR and Ebola funding; and (b) indiscriminately terminated at least 86% of all USAID

---

[15] See *Slash First, Fix Later: How Elon Musk Cuts Costs*, New York Times (Nov. 16, 2024), https://www.nytimes.com/2024/11/16/technology/elon-musk-cost-cuts.html; *RFK Jr. Plans to Reinstate Some Federal Workers, Programs,* https://www.wsj.com/_us-news/rfk-jr-plans-to-reinstate-some-federal-workers-programs-ec215056?mod=us-news_lead_pos2 (quoting RFK, Jr.: "Part of the DOGE—we talked about this from the beginning—is we're going to do 80% cuts, but 20% of those are going to have to be reinstalled, because we'll make mistakes.").

contracts and awards. Ex. 93 ¶ 5.

**3.** ***Defendants' continuing impoundment of billions in appropriated funds is contrary to law.***

Defendants continue to withhold billions in Congressionally appropriated funds without constitutional or statutory authority. See section I.C above.

**4.** ***Defendants' continuing impoundment of billions in appropriated funds is also arbitrary and capricious.***

Secretary of State Rubio's January 24, 2025, ALDAC mandated a blanket impoundment of foreign assistance funding. That approach was arbitrary and capricious—and was not mitigated by the post hoc "review" Defendants claim to have conducted. That "review" involved only a spreadsheet of single-line summaries for each award, with perhaps five or six cells, identifying merely the recipient, the amount, and "the subject matter" of a contract—with no examination of the underlying agreements, no consultation with contract officers, and no effort to understand project context. Ex. 93 ¶ 5. It was a superficial review, insufficient to justify terminating billions in programs (with a long history of bipartisan support). It is not the reasoned decisionmaking the APA demands—especially where, as here, the agency is radically and disruptively upending decades-old policy. Moreover, there is no evidence Defendants considered less harmful alternatives or the reliance interests of affected parties. *State Farm*, 463 U.S. at 51; *Regents of the Univ. of Cal.*, 591 U.S. at 30.

**G. With or without APA claims, the PSC Association is likely to succeed on its wholly independent ultra vires claim.**

The PSC Association is independently likely to prevail on its ultra vires claim, which does not depend on the APA. Judicial review for ultra vires acts rests on "the longstanding principle that if an agency action is 'unauthorized by the statute under which the agency assumes to act,' the agency has 'violated the law …. '" *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv*.,

26 F.4th 960, 970 (D.C. Cir. 2022) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)) (cleaned up). As the D.C. Circuit has emphasized, ultra vires review is a "weapon in the arsenal for attacking federal administrative action," where defendants "plainly act in excess of [their] delegated powers and contrary to a specific prohibition … that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022). That is precisely the case here.

As shown above, no statute, constitutional provision, or other source of law permits Defendants to unilaterally disable and destroy USAID or impound Congressionally appropriated funds. Defendants' actions disregard foundational constitutional principles of separation of powers, including the Appropriations Clause, the Spending Clause, and the Take Care Clause. They also flout clear, mandatory appropriations statutes.

Even if this Court were to find that the Contract Disputes Act bars some forms of relief in this forum—a conclusion that would require overruling *Bowen v. Massachusetts,* 487 U.S. 879 (1988)—the PSC Association still has an overwhelming likelihood of prevailing on its ultra vires claim because Defendants' actions plainly exceed the limits of their statutory and constitutional authority and strike at the heart of Congress's exclusive prerogatives. A likelihood of showing a violation of any of these provisions—the Appropriations Clause, the Spending Clause, the Take Care Clause, FARRA, or the ICA, all of them checks and balances against "the encroachment or aggrandizement of one branch at the expense of the other," *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)—is sufficient to demonstrate the Association's likelihood of success on its ultra vires claim.

