# EXHIBIT 6

**25-cv-469-CJN**

## DECLARATION OF T. CHRISTOPHER MILLIGAN

I, T. Christopher Milligan, declare as follows:

1.      I am a former Senior Foreign Service Officer with three decades of experience leading and implementing organizational reforms that advance U.S. development and humanitarian goals.

2.      I served with the United States Agency for International Development (USAID) from 1990 until my retirement in November 2021.

3.      I began my career at USAID as a Presidential Management Intern and USAID International Development Intern. Over the next three decades, I held thirteen different positions, progressing from intern to Counselor to the Agency. I served in USAID headquarters in Washington D.C. and in multiple missions and embassies overseas. During several years of my service, I was detailed to or filling a USAID-designated position at the State Department or Pentagon.

4.      I served as Counselor to the Agency from September 2018, during the first Trump Administration, until my retirement in November 2021, during the Biden Administration.

5.      The Agency Counselor is the most senior career officer at USAID. Exhibit A to my declaration is an organizational chart that accurately depicts the structure of USAID as of November 2021, at the time I retired. As shown in Exhibit A, the Counselor reports directly to the Administrator of USAID.

6.      As Counselor, I provided executive leadership and direction on a broad range of issues, particularly those of a high priority or a sensitive nature. Notably, I provided strategic leadership on the Agency's Transformation Initiative under the first Trump Administration, the

largest organizational reforms undertaken in decades that reshaped USAID, revamped processes and strengthened the workforce.

7.     Throughout my USAID career, I led and contributed to high-priority initiatives, furthering U.S foreign policy objectives. This experience includes:

- As the inaugural Senior Deputy Assistant Administrator for the Bureau for Policy, Planning, and Learning, I led the establishment of this new bureau, implemented organizational reforms, directed USAID's policy and planning processes, and enhanced the Agency's learning, monitoring, and evaluation systems.

- As the Senior Development Advisor for the first Quadrennial Diplomacy and Development Review, I provided strategic guidance to streamline bureaucratic procedures, revamp strategic processes at the State Department and USAID, and improve accountability for results.

- As the first Regional Director for the Near East in the Office of the Director of U.S. Foreign Assistance at the Department of State, I contributed to the launch of this new office, ensuring strategic coordination and effective utilization of over $7 billion annually in U.S. foreign assistance across the politically sensitive Near East and North Africa region.

- As Deputy Reconstruction Coordinator for the Organization for Reconstruction and Humanitarian Assistance (ORHA) at the Pentagon, I developed pre-war reconstruction and humanitarian assistance plans for Iraq, designed ORHA's organizational structure, recruited interagency personnel, and integrated these plans into broader U.S. government strategy for Iraq.

8.      Per the Congressional Notification (CN) of March 28 2025 (attached as Exhibit B), the Trump Administration proposes to dismantle USAID, eliminate bureaus and offices and realign selected functions to the State Department. The CN notes that only selected functions would be realigned to the State Department. USAID's remaining functions would be eliminated. These core elements of USAID's functions would be eliminated permanently, resulting in the permanent loss of capacity and expertise in areas such as democratic governance, conflict prevention and stabilization, among others. The remaining functions will be scattered among State Department Regional and Functional bureaus.

9.      This atomization of USAID, if allowed to proceed, will ensure that USAID cannot be reconstituted.

10.     Additionally, the dismantling of USAID, if allowed to proceed, will mean that USAID's congressionally mandated activities will not be executed.

11.     The State Department is not equipped, staffed or structured to assume USAID's role. Those who suggest otherwise are creating extraordinary risk to our country.

12.     Advancing American interests in the most dangerous environments using development assistance requires specific and advanced capabilities that the State Department does not possess. It took USAID decades to develop and maintain these capabilities, which rely on a highly specialized, skilled workforce and numerous complex systems.

13.     As a specialized National Security Agency, the USAID workforce has the highest education level of any Federal Agency. Indeed, according to Pew Research Center, "The most highly educated federal agency, among those with at least 1,000 employees, isn't NASA or the National Science Foundation, but the U.S. Agency for International Development." https://www.pewresearch.org/short-reads/2025/01/07/what-the-data-says-about-federal-workers/

(reporting analysis of the federal workforce based on data from the Office of Personnel Management and the Bureau of Labor Statistics). It took decades to build and deepen this expertise.

14.     The CN confirms that "substantially all USAID personnel will be separated from federal service with the current fiscal year." If these terminations are allowed to take effect and USAID's workforce dismantled, it will not be possible to rebuild this capacity in the short or medium term. This loss would be permanent for a significant amount of time.

15.     Additionally, the CN notes that "as part of this process, USAID missions overseas would be closed, U.S. direct hire personnel overseas would be returned to the United States, and most USAID locally employed staff would be separated from U.S. government service in accordance with local law."

16.     With USAID functions being eliminated or scattered across the State Department, virtually all staff terminated, USAID Missions closed and their assets disposed of, and local staff separated, it would not be possible to reconstitute USAID.  This is a permanent and lasting elimination of the U.S. government's development function.

17.     The CN confirms that the State Department is causing irrevocable harm by terminating USAID personnel. The CN notes, "The Department is not currently in a position to accurately project its needs or the exact numbers of USAID personnel to be hired in connection with realignment of USAID's programs and activities." This sentence is completely inconsistent with an intent to retain the functions of USAID. To prevent irrevocable harm, the Department should cease and reverse the termination of employees until there is a detailed and thorough plan to retain the functions of the agency. This step, if taken now, will lessen the damage to USAID.

However, if it is delayed by months or more, it will come too late, and USAID will be unconstitutionally dismantled.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 9, 2025.

/s/ T. Christopher Milligan





# Exhibit B



**United States Department of State**

*Washington, D.C.   20520*

**March 28, 2025**

### CONGRESSIONAL NOTIFICATION TRANSMITTAL LETTER

Consistent with sections 7015 and 7063(a) of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. F, P.L. 118-47), as carried forward by the Further Continuing Appropriations Act, 2025 (Div. A, P.L. 118-158), and section 34 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2706), the Department of State (the Department) and the U.S. Agency for International Development (USAID) are notifying their intent to undertake a reorganization that would involve realigning certain USAID functions to the Department by July 1, 2025, and discontinuing the remaining USAID functions that do not align with Administration priorities.

In order to support this reorganization, the Department intends to restructure certain Department bureaus and offices that would implement programs and functions realigned from USAID. In connection with this transition, substantially all USAID personnel will be separated from federal service pursuant to Reduction-In-Force procedures. Consistent with applicable law, the Department intends to conduct a separate and independent hiring process to build foreign assistance capacity; the Department intends for this process to be available to eligible USAID personnel. During the transition period until such legislation is enacted, some funds from the Operating Expenses and Capital Investment Fund accounts in title II of the SFOAA may be made available to support these functions at the Department of State as outlined below.

The planned changes are explained further in the attached enclosure.

**Recipients**:
House Foreign Affairs Committee
Senate Foreign Relations Committee
House Appropriations Committee
House Subcommittee on National Security, Department of State, and Related Programs
Senate Appropriations Committee
Senate Appropriations Subcommittee on State, Foreign Operations, and Related Programs

UNCLASSIFIED
-2-

We hope this information is helpful.  Please do not hesitate to contact us with questions.

Sincerely,

Paul Guaglianone
Senior Bureau Official
Bureau of Legislative Affairs

Enclosure:
        As stated.

## CONGRESSIONAL NOTIFICATION

**Introduction**

Following Secretary Rubio's February 3, 2025, letter initiating consultations regarding USAID, the Department of State is notifying Congress of its intent to realign select USAID functions to the Department and to phase out others. This decision aligns with the Administration's broader efforts to streamline government functions, eliminate redundancy, and enhance accountability. The transition will ensure that foreign assistance operations are fully aligned with U.S. diplomatic and national security objectives. By integrating these functions into the Department, the Administration aims to improve efficiencies while maintaining critical humanitarian assistance and national security programs.

**Background**

USAID conducted a comprehensive review of its existing programs and awards to assess their alignment with U.S. foreign policy objectives. As a result of this review, numerous programs were discontinued, while 898 active grants, cooperative agreements, and contracts remain in place. The total amount for these activities is approximately $78 billion in total vehicle value, with approximately $8.3 billion in unobligated remaining value. Separately, USAID retains 421 operational and critical service contracts and other agreements.

In the initial phase of the transition, the Department would take on the management of USAID's financial and administrative systems and management of USAID's remaining operations and ongoing foreign assistance programs. These functions would, in the first instance, be provided as a service via interagency agreement in order to ensure that USAID programs can be safely and effectively administered by the Department during the transition period. Payment processing systems will be integrated into the Department to ensure a streamlined approach to managing life-saving humanitarian aid and national security programs. The State Department would also integrate USAID's partner vetting systems and is working to create a more efficient vetting system in the future. The Department intends for this first phase of the transition to be completed by July 1, 2025.

The Department anticipates requesting, in its fiscal year 2026 budget request, funding in the relevant Department appropriations to support the programs previously implemented by USAID, and proposing legislation to abolish USAID as an independent establishment.

**Key Functions**

The Department has carefully considered which USAID programs could continue to advance the Administration's foreign policy objectives. Those have been determined to be humanitarian assistance, global health functions, strategic investment, and limited national security programs. The Bureau for Humanitarian Assistance (BHA) provides lifesaving humanitarian

assistance—including food, water, shelter, emergency health care, sanitation and hygiene, and essential nutrition services—to the world's most vulnerable and hardest-to-reach people. The Bureau for Global Health helps reduce health disparities, delivers lifesaving vaccines, promotes child and maternal health, and works toward control and elimination of malaria, tuberculosis, and other diseases. These functions would be realigned to relevant bureaus and offices in the Department to ensure continuity of critical operations and that the United States continues to effectively administer life-saving and strategic aid across the globe. Other functions are likely to be substantially duplicative of existing functions and capabilities at the Department, and would be eliminated in the restructuring plan.

**Reorganization**

The Department would streamline its organizational structure to best accommodate the new humanitarian assistance and global health functions being absorbed from USAID. (See Organizational Chart in Tab #1). The Department has engaged both senior political and career staff to evaluate the most efficient and effective way to implement these USAID programs and activities.

*Regional Bureaus*
The Department's robust regional bureaus would assume primary responsibility for the administration and coordination of bilateral and regional USAID programming. An office of foreign assistance would be established in each of the Department's regional bureaus that do not already have such an office. The functions of USAID's regional bureaus would be realigned to a corresponding State regional bureau. In addition, appropriate procurement and program management functions from USAID's pillar and management bureaus would be realigned to the relevant Department bureaus. Management of assistance programs by regional bureaus would ensure that aid programs are delivered based on regional and local priorities, and consistent with applicable U.S. foreign policy interests in those locations.

USAID has the following five regional bureaus: (1) Latin America and the Caribbean (LAC); (2) Europe & Eurasia (E&E); (3) Middle East (ME); (4) Africa (AFR); and (5) Asia (ASIA). Their functions would be realigned to Department's regional bureaus as follows: AFR functions would be realigned to the Bureau of African Affairs; ASIA functions would be realigned to the Bureaus of South and Central Asian Affairs and East Asian and Pacific Affairs; E&E functions would be realigned to the Bureau of European and Eurasian Affairs; ME functions would be realigned to the Bureau of Near Eastern Affairs; and LAC functions would be realigned to the Bureau of Western Hemisphere Affairs.

*State Department Office of Global Food Security (GFS)*
The life-saving food and agriculture assistance programs from USAID's Bureau for Humanitarian Assistance would be implemented by an expanded Office of Global Food Security reporting to the Department's Under Secretary for Economic Growth, Energy, and Environment (E). Focusing these efforts within the E family reflects the central role that commerce and supply chain infrastructure – both domestic and overseas – plays in USAID's food assistance programming.

UNCLASSIFIED
-5-

The Department remains committed to ensuring that its food assistance programs continue to support American agricultural interests in efficiently delivering food to populations in need across the globe.

*State Department Bureau of Global Health Security and Diplomacy (GHSD)*
The functions of USAID's Global Health (GH) bureau would be realigned to the State Department's Bureau of Global Health Security and Diplomacy. The Department's existing GHSD bureau is already responsible for the administration of intergovernmental health programming and leads, manages, and oversees the U.S. President's Emergency Plan for AIDS Relief (PEPFAR) program. USAID's GH programs are already closely coordinated with GHSD, which possesses relevant expertise to responsibly and efficiently manage USAID's life-saving programs. The Department anticipates making significant investments to ensure that GHSD is able to effectively support USAID's substantial PEFPAR and other life-saving health programs. Likewise, GHSD would be able to effectively manage USAID's critical health supply chain network with greater interdepartmental and intergovernmental coordination.

Merging USAID's flagship global health programs into GHSD would result in considerable synergies, including for PEPFAR. For example, currently, GHSD plans and coordinates all appropriated funds for PEPFAR, and provides funds to USAID for program administration. Consolidating these functions into a single bureau would result in efficiencies in the planning and delivery of essential PEPFAR aid, allowing the Department's programs to achieve greater impact with fewer dollars, with fewer wasted dollars on indirect and administrative costs.

*Other Functional Bureaus*
In limited cases, certain programs may be managed by appropriate subject matter or functional bureaus at the Department. For example, the Department's Educational and Cultural Affairs (ECA) office manages exchange programs and could potentially implement some education assistance programs. Additionally, economic growth, trade, and energy-related programming could be administered by the Department's Bureau of Economic & Business Affairs (EB).

*Other Bureaus*
The remaining USAID bureaus and offices would be substantially abolished. Certain contracting, administrative, management, and executive functions would be realigned to analogous functions at the Department. For example, certain contracting functions and personnel in USAID's Office of Acquisitions and Assistance (OAA) may be integrated into the Department's Office of Global Acquisition to support expanded foreign assistance procurement activity. Legal, human resources, records management, and financial functions would also be integrated into appropriate offices at the Department.

The Department would also administer certain statutorily required functions, as required by law. For those statutory functions that are expressly assigned to USAID or its personnel under the law, the State Department will propose legislative changes to allow the State Department to perform any ongoing functions.

**USAID Personnel**

Substantially all USAID personnel will be separated from federal service within the current fiscal year via Reduction-In-Force procedures, consistent with applicable law. As part of this process, USAID missions overseas would be closed, U.S. direct hire personnel overseas would be returned to the United States, and most USAID locally employed staff would be separated from U.S. government service in accordance with local law. USAID and the Department of State would dedicate significant resources to ensuring that affected U.S. direct hire personnel posted overseas would receive safe, timely, and accessible repatriation travel and other arrangements.

The Department intends to commence, consistent with applicable law, appropriate hiring processes to bring in relevant Civil Service and Foreign Service personnel with the relevant skills and expertise to build foreign assistance capacity and administer USAID programs and activities. The Department anticipates making these processes available for eligible USAID personnel and external candidates after the USAID Reduction-In-Force process has been completed, consistent with applicable law.

The Department is not currently in a position to accurately project its needs or the exact numbers of USAID personnel to be hired in connection with the realignment of USAID's programs and activities. The Department also anticipates assigning or assuming the contracts of certain former USAID domestic and foreign Personal Services Contractors (PSC) that possess relevant expertise and/or are located in strategic areas.

**Financial Plan**

The Department of State would manage USAID operational accounts and activities as required, ensuring that operations are closed out in a smooth and orderly transition.  More specifically, the Contracting and Agreement Officer authorities and personnel would move to the Department.  The Operating Expense (OE) and Capital Investment Fund (CIF) Accounts, which are appropriated to carry out section 667 of the Foreign Assistance Act (FAA) would be administered by the Department for activities associated with administering foreign assistance. During the first phase of the transition, USAID would transfer or allocate OE funds to the State Department under section 632 of the FAA. Consistent with section 667 of the FAA, the President designated USAID as the agency responsible for administering part I of the FAA.  In a subsequent phase of the transition, the Department would request the President to designate the Department as that agency instead, once the Department is prepared to take on that responsibility.

The Department of State would assume responsibility for humanitarian assistance programming, ensuring that these programs are integrated with broader diplomatic efforts and national security goals.  BHA would be abolished and its functions realigned to the Department. Funding associated with Title II of P.L. 480 (also known as Food for Peace) is appropriated to the U.S. Department of Agriculture, in accordance with the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2024 (P.L. 118-42), as

UNCLASSIFIED
-7-

carried forward by the FY 2025 Continuing Appropriations Act (P.L. 118-83). Under the Food Security Act of 1985 (P.L. 99-198), the donation of agricultural commodities to foreign countries is implemented by the USAID Administrator. Secretary Rubio, as current acting Administrator of USAID, will continue to oversee the implementation of this program going forward until appropriate legislation is enacted authorizing the Department to assume this function.

Separately, USAID anticipates standing up a claims settlement process to ensure that any applicable claims of contractors, vendors, personnel or others are timely and adequately addressed by USAID. USAID would continue to operate this process until appropriate legislation is enacted to facilitate the transfer to the Department.

**Resources**

The table below reflects unobligated balances of accounts at USAID as of March 23, 2025.

| USAID Fully and Partially-Managed Foreign Assistance Accounts | | |
|---|---|---|
| Account | Account Symbol | USAID Unobligated Balance as of March 23, 2025 (in dollars) |
| **Title II - USAID** | | |
| Operating Expenses (OE) | 72 [] 1000 | $229,441,200 |
| Capital Investment Fund (CIF) | 72 [] 0300 | $133,008,903 |
| Office of Inspector General (OIG) | 72 [] 1007 | $30,938,711 |
| | | |
| **Title III - Bilateral Economic Assistance** | | |
| Global Health Programs** [1] | 72 19 [] 1031 | $7,082,476,856 |
| Development Assistance (DA)* | 72 [] 1021 | $7,378,979,411 |
| International Disaster Assistance (IDA) | 72 [] 1035 | $6,756,558,435 |
| Transition Initiatives (TI) | 72 [] 1027 | $81,408,484 |
| Complex Crises Fund (CCF) | 72 [] 1015 | $46,818,713 |
| Economic Support Fund (ESF)* | 72 [] 1037 | $5,647,197,058 |
| Democracy Fund (DF)** | 72 19 [] 1121 | $272,341,319 |
| Assistance for Europe, Eurasia and Central Asia (AEECA)* | 72 [] 0306 | $847,228,217 |
| **Additional USAID accounts with unexpired unobligated balances** | | |
| Commodity Credit Corporation Title II and III (CT) *** | 72 12 [] 2278 | $347,509,109 |
| Commodity Credit Corporation (CC) *** | 72 12 [] 4336 | $5,208,662 |
| Central America and Caribbean Emergency Disaster Recovery Fund | 72 [] 1096 | $4,545,538 |
| Special Assistance Initiative (AI) | 72 [] 1010 | $463,664 |
| Assistance For The New Independent States of The Former Soviet Union (NI) | 72 [] 1093 | $712,011 |
| Sahel Development Program | 72 [] 1012 | $474,512 |
| Sub-Saharan Africa Disaster Assistance | 72 [] 1040 | $81,818 |
| Development Fund for Africa | 72 [] 1014 | $0 |

SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED
-8-

| | | |
|---|---|---|
| Global HIV/AIDS Initiative (GA) | 72 [] 1030 | $277,708 |
| Global Fund to Fight HIV/AIDS (GF) | 72 [][ 1028 | $0 |
| HIV / AIDS Working Capital Fund | 72 [] 1033 | $309,505,354 |
| Civilian Stabilization Initiative (CS) | 72 [] 0305 | $1,151,530 |
| Child Survival and Health Programs (CD) | 72 [] 1095 | $16,507,818 |
| Andean Counterdrug Program (formerly ACI) (ACP) | 72 19 [] 1154 | $132,722 |
| Food and Nutrition (Legacy) | 72 [] 1023 | $2,767,500 |
| Population Planning and Health (Legacy) | 72 [] 1024 | $272,442 |
| Education and Human Resources Development (Legacy) | 72 [] 1025 | $2,649,022 |
| Property Management Fund | 72 [] 4175 | $13,865,818 |
| Working Capital Fund | 72 [] 4513 | $45,119,463 |
| Advance Acquisition of Property- Revolving Fund | 72 [] 4590 | $46,299 |
| Foreign Service National Separation Liability Trust Fund | 72 [] 8342 | $4,504,654 |
| Technical Assistance (TA) | 72 [] 8502 | $3,435,454 |
| Gift and Donations | 72 [] 8824 | $64,573,468 |
| Ukraine Loan Guarantees Program Account | 72 [] 0402 | $0 |
| Loan Guarantees to Israel Financing Account | 72 [] 4119 | $599,688,323 |
| MENA Loan Guarantee Financing Account | 72 [] 4493 | $172,388,873 |
| Sovereign Guarantee Program Account | 72 [] 1560 | $0 |
| Guaranteed Loan Financing Account | 72 [] 4464 | $0 |
| Direct Loan Financing Account | 72 [] 4463 | $535,245,137 |
| Other Legacy Accounts | | |
| *USAID is the parent for these accounts, but funds are implemented by State and USAID.* | | |
| ** State is the parent for these accounts, but funds are implemented by State and USAID.* | | |
| *** USDA is the parent for these accounts.* | | |
| (1) This includes GHP-USAID and GHP-State allocated to USAID | | |

UNCLASSIFIED
SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED
-9-

**Organizational Structure**

*Proposed Organization for State – USAID Merger*



UNCLASSIFIED
SENSITIVE BUT UNCLASSIFIED



UNCLASSIFIED
-11-

*Current USAID Organization Chart*



SENSITIVE BUT UNCLASSIFIED

UNCLASSIFIED
-12-

*Current Department of State Organization Chart*



February 2025

United States
Department of State Org Chart

GTM/OTA manages the Department of State's Organizational Chart
* The head of these organizations report directly to the Secretary (S)
for certain purposes

UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

# EXHIBIT 7

**25-cv-469-CJN**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL HEALTH COUNCIL, *et al.*,

     *Plaintiffs*,

     v.

DONALD J. TRUMP, *et al.*,

     *Defendants*.

Civil Action No. 25-cv-402 (AHA)

## DECLARATION OF NICHOLAS ENRICH

I, Nicholas Enrich, declare the following under penalty of perjury:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am the Acting Assistant Administrator for Global Health at the U.S. Agency for International Development (USAID).

3.     I was placed on administrative leave on Sunday, March 2, 2025.

4.     In my role as Acting Assistant Administrator for Global Health, my duties include implementing USAID appropriations for global health programming and providing technical leadership and international engagement on global health policy on behalf of the U.S. Government.

5.     As part of my official duties as Acting Assistant Administrator for Global Health, I prepared two memoranda documenting the impacts of recent actions taken within the Agency as they relate to the Bureau of Global Health.

6.     I prepared these memoranda, along with other Agency officials, in the ordinary course of business in my role at the Agency. They reflect information and data collected and

observed by myself and other employees at the Bureau of Global Health. Both documents contain my signature, as well as information regarding the primary drafters and the status of Bureau-level clearances. It is regular practice for USAID employees to prepare, for official use, memoranda containing facts within their personal knowledge.

7.    I am aware that these memoranda were filed by the plaintiffs in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State* (*AVAC*), No. 25-cv-400. I have reviewed the court filings and confirm that they are true and correct copies of the memoranda I prepared.

8.    Attached as **Exhibit A** is a true and correct copy of a Memorandum to the File, dated February 28, 2025, with the subject "Documentation of challenges and impediments to implementing the lifesaving humanitarian assistance waiver for the pause on foreign assistance (Jan 28 - Feb. 28)." This is the document that was filed in *AVAC* at Docket No. 46-1, Ex. A. I prepared this report along with Ramona Godbole, the Policy, Programs, and Planning (P3) Deputy Director for the Bureau of Global Health. I approved and finalized this report.

9.    Attached as **Exhibit B** is a true and correct copy of a Memorandum to the File, dated February 28, 2025, with the subject Documentation of Bureau for Global Health Workforce Reductions." This is the document that was filed in *AVAC* at Docket No. 46-1, Ex. B. I prepared this report along with Natalia Machuca, Deputy Director, Office of Professional Development and Management Support, Bureau for Global Health. I approved and finalized this report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 3, 2025, in Washington, D.C.

Nicholas Enrich

Exhibit A



FOR OFFICIAL USE ONLY

**MEMORANDUM TO THE FILE**

**Date:**        **February 28, 2025**

**Subject:**        Documentation of challenges and impediments to implementing the lifesaving humanitarian assistance waiver for the pause on foreign assistance (Jan 28 - Feb. 28)

**Approved:**    Nicholas Enrich, Acting Assistant Administrator for Global Health    *Nicholas Enrich*

**KEY TAKEAWAYS:**

- Successful implementation of Secretary Rubio's temporary waiver to the pause on foreign assistance for lifesaving humanitarian assistance was not possible due to administrative and bureaucratic challenges, including contradictory and shifting guidance regarding approval for required activities and failure of Agency leadership to process disbursement of funds for activities once approved.
- As a result of these challenges, the Bureau for Global Health (GH) has been wholly prevented from delivering life-saving activities under the waiver to date.

**BACKGROUND:**

On January 28, 2025, Secretary of State Rubio issued a temporary waiver to the pause on foreign assistance articulated in the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (EO) for lifesaving humanitarian assistance (LHA) activities. A subsequent Agency Notice, issued January 29, instructed that "Implementing partners currently involved in lifesaving humanitarian assistance programs should continue, or resume activities if they have been halted, in accordance with the following guidelines" and defined the scope of the waiver to include "...essential medicines, medical services, food, shelter, and subsistence assistance, as well as necessary supplies and reasonable administrative costs to facilitate the delivery of such assistance."

USAID's failure to implement lifesaving humanitarian assistance under the waiver is the result of political leadership at USAID, the Department of State, and DOGE, who have created and continue to create intentional and/or unintentional obstacles that have wholly prevented implementation. These actions include the refusal to pay for assistance activities conducted or goods and services rendered, the blockage and restriction of access to USAID's payment systems followed by the creation of new and ineffective processes for payments, the ever-changing guidance as to what qualifies as "lifesaving" and whose approval is needed in making that decision, and most recently, the sweeping terminations of the most critical implementing mechanisms necessary for providing lifesaving services. These actions individually and in combination have resulted in the U.S. Government's failure to implement critical lifesaving activities. This will no doubt result in preventable death, destabilization, and threats to national security on a massive scale. This memo serves to document the LHA waiver process and challenges encountered by the Bureau for Global Health to date, excluding PEPFAR.

**LHA WAIVER IMPLEMENTATION SUMMARY:**

***January 29-31: Initial Waiver Plan and Guidance***
- On January 29th at the Agency Senior Management Meeting, GH Acting Senior Bureau Official Ramona Godbole articulated to then Deputy Chief of Staff (DCOS) Joel Borkert that GH would send an info memo describing a process and criteria by which GH would approve activities for and implement the waiver for qualifying global health activities, and would carefully identify and track activities within awards that fall under the waiver. DCOS Borkert indicated his support for this approach.
- Also on January 29th, GH sent stop work orders (SWO) to all GH-managed Public Interest Organizations (PIOs), and included the waiver language verbatim at the advice of USAID General Counsel (GC) to indicate

1

to these partners that there was guidance to continue lifesaving components of their programs[1]. All other GH-managed agreements had already been sent SWOs prior to the issuance of the waiver.

- In addition, on January 29 USAID Executive Secretariat (ES) released a new template for all Foreign Assistance Pause Waiver Requests, indicating that new waiver requests would only be considered for the same day if submitted by 1:00 p.m. ET. This guidance was subsequently revised and an updated version was shared on January 31. As the blanket waiver for LHA had already been issued,  GH interpreted this guidance to apply only to waiver requests outside of the blanket waiver for LHA and/or for LHA activities that required new obligations in addition to disbursements.
- January 29 - February 2: GH identified emergency outbreak response activities needed to respond to the Ebola outbreak in Uganda through PIOs (UNICEF, IFRC, IOM) under the LHA waiver - the first approved global health activities under the waiver.  Approval to move forward was obtained by DCOS.
  - Despite receiving approval to conduct these Ebola response activities approximately 1 month ago, the implementing partners were never able to draw down funds for these life-saving activities, and have not received any funds to date.
- On January 31st, Acting Assistant Administrator for Global Health (A/AA), Nick Enrich, sent an email summary of GH's process to efficiently implement the LHA waiver for GH activities to DCOS Borkert, copying Chief of Staff Matt Hopson and then-Acting Deputy Administrator Ken Jackson, and followed up on February 3rd after no response.

*February 1-7: Initial Waiver Approvals and Requests for Payment*

- On February 4th, A/AA Enrich and DCOS Joel Borkert talked via phone and followed up via email confirming that GH's proposed process should move forward immediately, with GH approving lifesaving humanitarian global health assistance judiciously in accordance with the guidance, and providing regular updates to the FO including a full accounting of activities and budget. In a shift from previous guidance, during this conversation, DCOS Borkert also directed GH to modify the timeline of lifesaving assistance requests to cover 30 days rather than 90 days.  DCOS Borkert also indicated that GH should be "draconian" in what is approved under the waiver.
- On February 4th, GH shared this memo for the Acting Administrator with the DCOS Borkert, who subsequently cleared the memo by email on February 6th.[2]
  - This memo defined Bureau for Global Health LHA programming as including 1) Direct Service Delivery, 2) Emergency Response to Infectious Disease Outbreaks, and 3) Essential Health Commodities & Supply Chain Management.
  - The memo also established that GH A-AA was responsible for approving activities that fall within the waiver, and for sharing updates regularly with the Agency Front Office and coordinating with M/OAA to communicate with implementing partners of GH centrally managed awards to restart approved activities.
- GH developed an internal tracker [Tab 1] to collect award and activity information for LHA activities. GH A-AA reviewed the tracker daily and approved activities that met the definition outlined in the cleared memo. GH collected information only on centrally-managed awards, including field support.  Regional Bureaus led the collection and approval of bilateral awards that met the LHA waiver criteria independently.

---

[1] PIOs that received suspension letters inclusive of waiver language are Food and Agriculture Organization of the United Nations (FAO) Global Health Security Project Agreement (Award # 7200GH22IO00005), Food and Agriculture Organization of the United Nations (FAO) Emerging Pandemic Threats Agreement 2 (Award # GHA-G-00-06-00001), UNOPS Agreement (Award # AID-GH-IO-15-00002), UNOPS Agreement (Award # 7200GH24IO00001), UNICEF Umbrella Agreement-II (Award # 7200GH21IO00004),UNICEF Polio and Immunization Agreement II (Award # 7200GH22IO00001),IFRC Agreement 2 (Award # AID-GH-IO-17-00002), Global Financing Facility (GFF) for Women, Children and Adolescents Single-Donor Trust Fund Agreement (Award # 7200GH23IO00003/Bank Trust Fund No. 074019), IOM Agreement (Award # 7200GH25IO00002), Joint United Nations Programme on HIV/AIDS (UNAIDS) UNAIDS Agreement IV (Award # 7200GH22IO00004), and International Federation of the Red Cross and Red Crescent Societies (IFRC) Agreement 3 (Award # 7200GH23IO00002)

[2] By nature, Info Memos do not require explicit approval but are cleared and shared for informational purposes. On Feb. 6, it was unclear who was the Acting Administrator of USAID. While an Agency-wide February 3rd email indicated that Secretary of State Marco Rubio had been appointed as USAID's Acting Administrator, this communication raised a number of legal and practical questions still awaiting resolution. Additionally, previous Agency-wide guidance on the implementation of executive orders (Jan 25 and Jan 26) had placed severe restrictions on communications between USAID and State, indicating that all communication with State must first go through the USAID Front Office. Therefore, GH included Ken Jackson, the highest ranking political official at USAID, in its circulation of the Info Memo.

FOR OFFICIAL USE ONLY

- Consistent with the process established in the approved Info Memo, on February 7th, GH sent the first batch of GH-approved waivers for the Agency Front Office's visibility and to request their action to authorize expenditures/disbursements, given that access to Agency financial systems (Phoenix, GLAAS) was severed for GH and other financial management staff across the Agency.  GH provided an updated list of GH-approved waivers on February 10 to Paul Seong (detailee to Agency FO), copying DCOS Borkert.  At this point, there was no clear pathway to submit waiver requests, and GH personnel (Nida Parks, Ramona Godbole, and Nick Enrich) had been verbally told by DCOS Borkert to email Paul Seong copying the DCOS. Concurrently, M/OAA sent letters to the relevant implementing partners/awards to restart work on specific lifesaving activities, based on GH approval.
  - While the specified partners received letters indicating certain activities could restart as they were approved under the LHA waiver, several indicated that they could not restart these activities without getting paid by USAID for past invoices (prior to January 20th) and/or access to funds for the waived activities. Other partners restarted lifesaving activities using residuals, but even that work was short-lived. With USAID having failed to make payment on past due invoices or to provide access to funds for newly approved activities, and with residual funds fully extinguished, partners had no funding to continue the work, so it stopped. Communications documenting these challenges can be found here.
- Beginning around February 7th, members of GH leadership participated in a Department of State-led "Coordination Support Team," as part of the "Programs Working Group," which was charged with addressing challenges related to implementing the LHA waiver.  From the start, the Programs Group alerted Agency leadership that the lack of access to funds for implementing partners was a critical impediment to the ability to implement the waiver, as access to USAID financial systems (GLAAS and Phoenix) had been completely turned off by DOGE, per Bob Kingman and Daniel Gaush from Department of State ICASS Service Center, preventing the flow of any funds to implementing partners who were approved to implement LHA activities.

***February 8-14: Award Terminations and Changing Waiver Activity Approval Guidance***

- On February 8th, M/OAA notified GH of several "tranches" of awards that the Secretary of State (S) had identified for termination.  The list of awards slated to be terminated included awards that had been approved to implement activities under the LHA waiver. GH immediately alerted both DCOS Borkert and Assistant to the Administrator (AtA) Mark Lloyd both in writing and verbally that terminating the awards that were needed to implement lifesaving activities would undermine the ability of USAID to implement the LHA waiver.
  - OAA shared subsequent tranches of planned award terminations with GH centrally-managed awards  - Tranche 2 (on or around February 9th), Tranche 3 (February 10th), and Tranche 5 (February 23), and OAA gave GH the opportunity to highlight awards with LHA before termination.  Early in this process, one award with an LHA request (NTD West) was terminated before GH could effectively engage with OAA.
- On February 11th, Mark Lloyd asked A-AA Enrich for additional details on submitted waivers, including descriptions of awards from FACTSInfo and number of lives saved.
- On February 11th, DOGE advisor Jeremy Lewin emailed A-AA Enrich warning him to stop reviewing the awards slated for termination to identify if those awards were needed to implement activities under the waiver. Specifically Lewin stated: "I am hearing that Global Health is conducting supplemental reviews of awards slated for termination by Secretary Rubio and Acting Deputy Administrator Marocco. This is delaying the timely processing of these termination notices and is unacceptable" and specified that "bureaus should not be conducting their own policy and program reviews before acting on these termination instructions." A-AA Enrich responded that GH was flagging for Agency consideration that the awards that were slated for termination included those needed to implement the LHA waiver, but would stop if told to stand down. Lewin did not respond.
- On February 11th, Paul Seong, a detailee to the Agency FO, instructed GH to pause further approvals of activities to be implemented under the LHA waiver. His email stated:  "Please hold off on any more approvals until we have a conversation with Joel on this."  On February 12, A/AA Enrich shared that

FOR OFFICIAL USE ONLY

3

message with GH leadership and regional bureaus. Despite a growing list of lifesaving activities identified, GH paused on any further approvals.

- On February 13th, A-AA Enrich and Senior Deputy Assistant Administrator (SDAA) Julie Wallace were told by DCOS Borkert that there had been a false narrative spread in the media that GH had been told to pause on approving activities under the LHA waiver. A-AA Enrich stated that the Agency FO had in fact told GH to pause on further approvals, and reminded him of the previous day's email. DCOS Borkert as well as other senior advisors, including AtA Tim Meisburger and Senior FO Advisor Laken Rapier shouted at A-AA Enrich that there had never been a pause, and instructed him to immediately draft another Info Memo to correct the "false narrative in the media that there had ever been a pause."
- On February 13th, GH circulated the memo from AtA Mark Lloyd "performing the duties of Assistant Administrator, Global Health" which among other things, reiterated GH's approach to approval of waivers per the earlier February 4th memo.
  - While agency leadership previously told GH to only include requests for 30 days (articulated in the February 4th memo), GH was subsequently asked to shift to the original 90 days as articulated in the original waiver language.  This was updated in the February 13th memo.
- On February 14th, the Agency Front Office and ES circulated a new consolidated Foreign Assistance Pause Blanket Waiver and Exception Guidance which fully contradicted Mark Lloyd's memo from the previous day, and rendered the GH approval process for activities under the LHA waiver obsolete. Starting with the release of the February 14 guidance, GH was never again able to approve activities under the waiver, and from that point forward, zero lifesaving health activities have been approved by the Agency.
  - The February 14th guidance established a new process for approving LHA activities, and centralized the approval process with the Agency FO, and specifically required approval for all activities under the waiver by Ken Jackson as the named "Senior Bureau Official" for USAID. This new guidance contained several process updates, including two new templates (Blanket Waiver Request Sheet and the Obligation or Disbursement under Waiver of Foreign Assistance Pause) and articulated that all waiver requests needed to be sent through the Executive Secretariat (ES).
  - In addition, the guidance articulated that ES would inform the relevant Bureau and cc M/CFO POCs if/when activities were approved for payment, but was not responsible for working with M/CFO on coordinating the disbursement of funds for approved waivers.
- On February 14th, GH re-sent all approved activities under the waiver to date to ES, in the original GH-created format, clarifying that they had already been approved under the previous guidance.  All lifesaving activities that had not yet been approved as of the February 14th guidance, were subsequently submitted for approval in accordance with the new guidance. **No global health activities were ever approved under the updated guidance.**
  - GH considered submissions prior to February 14th approved to fall under the waiver, but not approved for payment until the Agency SBO signs the Obligation and Disbursement Form.
  - For submissions on or after February 14th, GH considered those requests as needing approval from the Agency SBO both for qualification under the waiver and for payment.
- On February 14th, a federal judge issued a temporary restraining order (TRO) prohibiting the freezing of foreign aid funds obligated prior to January 19. It was not immediately clear how the TRO pertained to LHA waivers, however, GH decided to continue to submit requests given the uncertainty of interpretation and implementation of the TRO.

### *February 15-21: Unapproved Waiver Activity Requests and Ongoing Lack of Payment*
- On February 18th, A-AA Enrich shared an action memo with Mark Lloyd recommending the utilization of an existing agreement with the WHO to utilize previously obligated funds to access a critical stockpile of PPE and lab supplies to support the Uganda Ebola outbreak response.  While the activities would normally be covered in the regular process for the lifesaving humanitarian assistance waiver, this memo was drafted for approval from State/F Director Pete Marocco, given that the implementing partner of the agreement is WHO, the subject of a separate Executive Order. Mark Lloyd cleared the memo on Feb. 19th and it was sent forward for COS Borkert clearance and DFA Pete Marocco signature. COS Borkert specified that DFA Marocco would not sign the memo and would not agree to utilizing the agreement with WHO to access the PPE stockpile, and instead ordered A-AA Enrich to "pick up the PPE and deliver it to the necessary

people and organizations in the region to respond to ongoing infectious disease outbreaks" without utilizing the agreement with WHO. DFA Marocco immediately responded to Borkert's email, threatening to the jobs of GH staff if an alternate plan was not carried out immediately, directing political appointees Borkert, Lloyd and Meisburger to "take all necessary personnel actions in the event this is not completed in the next 12 hours."

- On February 19th, DCOS Borkert sent an email to A-AA Enrich, AtA Lloyd, and A-AA for Africa Bureau Brian Frantz indicating that "life saving things like Marburg do not need a waiver (so there should be no pause). They do need to go through the payment approval process," contradicting the previously established processes described above.
- On February 20th, A-AA Enrich emailed AtA Mark Lloyd to request that he clarify the conflict between the guidance and DCOS email. It was later confirmed verbally and documented via email that the existing Agency guidance continues to be the active guidance despite comments from DCOS Borkert.
- On February 20th, GH sent all waiver requests that had previously been approved by GH as well as additional waiver requests that had gone through technical review and concurrence at the GH/AA level in the new format to ES and M/CFO, including links to an Obligation / Disbursement Form for each.
  - The GH Centrally Managed Award Blanket Waver Request Tracker can be found in Tab 2 and provides a running list of all submissions for approval and/or payment to the Agency FO.
- On February 21st, with no response to February 20th email (above), to help provide clarity around unclear and inconsistent guidance, GH again proposed some minor revisions to ES guidance through Mark Lloyd. These proposed edits included clarification that GH can approve the applicability of the waiver for activities, while the ES guidance was to seek approval for payment. Mark Lloyd subsequently indicated that the proposed edits were not approved and that GH should follow the guidance as laid out by ES.

### February 22-28: No approved waivers, no funding, and widespread mechanism terminations

- On February 21st, Mark Lloyd told GH leadership to update the waiver process by creating an additional layer of technical review for LHA waiver submissions from missions, a process which was previously managed entirely by the Regional Bureaus.
- On February 24, in an effort to move forward approvals and payments, the GH leadership team (A-AA Enrich and DAA Coles) walked through each waiver request with political leadership (Mark Lloyd and Tim Meisburger) in an effort to move forward approvals and payments. Political leadership provided guidance instructing GH to narrow the focus of its requests and to deprioritize activities related to neglected tropical diseases, Mpox, polio, Ebola, and any monitoring and surveillance activities, as those would not be approved. AtAs Lloyd and Meisburger stated at the meeting that even activities that had been approved by GH under the previous guidance needed to be re-approved, indicating that the Agency FO does not recognize any previous GH approvals for applicability of the LHA waiver under the Feb 6th info memo. At this meeting, AtA Lloyd and Meisburger informed GH leadership that all submissions would need to be cleared by AtA Lloyd prior to being submitted to SBO Jackson for approval.
- On Tuesday, February 25, GH provided a revised and prioritized list of GH centrally-managed awards/activities (none of which had been approved) to AtA Lloyd requesting approval of 16 urgent activities to support lifesaving commodities and services per the February 24 discussion. AtA Lloyd never responded or provided clearance or non-clearance. GH had planned to re-submit these prioritized activities for SBO Jackson's formal approval for inclusion under the waiver and payment after receiving Mark Lloyd's concurrence. To date, despite prompts at each daily meeting with AtA Lloyd, GH has not been given guidance to proceed.
- On Tuesday, February 25, through the Programs Working Group, GH was made aware of Frequently Asked Questions on the waiver developed by State and cleared by Pete Marocco. Question 20 indicates the following specified the funding accounts that the LHA waiver applies to, and it explicitly excludes non-PEPFAR health funding, meaning that none of the proposed activities could be approved under the LHA waiver.
- On February 26, GH raised the above mentioned FAQ and implications at the Programs Working Group meeting. Political leadership in attendance (Timothy Meisburger) indicated that the FAQ was a mistake. GH subsequently followed up with leadership requesting a revision to FAQ via email, however, the

omission was never corrected before the final FAQs were widely shared later that day via an Agency Notice.

- Also on February 26th, ES released additional updates to waiver guidance including that for awards over $1 million a budget breakdown would be required before approval; GH was also told to include dollar amounts within the disbursement / obligation forms already submitted by ES staff member Jenn Hurley.
- Additionally, on February 26th, over 5,000 USAID awards were terminated globally; GH was not notified of this action before it happened. The terminated awards included almost all of the awards that were needed to implement lifesaving activities. A-AA Enrich informed COS Borkert, SBO Jackson, and AtAs Lloyd and Meisburger immediately of the grave impacts on lifesaving activities related to malaria, tuberculosis, and ebola. In an email following the February 26th terminations, DCOS Borkert indicated that the awards that were terminated should not have been, and had been terminated in error: "Please hold on these life saving programs and let us review in the morning. There is an acknowledgement some may have been sent out in error and we have the ability to rescind. We need to identify what those are."
- As of February 27th, GH has identified over 100 awards (excluding PEPFAR) that had submitted LHA waivers for approval. A-AA Enrich emailed the list of awards and described their lifesaving impact on February 27th; when GH leadership were told that the list needed to be ranked, DAA Coles responded with top priority awards that had been terminated.
- On February 27, GH sent an additional list of awards / activities to ES seeking SBO Jackson's approval to allow the activities to proceed pursuant to the LHA waiver and to allow program payment (see Tab 2)

Finally, significant staffing changes occurred within USAID/GH throughout the timeframe in question - including regularly affecting staff by terminating them without warning, turning on and off access to systems, placing and removing staff from administrative leave, etc. - severely limiting the ability to navigate and respond to the shifting guidance and bureaucratic hurdles outlined above. These staffing disruptions are too numerous and expansive for this memo, and are summarized in a separate memo for the record (Tab 3). In addition to staffing disruptions within GH, there were significant numbers of individuals put on administrative leave both at Missions and at Regional Bureaus, further exacerbating challenges.

**IMPLICATIONS:**
- In total, to date, the GH Bureau has identified 72 activities across 31 awards that entail Lifesaving Humanitarian Assistance, not including bilateral awards with LHA waiver requests. To date, none of these activities have been approved by the Agency FO and no payments have been released, fully preventing their implementation.
- All or nearly all of the awards needed to implement lifesaving humanitarian assistance were terminated on or before February 27th, rendering impossible any efforts to implement activities under the waiver, even if they had been approved.
- The number of deaths attributable to the loss of USAID funding and support is not known at this time. Additional details on the U.S. National Security and Public Health from the Temporary Pause in Foreign Aid and Delays in Approving Lifesaving Humanitarian Assistance can be found in a separate memo for the record (Tab 4)

Attachments:
- **Tab 1:** 🟩 Global Health Centrally Managed Mechanisms_USAID Lifesaving Exception Request 2/4 [ GH internal submission form for centrally-managed awards with potential LHA components for GH review/clearance prior to submission to Agency FO]
- **Tab 2:** 🟩 GH Centrally Managed_USAID Blanket Waiver Request Tracker [submissions of waiver requests for approval to Agency FO]
- **Tab 3:** 🟦 Memo to File: Bureau for Global Health Workforce Reductions
- **Tab 4:** 🟦 Info Memo on Risks to U.S. National Security and Public Health from the Temporary Pause in...

FOR OFFICIAL USE ONLY

**CLEARANCE PAGE**

**Drafter**:  Ramona Godbole, GH/Policy, Programs, and Planning (P3) Deputy Director
**Approved**: Nicholas Enrich, GH/Acting Assistant Administrator

| <u>Bureau Level Clearances</u> | <u>Clearance Status</u> | <u>Date</u> |
|---|---|---|
| GH/P3: AJernigan | Clear | 2/28/2025 |
| GH/PDMS | INFO | |
| GH/ID/TB | INFO | |
| GH/ID/Mal | INFO | |
| GH/ID/ETD | INFO | |
| GH/ID/NTD | INFO/No staff left to clear | |
| GH/MCHN: AThambinayagam | clear | 2/28/2025 |
| GH/PRH: MShort | Clear | 2/28/2025 |
| GH/OHS | No staff left to clear | |
| GH/OHA | INFO | |
| GH/OCS | No staff left to clear | |
| GH/FO: NParks | Clear | 2/28/2025 |

Exhibit B



**MEMORANDUM TO THE FILE**

**Date:** February 28, 2025

**Subject:** Documentation of Bureau for Global Health Workforce Reductions

**Approved:** Nicholas Enrich, Acting Assistant Administrator, Bureau for Global Health    *Nicholas Enrich*

**Background**
On January 20, 2025, the Bureau for Global Health (GH) workforce totaled 783 encumbered positions. The GH workforce was made up of multiple staffing mechanisms including civil service (CS), foreign service (FS), and foreign service limited (FSL), personal support contractors (PSC), institutional support contractors (ISCs), Administrative Determined (6), and Other (Fellows, Intergovernmental Personnel Act, and Intermittent PSCs).

The breakdown by staffing mechanisms was the following:

- Civil Service: 291
- Foreign Service: 32
- Foreign Service Limited: 54
- Personal Service Contracts: 10
- Institutional Support Contractors: 374
- Other (Fellows (4), Intergovernmental Personnel Act (5), Intermittent PSCs (13)): 22

**Documentation of GH Workforce Reductions**

**Executive Order 14151**
On January 23, 2025, in accordance with Executive Order 14151 ""Ending Radical And Wasteful Government DEI Programs And Preferencing", GH requested to end the services for diversity, equity, and inclusion (DEI) positions under Global Health Training, Advisory, and Support Contract (GHTASC) (Attachment 1) . This resulted in four positions being removed from the contract, of which 3 were filled and one was vacant.

**Executive Order 14169**
In accordance with Executive Order 14169 "Reevaluating and Realigning United States Foreign Aid" and the All Diplomatic and Consular Posts Collective (ALDAC) issued by State Department on January 25, 2025, USAID issued stop work orders for existing foreign assistance awards.

*Institutional Support Contractors*
On January 27, 2025 pursuant to the FAR 52.242-15 Stop-Work Order clause, GH's institutional support contract, GHTASC (Contract Number 7200AA21N00004) was directed to stop all work



(Attachment 2). This resulted in the termination of a total of 405 institutional support contractors employed by GHTASC, of which 374 were assigned to GH and 31 were assigned to other USAID Bureaus. Institutional support contractors hired through GHTASC served in various technical and support roles. The GHTASC workforce was composed of senior technical experts, advisors, program analysts, program and special assistants throughout all GH offices.

*Intergovernmental Personnel Act*
On January 28, 2025 GH received a template to suspend Intergovernmental Personnel Act Agreements. These Action Memos were drafted and cleared by GH and HCTM's Human Chief Capital Officer on January 30, 2025 (Attachment 3). This resulted in the suspension of 5 Intergovernmental Personnel Act Agreements with 4 Universities.

*Personal Services Contracts*
GH contracted 10 individuals under personal services contracts (PSCs) to provide services in GH and 23 intermittent PSCs to provide services overseas. To date, 20 PSCs have been terminated. There are 3 remaining PSCs in GH, all are on Administrative Leave.

*Fellowships*
GH hosted 3 Science for Development Fellows and 1 Institute of Electrical and Electronics Engineers USA fellow. These awards were not managed by GH and received stop work orders.

**Administrative Leave**

On January 27, 2025, the GH Front Office members were placed on Administrative Leave. These included five personnel including GH's Senior Deputy Assistant Administrator, Deputy Assistant Administrator, two Acting Deputy Assistant Administrators, and the GH Chief Medical Officer. On January 28, 2025, acting leadership for USAID Bureaus and Independent Offices was appointed via an Agency Notice (Attachment 4).

On January 31, 2025, nineteen GH workforce members were placed on Administrative Leave in relation with Executive Order 14168 "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government". On February 3, 2025 the majority of GH staff lost system access and subsequently regained it between the evening and throughout the following day. On February 4, 2025 the majority of GH received Administrative Leave Notices and lost system access. On February 5, there were 151 workforce members who retained network access. The widespread Administrative Leave resulted in confusion, uncertainty, broken chains of command, and lack of operational staff needed to perform essential roles such as timekeepers and GovTA certifiers. GH's ability to operate was vastly affected between February 4, 2025 and February 10, 2025.

All GH staff that were placed on Administrative Leave returned to active work status on February 10, 2025, pursuant to a temporary restraining order issued by the U.S. District Court for the District of Columbia.



On February 24, 2025, after the Court dissolved its temporary restraining order, the majority of the remaining staff under CS, FS, and FSL staffing mechanisms was put on Administrative Leave. The total number of GH personnel on Administrative Leave before terminations occurred was 314 (Attachment 5).

**Essential Personnel Designation**

On February 4, GH Leadership was asked to make a "draconian" list of essential personnel (Attachment 6). Subsequently, additional requests for lists of essential personnel were requested by Agency Leadership.

On February 23, 2025 a total of 70 GH staff received an Essential Personnel Designation of which 59 are CS, 4 are FS, 7 are FSLs. There are 3 PCSs that have not been terminated and per the Agency Notice on Administrative Leave they have continued to report to work (Attachment 7). There is one individual who is designated essential who lost account access on February 24, 2025 and has not been able to regain account access. There's one CS individual who was terminated.

**Reduction in Force**

On February 24, 2025, 71 personnel assigned to four GH Offices received Reduction in Force (RIF) letters. The offices are 1) GH's Front Office, 2) Office of Policy, Programs, and Planning, 3) Office of Professional Development and Management Support, and 4) Office of Population and Reproductive Health. Five staff out of the 71 that received RIF letters subsequently received termination letters on February 24, 2025. Fifteen staff that received RIF letters had also received an Essential Personnel Designation the previous day.

**Terminations**

On February 24, 2025, termination letters were issued throughout USAID. GH has not been able to verify the total number of terminations due to account inactivations. To date, GH is tracking a total of 46 CS personnel that received termination letters. GH is aware of 20 PSC terminations. Since January 20, 2025 the GH workforce has been reduced by 449 workforce members.

**Current State**

There are 69 GH personnel that received Essential Personnel Designations, of which 15 received RIF letters. In addition to the 69 essential staff, 3 PSCs have not been terminated. The current number of GH staff is 72. Accounting for the 46 terminations that GH is currently tracking, there are 262 GH staff on administrative leave, of which many have lost access to their USAID accounts. These drastic staffing reductions have severely impacted GH's ability to function. GH has outlined the risks by current staffing levels to Agency Leadership (Attachment 8).

*Attachments*

1. Request to stop DEI-related services
   📕 1. USAID Mail - Urgent_ Immediate action needed.pdf
2. Credence Management Solutions Stop Work Order
   📕 7200AA21N00004  Stop-Work Order - Credence Management Solutions.pdf
3. Action Memo for Suspension Letters for GH IPA Agreements
   📕 Action Memo for IPA Suspensions.docx - Google Docs.pdf
4. Agency Notice - Correction_Leadership in USAID Bureaus and Independent Offices
   📕 4. USAID Mail - CORRECTION_ Leadership in USAID Bureaus and Independent …
5. GH Current State Tracker (February 28, 2025)
   📕 5. GH - Feb Current State - Table Data.pdf
6. Essential Personnel Lists  📕 6. USAID Mail - Fwd_ In person meeting tomorrow.pdf
7. Instructions During Administrative Leave
   📕 7. USAID Mail - Instructions During Administrative Leave.pdf
8. Risks posed by staffing levels
   📕 8. USAID Mail - Registering concern re_ risks posed by proposed staffing levels.pdf



**CLEARANCE PAGE**

**Drafter:** Natalia Machuca, Deputy Director, Office of Professional Development and Management Support, Bureau for Global Health

**Approver:** Nicholas Enrich, Acting Assistant Administrator, Bureau for Global Health

| Bureau Level Clearances | Clearance Status |
| --- | --- |
| GH/FO | INFO |
| GH/P3 | INFO |
| GH/PDMS | INFO |
| GH/ID | INFO |
| GH/MCHN | INFO |
| GH/PRH | INFO |
| GH/OHS | INFO |
| GH/OHA | INFO |
| GH/OCS | INFO |

# EXHIBIT 8

**25-cv-469-CJN**



**INFO MEMO FOR THE USAID ADMINISTRATOR AND DEPUTY ADMINISTRATOR**

**Date:**        March 4, 2025

**To:**          XXX

**From:**        Nicholas Enrich, Acting Assistant Administrator for Global Health

**CC:**          Assistant to the Administrator Mark Lloyd
                 Assistant to the Administrator Tim Meisburger
                 Assistant to the Administrator Ken Jackson
                 Acting Chief of Staff Joel Borkert

        **Subject:**    Risks to U.S. National Security and Public Health: Consequences of
        Pausing Global Health Funding for Lifesaving Humanitarian Assistance

**Key Takeaway:** The temporary pause on foreign aid and delays in approving lifesaving
humanitarian assistance (LHA) for global health will lead to increased death and disability,
accelerate global disease spread, contribute to destabilizing fragile regions, and heightened
security risks—directly endangering American national security, economic stability, and public
health.  If the pause leads to permanent contract terminations, the  $7.7B in resources
appropriated by Congress are no  longer be  used to support these lifesaving global health
programs, which could potentially result  in wasted resources.  The impacts on mortality and
morbidity are summarized in the tables below. While the Foreign Assistance Review is set to
take place in the coming weeks, it is important to recognize that a mechanism-by-mechanism
approach may overlook the broader impact of these programs across global health program
areas. This includes missed opportunities to enhance efficiency and cost-effectiveness within
LHA program areas.

**Illustrative quantifiable impacts of halting global health programing on the mortality and
morbidity of lives can be summarized as follows (see full table here):**

| Program Area | Global Case Increase over one year if Programs are permanently halted |
|---|---|
| Malaria | An additional 12.5-17.9 million cases and an additional |

**Commented [1]:** I thought this was a note for the record and not to the Sec State.

**Commented [2]:** I also thought this was a note for the records and this is how it was explained to GH staff who helped develop this memo.

**Commented [3]:** This number doesn't seem to match the tables below.  Make sure one of the tables adds up to this number so you can footnote it here.

**Commented [4]:** Aren't we still hoping some of these contracts will be turned back on?  Can we summarize what could be saved if these were turned back on next week?

**Commented [5]:** @nenrich@usaid.gov @jwallace@usaid.gov @ccoles@usaid.gov Can you please review and update language based on Cheri's question?

**Deleted:** being

**Commented [6]:** we don't know what will happen with these resources so I'm not sure we can say this. However, we do know it will cost the economy so much more and would result in xx number more cases.....summarizing the tables below in  this summary takeaway.

1

| | 71,000-166,000 deaths (39.1% increase)  annually |
|---|---|
| MDR-TB | 28-32% Increase in estimated incidence globally |
| TB | 28-32% increase in estimated incidence globally |
| EID (Ebola, Marburg, etc.) | Worst Case Scenario: More than 28,000 cases |
| Polio | Additional 200,000 paralytic polio cases/year (and hundreds of millions of infections overall), over next 10 years, if global polio eradication stops |

**Estimated number of people impacted annually in the absence of global health LHA (see full table [here](#)):**

| Life-saving health services in 48 countries with most maternal, newborn, and child deaths | Estimated Number of People Affected this Year Through the Halt in Services |
|---|---|
| **Maternal health:** pregnant women not reached through life saving services | 16,800,000 |
| **Newborn health:** critical postnatal care to newborns within two days of childbirth | 11,262,264 |
| **Child health:** Treatment only for pneumonia and diarrhea (among the top causes of preventable deaths in children under 5) | 14,782,398 |
| **Nutrition** | 1 million children not treated annually for severe acute malnutrition |

**Policy Recommendation**: Resume all mechanisms with submitted life-saving waivers to avert crisis-level expenditures, prevent mortality and morbidity, and protect national security. Upholding these programs is not only a legal and humanitarian obligation but also a critical strategic investment to make America safer, more secure, and more prosperous.

> **Commented [7]:** @ccoles@usaid.gov
> Carmen, if you are able, can you explicate this reference to expenditures? Does it relate to budget table below?
> _Assigned to ccoles@usaid.gov_

**Background**

On January 20, 2025, the President issued an executive order mandating a 90-day pause on most foreign assistance activities to allow for a comprehensive review. Eight days later, on January 28, Secretary of State Rubio issued a temporary waiver to this pause, as outlined in the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (EO),

2

allowing lifesaving humanitarian assistance (LHA) activities to proceed. While this temporary pause is intended to assess and realign foreign aid priorities, delaying approvals for LHA programs presents serious risks to national security, public health, and decades of progress in global health.  Americans consider it a moral strength to not only protect their fellow citizens but to also ensure U.S. medical innovations are made available to those less fortunate, particularly those in extreme poverty. The suspension of essential LHA during this review period is disrupting a range of critical health services, including maternal and child health and nutrition programs, malaria and tuberculosis treatment, and polio eradication efforts. Additionally, the canceling of critical contracts, prevents the ability to respond to the most pressing and urgent life-threatening challenges in the near-term.

As a result of the pause and programming delays, millions of individuals now face heightened risks of preventable diseases such as malaria, HIV/AIDS, TB, and multidrug-resistant tuberculosis (MDR-TB). Furthermore, setbacks in maternal and child health and nutrition initiatives threaten overall health outcomes in affected regions. Beyond the immediate consequences, these disruptions weaken critical disease surveillance and health supply chain systems, increasing the likelihood of unchecked outbreaks of emerging infectious diseases such as avian influenza, Ebola, and mpox—threats that can spread globally and endanger American citizens.

Historical data demonstrate that reductions in funding for global health initiatives and lifesaving health programming correlate with surges in disease incidence, reinforcing the urgency of sustained support for these programs to protect both global stability and domestic security. A failure to contain infectious diseases at their source heightens the risk of transmission to the United States, posing a direct threat to public health and economic stability. The consequences extend beyond human health, impacting American businesses and families by increasing healthcare costs, disrupting international trade, and straining domestic resources.

This memorandum outlines the critical consequences of withholding global health funding for LHA activities, emphasizing how this decision undermines the congressionally mandated efforts of USAID and jeopardizes American security by allowing preventable diseases to spread unchecked. USAID's Congressional legislative mandate per foreign assistance law and current funding status can be found in the Annex 1 of this memorandum.

**Impact of Terminating Lifesaving Humanitarian Aid (LHA) Awards in Global Health**

While we are currently in a 90-day review period regarding lifesaving humanitarian aid (LHA) awards, this section outlines the potential consequences should all LHA activities be permanently suspended. Such a suspension is expected to deteriorate public health outcomes

3

both domestically and globally, burden the U.S. economy and healthcare system, and escalate national security risks, including increased vulnerability to biothreats

***Deterioration of American Public Health and Increased Global Mortality***

**Key Impact 1:** Resurgence of preventable diseases: Domestic and global implications.

- **Halted interventions and treatments fuel the rise of preventable diseases:** The suspension of critical global health funding for lifesaving humanitarian assistance threatens not just global health but also the well-being of American communities. Without essential services—such as antiretroviral treatments, malaria prevention, routine immunization, and tuberculosis control—preventable diseases like HIV/AIDS, malaria, TB/MDR-TB, measles, diphtheria, pertussis and others will surge, undoing years of progress. As outbreaks spread unchecked, the consequences will extend beyond borders, increasing the risk of infections reaching the U.S., straining healthcare systems, and endangering American lives.
    - A systematic review of malaria resurgence events in 61 countries between the 1930s and 2000s, indicated 91% were due to a weakening of malaria control programs of which resource constraints contributed to over half of these[1]. Following the end of the 14-year Global Malaria Eradication Program in 1969, there was a global resurgence of the disease during the 1970s and 1980s[2].
- **Resurgence of MDR-TB: A growing American public health threat:** Tuberculosis programs worldwide keep drug-resistant TB in check. If these efforts collapse, the U.S. will see more cases of hard-to-treat TB arriving at its doorstep. Treating one patient with multidrug-resistant TB (MDR-TB) in the U.S. costs over $154,000 (and an average $494,000 for an extensively drug-resistant TB case)[3]. Without timely and effective treatment, multidrug-resistant tuberculosis (MDR-TB) cases will surge, posing a direct threat to both American and global public health. As international travel and migration increase, uncontrolled MDR-TB outbreaks abroad heighten the risk of transmission to the U.S., where containment efforts would require significant federal and state funding. The escalating burden of MDR-TB will not only drive up healthcare costs but also endanger frontline workers, making prevention and early intervention an urgent national priority.
- **Prevention Is More Cost-Effective Than Emergency Funding of Programs:** The 2014–16 Ebola outbreak cost the U.S. approximately $4.3 billion in response efforts, highlighting

---

[1] Institute for Health Metrics and Evaluation. https://www.healthdata.org/research-analysis/library/malaria-resurgence-systematic-review-and-assessment-its-causes

[2] https://www.ncbi.nlm.nih.gov/books/NBK525190/

[3] https://www.csis.org/analysis/protecting-united-states-health-security-risk-global-tuberculosis#:~:text=Treatment%20of%20a%20typical%20patient,of%20XDR%2DTB%20costs%20$494%2C000.

4

that reactive spending far exceeds proactive prevention costs. The COVID-19 pandemic further underscored how unplanned emergency spending can lead to trillions in economic losses. USAID-funded programs have historically curbed disease spread, saving lives and billions in economic costs. For example, immunization is among the most cost effective interventions in public health, saving an estimated 2-3 million deaths each year; for every dollar invested in immunization, up to $52 ROI is generated from saved costs of treating illnesses[4]. Sustaining these programs is crucial to avoiding costly, reactive crisis management. There is a $94 return in economic growth for every $1 spent on maternal and child health-specific foreign aid due to deaths prevented and improvements in the health status of populations in poor countries.

- **Reduced disease surveillance and undetected outbreaks:** Cuts in humanitarian assistance compromise surveillance systems essential for early detection of emerging infectious diseases. The diminished capacity to monitor and respond swiftly enables the unchecked spread of deadly outbreaks such as avian influenza and mpox. This lack of surveillance risks turning localized outbreaks into widespread public health emergencies, further endangering both local populations and global health security.

**Key Impact 2:** Humanitarian and regional instability fueled by worsening health crises.

- **Increased instability in fragile states through disease outbreaks:** Weak governance and poor infrastructure leave fragile states highly vulnerable to disease outbreaks, which can quickly escalate crises. In the Democratic Republic of Congo (DRC), ongoing violence and an aid cutoff have led to the collapse of health services, worsening malnutrition and cholera and measles outbreaks. Over 400 mpox patients were left stranded after fleeing overwhelmed clinics, while more than one million displaced people around Goma—and another 150,000 near Bukavu—face critical shortages of shelter, clean water, and medical care. In Burkina Faso, where 100% of the 23 million total population is at risk for malaria, "30 percent of health care facilities were either partially or fully non-functional due to frequent attacks on facilities and equipment, medical personnel, and medication shortages, adversely affecting 4 million people[5]." Additionally, in FY2024 over 34 million seasonal malaria chemoprevention doses were procured with PMI/USAID funds to protect children under five in three Sahel countries (Burkina Faso, Mali and Niger); these vulnerable children are now at greater risk with the high transmission malaria season rapidly approaching. In such conditions, the risk of a new pandemic looms large. From the Sahel to South Asia, cutting off health aid in fragile states threatens to turn crises into full-scale humanitarian disasters.

---

[4] https://immunizationevidence.org/immunization_terms/return-on-investment/
[5] https://reliefweb.int/report/burkina-faso/burkina-faso-complex-emergency-fact-sheet-1-fiscal-year-fy-2024

- **Amplification of migration pressures and regional destabilization:** Failing public health systems fuel migration crises, forcing people to flee when they can no longer access food, medicine, or basic security. Collapsing healthcare infrastructure not only displaces populations but also spreads disease across borders. This was evident in Venezuela in the late 2010s, where a breakdown of the health system—alongside economic collapse—led to resurgences of measles, diphtheria, and malaria, driving millions to flee and triggering a regional refugee crisis. The spread of Venezuela's measles outbreak into neighboring countries underscored the direct link between public health failures and migration. More recently, the COVID-19 pandemic and its economic fallout intensified migration pressures in Central America, particularly in Guatemala, Honduras, and El Salvador, where overwhelmed healthcare systems and food insecurity forced many to seek refuge in the U.S. Similarly, the ongoing conflict and health crises in Haiti—where gang violence has crippled hospitals and cholera has resurged—have led to a surge in migration to the U.S. and neighboring countries. As public health crises worsen, migration pressures will continue to rise, contributing to regional instability and humanitarian challenges. (citations documented)

**Key Impact 3:** Greater risk of disease spillover to the U.S.

- **A halt to global health aid programs increases the risk of dangerous diseases reaching the U.S.:** In a globally connected world, outbreaks abroad don't stay overseas. When public health systems fail to contain infectious diseases, the chances of U.S. exposure rise—whether through travel, military personnel, or migration.  Measles outbreaks in the U.S. in the past decade, for example, have often been traced to imported cases, as the disease was eliminated domestically. In 2023, the U.S. saw its first locally acquired malaria cases in 20 years, likely due to travelers introducing the parasite into mosquito-prone states like Florida and Texas[6]. 76% of US recorded TB cases annually are among foreign born individuals.
- **Uncontrolled epidemics abroad could trigger serious outbreaks in America:** Mathematical models illustrate this risk. For example, if global TB rates and drug resistance reached U.S. levels due to failed international control efforts, the consequences would be severe—over 33,000 TB deaths annually and treatment costs exceeding $11 billion[7].

*Economic and Healthcare System Strain*

**Key Point 1:** Costs of responding to outbreaks far exceed prevention investments.

---

[6] beatmalaria.org
[7] cgdev.org

- **Outbreak response costs dwarf prevention investments:** Historical data underscores that reactive spending on disease outbreaks significantly exceeds the costs of proactive prevention. For example, the U.S. response to the 2014-16 Ebola outbreak reached approximately $4.3 billion[8], covering direct healthcare expenditures and extensive economic disruptions from emergency measures and loss of productivity. If the U.S. elects not to provide aid for future outbreaks abroad, larger and less-contained epidemics may develop, ultimately necessitating even more costly domestic responses. This approach risks disrupting global trade, supply chains, and market stability, ultimately imposing far greater economic burdens on the U.S. than if robust prevention and early intervention measures had been maintained.
- **Unchecked pandemics trigger profound economic fallout:** The COVID-19 crisis vividly illustrated how insufficient preventive measures can precipitate widespread economic damage. Beyond overwhelming healthcare systems, the pandemic disrupted global supply chains, destabilized labor markets, and led to substantial declines in economic output. These impacts highlight the critical need for robust global health investments as a means of averting far greater future costs.

Key Point 2: Strain on U.S. healthcare infrastructure due to imported infectious disease cases.

- **Collapse of disease surveillance leads to more importations:** Global health programs fund disease surveillance networks that act as an early warning system for outbreaks. If these networks falter, the U.S. will frequently be flying blind until diseases show up at its own border. That scenario is a recipe for more imported outbreaks on U.S. soil. For instance, the quick detection and containment of Ebola in West Africa is what kept the 2014 outbreak from becoming a larger U.S. crisis. Even so, the few Ebola cases that did reach America illustrated the heavy burden of managing dangerous contagions: a single Ebola patient in New York in 2014 cost the city health department $4.3 million in response measures (contact tracing, specialized treatment, etc.), and no secondary cases occurred[9]. If global surveillance and response capacity erode, the U.S. could face multiple such cases or simultaneous threats (e.g. Ebola, drug-resistant malaria, novel coronaviruses). American hospitals and the public health system would be stretched by needs like isolation units, specialized diagnostics, and round-the-clock epidemiological investigations.
- **Maternal Health Emergencies and Medical Supply Shocks:** USAID programs have been pivotal in supporting maternal and neonatal care in low-income countries – from training midwives to supplying essential medicines (like oxytocin for hemorrhage or

---

[8] yalejournal.org
[9] cdc.gov

7

magnesium sulfate for eclampsia). A permanent aid halt means many of these supply chains and services will collapse[10]. The ripple effects can reach the U.S. in unexpected ways. For example, global supply disruptions during COVID-19 led to shortages of medical products in America; similarly, a breakdown in the international supply of maternal health commodities could affect availability of critical drugs or equipment domestically. Moreover, when maternal health crises escalate abroad, there can be secondary impacts such as increased medical evacuation cases, migration of high-risk patients, or calls on U.S. humanitarian responders, all of which ultimately put pressure on U.S. hospitals.

**Key Point 3:** Global economic repercussions impacting U.S. trade and markets.

- **Reduced productivity in key trade regions due to heightened disease burdens:**
  Diseases like malaria, HIV, and TB primarily strike working-age adults or their children, impairing productivity and economic output in Africa, Asia, and beyond. For example, malaria costs Africa an estimated $12 billion per year in lost GDP from worker absenteeism, lower productivity, and healthcare expenses[11]. Every $1 invested in malaria control returns $19 in economic growth.[12] Unchecked high rates of maternal and childhood morbidity or mortality can further exacerbate impacts on productivity. Undernutrition can reduce a nation's GDP by as much as 16.5 percent[13], as malnourished children perform worse in school and experience productivity losses as adults. Maternal and child health and nutrition foreign assistance makes America stronger by creating greater economic and political stability through improved family health, which increases the likelihood that children will attend school and grow into healthy, productive adults, thereby reducing conflicts, poverty, and radicalization of youth. Instability abroad risks affecting Americans - be it on our soil or by destabilizing markets from afar.[14],[15] Lower

---

[10] reuters.com

[11] archive.cdc.gov

[12] https://endmalaria2040.org/assets/Aspiration-to-Action-Dashboard.pdf

[13] Union, A. (2014). The cost of hunger in Africa: Social and economic impact of child undernutrition in Egypt, Ethiopia, Swaziland and Uganda background paper. *Abuja, Nigeria*. https://archive.uneca.org/sites/default/files/uploaded-documents/CoM/com2014/com2014-the_cost_of_hunger-english.pdf

[14] Each additional year of schooling can boost a girl's earnings as an adult by up to 20 per cent - https://www.unwomen.org/sites/default/files/2022-09/Progress-on-the-sustainable-development-goals-the-gender-snapshot-2022-en_0.pdf
**More girls in school = greater GDP:** If 10 percent more adolescent girls attend school, a country's GDP increases by an average of 3 percent.
**More school for girls = greater earnings:** An extra year of secondary school for girls can increase their future earnings by 10-20%.
**Education = more lives saved:** A child whose mother can read is 50 percent more likely to live past age five.

[15] "First, a 10 per cent increase in health expenditures boosts annual average real GDP per capita by 0.24 per cent. This is an economically meaningful result, given the average annual growth rate in the sample period of 2 per cent. Second, this paper also confirms the long-held view that health matters for economic growth. There is a statistically significant and economically

productivity in these regions weakens their economic output and trade capacity, thereby diminishing their ability to import U.S. goods and services. This contraction in trade not only limits market opportunities for U.S. businesses but also undermines the economic resilience of global supply networks that support U.S. markets.

- **Reduced partnerships with American farmers**: Through USAID's humanitarian assistance and nutrition programs, the U.S. engages American farmers and manufacturers in the delivery of commodities as part of food aid for food security and treatment of acute malnutrition in children[16]. Although USAID food aid programs account for less than 1% of current U.S. agricultural exports, they have historically provided American farmers and manufacturers with a stable $2 billion market[17], supporting an estimated 15,000–20,000 jobs. Permanently suspending these programs would likely reduce commodity prices, lower farm incomes, and trigger layoffs across food processing, manufacturing, and transportation sectors—ultimately weakening the global competitiveness of U.S. agriculture.

- **Global supply chain disruptions:** A strong global health system is essential for maintaining stable global trade. The COVID-19 pandemic vividly illustrated how health crises can cripple supply chains—factory shutdowns, travel restrictions, and worker illnesses in one region can quickly trigger shortages and price spikes worldwide. If U.S.-funded health programs that prevent outbreaks and strengthen health systems are halted, developing regions will face greater instability, increasing the risk of production disruptions. Key sectors of the U.S. economy remain vulnerable to such shocks. For example, a significant portion of pharmaceuticals and medical supplies—including generic drugs and personal protective equipment (PPE)—are manufactured in India, China, and other global hubs. A major epidemic in these regions could halt production, causing shortages that directly impact U.S. hospitals and pharmacies. Likewise, global health emergencies threaten agriculture and food supply chains; pandemic lockdowns in 2020 disrupted food processing and shipping worldwide, underscoring the far-reaching economic consequences of health crises[18].

- **Weakened Trade Partners and Global Markets:** Over the longer term, the cumulative impact of widespread disease and reduced human capital in low- and middle-income countries will undermine global economic growth. America's prosperity is deeply intertwined with global markets – U.S. companies invest in and source from these countries, and emerging economies constitute important consumer bases. If those economies are continuously set back by health disasters, the global GDP will be smaller

---

meaningful negative relationship between economic growth on the one hand and maternal and infant/child mortality on the other hand. There is also a positive and significant impact of adult life expectancy on economic growth." [Source](#)

[16] [How the United States Benefits from Agriculture and Food Security Investments in Developing Countries](#)

[17] [Betterworldcampaign.org](#)

[18] [pmc.ncbi.nlm.nih.gov](#)

than it otherwise would be, acting as a brake on U.S. growth as well. Moreover, health-driven economic stresses can fuel political instability and conflict, which threaten U.S. interests. Indeed, abrupt surges in unemployment, poverty, food insecurity, and illness can spark unrest or migration waves, destabilizing regions. Such instability often demands U.S. humanitarian, diplomatic, or even military responses, all of which carry significant costs. In contrast, stable and healthy nations make good trade partners and contribute to a stable international system that benefits the U.S. economically. By preventing the collapse of health systems abroad, USAID programs help countries remain stable, keep their economies functioning, and continue trading with the United States.

***National Security and Biothreat Vulnerabilities***

**Key Point 1:** Increased risk of bioterrorism and pandemic emergence.

- **Diminished surveillance increases vulnerability to undetected pathogen spread:** Weakened disease surveillance doesn't only jeopardize natural outbreak detection – it also creates openings for malicious actors. Global health monitoring systems serve as the "smoke alarm" for unusual disease patterns that could signal a bioterrorism event. If those alarms are switched off or muted due to lack of funding, a deliberate release of a pathogen could spread for weeks under the guise of a normal outbreak. Terrorists or rogue states might exploit surveillance gaps, targeting regions with poor monitoring to launch a biological attack, knowing it would take longer for the world to notice and respond. Indeed, the very technologies to engineer pathogens have become more accessible over time, lowering the bar for would-be bioterrorists (better citation? [citation](#)).
- **National Security Impacts:** Pandemics and biological threats don't respect borders, and their consequences extend beyond public health – they are national security concerns. An undetected pathogen can undermine military readiness, as disease spreads among troops or across bases before protective measures are in place. Widespread illness can also weaken domestic security forces and first responders, who fall ill in the line of duty. Moreover, adversaries could use a biological event to sow chaos: a sudden epidemic can destabilize economies, foment social unrest, and even be used as cover for disinformation or cyber attacks. The U.S. Department of Defense and intelligence community routinely list pandemic disease among top security threats, alongside bioterrorism, for these reasons. A collapse in global disease surveillance heightens these risks, as threats will be harder to see coming. As a recent analysis by global health experts warned, actions that *"undermine work to detect and contain disease outbreaks"*

10

could quickly **"roll back years of progress"** and *"put lives, the economy, and national security at risk[19]."*

**Quantified Impacts of Discontinued Aid by Disease Area - 2025**

| Disease Area | Global Case Increase (%) | Projected US Imported Cases | Estimated US Economic Impact ($) | Assumption/Notes/Data Sources |
|---|---|---|---|---|
| Malaria | An additional 12.5-17.9 million cases and an additional 71,000-166,000 deaths (39.1% increase) annually | 2000 cases/year | Reducing malaria burden could boost malaria endemic countries' economies by $142.73 billion and could generate $1.4 billion in US exports to Africa between 2023-2030; a 10% decrease in malaria incidence was associated with an increase in income per capita of nearly 0.3% | Data Sources: Malaria Atlas Project, Modeling Impact of PMI Funding Freeze Across 2025, February 27. 2025<br><br>Oxford Economics Africa<br><br>cdc/gov/malaria<br><br>The Economic Burden of Malaria: Revisiting the Evidence. Sarma et al., Am J Trop Med Hyg. 2019 Dec;101(6):1405-1415. doi: 10.4269/ajtmh.19-0386. https://pubmed.ncbi.nlm.nih.gov/31628735/ |
| MDR-TB | 28-32% Increase in estimated incidence globally | ~80 MDR cases/year | $40,000,000 only direct diagnosis, treatment and program costs (excludes larger societal, ie loss of productivity, costs) | Data Sources: WHO, CDC, CSIS Assumptions: 40% of global TB efforts are donor funded; 76% of US TB cases are Foreign-Born; costs per case are adjusted for inflation (3% average) |
| TB | 28-32% increase in estimated incidence | ~7,300 additional TB cases per year | $153,600,000 only direct diagnosis, treatment and | Data Sources: WHO, CDC, CSIS Assumptions: 40% of global TB efforts are donor funded; 76% of US TB cases are Foreign-Born; |

---

[19] cgdev.org

|  |  |  |  |  |
|---|---|---|---|---|
|  | globally |  | program costs (excludes larger societal, ie loss of productivity, costs) | costs per case are adjusted for inflation (3% average) |
| Highly Pathogenic Avian Influenza (HPAI) | Worst Case Scenario: 775M cases globally | 105M cases in the USA. | Based on the known impact of the COVID-19 pandemic, a HPAI pandemic is likely to cost the US at least $14 trillion. The economic impact of just animal losses from bird flu in 2022 cost the US economy up to $3 billion. | Based on Global COVID case data and average Assumes current outbreak progresses to human-to-human spread pandemic |
| EID (Ebola, Marburg, etc.) | Worst Case Scenario: More than 28,000 cases | 15 imported cases | >$2B and 10k jobs tied to exports. This was the cost of the WA Ebola Outbreak to the USA | Assumptions: Based on 2014-2016 West Africa Ebola epidemic |
| mpox | More than 127,000 cases | More than 34,000 cases in the US | Based on no intervention: USD 3,699,033 | Assumptions/Data Sources: Modeled off of mpox clade 2 pandemic |
| Immunization | 2-3 million deaths a year<br><br>89% increase in incidence in vaccine-preventable diseases among children alone (best case scenario) |  | Every dollar spent on immunization saves America an estimated $54 in social and economic costs. | Data sources: CDC, UNICEF, WHO, USAID annual reports to Congress<br>- Immunization is a best buy: it is one of the most cost-effective ways to support a healthier, safer world for everyone, including Americans.<br>- Immunizing people routinely and when outbreaks strike prevents disease from spreading across borders, including to America. Routine childhood vaccines protect children from highly infectious but preventable diseases like Diphtheria, Haemophilus influenzae type b (Hib), Hepatitis B, Measles, Meningitis, |

12

| | | | | Mumps, Pertussis (whooping cough), Polio, Rubella, and Tetanus. USAID supports countries to immunize against deadly and highly transmissible diseases. |
|---|---|---|---|---|
| Polio | Additional 200,000 paralytic polio cases/year (and hundreds of millions of infections overall), over next 10 years, if global polio eradication stops | ≥1 paralytic case/year over next 10 years, with potential sporadic outbreaks (assuming declining immunization coverage); increasing transmission risks over time | Incurred costs would include disease surveillance, multiple emergency outbreak responses, vaccination catch-up campaign, treatment, long-term disability (including for post-polio treatment), lost economic productivity and quality of life due to disability, reduced life expectancy (early mortality). | Data sources: CDC, Global Polio Eradication Initiative (GPEI) Investment Case 2022-2026<br>- Assumes reduced immunization coverage, termination of Gavi, UNICEF, WHO, and other funding<br>- Impacts include reduced access to quality, real-time data for action<br>- USAID's polio support has included surveillance, risk communication and community engagement, direct vaccination (including cross-border), laboratory testing networks, vaccine supply and cold chain support, and national/regional/global coordination<br>- With declining U.S. vaccination coverage, already millions of vulnerable Americans<br>- Immunity gaps in U.S. put Americans at risk for large outbreaks that can cause paralysis and death (e.g., 1/5 of adults 20-49 years old do not have poliovirus antibodies)<br>- Adults w/paralytic polio are more likely to die from paralysis than children<br>- Polio immunization coverage among U.S. children <2 years old already as low as 37% in some areas<br>- Estimates do not include potential new outbreaks of polio in large countries like India<br>- Up to 1/200 infected people can develop paralysis |

**Estimated number of people impacted annually in the absence of global health LHA-2025**

| Life-saving health services in 48 countries with most maternal, newborn, and child deaths | Estimated Number of People Affected this Year Through the Halt in Services | Estimated US Economic & Security Impacts | Assumption/Notes/Data Sources |
|---|---|---|---|
| **Maternal health:** pregnant women not reached through life saving services | 16,800,000 | | Data Sources/ Assumptions: - 2024 USAID reports to Congress - Total number of live births as a proxy for women who benefitted from live saving services |
| **Newborn health:** critical postnatal care to newborns within two days of childbirth | 11,262,264 | | - 2024 USAID reports to Congress - National and subnational population estimates |
| **Child health:** Treatment only for pneumonia and diarrhea (among the top causes of preventable deaths in children under 5) | 14,782,398 | Destabilized families and communities; increased migration across borders, including to U.S., due to country destabilization; reduced economic productivity and GDP; weakened trade partners and global economies; takeover of malign foreign actors in countries and regions with high U.S. economic and national security interests; increased danger to Americans at home, and traveling and living abroad; **There is a $94 return in economic growth for every $1 spent on maternal and child health-specific foreign aid** (including immunization but excluding nutrition interventions in this analysis) due to deaths prevented and | Data sources: 2024 USAID reports to Congress - Population-based country surveys |
| **Nutrition** | 1 million children not treated annually for severe acute malnutrition | | Data Sources: - 2024 USAID reports to Congress - Cost estimates for treating a child for severe acute malnutrition vary depending on context, but range from $100-200/per child - The FY24 budget for GHP nutrition was $165 million |

14



Investment in MCH saves live fosters eco

**$1 Invested in MCH**

improvements in the health status of populations in poor countries.

**Conclusion and Policy Recommendations**

Any decision to halt or significantly reduce global health funding for lifesaving humanitarian assistance (LHA)—despite approved waivers—and USAID global health programming, despite congressional mandates, would have severe domestic and global consequences. Such an action could lead to a sharp increase in preventable diseases, substantial economic losses, and heightened security risks. The effects would be felt both in the United States and worldwide, as rising disease burdens strain healthcare systems, disrupt economies, and contribute to global instability.

We recommend that the U.S. immediately resume life-saving humanitarian activities to prevent unnecessary mortality and morbidity, avert costly crisis-level expenditures, and safeguard national security. These programs are not only a legal and humanitarian obligation but also a vital strategic investment in America's safety, security, and economic prosperity. Failing to uphold them would undermine U.S. leadership, weaken global stability, and increase long-term costs.

15

16

**Annex 1**

**Congressional Legislative Mandate**

USAID operates under a comprehensive legal framework established by Congress to govern its global health assistance programs. This framework consists of both authorization and appropriation legislation, which define the agency's legal authorities, funding allocations, and programmatic requirements. The following sections outline the key legislative mandates shaping USAID's global health initiatives.

**Authorization Legislation:** USAID's global health assistance is primarily authorized under Section 104 of the Foreign Assistance Act of 1961 (FAA), as amended. Key amendments include the 2000 Global AIDS and Tuberculosis Relief Act and the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (PEPFAR Authorization), with subsequent reauthorizations in 2008, 2013, and 2018. Additionally, the annual State and Foreign Operations Appropriations Act (SFOAA) provides more specific authorizations and requirements for health assistance. Other relevant legislation includes the Global Malnutrition Prevention and Treatment Act of 2021 and various FAA provisions outside Section 104 that address global health programs. Furthermore, the annual SFOAA and select provisions of other legislation, such as the National Defense Authorization Act, define and grant additional legal authorities for USAID's global health efforts.

**Appropriation Legislation:** Funding for USAID's global health programs is appropriated annually through the SFOAA, which imposes specific legal requirements that must be met each fiscal year. USAID is not authorized to deviate from these funding allocations except in rare, exigent circumstances and only with statutory approvals and notifications. Additionally, certain Congressionally mandated disease-specific directives may not be fulfilled due to the termination of awards.

**Congressional Directive Categories[20]:**

- *HIV/AIDS,* which includes the following sub-activities identified by Congress: Global
- Fund to Fight AIDS, Tuberculosis and Malaria, Joint United Nations Programme on HIV/AIDS (UNAIDS), and Microbicides. **Associated Program Area: HL.1 HIV/AIDS.** *$330M appropriated for this purpose in FY24 alone.*

- *Tuberculosis,* which includes the following activities identified by Congress: Global TB Drug Facility. **Associated Program Area: HL.2 Tuberculosis.** *$394.5M*

---

[20] Congressional directive categories are outlined in the Global Health Programs account table included in the Joint Explanatory Statement accompanying each annual appropriations act. For example, for the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, P.L.118-47, Division F, the Joint Explanatory Statement is available at https://docs.house.gov/billsthisweek/20240318/Division%20F%20SFOPs.pdf.

*appropriated for this purpose in FY24 alone.*

- ***Malaria,** Associated Program Area: HL.3 Malaria. $795M appropriated for this purpose in FY24 alone.*

- ***Global Health Security,** Associated Program Area: HL.4 Global Health Security in Development (GHSD) $700M appropriated for this purpose in FY24 alone.*

- ***Other Public Health Threats,** which includes the following sub-activities identified by Congress: Neglected Tropical Diseases, Global Health Workforce, Health Reserve Fund. **Associated Program Area: HL.5 Other Public Health Threats (NTDs).** $130.5M appropriated for this purpose in FY24 alone.*

- ***Maternal and Child Health** (MCH), which includes the following activities identified by Congress: Polio, Gavi, the Vaccine Alliance (Gavi), Water Supply, Sanitation and Hygiene (WASH), and Maternal and Neonatal Tetanus. **Associated Program Area: HL.6 Maternal and Child Health.** $915M appropriated for this purpose in FY24 alone.*

- ***Family Planning/Reproductive Health.** Associated Program Area: HL.7 Family Planning and Reproductive Health (FP/RH). $523.95M appropriated for this purpose in FY24 alone.*

- ***Nutrition,** which includes the following activities identified by Congress: Iodine Deficiency Disorder, Micronutrients (of which, Vitamin A), and Ready-to-Use Therapeutic Foods. **Associated Program Area: HL.9 Nutrition.** $165M appropriated for this purpose in FY24 alone.*

- ***Vulnerable Children,** which includes the following activity identified by Congress: Blind Children. **Associated Program Area: ES.4.1 Education & Social Services - Vulnerable Children.** $31.5M appropriated for this purpose in FY24 alone.*

**Funding Status[21]**

Of the $3.985B in Fiscal Year 2024 resources appropriated directly to USAID for Global Health Programs (GHP-USAID account) for the specific health objectives described above, approximately $2.559B (64%) has been blocked from obligation to partners.

**Estimated Amounts of FY24 GHP-USAID Funding Impacted by Obligation Pause, by Congressionally Directed Program Area**

---

[21] Funding data pulled from Phoenix Viewer/Enterprise Reporting Portal as of 2/27/2025. All figures are estimates based on high level data analysis.

| | Appropriated ($) | Pending Obligation ($) - Obligation Paused by EO | Percent (%) |
|---|---|---|---|
| HL.1 HIV/AIDS | 330,000,000 | 73,843,370 | 22.38% |
| HL.2 Tuberculosis | 394,500,000 | 307,064,905 | 77.84% |
| HL.3 Malaria | 795,000,000 | 669,862,736 | 84.26% |
| HL.4 Global Health Security | 700,000,000 | 675,948,708 | 96.56% |
| HL.5 Other Public Health Threats | 130,500,000 | 90,522,107 | 69.37% |
| HL.6 Maternal and Child Health | 915,000,000 | 514,965,280 | 56.28% |
| HL.7 Family Planning and Reproductive Health | 523,950,000 | 55,633,306 | 10.62% |
| HL.9 Nutrition | 165,000,000 | 144,297,173 | 87.45% |
| ES.4 Vulnerable Children | 31,500,000 | 31,500,000 | 100.00% |
| TOTAL | 3,985,450,000 | 2,563,637,585 | 64.32% |

*Notes: These figures are likely underestimates of the amounts planned but with obligation paused from moving to implementing partners, as they do not account for funds bilaterally obligated into a USAID Mission Development Objective Agreement, which are no longer able to be subobligated to partners. FY24 funds are the most recent year of health resources available to USAID, as no FY25 GHP-USAID resources have yet been appropriated, and the Agency has not sought access to any of these resources under the current Continuing Resolution. All GHP-USAID resources from appropriation years prior to FY24 were 100% obligated in advance of their expiration.*

Of the total GHP-USAID resources appropriated directly to USAID from all fiscal years, at least $5.143B is currently obligated to implementing partners but not yet expended/disbursed – this total (100%) has been suspended as a result of the foreign assistance pause and related terminations from further use towards the specific health objectives mandated by Congress and described above.

**Estimated Amounts of Previously Obligated GHP-USAID Funding (All FYs) Paused from Expenditure/Disbursement, by Congressionally Directed Program Area**

| | Obligated to Implementing Partners and Currently Paused from Expenditure/Disbursement ($) |
|---|---|
| *HL.1 HIV/AIDS* | 1,517,719,650 |
| *HL.2 Tuberculosis* | 432,931,737 |
| *HL.3 Malaria* | 536,862,171 |
| *HL.4 Global Health Security* | 645,082,469 |
| *HL.5 Other Public Health Threats* | 91,529,255 |
| *HL.6 Maternal and Child Health* | 669,510,301 |

| | |
|---|---|
| HL.7 Family Planning and Reproductive Health | 727,320,899 |
| HL.9 Nutrition | 229,327,337 |
| ES.4 Vulnerable Children | 37,706,284 |
| Other, inc. Administrative and Program Oversight | 254,755,321 |
| TOTAL | 5,142,745,424 |

Notes: The figures above reflect total amounts of currently unexpended/undisbursed Global Health funding obligated to implementing partners. Virtually all expenditures, disbursements, and payments to partners have been halted due to lack of essential staff, lack of systems access, and foreign assistance review processes superimposed over regular procedures, impacting this full total. The total estimated amount of Global Health funds obligated to implementing partners from all fiscal years according to Phoenix data as of 2/27/2025 is $76,327,410,581. The ~$5.1B pending expenditure/disbursement represents 6.7 percent of these total obligations.

20

# EXHIBIT 9

**25-cv-469-CJN**



# UNITED STATES HOUSE COMMITTEE ON FOREIGN AFFAIRS

## STATEMENT OF NICHOLAS Z. ENRICH

### MARCH 25, 2025

My name is Nicholas Enrich. I am a civil servant with 15 years of experience serving in the federal government, under four different administrations. I joined the federal government in 2010 as a Presidential Management Fellow. Since 2013 until now, I worked specifically at USAID, culminating in over 12 years of experience within the Agency.  While my work was primarily with the Bureau for Global Health (GH), I also worked with the Bureau for Management. Currently, I am the Acting Assistant Administrator for GH at USAID. On March 2, 2025, I was placed on administrative leave as a result of my protected whistleblowing activities.

Prior to my current position, I was the Director of the Office of Policy, Programs, and Planning in the Bureau for Global Health. My responsibilities included: formulating and executing a global health budget, developing policy, engaging with legislators, procuring awards, monitoring and evaluation, and knowledge management. I was also responsible for the Bureau for Management and led the Critical Coordination Structure, USAID's operational readiness unit, to ensure continuity of operations and health and safety of the workforce. Additionally, I spent eight years serving in the Office of Infectious Diseases in the Bureau for Global Health. I hold a J.D. from Brooklyn Law School and a B.A. from Tulane University.

The GH Bureau has primary responsibility for implementing the approximately $10 billion annual budget for global health appropriated by Congress.[1] That budget includes funding for

---

[1] Congress Passes Full-Year Continuing Resolution Bill, Maintaining Global Health Funding at Prior Year Levels, KFF.org (Mar. 18, 2025), https://www.kff.org/global-health-policy/fact-sheet/congress-passes-full-year-continuing-resolution-bill-maintaining-global-health-funding-at-prior-year-levels/.

**WHISTLEBLOWER AID**

HIV, Tuberculosis (TB), Malaria, Maternal and Child Health, Infectious Diseases, Global Health Security, Family Planning and Reproductive Health, and Nutrition.

On January 28, 2025, I was designated by then-Acting USAID Administrator Jason Gray as the Acting Assistant Administrator for Global Health. That same day, Secretary of State Marco Rubio issued a blanket waiver[2] for life-saving humanitarian assistance (hereafter, LHA) from the actions instituted under Executive Order 14169 "Reevaluating and Realigning United States Foreign Aid" issued on January 20, 2025.[3] This EO was referred to as "the pause on foreign operations."

From January 28, 2025, implementing the LHA waiver was my top priority for the Bureau. However, by the time I was placed on administrative leave on Sunday, March 2, 2025, GH had been fully prevented from implementing the waiver, and our lifesaving programs had been effectively eliminated.

By Sunday, March 2, 2025, when I was pushed out of USAID, the following occurred:

(a) all – or nearly all – of our contracts and awards needed to implement the LHA waiver were terminated;

(b) authority to approve LHA activities was moved from GH leadership to the USAID Front Office, with an increasingly restrictive definition of what constituted "lifesaving activities," that ultimately excluded all GHP-USAID funds (except HIV);

---

[2] U.S. Dep't of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), https://www.state.gov/wp-content/uploads/2025/01/Final-Signed-Emergency-Humanitarian-Waiver.pdf.
[3] Exec. Order No. 14169, 90 Fed. Reg. 8619 (2025), https://www.whitehouse.gov/presidential-actions/2025/01/reevaluating-and-realigning-united-states-foreign-aid/.



(c) with some miniscule exceptions, no payments had been processed for any of the lifesaving work, which resulted in the complete incapacitation of many implementing partners (even those whose awards had not been terminated); and

(d) the GH workforce was reduced from 783 to approximately 67 people with most key staff members critical for administering aid terminated or placed on administrative leave.

Our complete inability to implement lifesaving activities was the result of a series of intentional actions and obstructions taken by the Trump Administration about which the public has been misled, including: USAID, the Department of State, and the Department of Government Efficiency (DOGE). Their concerted actions ultimately prevented my team and me from getting LHA activities approved, and from providing the funds to awards that would implement lifesaving activities.

I was dismayed and frustrated to hear that Peter Marocco, Director of the Office of Foreign Assistance at the United States Department of State and Deputy Administrator at USAID, came to the Hill recently and blamed failure to implement lifesaving programs on what he called "malicious over-compliance" on the part of USAID/GH staff. To suggest that career civil servants who have dedicated their lives to improving global health would intentionally fail to implement lifesaving programs to make the Administration look bad is not only facially ludicrous, but provides a helpful window into the cynicism and disdain that colors some of the Administration's view the of the federal workforce and our critical programs.

As infuriating as it was to hear the Administration trying to put the blame on career civil servants, it was not surprising. In fact, it was in anticipation of this type of scapegoating that prompted me and my team to devote most of our last few days to documenting how we were



prevented from actually implementing the LHA waiver issued on January 28, 2025. My goal was to share that documentation with our staff, so that when they were inevitably blamed for the monumental impact of shutting down essential global health programs, we would be prepared to present an accurate recitation of facts to clarify the record.

Moving forward, I am happy to walk through the roadblocks I encountered in my efforts to implement the LHA waiver. I can provide insight into the impacts on global health and US national security caused by our inability to implement LHA programs, and I can share knowledge about the actions of political appointees at various government agencies – including DOGE – as they relate to the unworkable processes and obstacles in implementing the LHA waiver policy.

**Process: Everchanging guidance**

On January 28, 2025, the LHA waiver was issued by Secretary Marco Rubio.[4]

On January 29, 2025, Senior leadership at USAID held a Senior Management Meeting (SMM) where the then-Deputy Chief of Staff (DCOS), Joel Borkert, discussed the approach on how to approve and report LHA waiver activities.

On January 29, 2025, the Executive Secretariat at USAID issued a "waiver request form". GH interpreted that this did not apply to the LHA waiver that was already issued, but did, in fact, apply to other requests for activities that had not already been granted a waiver.

At the Senior Management Meeting on January 29, 2025, my team described GH's proposed approval process for LHA activities. The proposed approval process was for GH to approve

---

[4] U.S. Dep't of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), https://www.state.gov/wp-content/uploads/2025/01/Final-Signed-Emergency-Humanitarian-Waiver.pdf.



activities that were needed to implement LHA, and then the approved activities would be shared

with the USAID Front Office for tracking and awareness.

On February 1, 2025, Ebola activities for the International Organization for Migration (IOM),

UNICEF, and The International Federation of Red Cross and Red Crescent Societies (IRFC)

were the first activities that I approved under the waiver. The Agreement Officer for these

awards sent letters to the implementing partners to notify them that the activities were approved

under the LHA waiver, and that the Stop Work Orders previously received due to "the pause" in

foreign assistance were partially lifted for the applicable approved activities.

On February 4, 2025, I drafted an informational memorandum documenting the GH process

and definitions for LHA.[5] This memo included a list of activities needed to avert loss of life

within the next 90 days, including: (1) Direct Service Delivery; (2) Emergency Response to

Infectious Disease Outbreaks; and (3) Essential Health Commodities & Supply Chain

Management. GH would approve the LHA activities and share the list of approved activities with

the Agency Front Office for tracking and payment. Joel Borkert approved the memorandum on

February 6, 2025.

On or about February 7, 2025, and February 10, 2025, respectively, GH approved

approximately 20 of the most critical LHA activities through the process outlined in the February

4, 2025, memo and sent it to the USAID Front Office for tracking and payment.

On February 11, 2025, Paul Seong sent an email about the GH approval process for LHA

activities, that said: "Please hold off on any more approvals until we have a conversation with

---

[5] https://s3.documentcloud.org/documents/25515976/doc-20250207-wa0002-250207-1100028292-2-1.pdf



Joel Borkert on this [LHA approval process]." I shared the instruction to "hold off" with GH and regional bureau staff.

On February 13, 2025, Joel Borkert called a meeting about the "false narrative in the press" that approvals for LHA activities had been paused. When Borkert asked what I knew about this, I referenced the email Paul Seong sent on February 11, 2025, which specifically had directed GH to hold off on the approval of LHA activities. Joel Borkert and several other USAID political appointees, including Laken Rapier (Senior Front Office Advisor), Adam Korzeniewski (White House Liaison), Tim Meisburger (Assistant to the Administrator, Bureau of Humanitarian Assistance), and Mark Lloyd (Assistant to the Administrator, Bureau for Conflict Prevention and Stabilization). Joel Borkert became visibly angry and shouted at me: "Approvals are not paused, there never was a pause." Then, Joel Borkert directed me to draft a follow-up memo to correct the "false narrative in the press", and to warn staff against leaking information to the press - which I did.

Mark Lloyd, issued this second informational memo on February 13, 2025. This memo served: (1) to correct "the false narrative in the press;" (2) to confirm that LHA waiver continued and that approval was "never paused;" and (3) to remind staff that unauthorized external communications were a violation of the standards of conduct and subject to discipline, including removal. Attached to the memo was a reinstatement of the GH approval process that had been paused by Paul Seong's February 11, 2025 email.

The next day, February 14, 2025, new Agency Front Office guidance was issued. The new guidance, titled "Foreign Assistance Pause Blanket Waiver and Exception Guidance," fully contradicted the February 13, 2025, memorandum issued the day before, and rendered all



guidance before it moot. The new guidance removed approval authority of what constituted LHA activities from GH, and moved it to the Agency Front Office – specifically to the Assistant to the Administrator for Management and Resources, Ken Jackson. This meant that any LHA activity now required Agency leadership approval before it could be implemented. The review process that was created is as followed:

    a.   First GH would review, then it would pass to Mark Lloyd. From Mark Lloyd, Agency Front Office Advisor Paul Seong would have to clear.

    b.   Then, it would pass to Chief of Staff Joel Borkert until, finally, it was presented to Ken Jackson for final approval.

Once the February 14, 2025 guidance was issued, no GH LHA waiver activities were approved ever again.

Starting on February 18, 2025, GH submitted a list of LHA activities that had been halted and GH was requesting approval to resume on a daily basis in accordance with the February 14, 2025, guidance. Note: ultimately there were 72 activities for which approval was requested. These activities were submitted repeatedly, but never approved.

On February 19, 2025, Joel Borkert emailed me, Mark Lloyd, and Brian Frantz (Acting Assistant Administrator, Africa Bureau). Joel Borkert's email said that "life saving things like Marburg do not need a waiver (so there should be no pause). They do need to go through the payment approval process." This email was a direct contradiction to the February 14, 2025, guidance, which specified that LHA activities required approval and provided the process for obtaining approval.

7



On February 20, 2025, I tried to clarify this discrepancy with Mark Lloyd by email, noting that although the official guidance provided a specific approval process, the USAID Chief of Staff had written that no approval was needed. Mark Lloyd never responded.

On February 21, 2025, I suggested a track-change revision to the February 14, 2025, guidance to codify Joel Borkert's statement that Agency Front Office approval was not needed for LHA. The proposed revision clarified that Ken Jackson's approval was only required for the payments; as the activities themselves were already approved by GH. I did not receive a response until February 26, 2025, when Mark Lloyd wrote that Joel Borkert was incorrect and that the February 14, 2025, guidance was, in fact, the correct process.

On February 21, 2025, Mark Lloyd told us about an additional layer to the process for awards managed at USAID missions. This addition required missions to go through the GH review chain, rather than through the existing regional bureau process.

On February 24, 2025, in an effort to move the stalled approvals and payments forward, I met with Mark Lloyd and Tim Meisburger. Together, we walked through each of the 72 LHA activities that were sent for waiver approval. Mark Lloyd and Tim Meisburger instructed GH to narrow the focus of its requests and to deprioritize activities related to neglected tropical diseases, MPox, Polio, Ebola, and any monitoring and surveillance activities. It was made clear that anything on that deprioritization list would not be approved. Further, Mark Lloyd and Tim Meisburger stated that even activities that had been approved by GH under the previous guidance needed to be re-approved, indicating that the Agency Front Office did not recognize any of the approximately 20 previous GH approvals for applicability of the LHA waiver under any of the



previous memos. The effect of the February 24, 2025 meeting was an extreme narrowing of the definition of LHA.

On February 25, 2025, relying on my discussion with Mark Lloyd and Tim Meisburger from the previous day, GH submitted a revised priority list of the most critical LHA waiver activities to Lloyd. Lloyd never responded, and to my knowledge none of the activities were ever approved.

On February 25, 2025, GH was made aware of a Frequently Asked Questions document (FAQ) on the LHA waiver developed by the State Department and approved by Peter Marocco. One of the questions was to specify the funding accounts that the LHA waiver applied to, and it explicitly excluded all all non-PEPFAR[6] health funding, meaning that none of the activities submitted for under the LHA waiver were eligible.

On February 26, 2025,  I flagged the problematic definition of lifesaving activities to Mark Lloyd and Tim Meisburger. Tim Meisburger said the definition was a mistake. I said it should be corrected, and sent proposed redline edits to the FAQs for correction. Lloyd and Meisburger took no action to correct the guidance, and the FAQs were formally issued to USAID via Agency Notice on February 26, 2025, with the original, "mistaken" definition of LHA, which excluded all non-PEPFAR health activities.

Later in the day on February 26, 2025, all, or nearly all, of our awards for global health assistance were terminated.

---

[6] The United States President's Emergency Plan for AIDS Relief, https://www.state.gov/pepfar/.



## Process: Failure to process payments

On or about February 7, 2025, it was clear that payments were not being processed for approved LHA activities. This was one of the key mandates of "Programs Group," a part of the Coordination Support Team (CST) that was set up on February 7, 2025, to address problems related to a smooth drawdown of USAID and folding it into the State Department. Without access to funds, implementing partners were simply unable to carry out approved LHA activities.

At a meeting on February 10, 2025, the Programs Group alerted Agency leadership that the lack of access to funds for implementing partners was a critical impediment to the ability to carry out the LHA waiver. This was because access to USAID financial systems (known as GLAAS and Phoenix) had been completely turned off by DOGE. This order ultimately prevented the flow of any funds to partners who were approved to implement LHA activities. At that point, it was clear: to process payments, Phoenix needed to be turned back on with access restored.

On or about February 10, 2025, Meghan Hanson, Director of the Office of Policy, and Tim Meisburger claimed the reason Phoenix would not be turned on was because a series of illegal payments had been made in contravention of "the pause". When I noted that the Stop Work Orders (SWOs) on all of USAID's/GH's awards should solve that issue, there was no response.

Over the next three weeks, DOGE – in coordination with the Department of State and USAID leadership – attempted to determine what the minimum level of Phoenix access should be to process payments for top priority activities. The result was that access to financial systems was never restored for the Agreement and Contracts Officers (A/COs), the individuals who could actually verify that the work that had been contracted for had been completed, and had access to approve vouchers. Instead, access was only granted for a tiny number of individuals, of whose



identities I am unaware. It was unclear on what basis decisions were made, or which payments would be processed. Based on information we received, however, it was clear that the only payments prioritized were those for plaintiffs in ongoing payment lawsuits. On February 14, 2025, a new process was established in the wake of the "Foreign Assistance Pause Blanket Waiver and Exception Guidance." The new process required a form to be filled out and sent to Ken Jackson, who would approve payments. This created an immediate backlog of approvals for payments that, to the best of my knowledge, has still not been cleared.

This "new system" replaced the "old system" that worked for years. Additionally, this new system, in my opinion, removed vital checks and balances to avoid waste, fraud, and abuse by removing the individuals from the approval process with actual knowledge needed to verify what the funds had been used for. Additionally, the new system opened the door to massive mistakes from individuals that do not understand USAID financial systems. Mistakes that occurred included massive overpayments that were approved, payments that were sent to the wrong partners, or for the total TEC/Ceiling of the award, rather than just allowable disbursements – including unallowable costs.

On February 24, 2025, we learned from Department of State Financial Officer Maureen Danzot that payments needed to be submitted for approval not just for waivers, but also for payments for previously incurred costs prior to "the pause". This was jarring because this step has never been a part of the approval process, and therefore no approval requests had been submitted by GH through the established process for previously incurred costs for any implementing partners.



The failure to provide access to funds and the corresponding backlog of payments resulted in the inability of implementing partners to execute critical lifesaving activities and, in some cases, led to implementing partners terminating their staff or dissolving altogether – resulting in long-term setbacks to foreign assistance capacity.

Peter Marocco stated that the changes to the payment system, which removed access to the system for almost all staff, were necessary to address the problem of "insufficient payment control or review mechanism." However, the new system actually eliminated the existing robust due diligence system of payment control and review by removing system access for project managers and Agreement Officers who were positioned to validate expenditures against expected deliverables and allowable costs. Instead, the new system allows access only for a small number of individuals with no knowledge of the awards for which payments are requested, no visibility of the vouchers submitted by implementing partners, and no understanding of the scope or intended deliverables of the awards for which they are assessing requests for payments.

### Termination of Contracts

Starting on February 8, 2025, and at regular intervals through February 26, 2025, GH became aware that State leadership and DOGE had begun to identify "tranches" of awards that should be immediately terminated. These lists of awards slated for termination were sent to the Office of Acquisition and Assistance (OAA) with exceedingly short timelines and immense pressure to move the terminations as quickly as possible.

With the first three tranches on or about February 8, 9, and 10, 2025, OAA informed GH which of the awards we managed were slated for termination. We quickly reviewed the awards to identify if any of them were needed to implement LHA activities, and then informed OAA and



Agency leadership when we identified awards that had already been approved for activities under the waiver, or would likely be needed for LHA activities in the near future. For the first three tranches, the notification email from OAA asked Agreement Officers (AOs) to ensure that none of the waivers (e.g., LHA) applied to the awards slated for termination. However, the timeframes for actions were so short that at least one GH award was terminated that had already been approved under the LHA waiver.

On February 11, 2025, I received a warning email from Jeremy Lewin, a DOGE staff member. The email said: "I [Jeremy Lewin] am hearing that Global Health is conducting supplemental reviews of awards slated for termination by Secretary Rubio and Acting Deputy Administrator Marocco. This is delaying the timely processing of these termination notices and is unacceptable." Further, Lewin specified that "bureaus should not be conducting their own policy and program reviews before acting on these termination instructions." I responded by saying GH was flagging awards that were slated for termination that had been approved to implement lifesaving activities under the LHA waiver, for Agency consideration prior to termination. I said that I would stop, if told to. Lewin never responded.

Following that exchange, future tranches – including tranches on February 23, 2025, and February 26, 2025 –  did not include the caveat for AOs to check to see if any of the waivers applied before terminating the awards.

On February 26, 2025, the sixth "tranche" of awards arrived. This time, all – or nearly all – remaining GH awards needed to implement the LHA waiver were terminated without advanced notice.



It is important to note:  It was never clear what criteria State/DOGE were using to terminate awards. It all seemed very random. OAA leadership told me they had to do keyword searches to find critical infrastructure awards that were on the termination lists (e.g., the award for Phoenix, for the lease to the one remaining USAID building, for the phone company, etc.). Additionally, Tim Meisburger said that part of the problem was that LHA awards had unclear names that did not convey that they included lifesaving work. He was referring to the problem of utilizing a keyword search approach to identify critical infrastructure awards.

## Termination of Staff

As of January 20, 2025, there were 783 positions in GH.

Four diversity and inclusion positions were eliminated on January 23, 2025.

On January 25, 2025, stop work orders (SWOs) on all contracts – including Global Health Technical Assistance Support Contract (GHTASC), GH's primary contract for institutional support contractors (ISCs) who made up nearly half of the GH workforce – resulted in the termination of 374 ISCs that supported GH. This cut included all support staff, including administrative and program assistants, across the bureau. Cuts also eliminated technical health experts. Because Direct Hire employee positions are prioritized for positions with inherently governmental functions, like contract management, budget administration, and external representation, the vast majority of support staff and technical expertise were hired as ISCs. Thus, the abrupt loss of 374 ISCs on January 25, 2025 essentially incapacitated the effective operations of the GH Bureau.

On January 27, 2025, 5 Agency Front Office staff members were placed on administrative leave.

14

On January 31, 2025, 19 additional staff members were put on administrative leave, in accordance with Executive Order 14168 "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."

On February 3, 2025, all – or nearly all – staff lost system access to all USAID systems, including email. While some regained access on February 4, 2025, others did not. The majority of GH received Administrative Leave Notices and lost system access again (if they had regained it) on February 4, 2025.

On February 5, 2025, there were 151 workforce members who retained network access. The widespread administrative leave resulted in confusion, uncertainty, broken chains of command, and a critical lack of operational staff needed to perform essential roles. The result was that GH's ability to operate was crippled between February 4, 2025 and February 10, 2025.

On February 6, 2025, I emailed Agency leadership to describe the detrimental effects of the massive staffing cuts. In the email, I wrote: "We must express in the strongest possible terms that the [reduction in] USAID global health personnel globally is deeply concerning and dangerous, as it directly undermines the safety and well-being of both American citizens and vulnerable populations worldwide who rely on USAID's life-saving global health programming, including emergency outbreak response." Additionally, I wrote: "Reducing the USAID global health workforce in Washington and at Missions to such minimal levels is tantamount to condemning lives. As you know, there is an escalating Ebola outbreak in Uganda right now. Insufficient staffing to address this crisis directly jeopardizes the safety of American citizens."

On February 7, 2025, a U.S. district court judge granted a temporary restraining order (TRO) that prevented the government from placing additional USAID employees on leave.



On February 10, 2025, all staff placed on administrative leave returned.

On February 23, 2025, the TRO expired and all staff were notified that they would be on administrative leave, barring a classification as "essential." Approximately only 70 GH staff received an Essential Personnel Designation.

On February 23, 2025, 71 personnel assigned to four GH Offices received Reduction in Force (RIF) letters. The affected offices are: (1) GH's Front Office; (2) Office of Policy, Programs, and Planning; (3) Office of Professional Development and Management Support; and (4) Office of Population and Reproductive Health. Additionally, 15 staff members that received RIF letters had also received an Essential Personnel Designation earlier that day.

The overall impact of the staffing cuts was stunning. Our budget and operations personnel, for example, were reduced from 51 staff members 4. The Office of HIV/AIDS was reduced from approximately 300 to 19 staff members.

### Ebola Outbreak

An Ebola outbreak in Uganda was identified in late January 2025. I met with Joel Borkert and the GH Outbreak Response Team on February 4, 2025. At that meeting we identified key actions we needed to take to move forward, and discussed the key activities under the LHA waiver for UNICEF, IFRC, IOM and WHO.

On February 4, 2025, letters were sent to UNICEF, IFRC, IOM to notify them of the approved activities under the LHA waiver and to inform them to resume the Ebola response activities in Uganda.

On February 5, 2025, Joel Borkert forwarded an email from the National Security Council (NSC) Deputy Director that said: "I understand State has approved a waiver for the Ebola



programs, but it would be immensely valuable to confirm at the Deputies Committee meeting that State has fully implemented the waiver and that necessary personnel at USAID HQ and in the field are fully funded and remaining in place to conduct critical monitoring and containment activities.  With 10,000 Americans in Uganda at any given time—and with two confirmed U.S.-person exposures—we need to make sure we're minimizing spread and the possibility of this jumping to the United States. This is something we've been discussing with your team over the last week since the State ALDAC assistance pause was put into place.  But amidst the broader USAID reform efforts, I am still getting various reports of personnel and funding obstacles to Ebola program implementation.  The DC will be a good opportunity to establish confirmation for the interagency that our Ebola assistance teams are on the ground and working."

I responded to the email on February 5, 2025, with a request for a call. In that call, I planned to summarize the operational challenges that hindered a full-scale USAID Ebola response. I never received a reply. I ended up sending a reply summarizing GH's obstacles and confusions in a February, 5, 2025, email. The email described the challenges instituted by the new Administration that hindered our efforts to mount a robust Ebola response, including communications restrictions, newly established bureaucratic bottlenecks, massive staffing cuts, and inability to engage with WHO. Just for the staffing challenges, I summarized the following: "An ebola outbreak of this severity is an all-hands-on-deck situation under normal circumstances, and is time consuming and psychologically draining. We are not in a position to effectively respond when our entire bureau loses access to the network and systems, and are spending hours each day trying to figure out who is still working at USAID versus on administrative leave, our staff who should be focused on ebola are forced to cover other critical



infectious disease outbreaks like Mpox, tuberculosis, and malaria as there are no staff left to work on those. Recognizing that USAID is going through a major overhaul right now, that process needs to be temporarily paused in order for us to respond to this critical national security threat by flexing all relevant staffing capacities and implementation mechanisms."

On February 6, 2025, I emailed Agency leadership – including Joel Borkert, Paul Seong, and Ken Jackson – warning unequivocally that the cuts of GH staff would hamper Ebola response and place American lives at risk.

On February 7, 2025, I told Paul Seong and Joel Borkert via email that disbursements were needed for Ebola activities, and that we still needed help on utilizing the WHO agreement to make this happen.

On February 8, 2025, I emailed Agency leadership – including Joel Borkert, Paul Seong, Ken Jackson, and Tim Meisburger – stating that cuts to staff would result in deaths. Further, I advised they needed to stop canceling contracts, and needed to turn payments back on. I wrote: "in order to implement life-saving humanitarian health assistance in a responsible and effective manner, USAID/GH requires full operational capacity of all USAID staff responsible for programming and administration of these activities, both at Missions and in Washington… In addition to USAID staff, we have requested a halt to the termination of all global health-focused awards until a determination is made as to whether the mechanisms are needed to implement life saving humanitarian assistance. Another issue that requires immediate action is the resumption of payment services for all health and humanitarian partners/projects carrying out critical life saving assistance so that they can be paid for work conducted prior to and permitted under the Waiver. At this time, a significant portion of partners who are receiving our direction to resume or



continue lifesaving global health activities are not able to carry out this work as they are not being paid, and in many cases, are still owed payment for work performed prior to receipt of the stop work order. Unless the steps above are taken to restore USAID's ability to responsibly and effectively manage our lifesaving programs and implementing partners, the consequences on lives lost and funding squandered will grow exponentially and irreversibly in many cases."

On February 11, 2025, I emailed Mark Lloyd, Joel Borkert, and Ken Jackson, to note that we still needed guidance on how to move forward with the transportation of personal protective equipment (PPE) that would assist in Ebola response. WHO was the implementer for this effort, and there needed to be cooperation with the organization directly. I did not receive a response.

On February 12, 2025, I notified Tim Meisburger, Mark Lloyd, and Joel Borkert via email that there was an urgent need to process payments for Ebola activities. I noted that "our implementing partners are still unable to access funds to implement the work USAID has authorized them to undertake as part of the USG response to this critical health emergency. For example, IOM is positioned to bolster Ebola screening at Entebbe International Airport in Uganda, but has not commenced as they are not able to access advance funds. This is leading to unscreened passengers traveling internationally, potentially onwards to the U.S…. Yesterday, Elon Musk publicly confirmed from the Oval Office about USAID that 'we have, for example, turned on funding for Ebola prevention….' This hasn't actually happened for USAID-funded Ebola activities due to this payment obstacle."

Rather than offering to push to get the payments issue resolved, Tim Meisburger responded by criticizing the implementing partner for refusing to work without funds. In an email, Tim Meisburger wrote: "So, this is one of the most critical health emergencies in the world, but the



International Organization for Migration, which has capacity on the ground, will not provide this screening because the US has a short-term cash flow problem? I'm really appalled." I responded, via email: "We share your concerns about IOM starting activities, but are not in position to force them without providing access to funding as provided in the agreement terms… In the interim, the lack of payment is hampering our ebola response." Neither Tim Meisburger, nor other Agency Front Office recipients of my email ever responded.

Day by day, my team and I raised the payment issues. However, none of our partners ever received access to funds for activities, LHA or otherwise.

On February 18,  2025, I shared an Action Memo requesting Peter Marocco's approval to use the WHO agreement to transfer personal protective equipment (PPE) needed for the Ebola response to Uganda. Since February 4, 2025, I repeatedly requested approval to utilize the WHO award that was needed to  move the approximately 27,000 sets of PPE. The PPE was in a WHO warehouse in neighboring Kenya, and was already procured under the agreement. This activity could not be approved under the LHA waiver process because engagement with WHO was prohibited by a separate Executive Order issued on January 20, 2025 ("Withdrawing the United States from the World Health Organization"). Despite repeatedly requesting written guidance on how to utilize the WHO agreement to move PPE, no guidance was ever provided, and the February 18, 2025 Action Memo was another attempt to seek approval to move the critically needed PPE.  Mark Lloyd cleared the Action Memo on February 19, 2025. The Action Memo was sent to Joel Borkert for the next stage of clearance.

Joel Borkert called me on February 19, 2025, saying that he did not understand why PPE had not been moved yet. I explained that we had not received approval to do so, due to restrictions on



engaging with the WHO under the Executive Order. I reminded him that Peter Marocco could immediately sign the Action Memo, which would allow the PPE to be rapidly transferred to Uganda to aid in the Ebola response. Joel Borkert said that was "not going to happen." Instead, Joel Borkert told me that Peter Marocco was ordering me to find another way to get the PPE distributed, without using WHO. This was problematic for many reasons, including the fact that WHO owned the Uganda warehouse where the PPE was being stored.

In a follow-up email later on February 19, 2025, Joel Borkert reiterated Peter Marocco's order: "I just spoke with Mr. Marocco regarding the U.S. purchased and owned PPE in a WHO warehouse in Kenya. We are ordering you to pick up the PPE and deliver it to the necessary people and organizations in the region to respond to ongoing infectious disease outbreaks." Then, Peter Marocco responded to Joel Borkert's email and threatened to fire me if I did not move the PPE immediately. Peter Marocco's email directed Joel Borkert, Mark Lloyd and Tim Meisburger to "take all necessary personnel actions in the event this is not completed in the next 12 hours."

Despite working late into the night trying to make it happen, moving the PPE without engaging WHO was simply not possible. There was no one who could take possession of the PPE, and no way to get it out of the warehouse without utilizing WHO services. A slightly longer term option to utilize UNICEF instead was identified, and we moved forward with that approach. However, the effort became moot when the UNICEF agreement was terminated, without warning, on February 26, 2025 before any PPE could be delivered.

On February 24, 2025, I addressed each waiver request in a meeting with Mark Lloyd and Tim Meisburger in an effort to move forward approvals and payments. Tim Meisburger specifically noted that Ebola was a "scam" because there had only been "one death." I tried to



explain that Ebola was still in an incubation period, and that we should see the response through. However, political leadership was not amenable to this suggestion. Tim Meisburger and Mark Lloyd provided guidance instructing GH to narrow the focus of its requests and to deprioritize activities related to neglected tropical diseases, MPox, Polio, Ebola, and any monitoring and surveillance activities. Funding for the items listed (Ebola, etc.) would not be approved. Mark Lloyd and Tim Meisburger stated at the meeting that even activities that had been approved by GH under the previous guidance needed to be re-approved, indicating that the Agency FO does not recognize any previous GH approvals for applicability of the LHA waiver under the February 6, 2025, informational memo.

On February 24, 2025, Peter Marocco responded to a NSC inquiry as to the status of Ebola response activities. In an email, Peter Marocco wrote: "We have approved every Ebola support program I am aware of - even the ones that we believe may have exaggerated magnitude." Based on all that transpired in the days before, it is likely Peter Marocco knew his statement was untrue. As described above, none of the Ebola activities had been approved, and Peter Marocco was aware of this fact. On February 25, 2025, Elon Musk said in a White House cabinet meeting that Ebola activities had been accidentally turned off, and then turned back on immediately. This was also false, as none of the activities were approved, and no funds had been made available for any Ebola response activities.

On February 26, 2025, a second Ebola death in Uganda was reported, indicating that the outbreak was not over (at least two additional deaths have since been reported, bringing the total deaths to at least four). The GH Outbreak Response Team briefed Tim Meisburger and Mark Lloyd on the importance of approving activities to respond to the outbreak.



Later on February 26, 2025, the UNICEF agreement was terminated without warning. This signaled the end of any ability to move PPE, or to conduct other critical Ebola response activities. On February  27, 2025, I emailed leadership – including Joel Borkert, Mark Lloyd, Ken Jackson, and Tim Meisburger – to warn them about the risk of terminating the UNICEF agreement. I wrote: "As you know, UNICEF is one of our few key implementing partners implementing the Uganda Ebola response…. we were just notified that our agreement with UNICEF was terminated. As you heard in your briefings yesterday and today, this is a critical blow to our ability to implement the Ebola response at a critical time."

### The Memos

On March 2, 2025, I sent two memos to all GH staff members, and a third memo was in draft version. It is important I explain why I drafted them.

By the end of the day on February 26, 2025, with all – or nearly all – of the awards needed to implement LHA terminated, and with no path for approval of new activities or any way for them to access funds if there was approval, it had finally become clear that we would not be able to implement the LHA waiver. At that point, I determined that our top priority for GH had changed from working to implement the LHA waiver, to needing to document the events that occurred including vacillating guidance and roadblocks that had been established preventing us from implementing lifesaving activities, and to warn the Administration of the risks that this posed to human life and U.S. national security.

I was concerned that when the impacts on global health that resulted from the dismantling of USAID became clear, the Administration would blame USAID/GH staff for ineffectively implementing the waiver they put in place – a concern that has already become a reality, with



Peter Marocco blaming USAID staff for "malicious over-compliance." That was why it was critical to factually document all we had done, and to ensure that staff had access to the documentation, whether they were still working, on administrative leave, or terminated.

The memos served to summarize the repeated requests, pleas, and warnings regarding the need to implement lifesaving activities to avert loss of life on a massive global scale and substantial risks to U.S. national security and foreign policy interests.

Specifically, modeling and analysis suggests that the failure to implement LHA, if prolonged, will likely result in: a 39 percent increase in Malaria cases annually, and up to an additional 166,000 deaths; an annual 28-32 percent increase in Tuberculosis and drug-resistant Tuberculosis globally; up to an additional 28,000 cases of viral hemorrhagic fever (e.g., Ebola, Marburg, etc.); and an additional 200,000 annual cases of paralytic Polio, and hundreds of millions of new infections overall.[7]

Additionally, ending these lifesaving activities will result annually in 16.8 million pregnant women not receiving lifesaving services like essential medications and services for postpartum hemorrhaging and eclampsia; 11.2 million newborn babies not receiving critical postnatal care within two days of childbirth; 14.8 million children not receiving treatment for pneumonia and diarrhea, two of the top causes of preventable death in children under 5; over 3 million people living with HIV losing access to their lifesaving treatment; and one million children not treated for severe acute malnutrition.[8]

---

[7] Nicholas Enrich, *Risks to U.S. National Security and Public Health: Consequences of Pausing Global Health Funding for Life Saving Humanitarian Assistance*, NY TIMES (Mar. 4, 2025), https://static01.nyt.com/newsgraphics/documenttools/2dbddd9a823b8824/168a9032-full.pdf.
[8] *Id.*

24



Beyond the direct impact on human lives due to ending these lifesaving activities, other widespread impacts will be felt indirectly. For example, ending disease monitoring and surveillance prevents early detection of emerging diseases and eliminates opportunities to respond swiftly before they overwhelm health systems and spread uncontrollably. The lack of surveillance risks turning localized outbreaks into widespread public health emergencies, further endangering both local populations and global health security.

Additionally, the end to critical USAID global health programs creates substantial risks to U.S. national security. A halt to global health aid programs increases the risk of dangerous diseases reaching the U.S. In a globally connected world, outbreaks abroad do not stay overseas. When public health systems – with support from USAID – fail to contain infectious diseases, the chances of U.S. exposure rise through travel, military personnel, and migration. Uncontrolled epidemics abroad could trigger serious outbreaks in America. Mathematical models and empirical examples illustrate this risk. Without effective disease surveillance networks, the U.S. will be flying blind until diseases show up at our own border. That scenario is a recipe for more imported outbreaks on U.S. soil. For instance, the quick detection and containment of Ebola in West Africa is what kept the 2014 outbreak from becoming a larger U.S. crisis. Even so, the few Ebola cases that did reach America illustrated the heavy burden of managing dangerous contagions: a single Ebola patient in New York in 2014 cost the city health department $4.3 million in response measures (contact tracing, specialized treatment, etc.), and no secondary cases occurred. If global surveillance and response capacity erode, the U.S. could face multiple such cases or simultaneous threats (e.g. Ebola, drug-resistant malaria and tuberculosis, novel coronaviruses, etc.). American hospitals and the public health system would be stretched by

**WHISTLEBLOWER AID**

needs like isolation units, specialized diagnostics, and round-the-clock epidemiological investigations.

Finally, the halting of USAID global health activities poses substantial risks to U.S. foreign policy interests, as the global economic repercussions will have impacts on U.S. trade and markets. Reduced productivity will occur in key trade regions from heightened disease burdens. Diseases like malaria, HIV, and TB primarily strike working-age adults or their children, impairing productivity and economic output in Africa, Asia, and beyond.

For example, malaria costs Africa an estimated $12 billion per year in lost GDP from worker absenteeism, lower productivity, and healthcare expenses.[9] Unchecked high rates of maternal and childhood morbidity or mortality can exacerbate impacts on productivity.[10] Undernutrition can reduce a nation's GDP by as much as 16.5 percent, as malnourished children perform worse in school and experience productivity losses as adults.[11] Lower productivity in these regions weakens their economic output and trade capacity, thereby diminishing their ability to import U.S. goods and services. This contraction in trade not only limits market opportunities for U.S. businesses but also undermines the economic resilience of global supply networks that support U.S. markets.

Over the longer term, the cumulative impact of widespread disease and reduced human capital in low-and middle-income countries will undermine global economic growth. America's prosperity is deeply intertwined with global markets: U.S. companies invest in and source from these countries, and emerging economies constitute important consumer bases. If those

---

[9] *Id.at 8.*
[10] *Id.*
[11] *Id.*



economies are continuously set back by health disasters, the global GDP will be smaller than it

otherwise would be, acting as a brake on U.S. growth as well.

# EXHIBIT 10

**25-cv-469-CJN**



## Re: Follow-Up on 02.26.2025 Award Termination Announcements

**Nicholas Enrich** <nenrich@usaid.gov>                                        Thu, Feb 27, 2025 at 9:04 AM
To: Joel Borkert <jborkert@usaid.gov>
Cc: Nadeem Shah <nshah@usaid.gov>, Jami Rodgers <jrodgers@usaid.gov>, Adam Cox <acox@usaid.gov>, Matthew Johnson <matjohnson@usaid.gov>, Rachel Chilton <rchilton@usaid.gov>, Lyudmila Bond <lbond@usaid.gov>, Christopher Nikola <cnikola@usaid.gov>, Gregory Marchand <gmarchand@usaid.gov>, Julie Wallace <JWallace@usaid.gov>, Carmen Coles <ccoles@usaid.gov>, Nida Parks <nparks@usaid.gov>, Ramona Godbole <rgodbole@usaid.gov>, Courtney Magill <cmagill@usaid.gov>, Diane Bui <dbui@usaid.gov>, Mark Lloyd <mlloyd@usaid.gov>, Timothy Meisburger <tmeisburger@usaid.gov>, Kenneth Jackson <kennjackson@usaid.gov>, "Aiyong (Paul) Seong" <aseong@usaid.gov>, Meghan Hanson <mhanson@usaid.gov>, Cheri Vincent <cvincent@usaid.gov>

Hi Joel,

Following up on this, we have identified many more awards that have been terminated that are implementing critical lifesaving activities under the waiver. Right now, I am sharing details of another of our most important awards that was terminated yesterday that needs to be unterminated in order to save millions of lives in the short term (similar two the flagship projects I noted last night). See below for further details, as we work to rapidly gather information on the rest.

Stop TB Partnership/Global Drug Facility (GDF) **(7200GH24IO00001)** manages the global procurement of lifesaving TB drugs for all countries around the world. Without this award, even if a country wants to buy TB drugs, the 130 countries served by GDF will no longer be able to do it because of the termination of USAID funding and manufacturers will stop producing these commodities without a pooled market. This mechanism saved 3.3 million lives last year and over a 6 month period prevented over 3 million new TB and DR-TB cases especially among children. In addition, almost 50% of the commodities will directly affect American companies that make them. There are 10.8 million that contract the disease and over 1 million die from it each year - TB is the number one infectious disease killer in the world.

We are currently in the process of collecting data from across operating units on awards that were terminated yesterday that are implementing lifesaving activities under the waiver.

So far, we have collected data from ~30 missions and the summary is in the table below. We will send up the details this morning so that hopefully these critical lifesaving activities can be unterminated.

| Non-PEPFAR GH | |
|---|---|
| Number of Awards Terminated | 100 |
| Number of Awards Terminated with LHA waiver submitted | 73 |
| Number of OUs reporting | 27 |
| **PEPFAR** | |
| Number of Awards Terminated | 161 |
| Number of Awards Terminated with PEPFAR waiver | 121 |
| Number of OUs reporting | 33 |

Please let me know if you have any questions.

Thanks,
Nick


**Nicholas Z. Enrich**

Acting Assistant Administrator

Bureau for Global Health

U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT

On Wed, Feb 26, 2025 at 8:35 PM Joel Borkert <jborkert@usaid.gov> wrote:
> Please hold on these life saving programs and let us review in the morning. There is an acknowledgement some may
> have been sent out in error and we have the ability to rescind. We need to identify what those are.
>
>
> Respectfully,
>
> **Joel M. Borkert**
> Acting Chief of Staff
> U.S. Agency for International Development
> Office: (202) 712-4573
> Cell: (202) 975-3203
>
>
> On Wed, Feb 26, 2025 at 8:30 PM Nicholas Enrich <nenrich@usaid.gov> wrote:
>> Hi Nadeem,
>>
>> Thanks for sharing this. I understand that you are looking for awards to be un-terminated that are related to "safety,
>> security, and operations of USAID staff."
>>
>> I understand that you are NOT requesting a list of awards that are critical to implementing lifesaving humanitarian
>> assistance to be un-terminated. I strongly urge you to reconsider this request, as several essential awards were
>> terminated today that are necessary to provide lifesaving humanitarian assistance. I have sent separate examples
>> including essential lifesaving malaria (GHSC-PSM TO 2 and 4) and maternal and child health (MOMENTUM Country
>> and Global Leadership (MCGL)) provisions. We understand there are others as well, but we've only been able to
>> identify these two so far.
>>
>> I urge you to reconsider and add awards that provide lifesaving humanitarian assistance to your list of awards to be
>> un-terminated.
>>
>> Awards that were terminated today include the most crucial GH awards to deliver lifesaving humanitarian assistance.
>> Failure to reverse the decision to terminate these awards will definitely result in massive loss of life.
>>
>> Please clarify.
>>
>> Thanks,
>> Nick
>>
>>
>>
>> **Nicholas Z. Enrich**
>> Acting Assistant Administrator
>> Bureau for Global Health
>> U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT
>>
>>
>>
>> On Wed, Feb 26, 2025 at 8:19 PM Nadeem Shah <nshah@usaid.gov> wrote:
>>> Colleagues,
>>>
>>> As you are aware, today USAID issued termination notices for a large number of awards. These
>>> awards were identified by the Front Office after a full review of USAID obligations and programs and
>>> were personally reviewed and approved for termination by Secretary Rubio and PTDO Deputy
>>> Administrator Marocco. We will be sharing a full list of awards terminated with additional details soon.
>>>
>>> We understand that some of these awards may have been for essential services, which the Front
>>> Office would like to turn back on. We need your immediate input on any awards that may have been

terminated that contain essential services related to the safety, security, and operations of USAID staff.

**If this applies to any of your awards, please fill out this Google Form ASAP.**

Your prompt response is crucial in ensuring that we maintain necessary services. If you have any questions or concerns, please don't hesitate to reach out.

**Note:** This process is not intended to address program spending or awards that may have previously had waivers. Those concerns will be addressed through a separate process.

Thank you for your attention to this matter.

Nadeem

Sensitive But Unclassified (SBU)

**EXHIBIT 11**

**25-cv-469-CJN**

**NEXT DECLARATION OF JANE DOE**

I, Jane Doe, declare as follows:

1.      I am a personal services contractor (PSC) employed with the United States

Agency for International Development (USAID). I work in USAID's Bureau of Humanitarian

Assistance. I am stationed in Washington D.C.

2.      I am a member of the PSC Association (PSCA) and serve on its Executive

Committee.

3.      I have previously filed declarations in *Personal Services Contractor Association*

*v. Trump*, Case No. 1:25-cv-469-CJN (Dkt. Nos. 6-5, 10-2, and 15-6) (*PSCA*), and in *American*

*Foreign Service Association v. Trump*, 1:25-cv-00352-CJN (Dkt. Nos. 9-10, 24-16) (*AFSA*).

4.      This declaration updates my previous declarations to reflect subsequent events

and the impact of the mass termination of PSCs and the dismantling of USAID on the PSCA.

5.      The PSCA operates under a formal charter, which establishes its mission,

governance structure, and operational framework. The current charter is available at

https://uspsca.wixsite.com/uspscassociation/about.

6.      Under our charter, the PSCA is governed by a seven-person Executive Committee

elected by the General Assembly of members for at least one-year terms. At any given time, at

least two members of the Executive Committee are either residing overseas or have at least one

year of experience serving as an overseas PSC.

7.      I was elected by the membership and am a member of the PSCA Executive

Committee.

8.      Under the PSCA's charter, members of the PSCA are current and former USAID

PSCs who have served any duration of time as a PSC since 2010. Under our previous charter in

effect prior to the mass termination of PSCs, all USAID PSCs were automatically members of

the PSCA. Under the new charter, automatic membership has been granted to all PSCs who were

active PSCs as of January 31, 2025 and, through notification to the Executive Committee, is

available to any former PSCs who left service before January 31, 2025.

9.      Prior to USAID's initial mass termination of PSCs in February 2025, the PSCA

represented approximately 1,100-1,200 PSCs, including hundreds of PSCs stationed overseas. At

that time, the PSCA primarily used government resources and emails, as permitted by USAID

internal policies (ADS 115).

10.     The PSCA's current membership, following transition off government resources

in early February, includes the 1,000+ PSCs who were active as of January 31, 2025, and, in

addition to that, many "veteran" PSCs. 730 members are currently subscribed to at least one of

our active communications channels, and almost 500 are subscribed to multiple channels.

11.     The PSCA exists to protect the interests of and advocate for the rights of its

members.

12.     The PSCA has historically promoted the equitable treatment of PSCs regarding

benefits, entitlements, working conditions, and responsibilities, unless precluded by federal law

or regulation. PSCA served a vital function by protecting its members, because PSCs are not

unionized and do not enjoy civil service protections offered to other USAID employees under the

Civil Service Reform Act. If our members are terminated unjustly or in violation of the United

States Constitution, we are not eligible to appear before the Merit Systems Protection Board.

Since the end of January 2025, the PSCA has been forced to shift its advocacy efforts while

simultaneously rebuilding its entire membership roster. Instead of advocating for the equitable

treatment of PSCs in benefits, entitlements, and working conditions to Agency leadership, the

Association is now focused on defending PSCs' rights during the mass termination of our members and their repatriation from overseas, as well as bridging the substantial information gap and promoting the equitable access to information across all types of contracts and places of performance.

13.     Beginning on February 2, 2025, members of the Executive Committee were progressively locked out of their USAID email accounts, Google Drive, and other collaboration platforms. At the same time, hundreds of PSCA members were also locked out of the USAID network. This system lockout caused the PSCA to lose access to historical records, prior advocacy documentation, internal communications, and our entire membership roster and listserv, severely impairing our ability to communicate with our members.

14.     Over the following days and weeks, a small number of PSCs had their USAID email accounts restored, but most did not. Instead, many PSCs remained locked out of USAID systems until March 28, 2025, when notice was distributed announcing the global termination of USAID personnel and the agency's final dissolution.

15.     Only after a considerable investment of time and resources has the Executive Committee managed to re-establish the PSCA's operations and communications with PSCs to the level required to manage the current situation.

16.     The dismantling and destruction of USAID is severely injuring the PSCA. In addition to the time and resources required to re-establish and maintain the PSCA's operations and communications with PSCs, the PSCA is facing an existential crisis as the result of the mass terminations of our members. Most PSCs received 15-day notices of termination effective in February, with their last days of employment in early March.  On March 28, 2025, USAID

leadership announced that all PSCs (100% of the workforce) will be terminated as of July 1, 2025.

17.     This mass termination of PSCs and dismantling of USAID has also severely strained the Association's resources as we try to respond to an unprecedented number of inquiries from members about their rights and benefits, what they can expect, how to handle the terminations of their PSC contracts, and how, when, and whether our overseas members must repatriate. Executive Committee members are unpaid volunteers, and prior to January 20, 2025, the workload of the Executive Committee was not so demanding as to disrupt our work, family obligations, personal responsibilities, or time off. However, since the end of January, the Association (through the work of the Executive Committee and also ad hoc committees created to deal with the current crisis) has been engaged in constant crisis management. For several Executive Committee members, fulfilling our responsibilities has, at times, amounted to a full-time job. For all Committee members, the required time commitment has significantly exceeded what we anticipated when we made this commitment in October 2024. Responding to the current crisis is increasingly becoming an unsustainable burden, not only on the Executive Committee but also on the members engaged in the crisis response and the Association as a whole.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 11, 2025.

 /s/ Jane Doe

# EXHIBIT 12

## 25-cv-469-CJN

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
                                )
PERSONAL SERVICES               )
CONTRACTOR ASSOCIATION,         )
                                )
                    *Plaintiff*, )   Case No. 1:25-cv-469
                                )
            v.                  )
                                )
DONALD TRUMP, et al.,           )
                                )
                    *Defendants*. )
_____ )

## THIRD DECLARATION OF JANE DOE

I, Jane Doe, declare the following under penalties of perjury:

1.  I am over 18 years of age and competent to give this declaration.

2.  I submitted previous declarations in the related case of *American Foreign Service Association v. Trump*, No. 1:25-CV-352; ECF Nos. 9-10, 24-16. Those declarations are attached as Exhibits 1 and 2, and I re-assert and incorporate them by reference here. Those declarations detail the severe harm caused to U.S. Personal Services Contractors (PSCs) at USAID due to the agency shutdown, including abrupt loss of access to safety and security resources overseas, financial distress, and the failure of USAID leadership to provide clear guidance. They also provide background on the work and role of USPSc. This declaration provides additional updated information and refutes certain claims made in Defendants' filings in No. 1:25-CV-352, with a focus on those directly impacting PSCs.

Responding to Claims Made by Deputy Administrator Pete Marocco

3. Deputy Administrator Pete Marocco filed a declaration in Case No. 1:25-CV-352, ECF 35-1, which is attached as Exhibit 3. Mr. Marocco asserts that USAID personnel on administrative leave remain under Chief of Mission (COM) authority and continue to have access to security resources and emergency communications, including the SAFE Alert system and SCRY Panic app. Exh. 3, ¶ 3. However, this claim does not reflect operational realities, including as it applies to USPSCs.

4. Though some PSCs' accounts were restored after the TRO was issued in No. 1:25-CV-352, many PSCs remain completely locked out of their email and other USAID systems. Others have reported being locked out of essential security communication platforms since system deactivation on February 2, 2025. USAID missions have had to implement ad-hoc solutions, such as manually setting up SAFE notifications on personal devices, an unreliable workaround, and a violation of the principle that all official business should utilize government-furnished equipment.

5. Additionally, not all USAID missions have access to or use the SCRY Panic App. Moreover, even where available, not all staff were briefed on its use before being locked out of USAID systems. Notwithstanding claims of "robust" security (Exh. 3, ¶ 5), PSCs at high-risk posts, including Kyiv and Jerusalem, reported to me a loss of access to emergency support.

6. Further, my USAID PSC colleagues have been frustrated that the Defendants

in Case 1:25-CV-352 claimed that USAID employees have the "choice" to stay at post beyond the 30-day evacuation period, see Case 1:24-CV-352, ECF # 20 at 17-18, but failed to clarify that this option would come at a significant personal cost.

7. Claims that waivers delaying evacuations may be granted "on a case-by-case basis" have not been meaningful. Defendants have not provided guidance on who qualifies for an exemption, the approval process, or the expected timeline for processing waivers. The Defendants have also not indicated where PSCs posted overseas will ultimately be relocated to in the United States, meaning they cannot begin the search for housing, and those with children cannot start the process of enrolling them in new schools. Further, PSCs have not been given clarity regarding their future employment status, which creates additional challenges for finding housing without the guarantee of continued income.

8. PSCs who would choose to remain at post beyond 30 days will no longer receive what they had before: housing, cost-of-living allowances, and security coverage through the U.S. Embassy. PSCs staying at post would also lose their diplomatic status and immunities, which is a significant status change. Diplomatic status provides important protections in countries where Americans may be targets. There are real risks for PSCs who decide to stay at post. But many of them feel they do not have a "choice." Because of dependents' schooling, familial visa constraints, or personal medical circumstances, PSCs

may need to stay, making their decision to stay more involuntary and not a choice.

9. Further, despite Morocco's claims of progress in resolving financial disruptions (Ex. 3 ¶ 17), USAID's financial systems, including Phoenix and GLAAS, have been inaccessible since early February 2025. I have read the declaration from Walter Doe, attached as Exhibit 4, and confirm that his account of payment issues is consistent with the experiences reported by PSCs at USAID. As a result:

10. Overseas PSC colleagues have reported that USAID-leased residences have faced service disruptions due to unpaid invoices. One colleague shared a USAID mission management notice on February 14, 2025, warning of potential electricity and water cutoffs because utility bills cannot be paid. Another colleague reported her home running on a generator due to unpaid electricity invoices.

11. Reimbursements for both official work travel and personal insurance to which PSCs are contractually entitled remain unpaid. PSCs are owed thousands of dollars–in clear violation of the Prompt Payment Act.

12. The transition for PSCs posted overseas from the General Schedule to the Foreign Service pay scale under AAPD 25-02 has not been fully applied because contracts cannot be modified during the foreign assistance freeze, which is costing some affected PSCs approximately $3,000 per month.

<u>Updates or Additional Harms since Previous Declarations:</u>

13. Numerous domestic and overseas PSCs remain locked out of their email and other USAID systems and have been unable to regain access. As a result, affected personnel cannot complete time-sensitive, work-related administrative tasks, including payroll, contract inquiries, and security-related communications.

14. Several PSCs I know have received unexplained and inconsistent termination letters, while others have been informed secondhand through supervisors of impending contract termination. This lack of direct communication has left many PSCs in a prolonged state of uncertainty, leading to confusion among my colleagues about whether they should remain at post or make immediate plans to depart. Such action also creates further confusion, as it is our understanding that communications regarding contract actions should only come directly from a PSC's Contracting Officer (CO).

15. Additionally, there is ongoing confusion regarding protections extended to PSCs. This lack of clarity has created uneven implementation across U.S. diplomatic posts, leaving some PSCs protected while others remain vulnerable to termination or exclusion from employment benefits.

16. While forced repatriation is ostensibly on hold under the TRO in *American Foreign Service Association v. Trump*, No. 1:25-CV-352, many PSCs remain very uncertain about what would happen if their contract were terminated. My colleagues are grappling with the fact that a 15-day termination notice

for an overseas PSC is simply not enough time to wrap up a life and leave in an orderly fashion. This situation will create significant tension between the AIDAR Appendix D provisions for travel and transportation and the reality of getting people home under such constrained timelines.

17. One colleague told me the Consulate where he works couldn't process export documentation in less than 15 days. If his contract is terminated, he will likely have to leave his personal property behind for others to manage onward packing and shipping arrangements.

18. In practice, this approach is not just unworkable—it is also deeply wasteful. Rushed departures will lead to avoidable costs, abandoned property, and logistical chaos, all of which could be mitigated with a more reasonable approach to repatriation timelines. Agency leadership also confirmed that in their experience they allotted 30 days for overseas termination with repatriation, given the complexity and pressure on Embassy infrastructure.

19. Further, my colleagues also report that PSCs based overseas continue to lack access to key communication platforms needed for emergency coordination and security notifications, creating operational challenges. They are also confused about whether they have been placed on administrative leave despite not receiving any formal communication from their CO about being in such status.

20. Further, many PSCs have long been concerned about the public availability of their personal information—including full names, addresses, and phone numbers—on federal reporting systems such as the Federal Procurement Data

System (FPDS) and USAspending.gov, which is a reality of the PSC contracting mechanism despite a history of efforts to protect personally identifiable information (PII) through waivers. However, the situation has become significantly more alarming with the recent use of this data by the DOGE website, which, as of February 17, began publishing details of terminated PSC contracts. This has resulted in exposing PSCs' identities, locations, and employment statuses in a way that creates serious safety risks. Recognizing the severity of this issue and fearing for my personal safety and privacy rights, I took action by formally requesting a safety exemption that my personal Unique Entity Identifier (UEI) be replaced with a generic UEI in Global Acquisition and Assistance System (GLAAS), in line with the FAR exception contained in ADS 302mbj. I also requested the removal of my previously published personal information from these systems. I have been advised that the freeze on all PSC contract actions will not allow my Contracting Officer or the Office of Acquisitions and Assistance (OAA) to process this request, leaving me at risk.

21. The abrupt publicization of PSC contract terminations on DOGE's website represents an unprecedented new threat to our personal security, and it is unacceptable that individuals should have their personal details weaponized in this way. DOGE's website encourages viewers to draw inflammatory conclusions about these contracts, calling cancellation "savings" and "fraud detection/deletion." Immediate steps are needed to prevent further harm and

ensure PSCs are not put at risk simply for doing their jobs or having entered into contracts in good faith.

22. Further, many PSCs who were required to cover official work-related costs upfront remain unable to submit travel vouchers and other reimbursement claims through normal channels due to system lockouts.

23. Those who have successfully submitted vouchers are facing indefinite delays in processing due to frozen financial systems, with no updates on when payments will be disbursed. Some of these outstanding reimbursements amount to thousands of dollars in personal expenses incurred for official duties.

24. One colleague of mine reported her experience that "reimbursement workarounds," guidance instructing PSCs to submit paperwork via third-party proxies and/or help desks, have proven ineffective. In one case, her simple submission of a process that typically requires 20 minutes took 12 days to resolve, with over 8 hours of effort expended by four individuals.

25. Additionally, PSCs do not receive federal employee benefits such as group health or life insurance. Instead, they receive partial reimbursements against their contracts for their self-paid plans via the submission of an SF-1034. I do not know of any PSC that has received an SF-1034 reimbursement for benefits claimed after January 24, 2025.

26. I am personally owed approximately $2200.00, $1400.00 of which was requested over 30 days ago, a clear violation of the Prompt Payment Act. Some

of my colleagues are owed significantly higher amounts, and one colleague expressed severe anxiety about carrying these balances on his credit card with no known relief date.

27. A majority of PSCs are on contracts with a maximum period of performance of five years and thus reapply for the same or different positions every few years in order to maintain continuous employment and/or to advance to positions with greater responsibilities and higher salaries. PSCs with pending new contracts intended to start after January 24, 2025, have not received those new contracts despite being selected through extensive competitive processes and completing substantial amounts of paperwork necessary to execute those contracts. This creates uncertainty over future employment opportunities and has caused financial loss for those eligible for a substantial salary increase under their new contract.

28. Further, many PSCs have contacted the Association seeking clarity on their status, with no official answers available.

29. A PSC on a Diversity, Equity, Inclusion, and Accessibility (DEIA) contract reported: "I haven't received a termination letter but also haven't been paid this pay period, and I am not sure what to do next. Any information you can provide would be greatly appreciated."

30. A pregnant PSC reported: "I am being denied the ability to apply for Paid Parental Leave, and my OB Medevac [obstetric medical evacuation] request is being delayed, among so many other little details that I'm sure you are living

through."

31. Finally, since the February 3 system lockouts, a climate of paranoia and fear has developed within USAID, making it difficult for PSCs to communicate and coordinate on available resources.

32. Many PSCs have expressed concerns about retaliation for seeking clarity on their contract status, termination notices, or reimbursement claims. Some have stated they feel unsafe discussing their employment situation.

33. The lack of official guidance has fueled speculation and misinformation, further heightening anxiety among PSCs. Without a clear line of communication from USAID or the Department of State, PSCs are left to navigate an uncertain and chaotic situation alone.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 18, 2025.

_____ /s/ Jane Doe

**EXHIBIT 1**

**TO**

**JANE DOE'S DECLARATION**

**OF FEBRUARY 18, 2025**

# EXHIBIT I

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
)
AMERICAN FOREIGN SERVICE )
ASSOCIATION, et al., )
)
     *Plaintiffs*, )  Civil Action No. 1:25-CV-352
)
    v. )
)
DONALD TRUMP, et al., )
)
     *Defendants*. )
_____ )

## DECLARATION OF JANE DOE

I, Jane Doe, declare the following under penalties of perjury:

1.  I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.  I am a U.S. Personal Services Contractor at USAID.

**My position at USAID and the nature of my work**

3.  I am a USAID Personal Services Contractor (PSC) who has worked with the organization for five years. Currently, I serve as a Senior Humanitarian Assistance Officer, but I have previously held multiple leadership positions, including Planning Coordinator and Deputy Leader for Planning on the ████ Disaster Assistance Response Team (DART). My work has spanned high-risk humanitarian responses, including ████ and ████, where I have managed complex operations, coordinated with interagency and international partners, and led strategic planning

efforts. My role requires me to take on significant leadership and oversight responsibilities that directly impact USAID's ability to deliver life-saving assistance in conflict zones and disaster-affected areas.

**My general experience of the USAID shutdown**

4.      Despite having dedicated my career to USAID, I now find myself completely uncertain about my employment status. My experience of the shutdown has been characterized by chaos, uncertainty, and fear.

5.      Late Sunday night, I was abruptly cut off from my USAID email and all related platforms. I received no warning, no stop-work order, no termination notice, and no administrative leave notification—nothing. I simply lost access.

6.      While colleagues who still had access to their accounts received an email at 12:42 AM informing them that the office was closed, I never received that message. I woke up on Monday morning with no guidance—unsure whether I should report to work or whether I even still had a job.

7.      Reaching out to colleagues and supervisors proved difficult, as our primary means of communication—email and Google Chat—were now inaccessible to me. To this day, I have received no official clarification on my employment status. This has left me in an impossible situation where I cannot apply for unemployment benefits, cannot seek independent legal recourse, and have no way of knowing whether I am on administrative leave like some of my colleagues.

8.      On the evening of February 4, colleagues with active USAID accounts informed me that they had received an official email confirming their placement on

paid administrative leave. Since I do not have access to my account, I do not know if I received this email and, therefore, whether I am also on administrative leave or if my contract has simply been terminated without notification.

9.      I do not know if I will be paid for last week's work as I do not have access to the time and attendance site to input my timesheet. My supervisor also does not have access to approve the timesheet. Direct hire colleagues were recommended to reach out to USAID HR for completion of their timesheet. As a PSC, I do not have a centralized resource to provide this service.

10.      I have attempted multiple avenues to clarify my status. I called the IT help desk, which was unable to provide any information. I contacted the HR help desk, which told me they could not assist. I wrote to my Contracting Officer, who has, to date, not responded.

11.      I have dedicated my career to humanitarian assistance and believe deeply in USAID's mission. I have witnessed firsthand how USAID's work impacts lives around the world and strengthens America's global standing. However, the manner in which this shutdown has been carried out is shocking. It was executed by individuals who were neither vetted nor confirmed by Congress, individuals who do not understand the laws, rules, and regulations governing the U.S. Government. Their actions were not only reckless but also illegal, and they endanger the integrity of our institutions.

**The USAID shutdown has already harmed—and will continue to harm— me and other PSCs in the following ways**

12.      The USAID shutdown has caused significant harm to me and my

3

colleagues, both professionally and personally. The abrupt loss of access to work systems, financial uncertainty, and the spread of misinformation have created an environment of fear and instability. If the shutdown continues, these harms will only deepen, leaving many of us without income, legal protections, or the ability to return to our careers.

13. **Personal Safety Risks:** The shutdown could have life-threatening consequences for PSC colleagues serving in high-risk locations. The abrupt shutdown of government devices and access was highly reckless to colleagues in active conflict zones, such as Ukraine and Somalia. Friends and colleagues lost access to the Embassy safety communication channels, and many could no longer use a safety app called "Scry Panic 2.0," which is installed on government-furnished equipment. In addition, many PSCs serving USAID abroad were unsure if they remained under U.S. chief-of-mission authority, which guarantees access to U.S. Government resources to ensure staff safety and accountability, including for emergency evacuations. U.S. Department of State officials, who were tasked with developing a plan to get USAID officials home, had no instructions or information on the next steps.

14. Many USAID PSCs work in high-risk environments where access to security resources is critical. I have heard from overseas colleagues who have now lost access to Diplomatic Security systems, meaning they can no longer coordinate security protocols, evacuations, or emergency procedures. Without official communication from USAID leadership, these PSCs remain in dangerous locations without clarity on whether they still have institutional protection. Others fear that,

in the event of a medical emergency or security threat, they will be forced to rely on personal funds or external assistance, as USAID has not provided guidance on whether existing security protocols still apply to them.

15.     I have heard of PSC colleagues stationed at overseas posts who were blindsided by a general directive on the internet instructing USAID workers to return to the U.S. within 30 days. However, these colleagues have received no official communication, leaving them in limbo regarding whether this directive applies to them. One colleague stationed overseas with their spouse—who is 36 weeks pregnant—has been left without answers on whether they are required to evacuate. Returning to the U.S. at this stage in the pregnancy is medically unsafe, yet they have been given no guidance on their options or support.

16.     PSCs are also at increased risk of physical harm due to the threats, harassment, and misinformation that have accompanied the shutdown. The reckless rhetoric spread on social media and in political discourse has put USAID personnel at risk. I have heard from colleagues who have been labeled as criminals, supporters of terrorists, or Marxists—simply for doing their jobs.

17.     High-profile figures, including Elon Musk and his supporters, have fueled this misinformation, creating a hostile environment where USAID staff fear for their personal safety. With individuals involved in the January 6th insurrection now released, there is a heightened sense of danger that USAID employees could be targeted next. I have colleagues who no longer feel safe in their own homes, with some refusing to leave family members alone out of fear that someone radicalized by online

misinformation may try to harm them.

18.     Many of us are also deeply concerned that our personal information—home addresses, banking details, social security numbers, and phone numbers—has been compromised, significantly increasing the risk of harassment or identity theft. I learned that all of my personally identifiable information has likely been exposed to an unvetted and insecure source who may not hold a security clearance. This unauthorized access to sensitive data creates serious privacy and security concerns, and I have no clear recourse to address the potential risks. Without guidance from USAID or the federal government, I am left vulnerable to potential misuse of my information, including financial fraud, doxxing, or other forms of targeted harassment.

19.     **Loss of Employment Status & Work Access**: I lost access to my USAID email and all related platforms on Sunday night without warning. I received no official communication about whether I had been furloughed, terminated, or placed on administrative leave. Many PSC colleagues experienced the same sudden cutoff, leaving us unable to communicate with supervisors, access critical documents, or even confirm our employment status.

20.     **Financial Harm**:. As PSCs, we are personally liable for many upfront costs, including health and life insurance payments, travel expenses for temporary duty (TDY) assignments, and work-related language training. Under normal circumstances, these expenses are reimbursable under the terms of my contract.

21.     However, since the freeze on foreign assistance and the shutdown of

6

USAID operations, I and many of my colleagues have been unable to process thousands of dollars in reimbursement claims. I have heard of PSC colleagues who have incurred substantial out-of-pocket costs from diplomatic travel—covering hotels, meals, and transportation—who now have no way of knowing if they will ever be reimbursed. USAID still owes some of my colleagues thousands of dollars in reimbursements for travel or health care expenses, but they cannot claim these funds or even confirm when they might be paid due to payment systems being shut down under the Foreign Aid freeze.

22.     With contracting and payroll teams unable or unwilling to process pending claims, thousands of dollars in reimbursements remain unpaid. This is particularly damaging to PSCs stationed overseas, where diplomatic travel costs and emergency preparedness expenses are high. Colleagues who relied on USAID for financial stability are now forced to absorb these costs personally, further exacerbating their financial distress.

23.     Many PSCs are also currently not receiving income. I have heard from colleagues who have not been paid for multiple pay periods in 2024 and have received no response from payroll regarding their missing salaries. Many of these colleagues are overseas and gave up stable jobs with health insurance and retirement benefits to take on PSC roles, only to now find themselves in a war zone with uncertain income, housing, or medical coverage.

24.     One colleague, a senior humanitarian PSC based in East Africa, has gone unpaid for consecutive pay periods, leaving them struggling to meet financial

obligations. This also puts them at risk of filing incorrect taxes, as they have no way of accurately reporting their income. Meanwhile, another colleague has household effects in storage valued at $3,000 that they are entitled to retrieve, but due to the shutdown, the individuals responsible for processing these requests have been furloughed, leaving their property in limbo.

25.     Many PSCs had contracts set to be renewed in 2025 or 2026, providing expected job security. However, with the administration's actions, these renewals are unlikely to move forward, leaving us and our families without future income. I have heard from colleagues who had planned their careers, housing, and family decisions around their anticipated contract renewals, only to now face complete financial uncertainty.

26.     Moreover, with no clear timeline for resolution, PSCs risk long-term unemployment. Additionally, these large-scale staffing and funding cuts will likely drive thousands of PSC staff into a job market that is greatly constricted due to the agency's dismantling, rendering future job prospects uncertain. Some of my colleagues are pregnant or have children about to enter college, but without income, they are now unsure if they can afford essential items or tuition. Others do not own homes or have significant savings and risk losing their housing.

27.     Finally, many of us have worked for years to accumulate paid time off (PTO) for critical life events, such as family planning. Now, even receiving a payout for this accrued leave is uncertain. A colleague who spent years saving their PTO for family planning is now left in a situation where they do not even know if they will be

compensated for the leave they rightfully earned. Other PSC colleagues currently on parental leave could lose this benefit immediately upon termination of their contract, causing significant financial hardship. Furthermore, PSCs who have gradually accrued compensatory time—which can be used in lieu of PTO—will forfeit said time without any payout if their contracts are suddenly terminated, losing dozens of hours in leave earned from overseas travel and other duties.

28. **Disruption of Essential Benefits & Liabilities**: Many PSCs rely on USAID systems to access health insurance information, payroll and tax information, and security resources. Without access to these systems, some colleagues cannot verify whether their health insurance is still active or adjust their payroll settings, such as stopping automatic 401(k) contributions in anticipation of lost income.

29. The USAID shutdown also prevents PSCs from seeking unemployment benefits. PSCs do not receive the same employment protections as direct-hire staff, and because we cannot confirm our employment status, we are unable to apply for unemployment benefits. Many of us are also struggling to seek independent legal recourse, as there has been no formal documentation of termination or stop-work orders.

30. I know of a colleague whose contract was set to be renewed for another year. Despite being in good standing and meeting all performance requirements, their contract modification was delayed multiple times. They returned their signed contract renewal on January 27, but later that day, the contracting team was abruptly told to stop working. As a result, the renewal was never finalized, and the

9

colleague never received any official notice of termination or administrative leave.

31.     They have been left entirely in limbo—without employment, without access to health insurance reimbursements, and without clarity on whether they are even entitled to administrative leave or unemployment benefits. They had been refinancing their home and planning to start a family, all based on their expected income and benefits. Now, they face financial and personal upheaval with no clear recourse.

32.     **Exposure to Legal Liability:** I am an Agreement Officer Representative (AOR) managing a variety of multimillion dollar grants to USAID partners. Per instructions from USAID leadership, I have been explicitly prohibited from communicating with these implementing partners since January 23, 2025. Following this directive, my access to USAID systems was revoked without cause on February 6, 2025.

33.     This has effectively rendered me unable to fulfill my oversight responsibilities as outlined in the legally binding AOR Letters I have signed. Significant, undocumented changes have occurred across these awards due to ongoing disruptions to grant implementation—including partial Stop Work Orders, DEIA activity cancellations, and lapses in payment reimbursements.

34.     Without proper oversight and reporting to the designated Agreement Officers, USAID is in direct violation of its grant management obligations. I am also unable to report instances of fraud, waste, and abuse as required under my oversight responsibilities for these programs, further compounding the lack of accountability

and compliance with federal regulations.

35.     These actions constitute an intentional and fraudulent obstruction of federal oversight processes. There is growing concern among program staff, most of which in my bureau are PSCs, that implementing partners could seek legal recourse directed at their AOR for failure to adhere to USAID contracts.

36.     **Personal & Professional Harm**: The negative press surrounding USAID in the past week, along with misinformation and inflammatory rhetoric from political figures, has made PSCs feel targeted and harassed. I have felt the weight of this hostility, as it created a sense of professional uncertainty and reputational damage. USAID staff—especially PSCs—have been unfairly portrayed in political discourse, further isolating us and making it more challenging to seek external support or new employment opportunities.

37.     **Legal & Contractual Uncertainty**: As PSCs, we have a more vulnerable employment status than direct hire colleagues, yet we regularly take on all of the same responsibilities. My colleagues and I all serve inherently governmental functions. As PSCs, we are potentially subject to contracts that require 15 days' written notice before termination (if performed by the government in good faith). However, given the lack of communication, whether this legal obligation will be honored remains unclear. If USAID chooses to disregard these contracts, it could set a precedent that PSCs can be fired at will. Many of us deeply fear long-drawn-out legal proceedings in the future to acquire what is owed to us under the terms of our contracts, whether it be health insurance reimbursement, travel reimbursement,

regular pay, or payout of accrued annual leave.

**The USAID Shutdown Is Damaging the Agency's Mission**

38.     **Damaged Relationships with Implementing Partners:** Under USAID leadership's directive, we have been forced to ignore our implementing partners, who rely on us for critical updates and program continuity. This has severely harmed professional relationships that take years to build and maintain, undermining trust in USAID and jeopardizing future humanitarian and development efforts. Our inability to provide guidance or acknowledge partner inquiries risks long-term damage to USAID's credibility as a reliable donor and technical partner.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2025.

                                                                    /s/ Jane Doe
                                                                    Jane Doe

12

**EXHIBIT 2**

**TO**

**JANE DOE'S DECLARATION**

**OF FEBRUARY 18, 2025**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                          )
AMERICAN FOREIGN SERVICE                  )
ASSOCIATION, et al.,                      )
                                          )
              *Plaintiffs*,               )      Civil Action No. 1:25-CV-352
                                          )
        v.                                )
                                          )
DONALD TRUMP, et al.,                     )
                                          )
              *Defendants*.               )
_____          )

## FURTHER DECLARATION OF JANE DOE

I, Jane Doe, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I submitted the Declaration of Jane Doe, Compl. Exh. I.  I write to make further declarations as to the Personal Services Contractor Association (PSCA), of which I am an Executive Committee Member.

3.      U.S. Personal Services Contractors (PSCs) are just like direct-hires for virtually all purposes: If you were in the field with us, you would not know who was hired as a direct-hire and who was hired as a PSC. We work together, with direct hires, all as employees of U.S. Agency for International Development (USAID). However, we are not eligible for programs administered by the Office of Personnel Management (OPM), and if we are unjustly terminated, we are not eligible to appear before the Merit Systems Protection Board (MSPB).

4. The programs administered by OPM from which PSCs are statutorily excluded are Federal Employee Health Benefits (FEHB), Federal Employee Group Life Insurance (FEGLI), and retirement programs like Federal Employees Retirement System (FERS). To offer some measure of parity, the Agency for International Development Acquisition Regulation (AIDAR) generally provides for the partial reimbursement to PSCs, subject to annual limits, for individually purchased health and life insurance policies using their post-tax income. USAID has also established a 401(k) plan through which PSCs can make pre-tax contributions but without any matching by the Agency. OPM also manages an awards program for direct-hire personnel across the U.S. government; USAID has an additional awards program in which PSCs do participate.

5. USAID withholds federal and state income taxes for PSCs and issues W-2s.

6. PSCs and their authorized dependents who are posted overseas and PSCs who travel overseas on official business are issued Diplomatic Passports by the Department of State. PSCs posted abroad are also eligible for diplomatic titles.

7. The PSCA is an Employee Non-Labor Organization within the USAID. Established in 1999, the Association comprises PSCs employed by USAID both domestically and abroad. The PSCA, through an elected Executive Committee, advocates for equitable treatment of PSCs and direct-hire employees regarding benefits, entitlements, working conditions, and responsibilities, unless precluded by federal law or regulation.

2

8. Per the Association's charter, all PSCs at USAID are automatically members of the PSCA. The PSCA, then, represents about 500 PSCs stationed overseas in countries ranging from Armenia to Zimbabwe, and around 600 stationed in the United States.

9. The PSCA is governed by an Executive Committee consisting of up to seven individuals, elected from among its membership to serve one-year terms. I am one of those Executive Committee members.

10. The PSCA operates under a formal charter, which establishes its mission, governance structure, and operational framework. The includes regular elections, member engagement, and formal processes for advocacy and policy recommendations to USAID leadership.

11. Major policy shifts or structural changes within the Association, such as the establishment of new initiatives or councils, require approval through a General Assembly vote open to all members.

12. The PSCA has consistently engaged in structured advocacy with USAID leadership, including the Administrator's Office, the Management Bureau and its Office of Acquisition and Assistance, the Office of General Counsel, and the Office of Human Capital and Talent Management, to address critical issues affecting PSCs. The Association has successfully advocated for numerous policy and regulatory changes over the years.

13. The Association's Executive Committee also regularly disseminates information to its members via emails, informational briefings, a public website, and

3

other online resources, ensuring that PSCs remain informed of contractual rights and obligations and to provide updates on policy and regulatory developments.

14. Throughout the year, the PSCA Executive Committee conducts surveys and solicits direct feedback from members to ensure that advocacy priorities align with the most pressing concerns of PSCs. This engagement allows the Executive Committee to effectively represent the collective interests of the membership when interfacing with USAID leadership.

15. The Executive Committee regularly engages with individual PSC members through various channels to ensure timely communication and support. The Committee maintains an open email inbox where members can submit concerns and questions, responding to inquiries as they come in. When necessary, the Committee escalates issues to USAID leadership to advocate on behalf of PSCs. In addition, the Executive Committee regularly engages with the PSC Ombudsman in OAA to exchange information regarding key issues affecting PSCs.

16. When PSCs engage with the Executive Committee, they do so with the understanding that the committee's members serve on a volunteer basis. The Executive Committee does its best to source recommendations based on documented past experiences, but its advice is neither legal nor binding in nature.

17. Beginning on February 2, 2025, members of the Executive Committee were progressively locked out of their USAID email accounts, Google Drive, and other collaboration platforms. Hundreds of the Association's members similarly lost access to the USAID network. Specific to the needs of the Executive Committee, this abrupt

action resulted in the total loss of access to historical records, prior advocacy documentation, internal communications, and, most critically, its membership roster and listserv. Consequently, from February 3, 2025, onwards, the Executive Committee has been unable to formally and thoroughly consult the Association's membership on next steps, including possible legal action.

18.     The forced, unannounced removal from USAID systems also meant that the Executive Committee faced great difficulty in re-establishing its operations in an external setting. Some Executive Committee members did not even have each other's personal contact information because all prior communication was conducted through government-provided platforms. It took several days for the Executive Committee to reconnect and determine how to re-establish its operations outside of USAID systems without access to its membership roster or other records. USAID's decision effectively cut off all avenues of communication between the Executive Committee and its members and preemptively halted any potential response from the Association.

19.     Under normal circumstances, if PSCs were considering legal action or seeking collective legal representation, the Executive Committee would initiate a General Assembly vote to ensure full participation of its membership in determining the collective stance of the Association. Due to the abrupt USAID-imposed systems lockout, however, the Association lacks a mechanism to notify or convene members and thus cannot conduct a vote of its full membership.

20.     Given the impact of USAID's actions on the workforce, I would have recommended that the PSCA formally join this litigation as a plaintiff. Because PSCs

are identically situated to USAID direct-hires in nearly all respects, including those relevant to this case, PSCs have the exact same interest in this litigation as their direct-hire colleagues represented by the American Foreign Service Association and the American Federation of Government Employees. The Association and its members have suffered the same harms, including loss of access to essential communication channels, loss of safety, and sudden changes to employment-related rights without consultation or recourse. USAID's actions have, therefore, directly prevented the PSCA from exercising its representative function.

21.    We are hamstrung: The Administration has cut off our way of communicating with each other. The PSCA exists to help protect and advocate for the rights of PSCs, ensuring that they receive fair and equitable treatment by the agency. The recent actions of the agency have severely curtailed the Association's ability to fulfill this mission, leaving PSCs vulnerable and without proper collective representation in this matter.

22.    I respectfully ask the Court to afford any such relief that it affords to direct-hire employees also to U.S. Personal Services Contractors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2025.

/s/ Jane Doe_____

Jane Doe

6

EXHIBIT 3

TO

JANE DOE'S DECLARATION

OF FEBRUARY 18, 2025

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN FOREIGN SERVICE
ASSOCIATION, *et al.*,

      Plaintiffs,

v.

PRESIDENT DONALD TRUMP, *et al.*,

      Defendants.

Civil Action No. 1:25-cv-00352-CJN

I, Pete Marocco, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2.     Since Thursday, January 30, 2025, I have performed the duties and functions of both Deputy Administrators of the United States Agency for International Development ("USAID" or the "Agency"). I manage the day-to-day operations at USAID including personnel matters and operations. Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State. Previously, I served as a United States Marine and as a Deputy Assistant Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

3.     Under U.S. law and Presidential directive, all U.S. executive branch employees overseas on official business are under the authority of the Chief of Mission unless they meet

limited exceptions not applicable here.  Such executive branch employees are under the direction, coordination, and supervision of the Chief of Mission.  *See* 22 U.S.C. § 3927.  Under this authority, the Chief of Mission is responsible for the security of the executive branch employees and their eligible family members.  Additionally, the Secretary of State maintains security responsibility for these employees and their dependents, and also has responsibility to develop policies and programs to provide for their safe evacuation when their lives are endangered.  *See* 22 U.S.C. § 4802.

4.      Any USAID employee who is assigned to a post overseas would continue to fall under the authority of the Chief of Mission until such time as they depart post either for their new post of assignment or a designated location for separation.  This includes employees who are on administrative leave.  The Chief of Mission in a given country will be responsible for taking steps to ensure the safety of the individuals under his or her security responsibility.

5.      The Department of State, through Regional Security Officers (RSOs) overseas, maintains robust and thorough security programs to protect these personnel and their families. While the Department of State provides posts with standardized guidance for security programs, at the direction of the Chief of Mission, security personnel manage locally tailored programs that reflect each Mission's particular safety and security needs.

6.      Staff working at all diplomatic missions are protected through residential, personal, and physical security programs.  In general, personnel worldwide are equipped with two-way radios that connect to Post One for 24/7 communications in the event of an emergency, or for conducting on the spot and regular safety checks with staff and their dependents.  Mission staff are also required to prepare phone trees and mission directories for call down exercises that include both personal and government phone numbers, email addresses, and other means of

2

communication such as private messaging apps.  Post also utilizes the SAFE Alert system which provides electronic messaging to staff with security and safety alerts.  SAFE is a cloud-based emergency notification system that empowers overseas Posts to report events and operational status using SMS, email, phone, and IM (via mobile app) – from the field. It pushes notifications to Department devices and, if opted, personal devices.  Each USAID Mission is equipped with "Go-Bags" for staff to use while going on field visits.  Each "Go-Bag" includes personal tracking locators, satellite phones, first aid kits, and basic survival equipment in the event the staff member becomes captured, lost, or injured.  Posts continue to provide the same security services that were in place before any direct-hire employees were placed on administrative leave in February 2025.

7.      The Department of State maintains USAID connectivity and access to Scry Panic and SAFE, and to otherwise ensure that USAID personnel, like all personnel, have access to communications needed for their security and safety.  When an emergency occurs, one of the top priorities of Department of State is determining the welfare of Mission personnel, family members, and other individuals affiliated with the Mission.  Two of the tools the Department uses to accomplish this are SCRY Panic and SAFE.  When a SCRY Panic user hits the panic button, the app can activate geospatial tracking and initiate a Diplomatic Security response.  It is a situational awareness application designed specifically for all Chief of Mission Personnel, including EFM and Locally Employed Staff. SAFE, Safety and Accountability For Everyone (SAFE) is the Department's enterprise solution for emergency notification and accountability.  In addition to general communications, security procedures and resources continue in full and without exception, regardless of leave status, for all personnel under Chief of Mission authority.

3

8.      A recent example of the use of these communication systems is the Democratic Republic of Congo (DRC), where the U.S. Embassy in Kinshasa is currently on ordered departure because of political unrest.  Over 100 personnel, including dozens from USAID, were evacuated from Kinshasa starting on January 29, 2025.  All of these personnel were evacuated in keeping with established safety and security procedures and in the same manner as afforded to other U.S. government personnel.

9.      As the security situation in DRC deteriorated leading up to an ordered departure, USAID personnel - including those on temporary duty- were being contacted through the SAFE alert emails from Post as well as through messages in a WhatsApp group messaging platform. On-the-ground reports indicate that communications appeared to be going through without issue and regardless of administrative leave status, and staff or their dependents retained access to their phones to include the Scry Panic App.

10.     USAID staff posted to DRC were contacted through the DS Safe Alert system, as well as through phone trees, text messaging, and outside platforms such as WhatsApp group messaging. Cursory review showed that USAID personnel still had access to information provided via the Scry Panic app, regardless of their leave status, through other means of communication with Post.  Communication was clear, consistent, and without disruption which led to a successful evacuation.  All USAID employees and their family members from the DRC were welcomed by a USAID landing team at Dulles Airport in Dulles, Virginia, and were provided a host of necessities and care packages upon their arrival to the United States.   As a continued commitment to the safety and security of all USAID employees and their family members, USAID conducted a thorough review and immediate action was taken to rectify any telecommunication disruptions that may have impacted USAID personnel.

4

11. We plan to allow individuals who are placed on administrative leave in the future, and who remain at post, to retain access to communications systems that will ensure that they can be in contact with Mission security personnel, and to ensure that appropriate measures are in place so that USAID employees and their family members remain safe and secure. Examples of such measures include restrictions on travel to certain parts of a city or country, requirements to travel in armored vehicles, and curfews. Access to Department-issued mobile devices will facilitate continued connectivity to the DS SAFE Alert System, Whatsapp, Signal, and the Scry Panic App, and other messaging apps as needed, so that staff can continue to receive updates from and communicate updates to post. Chiefs of Mission are directed to issue clear policies and directives that are consistent with U.S. law and apply consistently across all agencies with employees under Chief of Mission authority.

12. When a U.S. executive branch employee is assigned overseas, the employee is eligible for allowances in accordance with U.S. law and as regulated by the Department of State Standardized Regulations (DSSR). The Secretary of State has delegated authority to establish the regulations and rates for overseas allowances consistent with the statutory authorities. Individual agencies may issue further guidelines within the scope of the regulations.

13. In accordance with DSSR 040i, an "employee" for purposes of the DSSR means an individual employed in the civilian service of a government agency (including ambassadors, ministers, and members of the Foreign Service of the United States under the Department of State); who is a citizen of the United States, officially stationed in a foreign area; who is receiving basic compensation; and who meets the eligibility requirements of DSSR subchapter 030 to receive allowances or applicable differential payments (additional monies over basic compensation for designated hardship posts).

14.    USAID employees assigned to an overseas post who are approved to remain at their post of assignment under U.S. orders, even while on administrative leave, and are receiving basic compensation, would continue to qualify for the allowances and differentials currently applicable to the employee (to include those relating to cost of living, education, hardship, danger).  Consistent with the DSSR, USAID would continue to fund the applicable allowances for each USAID employee until such time as the employee leaves the post under permanent change of station (PCS) orders for a new post of assignment or to the employee's selected location of separation.  Thus, if an employee currently qualifies for an education allowance, that allowance would continue while the USAID employee remains at post and is receiving basic compensation.  Likewise, if the employee qualifies for certain quarters allowances, including those relating to utilities, those too would continue.

15.    An employee who is directed to depart post and fails to do so, including those who choose to stay beyond the 30 day period to leave the country and who do not receive a waiver, would no longer be "officially stationed overseas" and would not meet the definition of employee under the DSSR as described above.  Such an employee would no longer qualify for allowances applicable to the assignment in a foreign location.  There may be some flexibility to allow children to continue in a school if the employee or post already paid for tuition through the current school year consistent with the authorized education allowance (see DSSR 270).  However, the family would be responsible for providing for their own housing and personal expenses, and would need to comply with applicable visa and related requirements. These individuals would therefore not qualify to receive the protections described in paragraph eleven above.

6

16.     When considering the transfer allowances available to an employee departing a post, either for their next post of assignment or to their selected location of separation, there are some statutory limitations on which  employees may receive the Home Service Transfer Allowance (HSTA), which covers the extraordinary, necessary, and reasonable expenses, not otherwise compensated for, incident to an employee establishing him or herself from an overseas post to a post of assignment in the United States.  As is the case for all U.S. government employees, employees on administrative leave would only be eligible to receive the HSTA consistent with 5 U.S.C. 5924(2)(B), if "*the employee agrees in writing to remain in Government service for 12 months after transfer, unless separated for reasons beyond the control of the employee that are acceptable to the agency concerned.*"  USAID has discretion to pay the HSTA for those separated involuntarily by the agency, but not for those who voluntarily separate.  This would include, for example, employees who voluntarily opted into the Deferred Resignation Plan.

17.     Due to changes in the process by which payments can be made and approved by the Agency over the past weeks, there have been delays in processing certain payments, including certain allowance payments to USAID employees.  However, USAID is working diligently to address these delays.  For example, on February 13, I approved access to the USAID system for processing outgoing payments for a number of USAID employees and lifted certain additional layers of review for certain routine payments to employees, including many allowance payments.  This will allow USAID to more expeditiously process payments using Title II funds, including many payments of allowances to employees, going forward.  Although these delays could continue to impact certain payments to employees in the immediate future, an employee's leave status would not itself impact the timing or eligibility for such payments.

7

18.     Additionally, the Department has operationalized a Coordination Support Team with more than 40 active participants and more than 200 total standing by with communications about how they can support any USAID personnel and dependents who desire to return to the United States.

19.     The information provided in this declaration is applicable to direct-hire employees.  Personal Services Contractors were not placed on administrative leave.

I declare under penalty of perjury under the laws of the United States that the information in this declaration is true and correct.


                                                    /s/ Peter Marocco
                                                    _____
                                                    Peter Marocco
                                                    PTFD Deputy Administrator, USAID
                                                    February 14, 2025

EXHIBIT 4

TO

JANE DOE'S DECLARATION

OF FEBRUARY 18, 2025

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                             )

AMERICAN FOREIGN SERVICE  )
ASSOCIATION, et al.,            )
                             )

              _Plaintiffs_,    )     Civil Action No. 1:25-CV-352
                             )

           v.                 )
                             )

DONALD TRUMP, et al.,      )
                             )

              _Defendants._   )
_____ )

## DECLARATION OF WALTER DOE

I, Walter Doe, declare the following under penalties of perjury:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am a member of the American Foreign Service Association.

3.     I have worked for USAID for over fifteen years. I currently serve overseas as a controller. In that role, I am responsible for disbursing payments to partners (like recipients of USAID grants), vendors (like cell phone companies and other local service providers) and USAID employees. Each overseas mission is assigned a controller who is trained, designated and formally appointed before being registered with the US Treasury.  Once designated, certifying officers are legally responsible for ensuring that payments comply with appropriation laws and other financial controls

4. On January 20, based on the president's executive order on foreign financial assistance, I stopped certifying payments in compliance with the immediate pause on new disbursements. Certification is the step through which authorized payments are transmitted to the Treasury Department to be paid.

5. On January 24, we received a State Department cable (25 STATE 6828) that "required the immediate issuance of stop-work orders" but also provided further instruction about the foreign assistance freeze, including a list of waivers. One of these waivers covered "salaries and related administrative expenses including travel for USAID employees, including their living and operating expenses (residential rent, communication, insurance, etc.). A second waiver allows payments for "legitimate expenses incurred prior to January 24 under existing awards or legitimate expenses associated with the stop-work orders." Pursuant to this directive, I began trying to certify certain approved payments (including for employee expenses) using our electronic payment system called Phoenix.

6. However, shortly after beginning to attempt to certify payments again, I noticed that the Phoenix system wasn't functioning the way it had in the past. Previously, after certifying a payment, I would be able to track its progress from Phoenix via the Treasury Department to the bank for final disbursement, but starting around January 27, the initial certification step would work but then the payment would remain in my payment queue and never finish processing.

7. Over the next several days, I and the other controllers responsible for processing payments tried to determine what was happening. We repeatedly asked

our main counterpart in Washington, the Acting Deputy Controller, for updates and guidance only to be told repeatedly throughout the week of January 27 to "stay tuned for further updates" as he was working with the Office of the Administrator on solutions. On January 30, I emailed him with my concerns and advised that "whoever transmits the M/CFO batches to Treasury and State should understand that the certifying officers take responsibility for their payments." At this point I was growing concerned because invoices were passing their due dates and we were not able to pay them.

8.     Every single payment that I tried unsuccessfully to process after January 27 was for an expense incurred before January 20. Most of the payments I have been trying to process were for expenses incurred in November or December of 2024. These included large payments to partners who bill us every month for the work performed in the previous month, as well as smaller administrative items like cell phone and other utility payments, travel reimbursements, and rental payments.

9.     On February 3, the situation changed yet again. As of that date, every time I tried to hit the "certify" button to begin a disbursement, I received an error message stating that I did not have authority to proceed. I contacted Phoenix Security to inquire if there was a technical problem in the system and was told "on Friday January 31, we were instructed to remove the ability to certify payments." They did not indicate who instructed them, only stating "Unfortunately I am unable to reverse this decision."

10.    On February 5, all USAID controllers received another diplomatic cable

3

indicating that USAID personnel could no longer process payments themselves but must request approval from a Senior Bureau Officer before forwarding the payment packages for processing. However, as of February 11, nobody can agree on who is the appropriate SBO for USAID payments and the State Department hasn't processed a single payment based on the new procedure.

11.     As of February 9, when I try to log into Phoenix, I receive a new error message stating that my sign-in attempt has failed. I have even less access to Phoenix after the February 7 court order than I did before that date.

12.     I have been in touch with many colleagues and all report the same experience. To my knowledge, worldwide there are no USAID financial management personnel, including controllers, that can access Phoenix.

13.     I have not been able to process payments under any of the waivers included in the January 24 cable, including legitimate expenses incurred prior to January 24 under existing awards or those for employee operating expenses. Though the waivers exist on paper, in reality all USAID funds have remained frozen because of technological barriers added to the system, I don't know by whom. Phoenix will not let us disburse anything.

14.     After three weeks of nearly a complete freeze, we have pending payments to partners in the country where I serve amounting to $3.8 million including $1.3 million in overdue payments which are incurring interest per the Prompt Payment Act. We also have pending administrative payments of $0.2 million, including one residential lease for a colleague which expires on February 14

4

and two school tuition payments for children of American colleagues who serve here with me. Now that we are locked out of Phoenix, our voucher examiners can't even work on the payment requests that continue to come in from partners and vendors let alone make any effort to move them through the disbursement process.

15.     We typically disburse $6-9 million per month for USAID activities "from the American people" in the country where I serve.  These payments go to local NGOs and small businesses as well as US-based partners who have worked with us for many years.  Due to uncertainty about the stop-work order and fear that payments may never resume, these partners have already laid-off staff and face potential bankruptcy.  It is legally and morally wrong to continue withholding payments from partners who completed work in good faith in November and December.  Furthermore, it is dangerous for the health and safety of my colleagues overseas to withhold payment for their housing, insurance, cell phones, and other basic needs.  It is also worth noting that employees are owed for travel they completed before January 20, which contributes to their anxiety as they face an uncertain financial future.

I declare under penalty of perjury that the foregoing is true and correct.

    Executed on February 11, 2025.


                    /s/ Walter Doe
                    Walter Doe

                    5

# EXHIBIT 13

**25-cv-469-CJN**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PERSONAL SERVICES<br>CONTRACTOR ASSOCIATION, | ) )<br>) )<br>) | Case No. 1:25-cv-469-CJN |
| *Plaintiff*, | ) )<br>) | |
| v. | ) )<br>) | |
| DONALD TRUMP, et al., | ) )<br>) | |
| *Defendants*. | ) )<br>) | |

## SECOND DECLARATION OF GREGORY DOE

I, Gregory Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration. I have personal knowledge of the facts stated in this declaration.

2. I am a USAID Contracting & Agreement Officer (CO/AO) stationed at a large and complex USAID mission overseas.

3. In February 2025, I was placed on administrative leave with the possibility of termination as part of the administration's stated goal of abolishing USAID.

4. On March 28, 2025, I received the global RIF memorandum sent to all USAID personnel worldwide under Jeremy Lewin's signature, via an email with the ominous subject line "USAID's Final Mission." A true and correct copy of the "Final Mission" email is attached as Exhibit A.

5. As part of the global RIF and USAID's destruction, I will be repatriated on June 15 and terminated effective July 1.

6. As COs/AOs, we are delegated with contracting authority to negotiate on behalf of the U.S. government. It is also our delegated responsibility to terminate the awards assigned to us, on the rare occasions this is needed—if those terminations do not violate the law.

7. As described in paragraphs 7-8 and 14-25 of my March 2, 2025 declaration (Dkt. 20-5), beginning on February 9, 2025, COs/AOs were instructed by Jami Rodgers and Jeremy Lewin, a DOGE team member, to carry out mass terminations of USAID foreign assistance awards grouped into a series of "tranches" and assigned to the individual COs/AOs responsible those awards.

8. When sending his USAID grant termination emails, Jeremy Lewin used the email address Jeremy.Lewin@cfpb.gov.

9. COs/AOs were directed to track the terminations on live spreadsheets. Exhibit B to my declaration is a true and correct copy of an email from Jami Rodgers sent on February 10, 2025 that includes links (now inactive) to the "trackers" for tranches 1 and 2.

10. The February 10 Rodgers email (Exhibit B) instructed COs/AOs not to proceed with terminations for awards that fall under "Humanitarian Assistance, PEPFAR, or any other relevant approved waivers, or statutorily required activities." Instead, we were instructed to "flag" those awards on the trackers. As described below, almost all of the flagged awards were later terminated en masse, including numerous (likely hundreds or more) awards identified by the COs/AOs as statutorily required activities.

11. Rodgers also included his February 10 email a link to a template electronic termination notice with generic language and instructed COs/AOs to download and use the generic template to terminate awards via email. He also stated that "COs/AOs will need to follow up with more robust and detailed messaging for each award. Further guidance on this and

additional templates are forthcoming." However, COs/AOs never received either "further guidance" or "more robust and detailed messaging" to send to our implementing partners whose awards we were instructed to terminate.

12. Over the next two weeks, we received a total of six tranches of awards to terminate or flag and recorded the information in the linked "trackers." Exhibit C to my declaration shows part of a live tracker. The third column, "Termination Confirmed," shows information entered by COs/AOs about each award. For terminated awards, we recorded the termination date. For flagged awards, we recorded the specific reason we had not terminated the award, for example, because the award fell under the waiver or was a statutory requirement, or if were waiting for guidance from USAID's general counsel. As shown on Exhibit C, COs/AOs flagged many awards because they were statutory requirements.

13. COs/AOs had numerous concerns about and objections to the contract "review" and termination process being directed by the DOGE team and other political leadership, which we sent to leadership in writing. Jami Rodgers's February 10 email (Exhibit B) includes a link to use to submit questions, which COs/AOs used. COs/AOs also sent emails back to Jami Rodgers and Jeremy Lewin using "Reply All."

14. As COs/AOs, our objections to the award termination process included but were not limited to: (a) the DOGE team and other political leadership were instructing us to send generic termination notices containing template language notifying awardees that their awards had been determined to not be in the "Government's interest" when COs/AOs had made no such determinations; (b) COs/AOs and CORs/AORs responsible for USAID awards, who have intimate knowledge of the awards' purposes, activities, statutory bases, outcomes,

and efficacy, had no role in the award "review" process; (c) although we were told many times that we would receive further guidance in writing with an explanation of the criteria, rationale, and procedures being applied to terminate awards, we never received any memo, email, or other document outlining any justification or rationale for the terminations or the criteria applied to determine that thousands of USAID awards and contracts funded by congressional appropriations were not "in the Government's interest"; and (d) as the COs/AOs holding the legal warrants to administer awards, we could be held personally liable for terminations carried out in violation of federal or local law or the United States Constitution. We felt that our warrants were being commandeered by the DOGE team and Agency leadership for unlawful and unconstitutional activities, with the intent to abolish USAID.

15. On February 26 , 2025, COs/AOs were informed that political leadership had completed the "review" and that thousands of USAID awards were slated for termination. COs/AOs raised numerous questions about the final review award announcements. The March 2, 2025 email from a CO to Jami Rodgers attached to my March 2 declaration  is one example.

16. The final terminations were carried out above our heads, in emails sent from a generic Department of State email address (aopefagrantspolicy@state.gov), with generic content stating that the recipient's USAID award was being terminated "for the convenience and the interest of the U.S. Government" at the direction of Marco Rubio and Peter Marocco, based on a determination that the award "is not aligned with Agency priorities" and that continuing with the program "is not in the national interest." The email ends "Thank you for partnering with USAID and God Bless America." An example of the mass termination emails is attached as Exhibit D.

17. The mass termination of USAID foreign assistance awards includes at least hundreds and probably thousands of foreign aid programs and policies authorized by Congress and for which Congress has appropriated billions of dollars of funds. As described in paragraph 27 of my March 2, 2025 declaration, at my own mission overseas, the terminations include awards that had been granted waivers for life-saving Humanitarian Assistance, President's Emergency Plan for Action and Relief (PEPFAR) and non-PEPFAR health support across the whole affected region. Almost half of our total awards for our host country fell under a waiver. These programs were terminated, reactivated, and then terminated again. Per communications from our awardees, both small local organizations and larger international development organizations are now going bankrupt.

18. The claim that a "thorough" or "rigorous" "review" was conducted prior to the mass termination of thousands of USAID foreign assistance awards is ridiculous. First, as pointed out in my March 2, 2025 declaration, as a Senior Fellow for the Center for Global Development, Charles Kenny, observed on LinkedIn: "Between 2/18 and 2/16 Secretary Rubio 'made a final decision with respect to each award, on an individualized basis', to terminate 8,644 State and USAID awards. That's about one award every minute and twenty seconds. (Based on 758 State + 498 USAID contracts terminated as of 2/18, 4,100 State and 5,800 USAID terminated as of 2/26.)"

19. Second, no COs/AOs, CORs/AORs, bureau chiefs, or other USAID personnel with even a minimal understanding of the awards' purposes, activities, budgets, efficacies, or statutory bases participated in the "review" process.

20. Also, according to Peter Marocco's February 25 declaration, the review was based on one line of data on a spreadsheet where the only information was the award amount, subject

matter, and a description that "often" included project location." This information cannot support a "thorough," "rigorous," or thoughtful review of a foreign assistance award to determine whether it is in the interests of the American people. The information also omitted consideration of whether the program carried out congressionally mandated activities or obligated funds appropriated by Congress that the Agency is required to spend.

21. Next, according to Marocco, after the first superficial review, done with no regard for congressional mandates, a "senior policy official" "confirmed" that the termination was consistent with U.S. foreign policy and USAID priorities. These "senior policy officials" did not consult with AOs/COs, AORs/CORs, or bureau chiefs about the awards and therefore could not have understood the awards' purposes, activities, budget, efficacies, or statutory bases. Marocco also does not explain how brand new "senior policy officials" were able to "confirm" the terminations were proper based on one line of superficial information on the DOGE spreadsheet. Additionally, congressional mandates were, once again, wholly disregard.

22. Marocco also states that the results of the "review" were then routed to him, to consider "institutional and diplomatic equities," which might lead the continuation of an award "for a variety of foreign policy reasons, such as the location of the project or the general subject matter, or the judgment and foreign policy perspectives of the second line reviewer." Marocco does not identify what criteria he applied or what information he took into account, and there is no suggestion that he considered any information about awards other than the one line of vague and superficial information on the DOGE spreadsheet.

23. After Marocco green-lit the terminations, they went to Secretary Rubio. According to Marocco, Secretary Rubio's "personal involvement confirmed that termination decisions

were taken with full visibility into the unique diplomatic, national security, and foreign policy interests at stake vis-à-vis foreign assistance programs." However, Marocco does not explain what Secretary Rubio did or describe what information he considered. It sounds like all Rubio did was consider a project's location, and this does not "confirm" to me and should not "confirm" to anyone that the decisions were taken "with full visibility" into anything. Marocco does not even state whether Rubio reversed any termination decisions or, if he did, whether reversals were based on anything other than location. It seems doubtful, since Rubio had almost no information in front of him and awards were terminated every one minute and twenty seconds.

24. My interpretation of the process described in Marocco's declaration is this: 1. the "policy staff" (DOGE team) generated spreadsheets with one line of vague information about USAID foreign assistance awards funded by Congress, which often did not even include the project's location(s); 2. based on that superficial information, "policy staff" (likely also the DOGE team) decided whether a program was consistent with the President's "foreign policy priorities" (with no consideration of congressional mandates); 3. a "senior policy official" with minimal-to-no understanding of the awards used unspecified information to "confirm" that ending the program was consistent with U.S. foreign policy (again, as determined by policy staff, not by Congress); 4. Marocco used the same superficial information to decide "institutional and diplomatic equities" (which again did not consider congressional mandates); and 5. terminations then went to Rubio, who considered "diplomatic, national security, and foreign policy interests" of the administration and reversed the termination of an unknown number of awards (which could be zero).

25. I am aware of no email, declaration, memo, or other document, or any statement by USAID

or State leadership, which in any way shows that USAID or State considered congressional mandates in terminating awards. In fact, I have only seen evidence of the opposite, that leadership disregarded congressional mandates and terminated thousands of foreign assistance awards against the express will of Congress. This includes but is not limited to: (a) as exemplified in Exhibit C, leadership terminated numerous awards flagged by responsible COs/AOs as statutorily mandated, including awards flagged by me for PEPFAR and other statutorily-mandated activities; (b) leadership disregarded objections by COs/AOs that the terminations included statutorily-mandated activities; and (c) it has been widely shared at high levels, and then to AOs/COs and others, that congressional mandates are not being honored.

26. While the awards were being terminated, to accelerate the complete dismantling of USAID, Jeremy Lewin sent the ominously titled "Final Mission" memorandum to all USAID Personnel, sealing the fate of the Agency. The memorandum announced the termination of nearly all USAID employees worldwide, in a final Reduction in Force with virtually no one spared. This was followed by individualized RIF notices filled with inaccuracies and inconsistencies detrimental to our rights and claims to be considered eligible for future job prospects under the Agency Career Transition Assistance Program (CTAP).

27. To add insult to injury, my individualized letter (attached as Exhibit E) contained inaccurate data such as an incorrect Service Computation Date (SCD), which was dated back to several decades, recording years of performance that doubled my actual years of performance, creating a risk of miscalculating my severance benefits to the detriment of the Government. Based on discussions with my coworkers, the majority of our individualized RIF notices also contained inaccurate performance ratings, including mine,

which incorrectly states "FS 2024: Satisfactory/Mid-Ranked" when my actual rating for FS 2024 was "Satisfactory/High-Ranked." These were massive procedural irregularities with these notifications, and we had no basis to believe that our retention standing was calculated fairly and in accordance with applicable regulations. In addition to other errors, the data on Tenure Group classification disregarded our Tenure Appointments, in my case, classifying me as Tenure Group 3 as opposed to Tenure Group 1. I had to write a long and comprehensive ticket to request corrections to the information in my RIF letter.

28. USAID is being gutted from the inside as there was no retention register, or a summary of one's comparative standing and placement, including point totals or ranking methodology. There was no clarification as to the Competitive Level (e.g., Competitive Level 2996)— what the designation signifies, how it is defined and how employees were assigned to these levels. Also notable is the absence of a formula and methodology used to calculate my Adjusted SCD, including the performance rating conversion, applicable credit years, and weighting applied.

29. There are clear deviations from Regulatory Requirements as it appears the Agency's current RIF process departs from the required Foreign Service procedures and policy framework, including ADS 454.3.3 and 453.3.4. These mandate consideration of the following in establishing retention registers: Tenure Group Creditable Service Performance, Overseas Service Language Proficiency, Promotion Eligibility Awards. However the RIF letter is inconsistent in that it first states retention registers are based on "veterans' preference, career status, performance, overseas service, and creditable government services" but then contradicts this by stating that "overseas service, promotion credit, and awards" were excluded. Foreign Service Act 6110 prohibits use of RIF

authority in an inappropriate or procedurally deficient manner.

30. As stated in my March 2, 2025 declaration, the impact of terminating awards, including more than a thousand personal service contracts, is the dismembering of USAID. Harm is being done as we speak to countless lives, without sound justification or the documentation required by rules and procedures authorized by Congress and in violation of congressional appropriations.

31. In the ordinary course of business of USAID, it is customary for overseas Mission Directors (MDs) within a specific USAID bureau (e.g. the Africa Bureau or Asia Bureau) to participate in phone calls with USAID leadership in Washington D.C. It is also customary for MDs to provide "read-outs" of these calls and for those read-outs to be shared either verbally or through reliable written communications channels to other USAID employees.

32. On April 1, 2025, I received a read-out of key points from an April 1 Asia Bureau call between MDs and USAID's Office of Human Capital and Talent Management (HCTM). Per this read-out, the statements made by HCTM to Asia Bureau MDs included:

   a. Every USAID position was being eliminated; 100% of agency has already been RIF'd or will be.

   b. There will be no retention register, so employees should focus on things to make sure they are getting the right benefits (e.g. that we are being off boarded with the right information).

   c. The RIF letter was sent to all USAID personnel, including over 600 overseas Foreign Service Officers.

   d. 3500+ got July termination dates.

   e. Employees retained to September are expected to close out, off board and shut

down the agency.

f.  COs are not being extended to September because the intent is to close all programmatic work by July 1. Anything left is to transfer to the State Department.

g.  HCTM advised DC leadership on the potential fallout of shutting down overseas missions and global mass layoffs that violate local laws related to labor and compensation, but "decision made."

h.  The intent is to bring employees back to the U.S. for at least 2 weeks before their separation dates for any final check out matters.

i.  For Foreign Service Nationals, there will also be a 100% RIF by no later than August 15, since no Americans should be overseas by then.

j.  State will probably also go through a RIF with notices sent out this week. The total number of Foreign Service Nationals to be RIF'd is over 10,000.

k.  450 people submitted retirement paperwork; 800 are retirement-eligible.

l.  PSCs are not handled by HCTM but the timing will be similar to the rest of employees who are all RIF'd.

m.  These are unprecedented times. HCTM recognizes it is hard to close down an agency and the work of our careers and that it is exhausting, intense, demoralizing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 11, 2025.

  /s/ Gregory Doe



**Exhibit A**

## USAID's Final Mission

**USAID Office of the Administrator** <usaid_fo@subscribe.usaid.gov>    Fri, 28 Mar
To:

# SENSITIVE BUT UNCLASSIFIED




**FROM THE OFFICE OF THE ADMINISTRATOR**

**MEMORANDUM TO ALL USAID PERSONNEL**

DATE:              March 28, 2025

SUBJECT:        USAID's Transition to the State Department

Dear USAID Colleagues,

I am writing to share important updates about the future of USAID. Our leadership team is committed to providing as much information as possible in an open, conscientious, and thoughtful manner.

As Secretary Rubio has said, following congressional consultations, the State Department intends to assume responsibility for many of USAID's functions and its ongoing programming. This transfer will significantly enhance efficiency, accountability, uniformity, and strategic impact in delivering foreign assistance programs – allowing our nation and President to speak with one voice in foreign affairs. It will also obviate the need for USAID to continue operating as an independent establishment. Accordingly, the Department will seek to retire USAID's independent operation, consistent with applicable law.

As part of that process, substantially all non-statutory positions at USAID will be eliminated. As a result, USAID personnel globally will be subject to a consolidated Reduction-In-Force ("RIF") action. Within the next few minutes, USAID personnel will

begin receiving RIF notices via email. These notices will specify one of two final separation dates: July 1, 2025, or September 2, 2025.

This RIF action is part of a multi-step process for the merger with State:

- In the next three months, we will work closely with the State Department to build their capacities to assume the responsible administration of USAID's remaining life-saving and strategic aid programming.
- During this period, the State Department will assess its needs and conduct a separate and independent hiring process, which will be available for eligible USAID employees. Overseas personnel will be offered safe and fully compensated return travel and other arrangements.
- By July 1, 2025, the State Department will have assumed responsibility for USAID's remaining programming, and many of our colleagues will depart for State or other opportunities.
- The remaining USAID personnel will then supervise the responsible decommissioning of USAID assets and the wind-down of the Agency's independent operations. By September 2, 2025, the Agency's operations will have been substantially transferred to State or otherwise wound down.

We will follow up with additional guidance but please find below some preliminary key information:

- **State Department Hiring Process:** A separate process will be established for hiring personnel into available roles at the State Department. While the details are still being finalized, we are committed to sharing additional information as soon as it becomes available, likely in April or May.
- **Support for Overseas Personnel:** Our top priority is ensuring the continued safety and wellness of our personnel, and the orderly repatriation of colleagues posted overseas. All overseas personnel will receive a USAID-funded return PCS, with a departure date that will be considered as the employee's end-of-tour date. Those with an end-of-tour date beyond summer 2025 are involuntarily curtailed from their assignment.
  - Employees with a RIF date of July 1, will be expected to complete PCS travel NLT June 15, and those with a RIF date of September 2, will be expected to complete PCS travel NLT August 15. For those with an end-of-tour date beyond summer 2025, this is considered an involuntary curtailment from their assignment. If you have specific circumstances that you believe justify a deviation from this procedure (e.g. a child's school calendar or personal/familial health considerations), please reach out to HCTM to request an exception.
  - *As previously stated with the PCS Portal Data call, there will be the opportunity to resubmit your PCS request. Please update your information within the next 72 hours.*
  - While overseas, USAID personnel will remain under Chief of Mission authority, and will retain full access to the Medical Unit, DPO/Pouch, and Post-provided housing until their official departure date. The State

Department is committed to offering additional resources and benefits to ensure the safety and security of USAID employees transitioning from service.

- **Continuation of Benefits:** All employees will continue to receive the benefits to which they are entitled. No one will lose earned benefits as a result of this RIF action.
- **Previously RIF'd Personnel:** All personnel who received a first wave RIF notice dated February 23, 2025, will receive a new superseding RIF notice today, along with the rest of the Agency. That notice will specify a new longer-dated notice period, with final separation of either July 1, 2025, or September 2, 2025.
    - These new superseding notices will ensure that those in the first RIF wave have the same notice, severance, and return travel periods as the rest of the Agency's workforce and retain the same eligibility for any potential State Department hiring. Consistent with applicable law, we are committed to treating all USAID personnel fairly and equally.

- **Administrative Leave & Go Forward Options:** We do not intend to place a significant number of employees on involuntary administrative leave. As you can imagine, there will be lots of work to responsibly migrate operations and responsibility to the State Department. We would like to offer every USAID employee the opportunity to participate in that important work, if they so choose. At the same time, we understand that many of you may prefer to take time to focus on your families and future. As we assess the Agency's draw-down staffing needs, we are providing the optional opportunity to indicate your preferred status going forward. A form will be provided tomorrow which will allow you to select one of the following options:
    - **Active Duty:** A substantial portion of the Agency will be required to remain on duty to support the successful drawdown of operations and the transfer of programs to the State Department. If you are interested in remaining on active duty in this capacity, we would be grateful for your continued service.
    - **Administrative Leave:** If you prefer to step away and focus on next steps, voluntary administrative leave will be available. Unless otherwise instructed, all staff with RIF notices who are not already on administrative leave may opt to cease work activities and request leave.

- **Email and Digital Access:** Email accounts have been reactivated for substantially all personnel on administrative leave and/or those part of the first wave RIF. Personnel should check their USAID email accounts for their Specific Notice of RIF and other important information.
    - We are committed to ensuring personnel, especially in the field, retain access to important employment and security information. We do not anticipate cutting access for a substantial number of USAID personnel.
    - Of course, access to government resources is a privilege, and personnel

must continue to follow Agency guidance and applicable rules regarding the use of government systems and handling/dissemination of government information. Violations of Agency guidance and policies may result in disciplinary actions and loss of digital access permissions.

We remain committed to ensuring this process is as smooth, respectful, and transparent as possible keeping our mission and people at the forefront. We know questions will remain and we will soon share a live FAQ document to provide ongoing updates and guidance.

Secretary Rubio, myself, and the rest of the front office are grateful for your continued service to our great nation. I would like to offer a special thank you to those of you who, even amid considerable personal and professional uncertainty, have remained steadfastly committed to serving the Agency and its important mission. You exemplify the very best ideals for public service and will not be forgotten or overlooked in this transition process.

Sincerely,

Jeremy Lewin

PTDO Deputy Administrator & Chief Operating Officer

---

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

This service is provided to you at no charge by United States Agency for International Development.

---

This email was sent to ████████████ using govDelivery Communications Cloud on behalf of: United States Agency for International Development · 1300 Pennsylvania Avenue NW · Washington, DC · 20004





**Exhibit B**

## Action Required – Termination of Awards for Convenience – Tranche 2
1 message

**Jami Rodgers** <jrodgers@usaid.gov>                                           Mon, Feb 10, 2025 at 6:19 PM
To: USAID OAA FSN Network Mail List <usaidoaafsnnetwork@usaid.gov>, Mission & FS CO/AOs - ALL <mission-fs-coaos-all@usaid.gov>, "M.OAA Mail List (USAID)" <m.oaamaillistusaid@usaid.gov>
Cc: Nadeem Shah <nshah@usaid.gov>, Adam Cox <acox@usaid.gov>, Matthew Johnson <matjohnson@usaid.gov>, OAAForeignOps <OAAForeignOps@usaid.gov>, Gregory Marchand <gmarchand@usaid.gov>, Chitahka Floore <cfloore@usaid.gov>, Deborah Broderick <dbroderick@usaid.gov>, Lyudmila Bond <lbond@usaid.gov>

Dear Colleagues,

On Sunday, February 9, Secretary Rubio reviewed and identified a number of activities that should be terminated for convenience in accordance with the [Executive Order on Reevaluating and Realigning United States Foreign Aid](#).

We take action on these activities by issuing notices to our partners. **Once you've taken action, please note this on column A of the tracker.** If you are not the current POC, please update and notify the correct person.

[2.10.25 USAID Grants & Media Contracts to Cancel (Tranche 2)_v2](#)

Before proceeding with any terminations, please coordinate with your relevant technical and program colleagues to ensure that no awards fall under the **Humanitarian Assistance**, **PEPFAR, or any other relevant approved waivers, or statutorily required activities**. Please flag these in the spreadsheet for further review. Additionally, please work with your A&A Specialists, A/CORs, and Alternates to ensure that ASIST files are complete and up to date for all awards.

Note: This list is in addition to the list that was issued yesterday, which is also linked below:

[USAID Contract + Grants to Terminate (Tranche 1)_v4](#)

These are the two major lists that all staff should be working from, and there may be future tranches.

**Termination Notice Templates**

For your convenience, M/OAA Policy has drafted several templates to assist with this process. You can access them here:

[Termination Notices Templates (A&A)](#)

Please note that the templates are locked for editing. To edit and use this document, please select "File" and "Make a Copy" or "File" and "Download." Please do not create copies of the templates in this folder.

Further, please note that these templates contain electronic notices. COs/AOs will need to follow up with more robust and detailed messaging for each award. Further guidance on this and additional templates are forthcoming.

Please submit any [questions here](#).

Thanks,
Jami

**Jami J. Rodgers, CPCM**

U.S. Agency for International Development (USAID)

Chief Acquisition Officer and Senior Procurement Executive

Director, Bureau for Management Office of Acquisition and Assistance (M/OAA)

617

| FOR M/OAA COMMS DO NOT EDIT | Tranche | Termination Confirmed | Award Number | Mission/Location | CO/AO Name | CO/AO Email | Total Est Cost | Total Obligated TD | Vendor Name | Activity Description | Period of Performance | Award Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| On Hold | 3 | HOLD | 72062322C00001 | USAID/SOMALIA | Jesse Gutierrez | @usaid.gov | $61,499,998.00 | | DT GLOBAL INC | USAID/Somalia's TIS3 (Formerly LOCALLY LEGITIMATE STABILIZATION-LLS) Supports the fight against al Shabaab, and gives the USG an important capability to stabilize ISIS-influenced parts of the country. | | |
| On Hold | 1 | HOLD | 72062322C00001 | USAID/SOUTH_SUD/OAA | Muyama, Ananciata | @usaid.gov | $5,383,119.00 | | GREEN POWERED TECHNOLOGY LLC | THE PURPOSE OF THE A&E SERVICE CONTRACT IS TO PROVIDE FULL ENGINEERING SERVICES, WHICH INCLUDES BUT ARE NOT LIMITED TO PROGRAM MANAGEMENT, CONSTRUCTION MANAGEMENT, FEASIBILITY STUDIES, PRELIMINARY ENGINEERING, DESIGN FOR THE US EMBASSY JUBA'S CONSTRUCTION PORTFOLIO OF THE EMBASSY AND RESIDENTIAL COMPOUNDS. | | |
| Waiting for Futher Guidance | 3 | Statutory requirement | 7200AA23F00004 | M/OAA/BHA-CPS | Ousay Wahaj | @usaid.gov | $49,010,035.00 | | PALLADIUM INTERNATIONAL LLC | TO ACQUIRE IMPLEMENTING PARTNER SUPPORT TO ESTABLISH AND MANAGE A FLEXIBLE, QUICK-RESPONSE MECHANISM SUPPORTING ACTIVITIES THAT WILL SUPPORT DEMOCRACY AND STABILITY IN ECUADOR | | |
| Waiver | 3 | pause on any termination notice. Waiver | 7200AA24F00001 | M/OAA/BHA-CPS | Ousay Wahaj | @usaid.gov | $37,782,625.73 | | MANAGEMENT SYSTEMS INTERNATIONAL, INC. | THE PURPOSE OF THIS TASK ORDER IS TO ACQUIRE CONTRACTOR SERVICES TO ESTABLISH AND MANAGE A FLEXIBLE, QUICK-RESPONSE MECHANISM THAT WILL PROMOTE DEMOCRACY AND STABILITY IN GUATEMALA. | | |
| | 3 | Statutory requirement | 7200AA24F00002 | M/OAA/BHA-CPS | Ousay Wahaj | @usaid.gov | $35,153,242.00 | | CHEMONICS INTERNATIONAL, INC. | THE PURPOSE OF THIS TASK ORDER IS TO ACQUIRE CONTRACTOR SUPPORT TO ESTABLISH AND MANAGE A FLEXIBLE, QUICK-RESPONSE MECHANISM SUPPORTING ACTIVITIES THAT WILL SUPPORT DEMOCRACY AND STABILITY IN EL SALVADOR | | |
| | 3 | Statutory requirement, seeking GC guidance. | 7200AA21F00001 | M/OAA/BHA-CPS | Ousay Wahaj | @usaid.gov | $70,069,537.00 | | CREATIVE ASSOCIATES INTERNATIONAL, INC. | USAID/OTI LITTORALS REGIONAL INITIATIVE TASK ORDER | | |
| | 3 | Statutory requirement, seeking GC guidance. | 7200AA23F00006 | M/OAA/BHA-CPS | Ousay Wahaj | @usaid.gov | $96,801,542.00 | | DT GLOBAL INC | USAID/OTI SUDAN 2 PROGRAM - FOLLOW-ON TASK ORDER TO EXPLORE SUDAN ENGAGEMENT | | |
| | 3 | Statutory requirement | 7200AA21F00007 | M/OAA/BHA-CPS | Ousay Wahaj | @usaid.gov | $140,727,163.00 | | MANAGEMENT SYSTEMS INTERNATIONAL, INC. | INITIAL FUNDING FOR OTI/COLOMBIA | | |
| | 3 | Statutory requirement | 7200AA23F00003 | M/OAA/BHA-CPS | Ousay Wahaj | @usaid.gov | $46,851,906.00 | | MANAGEMENT SYSTEMS INTERNATIONAL, INC. | USAID/OTI MOLDOVA INITIAL FUNDING REQ | | |
| | 3 | Waiver pending via M/OAA leadership. Draft Termination Letter on standby. | 7200AAD21N00001 | M/OAA/FOROPS | Nathan Strand | @usaid.gov | $46,571,821.00 | | CYBER ENGINEERING AND TECHNICAL ALLIANCE, LLC | THE CONTRACTOR WILL PROVIDE THE DELIVERY OF CRITICAL BUT OTHERWISE NON-INHERENTLY GOVERNMENTAL FUNCTIONS THROUGH THE PROVISION OF A&A SPECIALISTS AND SENIOR ADVISORS, FOR A VARIETY OF PERFORMANCE PERIODS, PROVIDING SERVICES EITHER REMOTELY OR IN- | | |
| | 2 | To be terminated | 7200GH21IO00005 | M/OAA/GH | Enrich, Nicholas | @usaid.gov | | | WORLD HEALTH ORGANIZATION | WHO | | |
| | 2 | To be terminated | 7200GH21O00003 | M/OAA/GH | Enrich, Nicholas | @usaid.gov | | | WORLD HEALTH ORGANIZATION | WHO POLIO AND IMMUNIZATION II | | |
| Yes | 1 | Terminated 02/24/2025 | 7200AA24N00003 | M/OAA/GH | Dunn, Alisa | @usaid.gov | $236,831,988.54 | | ICF INCORPORATED, L.L.C. | DEMOGRAPHIC AND HEALTH SURVEYS - 9 (DHS-9) | | |
| Yes | 2 | Terminated 02/24/2025 | 7200AA19CA00018 | M/OAA/GH | Smith, Gerald | @usaid.gov | | | UNIVERSITY OF CALIFORNIA, DAVIS | ONE HEALTH WORKFORCE - NEXT GENERATION (OHW-NG) | | |
| Waiver | 2 | Approved Waiver | 7200AA18CA00040 | M/OAA/GH | Nelson, Anna | n@usaid.gov | | | RESEARCH TRIANGLE INSTITUTE | TO ADDRESS CHALLENGES AND GAPS, RTI¿S SUSTAIN TEAM HAS DESIGNED A CAPACITY STRENGTHENING FOR SUSTAINABILITY APPROACH FOR CEP-NTD ELEMENT 2. THROUGH SEVEN IMPLEMENTATION STRATEGIES, SUSTAIN WILL SUPPORT COUNTRIES TO ACCELERATE PROGRESS NOW; ADDRESS BARRIERS WITH INNOVATION; DOCUMENT AND SHARE SUCCESSES; IDENTIFY LONG-TERM CONTROL PLATFORMS; AND STRENGTHEN LOCAL CAPACITY FOR PLANNING, BUDGETING, AND DELIVERY SO THAT NTD PROGRAMS CAN CONTINUE WITH HIGH LEVELS OF EFFECTIVENESS. SUSTAIN EXPERTS AND COUNTRY TEAMS WILL TAILOR THIS CAPACITY STRENGTHENING APPROACH AND STRATEGIES THROUGH REGULAR COMMUNICATION WITH USAID¿S NTD STAFF AND MINISTRIES OF HEALTH (MOHS). DATA AND CONTEXT WILL BE INCREASINGLY IMPORTANT AT THE COUNTRY LEVEL AS ELIMINATION APPROACHES; COVERAGE CHALLENGES IN THE LAST ENDEMIC AREAS ARE UNIQUE, REQUIRING INNOVATIVE STRATEGIES BASED ON | | |
| | 2 | Under Review to Determine Applicability of Waiver | 7200AA20CA00007 | M/OAA/GH | Dunn, Alisa | @usaid.gov | | | POPULATION SERVICES INTERNATIONAL | PROVIDE MALARIA/HIV TECHNICAL ASSISTANCE AND CAPACITY BUILDING TO PRIVATE HEALTHCARE PROVIDERS | | |
| Waiver | 3 | Approved Waiver | 7200AA23M00003 | M/OAA/GH | Gerald Smith | @usaid.gov | $106,690,553.00 | | GLOBAL SOLUTIONS VENTURES, LLC | LEAP GLOBAL | | |
| Waiver | 1 | Approved Waiver | 7200AA23C00065 | M/OAA/OHA | Bigelow, Erica | @usaid.gov | $105,862,782.00 | | DELOITTE CONSULTING LLP | TO PROVIDE A HOLISTIC COMMERCIAL OFF THE SHELF (COTS) SOLUTION WHICH COMBINES TECHNICAL, DATA ANALYTICS, CHANGE MANAGEMENT, AND SUPPLY CHAIN EXPERTISE | | |
| | 3 | Under Review to Determine Applicability of Waiver | 7200AA23C00089 | M/OAA/DDI 1 | Simone Cho | @usaid.gov | $45,996,640.98 | $19,465,496.43 | THE CADMUS GROUP LLC | THE ENVIRONMENTAL AND SOCIAL SAFEGUARDING AWARD IS TO PROVIDE OUS AND MISSIONS WITH THE ENVIRONMENTAL AND SOCIAL TECHNICAL ASSISTANCE, TRAINING SUPPORT AND KNOWLEDGE MANAGEMENT SUPPORT TO PERFORM THE AGENCY'S THE ENVIRONMENTAL AND SOCIAL MANDATE | 8/21/23 - 8/20/28 | Environmental And Social Safeguards Support (ES3) |
| | 3 | Seeking guidance on statutory requirement | 7200AA1M00009 | M/OAA/RFS | Cerrita Johnson | @usaid.gov | $69,130,638.72 | | ICF INCORPORATED, L.L.C. | THE USAID SURVEYS FOR MONITORING IN RFS TASK ORDER WILL SUPPORT THE WORK OF THE USAID BUREAU FOR RESILIENCE AND FOOD SECURITY IN SUPPORT OF THE COLLECTION AND USE OF HIGH-QUALITY POPULATION-BASED SURVEY DATA IN USAID BUREAU FOR RESILIENCE PRIORITY | | |
| | 3 | Statutory requirement | 7200AA22F00008 | USAID/BHA-CPS | Ousay Wahaj | @usaid.gov | $48,729,864.00 | | CHEMONICS INTERNATIONAL, INC. | SWIFT 5 OTI BELARUS | | |

| Flag | # | Status | Award No. | Operating Unit | Name | Email | Amount 1 | Amount 2 | Vendor | Description | Extra |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2 | In progress - On 2/12/25 AO submitted question to OAA/Washington as to need to inform Co-Donor Swiss Agency for Development & Cooperation (SDC). Awaiting guidance from OAA and/or GC. | 72016922CA00003 | USAID/KOSOVO/OAA | Larsen, Amy | n@usaid.gov | $9,000,000 | $7,431,105 | PARTNERSGLOBAL | Civil Society Resilience Strengthening activity | |
| Yes | 1 | Terminated on 02/24/2025 | 72061224LA00001 | USAID/MALAWI/OAA | Thunberg, Natalie | @usaid.gov | | | | | |
| | 3 | Pending Waiver Review . However , Possible non-PEPFAR Waiver. Please note the Program Description is incomplete as this a global health security activity that is being under consideration for review under waiver for Emergency Response to Infectious Disease Outbreaks. So pending a final decision on Mozambique's waiver request . | 72067422F00006 | USAID/Southern Africa | Aristide Horugavye | @usaid.gov | $30,000,000 | | RIGHT TO CARE | THE PURPOSE OF THIS TASK ORDER (TO) IS TO PROVIDE TAILORED, TARGETED INTERVENTIONS AND TECHNICAL SUPPORT TO THE COMMON MARKET FOR EASTERN AND SOUTHERN AFRICA (COMESA) REGION DURING PERIODS OF HEIGHTENED VULNERABILITY CAUSED BY EMERGING AND NEW ACUTE | ADAPT ARTO |
| | 2 | Flagged to Mission Leadership for Administrator/SPE Review to confirm Termination. Seeking Mission Award clarification: Please understand that | 72012124CA00001 | USAID/Ukraine | Pearson, Ronald | @usaid.gov | | | EURASIA FOUNDATION | DIGITAL TRANSFORMATION ACTIVITY | |
| | 1 | Notice drafted. Seeking leadership clarification: Please understand that | 72029423F50002 | USAID/WB GAZA/OAA | Harter, Daniel | @usaid.gov | $51,541.00 | | MAZARS CHARTERED ACCOUNTANTS AND CONSULTANTS | CONTRACT FOR THE SERVICES OF AN AUDIT FIRM TO PERFORM THE COMPLIANCE REVIEW REPORTS. | |
| | 1 | Notice drafted. Seeking leadership clarification: see above | 72029424F50002 | USAID/WB GAZA/OAA | Harter, Daniel | @usaid.gov | $53,748.00 | | MAZARS CHARTERED ACCOUNTANTS AND CONSULTANTS | MISSION ORDER NO. 21 COMPLIANCE REVIEW - FY 2024 REVIEW | |
| | 1 | Notice drafted. Seeking leadership clarification: The audit program is mandated by Appropriation law, specifically, SFOAA Section 7039 (d), OVERSIGHT BY THE UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, (1), | 72029424P00026 | USAID/WB GAZA/OAA | Harter, Daniel | @usaid.gov | $76,098.00 | | MAZARS CHARTERED ACCOUNTANTS AND CONSULTANTS | THE CONTRACTOR WILL PERFORM FINANCIAL AUDITS AND EXAMINATIONS OF SELECTED MISSION AWARDS. | |
| | 3 | | 72062423C00001 | USAID/WESTAFRICA/OAA | | | | | DAI GLOBAL LLC | AWARD OF A COST PLUS FIXED FEE COMPLETION TYPE CONTRACT TITLED "STRENGTHENING REGIONAL PEACE AND STABILITY (SRPS) IN WEST AFRICA PROGRAM" TO DAI GLOBAL | |
| | 3 | | | USAID/WESTAFRICA/OAA | | | | $38,228,393.00 | DEXIS INTERACTIVE LLC | THE OVERALL OBJECTIVE OF THE NEXT ACTIVITY IS TO IMPROVE COMMUNITY RESILIENCE TO VIOLENT EXTREMISM (VE) THROUGH MORE EQUITABLE AND DIVERSE ECONOMIC | |
| | 4 | Pursuing a co-funding waiver | 72018224C00001 | USAID/ALBANIA/OAA | Moges, Daniet | @usaid.gov | $12,000,000.00 | $12,000,000.00 | FOR STRONGER COMMUNITIES | IMPROVING ECONOMIC PROGRESS TOWARDS MEETING THE COPENHAGEN ECONOMIC CRITERIA FOR EU ACCESSION, WHICH STATES | |
| Yes | 4 | Contract ended. | 72069520S00004 | USAID/RWANDA/OAA | Ahl, Reid | @usaid.gov | $987,844.00 | $825,605.00 | FOREIGN AWARDEES (UNDISCLOSED) | THE PURPOSE OF THIS REQUISITION IS TO RECRUIT THE PMI ADVISOR FOR USAID/BURUNDI | |
| | 4 | Per OAA/W, waiting for further guidance | 72069522S00005 | USAID/RWANDA/OAA | Banco, Jonathan | @usaid.gov | $570,255.00 | $570,255.00 | FOREIGN AWARDEES (UNDISCLOSED) | THE PURPOSE OF THIS REQUISITION IS TO RECRUIT AN ACQUISITION & ASSISTANCE SPECIALIST FOR USAID BURUNDI | |
| | 4 | Per OAA/W, waiting for further guidance | 72069524S00001 | USAID/RWANDA/OAA | Quiggle, Douglas | @usaid.gov | $474,192.00 | $474,192.00 | DOMESTIC AWARDEES (UNDISCLOSED) | THE PURPOSE OF THIS REQUISITION IS THE RECRUITMENT OF THE USAID BURUNDI HEALTH TEAM DIRECTOR | |
| | 4 | Per OAA/W, waiting for further guidance | 72069525S00002 | USAID/RWANDA/OAA | Quiggle, Douglas | @usaid.gov | $155,530.27 | $155,530.27 | DOMESTIC AWARDEES (UNDISCLOSED) | THE PURPOSE OF THIS REQUISITION IS TO RECRUIT A SENIOR ADVISOR (SHORT TERM) FOR USAID BURUNDI | |
| Waiver | 4 | Do not terminate | 72MC1023C00011 | M/CIO | Payne, Calvin | @usaid.gov | $24,999,549.83 | $24,999,549.83 | EAGLE ONE SOLUTIONS, INC. | MISSION-ORIENTED BUSINESS MANAGEMENT SERVICES | |
| Waiver | 4 | Do not terminate | 72MC1024M00009 | M/CIO | Lentini, Joseph W. | @usaid.gov | $13,038,192.00 | $13,038,192.00 | ATT MOBILITY LLC | ACQUISITION OF A NEW CONUS MOBILITY RE-COMPETE | |
| | 4 | Statutory requirement, seeking GC guidance. | 7200AA23F00005 | M/OAA/BHA-CPS | Ousay Wahaj | @usaid.gov | $26,176,105.00 | $16,176,105.00 | DT GLOBAL INC | USAID/OTI SWIFT 5 SRI LANKA PROGRAM | |
| | 4 | Approved to continue by SBO, remove from termination list. | 72027920C00001 | USAID/MERP/OAA | Camp, Karla | @usaid.gov | $15,885,370.00 | $15,885,370.00 | MANAGEMENT SYSTEMS INTERNATIONAL, INC. | YEMEN CONTINUOUS LEARNING AND EVALUATION PROGRAM (YCLE) | |
| | 4 | | 72027922F50003 | USAID/MERP/OAA | Camp, Karla | @usaid.gov | $1,264,936.26 | $1,264,936.26 | PM CONSULTING GROUP LLC | USAID/YEMEN IS SEEKING REMOTE, SHORT-TERM ARABIC-ENGLISH-ARABIC INTERPRETATION AND TRANSLATION SERVICES FOR BOTH VERBAL AND WRITTEN COMMUNICATIONS. | |
| | 4 | Flagged for ME Bureau. Awaiting response before sending Termination Notice. Pursuing a waiver. | 72067024N00001 | USAID/MERP/OAA | Parnell, Robert | f@usaid.gov | $18,910,246.00 | $8,261,762.00 | CHEMONICS INTERNATIONAL, INC. | ENHANCED PARTNERSHIPS FOR INSTITUTIONAL CAPACITY (EPIC) | |
| | 4 | Pursuing a waiver | 72052322C00002 | USAID/MEXICO/OAA | Capellan, Andrea | @usaid.gov | $29,000,000.00 | $29,000,000.00 | PALLADIUM INTERNATIONAL LLC | SOUTHERN MEXICO:GENERATING EMPLOYMENT AND SUSTAINABILITY (SURGES) ACTIVITY | |
| | 4 | Statutory Asia Bureau - Contains Taiwan funds $200k (of $600K) commitment. | 72049220C00004 | USAID/PACIFIC ISLANDS | Crow, Jennifer | @usaid.gov | $34,999,999.00 | $34,999,999.00 | SOCIAL SOLUTIONS INTERNATIONAL, INC. | BASE AWARD - PACIFIC AMERICAN FUND INITIAL OBLIGATION OF $6,408,000 | |
| | 4 | TO BE REMOVED - Fails under an exception & BHA has submitted an additional memo for justification of the activities under the | 7200AA22F00015 | M/OAA/BHA-CPS | Irby, George | @usaid.gov | $19,720,977.00 | $19,720,977.00 | INTEGRITY GLOBAL INC. | TO PROCURE SOMALIA THIRD PARTY MONITORING SERVICES THROUGH THE PPL IDIQ MECHANISM. | |
| Waiver | 4 | Title II waiver | 7200AA21C00001 | M/OAA/T | Vicinanzo, Paul | @usaid.gov | $13,000,000.00 | $13,000,000.00 | C STEINWEG LOGISTICS (PTY) LTD | MOAA/T - TITLE II FOREIGN PREPO WAREHOUSES DURBAN, SOUTH AFRICA. | |
| | 4 | Waiver request pending. | 72066024F00001 | USAID/DROC/OAA | Wang, Gregory | @usaid.gov | $16,628,372.00 | $10,005,429.00 | PEREZ A PROFESSIONAL CORP | Please seek and appeal to Secretary of State decision to terminate. | |
| | 4 | Exception Requested & Pending. | 72026321C00002 | USAID/EGYPT/OAA | Elkhatib, Nehal | @usaid.gov | $36,300,000.00 | $36,300,000.00 | PALLADIUM INTERNATIONAL LLC | THE PURPOSE OF THIS ACTIVITY WILL PROVIDE TECHNICAL ASSISTANCE TO GOE AS WELL AS OTHER PRIVATE SECTOR STAKEHOLDERS TO ACHIEVE THREE RESULTS: ENHANCED EXPORT CAPACITY OF NEW AND EXPANDING EXPORT READY ENTERPRISES IN SELECTED SECTORS STRENGTHENED PUBLIC AND PRI | |
| Waiver | 4 | Already approved to resume under PEPFAR waiver. Have not terminated while waiting | 72055621C00007 | USAID/MOZAMBIQUE/OAA | Gillispie, Alice | @usaid.gov | $29,878,308.00 | $29,878,308.00 | AFRICA GLOBAL LOGISTICS MOZAMBIQUE LDA | REQUEST FOR PROPOSAL (RFP) FOR ADAPTING AND COMBINING | |
| | 4 | Flagged for Asia Bureau - Waiver Requested | 72049221C00002 | USAID/PHILIPPINES/OAA | Crow, Jennifer | @usaid.gov | $33,276,461.00 | $33,276,461.00 | CADMUS (NATHAN ASSOCIATES LLC) | BETTER ACCESS AND CONNECTIVITY (BEACON) PROJECT | |
| | 4 | Flagged for Asia Bureau - Waiver Requested | 72049223C00001 | USAID/PACIFIC ISLANDS | Crow, Jennifer | @usaid.gov | $23,941,735.28 | $23,941,735.28 | CADMUS (NATHAN ASSOCIATES LLC) | DIGITAL CONNECTIVITY AND CYBERSECURITY PARTNERSHIP (DCCP)-PACIFIC ACTIVITY INITIAL OBLIGATION $7,140,000 | |
| | 4 | Partial waiver for TPM, working on termination letter | 72066821C00008 | USAID/SOUTH_SUD/OAA | Colarik, Elizabeth | @usaid.gov | $48,938,341.00 | $48,938,341.00 | INTEGRITY GLOBAL INC. | MONITORING, EVALUATION, AND LEARNING SUPPORT (MELS) ACTIVITY. | |

# Exhibit D

-----Original Message-----
From: A/OPE/FA Grants Policy <aopefagrantspolicy@state.gov>
Sent: Thursday, February 27, 2025 5:21 AM
To: ████████████████████████████
Subject: Termination Notice ███████████████

Dear Partner:

Please see the attached notice regarding your indicated USAID award.

Your award is being terminated for convenience and the interests of the U.S. Government pursuant to a directive from U.S. Secretary of State Marco Rubio, in his capacity as the Acting Administrator for the U.S. Agency for International Development ("the Agency" or "USAID") and/or Peter W. Marocco, who is performing the duties and functions of both Deputy Administrators for USAID. Secretary Rubio and PTDO Deputy Administrator Marocco have determined your award is not aligned with Agency priorities and made a determination that continuing this program is not in the national interest. The decision to terminate this individual award is a policy determination vested in the Acting Administrator and the person performing the duties and functions of the Deputy Administrator.

Please direct follow up inquiries to IndustryLiaison@usaid.gov.

Thank you for partnering with USAID and God Bless America.

**Exhibit E**

March 27, 2025

**MEMORANDUM FOR** ███████████████████████

FROM:          Jeremy Lewin
                    PTDO Deputy Administrator and Chief Operating Officer
                    United States Agency for International Development

SUBJECT:      Specific Notice of Reduction in Force

This memorandum is to inform you that because your position is being abolished, you will be separated from the Foreign Service. The forthcoming RIF action is necessary to restructure USAID's operations to better reflect Agency priorities and the foreign policy priorities of the United States.

**PLEASE NOTE THAT IF YOU HAVE PREVIOUSLY RECEIVED A RIF NOTICE, this specific Notice of Reduction in Force supersedes that notice and your separation will be processed according to this notice.**

This is your specific notice of how this RIF will affect you. The Agency is abolishing your competitive area. You will be released from your competitive level and will not have an assignment right to another position in the competitive area. Consequently, you will be separated from the Foreign Service effective July 1, 2025       . You will continue in your present position during this specific notice period.

This RIF was conducted at the direction of USAID leadership. Retention registers list employees in retention standing order based on veterans' preference, career status, performance, overseas service, and creditable government service, as outlined in ADS 454. The Agency has determined that it is not practicable to include language proficiency, overseas service, promotion credit, or awards in the retention standing. Given that this is a RIF of all Foreign Service staff, these factors will not impact an employee's standing or treatment with the elimination of the entire competitive area.  The following information is currently reflected in USAID official files for use in determining your retention standing:

      Competitive Area: Foreign Service and Senior Foreign Service Worldwide

      Position Title, Grade: Foreign Service Officer, ███

      Competitive Level:  6505

      Service Computation Date (SCD): ████████████████

      Adjusted SCD: █████████████████

      Veterans' preference:  NONE

      Tenure Group:  Group 1

Six Most Recent Performance Ratings:

        2024 Promotion Board Rating:  Mid-Ranked

        2024 Performance Rating:  Satisfactory

        2023 Promotion Board Rating:  B

        2023 Performance Rating:  Satisfactory

        2022 Promotion Board Rating:  B

        2022 Performance Rating:  Satisfactory

      Creditable Government Service:  

NOTE: The adjusted RIF SCD includes all creditable military and civilian service and is adjusted with additional credit for performance ratings.

**Please contact hr-helpdesk@usaid.gov or submit a ticket through LaunchPad immediately, but no later than within five days of the receipt of this letter, if you believe any of the above information is incorrect. Corrections to your information will not impact your separation date but could change your eligibility for retirement, severance, or other benefits so it is important you review your information and engage with the USAID Office of Human Capital Talent Management (HCTM).**

You may be eligible for severance pay. If so, additional information will be provided to you with regards to the amount.

In lieu of severance, you may be eligible for an immediate retirement annuity upon separation. If you believe you may be so eligible, please contact HCTM. Likewise, you may be eligible for enrollment in the Foreign Service Institute Retirement Seminar and Job Search Program.

In either case, you are eligible for placement assistance under the Agency Career Transition Assistance Program (CTAP) which provides:

- Special selection priority to other Agency offices within the commuting area,
- Registration on the Agency Reemployment Priority List (RPL); and
- Information about special selection priority under the Interagency CTAP.

If you resign on or before the RIF effective date of  July 1, 2025           , your separation will be considered involuntary for the purposes of severance pay. Please be advised that you may affect your eligibility for Federal reemployment/placement assistance programs and/or your appeal rights if you resign.  You are strongly encouraged to contact **hr-helpdesk@usaid.gov** for information if you are considering resigning during this specific notice period.

This action is being taken under the foreign service RIF regulations and procedures, specifically The Foreign Service Act and ADS 454. HCTM will maintain the retention registers, RIF regulations, and

records affecting your action.  You may contact the HR help desk to review this material or to receive benefits information.

If you believe that your retention rights were violated, you may appeal the RIF action to the Merit Systems Protection Board (MSPB), Washington DC office. Your appeal must be in writing and must be filed during the 30-day period beginning the day after the effective date of the RIF action. If your appeal is not filed within this 30 calendar day limit, it may be dismissed as untimely filed, unless you can show good cause for the delay.

For more information on filing an appeal, you may review the MSPB appeal form and the MSPB appeal regulations.

Alternatively, you may file a grievance. Grievances shall be limited to cases of reprisal, interference in the conduct of an employee's official duties, or similarly inappropriate use of the employer's authority to conduct a RIF.

This RIF action does not reflect on your service, performance, or conduct. It is being taken solely for the reason stated.

Attached is additional supporting information, as well as an Acknowledgement of Receipt. Please kindly complete and transmit the Acknowledgement of Receipt to **hr-helpdesk@usaid.gov** at your earliest convenience.

Sincerely,

Jeremy Lewin
PTDO Deputy Administrator and Chief Operating Officer
United States Agency for International Development

# EXHIBIT 14

**25-cv-469-CJN**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| PERSONAL SERVICES ) | |
| CONTRACTOR ASSOCIATION, ) | |
| ) | Case No. 1:25-cv-469-CJN |
| *Plaintiff*, ) | |
| ) | |
| v. ) | |
| ) | |
| DONALD TRUMP, et al., ) | |
| ) | |
| *Defendants*. ) | |
| _____ ) | |

## DECLARATION OF GREGORY DOE

I, Gregory Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration.

2. I am a USAID Contracting & Agreement Officer (CO/AO) stationed at a large and complex USAID mission overseas. In February 2025, I was placed on administrative leave with the possibility of termination as part of the administration's stated goal of dismantling USAID.

3. Even before being placed on administrative leave, my work and that of my colleagues had come to a standstill due to the recent terminations of awards and contracts causing undue harm to the lives of communities, the viability of crucial implementing partners and the well-being of Personal Service Contractors (PSC), who are instrumental in carrying out important work alongside their U.S. direct hires counterparts. These actions have impaired our ability to carry out the foreign aid programs and policies authorized by Congress and for which Congress has appropriated billions of dollars of funds.

4. As a CO/AO, we are delegated with contracting authority to negotiate on behalf of the U.S. government. I describe our role as being the tip of the spear in strengthening partnerships

through critical engagement, contract support, and compliance with agreements that fund multi-million dollar awards. The awards are executed by local and international development partners, both big and small actors in the humanitarian landscape and international development arena.

5. In accordance with 2 Code of Federal Regulations (CFR) 700.1, an Agreement Officer is described as having "the authority to enter into, terminate, and closeout assistance agreements subject to this part, and make related determinations and findings on behalf of USAID. An Agreement Officer can only act within the scope of a duly authorized warrant or other valid delegation of authority." Similarly, in the contracting realm, governed by Federal Acquisition Regulations, FAR.1.602-1 authority states, "(a) Contracting Officers have authority to enter into, administer, or terminate contracts and make related determinations and findings. Contracting Officers may bind the Government only to the extent of the authority delegated to them. Contracting Officers shall receive from the appointing authority clear instructions in writing regarding the limits of their authority. Information on the limits of the contracting officers' authority shall be readily available to the public and agency personnel. (b) No contract shall be entered unless the Contracting Officer ensures all requirements of law, executive orders, regulations, and all other applicable procedures, including clearances and approvals, have been met."

6. My declaration is meant to paint a picture of the utter chaos and confusion being created by the dismantling of USAID, including the mass termination of USAID direct hires and PSCs and indiscriminate termination of USAID grants and awards. To this day, the Contracting Officers in the field are still awaiting a Memorandum (MEMO) that provides any rationale, justification, or criteria being applied to the determination of terminations of

2

awards and contracts.

7. On February 6, 2025, Contracting Officers worldwide received an email from Headquarters from the Management Office of Assistance and Acquisition M/OAA to issue notices immediately terminating close to 800 awards and contracts (including personal services contracts). No rational or criteria were provided to justify this direction to CO/AOs to terminate contracts and awards.

8. The direction to terminate 800 contracts and awards was issued in the context of the Stop Work/Award Suspension memo sent out on January 28, 2025 to implement the January 20, 2025, Executive Order 14169, *Revaluating and Realigning United States Foreign Aid*. The Stop Work/Award memo instructed USAID to pause and freeze aid pending a "review" of foreign assistance funded by USAID to align it with the president's policies.

9. Stopping the work of PSCs and terminating their contracts has impaired the ability of Contracting Officers worldwide, who need the technical, financial, executive, and administrative expertise of PSCs who work as Contracting Officer Representatives (CORs) and Agreement Officer Representatives (AORs). Without our technical counterparts (the CORs and AORs), our engagement with implementing partners is far more difficult. Our work to implement Agency priorities and Congressional mandates requires the technical expertise of PSCs, who work alongside U.S. direct hires.

10. As a CO/AO, we are responsible for a contract from the point of inception, when an award is conceived, through negotiation, and all way through sunset of the award. At every step, the proposals are evaluated by technical experts (the CORs and AORs). After the awards are issued or contracts executed, they are managed by the CORs and AORs through sunset of the award. Throughout the time of performance, those same technical experts (the

CORs/AORs) work hand in hand with the Contracting Officer to ensure that USAID implementing partners fulfill all legal, financial, and programmatic obligations.

11. The COs/AOs (tip of the spear) cannot function without the technical input of the CORs/AORs, and their concurrence is necessary to align with the needs of USAID as a donor agency in carrying out and fulfilling US foreign policy in various complex and highly technical fields such as health, economic growth, education, and various agency priorities, as authorized by Congress.

12. Of even more concern, the mass terminations did not factor in the need for key personnel (the PSCs) who kept USAID afloat, as termination of their contracts meant less staff to support the disbursements of funding as well as the loss of experience and expertise of professionals who greatly contributed to the maintenance, safety, and operations of facilities at Mission. USAID personnel are the backbone of humanitarian operations, the engine that keeps the machine running. Our Mission lost amazing and essential counterparts in our Executive Office without any justification, following termination of their personal services contracts. The same applies to PSCs in the technical fields, whose technical input is critical for a CO/AO to understand whether the implementing partner's activities are realistic and reasonable.

13. On February 7, 2025, we received an instruction to stop/pause terminations until further guidance. This created even further confusion.

14. From February 9 to February 11, we received lists of terminations broken into "tranches," with a direction to complete all terminations in Tranche 1 and Tranche 2 by close of business (COB) February 11 and all terminations in Tranche 3 by COB February 12. Again, we received no explanation, rationale, or justification for these directions, which were a

radical departure from agency practice. The directions we received were mandatory instructions to terminate huge lists of contracts and awards. We did not have the discretion or any opportunity to review individual awards or contracts to determine whether they were consistent with the agency's new priorities.

15. On February 9, the same day we received the notice of Tranche 1 terminations, local COs/AOs worldwide were instructed by the USAID Senior Procurement Executive (SPE) to include the following language in termination notices:

> Per FAR 52.249-6- Termination (Cost Reimbursement) (MAY 2004) "(a) The Government may terminate performance of work under this contract in whole or, from time to time, in part, if (1)- The Contracting Officer determines that a termination is in the Government's interest.

That language was a complete pretext and highly problematic to the COs, as COs had no role in making any determinations that contract terminations were "in the Government's interest."

16. On February 10, 2025, another CO colleague from another post asked the Senior Procurement Executive based in Washington DC headquarters, whether we have any documentation for the determination to terminate. Based on past experience, previous terminations were approved by the relevant Head of the Contracting Activity (Operating Unit Directors/Mission Directors), who made a decision that the termination was in the government's interest. By that point, the CO/AO had thoroughly documented the basis for such a determination, providing the CO/AO assurance and confidence to proceed with the termination, invoking the relevant foreign assistance or acquisition standards and procedures to explain the determination. Such documentation was used to defend the

termination made by the CO/AO if it was challenged by the partner.

17. On February 10, another question posed on behalf of CO/AOs from the field, again addressed to the Senior Procurement Executive in Washington DC, was whether the Senior Procurement Executive even has the delegated authority from the Acting Administrator to make the decision to terminate awards and contracts, or whether he would be sending further documentation from someone who does. The underlying fear was whether, as COs/AOs, we were being directed to exceed our delegated authority and assume programmatic and strategic decision-making beyond our mandate. This fear was based on the concern that whoever was behind the decision to place contracts and awards in the large "tranches" for termination did not have delegated authority, which would mean that we were being forced to act without legal authority in violation of the Code of Federal Regulations and the FAR.

18. Another CO from the field raised the question to the Senior Procurement Executive Jami Rogers, of whether USAID's General Counsel had provided legal clearance on the list of awards and contracts selected for terminations. We also sought clarification as to the justification for such terminations and also how these awards were selected. Another important question not answered was whether Congress had been notified of the terminations. Many of the contracts and awards were based on earmarked funds, and we were being given mandatory instructions to terminate awards and contracts paid for with congressionally earmarked funds without the necessary approvals and notifications in place to support the terminations.

19. Additionally, COs were left to fend for ourselves as to which costs for work already performed would be considered allowable and reasonable and who would make the final

determination on repayment for work performed prior to the Stop Work order.

20. On February 10, 2025, Management/Chief Information Officer (M/CIO) Jeremy Lewin, who is not a CO and does not have the legal authority of a CO, specified that the Senior Procurement Executive would have more details and would perhaps put out a memo with answers to the CO/AO's questions. In the meantime, he stated that Secretary Rubio and Acting Deputy Administrator Marocco had signed off on the terminations in the tranches.

21. On February 11, 2025, in response to the delegated authority question, a follow up email was sent out by SPE stating that "termination authority" is delegated to me as the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluation and Realigning United States Foreign Aid.

22. To this day (March 2, 2025), COs/AOs have not received any Memo, email, or other document outlining any justification or rationale for the terminations or the criteria applied to determine that thousands of USAID awards and contracts funded by congressional appropriations were not "in the Government's interest."

23. Moreover, COs/AOs were confused by the continuing direction to terminate contracts without any individual determinations by COs/AOs given: (a) the January 31, 2025 Notice of Court Order in *New York et al. Trump* (Case 1:25-cv000390JM-PAS) that "All Federal Agencies (even those not named as defendants in the case) should comply with the above-referenced terms, which states that 'Federal agencies cannot pause, freeze, impede, block or cancel, or terminate any awards or obligations on the basis of…the President's recently issued Executive Orders'"; and (b) the February 13, 2025 temporary restraining order in *AIDS Vaccine Advocacy Coalition v. United States Department of State* (Case No. 25-cv-

400) and *Global Health Council v. Trump* (Case No. 25-cv-402) that prohibits implementation of the foreign assistance funding freeze. Many COs/AOs in the field and at headquarters have serious concerns that COs/AOs are being directed to implement the pause on foreign assistance under the President's Executive Order, *Revaluating and Realigning the United States Foreign Aid*, in violation of federal court orders.

24. Additionally, as a CO, I have found many programs that qualify under life-saving activities and should be covered by the waiver on the list for termination with no explanation and subject to the mandatory instructions to terminate. CO are left to fend for ourselves without any coverage, guidance, or clear justifications.

25. As COs, we are also greatly limited in our ability to evaluate whether a project or program activity qualifies under a particular waiver by the absence of PSCs whose contracts were abruptly terminated.

26. On February 26, 2025, just hours before the Trump administration was ordered to pay organizations for past work, as mandated by a federal judge on February 25, 2025, the agency terminated nearly 10,000 USAID and State Department foreign assistance awards. The government's justification according to a court filing was that, with those termination, there would be no further USAID nor State obligations that remained in a suspended or paused state that required payment for work completed before February 13.

27. At our USAID Mission overseas, the February 26, 2025 terminations included awards that had already been granted waivers to continue life-saving Humanitarian Assistance, President's Emergency Plan for Action and Relief  (PEPFAR) or non-PEPFAR health support across the whole region affected. Almost half of our total awards for our host country fall under the waiver.  The COs/AOs are receiving calls and correspondence from

implementing partners asking why their awards were terminated after being granted waivers. Many smaller local organizations as well as larger international development organizations are nearly bankrupt and having to lay-off or furlough staff, even after curtailing their activities to proceed with limited scope of activities under their waivers.

28. Even more concerning is that the terminations also include payments to vendors providing mission-critical operations-specific contracts or purchase orders that are extremely critical in providing safety and security services, and also health and maintenance of facilities and operations such as janitorial services. For our own Mission, this includes service contracts and, as a result of the terminations, vendors stopped working on anything related to the Mission compound or operations. We are now being told that some of these terminations were a "mistake" that USAID is trying to rescind. The contract terminations in numerous other Missions (though not our own) included cell phone providers, even though loss of cell phone service would cut off critical safety and security communications.

29. The terminations of USAID contracts and awards, including personal services contracts, has caused innumerable irreparable harms. As Mission CO, I can attest that there has been no individual review of contracts (implementing partner contracts or PSC contracts) by USAID personnel with knowledge of those contracts, that no documentation of any such reviews has been generated either in the field or by our CO/AO counterparts in Washington, and that the process used to terminate awards and contracts with implementing partners and PSCs has been flawed and inconsistent with all past practice. I have heard from colleagues that an algorithm or artificial intelligence (AI) software may have been used to select awards on the termination list. In the meantime, COs/AOs are still awaiting any sort of Memo to provide justification.

30. To provide context on the enormity of the task and the ridiculousness of the claim that an individual review of awards was conducted, a Senior Fellow for the Center for Global Development, Charles Keeny, observed on LinkedIn: "Between 2/18 and 2/16 Secretary Rubio 'made a final decision with respect to each award, on an individualized basis', to terminate 8,644 State and USAID awards. That's about one award every minute and twenty seconds. (Based on 758 State + 498 USAID contracts terminated as of 2/18, 4,100 State and 5,800 USAID terminated as of 2/26.'" What alarmed me was, on February 24th, there was an email (see attached) titled "Mass Terminations from DC and Comp Time/Over Time" coming from Headquarters stating that we (Contracting Officers) "have been instructed by DOGE & Jami to terminate several awards tonight." The email goes on asking "for those of you that need to work outside of work hours please contact your supervisor in advance of comp time/over time based on what your're able to get. For those of you in Foreign Operations, please consider this as your approval for Comp Time for the termination actions at hand."

31. On March 2, 2025, the most recent communications depict the fallout of terminations with various COs sharing the plight of Implementing Partners IPs). One CO from the field shares (see attached) that they are receiving letters that some IPs do not have the funds to terminate their awards (severance, early lease termination, withdrawing staff, paying admin staff to carry out closeout). Another CO from a different mission agrees saying the same applies at their location, and they have been told the partners do not have the funds to terminate their awards, and for example that they are in violation of local law to pay severance to local staff within 7 days of their termination. Other COs have confirmed no payments have been made worldwide. We (Contracting Officers) have been not a single payment has gone

out. So the only thing I (the CO) can tell partners has been to reconcile current funding with expenditures and what they owe due to the termination and document for when the system does open. The CO laments that the "situation" is really hard to believe. That we do our best to be fair and reasonable to make these contracts and agreements, to do good work while following them, and then all the credibility is lost when we don't act with integrity.  In one African country the local IP s are starting to threaten USAID.

32. The impact of terminating awards, including PSC contracts, is the dismembering of USAID, without the programs and accompanying expertise as well as the critical support in operations and infrastructure to justify its very existence and purpose. Harm is being done as we speak to countless lives, without sound justification or the documentation required by rules and procedures authorized by Congress and in violation of congressional appropriations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 2, 2025.


   /s/ Gregory Doe



## [FSCO] Mass Terminations from DC and Comp Time/Over Time

Mon, 24 Feb at 23:31

To: Foreign Service Contracting Officers <fsco@usaid.gov>
Cc: OAAForeignOps <OAAForeignOps@usaid.gov>

Hi FS COs,

I hope that you all are doing well.

We've been instructed by DOGE & Jami to terminate several awards tonight, so you may see some awards of yours that have been terminated.  You should be CC'd on any emails that are going out.  This of course will have to be officially done later in time through a GLAAS action from someone in the Mission/Region covering that portfolio, but I wanted to give you a heads up.

Also, for those of you that need to work outside of work hours please contact your supervisor in advance for comp time/over time based on what you're able to get.  For those of you in Foreign Operations, please consider this as your approval for Comp Time for the termination actions at hand.

Thanks to all for your patience as we sort through all of this.  There are MANY more terminations coming, so please gear up!



Sensitive But Unclassified (SBU)



---

## [FSCO] Kindly Requesting an Update on Payments for Field A/COs

---

████████████████                                          Sun, 02 Mar at 15:21

To: Jami Rodgers <jrodgers@usaid.gov>, Nadeem Shah <nshah@usaid.gov>, Rebecca Krzywda <rkrzywda@usaid.gov>, Lynn Winston <lwinston@usaid.gov>, Nancy Mausolf <nmausolf@usaid.gov>, Kent Benson <kbenson@usaid.gov>, Diane Perone <dperone@usaid.gov>, Gregory Marchand <gmarchand@usaid.gov>
Cc: Matthew Johnson <matjohnson@usaid.gov>, Hillary Marshall <hmarshall@usaid.gov>, Rachel Chilton <rchilton@usaid.gov>, Lindsay Shurtz <lshurtz@usaid.gov>, Foreign Service Contracting Officers <fsco@usaid.gov>, OAAForeignOps <OAAForeignOps@usaid.gov>

Hello M Bureau Leadership Team and esteemed colleagues in DC and the field,

Good morning! I hope that you are all well and are disconnecting as much as possible during the weekend.

Has there been any updates and/or progress made to paying implementing partners (IPs)?

I continue to hear a lot that not paying IPs is and will continue to raise issues.  As raised on Friday in one African country the local IPs are starting to threaten USAID, which affects the safety and security of our USDH and local personnel.  As you all know, the laws that we live and work in overseas differ per country and with more local partners in recent years we have more liability when it comes to following local laws. IPs are also stating that they don't have the funds to continue working in some cases where we've rescinded their termination notices.  Also, many continue to not have access to their Letters of Credit (at least one ex. of this was mentioned in Ukraine).

Just overnight I've seen the following messages from FSCOs (CC'd) in the field:

CO#1 -- "I'm also starting to receive letters that some IPs do not have the funds to terminate their awards (severance, early lease termination, withdrawing staff, paying admin staff to carry out closeout)."

CO#2 -- "Same here - I have been told the partners do not have the funds to terminate their awards, and for example that they are in violation of local law to pay severance to local staff within 7 days of their termination. I am not sure how to advise them".

CO#3 -- "I have as well. I shared with RLO. But that was after the first SWOs went out. No payments have been made worldwide. We were told not a single payment to IPs has gone out. So the only thing I can tell partners has been to reconcile current funding with expenditures and what they owe due to the termination and document for when the system does open. But this "situation" is really hard to believe. I mean we do our best to be fair and reasonable to make these contracts and agreements, to do good work while following them, and then all credibility is lost when we don't act with integrity."

Between the other emails that I've received and these messages I continue to be more concerned about not only the safety and security of our staff overseas,and our credibility, which also affects the Dept. of State.

I just wanted to make sure that everyone was updated with the latest sentiments from some, if not all, overseas COs.  They are now holding more responsibility than ever, since many of them are one of only a few USAID staff that are still "essential".  Several are acting Mission Directors, Deputy Mission Directors, and covering many countries in their regions.

We also need to coordinate with the EXOs in the field to ensure that they are covering as regionally as possible, like COs are doing.  This will help to reduce the growing workload of COs, so I'm including Kent Benson.

Thanks in advance for helping us continue to ensure the safety of our staff overseas, while also fulfilling the legal responsibilities that are part of the contractual relationships that we enter into globally as Agreement/Contracting Officers, which includes EXOs.

I optimistically look forward to good news regarding payments, but would appreciate any update for the field.  Please "reply to all" with your response.

Best regards,



Sensitive But Unclassified (SBU)

**EXHIBIT 15**

**25-cv-469-CJN**

## DECLARATION OF FRANCISCO DOE

I, Francisco Doe, declare as follows:

1.     I am employed with the United States Agency for International Development (USAID) and stationed overseas. I have personal knowledge of the facts stated in this declaration.

2.     Earlier this week, Marcus Thornton, who has been serving as the Deputy Chief of Staff of USAID during its dismantling, sent an email to overseas mission directors (MDs), with instructions and information related to the final dismantling of USAID. I have seen that email, which has been forwarded in the ordinary course of business to many people who are not MDs. A true and correct copy is attached as Exhibit A.

3.     The following information was conveyed in Thornton's email and on a series of phone calls involving MDs and Agency leadership. As is common practice at USAID, the "read-outs" of the phone calls were shared with Agency staff, myself included:

    a.  **Congressional earmarks for programs will not be honored**.

    b.  We should maintain very low expectations on "reclama" for terminated programs; in other words, terminated programs will not be restarted.

    c.  **State political leadership made the following statements:**

        •  **"Come hell or high water, USAID will be integrated fully into State by July"**

        •  **"Litigation is over; just get on with it"**

        •  **"USAID will be a test case for the State RIF to follow"**

    d.  There is no visibility in how assistance programs are cut, why, or any out-year budgets, which makes staffing projections all the more difficult.

e.  The anticipated end state of USAID in the field is that we will become part of existing embassy sections, not a standalone office/section.

f.  By August 15, MDs are directed to repatriate all Foreign Service Officers (FSOs) and Personal Services Contractors (USPSCs).

g.  Also by August 15, there will be a 100% RIF of all Foreign Service Nationals (FSNs).

h.  There will not be a "crossover" of staff to State.

i.  They will work with Chiefs of Mission to create/request new positions (Limited Non-Career Appointment and Locally Engaged Staff) to manage active programs, but the creation, classification and competition for those will be State-led from DC.

j.  USPSCs are eligible to apply for LNA positions.

k.  In the next 2 to 3 years, State may create a new development/assistance cone for the Foreign Service.

l.  The "back office" functions of Office of Acquisition and Assistance, Office of Financial Management, Human Resources, and other functions will be centralized at State in DC, as will all design work for new programs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 9, 2025.


   /s/ Francisco  Doe

From: **Marcus Thornton** <mathornton@usaid.gov>

Date: Tue, 8 Apr 2025 at 1:19 AM

Subject: (SBU) DIRECTIVES FOR USAID MISSION DIRECTORS ON REPATRIATION OF FSOs AND RIF OF FSN STAFF

To: Jeremy Lewin <jlewin@usaid.gov>, Kenneth Jackson <kensjackson@usaid.gov>

<span style="color:red">**Exhibit A**</span>

**SENSITIVE BUT UNCLASSIFIED**

**TO:** ALL U.S. Agency for International Development (USAID) Mission Directors

**INFO:** ALL CHIEFS OF MISSION (COMs) AT ALL DIPLOMATIC POSTS

**FROM:** USAID - OFFICE OF THE ADMINISTRATOR

**SUBJECT:** (SBU) DIRECTIVES FOR USAID MISSION DIRECTORS ON REPATRIATION OF FSOs AND RIF OF FSN STAFF

1. **(SBU) SUMMARY:** This message directs all USAID Mission Directors (MD), including Acting Mission Directors (A-MD) and AID Representatives, to work under the authority of Chiefs of Mission (COMs) and in close coordination with embassy management sections (MGT) to execute two critical actions: (1) repatriate all USAID Foreign Service Officers (FSOs) by August 15, 2025 and (2) conduct a Reduction in Force (RIF) for all Foreign Service National (FSN) staff also by August 15, 2025. USAID requests that COMs and their management sections take necessary steps to ensure timely compliance.

2. **(SBU) REPATRIATION OF FSOs:** All USAID FSOs must be repatriated by August 15, 2025. Mission Directors and AID Representatives are to support COMs and MGT, who are empowered to engage with this process and ensure its on-time completion. This includes repatriation of eligible family members and U.S./Third Country Personal Services Contractors (PSCs). USAID staff are expected to prioritize this effort, and COMs and MGT are requested to direct embassy resources as needed to overcome obstacles.

3. **RIF OF FSN STAFF:** All FSN staff must be separated via a Reduction in Force by August 15, 2025. Mission Directors are to implement this under COM oversight, ensuring compliance with local labor laws, Local Compensation Plans, and post-RIF policies. COM, USAID and MGT leadership is requested in this effort to resolve any issues. The process to transition programs and personnel is a State-led process. USAID staff should not delay RIF actions awaiting Department of State decisions.

4. **COLLABORATION WITH DEPARTMENT OF STATE:** USAID acknowledges that the State Department, through COMs, is managing the transition of certain USAID programs and related staffing. USAID's primary responsibility is to execute the repatriation, RIF, and mission and activity closeout. COMs have USAID's full support to prioritize these actions over other considerations.

5. **LOCAL PROBLEM-SOLVING:** Missions should address challenges at the local level, leaning heavily on COMs and embassy resources, including MGT, to resolve issues such as legal disputes related to the RIF. USAID requests COMs to take any necessary actions to meet the deadlines of August 15, 2025 for FSO repatriation and FSN RIF completion. Washington (i.e., USAID HQ staff) will provide support, but MDs, A-MDs, and AID Reps at post are expected to lead implementation, adapt as needed, and address challenges under COM leadership.

# EXHIBIT 16

**25-cv-469-CJN**

## DECLARATION OF MARJORY DOE

I, Marjory Doe, declare as follows:

1.    I am an Agreement Officer's Representative and Contract Officer's Representative at USAID/BHA. I have personal knowledge of the facts stated in this declaration.

2.    There was a foreign assistance review conducted on USAID awards by the current Administration, the results of which were supposedly shared with Congress (on March 28, 2025) to report on awards being retained or terminated.

3.    After the past two weeks since March 28, additional awards continued to be terminated without justification, explanation, or prior notice. This included full terminations for awards and contracts that had previously received a stop work order, then a notice to resume, then a termination, and then a rescission of that termination.

4.    Two examples of termination notices issued to implementing partners after March 28 are attached as Exhibit A. The first notice states that a "policy determination was made to terminate" the award. The second notice identifies Jeremy Lewin (a DOGE team member now serving as a deputy administrator and "COO") as the person who issued the directive to terminate the award.

5.    Some of these awards were authorized to resume work only two weeks before being terminated again; the termination rescission letter read "as a result of the review conducted by the Department of State and USAID leadership, this notice services to cancel both the pause identified in USAID's January 28, 2025 communication to implementing partners for this contract as well as the above referenced partial stop-work order." The subsequent termination read that "in accordance with an individualized review of your award, a policy determination was made to terminate your award in alignment with Agency priorities and the national interest."

Other terminations read "the award is being terminated for the convenience of the U.S. government pursuant to a directive from Jeremy Lewin, performing the duties of the Deputy Administrator for Policy and Programming and Chief Operating Officer for the U.S. Agency for International Development, for alignment with the Agency priorities and national interest. The decision to terminate this individual award is pursuant to a review and determination that the award is inconsistent with the Administration's priorities."

6.      Partners who received such notices continue to reach out to the Agreement and Contract Officers expressing confusion, as they had recently been authorized to resume work. They have yet to receive clarification on the decision.

7.      The terminated awards that I manage were all for emergency humanitarian assistance, providing food, nutrition, health, water and sanitation, and shelter services.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 14, 2025.


  /s/ Marjory Doe

# Exhibit A



**To:** ████████████████

**Subject:**    Notice of Full Termination for Convenience

**Contract:**    ████████████████

**Date:**    April 1, 2025

Dear ████████████████████████████████

In accordance with an individualized review of your award, a policy determination was made to terminate your award in alignment with Agency priorities and the national interest.

████████████████████ is completely terminated under FAR clause 52.249-6, effective immediately. Immediately stop all work, terminate subcontracts, and place no further orders except to the extent that you or a subcontractor wish to retain and continue for your own account any work-in-process or other materials. Provide by electronic means similar instructions to all subcontractors and suppliers. Detailed instructions to follow.

Please confirm your receipt and agreement with this Termination Notice by completing and returning the acknowledgement below. Should you have questions concerning this letter, please contact me at moaa.bha@usaid.gov with a copy to the COR. We will follow up with further guidance as soon as possible.

Sincerely,

CHRISTIE       Digitally signed by CHRISTIE
CANDYCE        CANDYCE SAVAGE
SAVAGE         Date: 2025.04.01 15:11:54
               -04'00'

Christie Savage
Contracting Officer

████████████████████



**FROM THE AMERICAN PEOPLE**

**April 4, 2025**

**To:**        Email: ████████████████

**Subject:**    Termination Notice of Award ████████████████

**Reference:**   Assistance 2 CFR 200.340 (4), 2 CFR 700.14 (US NGOs), OR provision M.10 (non-US-NGOs)

Dear Implementing Partner,

This award is being terminated for the convenience of the U.S. Government pursuant to a directive from Jeremy Lewin, performing the duties of the Deputy Administrator for Policy and Programming and Chief Operating Officer for the U.S. Agency for International Development ("the Agency" or "USAID"), for alignment with Agency priorities and national interest. The decision to terminate this individual award is pursuant to a review and determination that the award is inconsistent with the Administration's priorities.

I have been delegated authority to terminate this award. In accordance with the referenced authority, the subject award is hereby completely terminated effective immediately as of the date of this letter.

Immediately cease all activities, terminate all subawards and contracts, and avoid incurring any additional obligations chargeable to the award beyond those unavoidable costs associated with this Termination Notice. Immediately provide similar instructions to all subrecipients and contractors. Detailed instructions to follow.

Detailed instructions will follow, and a formal modification/amendment to memorialize this action is forthcoming from the Cognizant Agreement Officer. For questions regarding this letter, please contact me at moaa.bha@usaid.gov, with a copy to the Agreement Officer's Representative (AOR). Kindly confirm receipt of this Termination Notice via electronic email response to the sender with a copy to moaa.bha@usaid.gov and the Industry Liaison email at industryliaison@usaid.gov.

Sincerely,

CHRISTIE        Digitally signed by CHRISTIE
CANDYCE        CANDYCE SAVAGE
SAVAGE         Date: 2025.04.04 17:19:21
               -04'00'

Christie Savage
Terminating Agreement Officer
USAID

**EXHIBIT 17**

**25-cv-469-CJN**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
PERSONAL SERVICES                         )
CONTRACTOR ASSOCIATION,                   )
                                          )
            *Plaintiff.*                   )          Case No. 1:25-cv469-CJN
                                          )
      v.                                  )
                                          )
DONALD TRUMP, et al.,                     )
                                          )
            *Defendants.*                  )
                                          )
_____

**SECOND DECLARATION OF Y. DOE**

I, Y. Doe, declare as follows:

1.      I am over 18 years old and competent to give this declaration, the contents of
which are based on my personal knowledge, information and belief.

**Update on My Own Circumstances Since February 18, 2025**

2.      I am a USAID Personal Services Contractor (PSC) and a member of the PSC
Association. This is my second declaration provided in support of the Association's motion for a
temporary restraining order.

3.      Since I signed my first declaration on February 18, 2025, my situation
fundamentally has not changed:

      a.   I am still in limbo. Leadership is still giving me verbal assurances that my
           lapsed contract will be renewed. I send a daily email stating that I am prepared
           to work but have not received a single response.

b.   Further, the ordered departure (OD) from the Democratic Republic of the
Congo has been extended for another 30 days. However, I have no written
confirmation or definitive guidance about my employment status or contract
extension. This means I am not able to receive the housing allowance or daily
stipend that are afforded to my other colleagues also on OD.

c.   Despite my need to make long-term financial and other commitments
impacting my life, the Agency that employs me has provided no reliable
indication of any plan for what I can expect in the coming days, let alone in
the coming months.

d.   The Agency is in complete disarray. Among countless other examples, per a
recent call that leadership conducted with DRC personnel, they are aware that
the support to personnel evacuated by boat from the Democratic Republic of
the Congo has been sub-par, yet the non-repayment of vouchers and
uncertainty still persists.

e.   I am still owed upwards of $18,000 in unpaid vouchers for travel, health
insurance, and other entitlements. These obligations, including Cost of Living
Allowance (COLA), Special Evacuation Allowance (SEA), Meals and
Incidental Expenses (M&IE), and health insurance costs have not yet been
paid or reimbursed, and it is still unclear they will ever be paid. I do not know
for how long I can continue to shoulder this financial burden.

f.   The lack of clarity and abandonment by my employer continues to have
broad-reaching implications on my life, my household, my finances and my
personal well-being.

2

g.   I still can't leave Washington D.C., however, the benefits to which I was entitled while on ordered departure, including a housing stipend, stopped when my contract lapsed. Now, I am under even more financial stress. I can't sign a lease, because I have no confirmation of my status as a federal employee and no money. I cannot afford $190 a night for a hotel in Washington D.C. I have no housing and am staying with friends in spare bedrooms and on sofas.

h.   I still have no health insurance.

i.   My pets and belongings are stuck in the DRC. Because the agency has fallen apart, DRC personnel have been told that we should not expect to be reunited with our personal property for at least a year. Similarly, the fate of our pets remains uncertain, many colleagues have given them up for adoption in Kinshasa as they have no hope of getting them back. I am exploring ways to extract them at great personal expense.

j.   The cumulative exhaustion of the above is severely impacting my mental health. I have dedicated my life and career to a sector that is currently being decimated. When I think about my future employment prospects and the future of those we serve I feel anxious, fearful and powerless.

**Continuing Trauma Being Inflicted on USAID Personnel**

4.   It is the opinion of many of the personnel at USAID (I would pose the opinion of the majority) that the way in which the so-called 90-day review has been implemented actively seeks to cause psychological and financial harm to committed US government employees.

5.      In a speech in 2023, Russell Vought, the current Director of the Office of Management and Budget (OMB) under President Trump, made the following statement:

> "We want the bureaucrats to be traumatically affected. When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains. We want their funding to be shut down... We want to put them in trauma."

6.      From my perspective, and those of my USAID colleagues, it is apparent that the methods currently used by the administration to interact with USAID staff are animated by malice and seek to 'put us in trauma'.

7.      On Wednesday January 22, Acting Administrator Jason Gray sent email asking employees to report "facts and circumstances" of a "change in any contract or grant description or personnel position description within the Agency since November 5, 2024 to obscure the connection between the contract or grant and DEIA or similar ideologies." The tone of the email was threatening. It encouraged employees to report on one another, creating an environment of mistrust. It also created an atmosphere of fear for anyone who might have been involved in activities aligned with diversity, equity or inclusion in the past.

8.      On Saturday January 25 (outside of core working hours), the USAID workforce received a message from Ken Jackson titled "Message and Expectations to the Workforce". The message was tantamount to a gag order on communicating externally, it also set the stage for upcoming 'scrutiny' and was threatening in nature stating:

"Failure to abide by this directive, or any of the directives sent out earlier this week and in the coming weeks, will result in disciplinary action."

4

9.      On Monday January 27, 56 senior career staff were put on administrative leave via email, with allegations that they had "circumvented The President's Executive Orders". The following day 1,000+ institutional support contractors were furloughed. At this point, only a week into the new administration, there was already widespread confusion and fear of the aforementioned 'disciplinary action'.

10.      On Tuesday January 28, a portion of staff received the, now notorious, "Fork in the Road" email from hr@opm.gov. Until this point, USAID had still not received any formal guidance on what was happening or how the review was going to take place. This email was not received by all hiring mechanisms and so made me and my other PSC colleagues fearful of what was in store for us.

11.      On Saturday February 1, the USAID website was taken down by a DOGE official, they also gained access without authentication to USAID social media accounts and took down X and IG, and USAID main social media handles. Hundreds of staff lost access to their emails and were not provided with notification. This communications blackout was inflicted over the weekend causing considerable stress and confusion as to what it meant for people's employment.

12.      On Sunday February 2, Elon Musk, head of the Department of Government Efficiency (DOGE), referred to USAID as a "criminal organization" and stated, "Time for it to die." Until then staff had understood that programming was under review for reasons of efficiency and to ensure compliance with administration priorities. Now we were being publicly denigrated as criminals, manufacturing the consent for our demise.

13.      The same day, DOGE sent an email, using USAID's Press email box, to all staff saying the USAID headquarters at the Ronald Reagan Building will be closed the following day

5

(February 3), and Agency personnel normally assigned to work at USAID will work remotely to work from home. However, at the same time hundreds of staff around the globe were losing access to all systems, struggling to communicate with one another, their supervisors or with the security apparatus responsible for keeping them safe. Already people were panicking about what the systems lock-out meant for their employment, their healthcare and their personal safety, especially at a time where we were being painted as villains and 'insubordinate'.

14.     On Monday February 3, USAID staff still tried to return to work in the best capacity they could, working from home or going into offices abroad despite having no access to systems, only to be met with more malicious rhetoric. Elon Musk announced plans to dismantle USAID, citing "It became apparent that it's not an apple with a worm in it. What we have is just a ball of worms. You've got to basically get rid of the whole thing. It's beyond repair." Shortly thereafter, President Donald Trump referred to USAID as "radical left lunatics," criticizing the agency's management and operations. This villainization by those in the highest positions of power were having the desired effect to traumatise staff.

15.     Also on February 3, Elon Musk stated, "We spent the weekend feeding USAID into the wood chipper," indicating his commitment to dismantling the agency with no regard for the fact that it is composed of hardworking employees in the US and abroad and that he would be splintering lives.

16.     On Tuesday February 4, a memorandum was sent to all USAID employees from Acting Deputy Administrator for Policy and Planning and Acting Deputy Administrator for Management and Resources, Pete Marocco, informing staff they are being placed on Administrative Leave or "excused absence with pay effective immediately, pursuant to ADS 480. You will remain on administrative leave with pay until otherwise notified...During the

period you are on administrative leave you are not to enter USAID premises, access USAID systems, or attempt to use your position or authority with USAID in any way without my prior permission or prior permission of a supervisor in your chain of command."

17.     Later, an Internal Communications notice went to employees stating that on Friday, February 7 at 11:59 PM, all USAID direct hire personnel will be placed on administrative leave globally. "For USAID personnel currently posted outside the United States, the Agency, in coordination with missions and the Department of State, is currently preparing a plan, in accordance with all applicable requirements and laws, under which the Agency would arrange and pay for return to travel to the United States within 30 days and provide for the termination of PSC and ISC contracts that are not determined to be essential." The effect of these two messages was to sow widespread panic amongst colleagues in DC and abroad. Already under considerable stress, staff were now working under the assumption that they only had a few days to prepare handovers of their work or, in many cases, prepare to move their entire families across continents.

18.     On Thursday February 6, USAID political leadership informed staff that of the over 13,000 workforce, only 300 have jobs that will continue past February 7. At this point, USAID had been subject to the oscillating impacts of decision-making for over two weeks. Already exhausted, we were being told that we would lose our jobs, homes and safety nets at a moment's notice, and be thrust into a sector that was also decimated from the funding freeze. It's hard to describe the atmosphere amongst colleagues as anything other than tears and terror.

19.     On Tuesday February 18, at midnight, the first of several rounds of batch terminations of PSCs was issued. Each batch was sent to hundreds of individuals in *bcc*. The

email was not only noncompliant with contract regulations, it was dehumanizing and caused yet more stress for the individuals who received them.

20.     Those terminated were offered a short window to retrieve belongings from one of the former USAID buildings. Many individuals went to support their coworkers, and show solidarity. As staff congregated to commiserate, another batch of terminations went out firing yet more of those in the room. The vitriolic rhetoric employed by the administration combined with their actions, understandably caused me and others to feel like they are being purged from a job and organization they love, as well as fear for their future prospects.

21.     On Saturday February 22, a colleague directed me to a tweet posted by Elon Musk demanding that federal workers justify what they got done last week and that "failure to respond will be treated as a resignation". Shortly thereafter colleagues started receiving an email from an unknown HR address with the subject "What did you do last week?" (in lower case). This email requested five bullet points but made no mention that failure to respond would be treated as resignation. There was consternation from the workforce that we might have to respond to some form of "shadow control" which is issuing instructions, or that instructions or policy was now being communicated via social media.

22.     Elon Musk later implied that the email had been a ruse, further evidencing that USAID and federal employees are being subjected to psychological harm at the whim of an individual or group of powerful individuals.

23.     The government is subjecting employees to a form of psychological warfare.  The mental health of USAID employees is bad. We are being gaslit by our employing agency and the U.S. government. We are being maligned.

24.     What is happening at USAID is trauma being inflicted on the workforce in line with Russell Vought's playbook. Despite our service to the U.S. government and American public,  we are being treated without even basic dignity.

**Pending Humanitarians Disasters from the Dismantling of USAID**

25.     The mass terminations, imposition of administrative leave and lapses in contracts means that there is no one left at USAID to implement anything. Despite the treatment that we as USAID employees have received, there are still many willing to resume their roles at a moment's notice to try to salvage programs and provide desperately-needed assistance.

26.     The new administration's disorderly implementation of Stop Work Orders (SoW) and the 90-day review, has already inflicted significant harm on NGOs. The non-payment of services already provided, even prior to the new administration taking office, coupled with the uncertainty around future payments means that NGOs have had to take drastic measures. They have laid off staff, closed offices, reduced the activities they provide; feeding fewer children, building fewer shelters, halting the provision of clean water.

27.     The upheaval in the provision of foreign assistance is complicating humanitarian efforts in Eastern Congo. Since January 2025, escalating conflict in North and South Kivu has displaced over 1 million people. The USG funds approximately 70% of the humanitarian response but the turbulence has made it difficult to scale up assistance effectively. We as USAID workers were forced to sit in silence as our implementing partners reached out with reports, and shared footage of bodies in the streets. We were unable to offer guidance, support or even condolences.

28.     The transition, combined with the conflict in Eastern Congo has also heightened risks. The programming implemented there depends on continuous supervision and monitoring.

The wanton terminations, imposition of admin leave and lapses in USAID staff contracts is impacting the oversight of US taxpayer-funded programs in DRC and around the globe.

29.     It is my understanding that the funds that were supposed to be unfrozen under Judge Ali's temporary restraining order include funds committed to the World Food Program (WFP). Around the globe, WFP implements the UN Humanitarian Air Service which transports food, medicine, and humanitarian personnel.

30.     The UNHAS service is particularly critical in Eastern Congo. Road infrastructure is largely non-existent and, even where there is a road network, insecurity makes overland travel incredibly dangerous. In early February, three humanitarian workers under a USAID Bureau of Humanitarian Affairs project were executed in their vehicle while trying to deliver aid.

31.     While USAID is not the only agency that funds humanitarian air service in the DRC, it is by far the largest single contributor, and the service cannot be maintained without USAID funds. Due to the funding freeze, and despite Judge Ali's TRO, humanitarian assistance via helicopter has already stopped. And the rest of the air service, which includes major aircraft, is expected to be grounded within the next 48 hours.

32.     In 2024, the service transported 44,236 passengers and carried 597 metric tons of cargo, this included vital medications, food assistance, materials to build shelters and nutritional supplements for infants. It is reasonable to expect, given the ongoing conflict on the ground, that the demand for air transport will be even more acute in 2025.

33.     UNHAS is relied upon by 212 organizations, many of which are also recipients of USAID funding, to carry out their operations.

34.     Even a brief hiatus in service provision will have drastic implications on the provision of humanitarian assistance and broader implementation of the UN mandate in Eastern Congo.

35.     The same situation is likely to be replicated in other settings where WFP operates UNHAS if funding is not secured.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 26, 2025.

　　　　　　　　　　　　　　　_/s/ Y. Doe_____

# EXHIBIT 18

**25-cv-469-CJN**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| PERSONAL SERVICES | ) | |
| CONTRACTOR ASSOCIATION, | ) | |
| | ) | Case No. 1:25-cv-469 |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## DECLARATION OF Y. DOE

I, Y. Doe, declare as follows:

1.       I am over 18 years old and competent to give this declaration, the contents of which are based on my personal knowledge, information and belief.

2.       I am a USAID Personal Services Contractor (PSC) and a member of the PSC Association. Currently, I serve as a Program Officer, assigned to USAID/Democratic Republic of the Congo in Kinshasa.

3.       My PSC contract has a one-year base term (February 2021 - February 2022), followed by four option years, which would extend my current assignment through February 2026.

4.       On February 14, 2025, I was due to sign and enter into option year four of my contract.

5.      In order to ensure that the retention of PSC personnel is merit-based, annual performance evaluations are conducted prior to PSC contract extensions. My performance evaluation was conducted and finalized in December 2024. I received an "exceptional" rating and, further, I was assured that the review was submitted in accordance with personnel procedures in the first week of January 2025.

6.      During the course of my employment, it has been known for USAID option-year paperwork to be issued on or after the anniversary date with retroactive effect. Given this precedent, I continued to fulfill my function in accordance with the terms of my employment, including travelling for temporary duty (TDY).

7.      While PSC contracts state that contract extensions are by mutual agreement and at the discretion of the Supervising Officer, in practice, when PSCs have strong performance reviews and wish to remain in their posts, and especially given the level of needs and volume of work, USAID routinely extends their contracts.

8.      On January 20, 2025, the President of the United States issued an Executive Order (the Executive Order on Review of Foreign Assistance Programs) imposing a 90-day "pause" on all U.S. foreign assistance. Given the ambiguities and inconsistencies in the language used, it was unclear how the executive order would be applied to PSC employees, particularly in relation to exercising the option year. However, I was given assurances by my supervisors who were in touch with agency leadership that my contract modification was proceeding as expected.

9.      On January 24, 2025, Secretary of State Marco Rubio issued a communique to all diplomatic and consular missions ("ALDAC"), purporting to provide "waivers" to stop-work orders issued under the Executive Order:

2

(U) The Secretary of State has approved waivers of the pause under the Executive

Order and this ALDAC, subject to further review, with respect to:

[...]

(b) emergency food assistance and administrative expenses, including

salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses,

including travel, for U.S. direct hire employees, personal services

contractors, and locally employed staff.

10.    After receiving notice of these purported waivers, I immediately reached out to

seek clarity on my contract and received written assurance, on January 27, 2025, that the

Office for Talent Acquisition Management and Outreach (TAMO) was "proceeding with

business as usual for current PSC contracts. However, if any guidance comes out from the

Agency Front Office and General Counsel, we will keep you updated."

11.    Since receiving that assurance on January 27, 2025, I have received no definitive

guidance about my employment status or contract extension. Though I have received verbal

and written assurances from supervisors that PSC actions, such as my option year, were

being processed.

12.    Unfortunately, despite the assurances received, I did not receive the paperwork

required to exercise my option year in a timely fashion. Nor did I receive notice of

termination. In fact, I have received no communication at all on the status of my position or

the future of my role. My contract has not been formally terminated, but it has not been

extended either. I am in limbo.

3

13.     Uncertainty over future employment and job security would be enough to cause anyone anxiety. However, as an PSC based overseas, the lack of clarity and abandonment by my employer has much more broad-reaching implications on my life, my household, my finances and my personal well-being.

14.     In service of the US Government, four years ago, I moved my entire household to Kinshasa, DRC, including my spouse and two pets. The leased housing provided by the U.S. Government has become home for us.

15.     Prior to January 20, 2025 I departed my post in Kinshasa, and on January 20, 2025, arrived as temporary support for another USAID Regional Officer for a period of three months.

16.     I readied myself to take on my new portfolio. However, the Executive Order issued on January 20, 2025 to pause all U.S. foreign assistance meant that I was never able to fulfill my duties and speak to implementing partners.

17.     Aside from concern for our own personal circumstances, there was a palpable fear that, in the event of a natural disaster in the region, the response would be crippled due to the stop work orders (SoWs).

18.     In addition to the stress my new team and I were facing, over the weekend of January 25–26, 2025, M23 rebels in eastern DRC took control of the city of Goma. Due to the aforementioned "pause" on all U.S. foreign assistance, our implementing partners were sending footage of the horrors unfolding and reaching out for guidance to their USAID counterparts—to which we were unable to respond.

19.     Given the time zone difference, I was receiving these updates from the DRC and monitoring the situation as closely as I was able throughout the night, in case I would be

able to provide some form of remote support to my "home team" in DRC. But because of the SoW, there was nothing I could do. I felt impotent.

20.    On January 28, 2025, the majority of American staff and their families at the mission in Kinshasa were placed on ordered departure (OD) due to escalating violence in the capital and targeted attacks on US infrastructure, including private homes.

21.    I was in communication with friends and colleagues in Kinshasa during this stressful time. They were given the directive to choose between their personal belongings and their pets, as only one item per person was allowed on the boat.

22.    Neighbors secured my own home, leaving our pets behind while I frantically sought to arrange care for them over the phone.

23.    On Sunday, February 2, the majority of colleagues globally began to be locked out of their systems. I, somehow, retained access and became the conduit for relaying the constantly changing stream of information to the team. Were it not for my continued access and those of our locally employed staff, my colleagues and I would have been unable to coordinate or remain informed of new developments.

24.    On February 4, employees received an email titled "The Path Forward" which detailed that as of Friday, February 7, 2025, USAID direct hire personnel would be placed on administrative leave globally, with a few unclear exceptions, and that USAID personnel based overseas would be recalled to the United States within 30 days, subject to consideration of "case-by-case" exceptions. The email was signed "Thank you for your service."

25.    Regarding the PSCs, the "Path Forward" email stated that the Agency was "currently preparing a plan, in accordance with applicable requirements and law" that

would "provide for the termination of PSC and ISC contracts that are not determined to be essential." However, the email did not announce the termination of any contracts at that time, did not detail how determinations of "essential" were to be made, and did not explain how those terminations would be carried out in a safe and dignified manner. It stated only that the Agency was "preparing a plan" to terminate PSC contracts.

26.    The "Path Forward" email created a sense of panic for all of us based overseas and also my DRC colleagues now on evacuated status in the US.

27.    Following receipt of that email, the consensus was that I should curtail my TDY and join my colleagues on ordered departure/evacuation status in Washington DC.

28.    During my TDY, I had been incurring significant costs, which I am not sure will be honored.

29.    Trump administration officials have cut off my Agency's capacity to pay me what I am owed. I have undertaken significant costs and liabilities in good faith reliance on the government's obligations to my family and me for my service. These obligations, including Cost of Living Allowance (COLA), Special Evacuation Allowance (SEA), Meals and Incidental Expenses (M&IE), and hotel costs have not yet been paid or reimbursed, and it is unclear at the time of writing whether they will ever be paid. Despite my need to make long-term financial and other commitments regarding my life and lifestyle, the Agency that employs me makes unexplained short-term threats to my employment with no indication of any plan for what I can expect in the coming days, let alone in the coming months.

30.    I am currently owed upwards of $18,000 in unpaid vouchers for travel health insurance and other entitlements. I am continuing to accrue costs, and I am unsure for how long I can shoulder this financial burden.

31.    Furthermore, being in the US means I will lose entitlements that I have relied upon, such as housing, utilities, cost of living allowance (COLA) and post-differential.

32.    As part of the evacuation instructions and the Executive Orders mandating a return to in-person work, staff were informed they must relocate to the Washington, DC area so they could go to the office. However, since February 3, the USAID buildings have been closed to staff. As of the time of this writing, they have never reopened. Despite being forced to take on expensive DC-area leases and costs, USAID staff have never been allowed to go to the office. Again, despite significant efforts by USAID administrative (non-political) staff, thus far no evacuation support payments have yet been made to anyone from USAID/DRC.

33.    I do not have property in the US and, unfortunately due to bereavement, have limited family ties in the US. In an effort to keep my costs down, I am staying with friends in spare bedrooms and on sofas, moving every few days.

34.    My Home of Record in my contract is in the not in the US, but while I remain in limbo with my contract, I am scared to return home (where my costs would be significantly lower), because it could be considered a breach of the order requiring us to work in the shuttered offices in Washington, D.C. (the return-to-work order).

35.    Because I was stationed overseas, I also do not have a health insurance plan that covers me for medical treatment in the US. The uncertainty with my contract and position, and with my employment overall, means that I am unable to obtain health insurance and live in constant fear of illness or injury.

36.    My PSC contract states, "For travel to and from post of assignment, the contractor shall be reimbursed for travel costs and travel allowances from place of residence

in the United States (or other location provided that the cost of such travel does not exceed the cost of the travel from the contractor's residence in the United States) to the post of duty in the Cooperating Country and return to place of residence in the United States (or other location provided that the cost of such travel does not exceed the cost of travel from the post of duty in the Cooperating Country to the contractor's residence) upon completion of services by the individual."My belongings and pets remain in Kinshasa and I do not know to what extent the US Government will honor the terms of my contract, particularly since they allowed it to lapse while I am on an overseas assignment.

37.   Contractually, I should be reimbursed for OD until February 27, 2025. However, no one knows what will happen after that date, and no one knows the implications of the fact that my February 14, 2025 contract anniversary date has lapsed.

38.   Given the assurances I received, I had no reason to prepare for the termination of my contract.

39.   Since January 20 2025, I have been living in a perpetual state of anxiety and turmoil. To-date, I remain available to carry out the functions of my role as stated in the terms of my PSC contract until directed otherwise, but have received no guidance, support or definitive response. In remaining committed to this role, I do so at personal and financial risk.

40.   At USAID, we are dedicated professionals committed to our mission of providing critical assistance to those in need. Despite rapidly evolving directives, we worked diligently in an attempt to ensure that aid reaches the most vulnerable communities. Throughout this process, we have faced malicious criticism and vitriol from those in the highest positions of power, both in internal communications and in the public sphere. The

8

inflammatory rhetoric directed at us has not only misrepresented our efforts but has also been used to justify treatment that fails to uphold the basic dignity and respect that all individuals deserve. In my case, and in those of many of my PSC colleagues, our situation is particularly precarious. The lack of humanity with which we are being treated threatens our livelihoods and, in some cases, our very lives. We remain steadfast in our pursuit of fair and just treatment for all USAID employees and the populations we support around the globe.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 18, 2025.

_/s/ Y. Doe_____

# EXHIBIT 19

**25-cv-469-CJN**

DECLARATION OF ZANE DOE

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a warranted contracting officer at the U.S. Agency for International Development (USAID).

3.      On January 20, 2025, the President of the United States issued an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," which called for a "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy," including a pause on new obligations and disbursements of foreign assistance funds.

4.      On January 24, 2025, Secretary of State Marco Rubio issued cable 25 STATE 6828, which directed contracting officers to issue stop-work orders for all current awards. It further noted there would be a review process for existing awards and that "decisions whether to continue, modify, or terminate programs will be made following this review." On the same day, Acting USAID Administrator Jason Gray sent an agency-wide email reiterating the applicability of this cable to the agency.

5.      On January 27, 2025, contracting officers throughout the agency sent stop-work orders and suspension notices to their implementing partners in accordance with this directive.

6.      Beginning on February 9, 2025, and continuing through February 25, 2025, agency leadership have communicated six "tranches" of approximately 100-200 awards each to be terminated to the USAID Senior Procurement Executive, Jami Rodgers, who in turn has communicated directives to contracting officers to take action by sending out termination notices.

1

7.      On February 12, 2025, in providing directive to terminate awards in one of these tranches, Senior Procurement Executive Rodgers stated that "termination authority is delegated to me as the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid. An Action Memorandum for each tranche of awards was reviewed and cleared through the State Department's Director of Foreign Assistance and approved by the Secretary. These action memos will be filed in a shared drive. This documentation along with this email can be used to support the terminations." Contracting officers have not received a copy of these memos to date.

8.      On February 26, 2025, without notice to the cognizant contracting officers who manage any given award, approximately 5,700 termination notices were emailed to implementing partners. The notices were signed using a generic cursive font (rather than a verified digital signature) by contracting officers who do not personally oversee the terminated awards. Emails were sent from a previously unseen address (SPE@usaid.gov). USAID personnel responsible for managing the awards were not copied on any emails.

9.      On February 28, 2025, an acting deputy director of OAA sent an email to contracting officers with a list of the awards terminated on February 26. Contracting officers were asked to flag any terminated award that may provide essential services to the functioning of the agency.

10.     The fact that this review was requested after the terminations had already taken place implies that any determination process may be arbitrary and subject to error. The process required the agency to rescind at least 100 termination notices simply to maintain its own operations.

11. This termination process is not standard operating procedure. Contracting officers have the "authority to enter into, administer, or terminate contracts and make related determinations and findings" within the confines of their warrant and appointment (48 CFR 1.602-1). Given the breadth of tasks these authorities encompass, a contracting officer will rely on the advice and guidance of a variety of specialists in completing these responsibilities (see 48 CFR 1.602-2(c)); no one individual can specialize in all fields required to responsibly and efficiently manage a contract. However, the contracting officer is ultimately responsible for authorizing contractual actions.

12. In the case of a termination of a contract, whether for the convenience of the government (such as in the case where a contract no longer meets the government's requirements) or for default (such as in the case of failure of the contractor to perform), the contracting officer will rely heavily on the advice of the individual appointed as the contracting officer's representative (COR). The COR serves as a technical specialist and is the "eyes and ears" of the contracting officer, performing a variety of duties including inspection and acceptance of supplies and services rendered, as well as regular communication of technical direction to the contractor. Based on my professional experience, when a COR has contemplated termination of a contract, a contracting officer would surely request documentation of the evidence as to why such a determination should be made prior to taking any action. The contracting officer will also normally consult with legal counsel to reduce legal risk to the government and ensure sound judgment and rationale are secured prior to taking any action. Given the rarity of termination actions at the agency prior to 2025, I have normally seen them met with much deliberation and consideration.

3

13.     The terminations that have taken place over recent weeks have upended that standard deliberative process. Contracting officers have been afforded no evidence of any deliberation prior to termination, much less any role in that process. CORs similarly have indicated that they are not part of this review process.

14.     In effect, the "wide latitude to exercise business judgment" (48 CFR 1.602-2) that should be afforded to contracting officers in making decisions has been eliminated. Contracting officers and the specialists who would normally support them have been muzzled, and the contracting officer's authority has been subjugated to some opaque and unknown determination process.

15.     In my professional opinion, the elimination of personnel and positions en masse is likely to have damaging effects on the ability of the agency to manage and oversee even those awards that have not been terminated. Remaining personnel will be required to take on the work of their eliminated colleagues, thus overburdening them and decreasing the quality of their work.

16.     To my knowledge, the agency has yet to provide an indication of how many personnel total have already been terminated or whose positions are subject to a reduction in force (RIF). However, conversations among personnel have indicated that all Washington-based personnel on civil service excepted appointments, foreign service limited appointments, and U.S. personal service contractors (USPSCs) are or will be terminated, along with nearly all personnel in the Office of Policy; the Bureau for Global Health; the Bureau for Democracy, Governance, and Human Rights; the Office of Budget and Resource Management; the Bureau for Resilience, Environment, and Food Security; the Bureau for Conflict Prevention and Stabilization; and all program offices in regional bureaus.

17.     Upon information and belief, the number of USPSCs in the Bureau of Humanitarian Assistance who have received termination notices is approximately 350.

18.     The Bureau for Humanitarian Assistance is responsible for the provision of life-saving assistance, including food, water, and shelter, in disaster and crisis response. USPSC personnel serve in a variety of technical and operational oversight roles, including as contracting/agreement officer's representatives. These personnel are essential in ensuring effective delivery of assistance and in combatting fraud, waste, and abuse. Humanitarian assistance by its very nature is provided in some of the most difficult operating environments across the world, and removing personnel who are able to provide oversight of assistance increases risk of the assistance being misused or diverted.

19.     On even a basic operational level, CORs play an essential role in the payment of invoices and disbursement of funds. CORs provide an administrative review and approval of every invoice, stating that, to the best of their knowledge, funds are being paid for services and supplies that have been completed and delivered. As the eyes and ears of the agency in working with implementing partners, CORs are most intimately aware of these details and are able to provide the most comprehensive review of invoices to be paid. To the extent that CORs have been terminated, will be terminated, or are currently on paid administrative leave, the agency is at greater risk of improper payment. Further, to the extent that other personnel normally involved in the invoice review process, such as voucher examiners, are unavailable to complete their role, that risk further increases.

20.     With these personnel absent from their positions, the agency also is at risk of not paying contractors for work that has been completed, as personnel are not available to process payments.

21. As a civil servant, I remain dedicated to executing the directives of the President and the agency. However, recent agency actions have caused confusion and have hamstrung the ability of personnel to carry out their functions. By removing personnel most acquainted with its standard operating procedures for the management and administration of contracts and other awards, the agency has hindered its ability to provide requisite oversight and management of awards.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 3, 2025

/s/Zane Doe_____

# EXHIBIT 20

**25-cv-469-CJN**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ———————————————— ) | | |
| PERSONAL SERVICES ) | | |
| CONTRACTOR ASSOCIATION, ) | | |
|  ) | | |
| *Plaintiff,* ) | | 1:25-cv-00352-CJN |
|  ) | | |
| v. ) | | |
|  ) | | |
| DONALD TRUMP, et al., ) | | |
|  ) | | |
| *Defendants.* ) | | |
| ———————————————— ) | | |

## SECOND DECLARATION OF URSULA DOE

I, Ursula Doe, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration.

2. I previously filed a declaration in *American Foreign Service Association v. Trump*, 1:25-cv-00352-CJN, ECF #19-4, with Exhibit 1.

3. I am a Personal Services Contractor with USAID's Bureau for Humanitarian Assistance (BHA). I am part of USAID/BHA's Support Relief Group (SRG) cadre, who provide critical gap-filling and "surge" capacity worldwide during events like natural disasters or the scale up of armed conflict. As a SRG staff member over the past year and a half, I have worked in Port-au-Prince, Haiti, Jerusalem, Israel, and Mogadishu, Somalia.

4. I have been in Mogadishu since May 2024, supporting BHA's humanitarian programming in Somalia.

5. The U.S. Embassy in Mogadishu is considered a high-threat post and is rated critical for security. Incidents of indirect fire are common in Mogadishu and all Embassy staff are bound by strict security standard operating procedures, which include having access to

phones, radios, and connectivity.

6. On February 2, 2025 (US time), my access to USAID's systems was unexpectedly cut off, leaving me without access to my email, travel or voucher systems, and any HR documents. My connection to the Scry Panic app (used by the Embassy for personnel tracking and locating) was also cut off as it was linked to my USAID email account. I was not informed that I was on administrative leave or any other status.

7. My access restrictions were raised immediately through my leadership due to security concerns. When calling the Chief Information Officer Helpdesk ("CIO"), per USAID procedures, to report my continued lack of access, I was told that I needed approval from 'political leadership' for my account to be reenabled.

8. In order to re-enable my account, my leadership raised their concerns regarding my lack of account access to the Assistant to the Administrator (AtA) of BHA, who is a political appointee. There was no action and I remained without access to USAID systems.

9. Days later, I was put on a broader list of BHA staff who lost access, for political leadership approval. I was told that the access list reached the AtA's desk. Again, there was no action.

10. Throughout the next two weeks, I called CIO repeatedly for a status update on my account. I was told that I was not "on the list" to be re-activated and I would have to speak with my political leadership to be put on a list for account access.

11. I raised this issue again through my leadership and was told that the AtA was "familiar with my case specifically". Despite this, I still remained without account access.

12. My account was finally reactivated early in the morning on February 21, 2025. In the early morning of February 22, I received a termination letter, through that same account. The termination notice was sent to me without any identifying factors (like my name or contract

2

number). I was BCC-ed on the email along with - I later learned - hundreds of others within my cadre.

13. I have received no further communication on my termination beyond the form template that I was BCC-ed on. I am still in Mogadishu, with a contract termination date that is quickly approaching. I am in country on a diplomatic passport and am staying in Embassy housing. I am on temporary duty status in country and am not authorized to remain in country if I am no longer employed by the U.S. Government.

14. My termination date is March 10 and, though I have just reached out to leadership on my travel back, most individuals responsible for travel-related matters within the agency have been put on admin leave and our payment and obligation systems are still down.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 26, 2025.


_____ /s/ *Ursula Doe*
Ursula Doe

# EXHIBIT 21

**25-cv-469-CJN**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

PERSONAL SERVICES                          )
CONTRACTOR ASSOCIATION,                     )
                                            )
                 *Plaintiff,*               )          Case No. 1:25-cv-469
                                            )
        v.                                  )
                                            )
DONALD TRUMP, et al.,                       )
                                            )
                 *Defendants.*              )
_____            )

**DECLARATION OF JACK DOE**

I, Jack Doe, declare as follows:

**1.**    I am over 18 years old and competent to give this declaration, the contents of

which are based on my personal knowledge, information and belief.

**2.**    I am a USAID Personal Services Contractor (PSC) and a member of the PSC

Association. Currently, I serve as Senior Humanitarian Program Officer, stationed

overseas in ███████████████.

**My position at USAID and nature of my work**

**3.**    I am a USPSC with USAID who has worked with the organization for more

than eight years. Currently I work as a Senior Humanitarian Program Officer managing

emergency food, health, and WASH programs. In my time with USAID, I have held multiple leadership positions, including Planning Coordinator for the 2023 Turkey Earthquake Disaster Assistance Response Team (DART), and as Planning Coordinator and Deputy Leader for Planning for the Levant (Gaza) DART. Throughout my work I have managed complex humanitarian operations, coordinated across interagency and international partners, and led strategic planning efforts. My work is primarily focused on providing emergency food and nutrition assistance in conflict zones and disaster-affected communities.

**Harm caused by USAID Shutdown**

4.     On the evening of February 2, 2025, I became aware that I had lost access to my USAID email and all agency systems. At the time, I was on Temporary Duty (TDY) in Blackstone, Virginia attending Foreign Affairs Counter Threat (FACT) training, which is a required security course for all staff who will spend more than 90 days overseas in a given year, and must be renewed every six years. I never received any specific communications or direction from USAID other than public statements from Agency officials that all staff were being placed on Administrative Leave and that all field staff would be recalled within 30 days. Despite the lack of clarity regarding my employment status and if I would be able to return to post after training, I remained at training for two days. When it became clear that the Administration intended to recall

all overseas officers, I departed FACT to make arrangements for potential permanent
and imminent relocation to my home of record.

5.     To date, I remain without access to my email, time & attendance system, or
other Agency systems, including Department of State systems meant to manage
security and travel issues. I have received no formal notification from USAID officials
that I am on administrative leave, and despite public assertions that no staff are on
administrative leave, my last paystub indicates that I paid for Administrative Leave for
the week of February 3-7. My timesheet was coded as Administrative Leave for this
period by Agency staff according to the guidance they received at the time, despite the
fact that I was in required security training for the first two days of the week. The
submitted timesheet also did not include my Post Differential Allowance of 15% to
which all staff assigned to ███████ are entitled.

6.     I was able to return to ██████ on February 10, as I had a ticket issued for
travel prior to any changes in travel processes or approvals. However, as I remain
without access to our travel platform, I am unable to seek reimbursement for my
approved travel from January 16 - February 10; and I remain unsure if these costs will
be approved as I have received no information regarding my employment status.

7.     Additionally, I have yet to be reimbursed more than $19,000 in lodging, per
diem, and other approved costs from my deployment as Deputy Leader for Planning
for the Levant (Gaza) DART from November 11, 2024 - January 4, 2025. The voucher for

reimbursement was submitted and received first level approval on January 17, before the change in Administration and revised travel guidance, however there has been no progress to proceed with additional approvals and reimbursement of costs.

8.      My PSC with USAID has a period of performance from March 10, 2024 - March 9 2029, though there is only sufficient funding to cover salary/allowance payments for the first year of the contract. Given the lack of clear guidance on when repatriation and separation from the Agency may occur, I am concerned that there will not be sufficient funds available to continue to pay my salary/allowances if I am not able to repatriate prior to funding being exhausted on/around March 9, 2025. Additionally, it remains unclear to me if there will be sufficient funding to allow for annual leave payout and any other eligible reimbursable costs to which I would normally be entitled to.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 17, 2025.

   /s/   Jack Doe

# EXHIBIT 22

**25-cv-469-CJN**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
PERSONAL SERVICES                       )
CONTRACTOR ASSOCIATION,                 )
                                        )     Case No. 1:25-cv-469
            *Plaintiff,*                 )
                                        )
            v.                          )
                                        )
DONALD TRUMP, et al.,                   )
                                        )
            *Defendants.*                )
_____         )


**DECLARATION OF KAY DOE**

I, Kay Doe, declare as follows:

1.     I am over 18 years old and competent to give this declaration, the contents of which are based on my personal knowledge, information and belief.

2.     I am a USAID Personal Services Contractor (PSC) and a member of the PSC Association. I have worked for USAID for 10 years. Currently, I serve as a deputy team lead for the Office of Middle East, North Africa, and Europe at USAID's Bureau for Humanitarian Assistance (BHA), based in Washington, D.C.

3.     My most recent PSC contract began on February 12, 2023, with a period of performance through February 11, 2028. On February 12, 2024, I received notice that I

had been selected for new PSC position with USAID and eventually, in coordination with BHA's PSC Contracts Team, confirmed February 8, 2025, as the start date for my new position.

4.     On the morning of February 3, 2025, I attempted to login to my USAID e-mail account and was met with an error message. I received no stop-work order, no termination notice, and no indication that I had been placed on administrative leave. I notified my supervisor of the loss of access and continued attempting to login throughout the day with no success. I have attempted to log in every work day since losing access, multiple times per day; as of February 17, my access to USAID systems had still not been restored. Every day, I have alerted my supervisor and the contracting officer who executed my contract to my loss of access, but I have received no response from the contracting officer, nor any indication of a change in my employment status. On February 11, 2025, USAID's CIO Help Desk informed me over the phone and in writing that they were unable to restore my account, "without authorization from political leadership."

5.     Meanwhile, the status of both my current and new contract are uncertain. Each year, coinciding with my contract anniversary date (February 12), the contracting officer must execute an incremental modification to my contract to add additional funds for the upcoming year. I have received no communication about the status of this modification, and have no indication that it has indeed been executed. Simultaneously,

despite previously confirming a February 8, 2025, start date for my new position, I have received no communication regarding the status of the new contract. Coupled with the removal of my access to USAID systems since February 3, 2025, the status of my employment is deeply unclear.

6.      Furthermore, I have not received payment for the previous pay period, nor reimbursement for health insurance and other expenses covered under my current contract—amounting to more than $5,000—which I submitted for reimbursement on February 2, 2025. I am aware of multiple other PSC colleagues who have also not received, or only received partial, payment for the previous pay period and/or are awaiting reimbursements for covered costs, many of whom also continue to lack access to USAID systems.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 17, 2025.

     /s/   Kay Doe

# EXHIBIT 23

**25-cv-469-CJN**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| PERSONAL SERVICES CONTRACTOR | ) | |
| ASSOCIATION, | ) | |
| | ) | Case No. 25-cv-469-CJN |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| _____ | ) | |

**DECLARATION OF BARBARA DOE**

I, Barbara Doe, declare the following under penalty of perjury:

1. I am over 18 years of age and competent to give this declaration, based on my personal knowledge, information, and belief.

2. I work as a personal services contractor (PSC) for USAID in Africa as part of the PEPFAR program to combat HIV/AIDS.

3. I am a Health Advisor (including oversight of Care and Treatment and orphan and vulnerable children programs).

3. I am in the third year of a five-year contract, currently in the second year of a two- year option, with one more option year possible. Based on the terms of my contract, I was expecting to remain employed at my current post until at least into portions of 2026, if not into 2027. Our program currently has funds obligated for my position through the current fiscal year, and my program oversight, as Agreement Officer's Technical

Representative (AOR), including two programs that are currently included in waivers for USAID programs during the 90 day pause.

5. Beginning in the early morning hours of February 3, 2025, I was locked out of all of my USAID computer, payment and security systems.

6. My position involves making sure that cooperating agreements with our local partners comply with all U.S. government requirements, including executive orders. I am the AOR for a program that supports Care and Treatment and Orphan and Vulnerable Children Programming, both covered under Global Health Security and Diplomacy (GHSD's) approved waiver for programming. These programs are planned at $11 million a year. In the last couple of weeks, I've spent a lot of time reviewing the local agreements in light of President Trump's new executive orders, and making any necessary changes to bring them into compliance with my assigned agreement officer.

7. My lack of access to email and USAID computer systems has significantly impacted my work. Since February 3, my colleagues and I have had to do any discussions and work that requires my direct input in the conference room reviewing documents via shared documents because of my lack of USAID computer systems access. I am not invited to general meetings, that are meant to provide updates on current status for USAID in our efforts to continue compliance with President Trump's executive orders, as I am not able to access my work calendar.

8. I also lack access to routine communication methods that I should have under Chief of Mission including security and housing updates, etc. I have in fact missed at least one security notice that was issued, and only found out about it as a work colleague talked to me about it. I have also not gotten some emails around housing due to my non access to

my work email. Also our Chief of Mission sends out emails that I do not receive, so I am not able to be updated on what is occurring in my Embassy that is relevant to me and my family. While I am working with my Agreement Officer ("AO") to work with partners to align with the approved waivers and guidance, we are concerned as there are continued delays for payments, requests for budgets were only received late last week after having approval for these activities weeks ago. Some staff and office spaces were already terminated to align with local labor laws. Also with the new status of having people that are critical to our work either being put on administrative leave or being issued RIFs, it makes it very hard to ensure we are meeting the required standards for oversight and management of the approved waived activities.

9. If I'm forced to return to the United States, it will be very destabilizing for me and my family. I have two school aged children, and they have never lived in the United States. Both of my children are currently enrolled in school until the end of June 2025. This forced (it is not voluntary, as if we stay we have to cover all costs which is prohibitive) return to the states, outside of what was planned for January 2026 or at the latest January 2027, is destabilizing for our children. They will have to change school approaches (U.S.-based school teaching versus schooling for International Baccalaureate) at the same time as adjusting abruptly to a human-made emergency (i.e., not like COVID).  They are also being forced to enter a new school with only two months remaining, which is hard educationally and socially to catch up with where kids are in class.

10. If we are only given 15 days' notice of termination, that does not allow for any ability to prepare to depart post – as normally this process starts six to eight weeks prior. For example:  I am required to get my host government's approval to sell cars, and that can

take multiple weeks; I would need to be here for pack out which can take anywhere between three weeks to five weeks.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 26, 2025.

/s/ Barbara Doe

**EXHIBIT 24**

**25-cv-469-CJN**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| AIDS VACCINE ADVOCACY COALITION, et al., | ) ) ) | |
| *Plaintiffs,* | ) ) | Civil Action No. 25-cv-400 |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) ) ) | |
| *Defendants.* | ) ) | |
| _____ | ) | |

**DECLARATION OF JESSICA DOE**

I, Jessica Doe, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a Contracting Officer and Foreign Service Officer at USAID.

3.      On January 20, 2025, the President of the United States issued an Executive Order directing a 90-day "pause" on all U.S. foreign assistance.

4.      On January 20, 2025, the President of the United States issued an Executive Order on "Ending Radical and Wasteful Government DEI Programs and Preferences."

5.      On January 22, 2025, USAID Senior Procurement Executive (SPE) Jami Rodgers emailed the Office of Acquisition and Assistance (OAA) Mail List and all Foreign Service Contracting and Agreement Officers (COs) a DEIA Award Tracker

that "identifies awards with DEIA award titles or descriptions. He specified that, in accordance with "Initial Guidance Regarding DEIA Executive Orders" issued by the Office of Personnel management (OPM), COs must immediately terminate those contracts.

6.    In order to faithfully execute these instructions and work in good faith to implement the Executive Order, COs began reviewing the scopes of all awards to ensure they did not contain DEIA components. It was a difficult exercise as DEIA was never defined by the Agency Front Office and therefore it was unclear whether terms just as "gender" or "sex" should also be removed despite being a federally protected status.

7.    It is evident from SPE Rodger's instructions that this list of terminations was compiled from a search in GLAAS, our contract management system, for titles or descriptions that contained words like "diversity." The list was not compiled from a review of the scope of the awards.

8.    On January 27, 2025, SPE Jami Rodgers wrote in an email to all of OAA and the Foreign Service COs: "We will provide further guidance and templates on specifics for different types of awards and actions that you can take as we administer stop work/suspensions as soon as possible. [Acquisitions and Assistance (A&A)] staff may submit questions and we will make FAQ responses available to all A&A staff."

9.    The FAQs referred to in the January 27 email were not provided to OAA staff until February 6, 2025, when many of the questions about the pause were no longer relevant, such as "how do COs communicate with implementing partners

about what costs are 'legitimate' during the Stop Work Order period to ensure that they will not later be denied payment due to a differing opinion about what costs are allowable during a period of stopped work?"

10.     In a normal review process, such questions would be answered. For example, when USAID implementation in Afghanistan stopped in 2021, the partners were notified that salaries may continue to be paid to maintain operational readiness. None of this guidance was provided to COs or partners in this instance.

11.     On January 28, 2025, SPE Rodgers emailed all Foreign Service COs and stated that, for contracts, if "you have not already, issue a written stop-work order…" and for assistance awards, if "you have not already, issue a written suspension order…."

12.     On January 30, 2025, our contract management system GLAAS was shut down. COs were thereby prevented from modifying any awards, such as to remove DEIA terminology.

13.     On February 5, 2025, OAA/Washington instructed COs to terminate "media contracts/activities/purchase card awards," and that they had to "report back to the front office today on this matter."

14.     When OAA/Washington asked senior USAID management to allow them to review the termination lists in advance, they were told they could not do so.

15.     When OAA/Washington asked for the reasoning behind the specific terminations, they were told "a team" is reviewing "public data" and making these determinations.

16.     When OAA/Washington asked that specific awards be removed from the termination list for a justifiable reason, they were told, these awards "Clearly don't fit in the president's agenda" and that "questioning Sectary Rubio and President Trump's decision" constitutes "dissension."

17.     On February 9, 2025, SPE Jami Rodgers sent a tranche of terminations to COs. "Tranche 1" contained instructions to terminate 71 contracts and 66 grants. The list included awards with the terms "consulting," "energy," "elections," and "democracy," to name a few.

18.     COs highlighted that several awards in Tranche 1 were within the scope of the current approved waivers, such as Third Party Monitoring for BHA (Bureau of Humanitarian Assistance) Programs. Had a thorough review of the awards been conducted, these awards would not have been listed for termination since they are within the scope of current waivers.

19.     Other awards were clearly terminated without any actual process or consideration. For instance, Tranche 1 included termination of a contract for preliminary engineering and design for the construction of the U.S. Embassy in Juba. The contracting company was "Green Powered Technology LLC" (named after President and Founder Phillip S. Green and not because it is a "green" company). Eventually, that award was removed from the termination list.

20.     Some of the awards included on the termination list also required Congressional, Government Accountability Office, and the Office of the Inspector General notification, including a contract with an audit firm to meet the oversight

requirement specified in GAO Report GAO-06-1052R, titled "Foreign Assistance: Recent Improvements made, but USAID Should Do More to Help Ensure Aid Is Not Provided for Terrorist Activities in West Bank and Gaza," and GAO-21-332, entitled, "Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks." That GAO report stated, "The Administrator of USAID should conduct post-award compliance reviews of prime awardees and their subawards of ESF assistance for the West Bank and Gaza program in time to identify noncompliance and take appropriate action before the awards end, should funding for USAID's West Bank and Gaza program resume."

21.     As the above example shows, while stating that the goal was to find "fraud and corruption" as part of the 90-day review, USAID was terminating contracts that were designed to do exactly that.

22.     COs began to submit questions to SPE Rodgers to ask for clarification on the authority to instruct COs to terminate the awards and the basis for terminations. COs also sought instruction as to what to say to partners who were not being reimbursed for costs incurred prior to January 24.

23.     Responses to these questions were not provided by SPE Jami Rodgers or OAA/Washington.

24.     On February 10, 2025, SPE Jami Rodgers send a second tranche of terminations to COs.  Tranche 2 included "Media Awards" and 58 grants.

25.     Again, numerous awards on the list were found to be within the scope of the approved waivers, such as for PEPFAR and for lifesaving activities to respond to

5

the Ebola outbreak.

26.     Further, several of the awards were for basic education programs and contained funding appropriated through the READ (Reinforcing Education Accountability in Development) Act of 2017, which was originally signed into law on September 8, 2017 by President Trump, and introduced in 2023 for reauthorization by then Senator Marco Rubio.

27.     When the COs asked the Agency Front Office about these awards, the COs were instructed to terminate them without notification to Congress that funds appropriated through a specific Act of Congress were being terminated.

28.     On February 11, 2025, SPE Jami Rodgers sent a third tranche of terminations, along with instructions to terminate the awards in Tranche 1 and 2 by "close of business, Tuesday, February 11," and Tranche 3 by "Wednesday, February 12 close of business."

29.     SPE Jami Rodgers provided further instruction that the "termination authority is delegated to me as the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid. An Action Memorandum for each tranche of awards was reviewed and cleared through the State Department's Director of Foreign Assistance and approved by the Secretary. These action memos will be filed in a shared drive. This documentation along with this email can be used to support the terminations."

6

30.     These action memos were never shared with the COs.

31.     A copy of an unsigned memo on a State Department letterhead dated February 10, 2025, entitled, "Tasking Memo to USAID Contracting and Agreement Officers," from Kenneth Jackson, Assistant to the Administrator for Management and Resources, drafted by Joel M. Borkert, stated, "The Secretary has approved the cancellation of the attached contracts after determining they do not advantage U.S. interests. These tranches have gone through multiple vetting processes, and should be expeditiously terminated. Let me or the Chief of Staff know immediately if you believe the contract falls within the current waiver guidance or needed modified [sic]."

32.     On February 11, 2025, COs were notified by the GLAAS Helpdesk that Phoenix (the Agency payment system) was closed and that "the Agency has temporarily restricted access to Phoenix until further notice." As a result, no payments were able to proceed for any of my Mission's programs.

33.     On February 12, 2025, SPE Jami Rodgers sent a fourth tranche of terminations. He also COs to, "complete as many termination notifications as possible today."

34.     Again, many awards on the list are removed from termination as they fall within an approved waiver. In addition, many monitoring and evaluation contracts were listed to be terminated. These contracts are relied upon to ensure that there is no fraud, waste, or abuse in the delivery of approved activities, such as food assistance and PEPFAR medication distribution.

35.     When individuals raised the need for an appeal to the termination of

monitoring services, OAA/Wahington instructed me to terminate the award on the basis that the State Department had called and said to do it immediately. This termination left critical food assistance and medication distribution without adequate monitoring and oversight and increasing the risk of fraud, waste and abuse.

36.    On February 13, 2025, Mark Lloyd, who performs the duties of Assistant Administrator, Bureau for Global Health, issued a memorandum titled, "Clarifying that Global Health (GH) programming under the lifesaving humanitarian assistance waiver has continued uninterrupted and was never paused." The memorandum stated that its purpose was "to correct a false narrative in the press, and provide clarity for staff on external communications." It went on to say, "[t]he authority to waive lifesaving Global Health activities under Secretary Rubio's January 28, 2025, general waiver for lifesaving humanitarian assistance continues, and was never paused. Staff are reminded to confirm to Agency standards of conduct, and to leadership expectations, by using their chain of command to clarify any questions or misunderstandings; and are reminded that unauthorized engagement externally with the press or others is subject to discipline, including dismissal."

37.    As a CO, I issued a partial lifting of the Stop Work Order for PEPFAR partners to continue life savings activities in accordance with the limited waiver for life-saving HIV service provision approximately 14 days ago.

38.    As of today, the Mission and I continue to raise to Washington leadership including the Agency Front Office that although we have authorized the restarting of the PEPFAR programs, the partners have not been able to restart due

8

to a lack of funding. For example, since January 24th, for the Mission programs I manage as a CO, over 28,000 orphans and vulnerable children will lose access to treatment and prevention to HIV services per day, and 5,000 living with HIV will lose access to anti-retroviral medication per day.

39.    For non-PEPFAR lifesaving Mission activities that I manage, over 50 mothers suffering from severe bleeding following childbirth who cannot access treatment will have post-partum hemorrhage per day, 30 women will die per day related to childbirth, and over 1,000 newborns will be deprived of life saving newborn health services, including nearly 40 who will be deprived of life saving resuscitation at birth. An additional 250 newborns will die before being a month old.

40.    Despite being authorized to proceed with implementation of lifesaving activities, PEPFAR implementing partners cannot proceed as their programmatic accounts are hundreds of thousands of dollars in debt.

41.    Other PEPFAR partners authorized to restart activities have had to take out private loans to cover programmatic costs, and they also state they are now not following the local law because they do not have enough funding to pay required severance for local staff per local law.

42.    The Mission also sent a request for authorization to the Agency Front Office to authorize other non-PEPFAR lifesaving activities that are within the scope of the waiver, such as tuberculosis treatment, malaria treatment, antenatal care to address emergency complications. That request has not been answered in over two weeks.

9

43.    On February 17, 2025, SPE Jami Rodgers instructed COs that this
Court issued a TRO in the cases titled *AIDS Vaccine Coalition v. U.S. Department of
State* and *Global Health Council v. Trump*. SPE Rodgers stated, "Accordingly, until
further notice, all Contracting and Agreement Officers should not enforce any Agency
directive issued under Executive Order 14169 and the Secretary's implementing
memorandum that requires the generalized stop work order, suspension, or pause of
Agency contracts, grants or other federal assistance awards. The Front Office is in
the process of adopting a comprehensive review process for assuring payment
integrity and determining that payments under existing contracts and grants are not
subject to fraud or other bases for termination. These new case-by-case review
processes will be consistent with the TRO. Further guidance on the new payment
integrity and grants and contracts review process is forthcoming."

44.    On February 17, 2025, COs emailed Jami to ask for further clarification,
and if OAA/Washington would send a template for COs to reverse Stop Work Orders
(SWOs). Further, COs noted ambiguities in his directive: We did not know whether
COs were being directed to take any specific actions based on his email. One CO asked
in an email whether we are to rescind SWOs and terminations already issued, or just
halt SWOs and terminations moving forward. Another asked about the new payment
review process, and how to inform partners about the status of outstanding payments
for vouchers incurred prior to January 24, 2025.

45.    SPE Jami Rodgers never responded.

46.    On February 18, 2025, COs were notified by USAID/M/OAA/Foreign

10

Operations that SPE Jami Rodgers would issue templates to reverse SWOs, but they had not been received at the date of this declaration.

47.     Also, starting on February 18, USAID staff began to notice that all emails contained the language, "(SBU) Sensitive But Unclassified," at the bottom of their email and that the language could not be removed, even when not sending SBU information. The SBU disclaimer was not visible when drafting an email and only when an email was received by the intended recipient. Due to this SBU label, COs became hesitant to send out any information to implementing partners without unambiguous prior authorization from SPE Rodgers.

48.     It has become clear that actions taken by Defendants to gut the staff of USAID also prevent compliance with the TRO. Without USAID Foreign Service Officers managing the many steps required, from budget, to contracting, to financial support, none of the Agency's overseas programs will be effectively restarted under the TRO, or as authorized to restart under the applicable waivers.

49.     I have not personally seen any evidence that a thorough, case-by-case analysis has taken place with regard to the suspensions, stop-work orders, and terminations already issued by the Agency.

50.     I will faithfully continue to execute the directives of the President, Courts, and USAID as a civil servant who is proud to serve my country. But I and other COs have been left without guidance or direction to implement this Court's order.

51.     I declare under penalty of perjury that the foregoing is true and

correct.

      Executed on February 19, 2025.

                                             /s/ Jessica Doe
                                             Jessica Doe

# EXHIBIT 25

**25-cv-469-CJN**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
                                  )
AMERICAN FOREIGN SERVICE          )
ASSOCIATION, et al.,              )
                                  )
            *Plaintiffs*,         )        Civil Action No. 1:25-CV-352
                                  )
      v.                          )
                                  )
DONALD TRUMP, et al.,             )
                                  )
            *Defendants*.         )
_____ )

## **FURTHER DECLARATION OF RANDALL CHESTER**

I, Randall Chester, declare the following under penalties of perjury:

1.      My name is Randall Chester.

2.      I am the Vice President of the American Foreign Service Association

(AFSA) representing 1,980 Foreign Service Officer and 485 non-career Foreign

Service Limited officers who work for the United States Agency for International

Development (USAID).

3.      AFSA is both the principal advocate for the long-term institutional

wellbeing of the professional career Foreign Service and responsible for

safeguarding the interests of AFSA members.

4.      AFSA also seeks to increase understanding among the American

people about the vital role of the U.S. Foreign Service in sustaining American global

leadership. AFSA exists to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests and values.

5.     AFSA provides support to its bargaining unit as the officially recognized union to represent the interests of the Foreign Service to USAID.  This role is codified in the AFSA-USAID Cooperative Framework.

6.     In this role, AFSA enters into negotiations with USAID on a wide range of personnel issues including:  appointments, promotion standards, assignment processes, disciplinary actions, and leave among others. AFSA assists its members when facing allegations of misconduct, investigations by the Office of Inspector General, Office of Civil Rights, and the Office of Security.  AFSA also supports its members in the event USAID fails to repay valid expenses, incorrectly applies or denies applicable benefits and allowances, or other discrepancies that arise between USAID and the officer.

7.     Last week USAID sent a RECALL notice to 1,400+ USAID Foreign Service Officers (FSO) serving overseas.  The notice provided no reasons for the recall, no timeline for its duration, and no explanation of expectations for the returned FSOs.

8.     The notice directs all FSOs to return to the United States within 30 days.  The notice allows for extension requests to be granted under special circumstances.  However, it does not provide a process to initiate a request or suggest a method for how or who will approve each request.

9.     This notice is devasting to FSOs and their families who will suffer undue emotional stress, mental anguish, financial hardships, and for some FSOs professional liabilities.

10.    The emotional and mental anguish is already presenting itself.  Since this notice was issued, AFSA has received well over 500 emails and phone calls looking for details, explanations, and reasons for the recall.  Normally, USAID would have already answered and provided these details, but none have been given. FSOs have reported high stress levels, sleeplessness, and anxiety over the recall. Additionally, FSOs report that their children are experiencing the same stress and anxiety levels after being told that they were moving potentially mid-school year and with little or no time to adjust.

11.    Financially, this abrupt recall will devastate the bank accounts of many FSOs.  The Agency has yet to provide any details on which transfer allowances will be afforded to the returnees.  Assuming that the FSOs are returning under Permanent Change of Station (PCS) orders, FSOs would be entitled to the following, among other things:

- Allowances
  - 60-90 days housing and meal allowance (for an "Ordered Departure" this allowance goes up to six months (i.e., 180 days))
  - Home Service Transfer Allowance (between $5,000-$7,500) estimated
  - Rental Car reimbursement
- Other Expenses Paid by USAID
  - Shipping of Household Effects (HHE)
  - Unaccompanied Baggage Allowance (UAB)
  - Personal Vehicle Shipment (POV)

12.     At this time, FSOs are not certain if any of the above will be provided. The lack of information on what allowances will be afforded mean that FSOs could be out of pocket for tens of thousands of dollars for just the first few months.  These expenses would normally be covered by USAID.  Furthermore, at this time USAID has informed staff that travel reimbursements are halted.  This exacerbates the problem for FSOs who may not know when or if they will ever be reimbursed for their expenses.

13.     Additionally, a normal transfer window for a FSO is six to nine months.  A FSO is usually informed of their onward assignment well in advance from the actual departure.  This affords them the opportunity to sell personal items they wish not to take to their next residence or sell items that can't be exported. For example, many countries restrict the importation of used vehicles which means that FSOs buy and sell cars rather than export them.  The abrupt move may lead to FSOs being unable to sell their vehicles at market value or take a loss as they may not be eligible or inappropriate for export to the U.S.  For example, many countries have right hand drive and/or engine and emission standards lower than the U.S. making them non-road worthy.  The rapid departure may increase financial losses to FSO.

14.     While serving overseas, FSOs receive additional financial allowances. This includes Post Differential (5-25%), Hardship Pay (5-35%), Special Incentive Pay (15%), and host County Cost of Living Allowance (based on local currency cost of living and family size).  These are percentages of a FSOs annual salary for a pay

period.  The total of these allowances varies dramatically across countries for zero to 90% additional/bonus.  Returning to the U.S. removes all these allowances and dramatic lowering of FSO salaries.

15.     Many FSOs, likely the majority, have families.  Often spouses work within the Embassy community as Eligible Family Members (EFM).  EFMs provide vital support and professional services but are paid a sub-standard wage. Nonetheless, this added annual income of $30,000-$60,000 (estimates) will disappear as the FSO recall will force spouses of FSOs to terminate their employment.  FSO families will be limited to that single income until the spouse is able to attain new employment in the US.

16.     Finally, it is important to consider that this uncertainty makes it difficult for any decision regarding long-term housing.  This raises the out-of-pocket costs for the FSO deciding to forgo purchasing a home versus remaining in a high-cost short term rental house.

17.     The recall notice will also leave some FSOs vulnerable to professional liability claims.  Some FSOs are "warranted" Contracting Officers (CO) and Financial Management Officers (FMO) are legally responsible for ensuring payments to providers are appropriate and accurate.  They rely on other FSOs and foreign national staff (FSN) to confirm and verify service delivery.  With no FSO or other staff working, the COs and FMOs have no way to legally approve payments for services prior to the stop work order issued two weeks ago.  USAID has a variety of different contracting and grant mechanisms and USAID is responsible for

5

payment of all goods and services prior to when the stop work order was issued. Demands of repayment often come one to six months after the service is completed. If a CO or FMO does not pay a submitted receipt/voucher they can be held liable by the provider (note the prompt payment act requires payment within 30 days). The catch 22 for the CO and FMO is that they also cannot approve payment without verifying the services were delivered (often by a FSO or Foreign Service National) or be subject to an investigation by the Inspector General. This is a liability passed onto the FSO.

18.   Because of this recall notice, some embassy/posts have already removed USAID FSOs from their internal security warning/alert systems and informed relevant host country ministries that USAID staff are not accredited diplomats with the U.S. government. This is added stress and legal jeopardy for FSOs. Without access to the embassy alert systems, FSOs and their families may miss critical weather, civil disobedience, or other safety notifications. Removing their diplomatic status may also result in the FSO having to pay "duty" on goods exported or sales of personal items adding to the above financial hardships.

19.   Finally, we learned of reports that the administration plans to reduce the number of workers at USAID from more than 10,000 positions to just 290.[1] If this occurs, FSOs will necessarily be among those terminated, with catastrophic consequences to their careers, families, and finances.

---

[1] Karoun Demirjian and Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, New York Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/usaid-job-cuts.html.

20.    In sum, if the USAID shutdown is allowed to continue, it will result in a tremendous amount of undue and unwarranted financial, mental, and emotional stress on FSOs and their families. The potential professional liability jeopardies (discussed above) are unjust as FSOs will be prevented from performing their jobs with no recourse to prevent potential fraud or legally approve submitted payment vouchers. The mandatory recall is likewise punitive in nature given the unnecessary pace of the withdrawal. The recall by design serves only to harm the FSO and provides no real justification or path for a potential future return.  On its own, the recall puts FSOs, American citizens, in financial jeopardy that could take years to overcome. FSOs will experience even more devastating financial consequences if the administration moves forward with the reported plan to slash the workforce to 290 employes total. The shutdown of USAID is at its core inhumane.

21.    The Recall Notice and placement or threatened placement of FSOs on administrative leave has also negatively impacted AFSA's ability to provide timely, accurate information to our members. AFSA normally receives approximately 50 emails a day from our members asking for assistance with a wide variety of employment-related issues. In the last two weeks, the volume of requests for assistance or information has exploded to 200 to 300 emails a day. Many of these emails ask very specific questions that we are simply not able to answer, due to both the sheer volume of emails and the lack of clear information provided by USAID.

22.     AFSA has also had to spend a considerable amount of time updating its membership records to input private email addresses. AFSA estimates that, to date, it has had to update 500-600 member accounts in two different databases. Had we not done this, our members would not be able to receive the messages we have been sending out on a nearly daily basis.

23.     AFSA also held two townhall meetings with over 1,000 participants where we explained existing legal protections should USAID attempt to summarily terminate their employment. Prior to the meetings, members submitted over 350 individual questions. Unfortunately, due to the volume of questions and the absence of clear guidance or information from USAID, we were not able to answer many of these questions.

24.     The resources AFSA has had to expend in response to the Administration's actions have been diverted from AFSA's other activities. AFSA is the exclusive bargaining agent at five other foreign affairs agencies, with the Department of State being our largest bargaining unit. We represent over 17,000 members. Because so many resources have been diverted to addressing urgent issues at USAID, AFSA has not been able to devote adequate time to assist members at these other agencies or to deal with general labor management issues at these agencies.

25.     AFSA strives to provide accurate and timely support to all of our members.  We normally have been able to get back to members with clear answers to their questions within one or two days. The Administration's actions within the

past two weeks have made it impossible for AFSA to do this, which not only threatens our good reputation but leaves our members with little guidance during this incredibly stressful period.

26.     To the best of my knowledge, none of the Agency leadership removed January 27 interfered with implementation of the pause (SWO) or other EOs. The assumption is that the multiple requests for clarification regarding the structure and information needed for the "review" process; or for clarity on the waiver process and status of any requests were seen as "obstructionist" when we (Agency career leadership) simply needed direction, definition, and guidance so we could properly implement the EOs.  This term again will hurt FSOs seeking future work and having to justify years of employment at the Agency.

27.     Individual reputational damage is already happening.  Our members fear that the word "criminal" ascribed to USAID's work and workforce will taint association or prior employment with the Agency and make it extraordinarily difficult to find work (particularly if an individual served with USAID for years/decades) - every interview (if you even make it that far) will have to be opened with a defense of past work history, actions, and experience. Essentially these claims (by the Administration) will create a broad "blacklist" for any employees or others associated with the Agency as they seek new employment.

28.     Further, the term "Insubordination" and similar assertions by Secretary of State Rubio are unfounded. None of the Agency leadership removed January 27 interfered with implementation of the pause (SWO) or other EOs. The

assumption is that the multiple requests for clarification regarding the structure and information needed for the "review" process; or for clarity on the waiver process and status of any requests were seen as "obstructionist" when we (Agency career leadership) simply needed direction, definition, and guidance so we could properly implement the EOs.

29.    Many FSOs and FSLs fear that seeking new employment will now have to justify their careers with USAID.  This will make finding new work difficult if not impossible for many long-term officials.

30.    On Sunday, February 9 at 11:28 PM USAID personnel received the following message from the Office of the Administrator:  "The former USAID headquarters at the Ronald Reagan Building in Washington, D.C., the USAID properties at the USAID Annex, 400 C Street, SW (formerly SA-44), the SEC Warehouse in Springfield, the Alternate Operating Facility in Leesburg, as well as 555 12th Street, NW, will remain closed until further notice. Agency personnel normally assigned to work at these USAID properties should telework, unless otherwise notified with a specific reporting time and location…."

31.    AFSA has heard from several of its members whose work often involves classified information that can only be viewed or discussed in a Sensitive Compartmented Information Facility, known as a SCIF. The closure of all USAID facilities in the area means that these individuals do not have access to a SCIF and cannot perform their duties. This remains true regardless of whether their USAID network access is restored.

32.     Per the Framework Agreement between USAID and AFSA, AFSA has

a physical office at USAID headquarters in the Ronald Reagan Building in

Washington, D.C. AFSA maintains sensitive files and data, to include documents

protected by attorney-client privilege and union privilege. AFSA has not been

afforded the opportunity to enter into the building, and its office, to retrieve these

files. AFSA also has legitimate and reasonable concerns that non-authorized

individuals may have accessed our office and our files.

33.     At approximately 2:45 pm on Monday, February 10, 2025, I was

notified, by USAID's Bureau for Management, Office of Management Services

(M/MS), that they no longer have the lease for the Ronald Reagan Building and that

all staff who were there on the morning of February 10th were moved. I was also

informed that none of USAID's domestic leases are listed as USAID leased property

in General Service Administration's systems.

34.     In addition, on February 11, we received firsthand accounts from our

members posted overseas advising that, despite the Temporary Restraining Order,

they were being encouraged to fill out paperwork to evacuate to the United States,

and "departure rooms" were being set up to facilitate departures.

35.     We also learned on February 11 that all USAID staff who were

enrolled in various types of training, including language training, at the National

Foreign Affairs Training Center in Arlington, Virginia, had been disenrolled.

Executed on February 11, 2025

/s/    *Randall Chester*
Randall Chester

11

# EXHIBIT 26

## 25-cv-469-CJN

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civil Action No. 1:25-CV-352 |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

## DECLARATION OF THOMASINA DOE

I, Thomasina Doe, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.       I am a member of the American Foreign Service Association.

3.      I am a member of the Acquisition and Assistance workforce at USAID.

4.      On February 6, 2025, the Industry Liaison (communication position within the Management Bureau) sent an email to all Contracting and Agreement Officers, instructing officers to immediately terminate 800 awards (contracts and grants).  The instructions did not come from an authorized procurement official with the ability to instruct any Contracting Officer to utilize their warrant, nor did it have the legally required information in order to comply with these instructions, namely, when we would obtain proper authorization to complete the terminations, rationale for the terminations, and authority for the terminations. Several individuals asked

questions about these issues, which went unanswered. The Contracting Officers were told to update the spreadsheet immediately and timelines of two-hour intervals were suggested to complete updates. Per the Federal Acquisition Regulation (FAR), contract terminations take approximately one year, but Contracting Officers were told to do this immediately, without explanation as to how such an expedited timely was feasible.

5.      No Operating Unit was ever given any opportunity to explain how their awards aligned with the America First priorities, many of which do align. Some were already headed for finalization, as the end of the period of performance had already come or was coming up soon. In these cases, a termination wouldn't make sense. Some of the awards had valid waivers for life-saving activities, but they were still on the termination list.

6.      Within one or two hours, the email was rescinded without any explanation. By that point, of the 800 awards, approximately 70 were marked with letters having already been sent to terminate the awards.  Access to the termination spreadsheet was then rescinded as well.

7.      On February 10, 2025, Contracting and Agreement Officers received two new spreadsheets, both from the Senior Procurement Executive, who does have valid authority to instruct us to use our warrants. These spreadsheets contained approximately 200 awards to be terminated. These awards were new and different. Awards that appeared on the initial spreadsheet were not necessarily on the new spreadsheets. Awards that had not appeared on the original 800-award spreadsheet

2

were now in these 200-award spreadsheets.

8.      While the Senior Procurement Executive sent the email, there was no indication from whom the order was coming officially for documentation purposes. When someone asked the Senior Procurement Executive, Jami Rodgers, an individual named Jeremy Lewin responded: "Jami has more detail and perhaps put out a memo clarifying this, but all of the terminations in these tranches have been signed off by Secretary Rubio and Acting Deputy Administrator Marocco. The programmatic choices are being made at the most senior levels. Jami or Ken Jackson can direct the termination of these programs and are doing so consistent with the Secretary's express approval and directives." This individual is unknown to the Contracting Officers, nor is his title in his email, nor did he provide any valid information that could be used and acted upon. Contracting Officers have no such memo upon which to base any terminations. The comment seemed to be a threat.  This same individual also responded to a particular Contracting Officer's question to the Senior Procurement Executive without having the proper authority or knowledge to advise the Contracting Officer.

9.      Multiple Contracting Officers have voiced public questions and concerns about how to proceed legally with the terminations. Much information is still missing for the Contracting Officers to proceed to follow such a directive.  Some of these questions include whether the Office of General Counsel has cleared these terminations, whether Congress has approved terminations of earmarked funding, whether these terminations are within Contracting Officer's warrants, whether this

order violates current temporary restraining orders that prohibit all Agencies from terminating any awards, whether USAID will protect us from liability related to these terminations, what the justification for these terminations are, and other concerns. None of these questions or concerns have been addressed. I am unsure if any termination letters have been sent as a result of the February 10, 2025 communications.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 11, 2025.


_/s/ Thomasina Doe_
Thomas Doe

4

# EXHIBIT 27

**25-cv-469-CJN**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| AIDS VACCINE ADVOCACY ) | |
| COALITION, et al., ) | |
| ) | |
| *Plaintiffs*, ) | Civil Action No. 25-cv-400 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF STATE, et al., ) | |
| ) | |
| *Defendants*. ) | |
| _____ ) | |

**DECLARATION OF MITCHELL WARREN**

I, Mitchell Warren, declare the following under penalties of perjury:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am the Executive Director of the AIDS Vaccine Advocacy Coalition (AVAC), a New York-based non-profit organization that leverages its independent voice and global partnerships to accelerate the ethical development and equitable delivery of effective HIV prevention options.

3.     AVAC was the recipient of a five-year Cooperative Agreement with USAID in June 2016 to fund our HIV Prevention and Biomedical Research Project. That agreement funded our work on the Coalition to Accelerate & Support Prevention Research (CASPR), a coalition of African civil society organizations that conducts research on HIV prevention and translates that research into resources for local

communities, including medical research trial participants.

4.    AVAC's work with CASPR has been essential in, among other things, preparing African nations for the rollout of pre-exposure prophylaxis (PrEP), a medication regimen used to prevent HIV infection in people who are at high risk of exposure to the virus.

5.    PrEP is an essential part of the global fight against HIV/AIDS. This lifesaving treatment is highly effective in preventing HIV infection and has drastically reduced the number of new HIV infections and AIDS-related deaths.

6.    In turn, the support of the United States through the President's Emergency Plan for AIDS Relief (PEPFAR) is crucial in supporting PrEP initiations for high-risk populations globally. According to the government's own materials, PEPFAR accounts for more than 90% of PrEP initiation worldwide.[1] And PEPFAR is currently supporting long-acting injectable PrEP with plans to launch in six additional countries by the end of 2024.[2]

7.    This injectable—lenacapavir—is astonishingly effective. One trial found 100% efficacy in preventing HIV in a group of 5,300 people in Uganda and South Africa. Another showed a 96% reduction in HIV incidence.

8.    CASPR is a crucial part of the rollout of lenacapavir. Our experience has shown that even extremely effective medication must be supported by programs,

---

[1]    *See* hiv.gov, *PEPFAR* (Dec. 23, 2024), https://www.hiv.gov/federal-response/pepfar-global-aids/pepfar.

[2] *Id.*

policies, and funding to improve access. Through CASPR, AVAC is working diligently to ensure that rollout of the new, life-saving medication is both swift and ethical.

9.      In 2021, USAID extended the cooperative agreement for five years—until June 19, 2026—and doubled the amount of funding provided to AVAC under the grant.

10.     Grant funding from USAID constitutes 40 percent of AVAC's total operating budget.

11.     As a result, the orders freezing funding and requiring AVAC to stop work on federally funded projects have eviscerated AVAC's ability to provide crucial support to HIV preventive research, development, and rollout. The freeze forced us to halt all CASPR work, resulting in disruption to HIV prevention research and development and to clinical trials.

12.     So far, AVAC has had to lay off 7 people from our 46 person staff as a result of the abrupt halt in federal funding. We will be forced to lay off 10 more people over the next month.

13.     The injuries suffered by AVAC are ongoing and will persist unless the stop-work orders are rescinded.

14.     A true and correct copy of the stop work order AVAC received is attached to this declaration as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025.

___/s/_____

Mitchell Warren
Executive Director, AVAC

# EXHIBIT A



January 27, 2025

Delivered by email to Mitchell Warren, AVAC

**Subject:**       Order to Suspend Work - 2 CFR § 700.14

**Reference:**    AID-OAA-A-16-00031, Coalition to Accelerate & Support Prevention Research (CASPR)
                        Cooperative Agreement

Executive Order <u>Reevaluating and Realigning United States Foreign Aid</u>

Dear AVAC:

In accordance with President Trump's Executive Order entitled <u>Reevaluating and Realigning United
States Foreign Aid</u> with additional guidance per the USAID Notice issued to Implementing Partners on
January 24, 2025, and pursuant to 2 CFR § 700.14 Award Suspension and Termination (incorporated in
Standard Provision M.10 for Non-U.S. NGOs), the Agreement Officer hereby issues an order for the
recipient to immediately suspend work under this cooperative agreement, including sub-contracts and
sub-awards.  All awards are to cease implementation immediately as of today, January 27, 2025.

Therefore, upon receipt of this Stop/Suspend Work order, the Recipient must immediately
comply with the terms of this order and take ALL reasonable steps to minimize the incurrence of costs
allocable to the work covered by the order during the period of work stoppage.

The recipient shall not resume work under this cooperative agreement until notification has been
received in writing from the Agreement Officer that this Suspend Work Order has been canceled.

Please confirm your receipt and agreement with this Suspend Work Order by completing and returning
the acknowledgement below.  Should you have questions concerning this letter, please contact me at
efortson@usaid.gov.  We will follow up with further guidance as soon as possible.

Sincerely,

ELTON E
FORTSO
N

Digitally signed
by ELTON E
FORTSON
Date: 2025.01.27
15:16:43 -05'00'

Elton E. Fortson
Agreement Officer

USAID cc: Ashley Lima, Agreement Officer's Representative

**Acknowledgment of Receipt**

I, _____, acknowledge receipt of this Stop/Suspension
of Work Order and confirm compliance with the instructions outlined herein.


Signature: _____

Name: _____

Title: _____

Date: _____

# EXHIBIT 28

**25-cv-469-CJN**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AMERICAN FOREIGN SERVICE ) | |
| ASSOCIATION, et al., ) | |
| ) | |
|                *Plaintiffs*, ) | Civil Action No. 1:25-CV-352 |
| ) | |
|        v. ) | |
| ) | |
| DONALD TRUMP, et al., ) | |
| ) | |
|             *Defendants*. ) | |
| _____ ) | |

## DECLARATION OF WALTER DOE

I, Walter Doe, declare the following under penalties of perjury:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am a member of the American Foreign Service Association.

3.     I have worked for USAID for over fifteen years. I currently serve overseas as a controller. In that role, I am responsible for disbursing payments to partners (like recipients of USAID grants), vendors (like cell phone companies and other local service providers) and USAID employees. Each overseas mission is assigned a controller who is trained, designated and formally appointed before being registered with the US Treasury. Once designated, certifying officers are legally responsible for ensuring that payments comply with appropriation laws and other financial controls

4.    On January 20, based on the president's executive order on foreign financial assistance, I stopped certifying payments in compliance with the immediate pause on new disbursements. Certification is the step through which authorized payments are transmitted to the Treasury Department to be paid.

5.    On January 24, we received a State Department cable (25 STATE 6828) that "required the immediate issuance of stop-work orders" but also provided further instruction about the foreign assistance freeze, including a list of waivers. One of these waivers covered "salaries and related administrative expenses including travel for USAID employees, including their living and operating expenses (residential rent, communication, insurance, etc.). A second waiver allows payments for "legitimate expenses incurred prior to January 24 under existing awards or legitimate expenses associated with the stop-work orders." Pursuant to this directive, I began trying to certify certain approved payments (including for employee expenses) using our electronic payment system called Phoenix.

6.    However, shortly after beginning to attempt to certify payments again, I noticed that the Phoenix system wasn't functioning the way it had in the past. Previously, after certifying a payment, I would be able to track its progress from Phoenix via the Treasury Department to the bank for final disbursement, but starting around January 27, the initial certification step would work but then the payment would remain in my payment queue  and never finish processing.

7.     Over the next several days, I and the other controllers responsible for processing payments tried to determine what was happening. We repeatedly asked

our main counterpart in Washington, the Acting Deputy Controller, for updates and guidance only to be told repeatedly throughout the week of January 27 to "stay tuned for further updates" as he was working with the Office of the Administrator on solutions. On January 30, I emailed him with my concerns and advised that "whoever transmits the M/CFO batches to Treasury and State should understand that the certifying officers take responsibility for their payments." At this point I was growing concerned because invoices were passing their due dates and we were not able to pay them.

8.     Every single payment that I tried unsuccessfully to process after January 27 was for an expense incurred before January 20. Most of the payments I have been trying to process were for expenses incurred in November or December of 2024. These included large payments to partners who bill us every month for the work performed in the previous month, as well as smaller administrative items like cell phone and other utility payments, travel reimbursements, and rental payments.

9.     On February 3, the situation changed yet again. As of that date, every time I tried to hit the "certify" button to begin a disbursement, I received an error message stating that I did not have authority to proceed. I contacted Phoenix Security to inquire if there was a technical problem in the system and was told "on Friday January 31, we were instructed to remove the ability to certify payments." They did not indicate who instructed them, only stating "Unfortunately I am unable to reverse this decision."

10.     On February 5, all USAID controllers received another diplomatic cable

3

indicating that USAID personnel could no longer process payments themselves but must request approval from a Senior Bureau Officer before forwarding the payment packages for processing. However, as of February 11, nobody can agree on who is the appropriate SBO for USAID payments and the State Department hasn't processed a single payment based on the new procedure.

11.     As of February 9, when I try to log into Phoenix, I receive a new error message stating that my sign-in attempt has failed. I have even less access to Phoenix after the February 7 court order than I did before that date.

12.     I have been in touch with many colleagues and all report the same experience. To my knowledge, worldwide there are no USAID financial management personnel, including controllers, that can access Phoenix.

13.     I have not been able to process payments under any of the waivers included in the January 24 cable, including legitimate expenses incurred prior to January 24 under existing awards or those for employee operating expenses. Though the waivers exist on paper, in reality all USAID funds have remained frozen because of technological barriers added to the system, I don't know by whom. Phoenix will not let us disburse anything.

14.     After three weeks of nearly a complete freeze, we have pending payments to partners in the country where I serve amounting to $3.8 million including $1.3 million in overdue payments which are incurring interest per the Prompt Payment Act. We also have pending administrative payments of $0.2 million, including one residential lease for a colleague which expires on February 14

4

and two school tuition payments for children of American colleagues who serve here with me. Now that we are locked out of Phoenix, our voucher examiners can't even work on the payment requests that continue to come in from partners and vendors let alone make any effort to move them through the disbursement process.

15.    We typically disburse $6-9 million per month for USAID activities "from the American people" in the country where I serve.  These payments go to local NGOs and small businesses as well as US-based partners who have worked with us for many years.  Due to uncertainty about the stop-work order and fear that payments may never resume, these partners have already laid-off staff and face potential bankruptcy.  It is legally and morally wrong to continue withholding payments from partners who completed work in good faith in November and December.  Furthermore, it is dangerous for the health and safety of my colleagues overseas to withhold payment for their housing, insurance, cell phones, and other basic needs.  It is also worth noting that employees are owed for travel they completed before January 20, which contributes to their anxiety as they face an uncertain financial future.


I declare under penalty of perjury that the foregoing is true and correct.

    Executed on February 11, 2025.


    <u>/s/ Walter Doe</u>
    Walter Doe

5

# EXHIBIT 29

**25-cv-469-CJN**

## FIRST DECLARATION OF DELLA DOE

I, Della Doe, declare the following under penalties of perjury:

1.        I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.        I am a member of the American Foreign Service Association.

3.        I have worked for USAID for over a decade. I currently serve overseas as a financial manager, and in that role I am responsible for making payments to USAID foreign assistance partners (contractors and grantees), vendors and USAID employees.

4.        Normally many of USAID's U.S. implementing partners would have access to a letter of credit (LOC) system to be able to draw cash for 10-day activity needs. Once this access is set, a partner can draw on the cash through the LOC system swiftly without additional approvals, within certain parameters set up in the system. Such expedited access to cover the activity needs is important to successful activity implementation, especially for Humanitarian Assistance activities. To my knowledge the access to LOC facilities was interrupted for some partners sometime the week of January 20, and still has not been fully restored even after the TRO in Case Nos. 25-cv-400 and 25-cv-402 took effect on February 13.

5.        Additionally, for those partners not operating under an LOC, USAID/Washington and missions directly process payments on an advance and/or reimbursement basis. The invoice and respective payment are reviewed and approved by the Agreement/Contracting Officer Representative (AOR/COR), voucher examiners, and Authorized Certifying Officer (often a Controller or other designated U.S. staff). The payment review process normally takes between 15–28 days and payment gets disbursed to a partner under 30 days in compliance with the Prompt Payment Act.

1

6.      I have read the declaration of Walter Doe filed in Case No. 25-cv-352 (Exhibit 1) and his experience of interruptions in the USAID payment process starting on January 20th is consistent with my experience. On or about January 27 Certifying Officers worldwide noticed that the certified payments wouldn't go through the Agency accounting system (Phoenix) to the U.S. Treasury for disbursement, and on or about February 3 we lost the ability to certify payments in Phoenix. At that time this ability was lost for all payments, even those that fell under the waivers/exceptions specified in the State Department Cable 25 State 6828 issued on January 24, which included legitimate expenses for programmatic activities incurred before the date of the Cable.

7.      On February 5 the State Department issued a follow-on cable 25 State 10948 which provided technical guidance on obtaining additional approvals when making Agency's administrative payments, as well as programmatic payments for expenses incurred before January 24, 2025 (so-called 12(d) payments), and instructions on how to seek exceptions for activities (so-called 12(e) exceptions). The necessary approvals include Director of State Department's Bureau for Foreign Assistance for programmatic payments, and USAID's Senior Bureau Official for both programmatic and administrative payments. Both approvals are an additional layer to a regular USAID payment process. The role of the Senior Bureau Official (SBO) was assigned to only one person, Chief of Staff Kenneth Jackson. However as on February 5 and almost two weeks afterwards, Phoenix disbursement function was unavailable to the Agency's staff, the process outlined in the cable was meaningless.

8.      The TRO was issued on February 13; however, there was no official or unofficial guidance released to the Agency's Authorized Certifying Officers since then on how the TRO is to be implemented. The only new official guidance the Agency issued to Certifying officers

since TRO was on February 20 and concerned the Agency's own administrative payments such as staff salaries and benefits, rent, utilities, security services and such. The Agency has issued no guidance regarding payments to implementing partners.

9.     The Agency has restored access to Phoenix for a very limited number of staff on or about February 18. In a normal course of operations the Agency would have by my estimates between 50–80 Certifying Officers who would facilitate timely processing of all types of payments, and hundreds of voucher examiners to log in and review the payments. My understanding is that currently the access is restored only to a very reduced number of Certifying staff worldwide, less than 20, and only 40 or so voucher examiners. This highly reduced staff was charged with processing mostly the Agency's own administrative payments across many missions and Washington. The SBO has been responsive to approval requests for those internal administrative payments. This in stark contrast to requests for payments to implementing partners, for which we received no SBO approvals or new guidance.

10.     Since there was no new official guidance since the TRO, missions' only reference remains State Cable 10948, which predates the TRO. Even following that guidance, I was not able to obtain all necessary approvals for any programmatic payments, including legitimate expenses incurred prior to January 24 under existing awards. To my knowledge numerous missions including mine tried to obtain approvals from the Director of State Department's Bureau for Foreign Assistance and USAID Senior Bureau Official for 12(d) and 12(e) payments, and very few obtained just one approval but not both as required by the cable 10948. We also tried unsuccessfully to obtain guidance on what is the payment process in the absence of Cable-prescribed approvals but with the TRO in place. Though the waiver process is described in the pre-TRO cable, in reality all USAID funds have remained undisbursed because

of deliberate unresponsiveness of officials charged with implementing the TRO and/or the same officials not providing approvals for programmatic payments under existing waivers.

11.     Currently my mission has more than $30 million in unpaid invoices for 2 months of implementing partners' work, with half of those past Prompt Payment Act due date (30 days) and incurring interest every day. If one were to extrapolate the numbers across all of the missions and USAID/Washington, given that annual USAID appropriation is $40 billion, the total dollar amount of unpaid invoices would certainly surpass $1billion at the most conservative estimate.

12.     On February 23 the Agency notice placed the majority of Agency personnel on administrative leave, and left  only a few hundred (mostly administrative) staff as essential. This decimation is in addition to the Agency's prior dismissal of institutional contractors and PSC staff. This leaves the Agency with no sufficient personnel to review and approve thousands of programmatic payments that are due to hundreds of implementing partners for work performed prior to January 24. Even if the TRO is properly implemented the Agency has no adequate staff remaining on duty to process the payments.

13.     Arbitrary withholding of due payments to U.S. and non-U.S. based partners does grave damage to the reputation and reliability of the U.S. government both domestically and internationally. USAID is a USG Agency which signed the contracts and grants in line with the Code of Federal Regulations and other statutes; USG refusal to pay for the past performed work and non-compliance with the TRO can shatter Americans' certainty in the rule of law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Della Doe*_____
Della Doe

4

# EXHIBIT 30

**25-cv-469-CJN**

Docusign Envelope ID: DE763B-234DE9-4B05-8CCF-37BEB8EA8592
Case 1:25-cv-00489-CJN   Document 39-4   Filed 04/23/25   Page 289 of 306
Case 8:25-cv-00462-TDC   Document 17-2   Filed 02/18/25   Page 227 of 393

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1-26,

*Plaintiffs*

v.

ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY,

*Defendants*

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF J. DOE 2

I, J. Doe 2, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 2" in the complaint.[1]

2.      I am an employee at the United States Agency for International Development ("USAID") and have been with the agency for over 10 years.

3.      My main duties include technological responsibilities related to cybersecurity and privacy. My position involves extensive interaction with USAID's information technology ("IT") infrastructure, including its data security systems.

4.      On January 30, 2025, I was working from the USAID office when I was told to provide systems access to individuals from DOGE.

5.      I conducted research and determined that the individuals from DOGE who were trying to get access to these crucial systems have a history of issues with data misuse. I was alarmed and

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

000227

Docusign Envelope ID: DE763BA3-4DE9-4B05-8ECF-37BEB8EA8E92

Case 1:25-cv-00489-CJN    Document 39-4    Filed 04/23/25    Page 290 of 306
Case 8:25-cv-00462-TDC    Document 17-2    Filed 02/18/25    Page 228 of 393

raised this issue with my supervisors, indicating that the DOGE personnel should not obtain access.

6.      However, I thereafter discovered that the DOGE personnel had already been given access. Furthermore, the DOGE personnel were given *root access* to USAID systems, the highest level of access one can obtain and which allows a person to take over a system. This includes the ability to modify, add, delete data, and create user accounts.

7.      On Feb 1, 2025, DOGE personnel who did not have a security clearance, used their administrative rights to grant themselves access to restricted areas requiring security clearance. It is unclear what the DOGE personnel did with that access.

8.      DOGE personnel have also taken over delegate rights to every USAID mailbox. With this they have the ability to see every email, delete, and send email on behalf of every user within USAID.  I am also aware that there is rapid preparation to tear down the USAID network to create a condition where USAID employees will not have access to any facilities nor computing environment.

9.      All of the classified systems in multiple USAID buildings have been dismantled and are not available to use.  If there is information that is being shared with USAID on critical issues occurring around the world of a classified nature, which may only be accessed by USAID staff through the classified systems inside of the USAID systems, that access no longer exists because the IT infrastructure and access no longer exists.

10.     On February 4, 2025, I was put on administrative leave and lost all access to USAID systems.

Docusign Envelope ID: DE763BA3-4DE9-4B05-8ECF-37REB8EA9E92

Case 1:25-cv-00489-CJN    Document 39-4    Filed 04/23/25    Page 291 of 306
Case 8:25-cv-00462-TDC    Document 17-2    Filed 02/18/25    Page 229 of 393

11.      On February 10, 2025, I was allowed back into the USAID system, apparently pursuant to a temporary restraining order in a separate lawsuit between different parties. I currently have access to my USAID email, but other USAID systems have been taken offline.

12.      I understand that the DOGE personnel have administrative privileges into all the USAID systems and tools and that DOGE personnel took information out of the agency and sent it elsewhere.

13.      DOGE's actions have caused me emotional injury, as I am aware of the extent of confidential information that has been breached by DOGE, including confidential information of USAID personnel, and the privacy laws broken.

14.      Since Defendants began dismantling USAID, there has been a more than two-fold increase in the total number of security incidents flagged by our IT tools. This includes both incidents related to outside attacks and incidents related to internal use of sensitive data (e.g. individuals within USAID downloading materials that contain sensitive information, like social security numbers, which is flagged even when an individual is downloading their own information). This has overwhelmed the IT team responsible for responding to these incidents. Previously, the IT team could keep up with the incident response on essentially a daily basis but can no longer do so. This is a security issue in and of itself as the IT team is stretched thin and therefore cannot focus as much attention as needed on actually threatening incidents.

15.      I understand that the USAID buildings/floors within buildings have been given to other agencies for other purposes, including allowing the breaking down of offices and cubicles. USAID staff and contractors who worked in the USAID buildings are not allowed inside, even to obtain personal belongings. Before I was no longer allowed in the USAID building I worked in, I

Docusign Envelope ID: DE763BA3-4DE9-4B05-8ECF-37REB8EA8E92

Case 1:25-cv-00489-CJN    Document 39-4    Filed 04/23/25    Page 292 of 306
Case 8:25-cv-00462-TDC    Document 17-2    Filed 02/18/25    Page 230 of 393

kept in my office photographs, awards, coins collected over the years, and other keepsakes. I no

longer have access to these items.

16.     My fellow USAID staff and I are locked out of our offices, and we were told to stay away

from all USAID locations.  While we have been away, the leases were allowed to expire as they

sought other Agencies to occupy the buildings. I am aware that the headquarters location at the

Ronald Reagan Building. 1300 Pennsylvania Ave. has been turned over to the Department of

Homeland Security/ Customs and Border Protection. The building that I worked from, 500 D

Street SW, is actively being shopped out to other Agencies. This is happening with no

communications to employees other than that the buildings are closed until further notice.

17.     Our regular activities are not being performed as the usual processes are not being

followed and there is complete uncertainty about the path forward.  No one knows who holds

certain roles and how to advance through most processes as many of the leaders are not in their

formal roles and most people are fearful of making any decisions.  It is clear that the focus is on

the total dismantling of the Agency and not its core functions, not the support functions that are

codified by statute.  This includes FITARA, FISMA, the Privacy Act, Section 508 of the

Americans with Disabilities Act, E-Government Act of 2002, Government Performance and

Results Act, the Paperwork Reduction Act and many more. The best description of the current

environment is very tense and paralyzing.

Docusign Envelope ID: DE763BA3-4DE9-4B05-8FCF-37BEB8EA8592
Case 1:25-cv-00489-CJN    Document 39-4    Filed 04/23/25    Page 293 of 306
Case 8:25-cv-00462-TDC    Document 17-2    Filed 02/18/25    Page 231 of 393

18.    I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 18th day of February, 2025.**

                                                            **J. Doe 2**

                                                    Signed by:
                                                    J. Doe 2
                                                    5ADF4EA99FCF449...
                                                    **Signature**

000231

**EXHIBIT 31**

**25-cv-469-CJN**

Docusign Envelope ID: 8435F213-8616-4414-82B9-4495319FE123

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1-26, | |
| *Plaintiffs* | |
| v. | **Case No. 25 8:25-cv-00462-TDC** |
| ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY, | |
| *Defendants* | |

## DECLARATION OF J. DOE 7

I, J. Doe 7, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 7" in the complaint.[1]

2.      I am a Civil Service Excepted ("CSE") employee at the United States Agency for International Development ("USAID") and have been with the agency for over 10 years.

3.      I work in a bureau focused on disaster response.

4.      On Sunday, February 2, USAID personnel were cut off from accessing USAID systems in droves.

5.      On Monday, February 3, more USAID personnel were cut off from accessing systems. That morning, I spoke with the information technology ("IT") personnel in my building. The IT team shared that representatives from DOGE had access to all systems. The IT personnel knew this because they were required to help the DOGE representatives obtain access. Two separate IT

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

Docusign Envelope ID: 8435F213-8616-4414-82BD-4495319FE423

personnel told me that the representatives from DOGE "have everything" and that they now have "the keys to the kingdom."

6.      On the morning of February 3, I was contacted by USAID personnel overseas who were stranded without access to government phone, laptop, and systems, including AtHoc and Scry, the apps used to disseminate emergency safety and security information/direction to colleagues. The systems to help the USAID people stranded overseas were shut down, and so I could not assist them.

7.      On Tuesday, February 4, I went into the office and was eventually informed by colleagues that I and other personnel had to leave the building. I then went home to keep working. That evening, I was told I was put on administrative leave via an email from the USAID press email address, sent from one of DOGE's representatives. Shortly after receiving this notice, I lost access to USAID systems.

8.      On Sunday, February 9, apparently in response to a temporary restraining order issued in another lawsuit, I was given access to USAID systems.

9.      I did not have access to the Abacus system until February 13. Our Bureau uses Abacus for award management, running reports on awards, partners, and tracking our available budget and funds. As of February 17, the Automated Directive System (ADS), which covers all internal USAID policy and guidance from everything to HR and timekeeping issues to acquisitions and assistance to non-governmental organizations, UN agencies and other Public International Organization (PIOs), and for-profit organizations, was still offline.

Docusign Envelope ID: 8435F213-8616-4414-82BD-4495319FE423

Case 1:25-cv-00469-CJN   Document 39-4   Filed 04/23/25   Page 297 of 306
Case 8:25-cv-00462-TDC   Document 17-2   Filed 02/18/25   Page 238 of 393

10.      Many PSCs were not paid for 2025 Pay Period 1 and did not receive their cost of living adjustment, and they were not paid for outstanding vouchers for travel, health insurance, and other reimbursable expenses.

11.      The freeze on payment systems has also resulted in implementing partners being unable to get paid out for vouchers submitted for work already completed. World Food Program alone is owed over $819M for work already completed. Several non-governmental organizations have already had to close up shop.

12.      Not all of my team members and colleagues have had their access to email and systems restored, and that has placed an extra burden on those of us who are able to continue working. Those without access are unable to use email, any of the databases including documents on the shared drives, and are unable to work on anything SBU (sensitive but unclassified), as SBU materials can only be completed on government systems.

13.      As part of my job, I am expected to serve on Response Management Teams (RMT) in a classified Ops Center in DC and/or Disaster Assistance Response Teams (DART) overseas at any given moment. At this time, USAID no longer has the lease to our headquarters space in the Ronald Reagan Building, which therefore means that we don't have access to any classified Ops Centers. Customs and Border Patrol has taken over our space. We have been told that no one from USAID will be allowed access to retrieve their personal items.

14.      As a result of not having access to a classified Ops Center, we can not conduct regular operations for disaster response. This means that if an earthquake similar to the February 6, 2023 earthquake in Turkey and Syria were to occur tomorrow, we would be unable to operate as normal. At this time, we have active RMTs for the Afghanistan, Ukraine, Sudan, Gaza, and

Docusign Envelope ID: 8435F213-8616-4441-82BD-4495319FE423

Case 1:25-cv-00489-CJN     Document 39-4     Filed 04/23/25     Page 298 of 306
Case 8:25-cv-00462-TDC     Document 17-2     Filed 02/18/25     Page 239 of 393

Yemen regions, however they do not have access to the classified Operations Center in the

Ronald Reagan Building. Staff who had been delegated to short-term Tour of Duty (TDY)

assignments on the respective DARTs have been called home, and the disaster responses are not

able to function as normal.

15.     I understand that the DOGE representatives have access to my personnel, medical, and

security clearance files. These files have extremely sensitive information about me and my

family members, including information that could subject me to harassment by DOGE members

and/or by third parties. I am extremely worried about this prospect. Some of my colleagues have

been doxxed, and so this concern is especially heightened.

16.     I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 17th day of February, 2025.**

**J. Doe 7**

**Signature**

# EXHIBIT 32

**25-cv-469-CJN**

Docusign Envelope ID: 80452E-A2B8F-408C-BEA3-648DBCB---E0
Case 1:25-cv-00489-CJN   Document 39-4   Filed 04/23/25   Page 300 of 306
Case 8:25-cv-00462-TDC   Document 17-2   Filed 02/18/25   Page 241 of 393

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1-26,<br><br>*Plaintiffs*<br><br>v.<br><br>ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY,<br><br>*Defendants* | **Case No. 25 8:25-cv-00462-TDC** |

## DECLARATION OF J. DOE 9

I, J. Doe 9, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.       I am a plaintiff in this litigation, identified as "J. Doe 9" in the complaint.[1]

2.       I am a personal services contractor ("PSC") offshore at the United States Agency for International Development ("USAID").

3.       I am in a high-risk area in the Middle East.

4.       On Monday, February 3, 2025, I tried to login to my USAID email account but was locked out. I received no warning or notification in advance of being shut out of USAID's systems. My supervisor and Head of Mission were not informed in advance of the cutoff.

5.       All of the contacts and the safety and security applications, including the SCRY application used to monitor and account for overseas personnel, were removed remotely from my USAID work phone. The SCRY application is the safety and security mechanism by which federal government staff overseas in dangerous areas indicate that they are in a dangerous situation and access help.

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

Docusign Envelope ID: 804E2EBA-2B8F-403C-BEA3-649DBCB7BBE0
Case 1:25-cv-00469-CJN    Document 39-4    Filed 04/23/25    Page 301 of 306
Case 8:25-cv-00462-TDC    Document 17-2    Filed 02/18/25    Page 242 of 393

6.      I live with my family in the foreign country in which I am stationed and I am concerned

for mine and my family's safety. If there is an emergency, I hope we will be able to get out and

be taken care of by USAID, but there is no guarantee as over the last few weeks, nothing done

within USAID by Defendants has been according to protocol or implemented in a methodical,

safe manner.

7.      I have no idea what my status is each day. I continue to go into the office in order to

execute my duties to the best of my ability despite not having access to any of the tools and

resources required to do so.

8.      As of February 17, 2025,  I am still locked out of all USAID systems, including email,

safety and security applications (including SCRY application), my calendar, Drive, and desktop.

I have tried numerous times to reach out to different helpdesk lines in Washington, DC. The only

response I have received is a message that the helpdesk confirms my account is disabled but that

they can only tell me to contact political leadership in order to try to obtain my access to USAID

systems.

9.      Our Mission leadership and human resources held a meeting at the end of last week. They

indicated that PSCs should prepare for when, not if, our contracts will be terminated. It is unclear

whether the 30-day period to depart will apply to us as soon as the Temporary Restraining Orders

in other cases lapse. It appears that even if we get approval to stay (*e.g.* to allow my child(ren) to

finish the school year), we would no longer receive important provisions, like

government-provided housing. I am scheduled to go on medical leave soon. If my contract is

terminated before that time, I will lose the paid medical leave I have relied on.

10.      I am under an incredible amount of emotional and psychological distress. My safety and

my family's safety weighs on my mind. I am worried and anxious about whether my family will

Docusign Envelope ID: 804E2EBA-2B8F-409C-BEA3-648DBCB7BBE0
Case 1:25-cv-00469-CJN    Document 39-4    Filed 04/23/25    Page 302 of 306
Case 8:25-cv-00462-TDC    Document 17-2    Filed 02/18/25    Page 243 of 393

be uprooted in the next thirty days, including taking my child(ren) out of their school in the middle of the school year. I am distressed that I may lose my job without access to my salary, healthcare, and housing. And I am in emotional turmoil over the prospect of having a major medical event (I am already feeling the effects of this medical situation) without knowing that I will have access to my healthcare nor my paid medical leave. Additionally, the emotional and psychological distress from the situation within USAID exacerbates the effects of my medical situation.

11.    I hereby declare under penalty of perjury that the foregoing is true and correct.


**Executed on the 18th day of February, 2025.**


**J. Doe 9**

Signé par :

J. Doe 9

E9C00053D73D43D...

**Signature**

# EXHIBIT 33

**25-cv-469-CJN**

Docusign Envelope ID: 9B45FE66-9676-4AF8-A182-D08E21BE44EA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1-26,

*Plaintiffs*

v.

ELON MUSK, in his official capacity,
UNITED STATES DOGE SERVICE, *and*
the DEPARTMENT OF GOVERNMENT
EFFICIENCY,

*Defendants*

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF J. DOE 26

I, J. Doe 26, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 26" in the complaint.[1]

2.      I am a Civil Service Excepted (CSE) employee at the United States Agency for International Development ("USAID") and have been with the agency for over 13 years. I am a senior manager at USAID.

3.      On February 3, I lost access to my USAID email and systems. I received no explanation for this but rather was just cut off from the systems. I could not email my supervisor and could not receive any message explaining admin leave. I emailed HR Helpdesk to request leave or access restored. HR Helpdesk responded letting me know that they could not confirm my status but the fact that I did not have systems access likely meant I was on admin leave status.

4.      My email access was restored on Sunday, February 9, after a TRO in another lawsuit. I have systems access and have been teleworking but have no access to my work station in the Ronald Reagan Building.

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

000255

Docusign Envelope ID: 9B45FE66-9676-4AF8-A182-D08E21BE44EA
Case 1:25-cv-00469-CJN    Document 39-4    Filed 04/23/25    Page 305 of 306
Case 8:25-cv-00462-TDC    Document 17-2    Filed 02/18/25    Page 256 of 393

5.      There is a substantial negative impact on my work and some limitations due to the current situation of uncertainty, no access to the building, and lack of fully functioning systems within the Agency. Examples include (1) some staff still don't have access to systems, (2) some staff who need to access classified email cannot do so, (3) staff members who onboarded recently still have not been issued their onboarding materials, (4) the lack of access to the Ronald Reagan Building hinders our ability to properly manage government records and hinders our office from the close collaboration that is integral to our functioning, (5) many key members of our workforce were institutional contractors whose contract was terminated with no warning mid-week, (6) the Agency financial system (Phoenix) has not been accessible or functional all week, preventing us from processing payments for staff and partners.

6.      I understand that DOGE "broke" or "damaged" the system. The inability to use Phoenix has caused incredible hardship to the Agency worldwide.

7.      Despite being initially told to report to work on Monday, February 10, I was subsequently told that my access to the Ronald Reagan Building was not allowed, due to the building lease having been signed over to Customs and Border Protection. At least one other colleague attempted to gain access to the building and was denied. This colleague (and some others) have their government-furnished equipment (laptop, phone) still in the building and have not been able to retrieve it all week.

8.      The lack of access to the building is problematic because staff and leaders are not able to access resources they need in the building or any classified materials. The lack of access to this classified material and communications methods prevents us from participating in interagency discussions on national security issues.

Docusign Envelope ID: 9B45FE66-9676-4AF8-A142-D08E21BE44EA

Case 1:25-cv-00489-CJN    Document 39-4    Filed 04/23/25    Page 306 of 306
Case 8:25-cv-00462-TDC    Document 17-2    Filed 02/18/25    Page 257 of 393

9.      My job duties require access to physical records (files) in our office, the lack of which is problematic for the closeout of contracts that were terminated this week. The orderly and lawful closeout of these awards, including prompt payment, requires proper record keeping.

10.     Many of the programs that our office implements were on a list of contracts to be terminated - an action that, once taken, cannot be reversed (and requires thousands of hours of effort and months of time to recompete).

11.     As a result of the public smear campaign by Defendant Elon Musk against USAID and our staff, I feel unsafe.

12.     I hereby declare under penalty of perjury that the foregoing is true and correct.


**Executed on the 17th day of February, 2025.**

                                                        **J. Doe 26**

                                                        Signed by:

                                                        *J. Doe 26*
                                                        A03A327FCC81439...

                                                        **Signature**

000257

3