

# Foreign Assistance: Where Does the Money Go?

August 8, 2024

**Congressional Research Service**

https://crsreports.congress.gov

R48150

**CRS REPORT**
Prepared for Members and
Committees of Congress

**Congressional Research Service**
Informing the legislative debate since 1914

**SUMMARY**

**R48150**

August 8, 2024

**Nick M. Brown**
Analyst in Foreign
Assistance

# Foreign Assistance: Where Does the Money Go?

Congress provided $66.1 billion in foreign assistance appropriations in FY2023. In allocating foreign assistance and overseeing agencies' execution of those funds, some Members of Congress have focused on the countries, international organizations, and sectors (global health, counter-narcotics, basic education, etc.) receiving aid. Congressional oversight has shed less light on the implementing partners through whom funding turns into programs, and the partnerships that activate that programming.

This report provides an overview of the major methods of foreign assistance delivery, focusing on nonmilitary aid programmed through the U.S. Agency for International Development (USAID). It uses information from government databases, policies and strategies, and program descriptions to explain how aid dollars go from appropriation by Congress to expenditure by implementing partners.

Most U.S. foreign aid is provided as a "project," assistance designed and implemented to achieve discrete and defined development objectives. Projects deliver commodities, technical assistance (as either short-term consultants or long-term advisors and staff), equipment, infrastructure, events, and grants, among other things. A smaller share of assistance is provided to fund the general operating budgets of foreign governments (known as "budget support") or U.S. contributions to public international organizations (known as "core contributions"). Administrative costs consume a portion of aid funds as well, which Congress has long monitored. Finally, agencies sometimes provide foreign assistance loans or loan guarantees, though this is now a much smaller share of assistance than in USAID's early years.

USAID spends aid dollars mostly through "implementing partners": third parties that include private contractors, nonprofit organizations, foreign governments, international organizations, and other U.S. government agencies. Implementing partners may be U.S., foreign, or international organizations. Projects are typically executed through either an "acquisition" contract, typically with a for-profit implementing partner, or an "assistance" grant or cooperative agreement, typically with a nonprofit organization, foreign government, or public international organization. Since FY2019, USAID funding has incrementally shifted from acquisition to assistance.

When evaluating U.S. foreign assistance policy and providing oversight of agency implementation of foreign assistance funds, Congress may weigh a series of trade-offs related to implementing partners and mechanisms, such as the following:

- What are the risks and benefits of using U.S. firms and nonprofits, versus local partners, to implement U.S. foreign assistance?
- Which types of expenditures constitute the "cost of doing business," and how would Congress balance such costs against program funds?
- What information should Congress seek on contractor indirect costs, and what is the proper way to evaluate the shape and size of those expenses?
- What are the benefits and drawbacks of implementing aid through multilateral mechanisms, such as public international organizations?
- Should USAID consider its nongovernmental implementing partners primarily as a tool to implement U.S. foreign assistance, or as an independent community of development workers that may be indifferent toward U.S. assistance priorities?

This report is intended to describe the implementation vehicles used to deliver foreign assistance, not the appropriations, program planning, and award processes from which they result. For more details on the funding process, see CRS In Focus IF11515, *U.S. Foreign Assistance: Budget Development and Execution*, by Nick M. Brown. For a broad overview of U.S. foreign assistance, see CRS Report R40213, *Foreign Assistance: An Introduction to U.S. Programs and Policy*, by Emily M. McCabe and Nick M. Brown.

# Contents

Introduction .................................................................................................................................... 1

Types of Foreign Aid ....................................................................................................................... 2

    Projects .......................................................................................................................................... 3

    Budget Support and Core Contributions ...................................................................................... 5

        Budget Support: Loans and Loan Guarantees ........................................................................ 6

    Administrative Costs ..................................................................................................................... 7

Implementing Partner Types ............................................................................................................ 7

    Nongovernmental Organizations .................................................................................................. 8

    Public International Organizations ...............................................................................................11

    Foreign Governments ................................................................................................................. 14

    Interagency Agreements ............................................................................................................. 16

Policy Issues ................................................................................................................................... 17

    USAID Operating Costs ............................................................................................................. 17

    Implementing Partner Indirect Costs ......................................................................................... 18

    Nongovernmental Partners' Role in the USAID Ecosystem ..................................................... 20

    Competition and Oversight on PIO Agreements ....................................................................... 22

    Local Partnering ......................................................................................................................... 23

## Figures

Figure 1. U.S. Nonmilitary Foreign Aid, by Type, FY2013-FY2022 ............................................. 3

Figure 2. USAID Funding Obligations, by Implementing Partner Type, FY2013-2022 ................ 7

Figure 3. USAID Funding Obligations, by NGO Type, FY2013-2022 .......................................... 8

Figure 4. U.S. Nonmilitary Foreign Assistance to Public International Organizations, ............... 13

Figure 5. Nonmilitary Foreign Assistance to Foreign Governments ............................................ 16

## Tables

Table 1. NGOs Obligated More than $1 Billion in U.S. Nonmilitary Foreign Assistance,
    FY2013-FY2022 .........................................................................................................................11

## Contacts

Author Information........................................................................................................................ 25

# Introduction

Congress appropriated $66.1 billion for foreign assistance activities in FY2023.[1] In overseeing agencies' execution of those funds, Congress requires substantial information from agencies about foreign assistance funding levels, recipient countries, and the reasons for the assistance.[2] The resulting reports and notifications often highlight a country's need for assistance but not necessarily how those needs will be met.[3] Detailed reporting on field activities explains how funds are spent. However, such information is unevenly available across agencies, geographies, projects, and assistance sectors. It is often especially unclear whether aid is provided primarily in the form of goods, services, or cash. In the absence of such details, policymakers and the public may be unaware what aid dollars actually provide to targeted communities overseas.[4]

Most agencies provide U.S. foreign assistance through "implementing partners." Few foreign governments receive direct budget support, and some foreign assistance dollars never leave the United States at all—instead going to a U.S. business for the end benefit of a foreign population. Money goes to U.S. farmers, defense contractors, and management consultants, among others, for commodities or services provided to benefit foreign populations. This report is about the implementing partners that spend the vast majority of aid dollars on behalf of the U.S. government. It largely addresses nonmilitary assistance managed by the U.S. Agency for International Development (USAID), the lead provider of nonmilitary U.S. foreign assistance.

This report describes who implements nonmilitary aid, how agencies partner with them, and why such matters may be of congressional interest. It examines the types of aid (project-based, budget support, and administrative costs) and their relative magnitude, then details the types of partners that agencies engage: firms and nonprofit organizations, public international organizations (PIOs), foreign governments, and other U.S. agencies. Finally, it explores selected issues in implementation that have generated interest in the 118th Congress and some previous Congresses.

Data in this report are based on foreign assistance obligations as reported in foreignassistance.gov, focusing on FY2013-2022, the last year for which data was fully reported at the time of this report's publication.[5]

---

[1] For detailed information on U.S. foreign assistance funding, see CRS Report R47579, *Department of State, Foreign Operations, and Related Programs: FY2024 Budget and Appropriations*, by Emily M. McCabe and Cory R. Gill.

[2] For a general overview of U.S. foreign assistance, see CRS Report R40213, *Foreign Assistance: An Introduction to U.S. Programs and Policy*, by Emily M. McCabe and Nick M. Brown.

[3] For recent examples, see USAID, *Report to Congress on Programs in Forestry and the Conservation of Biodiversity During Fiscal Year 2021: Results and Funding*, January 2023; Department of State, *Congressional Budget Justification: Department of State, Foreign Operations, and Related Programs*, March 9, 2023, pp. 114-117. Congressional notifications are nonpublic and thus not cited in this report.

[4] See Myth #4 and #5 at George Ingram, "What every American should know about US foreign aid," October 2, 2019. See also exchange between Senator Paul and Secretary of State nominee Rex Tillerson, U.S. Congress, Senate Committee on Foreign Relations, *Nomination of Rex Tillerson to be Secretary of State*, 115th Cong., 1st sess., January 11, 2017, S. HRG. 115–4 (Washington: GPO, 2017), pp. 71-72.

[5] Foreignassistance.gov is the primary government website for reporting of foreign assistance. It was created to meet the requirements of the Foreign Aid Transparency and Accountability Act of 2016 (FATAA, P.L. 114-191) and is used to meet the public reporting requirements of the Foreign Assistance Act of 1961, as amended (P.L. 87-195). Foreignassistance.gov reports that a few agencies have not completed FY2022 reporting, but the website indicates reporting for that year is comprehensive, unlike for FY2023. As a result, this report uses FY2022 data.

---

### Key Terms

An **implementing partner** is an entity who partners with USAID to execute a foreign assistance activity. This term may refer to private contractors, nonprofit organizations, foreign governments, international organizations, and other U.S. government agencies.

**Economic assistance** is all nonmilitary foreign assistance provided by the U.S. government.

A **project** is funding with a set of inputs, activities, and outputs to reach a specific objective within a defined time frame, budget, and geographical area.[6]

A **scope of work** is a description of the activities an implementing partner is to do for the government.

**Institutional support contractors** are personnel who work within USAID but are employed by a private firm, which administers their benefits, compensation, and supervision. They perform work that supports internal agency operations but cannot perform "inherently governmental functions" such as setting agency policy and supervising federal employees.[7]

**Personal services contractors** work on time-limited assignments with USAID, often in support of USAID's internal processes.

A **for-profit firm**, often called a "contractor," seeks to implement foreign assistance for a fee, to make a profit.

A **nonprofit organization** seeks to implement foreign assistance to advance its own mission—such as improving the plight of disadvantaged people or promoting environmental sustainability—not to make a profit. Generally, nonprofits are not described as contractors, as they usually implement grants and cooperative agreements, not contracts.

