

# U.S. International Food Assistance:
# An Overview

Updated February 23, 2021

**Congressional Research Service**
https://crsreports.congress.gov
R45422

**Congressional Research Service**
*Informing the legislative debate since 1914*

**SUMMARY**

R45422

February 23, 2021

**Alyssa R. Casey**
Analyst in Agricultural Policy

**Emily M. Morgenstern**
Analyst in Foreign Assistance and Foreign Policy

# U.S. International Food Assistance: An Overview

The United States is one of the foremost donors of food, or the means to purchase food, to people around the world at risk of hunger. The goal of U.S. international food assistance programs is to provide emergency relief to populations impacted by crises, such as conflicts or natural disasters, and nonemergency assistance to address chronic food insecurity and help populations build resilience to potential threats to food supplies. The current suite of international food assistance programs began with the Food for Peace Act (P.L. 83-480), commonly referred to as "P.L. 480," which established the Food for Peace programs. Congress has since authorized additional programs through agriculture legislation and reauthorized these programs through periodic farm bills. Congress also has established international food assistance programs in foreign affairs legislation and subsequent reauthorizations, such as the Global Food Security Act of 2016 (P.L. 114-195) and its 2018 reauthorization (P.L. 115-266).

Jurisdiction for international food assistance programs is split across the House and Senate Agriculture Committees and the House Foreign Affairs and Senate Foreign Relations Committees. The U.S. Agency for International Development (USAID) and the U.S. Department of Agriculture (USDA) administer U.S. international food assistance programs. Congress funds international food assistance programs through annual Agriculture appropriations and State, Foreign Operations, and Related Programs (SFOPS) appropriations acts. Annual outlays for U.S. international food assistance averaged $3.3 billion between FY2010 and FY2020. Outlays during this period varied, declining to a low of $2.29 billion in FY2013 and increasing to a high of $5.06 billion in FY2020.

U.S. international food assistance programs provide support through two distinct methods: (1) in-kind aid, which ships U.S. commodities to regions in need, and (2) market-based assistance, which provides recipients with vouchers, direct cash transfers, or locally and regionally procured food. Historically, the United States provided international food assistance exclusively through in-kind aid. In 2010, the Obama Administration established, and Congress later codified through legislation, the Emergency Food Security Program (EFSP), which provides largely market-based assistance. Since the establishment of EFSP, U.S. provision of market-based food assistance has increased. Market-based assistance now accounts for approximately 59% of total international food assistance, while in-kind aid comprises roughly 41%.

Despite the growth in market-based assistance, U.S. international food assistance still relies on in-kind aid. Many other countries with international food assistance programs have converted to primarily market-based assistance. U.S. reliance on in-kind aid is controversial due to its potential to disrupt international and local markets and because it typically costs more than market-based assistance. At the same time, lack of reliable suppliers and poor infrastructure in recipient countries may limit the efficacy of market-based assistance. Cargo preference—the requirement that 50% of all in-kind aid be shipped on U.S.-flag ships—also is controversial due to findings that it can lead to higher transportation costs and longer delivery times. Higher costs may be partially due to higher wages and better working conditions on U.S.-flag vessels compared to foreign-flag vessels. Cargo preference also may contribute to military readiness, though some studies suggest there is little evidence to support this assertion.

Prior Administrations and certain Members of Congress have proposed changes to the structure and intent of international food assistance programs. The 2018 farm bill (P.L. 115-334) and the Global Food Security Reauthorization Act of 2017 (P.L. 115-266) both will expire at the end of FY2023. Congress may consider changes to international food assistance programs in the next farm bill or Global Food Security Act reauthorization, or in stand-alone legislation.

# Contents

Introduction ............................................................................................................. 1
Jurisdiction ............................................................................................................. 1
International Food Assistance Programs ....................................................................... 3
    Food for Peace Title II ..................................................................................... 4
    Farmer-to-Farmer (Food for Peace Title V) ....................................................... 5
    McGovern-Dole International Food for Education and Child Nutrition ...................... 6
    Local and Regional Food Aid Procurement Program ............................................. 6
    Food for Progress ............................................................................................ 7
    Bill Emerson Humanitarian Trust ....................................................................... 7
    Emergency Food Security Program ..................................................................... 8
    Community Development Fund ............................................................................ 8
Food Assistance Funding ........................................................................................... 9
Recent Administration Proposals .............................................................................. 10
    Proposed Food Aid Reform Under the Obama Administration ............................... 10
    Proposed Funding Cuts and Account Consolidation Under the Trump Administration ........ 12
Issues for Congress ................................................................................................ 13
    In-Kind and Market-Based Food Assistance ....................................................... 13
    Cargo Preference ........................................................................................... 16
Looking Ahead ....................................................................................................... 18

## Figures

Figure 1. U.S. International Food Assistance Jurisdiction ................................................ 2
Figure 2. U.S. International Food Assistance Outlays, FY2010-FY2020 .............................. 10
Figure 3. U.S. In-Kind and Market-Based Food Assistance Outlays, FY2010 and FY2020 ....... 13

## Tables

Table A-1. U.S. International Food Assistance .............................................................. 19

## Appendixes

Appendix. U.S. International Food Assistance Programs .................................................. 19

## Contacts

Author Information ................................................................................................. 21

# Introduction

The United States is one of the foremost donors of food, or the means to purchase food, to people around the world at risk of hunger. The goal of U.S. international food assistance programs is to provide emergency relief to populations impacted by crises, such as conflicts or natural disasters, and nonemergency assistance to address chronic food insecurity and help populations build resilience to potential threats to food supplies.

Current food assistance programs originated in 1954 with the passage of what is now named the Food for Peace Act (FFPA, P.L. 83-480).[1] This legislation, commonly referred to as "P.L. 480," established Food for Peace programs. Originally, Food for Peace had multiple aims: (1) to provide food to undernourished people abroad, (2) to reduce U.S. stocks of surplus grains that had accumulated under U.S. Department of Agriculture (USDA) commodity support programs, and (3) to expand potential markets for U.S. food commodities. Since the end of the Cold War, U.S. food assistance goals have shifted away from the latter two aims and more toward emergency response and supporting local agriculture markets in recipient countries.

For most of its existence, U.S. international food assistance provided exclusively *in-kind aid*—commodities sourced in the United States and shipped to recipient countries. U.S. law requires some international food assistance programs to provide primarily in-kind aid.[2] However, in recent decades, U.S. international food assistance has shifted from exclusively in-kind to a combination of in-kind and *market-based assistance*—such as locally or regionally procured food, cash transfers, or vouchers.

> ### What Is Global Food Security?
>
> In the 1990 farm bill, Congress defined *international food security* as "access by any person at any time to food and nutrition that is sufficient for a healthy and productive life."
>
> In 1992, the U.S. Agency for International Development (USAID) issued a policy determination defining *food security* as "when all people at all times have both physical and economic access to sufficient food to meet their dietary needs for a productive and healthy life." This definition took elements from the 1990 definition, as well as from food security definitions put forward by the World Bank and the U.N. Food and Agriculture Organization.

This report provides an overview of U.S. international food assistance programs, including congressional jurisdiction, historical funding trends, and issues for congressional consideration. This report focuses on international food assistance programs that currently receive funding from Congress.[3]

# Jurisdiction

Congressional jurisdiction over international food assistance programs is split between two authorizing committees and two appropriations subcommittees. Jurisdiction generally aligns with the major pieces of legislation that historically provided statutory authority for international food assistance programs: the FFPA and the Foreign Assistance Act of 1961 (FAA, P.L. 87-195). Administration of international food assistance programs also is split across two federal agencies: the U.S. Department of Agriculture (USDA) and the U.S. Agency for International Development

---

[1] This law was originally titled the Agricultural Trade Development and Assistance Act when passed in 1954. In 2008, Congress renamed it the Food for Peace Act.