## II. Allowing the destruction of USAID to continue will cause irreparable harm that cannot be remedied at law.

When this Court denied the Association's motion for a TRO on March 6, it discounted claims and evidence of irreparable harm in part because "the government has reiterated that its current

actions vis a vis USAID are taken with an eye toward reviewing the agency's operations." ECF 23 at 8:1-3. That has changed. Defendants have now publicly announced their plan to abolish USAID outright—"come hell or high water"—by July, without Congressional authorization. Ex. 6 at ¶ 3; Ex. 2; Ex. 3. They are also boasting of billions in alleged "savings" from impounded funds and terminated contracts, and they are openly disavowing any obligation to spend money as Congress directed. Ex. 1; Ex. 2 at 6-8; Ex. 56 at 4.

Unless the judiciary intervenes, these actions will cause—and are already causing—irreparable harm, including to the PSC Association and its members. This irreparable harm takes several distinct yet compounding forms.

*First,* as part of the destruction of USAID, Defendants have issued termination notices to all PSCs. Ex. 57; Ex. 58; Ex. 11 at ¶ 16. While job loss is not normally an irreparable harm, this is not a normal situation. Both the sheer scope and the "circumstances surrounding" the ongoing mass firings of PSCs and the entire rest of USAID's workforce presents a "genuinely extraordinary situation" that "so far depart[s] from the normal situation" as to justify preliminary injunctive relief. *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). USAID's workforce, including PSCs, is highly educated and highly specialized. Ex. 6 at ¶ 13; Ex. 5 at ¶¶ 10-16. USAID is by far the biggest employer in the humanitarian aid sector, and almost all other employers in the sector, especially American employers, depend on contracts, grants, and awards from USAID. Without USAID funding, much of the rest of the sector disintegrates. As a result, for the vast majority of PSCs, the loss of employment means the loss of an entire career. Such massive economic disruption can be irreparable harm, as this Court has recognized. See *TikTok Inc. v. Trump*, 507 F. Supp.3d 92, 113 (D.D.C. 2020) (Nichols, J.) (finding irreparable harm to TikTok because "shutting [it] down … would, of course, have the immediate and direct effect of driving all existing and

potential users to alternative platforms and eroding TikTok's competitive position"). Moreover, in addition to firing thousands of U.S.-based humanitarian workers, Defendants are also firing and repatriating thousands of such workers from overseas, all of whom must now find jobs in the U.S. It blinks reality to think that reinstatement would remedy the harms of such massive disruptions for thousands of USAID workers and their families. And on top of all this, PSCs' personal information is being published on the widely publicized DOGE website. Ex. 12 at ¶ 20; ECF Nos. 6-13 at ¶¶ 3, 8 and 6-15 ¶¶ 3-4.

*Second,* without preliminary injunctive relief now, even if this Court rules later that Defendants' actions are unlawful, it would be too late. Once USAID's infrastructure—its workforce, systems, contracts, and global partnerships – is dismantled, it cannot easily be restored. Ex. 5 and 6.[16] *Cf. TikTok*, 507 F. Supp.3d at 113 (concluding that if TikTok were "shut down (even briefly) but that shutdown was later held to be unlawful, TikTok would not be able to recover the harm to its user base"). Once broken, there is no switch that can be flipped from "off" back to "on" to put USAID back together again. And once institutional capacity is destroyed, neither reinstatement nor money damages are adequate remedies. Reinstatement would mean return[ing] to an empty agency with no infrastructure to carry out [its] programming." *See Widakuswara,* Case. No. 1:25-cv-1015-RCL, ECF No. 98 at 22 n.22. And "[s]hutting down necessary systems, laying off personnel, and terminating contracts, *even ones that might be able to be eventually reinstated*, halt agency function in the short term and threaten the efficacy of the agency in the long term ....

---

[16] During the first Trump Administration, with Congressional authorization, USAID merged its Offices for Food for Peace (FFP) and for Foreign Disaster Assistance (OFDA)—to form the Bureau for Humanitarian Assistance (BHA). It took *two years* to create operational systems suitable for the new BHA, and nearly three years to staff that bureau with suitable personnel, even though FFP and OFDA were offices with complementary mandates. Restarting a whole agency will take much longer. Exs. 5 and 6.

In short, these harms cannot be remedied with mere money damages." *Id.* at 32-33 (emphasis added). Declining to issue preliminary relief now will make relief later ineffective because, in the interim, Defendants, by acting faster than the judiciary, will have rendered the elimination of USAID a likely irreversible fait accompli.