# Types of Foreign Aid

Foreign assistance takes various forms. It may include the direct provision of commodities and equipment (e.g., food and generators); capacity-building technical assistance to partner governments or local beneficiaries; funding for transportation, water, or energy infrastructure; support to the general budget of foreign governments and international organizations; and direct lending or loan guarantees to partner governments, among others. For reporting purposes, agencies categorize all of these activities under five aid "types": Projects, Administrative Costs, Core Contributions, Budget Support, Technical Assistance, and Other. Most U.S. foreign aid in recent years has been classified as projects, funded and managed through aid agencies (see **Figure 1**).

---

[6] Adapted from Organisation for Economic Co-operation and Development (OECD) Committee Working Party on Development Finance Statistics, "Converged Statistical Reporting Directives for the Creditor Reporting System (CRS) and the Annual DAC Questionnaire: Annexes," April 9, 2021, p. 107. USAID maintains its own definition with references to its internal procedures; for reader accessibility, this report does not use that definition here. USAID defines an "activity" as a single implementing mechanism (such as a contract, grant, or cooperative agreement) to carry out one or several interventions, whereas a "project" is a group of activities designed to coordinate and advance a development result. USAID, ADS 201, pp. 51-52; USAID, "Activity Design," https://www.usaid.gov/activity-design, accessed June 6, 2023; USAID, "Project Design," https://www.usaid.gov/project-design, accessed August 3, 2023. This report includes both "project-type" and "technical assistance" when calculating totals for this aid type, as data from reporting agencies did not indicate a substantial difference in implementation approaches between those two classifications.

[7] Inherently governmental functions are defined in the Federal Acquisition Regulation Subpart 7.5.

### Figure 1. U.S. Nonmilitary Foreign Aid, by Type, FY2013-FY2022

Obligated Funding, by percentage of total assistance



**Source:** ForeignAssistance.gov.

**Notes:** ForeignAssistance.gov classifies aid as "military" and "economic." Economic aid includes assistance for governance, nuclear security, public health, and humanitarian assistance, among others. Given the variety of assistance, this report adopts the term "nonmilitary" for anything classified in foreignassistance.gov as "Economic" aid.

These categories may be misleading. Project-based aid includes certain types of assistance provided directly to partner governments for ongoing operations, or for purchasing commodities delivered directly to disaster-affected communities. U.S. foreign assistance agencies report aid type under a framework agreed and maintained by the Organisation for Economic Co-operation and Development's (OECD's) Development Assistance Committee (DAC), a forum of leading bilateral donor countries.[8] This reporting paradigm applies to all donors, and it does not account for the U.S. approach to foreign assistance delivery, leading to some apparently anomalous classifications. For instance, aid appropriated as "direct financial support" to the Government of Ukraine in 2022 was structured as a reimbursement for verified government expenditures—such as teachers' salaries and social assistance payments—and managed by the World Bank. That funding has been classified as a project, including in the above figure, though the funding is meant to support Ukraine's central budget.

The aid type classifications used in reporting are important background to understand agencies' relationships with an implementing partner, though the partner type is highly consequential for how aid will be implemented (see "Implementing Partner Types "). While data reported in foreignassistance.gov may lack nuances necessary to understand the nature of each partnership, it still provides useful topline information about relative aid flows.

## Projects

Projects take many forms but generally involve a third-party implementing partner working under an agreement with the managing foreign aid agency (see "Managing, Funding, and Implementing Agencies" text box). Such projects generally have a high-level goal, several objectives to advance that goal, a series of quantitative targets for making progress toward that objective, and a well-defined "scope of work" for the implementing partner (see "Key Terms" text box). Usually, the project goal is aspirational and would require complementary developments outside the project

---

[8] See Organisation for Economic Co-operation and Development, Development Assistance Committee Working Party on Development Finance Statistics, "Converged Statistical Reporting Directives for the Creditor Reporting System (CRS) and the Annual DAC Questionnaire: Annexes," April 9, 2021,

itself to be achieved—such as effective leadership by the central government, receptivity to new practices by local populations, and a relatively stable implementing environment. In practice, projects are diverse. A project's scope may involve delivery of medicine or food, building a highway, researching a new technology, or advising a government on customs procedures, among others. A nongovernmental organization (NGO) is the most common partner organization for USAID. Of the $181.5 billion in foreign assistance obligations for projects by USAID from FY2013 to 2022,[9] NGOs implemented $109.8 billion (60%).[10] Public international organizations (PIOs) are the second-largest category of project-based implementing partners.

---

### Managing, Funding, and Implementing Agencies[11]

In many cases, the agency funding an activity is not the one that oversees it or carries it out. Large portions of the aid budget involve partnerships across agencies as a result of agencies' policy competencies, skill in managing implementers, preferences of Congress, and implementation ability. For instance, the State Department controls funding allocations for the Economic Support Fund (ESF), which is the U.S. government's aid account chiefly motivated by foreign policy concerns, but after determining funding allocations, the State Department transfers much of its ESF funding to USAID to develop the projects, select implementers, and oversee implementation. "Managing agency" may also be described as the "administering agency," and the "funding agency" often takes part in shaping the project design. In some cases, agencies may be the implementing partner themselves; for example, the Peace Corps operates a USAID-funded "Small Projects Assistance" program that Peace Corps volunteers implement in the field.

---

Project-based assistance is the predominant method of providing foreign assistance for several reasons. For one, this structure mitigates the risk of implementing partners diverting funding to objectives outside of U.S. priorities.[12] Project-based aid expenditures are to be "allowable, allocable, and reasonable" under an agency-designed scope of work.[13] Detailed scopes of work allow audits of project costs and direct oversight of project activities, making reporting lines clearer.

USAID typically initiates projects by developing a preliminary design and a research agenda to further scope the concept.[14] Agency staff develop these proposals and then submit them for

---

[9] Foreignassistance.gov. Data include "Implementing Partner Category" of "Church and Faith Based," "Enterprises," "NGO," "Public and Private Partnerships," and "Universities and Research Institutes." Data are included for USAID alone because certain other agencies' reporting includes some anomalies. For example, the Millennium Challenge Corporation reports itself as the implementing partner for all of its compacts, despite its operational model consistently delegating compact implementation to the recipient country's government. While such anomalies may also occur within USAID's reported data, a random sampling of data conducted by CRS did not indicate any such systemic reporting anomalies.

[10] While NGOs are sometimes colloquially equated with nonprofit organizations, this report uses the term "NGO" for both nonprofits and for-profits because programming arrangements are often similar for both groups of implementing partners. Firms are also often called "contractors" because of their contractual relationship with USAID, and "contractor" is also often used for individual consultants employed by USAID. Nonprofit organizations are seldom considered contractors, as they usually operate under a grant or cooperative agreement. While widely used, this report avoids the term "contractor" given its imprecision.

[11] "Managing" and "Funding" agencies is derived from foreignassistance.gov, "Glossary," https://www.foreignassistance.gov/about#tab-glossary, accessed August 3, 2023.

[12] See USAID, "Risk Appetite Statement: A Mandatory Reference for ADS Chapter 596," August 22, 2022, pp. 11-12.

[13] These three terms determine whether a cost may be reimbursed by the government. An "allowable" cost is not prohibited by law or regulation. An "allocable" cost is associated with the scope of work in the implementer's agreement. A "reasonable" cost is one a "prudent" businessperson would incur to carry out the activity. USAID, "Country Contracting Handbook Chapter 4: Cost Principles for Country Contracts," Mandatory Reference to ADS 305, last revised July 16, 2001, pp. 5-6.

[14] The content in this section is largely based on USAID, "Automated Directive System Chapter 201: Program Cycle Operational Policy (ADS 201)," revised July 17, 2024, pp. 57-89.

approval.[15] The resulting proposal (1) states a development problem (usually associated with objectives in a country strategy or a global initiative's strategy), (2) hypothesizes how a project may solve it (a "theory of change"), and (3) proposes an approach to implementing that solution. If approved, USAID then issues a call for proposals from implementing partners, with the implementation approach as the "scope of work." For instance, a USAID project may identify evidence that professionalizing a government's revenue collection and budget development processes leads to improved government responsiveness to its constituents more generally, improving faith in government and stabilizing democratic institutions. USAID officials then may propose a fiscal management project intended to build capacity in a partner government's tax and budget bureaus.[16] Such projects may comprise a single implementing partner award or several.

A paradigmatic project contains a dedicated scope of work with established deliverables and performance targets, to be carried out by an implementing partner's team over a defined time period (typically not to exceed five years). A project may include building infrastructure, technical assistance, supply of goods or services, or some combination of all three. Usually, projects are divided into several work streams, each called "components." The fiscal management project, for example, may include (1) technical assistance to reform an agency's administrative procedures, (2) training for bureau staff in modern accounting practices, (3) a quantitative analysis of current tax compliance rates, (4) a marketing campaign encouraging citizens to pay their taxes, and (5) sourcing of new accounting software for each bureau to track finances better. Projects often have "cross-cutting themes" as well, which may include addressing the needs of vulnerable populations and ensuring the views of local residents are taken into account, among others.

## Budget Support and Core Contributions

In contrast to project-based assistance, a U.S. foreign assistance agency may fund the general budget of a recipient organization. The Foreignassistance.gov database uses the label "budget support" for funding provided to a recipient government to support general operating costs rather than a specific scope of work. The label "core contribution" is used when such funding is provided to public international organizations (such as United Nations entities). Since at least 1995, most such assistance has been provided to public international organizations, with a smaller share going to foreign governments. Since 2022, the substantial budget support to Ukraine has reversed this balance, although that aid has been classified as a project.[17]

USAID generally has issued budget support to foreign governments in a funding tranche after the government has met a predefined milestone.[18] In providing budget support, USAID generally has relinquished exclusive control over spending, and funds instead have been managed according to

---

[15] Other agencies' planning processes differ substantially. The Millennium Challenge Corporation (MCC) is one such example. MCC asks its potential recipient countries to develop such proposals, in line with its "country-led" development approach. For further information on the Millennium Challenge Corporation (MCC), see CRS Report RL32427, *Millennium Challenge Corporation: Overview and Issues*, by Nick M. Brown.