[2] For example, statute requires all aid provided through the Food for Peace Title II program to be in-kind commodities, with limited exceptions (7 U.S.C. §1732(2)). For further detail, see "International Food Assistance Programs."

[3] For information on historical and inactive food assistance programs, see CRS Report R41072, *U.S. International Food Aid Programs: Background and Issues*, by Randy Schnepf.

(USAID). **Figure 1** shows the congressional jurisdiction and implementing agency for each U.S. international food assistance program discussed in this report.

**Figure 1. U.S. International Food Assistance Jurisdiction**



**Source:** CRS

**Notes:** Feed the Future Development refers to agricultural development assistance provided under the Feed the Future initiative. The Feed the Future initiative is a government-wide initiative that includes all programs in this matrix, as well as other assistance provided outside USDA and USAID. Thus, this matrix does not include all programs that comprise the Feed the Future initiative. The programs highlighted in this graphic are the programs discussed in this report. SFOPS = Department of State, Foreign Operations, and Related Programs; USDA = U.S. Department of Agriculture; USAID = U.S. Agency for International Development.

The House and Senate Agriculture Committees have jurisdiction over programs authorized in the FFPA and other agriculture legislation. The House and Senate Agriculture Appropriations subcommittees have jurisdiction over funding for these programs. The FFPA contains statutory authority for four international food assistance programs, two of which are currently active—Food for Peace (FFP) Title II and the Farmer-to-Farmer Program.[4] Outside of the FFPA, Congress has authorized additional international food assistance programs in subsequent agriculture legislation, including the Bill Emerson Humanitarian Trust, the Food for Progress Program, and the McGovern-Dole International Food for Education and Child Nutrition Program.[5] Congress has amended these programs in periodic farm bills, most recently the 2018 farm bill (Agriculture Improvement Act of 2018, P.L. 115-334). The programs under the Agriculture Committees' jurisdiction are based primarily on in-kind aid.

---

[4] Food for Peace (FFP) program names refer to the titles in the Food for Peace Act (FFPA, P.L. 83-480) that originally authorized the programs. FFP Title II and FFP Title V (commonly known as the Farmer-to-Farmer program) remain active today. Titles I and III of the FFPA authorize currently inactive programs. Title IV includes general authorities and program requirements.

[5] For more information on the authorizing statute for each program, see **Appendix**.

The House Foreign Affairs and Senate Foreign Relations Committees have jurisdiction over programs with statutory authority in the FAA. Congress enacted the FAA in 1961 and has amended it through periodic legislation. The Global Food Security Act of 2016 (GFSA, P.L. 114-195) amended Section 491 of the FAA to create the Emergency Food Security Program (EFSP). The program is authorized to provide emergency food assistance "including in the form of funds, transfers, vouchers, and agricultural commodities" to address emergency food needs as a result of natural, human-induced, and complex emergencies. The Global Food Security Reauthorization Act of 2017 (P.L. 115-266) reauthorized EFSP through FY2023. The Community Development Fund (CDF) also derives its authority from the FAA, though the act does not specifically authorize CDF. Rather, CDF is designated as a portion of the Development Assistance (DA) account within the Department of State, Foreign Operations, and Related Programs (SFOPS) appropriation. As such, it is subject to DA's FAA authorities.[6]

# International Food Assistance Programs

USDA and USAID administer seven different international food assistance programs. The programs are implemented through partner organizations with oversight and program funding from USAID or USDA. These partner organizations typically are nongovernmental organizations (NGOs) or international organizations, though foreign country governments and private-sector companies are eligible to participate in some programs.[7] USDA's Commodity Credit Corporation (CCC) procures commodities for all food assistance programs, regardless of which agency implements the program.[8] Typically, funding for an international food assistance program supports multiple *projects* in a given fiscal year. For example, in FY2019, FFP Title II funding supported over 100 projects in more than 30 countries.[9]

International food assistance programs may differ from one another in a number of ways, including in their delivery method, sometimes referred to as a *modality*. Programs provide assistance through two distinct methods:

1. **In-kind** contributions are commodities produced in the United States and shipped to the target region. In addition to standard in-kind contributions, in-kind assistance also may be provided through the following methods:

    a. **Prepositioning** is a form of in-kind aid where shelf-stable (i.e., not easily spoiled) U.S. commodities are prepositioned in storage facilities in the United States and abroad to enable quicker response to emergencies.

---

[6] These include Sections 103, 104, 106, 214, 251-255 and Chapter 10 of Part I of P.L. 87-195.

[7] A nongovernmental organization (NGO) typically is a voluntary group or institution with a social mission, which operates independently from government. Partner NGOs may be based in the United States or in another country. An international organization may include an intergovernmental organization or a multilateral institution such as the United Nations World Food Program.

[8] The Commodity Credit Corporation (CCC) is a government-owned financial institution, overseen by the U.S. Department of Agriculture (USDA), which procures commodities, processes financial transactions, and finances domestic and international programs to support U.S. agriculture. The CCC procures U.S.-produced commodities for international food assistance programs on the open market. For more information on the CCC, see CRS Report R44606, *The Commodity Credit Corporation (CCC)*, by Megan Stubbs.

[9] U.S. Agency for International Development (USAID), *USAID International Food Assistance Report to Congress for Fiscal Year 2019*.

     b.  **Monetization** is a form of in-kind aid in which the partner organization sells U.S. commodities on local markets in developing countries and uses the proceeds to fund development projects.[10]

2.  **Market-based assistance** provides direct cash transfers, food vouchers, or locally and regionally procured food to populations in need (also called *beneficiaries*). Under local and regional procurement (LRP), partner organizations purchase food in the country or region where it is to be distributed rather than in the United States.[11]

International food assistance programs may provide emergency assistance, nonemergency assistance, or both. Emergency projects seek to distribute immediate, life-saving food and nutrition assistance to populations in crisis due to conflict or natural disaster. Nonemergency projects address the root causes of food insecurity and seek to build resilience among vulnerable populations. Nonemergency projects often provide a combination of food distribution and nonfood assistance including education programs, technical assistance, and broader community development initiatives.

---

### International Food Assistance and the Feed the Future Initiative

Feed the Future is a government-wide initiative that aims to improve U.S. international food security efforts by strengthening coordination and uniting all food-security-related programs under common goals and evaluation criteria. Feed the Future coordinates nonemergency food assistance programs with other food security efforts, such as global health and agricultural development programs. Because Feed the Future focuses on long-term food security, it does not include emergency food assistance activities. However, nonemergency food assistance— including the McGovern-Dole, Food for Progress, and Farmer-to-Farmer programs; nonemergency assistance provided under Food for Peace Title II; and Community Development Fund programming—are part of Feed the Future. USDA and USAID submit data on nonemergency food assistance programs to collaborative Feed the Future evaluations.[12]

---

## Food for Peace Title II

Under FFP Title II, the federal government donates U.S.-sourced commodities to a qualifying international organization or NGO to be distributed directly to food-insecure populations.[13]

---

[10] *Monetization* is a process by which implementing partners sell in-kind commodities in local markets to fund nonemergency projects. Monetization used to be required for some FFP Title II assistance by the farm bill; the most recent farm bill (P.L. 115-334) eliminated the monetization requirement, instead replacing it with a permissive authority. Analysts have found that in practice, monetization loses 20-25 cents on the dollar (see, for example, Erin C. Lentz, Stephanie Mercier, and Christopher B. Barrett, "International Food Aid and Food Assistance Programs and the Next Farm Bill," American Enterprise Institute, October 2017, p. 8, at http://www.aei.org/publication/international-food-aid-and-food-assistance-programs-and-the-next-farm-bill/).