*Third,* USAID's workforce is unique and not readily replaceable. It includes (and requires) skilled, specialized, trained experts across a wide range of fields—including water engineers, firefighters, infectious disease specialists and supply chain and logistical experts, among others. Ex. 5 ¶¶ 10-11; Ex. 6 ¶ 13. See https://www.pewresearch.org/short-reads/2025/01/07/what-the-data-says-about-federal-workers/ ("The most highly educated federal agency, among those with at least 1,000 employees, *isn't NASA or the National Science Foundation, but the U.S. Agency for International Developmen*t") (emphasis added). USAID's employees must also be available to rapidly deploy to some of the world's most challenging environments. On February 6, 2023, for example a magnitude 7.8 earthquake struck south-central Turkiye. USAID had a team on the ground in Turkiye in 24 hours and deployed more than 200 USAID personnel to Turkiye from around the world to provide search and rescue, emergency shelter, health services, food assistance, and other critical humanitarian aid. Recruiting that kind of talent takes time, and even before January 20, 2025, USAID was having trouble recruiting enough PSCs to respond rapidly to humanitarian crises. Ex. 85 at 6, 9-11. Per USAID directives, it should take 145 days from bid to award for a personal services contract. In reality, it takes up to a year or more. *Id.* at 10. And rebuilding this workforce is also complicated by procurement rules and security clearance requirements. And Defendants have made clear that no USAID employees will be transferred to the State Department. Ex. 2 at 6; Ex. 15 at 3. Without court intervention restoring the status quo ante, this highly skilled and trained team of specialists will scatter. Ex. 5 at ¶¶ 11–12). And once

dispersed, rebuilding this workforce may take years. Defendants are not simply making changes to an organizational chart. They are gutting a nearly impossible-to-replace workforce.

*Fourth,* USAID's ability to respond to crises worldwide depends on a network of partners, throughout the world, carefully built over decades of collaboration. That network is dissolving due to Defendants' actions, and the longer the dismantling of USAID is allowed to continue, the harder it will be and the longer it will take to rebuild it. Partner organizations, here and overseas, are wary now of USAID and its reliability. And they can continue only for so long without funding and knowledge of what's coming. Ex. 5 ¶¶ 22–23; *AIDS Vaccine Advoc.*, 2025 WL 752378 ** 18–20. These harms aren't theoretical: USAID'S implementing partners have had to lay off employees, stop or limit operations, or even close their doors as a result of Defendants' actions' and destroying these relationships and arbitrarily cancelling contracts with partners eliminates USAID's ability to function. The contrast between USAID's responses to the 2023 earthquake in Turkiye and the 2025 earthquake in Myanmar is stark. In 2023, USAID leveraged pre-negotiated commercial contracts to move prepositioned emergency supplies and deployed personnel within 24 hours. Ex. 5 ¶ 20. In contrast, in 2025, when a major earthquake hit Myanmar, the U.S. had no response team on the ground during the crucial 72-hour rescue window. *Id*. ¶ 22.

*Fifth,* appropriations are expiring, but USAID cannot spend them. Staff have been terminated, contracts ended, and OMB not apportioning funds. USAID is currently structurally incapable of fulfilling Congressionally mandated responsibilities, programs, and spending. Without judicial intervention, the combination of employee terminations, contract and award terminations, and OMB's failures to apportion appropriations eliminates USAID's ability to fulfill its Congressionally mandated purposes.

*Sixth*, the human cost is staggering—and irreparable. As a result of Defendants' destruction of USAID., including cutting off live-saving humanitarian assistance, there are currently 100 deaths from hunger and disease every hour that otherwise would have been prevented. Impact Metrics Dashboard at https://www.impactcounter.com/dashboard (sorted for sorted for Funding Source "USAID") (last visited Apr. 20, 2025).[17] Immiseration, instability, hunger, disease, and death only increase if USAID does not do the work that Congress has mandated it to do.