[16] See, for example, USAID El Salvador, *Country Development Cooperation Strategy (CDCS) FY 2020-2025*, updated March 24, 2021, p. 35.

[17] These descriptions are adapted from the OECD's statistical reporting framework, which U.S. assistance agencies use for their aid type reporting. OECD DAC Working Party on Development Finance Statistics, "Converged Statistical Reporting Directives for the Creditor Reporting System (CRS) and the Annual DAC Questionnaire: Annexes," April 9, 2021, p. 104. A small share of core contributions, less than 10%, is allocated to international nonprofits, mostly the International Committee of the Red Cross.

[18] The analysis here, as well as throughout the report, focuses primarily on the period FY2013 to present. It is possible that in earlier periods, particularly prior to the 1980s when budget support was a much larger share of U.S. assistance, such funding was not in exchange for performance milestones.

the recipient's own budgetary procedures and authorities.[19] While USAID has less direct control over the recipient's use of budget support aid, the agency does control whether it issues a funding tranche. For instance, USAID generally has provided budget support to Jordan (a top recipient of U.S. budget support aid) after the USAID/Jordan mission certifies annually that certain policy reforms have been met.

For core contributions, the United States generally has not structured its funding in tranches. Rather, U.S. representatives have a direct role in the organization's decisionmaking—often as a shareholder, member of the Board of Directors, or in appointing the organization's leadership. For instance, the United States influences the World Bank's decisionmaking as a major shareholder and nominates its President.[20]

### Budget Support: Loans and Loan Guarantees

Historically, U.S. budget support to governments included a substantial lending element. From 1962 to 1988, loans represented 28% of total U.S. economic foreign assistance.[21] Since 1988, Congress and the executive branch have shifted away from lending toward primarily grant-based assistance, viewing loans as contributing to already-burdensome debt levels among aid recipients.[22] There has been some recent renewed interest in converting grant-based budget support to loans, with an FY2024 aid package to Ukraine requiring budget support through a loan rather than a grant.[23]

More frequently since the end of the Cold War, USAID has provided financing to governments through loan guarantees rather than direct loans. Loan guarantees are a commitment to repay all or part of a loan in the event a borrower stops payments. From 1993 to 2017, USAID issued 20 guarantees of sovereign bond issuances to Middle Eastern states and Ukraine, but only three remain active.[24] The most recent such guarantees were issued in support of countries facing fiscal constraints due to political crises (the Arab Spring and the Russian incursion into Crimea and Eastern Ukraine). USAID has not issued any guarantees since 2017.[25]

Development financing to private entities, including loans and loan guarantees, remains an active area of U.S. support for international development. The U.S. International Development Finance Corporation administers most of those activities, typically by financing private sector projects rather than sovereign debt.[26] This financing generally has been based on market rates and, as a result, has not been accounted as foreign assistance.

---

[19] Ibid. As noted above, this reporting framework is derived from the OECD, whose classifications may not align neatly with U.S. foreign assistance implementation paradigms (for example, classifying Ukraine budget support as a project).

[20] USAID Office of Inspector General (OIG), *Jordan Cash Transfer Program: USAID Generally Followed the Grant Agreement and Agency Policy With Some Due Diligence Exceptions*, Report Number 8-278-23-001-P, November 17, 2022, p. 4.

[21] USAID, *U.S. Overseas Loans and Grants and Assistance from International Organizations: Obligations and Loan Authorizations, July 1, 1945 - September 30, 1988*, CONGR-R-0105, 1989, p. 4.

[22] Volumes of the *U.S. Overseas Loans and Grants and Assistance from International Organizations* publication issued since 1989. While the Food for Peace program continued to offer some loans after 1988, USAID lending ended. CRS Report 98-916, *Foreign Aid: An Introductory Overview of U.S. Programs and Policy*, by Curt Tarnoff and Larry Nowels, updated January 19, 2005 (nondistributable but available to congressional clients upon request).

[23] See Section 507 of the Ukraine Security Supplemental Appropriations Act, 2024 (Div. B of P.L. 118-50).

[24] USAID, *Agency Financial Report Fiscal Year 2018*, December 19, 2018, p. 51.

[25] USAID, *Agency Financial Report Fiscal Year 2023*, November 15, 2023, p. 84.

[26] See CRS Report R47006, *U.S. International Development Finance Corporation: Overview and Issues*, by Shayerah I. Akhtar and Nick M. Brown.

## Administrative Costs

Administrative costs are funds used to deliver or implement aid that do not fit the definitions of project aid or budget support/core contributions.[27] From FY2013 to FY2022, U.S. assistance agencies directed 7.7% of nonmilitary foreign assistance obligations toward administrative costs. The parameters of administrative costs are highly nuanced and differ from agency to agency: some agencies, for instance, classify monitoring and evaluation as an administrative cost, while others do not. Congressional directives from the 1970s have shaped what USAID classifies as administrative costs. Congress directed that the following two categories be funded by the "Operating Expenses" account:

- All salaries and benefits of USAID direct hires, including Foreign Service and Civil Service, including when those employees are working to oversee a project activity.
- All costs not directly related to a specific project.[28]

USAID classifies all Operating Expenses as an administrative cost. Activities are considered operating expenses if they are inherently governmental or part of the cost of doing business. Examples include developing USAID policies and notices to Congress, drafting contract agreements for projects, and managing USAID accounting.[29] Because all USAID salaries are considered administrative costs, work such as supporting project implementation and designing development interventions are considered administrative expenditures. By contrast, administrative work by USAID implementing partners is considered a project cost.

## Implementing Partner Types

U.S. foreign aid agencies seldom directly implement aid programs. Agencies partner with for-profit firms, nonprofit organizations, foreign governments, public international organizations (PIOs), other U.S. agencies, and individuals to carry out their programs (see **Figure 2**). USAID uses the broad term "implementing partner" to describe any member of its partner community. Many of these partners align primarily with a particular partnering mechanism (firms with contracts; nonprofits with cooperative agreements; U.S. government agencies with interagency agreements; foreign governments with bilateral grant agreements; and so on). However, partner



**Figure 2. USAID Funding Obligations, by Implementing Partner Type, FY2013-2022**

**Source:** foreignassistance.gov.

**Notes:** See footnote 13 for organization types included in "Non-Governmental Organizations" category.

---

[27] Adapted from OECD DAC Working Party on Development Finance Statistics, "Converged Statistical Reporting Directives for the Creditor Reporting System (CRS) and the Annual DAC Questionnaire: Annexes," April 9, 2021, p. 110.

[28] USAID, ADS Chapter 601: Funding Source Policy, revised April 4, 2022, p. 2.

[29] For more examples of USAID operating expenses, see USAID, ADS Mandatory Reference 601maa, "Cost of Doing Business," revised February 10, 2004.

models vary according to the project, and multiple types of implementing partners may apply for any U.S. foreign assistance funding opportunity. Certain NGOs, such as the National Endowment for Democracy, are government-sponsored entities that receive nearly all their funding from the U.S. government, and many universities implement both contracts and cooperative agreements.[30] This section profiles each type of partner, focusing especially on the partnering models most characteristic of each partner category.

## Nongovernmental Organizations

Among nongovernmental organizations (NGOs), U.S. assistance may be directed toward two types of entities: for-profit enterprises, sometimes classified as "firms," and nonprofit organizations (see "Definitions" text box). Foreign assistance reporting also includes distinct categories for universities and research institutes as well as church and faith-based organizations. For-profit firms generally seek out "acquisition" opportunities with agencies, governed by the Federal Acquisition Regulation and usually resulting in a contract. Nonprofits typically seek "assistance" opportunities, which result in grants and cooperative agreements (see "Acquisition and Assistance: What's the



**Figure 3. USAID Funding Obligations, by NGO Type, FY2013-2022**

**Source:** foreignassistance.gov.

Difference?" text box). This report uses the term "NGO" to refer collectively to nonprofit and for-profit private organizations.[31] There is no restriction on nonprofit organizations competing for contracts nor for-profit firms competing for grants and cooperative agreements, and NGOs often implement a composite of each. Despite that, because USAID prohibits profits on grants and cooperative agreements, firms generally prioritize contracts.[32] Both instruments are subject to competitive processes, although grants and cooperative agreements can be awarded more quickly and with fewer restrictions.[33] Within nonmilitary assistance, USAID dwarfs other agencies in the volume of its NGO partnering—69.8% of all NGO-implemented nonmilitary aid obligations in 2022 came from USAID.[34] Within USAID, most of these activities are routed through USAID's acquisition and assistance officers, who oversee competition and administration of the agency's project-based agreements.

---

[30] National Endowment for Democracy, *FY2021 Financial Report,* September 30, 2021, p. 4.

[31] See footnotes 11 and 12 for considerations related to this terminology.

[32] Firms may seek such opportunities to build out new technical expertise or defray some of their operating costs, among other reasons.

[33] USAID's policies indicate that the lead time for acquisition is about nine months and five months for assistance. USAID, ADS 201, p. 57.

[34] Foreignassistance.gov.

---

### Acquisition and Assistance: What's the Difference?

Foreign assistance agencies' partnerships with NGOs are classified as either *acquisition* or *assistance* relationships. *Acquisition* largely corresponds to contracts and direct purchases, typically with for-profit entities, whereas *assistance* includes grants and cooperative agreements, typically with nonprofit organizations. A cooperative agreement is similar to a grant but generally involves a greater role for USAID in overseeing activities, and contracts generally involve a still-greater oversight role for USAID.

Acquisition mechanisms are intended for the purchase of goods or services to achieve an agency's own objectives. By contrast, assistance provides funding to a third party to carry out activities that align with the objectives of both the funding agency and the implementing partner. Most contracts are implemented by for-profit entities with a primary objective to be profitable (even if owners also seek to advance social aims). For instance, pharmaceutical companies may specialize in producing medicines to cure a disease, but their objective is to sell those medicines for a profit, not to give them away as a goodwill measure. By contrast, assistance partnerships provide funding to a third party to carry out activities that align with the objectives of both the funding agency and the implementing partner.[35] For example, USAID may fund a nonprofit health clinic to administer the medicine that USAID has procured.