[11] Historically, this modality has been referred to as *local and regional procurement* (LRP). More recently, USAID has recognized that in rare cases food must be procured outside the country or region of need for reasons of cost, timeliness, or appropriateness. Thus, USAID began referring to this modality as *local, regional, and international procurement* (LRIP). See Office of Food for Peace, *Information Bulletin 19-03*, August 8, 2019, at https://pdf.usaid.gov/pdf_docs/PA00TVW5.pdf. This report uses *local and regional procurement* to maintain consistency when discussing past studies and data on LRP.

[12] For more information on Feed the Future, see CRS Report R44216, *The Obama Administration's Feed the Future Initiative*, by Marian L. Lawson, Randy Schnepf, and Nicolas Cook. For more information on collaborative monitoring of international food assistance programs and Feed the Future, see USAID and USDA, "U.S. International Food Assistance Report to Congress," various years beginning in FY2012.

[13] Partner organizations also may monetize commodities. However, since the 2018 farm bill eliminated the monetization requirement, use of monetization in FFP Title II has decreased significantly. According to 7 U.S.C. §1723(c), monetization proceeds may "be used to implement income-generating, community development, health,

USAID administers FFP Title II. The program funds both emergency and nonemergency projects. USAID determines how much program funding to allocate to emergency and nonemergency projects each year, within statutory requirements. The majority of FFP Title II funds support emergency assistance. In FY2019, 84% of FFP Title II funds supported emergency assistance and the remaining 16% supported nonemergency assistance.[14]

FFP Title II has statutory authority in the FFPA, and Congress provides funding for the program in annual Agriculture appropriations bills. The FFPA contains a number of requirements that dictate how USAID must implement FFP Title II. These requirements include the following:

- All commodities must be U.S.-sourced commodities, with limited exceptions.[15]

- At least 75% of nonemergency commodities must be in the form of processed, fortified, or bagged commodities (*value-added commodities*), and at least 50% of bagged, whole-grain commodities must be bagged in the United States.[16]

- FFP Title II must distribute a minimum of 2.5 million metric tons of commodities per year, of which 1.875 million metric tons must be distributed as nonemergency assistance.[17]

- USAID must allocate a minimum of $365 million and a maximum of 30% of total FFP Title II funding to nonemergency assistance each year.[18]

## Farmer-to-Farmer (Food for Peace Title V)

The John Ogonowski and Doug Bereuter Farmer-to-Farmer program finances short-term (typically two- to four-week) volunteer placements in developing countries to provide technical assistance to farmers.[19] Volunteers are U.S. citizens drawn from farming, agribusiness, universities, and nonprofit organizations. USAID, which administers the program, selects eligible NGOs to coordinate volunteer placements. Potential volunteers apply directly to the coordinating NGOs and are selected based on the needs of the individual or organization in the developing country. The Farmer-to-Farmer program does not finance food distribution. It is included in this discussion because it is part of the suite of programs the FFPA authorizes and it receives funding through annual appropriations for Food for Peace programs.

---

nutrition, cooperative development, agricultural, and other developmental activities." It also states that proceeds may be used for transportation, storage, distribution, or enhancing the use of FFP Title II commodities, or they may be invested, with any earned interest used for the purposes of the food assistance project under which the monetization occurs.

[14] USAID, *International Food Assistance Report to Congress for Fiscal Year 2019,* April 2020.

[15] 7 U.S.C. §1723(2).

[16] 7 U.S.C. §1724(b). The USAID administrator may waive this requirement if he or she determines the program goals would not be best met by enforcing it. In FY2019, 18% of nonemergency commodities were value-added and 23% of whole-grain, bagged commodities were bagged in the United States.

[17] 7 U.S.C. §1724(a). The USAID administrator has discretion to waive the minimum tonnage requirement to meet emergency needs or if such quantities cannot be used effectively as nonemergency assistance. The administrator has waived this requirement every year in recent decades. In FY2017, Title II assistance totaled 1.5 million metric tons of commodities, 243,180 metric tons of which were nonemergency assistance.

[18] 7 U.S.C. §1736f(e). Statute also states that funds appropriated for the Farmer-to-Farmer Program and for Community Development Funds that are used for implementing income-generating, community development, health, nutrition, cooperative development, agricultural, and other developmental activities may be counted toward the minimum FFP Title II nonemergency requirement.

[19] Congress established the program as the Farmer-to-Farmer Program and later renamed it after John Ogonowski, one of the pilots killed in the September 11, 2001, attacks and Representative Doug Bereuter, who was an initial sponsor of and advocate for the program.

Congress established the Farmer-to-Farmer program in the 1966 FFPA reauthorization (P.L. 89-808). Congress did not fund the program until the 1985 farm bill (P.L. 99-198) established minimum required funding of 0.1% of the annual funds appropriated for Food for Peace programs. Congress has periodically updated minimum required funding levels in the farm bill. The 2018 farm bill (P.L. 115-334) reauthorized minimum funding of the greater of $15 million or 0.6% of the funds appropriated annually for Food for Peace programs.

## McGovern-Dole International Food for Education and Child Nutrition

The McGovern-Dole International Food for Education and Child Nutrition Program aims to advance food security, nutrition, and education for children—especially girls—by providing in-kind aid to be distributed in school meals in priority countries. The program, administered by USDA, also focuses on improving children's health before they enter school by providing food to pregnant and nursing mothers, infants, and children under school age. In addition to providing food, the program encourages governments in recipient countries to establish national school feeding programs and provides technical assistance to help them do so. USDA chooses priority countries for McGovern-Dole projects each year based on criteria including per capita income, literacy, and malnutrition rates

Congress established McGovern-Dole in the 2002 farm bill (P.L. 107-171). The 2018 farm bill (P.L. 115-334) reauthorized the program, including discretionary funding of "such sums as necessary." P.L. 115-334 also amended the program to authorize USDA to use up to 10% of annual McGovern-Dole funding for LRP.[20] (This is separate from funding set aside for USDA's LRP Program in annual appropriations for McGovern-Dole; see next section.) The 2018 farm bill conference report directed USDA to incorporate LRP assistance, particularly in the final years of McGovern-Dole projects "to support the transition to full local ownership and implementation." Congress funds the McGovern-Dole program through annual Agriculture appropriations bills.

## Local and Regional Food Aid Procurement Program

The LRP Program finances the provision of locally and regionally procured foods to beneficiaries, usually in nonemergency situations. USDA provides funding to partner organizations, which then procure eligible commodities in the country or region in which the commodities will be distributed. All procured commodities must meet certain nutritional, quality, and labeling standards determined by USDA. USDA typically has used the LRP Program to supplement in-kind assistance in McGovern-Dole projects.[21] In FY2019, USDA financed three LRP Program projects in Burkina Faso, Cambodia, and Nicaragua. All three projects provided commodities to schools to supplement McGovern-Dole projects.[22]

Congress established the LRP Program as a pilot program in the 2008 farm bill (P.L. 110-246). The provision authorized pilot projects to provide locally and regionally procured food to beneficiaries, and directed USDA to have an independent third party conduct an evaluation of all pilot projects. The provision provided $60 million in mandatory funding over four years to finance the pilot projects and evaluation. The 2014 farm bill (P.L. 113-79) permanently authorized the program and authorized discretionary funding of $80 million annually for FY2014-FY2018.

---

[20] P.L. 115-334, §3309.

[21] Statute authorizes USDA to give preference for LRP Program awards to eligible entities "that have, or are working toward, projects under" the McGovern-Dole program (7 U.S.C. §1726c(e)(2)).

[22] For further detail, see USDA, *Local and Regional Food Aid Procurement Program FY2019 Report to Congress*, June 2020, at https://www.fas.usda.gov/newsroom/local-and-regional-food-aid-procurement-program-fy-2019-report-congress.

The 2018 farm bill (P.L. 115-334) reauthorized this level of funding through FY2023. Since FY2016, Congress has appropriated funding for the program as a set-aside within funding for the McGovern-Dole Program. In FY2021, Congress set aside $23 million of McGovern-Dole funding for the LRP Program.