* * * * *

If the Court does not preliminarily restrain Defendants now, it will be too late. Defendants are eviscerating USAID in defiance of Congress and the Constitution and, at most, moving mere remnants into the State Department, which not only does not have the capacity to assume USAID's functions but is now undergoing its own RIF. Ex. 6 at ¶ 11. See https://www.npr.org/2025/04/22/nx-s1-5372587/marco-rubio-announces-overhaul-of-u-s-state-department. Without immediate action by the Court, USAID will have no employees or programs, and tens of billions of dollars of Congressionally appropriated funds will be left impounded, all in violation of the U.S. Constitution and law.

## III.  The equities and the public interest decisively favor Plaintiff.

"[W]hen the Government is the opposing party," the final two factors for preliminary injunctive relief—the balance of equities and the public interest—"merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). The question, then, is whether the harm of not issuing an injunction outweighs the harm of issuing it.

---

[17]  See also https://www.nytimes.com/2025/04/19/_world/africa/sudan-usaid-famine.html; Hana Kiros, *'In Three Months, Half of Them Will Be Dead'*, The Atlantic (Apr. 16, 2025), https://www.theatlantic.com/health/archive/2025/04/usaid-doge-children-starvation/682484/; Declan Walsh, *Trump's Aid Cuts Hit the Hungry in a City of Shellfire and Starvation*, New York Times (Apr. 19, 2025).

That balance tips decisively in favor of an injunction here.

The burden to the Government of being preliminarily restrained from exercising its unprecedented assertions of Executive power is insignificant. "It is well established that the Government *cannot suffer harm* from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (emphasis added). There is "*no interest in the perpetuation of unlawful agency action.*" *Open Cmtys. All. v. Carson*, 286 F. Supp.3d 148, 179 (D.D.C. 2017) (emphasis added). And it is axiomatic that government cannot "prioritize *any* policy goal" over the Constitution. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (emphasis added).

On the other side of the ledger, consider what happens without preliminary injunctive relief. USAID ceases to exist. All PSCs (and virtually the entire USAID workforce) are laid off. Decades of bipartisan efforts to project U.S. "soft power" are cast aside. The human consequences for recipients of USAID aid are immediate and, too often, fatal. And Defendants will succeed in dismantling an agency, as a fait accompli, before any court can reach the question of the constitutionality of their actions, rendering later injunctive relief ineffectual.

## IV. The terms of the proposed preliminary injunction are tailored to Defendants' conduct, afford Defendants appropriate flexibility in determining how to comply, and are necessary to preserve the availability of effective final relief.

The PSSC Association's proposed preliminary injunction (filed with this brief) would "restore the status quo ante pending a determination on the merits." *League of Women Voters of United States v. Newby*, 671 Fed. Appx. 820, 821 (D.C. Cir. 2016). Its terms are designed to ensure that USAID remains operational, thereby preserving the possibility of reviving the agency without requiring its full reconstruction from the ground up. At the same time, the injunction is tailored to Defendants' unlawful conduct and the harms it has caused, while appropriately deferring to the Executive's discretion rather than dictating staffing levels necessary to comply with the injunction

and with statutory mandates to obligate and spend foreign assistance funds, manage programs, and ensure payments to implementing partners. Without this relief, Defendants' unlawful acts—including OMB's refusal to apportion appropriated funds, without which USAID cannot obligate them—will continue, and the possibility of effective final relief will be very substantially impaired and very likely irreparably compromised.

## CONCLUSION

For all the reasons stated above, the Court should grant the PSC Association's motion for a preliminary injunction.

Dated: April 23, 2025

Respectfully submitted,

/s/  *Joshua Karsh*

Carolyn E. Shapiro
Schnapper-Casteras PLLC
200 E. Randolph St., Ste 5100
Chicago, IL 60601
cshapiro@schnappercasteras.com
773-520-7533

*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.*

Marni Willenson
D.C. USDC Bar No. IL0011
Illinois Bar No. 6238365
Willenson Law, LLC
3420 W. Armitage Ave.,
Ste 200
Chicago, IL 60647
marni@willensonlaw.com
312-546-4910

Joshua Karsh
Mehri & Skalet PLLC
1237 Judson Ave.
Evanston, IL 60202
jkarsh@findjustice.com
773-505-7533

*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.*

*Counsel for Plaintiff*