In many cases, the distinction between these two partnering models is straightforward: an agency seeking to provide medical care for HIV/AIDS patients is likely to purchase medicine from a pharmaceutical firm and to provide grant funding to a local clinic to administer that medicine. One of the most substantial differences between the two types of partnerships is that while implementing partners may make a profit on acquisition mechanisms, they may not do so under assistance.

In other cases, however, acquisition and assistance may look very similar during implementation. In Mozambique, for example, USAID contracted with DAI, a firm whose stated sectoral expertise includes rural agricultural development, to implement a Feed the Future program from 2017 to 2022 oriented on expanding production and sales of certain cash crops.[36] Over the same time period, USAID also issued a cooperative agreement to Winrock International, a U.S. nonprofit organization with a technical group dedicated to strengthening food systems, to manage a regional program in northern Mozambique focused on increasing crop yields and crop resilience.[37]

Grants and cooperative agreements appear to make up substantially more USAID funding than contracts, with three-quarters of new NGO awards by value going to assistance in FY2023, compared with a quarter to acquisition.[38] Across all USAID foreign assistance to NGOs from FY2013 to FY2022, 59.8% of funding went to nonprofit organizations and 40.2% went to for-profit firms (see **Figure 3**). Universities and research institutes comprised an important subset of nonprofits, accounting for 6.5% of USAID funding to nonprofits from FY2013 to FY2022. USAID partners with these institutions in part for their sectoral research expertise, in particular agricultural schools and public health research facilities. Church and faith-based organizations were a second substantial subset from FY2013 to FY2022, with 5.8% of USAID funding for nonprofits over the same period. Over half of that funding was directed to a single organization, Catholic Relief Services, primarily for disaster assistance. **Table 1** lists USAID's top reported NGO implementing partners.[39] From FY2013-FY2022, of the more than 6,000 unique NGOs who

---

[35] Federal Grant and Cooperative Agreement Act (FGCAA), 31 U.S.C. §6301.

[36] USAID, "Feed the Future Mozambique Innovations (FTF INOVA)," October 2019; DAI, "Economic Growth," https://www.dai.com/our-work/solutions/economic-growth.

[37] Winrock International, "Agriculture, Resilience & Water," fact sheet, 2023; Winrock International, "Feed the Future Mozambique Resilient Agricultural Markets Activity – Nacala Corridor, Year 2, Quarter 1 Report October 1, 2017-December 31, 2017."

[38] USAID Office of Acquisition and Assistance (OAA), *2023 Fiscal Year Progress Report*, February 16, 2024, p. 3. Interagency Agreements and grants to PIOs are excluded because this section focuses on NGOs. Personal Services Contracts are included as acquisition. This analysis includes indefinite quantity contracts, which may not be fully utilized—if not, the share for acquisition would be further reduced. Note that award amounts are not obligations but reflect the ceiling value of a contract.

[39] This list is incomplete; more than a third of obligations in foreignassistance.gov over this period are marked as redacted or "other." Implementing partner names may be redacted on the basis of exceptions provided in the Foreign Aid Transparency and Accountability Act of 2016 (FATAA, P.L. 114-191). Those exceptions are to protect the implementing partner's health or physical security, or to protect the national security interests of the United States.

received nonmilitary assistance obligations, the share of aid implemented by the top ten partners, by obligation value, has remained around 20%.[40]

USAID assistance implemented through NGOs largely goes to U.S. organizations, with 82.7% of NGO assistance obligations from FY2013 to FY2022 allocated to U.S. NGOs.[41] USAID has been seeking to reduce this percentage in favor of more aid implemented through local organizations (see "Local Partnering"), although some of the 17.3% of USAID assistance implemented by non-U.S. NGOs include multinational organizations, such as Deloitte (see **Table 1**), and partners based in other donor countries, such as the Canadian CGI Group, Inc.[42]

Implementation may differ considerably from activity to activity. Assistance projects range from "cooperative agreements" with tens of millions of dollars in funding, multiple project teams, and a multiyear project office funded with USAID assistance, to small-scale grants of thousands or hundreds of dollars, including to innovators seeking to pilot a new approach to development, or to communities affected by a natural disaster seeking to rebuild their homes. Given limited USAID staff resources to manage the thousands of small grants issued yearly, implementing partners typically issue those smaller-scale awards as "subgrants" or "grants under contract." Implementing partners also procure goods and services from third parties, further expanding the number of organizations involved in any activity.[43] Contracts may exceed $1 billion in total value and be implemented across multiple countries, several scopes of work, and several technical areas, or may be as small as a few dollars, like a taxi receipt.[44] Acquisition and assistance awards include both direct and indirect costs. "Direct costs" are those expenses associated with the direct implementation of the activity. "Indirect costs" include an implementing partner's central office expenses, including management and administrative labor wages, fringe benefits such as annual leave, office rent for the central office (whereas project office rents are directly allocable to the activity), and accounting software, among other costs.[45]

---

[40] Foreignassistance.gov. The 6,000 figure is a fraction of the total number of NGOs receiving U.S. assistance, as it does not include sub-grantees and vendors under USAID projects.

[41] This amount includes both U.S. NGOs and international NGOs that are domiciled in the United States but with offices or subsidiaries in other countries—such as Save the Children Federation and the International Rescue Committee. Such international NGOs do not include public international organizations—a separate category.

[42] Foreignassistance.gov.

[43] It would be difficult to precisely tabulate how many subawards implementing partners issue each year. As one example, however, the USAID Office of Transition Initiatives project in Iraq reported that in one six-month period, it approved 72 new activities, consisting of subcontracts, grants-under-contract, and other award types—some activities may include multiple implementing partners. Chemonics International, "Understanding USAID Awards: 'How to Work with USAID" Training Series,'" December 2022, April 30, 2021, p. 3.

[44] For one of USAID's largest anticipated projects in its history, see USAID, "NextGen Global Health Supply Chain," https://www.usaid.gov/partner-with-us/find-a-funding-opportunity/next-generation-global-health-supply-chain.

[45] USAID, "An Indirect Cost Rate Guide for Non-Profit Organizations," January 27, 2023, pp. 31-39.

**Table 1. NGOs Obligated More than $1 Billion in U.S. Nonmilitary Foreign Assistance, FY2013-FY2022**

| Rank | Organization Name | Organization Type | Total Obligations, FY2013-2022 |
|---|---|---|---|
| 1 | Catholic Relief Services | U.S. faith-based organization | $4,637,395,555 |
| 2 | Chemonics International, Inc. | U.S. for-profit enterprise | $4,536,397,348 |
| 3 | FHI 360 | International nonprofit | $3,788,300,843 |
| 4 | Development Alternatives, Inc. | U.S. for-profit enterprise | $3,071,449,561 |
| 5 | Abt Associates, Inc. | U.S. for-profit enterprise | $2,629,027,445 |
| 6 | RTI International | U.S. university/research institute | $2,307,061,081 |
| 7 | John Snow International | U.S. nonprofit | $1,840,556,823 |
| 8 | Save the Children Federation, Inc. | U.S. for-profit enterprise | $1,543,142,073 |
| 9 | ARD, Inc. | International nonprofit | $1,485,806,517 |
| 10 | Jhpiego Corporation | U.S. nonprofit | $1,260,308,627 |
| 11 | Deloitte | Non-U.S. for-profit enterprise | $1,174,468,049 |
| 12 | World Vision | International nonprofit | $1,166,734,792 |
| 13 | Mercy Corps | U.S. nonprofit | $1,135,480,585 |
| 14 | ADCI/VOCA[a] | U.S. nonprofit | $1,084,647,816 |
| 15 | Population Services International | International nonprofit | $1,077,027,102 |

**Source:** foreignassistance.gov.

**Notes:** In addition, more than $50 billion over this period was obligated to "redacted" or otherwise unspecified recipients, some or much of which may include these organizations. The distinction between a "U.S. nonprofit" and an "international nonprofit" was not provided in foreignassistance.gov. This report provides these classifications to align with the government's reporting of the data.

a. Also does business as "Agriculture Cooperative Development International/Volunteers in Overseas Cooperative Assistance."

# Public International Organizations

Public international organizations (PIOs), also known as multilateral organizations and international organizations, are organizations generally consisting of multiple member states, such as United Nations (U.N.) agencies and multilateral development banks.[46] PIOs implemented 35.4% of U.S. nonmilitary foreign assistance from 2013 to 2022. While USAID was the single largest U.S. foreign assistance contributor to PIOs by managing agency from FY2013 to FY2022, several U.N. entities partner primarily with the Department of State, and the Department of the Treasury manages funding to the World Bank and the regional development banks.[47]

---

[46] This definition is derived from *ADS Chapter 308: Agreements with Public International Organizations*, revised June 15, 2021, p. 7. As noted elsewhere in USAID policy, other statutes or regulations may make designations of PIOs that differ from USAID's.

[47] For more information on the U.N., see CRS In Focus IF11780, *United Nations Issues: Overview of the United Nations System*, by Luisa Blanchfield. For further information on assessed contributions (not a topic of this report) as well as voluntary contributions (the subject of this section), see CRS In Focus IF10354, *United Nations Issues: U.S. Funding to the U.N. System*, by Luisa Blanchfield. For the World Bank, see CRS In Focus IF11361, *The World Bank*, by Rebecca M. Nelson.