## Food for Progress

Under the Food for Progress program, USDA donates U.S. agricultural commodities to international organizations, NGOs, foreign governments, or private entities, which can then distribute the commodities to beneficiaries or monetize the commodities by selling them locally to raise funds for development projects.[23] Food for Progress projects focus on improving agricultural productivity and expanding agricultural trade. Statute directs USDA, when awarding projects, to consider a country's commitments to promote economic freedom and expand efficient domestic commodity markets.[24] In FY2020, USDA funded five Food for Progress projects in seven countries.[25]

Congress first authorized the Food for Progress program in the 1985 farm bill (P.L. 99-198). It may receive funding through either Food for Peace Title I appropriations or CCC financing. Congress has not appropriated funding for new Title I programs since FY2006. Food for Progress now relies on CCC financing. Statute requires the program provide a minimum of 400,000 metric tons of commodities each fiscal year.[26] However, this minimum has not been met in recent years, with actual totals averaging 253,269 metric tons per year between FY2010 and FY2019.[27] Statute authorizes the program to pay no more than $40 million annually for freight costs,[28] which limits the amount of shipped commodities, particularly in years with high shipping costs. The 2018 farm bill authorized a new pilot program to finance Food for Progress projects directly rather than through monetization.[29] The act authorized appropriations of $10 million per year for FY2019-FY2023 for pilot agreements. Congress has not provided funding for these pilot agreements to date.

## Bill Emerson Humanitarian Trust

The Bill Emerson Humanitarian Trust (BEHT) is a reserve authorized to hold funds or commodities for use in rapidly responding to emergency food needs in humanitarian contexts. USDA and USAID jointly administer the BEHT, and the CCC holds all BEHT funds. These commodities or funds can supplement FFP Title II when international food assistance programs cannot meet emergency food needs in a given fiscal year. The BEHT allows USDA and USAID the option to provide additional food assistance quickly, without having to rely on supplemental appropriations from Congress. BEHT funds or commodities are subject to many of the same requirements as FFP Title II, including the requirement to provide in-kind aid.

---

[23] Statute authorizes USDA to provide commodities to partner entities for distribution or monetization. In practice, the majority of Food for Progress projects have monetized all commodities.

[24] 7 U.S.C. §1736o(c)-(d).

[25] USDA, "Food for Progress Funding—FY2020," at https://www.fas.usda.gov/programs/food-progress/food-progress-funding-fy-2020.

[26] 7 U.S.C. §1736o(g).

[27] USDA and USAID, *U.S. International Food Assistance Report*, for years FY2010 through FY2019.

[28] 7 U.S.C. §1736o(f)(3).

[29] P.L. 115-334, §3302.

Congress authorized the BEHT in its current form in the Africa: Seeds of Hope Act of 1998 (P.L. 105-385).[30] Congress authorized the BEHT to hold funds or certain commodities (wheat, rice, corn, and sorghum), but, since 2008, the BEHT has held only funds.[31] Congress may appropriate funds to reimburse the CCC for any commodities or funds released from the BEHT. The CCC may either hold these funds in the BEHT or use the funds to replenish commodities to the BEHT. BEHT funds were last used in FY2014 to purchase 189,970 metric tons of U.S. agricultural commodities to supply FFP Title II projects in South Sudan.[32] Currently, the BEHT holds approximately $280 million in funds.[33]

## Emergency Food Security Program

EFSP is considered a market-based assistance program, providing assistance in the form of food vouchers, cash transfers, or the local or regional procurement of commodities (LRP).[34] USAID has asserted that it uses EFSP assistance when significant barriers exist to providing in-kind aid—for example, when in-kind food would not arrive soon enough or could disrupt local markets or when it is unsafe to operate in conflict zones. Once the agency has determined an EFSP intervention is needed, it uses four criteria to decide which market-based intervention is best suited to the recipient country context: market appropriateness, feasibility, project objectives, and cost.[35] In FY2019, the most recent year for which comprehensive data are available, USAID administered EFSP assistance in 50 countries. LRP was used most often, accounting for 45% of EFSP assistance, with food vouchers and cash transfers following at 27% and 23%, respectively.[36]

USAID's Bureau for Humanitarian Assistance administers EFSP. USAID first employed EFSP in FY2010 based on authority in the FAA to provide disaster assistance. In 2016, Congress permanently authorized EFSP in the GFSA. Congress funds EFSP through the International Disaster Assistance (IDA) account within the SFOPS appropriations bill.

## Community Development Fund

CDF is used to fund—either solely or in conjunction with FFP Title II nonemergency funds—USAID's Resilience Food Security Activities (RFSAs) in countries targeted by the Feed the Future food security initiative.[37] RFSAs typically are five-year programs aimed at addressing the

---

[30] The Bill Emerson Humanitarian Trust (BEHT) replaced the Food Security Commodity Reserve established in 1996 and its predecessor, the Food Security Wheat Reserve, originally authorized in 1980.

[31] In 2008, USDA sold the BEHT's remaining commodities—about 915,000 metric tons of wheat—and currently the BEHT holds only funds.

[32] USAID, *U.S. International Food Assistance Report: Fiscal Year 2014*, May 2016.

[33] Author communication with USDA Foreign Agricultural Service, January 11, 2021.

[34] For definitions of each market-based modality, see Appendix A in USAID, *Emergency Food Security Program Fiscal Year 2019 Report to Congress*, April 13, 2020, at https://www.usaid.gov/sites/default/files/documents/1867/USAID_FY2019_EmergencyFoodSecurityProgramReport.pdf.

[35] USAID, *Emergency Food Security Program Fiscal Year 2019 Report to Congress*, April 13, 2020.

[36] USAID, *Emergency Food Security Program Fiscal Year 2019 Report to Congress*, April 13, 2020. USAID reports that the remaining 5% was used for "complementary investments and other related activities."

[37] Resilience Food Security Activities formerly were referred to as Development Food Security Activities. Food for Peace Act Title II nonemergency funds are authorized by the Food for Peace Act and provided for in the Agriculture appropriation. As such, they are subject to specific requirements that are different from the Community Development Fund. For more on nonemergency programs, see CRS Report R45879, *International Food Assistance: Food for Peace Nonemergency Programs*, by Emily M. Morgenstern.
The Feed the Future initiative was launched by the Obama Administration and continues today. Current Feed the Future initiative target countries include Bangladesh, Ethiopia, Ghana, Guatemala, Honduras, Kenya, Mali, Nepal,

root causes of food insecurity. Although the composition of each project depends on the local context, RFSAs may include in-kind food distributions, seed and livestock distribution, water supply and sanitation activities, trainings for smallholder farmers, and the organization of microenterprise groups. USAID considers the RFSAs as a means to support the transition from short-term emergency food assistance programs to longer-term food security assistance, such as agricultural development and nutrition assistance programs. As such, they share a close relationship with USAID's emergency food security activities and broader Feed the Future initiative programming.

USAID's Bureau for Humanitarian Assistance administers CDF with input from USAID's Bureau for Resilience and Food Security. USAID first employed CDF to reduce the agency's reliance on monetization in its FFP Title II nonemergency projects and increase the funds available for a broader range of activities. Even as Congress has loosened the monetization requirement and made FFP Title II nonemergency funds more flexible, CDF remains in use today. Congress designates a level of funding each year for CDF within the DA account of the SFOPS appropriation. The designation typically is included in report language or in the joint explanatory statement accompanying the final appropriation.