Funding to PIOs includes both project-based agreements and "core contributions" to a PIO operating budget.[48] Importantly, U.S. assessed contributions, which are dues owed as an obligation of membership in the organization, are not considered foreign assistance and thus are not included in foreign assistance data reporting. "Core contributions" are U.S. voluntary contributions to a PIO's operating budget (see "Budget Support and Core Contributions"). Most PIOs receive foreign assistance funding primarily as either core contributions or project-based aid. For example, USAID (implementing State Department funds) provided support to the Global Fund to Fight AIDS, Tuberculosis and Malaria (the Global Fund) primarily through core contributions from FY2013 to 2022, whereas support to the Global Alliance for Vaccines and Immunization (GAVI) over that period was largely provided through project-based aid (see **Figure 4**).[49] Agencies decide such partnering structures by assessing multiple factors, possibly including congressional directives, the U.S. role in managing a PIO's decisionmaking (the United States may substantially influence decisionmaking for entities on whose Board it sits, such as the World Bank and the Global Fund), the PIO's accounting practices (such as whether it allocates costs to individual project budgets or mostly funds them in a general operating budget), which partnering instrument would best help USAID advance its aims, and the type of implementing partnership the United States plans with the PIO.

---

[48] Foreignassistance.gov.

[49] GAVI and Global Fund contributions are each appropriated to the State Department, but foreignassistance.gov lists USAID as the managing agency.

**Figure 4. U.S. Nonmilitary Foreign Assistance to Public International Organizations,**
FY2013-2022 Obligated Funding, Billions Current U.S. Dollars



**Source:** foreignassistance.gov.

**Notes:** *CGIAR: formerly known as the Consultative Group on International Agricultural Research. All recipients over $1 billion are named. Recipients of less than $1 billion have been consolidated into categories including "Regional Development Banks," "Other U.N.," and "Other Non-U.N." While the International Federation of Red Cross and Red Crescent Societies is classified as an international nonprofit in foreignassistance.gov, they are also on USAID's list of PIOs, so CRS has included them in this figure.

"Core contributions" to PIOs typically do not correspond to a set of performance targets (see the "Types of Foreign Aid" for information on such distinctions). These funds are pooled with funds from other donors, and the PIOs typically report annually on all their efforts for a given year,

rather than individual reports for activities funded by each donor.[50] Core contributions support the general operations of the recipient PIO, although funds may be designated for specific interventions. For instance, U.S. core contributions to the United Nations High Commissioner for Refugees (UNHCR) comprise contributions both to its "global appeal," for the organization's core annual operating budget, and to specific refugee response efforts. In FY2019, for example, the State Department provided UNHCR funding for humanitarian responses in Syria and South Sudan, among others, as well as for UNHCR's global appeal budget.[51] By contrast, USAID's largest core contributions recipient, the Global Fund, received a single annual funding transfer for its general budget ($15.89 billion from FY2013 to FY2022), with no geographically dedicated funding streams associated.[52]

Roughly half of U.S. foreign economic assistance to PIOs (49.6% from FY2013 to FY2022) was provided as project-based assistance.[53] Competition is not required for grants with PIOs, unlike for NGOs, although USAID encourages it where practicable. PIOs may submit applications for USAID acquisition and assistance solicitations as well.[54] Given the reduced competition and the frequent unavailability of legal recourse under U.S. law to enforce these agreements, USAID seeks to conduct an elevated level of vetting for such entities to ensure their financial systems have adequate controls to moderate the risk of waste, fraud, and abuse.[55] PIOs, particularly those that seek expansive membership and a reputation for neutrality, can operate in certain areas where other implementers are unable, sometimes making them the only conduit available for the United States to provide assistance.[56]

## Foreign Governments

U.S. foreign assistance to foreign governments consists of two categories: direct budget support and project-based assistance (generally provided as a grant). Direct budget support to foreign governments made up 1.9 % of foreign assistance from FY2013 to FY2022 (**Figure 5**). More than 87.3% of those funds went to four governments: 66.9% to the Government of Jordan and 29.5% to three Compact of Free Association (COFA) countries that receive U.S. economic assistance and security guarantees.[57] Budget support to Jordan consists of funds provided to Jordan's general treasury and funding to pay interest on existing debt. Although funds are not

---

[50] See, for example, UNHCR's 2021 Global Report and 2023 Global Appeal, accessible at https://reporting.unhcr.org/ publications.

[51] UNHCR, "Ad hoc Committee of the General Assembly for the announcement of voluntary contributions to the Programme of the United Nations High Commissioner for Refugees (UNHCR Pledging Conference)," December 6, 2022; UNHCR, "South Sudan Funding Update," April 27, 2023; UNHCR, "Syrian Arab Republic Funding Update 2023," April 27, 2023.

[52] Data and funding descriptions from foreignassistance.gov. While the World Bank Group collectively receives more assistance than the Global Fund, it is divided among several sub-units. Global Fund assistance is provided through funding appropriated to the State Department, but USAID is listed as the managing agency.

[53] Foreignassistance.gov.

[54] USAID, *ADS Chapter 308: Agreements with Public International Organizations*, revised June 15, 2021, p. 14.

[55] Ibid., p. 7.

[56] USAID Office of Inspector General, "Insufficient Oversight of Public International Organizations Puts U.S. Foreign Assistance Programs at Risk," Audit Report 8-000-18-003-P, September 25, 2018, p. 1.

[57] The COFA countries are the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau. COFA countries are former United Nations Trust Territory districts administered by the United States that through bilateral Compacts became sovereign countries. Compact assistance is administered by the Department of the Interior. For more on the Compacts, see CRS In Focus IF12194, *The Compacts of Free Association*, by Thomas Lum. For more on U.S. assistance to Jordan, see CRS Report RL33546, *Jordan: Background and U.S. Relations*, by Jeremy M. Sharp.

directed to a discrete purpose, tranches of funding have been subject to milestones negotiated annually by USAID and the Government of Jordan based on government reform or other government effectiveness benchmarks.[58] For COFA countries, budget support is apportioned to specific sectors (education, health, and infrastructure, among others) at levels agreed upon annually by the Department of Interior.

Foreign governments also receive project-based assistance. In some cases, project-based assistance operates similarly to direct budget support. U.S. assistance to the Palestinian Authority (PA) in FY2011-FY2016, for instance, paid down PA commercial debt in order to maintain its fiscal viability.[59] Large-scale infrastructure projects make up the largest share of project-based assistance to foreign governments, and such projects fall largely into two categories: (1) foreign policy-driven investments generally funded by the State Department and managed by USAID (largely in countries with instability, threats of extremism, or alleged malign foreign influence), and (2) development-driven investments under the Millennium Challenge Corporation, largely in well-governed countries. Within both categories, investments focus mostly on electricity generation and transmission, and transportation and logistics (including highways and port upgrades).[60] The second-largest class of projects implemented through partner governments, next to infrastructure, is global health programs, including support for government-procured medicine through the President's Emergency Plan for AIDS Relief (PEPFAR).[61]

The categorization of aid to foreign governments is not always straightforward. For example, U.S. assistance to Ukraine, by far the largest foreign government recipient of foreign aid in FY2022, is structured as a reimbursement for verified government expenditures. The reimbursements are managed by the World Bank, and the recipient is reported as the World Bank rather than the Government of Ukraine (see "Types of Foreign Aid"). The unique nature of the Ukraine economic support program is profiled in CRS In Focus IF12305, *U.S. Direct Financial Support for Ukraine*, by Emily M. McCabe and Nick M. Brown.

Finally, the United States occasionally provides funding to other bilateral donors, largely European partners whose funding often complements U.S. objectives. USAID may provide funds to donor countries (such as the United Kingdom or E.U. countries) when such partners have superior ability to deliver based on programming experience, geographic knowledge, cultural considerations, or operational footprint, among other possibilities. In such cases, USAID may provide funding to expand another donor's programming, rather than administering its own program. This may also reduce the risk of duplication of efforts, or outright contradictory programming. For instance, in Nigeria, USAID provided partial funding to a UK program to improve the country's health systems.[62] USAID has also long jointly implemented and funded aid projects with the Government of Israel in other countries in order to elevate its international

---

[58] USAID Office of Inspector General (OIG), *Jordan Cash Transfer Program: USAID Generally Followed the Grant Agreement and Agency Policy With Some Due Diligence Exceptions*, Report Number 8-278-23-001-P, November 17, 2022, p. 4.

[59] State Department, "Congressional Budget Justification FY2015 Appendix 3: Regional Perspectives," May 2015, p. 498.

[60] Foreignassistance.gov.

[61] For an overview of PEPFAR, see CRS Report R43232, *The President's Emergency Plan for AIDS Relief (PEPFAR), U.S. Global HIV/AIDS, Tuberculosis, and Malaria Programs: A Description of Permanent and Expiring Authorities*, by Tiaji Salaam-Blyther.

[62] Gov.UK Devtracker, "LAFIYA- Health Resilience in North East (HeRoN)," last updated August 11, 2022; funding provision indicated by data in foreignassistance.gov.

cooperation.[63] USAID has launched additional such "trilateral cooperation" activities with former aid recipients, such as with Brazil and Chile—so termed because they involve three parties: USAID, a former aid recipient, and a beneficiary country.[64]

**Figure 5. Nonmilitary Foreign Assistance to Foreign Governments**

Obligated Funding, Billions in Current U.S. Dollars, FY2013-2022



**Source:** foreignassistance.gov

**Notes:** Compacts of Free Association include Micronesia, the Marshall Islands, and Palau. The largest recipient in recent years by a wide margin is the Government of Ukraine, which has received over $22.9 billion in FY2022 and FY2023, but the recipient is listed as the World Bank, which manages Ukraine budget support as an implementing partner, and thus is not captured here. Pakistan assistance includes $43 million in de-obligations over this time period, stemming from funding obligations prior to FY2023. MCC Compacts would be a substantial component of the funding in this graphic, but the agency does not list the recipient government as the implementing partner. As a result, MCC compacts are excluded. Recipients over $100 million are named; all others have been consolidated into "UK and EU Donors" or "Other Countries."

## Interagency Agreements

In cases where another U.S. government agency is better-equipped to provide a good or service than an NGO, USAID may enter into an interagency agreement. For targeted technical support, USAID uses Participating Agency Services Agreements (PASAs), which can enable other agencies to second their employees to USAID on either a short-term or long-term basis. Staff from the Centers for Disease Control and Prevention, for instance, may be mobilized to conduct a short-term field study in a PEPFAR focus country, or over the long term to oversee execution of a Global Health Programs grant. In cases where another agency is qualified to conduct an entire

---

[63] The agency signed a memorandum of understanding with Israel's development agency in 2019 to advance bilateral cooperation. USAID, "United States and Israel Sign USAID-MASHAV Global Partnership Memorandum of Understanding," press release, August 21, 2019.