# Food Assistance Funding

U.S. international food assistance outlays have fluctuated over the past 11 years (**Figure 2**). Total outlays declined from FY2010 to FY2013. Outlays have increased since FY2013, partly in response to the Ebola epidemic in West Africa between 2014 and 2016 and ongoing conflicts in South Sudan, Syria, and Yemen. For example, in FY2019, the U.S. allocated over $1 billion of its emergency food assistance to needs arising from just the three conflicts in South Sudan, Syria, and Yemen.[38] Extreme weather shocks also have increased international food assistance needs. For example, the United States provided emergency food assistance in response to multiple severe droughts in the Horn of Africa between 2014 and 2020 and Tropical Cyclones Kenneth and Idai in southern Africa in 2019.

FFP Title II comprised the bulk of international food assistance outlays between the mid-1980s and the mid-2010s. However, since FY2010 (the first year of EFSP), EFSP assistance has grown from approximately 10% of total international food assistance outlays to 57% in FY2020. During that same period, Title II outlays decreased as a share of total international food assistance from 75% to 33%, even as Title II funding levels remained relatively constant, on average. These trends reflect a shift over the past decade from predominantly in-kind assistance to predominantly market-based assistance (see "In-Kind and Market-Based Food Assistance").

---

Niger, Nigeria, Senegal, and Uganda. For more on the history of Feed the Future, see CRS Report R44216, *The Obama Administration's Feed the Future Initiative*, by Marian L. Lawson, Randy Schnepf, and Nicolas Cook.

[38] USAID, Office of Food for Peace Fiscal Year 2019 Annual Report, December 2019, at https://www.usaid.gov/documents/1866/food-peace-fiscal-year-2019-annual-report.

**Figure 2. U.S. International Food Assistance Outlays, FY2010-FY2020**

$ in billions (current year)



**Source:** Figure created by CRS using data from USAID, *U.S. International Food Assistance Report*, various years.

**Notes:** FFP = Food for Peace; EFSP = Emergency Food Security Program; The "Other" category includes the Farmer-to-Farmer Program, Local and Regional Food Aid Procurement Program, Bill Emerson Humanitarian Trust, and Community Development Fund.

# Recent Administration Proposals

The Obama and Trump Administrations both pursued changes to the structure and intent of U.S. international food assistance programs. Although the proposed changes were different, the underlying arguments for both were similar: that U.S. international food assistance programs should be streamlined and better coordinated to increase both programmatic and cost efficiency. Responses to both Administration efforts were mixed, and Congress ultimately did not enact the major restructuring that either Administration proposed. These administrative proposals are detailed below.

## Proposed Food Aid Reform Under the Obama Administration

In its FY2014 budget request, the Obama Administration proposed changes to U.S. international food assistance programs that it asserted would allow the United States to reach an additional 2-4 million more people each year.[39] The proposal included shifting funds from FFP Title II to SFOPS appropriations accounts—mainly IDA and DA. For emergency food assistance, funds would be shifted from FFP Title II to IDA to allow for the increased use of market-based approaches in emergency contexts. Further, the Administration advocated for a new Emergency Food Assistance Contingency Fund. For nonemergency contexts, the Administration proposed a Community Development and Resilience Fund within DA. The Administration asserted that these changes

---

[39] Department of State, *FY2014 Congressional Budget Justification for Foreign Operations Volume 2,* May 17, 2013, p. 57.

would "make food aid more timely and cost-effective" and "allow the use of the right tool at the right time for responding to emergencies and chronic food insecurity."[40] The Administration claimed it did not seek to eliminate the use of U.S. in-kind food aid but rather to allow USAID to choose the contexts in which U.S. in-kind food aid was most appropriate. In an effort to address concerns from the Maritime Administration and its stakeholders about shipping contracts decreasing with in-kind aid levels, the Administration included $25 million for the Maritime Administration "for additional targeted operating subsidies for militarily-useful vessels and incentives to facilitate the retention of mariners."[41] Finally, the Administration estimated these reforms would be cost-effective for the U.S. taxpayer, reducing the deficit by an estimated $500 million over 10 years.

The Obama Administration's reform proposal met with polarized reactions. Within the implementing partner community, proponents of the plan agreed with the Administration's criticism of in-kind food, saying the approach was "outdated" and that with FFP Title II, "for every dollar that is spent on feeding the hungry, only 47 cents reaches a person in need."[42] The reform proposal was celebrated for its "right tool right time" approach and overall increased flexibility. However, other implementing partners expressed concern that removing U.S. food from U.S. international food assistance would undermine the program's congressional support and ultimately result in a decrease in funding for all U.S. international food assistance in the long run.[43]

In the U.S. agricultural community, the reactions to the reform proposal also were mixed. Some larger agribusinesses, including Cargill, and organizations such as the National Farmers Union voiced their support for the proposed changes.[44] However, commodity groups such as USA Rice joined with other organizations to write a letter to the President urging the continuation of U.S. food aid programs in the current form.[45]

Perhaps the most vocal constituency against the Administration's reform proposal was the shipping industry, with one union organization noting the proposal was "bad for the American farmer, bad for the American ports, bad for the taxpayer, and bad for our workers."[46] Others suggested the reform would harm the U.S.-flag fleet and ultimately would reduce U.S. military readiness.[47] However, in a letter to House Foreign Affairs Committee leadership, the Department

---

[40] Department of State, *FY2014 Congressional Budget Justification for Foreign Operations Volume 2,* May 17, 2013, p. 57.

[41] Department of State, *FY2014 Congressional Budget Justification for Foreign Operations Volume 2,* May 17, 2013, p. 57.

[42] CARE, *CARE Supports President Obama's Food Aid Reforms*, April 10, 2013, at https://www.care.org/news-and-stories/press-releases/care-supports-president-obamas-food-aid-reforms/.

[43] Ron Nixon, "Obama Administration Seeks to Overhaul International Food Aid," *New York Times*, April 4, 2013, at nytimes.com/2013/04/05/us/politics/white-house-seeks-to-change-international-food-aid.html.

[44] "Cargill Lends Support to Food Aid Reform," *AgriPulse*, May 23, 2013, at https://www.agri-pulse.com/articles/2878-cargill-lends-support-to-food-aid-reform; Roger Johnson, "Op-Ed: NFU Calls for More Flexibility on Food Aid," *AgriPulse,* May 21, 2013, at https://www.agri-pulse.com/articles/2868-op-ed-nfu-calls-for-more-flexibility-on-food-aid.

[45] Letter to the President from advocacy groups in support of current food aid programs, February 21, 2013.

[46] Letter from Robert McEllrath, President of the International Longshore & Warehouse Union, June 12, 2013, at https://www.documentcloud.org/documents/814081-international-longshoreand-warehouse-union-letter.html.

[47] Letter from Edward Wytkind, President of the Transportation Trades Department, June 18, 2013, at https://www.documentcloud.org/documents/814076-afl-transportation-trades-department-letter.html.

of Defense noted the reform proposal would not affect U.S. maritime readiness, national security, or the "Department's ability to crew the surge fleet and deploy forces and sustainment cargo."[48]

Although some Members of Congress introduced legislation that would have enacted the Administration's proposal, ultimately the reform in its entirety was not enacted. The 2014 farm bill and GFSA reflected some of the proposed changes, but the broader U.S. international food assistance structure remained intact during the Obama Administration.

## Proposed Funding Cuts and Account Consolidation Under the Trump Administration

Citing a desire to cut costs and find programmatic efficiencies, in its first two budget requests, the Trump Administration proposed eliminating funding for the McGovern-Dole and FFP Title II programs and funding all international food assistance through IDA within the SFOPS appropriation. However, in both instances, the requests also included significant cuts to IDA from the prior fiscal year: a 39% cut for FY2018 and a 17% cut for FY2019.

In its FY2020 and FY2021 budget requests, the Trump Administration again proposed eliminating the McGovern-Dole program, but instead of eliminating FFP Title II in favor of IDA, the Administration proposed a consolidated International Humanitarian Assistance (IHA) appropriations account that would combine funding from four humanitarian accounts: FFP Title II, IDA, Migration and Refugee Assistance, and Emergency Refugee and Migration Assistance.[49] According to budget documents, if enacted, IHA would have been managed by USAID under the policy authority of the Department of State. Notably, the proposed levels for IHA would have represented 37% and 38% decreases, respectively, from the prior year's appropriations for the component accounts.