[64] USAID/Brazil, "Trilateral Cooperation," accessed June 29, 2023; U.S. Embassy in Chile, "U.S. and Chile: Trilateral Development and Security Cooperation," press release, July 9, 2014.

project, USAID uses a Participating Agency Project Agreement (PAPA). For instance, USAID has provided funding to the Department of Energy's National Laboratories to advise the Government of India on power systems planning, as one component of the larger Greening the Grid initiative.[65] The State Department also provides funding to the Departments of Justice and Homeland Security, among other agencies, to execute some of its International Narcotics Control and Law Enforcement programs. Interagency agreements have typically constituted a small share of total assistance (generally less than 1% of USAID's funding).[66] In many cases, interagency partners are used as conduits for partnering with other NGOs—such as State Department management of International Narcotics Control and Law Enforcement activities—rather than implementers themselves. Such cases blur the lines between a "Managing Agency" and an "Implementing Partner," given that an NGO in such cases effectively operates as the implementing partner. As a result, aggregate data are not available on the magnitude of this funding as a share of foreign aid.

# Policy Issues

Partnering decisions affect foreign aid effectiveness, U.S. relations with foreign governments, and where U.S. funds ultimately are spent. As the 118th Congress weighs its foreign policy priorities, lawmakers may consider whether aid agencies' implementation mechanisms are advancing U.S. foreign policy interests, and doing so in a cost-effective way. This section focuses on issues affecting congressional oversight of foreign assistance management at USAID.

## USAID Operating Costs

Congress has long sought to manage USAID's "cost of doing business" through a dedicated "Operating Expenses" account.[67] "Program accounts," by contrast, fund USAID's development and humanitarian program implementation. Congressional guidance for costs to be included in the Operating Expenses account has not been updated in over 40 years, raising questions as to whether the "cost of doing business" reflects current operations at USAID. When foreign assistance funding was regularly reauthorized in the 1960s and 1970s, the committees weighed in on operational issues at USAID such as improving efficiency in agency decisionmaking, perceived lifestyle extravagance of certain USAID mission directors, and shifting staff from headquarters to missions.[68] Committees have not weighed in on such issues in recent reports or explanatory statements, and Members could consider reviving such practices as an oversight measure.

Congress may also revisit the types of costs allocated to the Operating Expenses account. While Operating Expenses are coded as an administrative cost in foreignassistance.gov, in practice, Congress directed in the 1970s that all USAID personnel costs be classified as Operating Expenses—including if such personnel do little administrative work.[69] By contrast, personal

---

[65] For an example of such an analysis that has been completed, see National Renewable Energy Laboratory (NREL), "India Renewable Integration Study," https://www.nrel.gov/analysis/india-renewable-integration-study.html, accessed February 23, 2023.

[66] USAID OAA, *2023 Fiscal Year Progress Report*, p. 2; *2016 Fiscal Year Progress Report*, p. 2.

[67] Prior to 1976, operating expenses had been directed at the account level, but the Senate argued that a separate line item would allow better management and oversight of the agency's cost of doing business. S. Rept. 94-704, p. 104.

[68] The Senate Foreign Relations Committee encouraged USAID's growing use of delegations of authority to field missions in the last enacted comprehensive foreign aid reauthorization, P.L. 99-83. See S.Rept. 99-34, p. 43.

[69] USAID's current operating policy cites the Senate Report for Fiscal Year 1980 Foreign Assistance and Related (continued...)

services and institutional support contractors (see "Definitions" text box) are a composite: those directly linked with a program are funded by program accounts, and those providing services for USAID's benefit are funded by Operating Expenses.[70] Over time, USAID's use of such contractors has grown, more as a result, according to USAID, of disproportionate growth in program account appropriations vis-à-vis operating expenses.[71] Implementing partners' operating expenses are fully covered by program accounts (see "Implementing Partner Indirect Costs"). This amalgam of allocation approaches may preclude Congress from holistically assessing whether USAID's "cost of doing business" is proportionate to the level of foreign assistance delivered. Congress could evaluate whether its aims in the 1970s and 1980s with respect to foreign assistance administration remain the same today, and could assess whether or not to set new standards for the account to track and manage new expenditure objectives. In considering such updates, Members may reflect on several factors related to USAID operating costs, including

- managing the size and shape of USAID's workforce, including use of less-expensive local employees and share of U.S. staff working in missions;
- assessing the ratio of resources directed to administrative versus technical work;
- balancing investments in USAID's program design efforts against its oversight of implementing partners; and
- evaluating what share of foreign assistance dollars are actually spent in a beneficiary country.

Congress could also evaluate a return to the approach of the early 1970s, when operating expenses were included as a sub-allocation within each program account. This reduced staffing flexibility, but may have allowed greater understanding of the relative "costs of doing business" for each segment of USAID's work. Congress could also compare the ratio of Operating Expenses to program accounts against practices in the private sector or other U.S. agencies (as well as other donors' aid agencies) to determine whether funding levels are appropriate.

## Implementing Partner Indirect Costs

While the Operating Expenses account provides Congress an annual tool to weigh in on USAID's cost of doing business, there is no such readily available tool for managing contractors' cost of doing business. Those costs are classified as contractor indirect costs under U.S. government accounting principles. Major USAID NGOs operate under a "Negotiated Indirect Cost Rate

---

Programs Appropriations Act as its basis for determining which USAID expenditures may be funded by operating expenses. USAID, *ADS Chapter 601: Funding Source Policy*, updated December 21, 2011, p. 3, citing S.Rept. 96-358. Congressional reports have in some cases conflated the Operating Expenses account with the agency's administrative costs, though Congress indicated when creating the account that it would go beyond administrative tasks. S.Rept. 93-620, p. 78.

[70] U.S. Government Accountability Office, *Foreign Assistance: USAID's Operating Expense Account Does Not Fully Reflect the Cost of Delivering Foreign Assistance*, GAO-03-1152R, September 30, 2003. Based on the determinations of this report (reflected in its title), USAID established comprehensive allocation policies for the Operating Expenses account, including for contractors.

[71] USAID's Operating Expenses account obligations were 10.31% of all USAID-managed program accounts in 2009 regular appropriations (Div. H of P.L. 111-8), and 8.84% of all program accounts in 2024 regular appropriations (Div. F of P.L. 118-47). This includes the Economic Support Fund, which is largely implemented under USAID, but excludes Global Health Programs—State, as large parts of it are not USAID-managed. The ratio has fluctuated over time. Operating Expenses account obligations were 8.19% of obligations to program accounts in 1989 (P.L. 100-461). By comparison, USAID allows a "de minimis" indirect cost rate for its implementing partners of 10%—considered a floor for such costs, which for most partners is likely higher.

Agreement," or NICRA. Moreover, Congress has not been able to obtain information from USAID on the magnitude of such indirect costs.[72] USAID and its implementing partner NGOs have sought not to share such information publicly, citing that many NGOs are reported to consider such information as proprietary or business confidential and consequently could affect their competitiveness.[73] USAID also indicated that indirect costs are not to be considered when assessing cost effectiveness. USAID has also stated that comparing indirect cost rates across organizations is "generally not possible."[74] This is because each implementing partner has its own policy for allocating indirect versus direct costs. Importantly, indirect costs are also not exclusively a measure of organizational "overhead" or administrative costs—project accountants are often a direct project cost, while some project technical leads may be a part of indirect costs. Despite their description as "negotiated," government guidance on negotiating indirect cost rates primarily concerns determining the ratio of an NGO's direct to indirect costs, as well as assessing what is allowable, rather than bargaining with those NGOs to drive their indirect costs down.[75]

These costs may be substantial. In 2002, USAID estimated its partners' average indirect costs to be 30% of project direct costs, and two Members of the 118th Congress suggested that such costs have risen in recent years.[76] A 2021 estimate by a group of development experts indicated that overhead and company profits could be 50% for some implementing partners.[77] Other donors, such as the E.U. and some U.N. agencies, have capped indirect costs at a lower rate, around 7%, but some analysts have asserted that such caps can lead implementing partners to conceal operating costs as project expenses. Those analysts argue that USAID's NICRAs are often a purer reflection of indirect costs than other donors.[78]

Such costs may be necessary to "keep the lights on" among implementing partners and ensure that a competitive, qualified bidding pool remains available to respond to and implement aid activities. One type of indirect cost, for instance, is the cost to NGOs of responding to USAID solicitations—often a complex, rigorous process from which USAID benefits if applicants put together highly responsive bids. Some private foundations have recently published analyses determining that focusing on excessive overhead spending, long a concern among commentators on charitable giving, may have negative consequences in eroding charities' institutional capacity.[79]

Regardless of the efficacy of indirect cost levels, an audit commissioned by USAID's Inspector General and issued in 2024 purported several deficiencies in USAID's management of indirect costs.[80] The auditor argued that USAID does not have a system to track indirect cost data, and assessed that USAID lacked both verification procedures for sub-awardees, and documentation supporting indirect costs. USAID disputed the latter two claims, arguing that it places

---

[72] Letter from Michael McCaul, Chairman of the House Foreign Affairs Committee, and Joni Ernst, U.S. Senator from Iowa, to Samantha Power, USAID Administrator, April 24, 2023.

[73] Ibid.

[74] USAID, "Best Practices Guide for Indirect Costing: A Mandatory Reference for ADS Chapter 302," revised November 17, 2014, p. 6.

[75] See Appendix IV to 2 C.F.R. §200.

[76] USAID Communication with CRS, September 2002, p. 3 [report is in hard copy]. Michael Igoe, "Lawmakers demand information about USAID indirect cost rates," *Devex,* April 25, 2023.