The Trump Administration's proposals to reduce and consolidate U.S. funding for international food assistance largely were unsupported by stakeholders, including food assistance implementing partners, commodity groups, and the shipping industry.[50] The proposals were similarly received in Congress, with existing programs continuing to receive bipartisan support in both chambers. As such, in the Administration's later years, U.S. international food assistance program stakeholders saw the budget requests as a routine exercise that had little effect on congressional action. For example, in a statement following the release of the President's FY2021 budget request, USA Rice's vice president of government affairs stated, "While it is discouraging to hear that the Administration is proposing to balance the budget on the backs of American farmers and those in need, we know that this budget will not be well received by Congress and is essentially dead on arrival."[51]

---

[48] Letter from Frank Kendall, Under Secretary of Defense, to Chairman Edward Royce and Ranking Member Eliot Engel, House Foreign Affairs Committee, June 18, 2013, at https://www.documentcloud.org/documents/814075-pentagon-letter-on-food-aid-reform.html.

[49] The Migration and Refugee Assistance and Emergency Migration and Refugee Assistance accounts both are in the State, Foreign Operations, and Related Programs appropriation and are managed by the Department of State's Bureau of Population, Refugees, and Migration.

[50] See, for example, American Maritime Officers, "Administration Seeks to Eliminate Food for Peace Title II, Roll Back MSP Funding in FY2018 Budget," *American Maritime Officer*, June 2017 at https://www.amo-union.org/news/2017/201706/201706.pdf; U.S. Global Leadership Coalition, "Analysis of the Administration's FY19 International Affairs Budget Request," February 12, 2018, at https://www.usglc.org/the-budget/analysis-administrations-fy19-international-affairs-budget-request.

[51] USA Rice, "President's FY2021 Budget Proposal," February 10, 2020, at https://www.usarice.com/news-and-events/

# Issues for Congress

## In-Kind and Market-Based Food Assistance

Historically, the United States provided international food aid exclusively via in-kind commodities. The United States remains one of the few major donor countries that continues the provision of large quantities of in-kind aid. Many other donors—such as Canada, the European Union, and the United Kingdom—have switched to primarily market-based assistance.[52] U.S. use of market-based assistance has increased significantly in recent years under EFSP, CDF, and the LRP Program—to the point where EFSP is now the largest among all U.S. international food assistance programs in terms of total annual outlays. In FY2010, in-kind aid comprised roughly 89% of U.S. international food assistance, with market-based assistance making up the remaining 11%. In FY2020, in-kind aid accounted for roughly 41% of assistance and market-based assistance comprised approximately 59% (**Figure 3**). During this same period, total international food assistance outlays grew over 97%, from approximately $2.6 billion to $5.1 billion.

**Figure 3. U.S. In-Kind and Market-Based Food Assistance Outlays, FY2010 and FY2020**



**Source:** CRS, using data from *U.S. International Food Assistance Report to Congress, FY2010*, and USDA and USAID preliminary food assistance outlays for FY2020.

---

publications/usa-rice-daily/article/usa-rice-daily/2020/02/10/president-s-fy-2021-budget-proposal.

[52] U.S. Government Accountability Office (GAO), *Local and Regional Procurement Can Enhance the Efficiency of U.S. Food Aid, But Challenges May Constrain Its Implementation*, GAO-09-570, May 2009.

**Notes:** In-kind and market-based breakdowns are CRS approximations, based on available data from USDA and USAID. FY2020 outlays are preliminary data. BEHT, which is used in years where USAID determines other international food assistance programs cannot meet emergency needs, was not used in FY2020. Data does not include the Farmer-to-Farmer Program, because the program does not provide food assistance. FFP = Food for Peace; MGD = McGovern-Dole; FFPR = Food for Progress; BEHT = Bill Emerson Humanitarian Trust; EFSP = Emergency Food Security Program; LRP = Local and Regional Food Aid Procurement Program; CDF = Community Development Fund.

Proponents of in-kind aid contend it supports American jobs. Providing U.S.-grown commodities supports the agricultural sector, and shipping those commodities on U.S.-flag ships supports the transportation sector. In-kind aid also supports American companies that produce ready-to-use therapeutic and supplementary foods, foods that are specially formulated to address malnutrition. Proponents also maintain the visibility of in-kind food with U.S labels fosters goodwill between the United States and recipient countries.[53]

U.S. in-kind aid may be appropriate when local food availability is scarce. For example, in 2012, during a severe drought in the Sahel region of Africa, USAID provided in-kind aid to recipients during the "lean season," when markets were not well stocked. According to USAID, in-kind aid allowed local farmers to plant and tend to crops instead of having to migrate in search of food.[54] However, in these instances, LRP also may be appropriate and may support regional markets. Prepositioning food at warehouses in the United States and abroad allows aid to reach recipients sooner than traditional in-kind aid in emergency situations. In 2014, the U.S. Government Accountability Office (GAO) found that prepositioning shortened delivery time frames for in-kind aid by one to two months compared with standard delivery methods.[55]

Critics of in-kind aid emphasize that it takes longer to reach recipients than market-based assistance and can be more costly, as transporting food aid requires food-safety measures such as regular fumigation to prevent contamination from pests, mold, or other forms of rot. Although prepositioning in-kind aid shortens delivery times, GAO found it can involve additional costs due to increased storage and shipping expenses. Prepositioned commodities also can cost more than traditional in-kind commodities, due to a limited supply of commodities available for domestic prepositioning.[56]

In 2011, GAO found that in-kind aid may not provide adequate nutrition to recipients during long-term emergencies. In some instances, lack of adequate nutrition led to micronutrient deficiencies. USAID and USDA can use specialized, nutrient-dense food products to supplement traditional commodities, but these products are costly and may be difficult to direct to intended recipients. GAO's analysis also found vulnerabilities in quality control of the food aid supply chain. In some instances, these vulnerabilities led to contamination of food aid commodities.[57]

Critics also contend that in-kind aid can be difficult to deliver in situations with geographic and security challenges. For example, in multiple instances, food aid has reportedly been stolen from warehouses near conflict zones in South Sudan.[58] In 2015, Dina Esposito, former director of

---

[53] See, for example, testimony of John Didion, Chief Executive Officer, Didion Milling, in U.S. Congress, House Committee on Agriculture, *U.S. International Food Aid Programs: Stakeholder Perspectives,* hearings, 114th Cong., 1st sess., September 30, 2015, S.Hrg. 114-28.

[54] USAID, *U.S. International Food Assistance Report FY2012*, April 2014.

[55] GAO, *Prepositioning Speeds Delivery of Emergency Aid, But Additional Monitoring of Time Frames and Costs Is Needed*, GAO-14-277, March 2014.

[56] GAO, *Prepositioning Speeds Delivery of Emergency Aid*.

[57] GAO, *Better Nutrition and Quality Control Can Further Improve U.S. Food Aid*, GAO-11-491, May 2011.