[77] Natalie Kitroeff and Michael Shear, "U.S. Aid to Central America Hasn't Slowed Migration. Can Kamala Harris?" *The New York Times*, June 6, 2021.

[78] David Ainsworth, "Are US lawmakers right to challenge USAID overhead spending?" *Devex,* July 3, 2023.

[79] Ibid.

[80] USAID Office of the Inspector General, "Negotiated Indirect Cost Rate Agreements: Opportunities Exist to Improve Processes and Data Management," Audit Report 3-000-24-001-U, January 26, 2024.

responsibility for such verifications and documentation contractually on its implementing partners. The agency did concur that its NICRA tracking software is reliable and accurate but "not a robust and automated system." USAID agreed that the agency would benefit from automation. Upon development of such an automated system, USAID may be able to more readily address lawmakers' inquiries regarding indirect cost volumes.

## Nongovernmental Partners' Role in the USAID Ecosystem

Congress has sometimes sought to manage the composition of USAID's NGO implementing partner base—the balance of nonprofits to for-profit firms, the extent of nonprofit organizations' reliance on U.S. assistance dollars, and USAID staff demeanor toward its implementing partners. USAID's 2018 Acquisition and Assistance Strategy stated that the number of new USAID partners had decreased consistently since 2011 and recommended engaging new and underutilized partners. The Strategy asserted that this consolidation should be counteracted and that a varied partner base would provide a more diverse array of technical competencies and perspectives for activity implementation.[81] Assistance data indicate that the number of unique USAID partners declined from 2017 to 2020 but has been increasing substantially since then.

| NGOs by Number of Appearances as Annual Top Five USAID Partner, FY2013-FY2022 | |
| --- | --- |
| **Organization Name** | **Times Appearing** |
| Chemonics International, Inc. | 10 |
| FHI360 | 10 |
| Development Alternatives, Inc. | 10 |
| Abt Associates, Inc. | 9 |
| Catholic Relief Services | 8 |
| RTI International | 2 |
| Management Sciences for Health | 1 |

**Source:** ForeignAssistance.gov.

At the same time, aid data indicate that USAID's major implementing partners are strikingly stable over time: three NGOs have been among USAID's top five partners every year for the past decade, with two more appearing nearly every year (see text box). The top five implementers have consistently received roughly 20% of all USAID obligations to NGOs each year. Some USAID implementing partners have addressed the aforementioned USAID concerns about consolidation by asserting that consolidation to a smaller group of high-performing industry leaders is natural for maturing industries.[82] At the same time, more than 1,300 NGOs have received greater than $1 million in obligations from USAID over that period, indicating barriers to entry are not prohibitive. This highly stable set of implementing partners nevertheless may draw congressional interest in USAID's relationship with those NGOs.

Congress asserted in 1978 that U.S. nonprofit organizations, called "private and voluntary organizations" in statute, are a potentially powerful tool for mobilizing charitable resources and demonstrate "the American spirit of self-help and assistance to others."[83] Some developments since then may call into question the extent to which USAID's partner community reflects such grassroots mobilization. As long-standing USAID partners have adjusted their business practices toward winning and implementing USAID awards, they have shaped their organizational

---

[81] USAID, "Acquisition and Assistance Strategy," December 2018, p. 2.

[82] Larry Cooley, Jean Gilson, and Indira Ahluwalia, "Perspectives on Localization," August 2021, p. 2. For an articulation of USAID's concerns, see USAID, *Acquisition and Assistance Strategy*, February 4, 2019, p. 1 (note: an updated Strategy was issued in March 2023, but did not focus on the issue of consolidation).

[83] §123 of the Foreign Assistance Act of 1961, P.L. 87-195, as amended, as added by §102 of the International Development and Food Assistance Act of 1978, P.L. 95-424.

practices to account for U.S. government accounting practices, compliance procedures, and development policies. As a result, USAID can attract qualified bidders for its projects overseas who are well-versed in agency policies, which may in part explain why USAID's top implementing partner list remains so stable. The aptness of these partners to comply with USAID regulations and align with agency priorities may impede efforts to localize U.S. foreign assistance, given qualified U.S. NGOs can often meet compliance burdens more easily (see "Local Partnering").

This alignment of NGOs with agencies' policies and priorities may also diminish the extent to which NGOs articulate and advance a mission statement independent of U.S. government concerns. USAID may be constrained to engage with new outside partners, whose experience outside of government may bring fresh thinking and diverse perspectives to bear on long-standing development challenges. Such NGO policy alignment with USAID may blur the line between contracts, in which USAID acquires something for its own use, and grants, in which USAID provides funding to an entity whose activities align with U.S. objectives.[84] Such considerations are well-documented in the defense industry and accepted as beneficial to some degree: for example, imperatives in the national security establishment to sustain the "defense industrial base."[85] For USAID, if the U.S. government is the near-exclusive funder of such entities, there may be fewer implementing partners that independently design their own programs and objectives. If USAID's implementer community lost such independent voices, ostensibly private NGOs could become extensions of USAID's thinking and operations. Having a stable set of partners focused primarily on USAID's priorities could improve award applicants' responsiveness to USAID priorities, but it could discourage emergence of innovative technical approaches if potential new partners find it challenging to submit responsive project proposals. Indeed, in 1981 the Senate observed that USAID held a "natural but problematic tendency" to view nonprofits as "extensions of [US]AID itself, not as development agencies with their own distinctive traditions, relationships, and styles."[86] Congress could consider to what extent foreign assistance policies encourage NGOs to prioritize USAID business over self-directed objectives. Congress may also evaluate how this relates to the goal in the Foreign Assistance Act of 1961 of having USAID partner with private entities as much as possible.[87]

Congress could consider legislative tools to manage the extent of implementing partners' reliance on foreign assistance dollars. In 1981, Congress amended the Foreign Assistance Act of 1961 to require that private and voluntary organizations obtain at least 20% of their funding from sources other than the U.S. government, unless the Administrator provides a waiver.[88] That provision was shifted to annual appropriations measures in FY1998. It was removed beginning in FY2005. No public explanation was provided for its removal. It was removed in the midst of an expansion of USAID's budget in the wake of the U.S. invasions of Afghanistan and Iraq and the launch of the President's Emergency Plan for AIDS Relief (PEPFAR). Subsequent to the removal of that requirement, in 2011 one of USAID's largest implementing partners, the Academy for Educational Development (AED), dissolved after being suspended from future USAID assistance because of allegations of false claims on two of its programs.[89] The organization noted that it

---

[84] Federal Grant and Cooperative Agreement Act, 31 U.S.C. §6301.

[85] CRS In Focus IF10548, *Defense Primer: U.S. Defense Industrial Base*, by Luke A. Nicastro and Heidi M. Peters.

[86] S.Rept. 97-83, p. 54.

[87] Foreign Assistance Act of 1961, P.L. 87-195, as amended, §102(b)(8).

[88] Foreign Assistance Act of 1961, P.L. 87-195, as amended, §123(g) (repealed).

[89] Department of Justice, "Washington, D.C.-based Academy for Educational Development Pays More Than $5 Million to Settle False Claims Act Allegations," press release, June 30, 2011; USAID, "USAID Suspends Academy for Educational Development from Receiving New U.S. Government Awards," press release, December 8, 2010.

received 90% of its funding from USAID and other federal agencies and thus could not continue as an independent entity.[90] The organization into which it was absorbed, FHI-360, which remains one of USAID's largest partners, also reported receiving more than 80% of its funding from the U.S. government in 2023.[91] Congress may consider the rationale for both the 80% limit and its 2005 removal, and evaluate whether foreign assistance agencies are best served by being one funder among many in an international development industry, or whether foreign assistance benefits from a "development industrial base" similar to the national security establishment's defense contractor community.[92]

## Competition and Oversight on PIO Agreements

USAID generally seeks to award funds to implementing partners through a competitive process, viewing competition as a way to "identify and fund the activities that best achieve USAID objectives."[93] The agency also often manages its NGO partners with "substantial involvement" in an activity's day-to-day operations.[94] Awards to PIOs, however, do not require competition prior to award, and PIOs are subject to "less oversight or fewer restrictions" than NGOs, according to USAID's Inspector General (IG).[95]

USAID policy states that it may not award funds to PIOs solely to avoid competition. However, the absence of competition, and the absence of viable alternatives in certain aid settings, may make USAID captive to certain PIOs if they are the only vehicle available for certain sectors and geographies. As a result, PIOs may have fewer incentives to meet USAID's implementation preferences. As noted above, the structure of such partnerships as grant agreements rather than contracts or cooperative agreements may also reduce transparency to the public given more limited reporting requirements. A 2018 audit by the USAID IG identified "major fraud schemes" on USAID activities in Iraq and Syria, including under PIOs.[96] It determined that, in certain cases, USAID had not completed necessary preapprovals of PIOs for USAID partnering prior to award. The IG also determined that USAID policy did not align with federal internal control standards, prompting the agency to revise its policy on PIO agreements.[97]

As a result of policy revisions prompted by the IG review, USAID has documented its partnering policy with PIOs more thoroughly. Nonetheless, Congress may further assess USAID's oversight

---

[90] Christopher Beam, "Contract Killer: Why did USAID suspend one of its biggest contractors without any explanation?" *Slate*, March 31, 2011; AED, "AED to Seek Orderly Acquisition and Transfer of its Programs and Assets; 50-year-old NGO Maps Positive Way Forward for Projects and Staff," press release, 2011.

[91] FHI-360, *Advancing equity, health, and well-being: 2024 Impact Report*, "2024 Financial Summary," 2024.

[92] "Development industrial base" terminology conceptualized by the author.

[93] USAID, *ADS Chapter 303: Grants and Cooperative Agreements to Non-Governmental Organizations*, revised 3/16/23, p. 22.

[94] Ibid., pp. 43-44.