[58] *United Nations News*, "South Sudan: U.N. Supply Warehouse Looted; Non-Critical Staff Ordered to Relocate," July

USAID's Office of Food for Peace, testified that many Syrian refugees who had fled to neighboring countries to escape conflict were widely dispersed rather than congregated in refugee camps (as has become more common in humanitarian contexts). According to Esposito, without the use of market-based assistance, USAID "would not be able to feed people inside Syria and would have great difficulty feeding those displaced within the region, particularly where refugees are dispersed within host communities."[59] Critics of in-kind aid also assert that in-kind commodities can disrupt local markets and cause price distortions.[60]

Market-based assistance can take the form of direct cash transfers, food vouchers, or LRP. Proponents of market-based assistance emphasize that it allows for quicker response times than shipping in-kind aid via ocean freight. This response time may be especially relevant to emergencies, when food needs are immediate. Research shows that LRP can arrive 14-16 weeks sooner than in-kind aid.[61] Proponents also contend that market-based assistance is less costly than in-kind aid, allowing donors to reach more people in need with less funding. The cost savings of market-based assistance can vary widely based on target destination and current commodity prices. GAO concluded that LRP costs 25% less, on average, than in-kind aid.[62]

Some research also found that market-based assistance can better meet local dietary preferences and can support local agricultural markets and producers, both of which may be fragile in the wake of conflict or disaster.[63] According to USAID, market-based assistance is especially appropriate in situations in which people are physically spread out or highly mobile or when there are security concerns about transporting in-kind aid.[64]

Market-based assistance may have policy or implementation challenges. Cost differences between LRP and in-kind aid can vary based on the specific commodity involved. For example, one study found that while LRP was less costly than in-kind aid when purchasing bulk cereals and beans, it was more expensive for processed foods such as vegetable oils or corn-soy blends.[65] In addition, using LRP in food-deficit regions or underdeveloped markets could cause local or regional price spikes or provide insufficient access to food due to local unavailability. Lack of reliable suppliers and poor infrastructure can also limit the efficiency of LRP.[66]

Critics of market-based assistance contend that in poorly controlled settings, cash transfers or food vouchers could be stolen or used to purchase nonfood items. In 2015, GAO found instances of fraud and theft in EFSP projects. GAO also determined that USAID risk assessments for EFSP

---

14, 2016; Save the Children, "Save the Children Strongly Condemn the Looting of Its Compound and Warehouse in Northern Jonglei," *ReliefWeb*, February 28, 2017.

[59] Dina Esposito, Director of the Office of Food for Peace, USAID, in U.S. Congress, Senate Committee on Foreign Relations, *American Food Aid: Why Reform Matters*, hearings, 114th Cong., 1st sess., April 15, 2015, S.Hrg. 114-74.

[60] Alexander Gaus and Julia Steets, "The Challenging Path to a Global Food Assistance Architecture," in *Uniting on Food Assistance: The Case for Transatlantic Cooperation*, ed. Christopher B. Barrett et al. (Abingdon, Oxon: Routledge, 2012), pp. 11-29.

[61] E. C. Lentz et al., "The Timeliness and Cost-Effectiveness of the Local and Regional Procurement of Food Aid," *World Development*, vol. 49 (September 2013), pp. 9-18; GAO, *Local and Regional Procurement*, GAO-09-570, May 2009.

[62] GAO, *Local and Regional Procurement*, GAO-09-570, May 2009.

[63] Overseas Development Institute, *Doing Cash Differently: How Cash Transfers Can Transform Humanitarian Aid*, September 2015.

[64] USAID, "Types of Emergency Food Assistance," updated June 4, 2018, at https://www.usaid.gov/food-assistance/what-we-do/emergency-activities/types-emergency.

[65] Lentz et al., "Timeliness and Cost-Effectiveness," pp. 9-18.

[66] GAO, *Local and Regional Procurement*.

projects did not fully address risks specific to market-based food assistance.[67] Additionally, in cases of particularly acute malnutrition, local foods may not offer adequate nutritional quality for therapeutic treatment and rehabilitation, especially for highly vulnerable populations such as children and pregnant or lactating women.[68] Under these circumstances, providing fortified or specialized in-kind foods may be preferable. Critics of market-based assistance also argue that it could undermine the coalition of commodity groups, NGOs, and shippers that advocate for international food assistance programs, potentially resulting in reductions in total U.S. food assistance funding.

## Cargo Preference

The Cargo Preference Act of 1954 (P.L. 83-164), as amended, mandates that at least 50% of the gross tonnage of U.S. food aid commodities must ship on U.S.-flag vessels. This requirement, known as *cargo preference*, is part of broader cargo preference requirements that apply to other government cargo, such as Department of Defense cargo.[69] The Department of Transportation's Maritime Administration (MARAD) monitors and enforces cargo preference. Under cargo preference, qualifying U.S.-flag ships must be privately owned and must employ a crew consisting of at least 75% U.S. citizens. Cargo preference applies to all commodities provided under international food assistance programs and transported via ocean freight, including in-kind aid and LRP. Congress increased the share of food aid commodities required to ship on U.S.-flag vessels from 50% to 75% in the 1985 farm bill (P.L. 99-198) and subsequently lowered it to 50% in a 2012 surface transportation reauthorization act (P.L. 112-141).

According to MARAD, the main purpose of cargo preference laws is to sustain a privately owned, U.S.-flag merchant marine to provide sealift capability in wartime and national emergencies and to protect U.S. ocean commerce from foreign control.[70] USA Maritime—an organization representing shipper and maritime unions—asserts that maintaining a U.S.-flag fleet and supply of U.S. mariners through cargo preference is a cost-effective alternative to the U.S. government building ships and hiring employees to maintain sealift capacity.[71]

MARAD contends that cargo preference is critical to the financial viability of U.S.-flag vessels and maintaining the supply of qualified U.S. mariners.[72] According to a 2017 report by MARAD's Maritime Workforce Working Group, the current supply of qualified U.S. mariners is sufficient to crew the fleet of government and privately owned U.S.-flag ships necessary during an initial activation (for example, during wartime or a national emergency). However, there are

---

[67] GAO, *USAID Has Developed Processes for Initial Project Approval But Should Strengthen Financial Oversight*, GAO-15-328, March 2015. Since this report, USAID has fully implemented all GAO recommendations to strengthen implementation of market-based assistance.

[68] David Ryckembusch et al., "Enhancing Nutrition: A New Tool for Ex Ante Comparison of Commodity-Based Vouchers and Food Transfers," *World Development*, vol. 49 (September 2013), pp. 58-67.

[69] 46 U.S.C. §55305; For more information on cargo preference, see CRS Report R44254, *Cargo Preferences for U.S.-Flag Shipping*, by John Frittelli.

[70] MARAD, "Cargo Preference," accessed 3 February 2021, at https://www.maritime.dot.gov/ports/cargo-preference/cargo-preference.

[71] USA Maritime, "Statement of USA Maritime on House Foreign Affairs Committee February 14, 2018, Hearing Regarding Food Aid Programs," February 15, 2018, at http://usamaritime.org/2018/02/statement-of-usa-maritime-on-house-foreign-affairs-committee-february-14-2018-hearing-regarding-food-aid-programs/.

[72] GAO, *DOT Needs to Expeditiously Finalize the Required National Maritime Strategy for Sustaining U.S.-Flag Fleet*, GAO-18-478, August 2018.

not enough U.S. mariners to support a sustained activation of this fleet for a period longer than 180 days.[73]

Shipping on U.S.-flag vessels typically costs more than shipping on foreign-flag vessels. A 2011 study by MARAD found that average daily operating costs for U.S.-flag vessels were 2.7 times higher than for foreign-flag vessels.[74] USA Maritime maintains that a primary reason for the higher cost is that U.S.-flag ships have better working conditions and pay higher wages than foreign-flag ships.[75] Ship owners surveyed by MARAD noted that "the standard of living in the U.S. and the social benefits provided to mariners contribute to U.S.-flag wages being significantly higher than foreign-flag wages."[76]

When shipping costs on U.S.-flag ships are higher than foreign-flag ships, cargo preference increases food aid costs. This reduces the volume of food aid provided and, therefore, the number of people aided. USAID officials have stated that for each $40 million increase in shipping costs, its food aid reaches one million fewer recipients each year.[77] USAID officials also noted that in some instances the agency has had to ship food aid on types of vessels that are not meant to carry bulk food cargo and are not compatible with equipment typically used to load and unload bulk grains. They asserted that this has resulted in increased costs and delays.[78] In a 2019 hearing, the Administrator of USDA's Foreign Agricultural Service stated that competition for U.S. vessels is limited and that shipping food aid on U.S.-flag ships costs roughly 200% more than on foreign-flag ships, reducing the amount of food aid commodities USDA is able to supply.[79]

Some opponents of cargo preference question its contributions to U.S. sealift capacity. They assert that few U.S.-flag ships depend on food aid shipments, and only some of those ships are capable of carrying military cargo. They also argue that cargo preference often benefits U.S. subsidiaries of foreign shipping companies rather than U.S. shipping companies.[80] A 2010 study asserted that cargo preference increased food aid costs and contributed little to national security because 70% of cargo preference vessels did not meet the criteria that would deem them militarily useful.[81]

In 2015, GAO found that from April 2011 through July 2014, cargo preference increased the overall cost of shipping food aid by an average of 23%, or $107 million in total. GAO also concluded that cargo preference contributions to Department of Defense sealift capacity were

---

[73] MARAD, *Maritime Workforce Working Group Report*, September 2017.