[95] USAID OIG, *Insufficient Oversight of Public International Organizations Puts U.S. Foreign Assistance Programs at Risk*, Audit Report 8-000-18-003-P, September 25, 2018, p. 2. For instance, the largest NGO partner with USAID from 2013 to 2022 was Chemonics International, which authored 4,276 documents available in the USAID Development Experience Clearinghouse library over that period, compared with 62 documents by the largest PIO partner over the same period, the World Food Programme (WFP). WFP may not be contractually bound to the same document submission requirements as Chemonics and, consequently, information on WFP's USAID-funded activities may be less publicly available. USAID, Development Experience Clearinghouse, search completed July 5, 2024.

[96] USAID OIG, *Insufficient Oversight of Public International Organizations Puts U.S. Foreign Assistance Programs at Risk*, Audit Report 8-000-18-003-P, September 25, 2018, p. 1.

[97] USAID, *ADS Chapter 308: Agreements with Public International Organizations*, revised June 15, 2021, pp. 10-11.

of PIO agreements.[98] For instance, Congress may assess the extent to which PIO agreements are included in USAID's annual plan for evaluation of projects compared with NGO-implemented projects. Congress may also evaluate USAID's "core contribution" funding to PIOs and the extent to which performance metrics are agreed to and tracked under those mechanisms.

## Local Partnering

Since the early 2000s, every USAID Administrator has prioritized greater engagement with local communities in recipient countries to both plan and implement foreign aid dollars—an initiative known as "local ownership" or "localization."[99] As justification for this goal, Administrators have cited possible lower costs for overhead and an opportunity to maximize the benefit to local communities for each dollar of foreign assistance.[100] They have also asserted that, once nourished by U.S. aid dollars, local organizations would be more likely to keep operating after USAID departs.[101] As one facet of that effort, certain Administrators have sought to expand the share of dollars going to "local entities."[102] That objective has under at least three localization initiatives been fraught with definitional issues, concerns about unintended consequences, and questions about whether that objective is the best way to make aid more responsive to local priorities.[103] USAID Administrator Samantha Power has revived a local partnering target, seeking for 25% of all acquisition and assistance dollars to be directed to local entities by 2025.

One especially disputed aspect of this target has been which entities to include in this 25% target. In its August 2022 "vision and approach" document on localization, USAID stated that it will count only organizations "registered and headquartered in the country in question," with particular interest in organizations that are based in the communities where activities are to occur.[104] Prior to Administrator Power's tenure, USAID had included "locally established partners," which includes both local entities and international organizations with local offices.[105] However, a 2023 analysis determined that USAID's proposed approach may both overestimate how much funding is going to local organizations and under-count total dollars obligated by USAID. The analysis indicated that USAID may inadvertently classify some locally established partners as local entities based on the databases used to track funding. For example, a local NGO in Guatemala spotlighted by USAID as obtaining a USAID grant had broken away from a larger international NGO that partners regularly with USAID.[106] Such an example may not reflect the

---

[98] The USAIG marked a recommendation to update the ADS Chapter 308 as "closed" as of February 11, 2020.

[99] USAID, *Policy Framework for Bilateral Foreign Aid*, January 2006, p. 23; USAID, "Remarks by Administrator Rajiv Shah at the USAID Forward Progress Event," press release, March 20, 2013; USAID, *Policy Framework: Ending the Need for Foreign Assistance*, 2019, p. 16; USAID, *Localization at USAID: The Vision and Approach*, August 2022.

[100] USAID, "Remarks by USAID Administrator Dr. Rajiv Shah at the Center for Global Development," January 19, 2011; USAID, "Administrator Samantha Power On A New Vision for Global Development," November 4, 2021.

[101] USAID, "Remarks by USAID Administrator Dr. Rajiv Shah at the Center for Global Development," January 19, 2011; USAID, *Acquisition and Assistance Strategy,* February 2019, p. 4; USAID, "Localization at USAID: The Vision and Approach," August 2022.

[102] USAID, "Remarks by USAID Administrator Dr. Rajiv Shah at the Center for Global Development," January 19, 2011; USAID, *Acquisition and Assistance Strategy,* February 2019, p. 4.

[103] Those include the USAID Forward initiative in the Obama Administration, the USAID Transformation initiative in the Trump Administration, and the Localization initiative currently ongoing.

[104] USAID, *Localization at USAID: The Vision and Approach*, August 2022, p. 4.

[105] A definition of locally established partners is available at https://www.usaid.gov/npi/npi-key-definitions. USAID's 2018 Acquisition and Assistance Strategy, since updated to omit locally established partner targets, emphasizes locally established partners as a primary goal. See USAID, *Acquisition and Assistance Strategy*, February 2019, p. 4.

[106] Rachel Chilton, "The Path to Prime Partnership: Insights from a Local Partner," *workwithusaid.org blog*, January 11, 2023.

type of support to an indigenously created community organization that USAID policy has characterized as the goal of localization efforts.[107] In addition, USAID does not plan to make assistance provided through PIOs subject to the target—a policy that would amount to a substantial carve-out of U.S. foreign assistance from the 25% target.[108] USAID has acknowledged some of these data limitations, describing its direct local funding indicator as "a proxy" for broader local entity criteria, rather than authoritative.[109]

While some development commentators have raised such doubts over the methodology for reaching the target, others have questioned whether the goal of direct local partnerships is efficacious at all. A 2021 analysis sponsored by some U.S.-based USAID implementing partners contends that projects implemented through U.S. NGO partners of USAID have increasingly relied upon local staff, with more than half of project leadership positions filled by local personnel. It also notes that 18% of project funds are sub-granted or subcontracted to local partners.[110] This percentage indicates that projects implemented by U.S. NGOs have moved toward USAID's 25% local partner target in recent years, but that further information is needed to determine the definitions used for local entities and the costs considered subject to that calculation—specifically, whether that amount is strictly direct cost procurement or whether it includes staff salaries and NGOs' indirect costs as well. USAID has sought in the past to collect precise data on this figure, with an uncertain degree of success.[111] A recent open letter signed by several foreign assistance transparency and effectiveness advocates encouraged USAID to mandate that implementing partners share levels of aid sub-awarded to local organizations.[112] Congress may examine USAID's efforts to tabulate such sub-awards to local entities, given that the aforementioned survey suggests that implementing partners have tabulated such information.

Some Members have raised concerns that partnering with local entities may carry fiduciary risks. In response to an Obama Administration initiative to increase the share of awards going to local organizations, the then-Chair of the House Oversight Committee raised concerns about directing aid through organizations without U.S. accounting practices, and further claimed that contracts are "inherently more transparent and accountable" than the grant awards often used to partner with local organizations.[113] USAID's current Risk Appetite Statement assigns "low" tolerance for fiduciary risk, which may be a hurdle to achieving the agency's localization goals.[114] Overcoming that hurdle may create additional challenges. As noted above, some U.S. NGOs have to some extent reoriented their internal procedures to focus primarily on winning and implementing USAID programs (see "Nongovernmental Partners' Role in the USAID Ecosystem"). Local organizations may find a similar need to transform themselves into primarily foreign aid-oriented entities to overcome fiduciary concerns—a consequence that would run counter to USAID's long-standing effort to transition countries away from foreign aid.

---

[107] USAID, *Local Systems: A Framework for Supporting Sustained Development*, April 2014.

[108] Publish What You Fund, "Metrics Matter: How USAID counts 'local' will have a big impact on funding for local partners," March 2023; USAID, "Key Performance Indicators: Direct Acquisition & Assistance Funding for Localization," April 2023, p. 2.

[109] USAID, "Key Performance Indicators: Direct Acquisition & Assistance Funding for Localization," April 2023, p. 3.

[110] Based on a survey of USAID contractors, including all of the top 10 recipients of USAID contracts. Perspectives on Localization, August 2021, p. 3.

[111] USAID, *Acquisition and Assistance Strategy*, February 2019, p. 3.

[112] Open Letter to USAID Administrator Power, "We need more U.S. foreign aid transparency," February 2023, https://aidtransparency.controlshift.app/petitions/we-need-more-aid-transparency.

[113] Letter from Darrell E. Issa, Chairman of the House Committee on Oversight and Government Reform, to Rajiv Shah, USAID Administrator, April 26, 2012.

[114] USAID, "Risk Appetite Statement," June 2018, p. 10.

Public comments of Members have generally been supportive of recent localization efforts, and some members of the development community have been supportive as well.[115] A recent legislative proposal is meant to make it easier for local organizations to partner with USAID, including by potentially supporting use of local languages in partnering processes and giving a higher baseline indirect cost rate to local organizations.[116] Nevertheless, Congress has yet to weigh in through oversight, reports, or legislation on localization goals relative to other priorities, such as fiduciary or operational risks. Congress may consider how, if at all, to evaluate such risk factors in light of their possible impact on localization. Moreover, congressional action may assist in tracking the efficacy of localization: while successive administrators have touted the aim of localization, each new administrator has also replaced his or her predecessor's approach with a new one. Sustained congressional oversight of or directives on localization could secure more consistent tracking of localization outcomes and impact.

## Author Information

Nick M. Brown
Analyst in Foreign Assistance

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

---

[115] For instance, Senator Tim Kaine introduced a bill (S. 2509) alongside Senator Marco Rubio authorizing the New Partnerships Initiative, a USAID program launched during the Trump Administration to expand USAID partnering with local actors. The Heritage Foundation also applauded localization efforts under the Trump Administration, arguing that "more funding to local organizations produces better aid outcomes." Max Primorac, "Chapter 9: Agency for International Development," in *Mandate for Leadership: The Conservative Promise*, ed. Paul Dans and Steven Groves (Heritage Foundation, 2023), p. 263. Stakeholders in the development community have also expressed support for localization, while raising methodological concerns. Omar Mohammed, "Is USAID taking the right approach on localization?" *Devex*, June 26, 2023.

[116] H.R. 7710. CRS identified at least one case in which USAID prohibited use of any indirect cost billings for local implementers (USAID/Philippines, Request for Proposal (RFP) No. 72049223R00001: Philippines, Pacific Islands and Mongolia Monitoring, Evaluation and Learning Activity (PIMMELA), November 23, 2022, p. 9).