[74] MARAD, *Comparison of U.S. and Foreign-Flag Operating Costs*, September 2011.

[75] USA Maritime, *A Critical Analysis of "International Food Aid and Food Assistance Programs and the Next Farm Bill" in Defense of the United States Merchant Marine*, May 2018.

[76] MARAD, *Comparison of U.S. and Foreign-Flag Operating Costs*.

[77] GAO, *DOT Needs to Finalize Maritime Strategy*, GAO-18-478, August 2018.

[78] GAO, *DOT Needs to Finalize Maritime Strategy*.

[79] U.S. Congress, House Committee on Appropriations, Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies, *International Food Assistance Programs at USDA and USAID*, 116th Cong., 1st sess., September 25, 2019 (Washington, DC, GPO: 2019).

[80] For example, see testimony of Andrew Natsios, Executive Professor, the Bush School of Government and Public Service, Texas A&M University, in U.S. Congress, House Committee on Foreign Affairs, *Modernizing Food Aid: Improving Effectiveness and Saving Lives*, hearings, 115th Cong., 2nd sess., February 14, 2018; and Brett D. Schaefer, "Reforming U.S. Food Aid Can Feed Millions More at the Same Cost," Heritage Foundation, May 17, 2018, at https://www.heritage.org/hunger-and-food-programs/commentary/reforming-us-food-aid-can-feed-millions-more-the-same-cost.

[81] Elizabeth R. Bageant et al., "Food Aid and Agricultural Cargo Preference," *Applied Economic Perspectives and Policy*, vol. 32, no. 4 (2010), pp. 624-641.

uncertain, because in the preceding 13 years, including during conflicts in Iraq and Afghanistan, the entire reserve sealift fleet was not activated. Additionally, MARAD had not fully assessed the potential availability of U.S. mariners needed for a full and prolonged activation.[82] In 2018, GAO analyzed the assessment of U.S. mariner availability in the above-mentioned Maritime Workforce Working Group report. GAO found that although "the working group concluded that there is a shortage of mariners for sustained operations, its report also details data limitations that cause some uncertainty regarding the actual number of existing qualified mariners and, thus, the extent of this shortage."[83]

# Looking Ahead

As Congress considers options for amending or reauthorizing international food assistance programs, Members may act through reauthorizing existing legislation or drafting new stand-alone legislation. Historically, Congress has made changes to international food assistance programs through periodic farm bills and, more recently, through the Global Food Security Act.[84] The 2018 farm bill (P.L. 115-334) and the Global Food Security Reauthorization Act of 2017 (P.L. 115-266) both are set to expire at the end of FY2023. As Congress considers drafting the next farm bill or potentially reauthorizing the Global Food Security Act, Members may consider changes to international food assistance programs.

Congress also may consider future changes to international food assistance programs through stand-alone legislation, such as the Food for Peace Modernization Act (S. 2551, H.R. 5276) introduced in the 115th Congress, or through annual Agriculture and SFOPS appropriations acts. In addition to funding levels, appropriations bills and accompanying explanatory statements often contain policy-related provisions that direct the executive branch how to spend certain funds. Congress may make changes to program funding or direct USAID and USDA on how to spend certain funds through annual appropriations acts.

---

[82] GAO, *Cargo Preference Increases Food Aid Shipping Costs, and Benefits Are Unclear*, GAO-15-666, August 2015.

[83] GAO, *DOT Needs to Finalize Maritime Strategy*, p. 32.

[84] For further detail on changes to international food assistance programs in the 2018 farm bill, see CRS In Focus IF11223, *2018 Farm Bill Primer: Agricultural Trade and Food Assistance*, by Anita Regmi and Alyssa R. Casey, and the "Trade" section in CRS Report R45525, *The 2018 Farm Bill (P.L. 115-334): Summary and Side-by-Side Comparison*, coordinated by Mark A. McMinimy.

# Appendix. U.S. International Food Assistance Programs

## Table A-1. U.S. International Food Assistance

| Program | Year Began | Statutory Authority[a] | Funding | Emergency or Nonemergency | Primary Delivery Method | Implementing Agency |
|---|---|---|---|---|---|---|
| Food for Peace Title II | 1954 | Food for Peace Act (P.L. 83-480) | Agriculture appropriations | E+NE | In-kind | USAID |
| Bill Emerson Humanitarian Trust (BEHT) | 1980[b] | Agricultural Act of 1980 (P.L. 96-494) | Mandatory funding[c] | E | In-kind | USDA |
| Farmer-to-Farmer (Food for Peace Title V) | 1985[d] | Food for Peace Act (P.L. 83-480) | Agriculture appropriations | NE | Technical assistance | USAID |
| Food for Progress | 1985 | Food Security Act of 1985 (P.L. 99-198) | Mandatory funding[c] | NE | In-kind | USDA |
| McGovern-Dole International Food for Education and Child Nutrition | 2002 | Farm Security and Rural Investment Act of 2002 (P.L. 107-171) | Agriculture appropriations | NE | In-kind | USDA |
| Emergency Food Security Program (EFSP) | 2010[e] | Foreign Assistance Act of 1961 (P.L. 87-195) | SFOPS appropriations | E | Market-based | USAID |
| Community Development Fund | 2010 | Foreign Assistance Act of 1961 (P.L. 87-195) | SFOPS appropriations | NE | Market-based | USAID |
| Local and Regional Food Aid Procurement Program | 2014 | Food, Conservation, and Energy Act of 2008 (P.L. 110-246) | Agriculture appropriations | NE | Market-based | USDA |

**Source:** Compiled by CRS.

**Notes:** E = Emergency; NE = Nonemergency; SFOPS = State and Foreign Operations; USAID = U.S. Agency for International Development; USDA = U.S. Department of Agriculture.

a. The laws cited here provide statutory authority for the programs. Congress has reauthorized international food assistance programs by amending these acts, such as through periodic farm bills or the Global Food Security Reauthorization Act (P.L. 115-266).

b. Congress first authorized BEHT in its current form in the Africa: Seeds of Hope Act of 1998 (P.L. 105-385), but authorized its predecessor, the Food Security Wheat Reserve, in the Agricultural Act of 1980 (P.L. 96-494).

c. Authorizing legislation establishes mandatory funding and the borrowing authority of USDA's Commodity Credit Corporation finances program activities.

d.  Congress authorized Farmer-to-Farmer in the Food for Peace Act of 1966 (P.L. 89-808) but did not fund the program until 1985.

e.  USAID first used EFSP in FY2010 based on authority in the FAA. Congress permanently authorized EFSP in the Global Food Security Act of 2016 (P.L. 114-195).

# Author Information

Alyssa R. Casey
Analyst in Agricultural Policy

Emily M. Morgenstern
Analyst in Foreign Assistance and Foreign Policy

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.