**EXHIBIT 47**

**25-cv-469-CJN**

# Where Are We? Snapshot of USAID Workforce



*List of countries serviced can be obtained at talentanalytics.usaid.gov

| 3452 Africa | 1619 Asia | 1020 LAC | 638 E&E | 647 Middle East |
|---|---|---|---|---|

Intermittent USPSCs, OIG and ISCs are included in the totals.

# Workforce by Hiring Mechanism

Estimated total number of staff onboard as of September 30. 2024 – 13,602.



SES are included in the CS|OE totals.

Legend:
- AD, EX
- PASA/Fellows
- CS (PF)
- CSE(PF)
- FSL
- USPSC
- CS (OE)
- FS (OE)
- FSN / CCN

Values: 86, 91, 133, 155, 517, 1,103, 1,652, 1,947, 5,330

EOFY ISC numbers are still being finalized, they are estimated around 2700.

# Interns, Intermittent USPSCs, and FSL OE-funded



66

Total number of Interns onboard



73

Total number of Intermittent USPSCs onboard



1

Total number of FSL OE-funded onboard

Brought to you by HCTM / PPSM/ Workforce Planning Division. For more information, check out the resources on our workforce planning site.

**FOR INTERNAL USE ONLY**

# Snapshot of USAID Workforce by Hiring Mechanism



FSN / TCN (40%)

FS (15%)

CS (13%)

ISC (18%)

USPSC (8%)

FSL (4%)

AD/EX (1%)

CSE (1%)

EOFY ISC numbers are still being finalized, they are estimated at 18% of the current workforce.

**FSN / CCNPSC –** Foreign Service National / Cooperating Country National Personal Service Contractor
**FS –** Foreign Service
**CS –** Civil Service
**CSE –** Civil Service Excepted
**ISC –** Institutional Support Contractor
**USPSC –** U.S. Personal Services Contractor
**FSL –** Foreign Service Limited
**AD –** Administratively Determined
**EX –** Expert
**TCN –** Third Country National

Institutional Support Contractor data is an estimate of the total number of ISC's onboard.
Brought to you by HCTM /PPSM Workforce Planning Division.
For more information, check out the resources on our workforce planning site .
**FOR INTERNAL USE ONLY**

# Who Are We? Snapshot of USAID's Civil Service Workforce



## Workforce by Grade

The USAID Civil Service Grade distribution is as follows: Grades 3-11 are 6%; Grade 12 is 7%; Grade 13 is 21%; Grade 14 is the largest at 37%; Grade 15 is 26%; and SES is 3%.

## Retirement Eligibility



The percentage of the Civil Service workforce eligible for retirement in 2024 is 9%. 11% of CS staff are eligible for retirement in 2025 and 13% of the Civil Service population are eligible for retirement in 2026.



**24%**

**Supervisor**

The percentage of CS employees that are supervisors as of September 2024.



**76%**

**Non-Supervisor**

The percentage of CS employees that are non-supervisory of September 2024.

Brought to you by HCTM / PPSM/ Workforce Planning Division. For more information, check out the resources on our workforce planning site.

FOR INTERNAL USE ONLY

# Who Are We? Snapshot of USAID's Foreign Service Workforce



## Workforce by Grade

The USAID Foreign Service Grade distribution is as follows: Grade 5 is 1%; Grade 4 is 13%; Grade 3 is the largest group at 29%; Grade 02 is 27%; Grade 1 is 23% and SFS is 7%.

## Retirement Eligibility

The percentage of the Foreign Service workforce eligible for retirement in 2024 is 22%. In 2025 approximately 27% of FS staff are eligible for retirement and 31% of the Foreign Service population are eligible for retirement in 2026.





Filled Foreign Service positions by backstop as of September 2024.

| Backstop | Value |
|---|---|
| 1 | 236 |
| 2 | 264 |
| 3 | 107 |
| 4 | 100 |
| 10 | 78 |
| 11 | 20 |
| 12 | 182 |
| 21 | 91 |
| 25 | 12 |
| 40 | 99 |
| 50 | 164 |
| 60 | 80 |
| 70 | 88 |
| 76 | 175 |
| 85 | 71 |
| 93 | 180 |

Brought to you by HCTM / PPSM/ Workforce Planning Division. For more information, check out the resources on our workforce planning site.
.

**FOR INTERNAL USE ONLY**

# Snapshot of USAID Overseas Workforce



**71% FS**

71% of Foreign Service staff are located overseas



29% of Foreign Service staff are stationed in Washington, DC



**46% USPSC**

46% of USPSC staff are stationed in overseas locations



54% of USPSC staff are located in Washington, D.C.

**2% FSL**

2% of FSL staff are stationed in overseas locations



98% of FSL staff are located in Washington, D.C.

## Operational Expense and Program Funded Percentages

■ PF  ■ OE



The percentage of USAID employees that are operational expense or program funded as of September 2024.

Brought to you by HCTM / PPSM/ Workforce Planning Division. For more information, check out the resources on our workforce planning site.
.

**FOR INTERNAL USE ONLY**

# EXHIBIT 48

**25-cv-469-CJN**



**OFFICE OF INSPECTOR GENERAL**
U.S. Agency for International Development

# Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance
## February 10, 2025

*Advisory Notice*



## Introduction

The United States Agency for International Development Office of Inspector General (USAID OIG), through its investigations and audits, conducts independent oversight of USAID's programs and personnel. Our oversight work includes reviews of the Agency's controls over its humanitarian assistance funding. For example, in July 2024, we published a report identifying shortcomings and vulnerabilities in USAID's oversight mechanisms to prevent diversion of aid to U.S.-designated terrorist organizations in Gaza. Similarly, in late January 2025, we issued a memorandum highlighting challenges and potential "fixes" to ensure enhanced accountability of foreign assistance funding, including humanitarian assistance programs funded by USAID but implemented by United Nations agencies.

In this alert, we identify risks and challenges to the safeguarding and distribution of USAID's $8.2 billion in obligated but undisbursed humanitarian assistance funds following (1) the Department of State's pause on foreign assistance programs and (2) subsequent personnel actions by USAID that have substantially reduced the operational capacity of its Bureau of Humanitarian Assistance (BHA).

## Background

On January 24, 2025, the Secretary of State ordered a pause in all new obligations of foreign assistance funding pending an 85-day review of United States foreign assistance programs.[1] The Secretary additionally ordered contracting and grant officers to issue stop-work orders for all existing foreign assistance awards.[2] As such, all USAID programs were suspended, including those with funds already obligated and disbursed.[3]

The Secretary's January 24 order contained an initial waiver for "emergency food assistance." Four days later, the Secretary issued a waiver for disbursements under existing "lifesaving humanitarian assistance" programs, defined as "life-saving medicine, medical services, food, shelter, and subsistence assistance, as well as supplies and reasonable administrative costs as necessary." USAID guidance on implementation of the pause and subsequent waivers also included a directive for staff to refrain from external communications outside of "communications necessary to implement the pause."[4] Moreover, Agency officials' plans to place more than 90 percent of the USAID workforce on paid administrative leave effective February 9 were paused for at least a week by a court order issued on February 7.[5]

---

[1] 25 STATE 6828. The Secretary of State issued this order consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid.

[2] 25 STATE 6828.

[3] Pre-existing programs falling under a waiver were eligible for payments; however, USAID staff and implementers state that the uncertainty and lack of communication surrounding the scope of the waivers has caused payment delays and decisions by aid organizations to suspend work.

[4] "Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," FAQs from Acting Administrator Jason Gray, USAID, January 26, 2025.

[5] "Update on the Path Forward," Office of the Administrator, USAID, February 8, 2025.

This alert is intended to raise risk-related concerns related to USAID-funded humanitarian assistance and is based on information provided by USAID staff, implementers, government officials, and prior OIG oversight work. In producing this alert, we followed Quality Standards as required by the Council of the Inspectors General on Integrity and Efficiency.

## Personnel Actions Reduce the Operational Capacity of USAID Staff Responsible for Humanitarian Assistance Programs

USAID employs approximately 10,000 staff, with approximately two-thirds posted at the Agency's more than 60 missions overseas.[6] BHA is the Agency bureau responsible for providing humanitarian assistance—including food, water, shelter, emergency healthcare, sanitation and hygiene, and critical nutrition services. According to BHA, prior to the personnel actions over the past 2 weeks, the bureau employed approximately 1,089 staff: 741 U.S. Direct Hires and Personal Services Contractors (197 posted overseas with the remaining 544 posted in Washington, DC), and 348 Institutional Support Contractors who, while employed by private contractors, essentially function like regular staff.

On February 4, 2025, USAID notified its entire workforce that they would be placed on paid administrative leave beginning February 8 with limited exceptions. At the same time, BHA staff began reporting sudden loss of access to USAID email and information technology (IT) systems. On February 7, based on disabled user account information, BHA leadership identified approximately 535 Direct Hires and Personal Service Contractors who had been placed on administrative leave but expected the number of sidelined staff to increase to just over 600 later that day. Hundreds of BHA's Institutional Support Contractors were furloughed the week before by their private employer. Collectively, executed and planned personnel actions would remove, temporarily or permanently, approximately 90 percent of BHA's worldwide workforce.

Existing waivers issued by the Department of State account for lifesaving humanitarian assistance programming should allow the flow of what BHA identifies as $8.2 billion in undisbursed obligations. However, BHA staff reductions, together with a lack of clarity about the scope of the humanitarian assistance waivers and the extent of permissible communications between BHA staff and its implementers, has significantly impacted USAID's capacity to disburse and safeguard its humanitarian assistance programming. Specifically, USAID's existing oversight controls—albeit with previously identified shortcomings[7]—are now largely nonoperational given these recent directives and personnel actions. Moreover, the February 7 court order that paused additional staff reductions[8] does not obviate, at this time, concerns regarding the capacity of BHA staff to work with implementing partners to protect and distribute humanitarian assistance commodities and conduct vital oversight of taxpayer-funded programs.

---

[6] Congressional Research Service, "U.S. Agency for International Development: An Overview," January 6, 2025. USAID FY 2022 Agency Financial Report,

[7] USAID OIG, Assessment of USAID's Oversight Policies to Prevent the Diversion of Assistance to Hamas and Other Terrorist Organizations," July 25, 2024. USAID OIG, "Memorandum: Challenges to Accountability and Transparency Within USAID-Funded Programs," January 28, 2025.

[8] *American Foreign Service Association v. Donald Trump*, Civil Action No. 1:25-cv-352 (D.D.C. February 7, 2025) (granting temporary restraining order).

## Disruptions to the Delivery of Humanitarian Aid Place U.S.-Funded Commodities at Risk of Diversion and Spoilage

While initial guidance following the pause in foreign assistance funding provided a waiver for emergency food assistance, shipments of in-kind food assistance have been delayed around the world. USAID-funded implementers face conflicting instructions, and USAID staff express concerns about potentially circumventing the restrictions on external communications by providing clarifying guidance. According to USAID staff, this uncertainty put more than $489 million of food assistance at ports, in transit, and in warehouses at risk of spoilage, unanticipated storage needs, and diversion. As a routine matter, USAID pre-positions emergency food aid in BHA warehouses around the world, including approximately 29,000 metric tons in Houston, Texas, valued at nearly $39 million, more than 40,000 metric tons in a warehouse in Djibouti in East Africa valued at $40 million, and over 10,000 metric tons in a South African warehouse valued at $10 million. All BHA warehouses have pre-positioned emergency food aid commodities supplied by U.S. manufacturers and American farmers, as required by law.

Moreover, USAID staff identified over 500,000 additional metric tons of food currently at sea or ready to be shipped. The food is sourced from American farmers pursuant to Title II Food for Peace (the longest standing permanent program for international in-kind food aid, administered by USAID) and Commodity Credit Corporation (CCC) funding. Because this funding source was not included under the Secretary's emergency food assistance waiver,[9] these commodities were held in limbo, subjecting them to spoilage, unanticipated storage needs, and potential diversion.

## Recent Directives Have Curtailed USAID's Ability to Vet Humanitarian Assistance Awards for Potential Terrorist Ties and Monitor Aid Deliveries in High-Risk Environments

The pause in funding and reductions in staff, including over 90 percent of BHA's workforce furloughed or placed on administrative leave, has undermined two key oversight mechanisms to ensure accountability over humanitarian assistance funding: partner vetting and third-party monitoring.

### Partner Vetting

USAID describes partner vetting as a risk-mitigation tool to "ensure that American taxpayer funds do not benefit terrorists and their supporters." Currently, partner vetting is required for programming in Afghanistan, Iraq, Lebanon, Pakistan, Syria, West Bank/Gaza, and Yemen where designated terrorist organizations such as Hamas, Hezbollah, ISIS, and Ansar Allah (also known as the Houthis) operate. Before the Agency awards a contract, grant, or cooperative agreement in these locations, the proposed awardee must submit to USAID data needed to vet the organization and its key personnel. The same vetting must be undertaken before an aid

---

[9] Reports indicate that food assistance under Title II programs has recently resumed. See U.S. Department of Agriculture, "USDA Global Food Security Programs Continue" (press release), February 7, 2025; Senator Jerry Moran's post on X, February 8, 2025; World Food Programme post on X, February 9, 2025.

organization issues a subaward. While USAID OIG has previously identified gaps in the scope of partner vetting,[10] USAID staff have reported that the counter-terrorism vetting unit supporting humanitarian assistance programming has in recent days been told not to report to work (because staff have been furloughed or placed on administrative leave) and thus cannot conduct *any* partner vetting. This gap leaves USAID susceptible to inadvertently funding entities or salaries of individuals associated with U.S.-designated terrorist organizations.

### Third-Party Monitors

Third-party monitoring[11] (TPM) is a mechanism USAID utilizes for oversight of humanitarian assistance programs, particularly in dangerous locations where its staff cannot safely travel. Site visits conducted by USAID-contracted TPMs help USAID verify if the delivery of physical goods align with self-reporting by aid organizations. TPM field monitors conduct simple, standardized surveys and interviews with recipients to check if USAID programming was delivered as intended. The January 24 pause on foreign assistance programming suspended all TPM contracts and activities, including in high-risk environments such as Ukraine, Afghanistan, Ethiopia, Haiti, Gaza, Iraq, Lebanon, Somalia, Syria, and Venezuela, impacting another layer of oversight over U.S. taxpayer-provided aid.

## Staff Reductions Have Constrained USAID's Ability to Receive and Respond to Allegations of Misconduct Involving Humanitarian Assistance Programming

The Secretary of State granted waivers for emergency food assistance and lifesaving humanitarian assistance. However, uncertainties about the scope of the waivers, the degree of permissible communication between USAID staff and aid organizations, the sudden dismissal of contract staff, and the placement of staff on paid administrative leave has limited BHA's ability to receive and respond to allegations of fraud, waste, abuse, or diversion of humanitarian aid.

As noted in our July 2024 advisory, USAID relies on aid organizations to self-report allegations of misconduct, consistent with their mandatory award obligations. Such mandatory reporting—particularly in nonpermissive environments such as Gaza and Ukraine where USAID's ability to travel to program sites is limited—enables USAID to take remedial measures to modify or in some cases terminate programming experiencing unacceptable losses. For example, in 2023 a USAID-funded nongovernmental organization (NGO) reported to USAID that food intended for families in the al-Hol displaced persons camp in northeast Syria had been diverted by the Asayish (Internal Security Forces of North and East Syria) and al-Hol camp administration to themselves. In response to this disclosure, USAID disallowed the relevant costs submitted by the NGO and undertook additional remedial measures to protect programming in Syria.

Further, USAID OIG has previously reported that USAID-funded commodities, supplies, and equipment in high-risk environments are susceptible to diversion to terrorist organizations,

---

[10] In July 2024, USAID OIG issued an advisory that identified the lack of vetting of UN agencies as a major vulnerability in USAID's partner vetting program.

[11] TPM includes the systematic collection of performance monitoring data by a contractor that has not been directly involved in the activity being monitored, either as a prime or subawardee.

such as Hamas. Over the past 2 weeks, staffing shortages and limitations on communications with aid organizations stemming from the cessation of U.S. foreign assistance have limited USAID's ability to receive, react to, and report allegations of diversion, all of which impacts the Agency's mandatory reporting obligations to Congress.[12] Additionally, according to BHA staff, the placement of most of its staff on administrative leave is preventing the bureau from responding to USAID OIG audit requests, reports of investigative findings, and other routine OIG oversight inquiries.

## Conclusion

USAID OIG's independent oversight of USAID's humanitarian assistance programs over the years has identified significant challenges and offered recommendations to improve Agency programming to prevent fraud, waste, and abuse. Our longstanding concerns about existing USAID oversight mechanisms persist. However, recent widespread staffing reductions across the Agency, particularly within BHA, coupled with uncertainty about the scope of foreign assistance waivers and permissible communications with implementers, has degraded USAID's ability to distribute and safeguard taxpayer-funded humanitarian assistance.

For more information on USAID OIG's work or to report allegations of fraud, waste, corruption, and abuse, please visit our website at oig.usaid.gov.

*On the cover:* USAID pallets with emergency food bars for Syrian refugees. Courtesy World Food Programme, 2013.

---

[12] Section 7015(j), P.L. 118-47, Further Consolidated Appropriations Act, 2024: "The Secretary of State and USAID Administrator, as applicable, shall promptly inform the appropriate congressional committees of each instance in which funds appropriated by this Act for assistance have been diverted or destroyed, to include the type and amount of assistance, a description of the incident and parties involved, and an explanation of the response of the Department of State or USAID, as appropriate."

# EXHIBIT 49

**25-cv-469-CJN**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ALLIANCE FOR RETIRED
AMERICANS, *et al.*,

                Plaintiffs,

      v.

SCOTT BESSENT, in his official capacity
as the Secretary of the Treasury, *et al.*,

                Defendants.

Civil Action No. 25-0313 (CKK)

I, Daniel Katz, declare under penalty of perjury:

1. I am the Chief of Staff of the Department of the Treasury (Treasury), and I have served in this role since January 20, 2025. I am a non-career appointee, reporting directly to the Secretary. In this role, I am the primary aide to the Secretary responsible for exercising supervision over the Deputy Chiefs of Staff, Executive Secretary, Director of Scheduling, and other officials and offices within the Office of the Chief of Staff. I am also currently performing the delegable duties of the Deputy Secretary, which were delegated to me on February 6, 2025, pending the confirmation of the nominee for Deputy Secretary.

2. I am familiar with the claims asserted against Treasury in the above-captioned action regarding the granting of access to systems maintained by the Bureau of the Fiscal Service to employees implementing Executive Order 14,158. Based on personal knowledge and information provided to me in the course of my official duties, I provide this declaration in support of the Defendants' Response to Plaintiffs' Objections to the Designation of the Administrative Record.

3. Supplemental AR Tab 1, Supp_25-cv-00313_DDC_UST_0001 contains a true and correct copy of a January 8, 2025, email from Jonathan Greenstein, who led the Trump Administration's Treasury Department Agency Review Team, to Treasury officials and other members of the Treasury Agency Review Team requesting that Thomas Krause (Krause) be included on the "day 1 team, to lead on Fiscal Services modernization efforts."

4. The Preliminary Work Plan produced in Treasury's administrative record at 25-cv-00313-DDC_UST_0060 was drafted by Krause, with input from me, and sent to senior Treasury officials.

5. Supplemental AR Tab 2, Supp_25-cv-00313_DDC_UST_0002 contains true and correct copies of Incident Detail tickets that set forth various IT steps taken to grant PAM, SPS, and CARS database access to Marko Elez (Elez).

6. Supplemental AR Tab 3, Supp_25-cv-00313_DDC_UST_0014 reproduces a copy of the document included in Treasury's administrative record at 25-cv-00313-DDC_UST_0063 with certain redactions lifted.

7. I reviewed the PST file of the 12:15 PM email bates stamped 25-cv-00313-DDC_UST_0066. I have confirmed that Elez sent this email from his "@treasury.gov" email address to his "@fiscal.treasury.gov" email address.

8. I reviewed the plaintiffs' March 11, 2025 Objections to the Designation of the Administrative Record (Plaintiffs' Objections), as well as the Court's March 13, 2025 order (March 13 Order) in this case.

9. A news article cited in Plaintiffs' Objections, at pages 4-5, references a "risk assessment" document created by a subcontractor. I confirm that that "risk assessment" document was not

considered by Treasury as part of the decision to grant access to BFS systems and therefore is

not properly part of the administrative record.

10. I have specifically reviewed Plaintiffs' Objections at pages 5-6 (paragraph 2) and the related

portions of the March 13 Order, and I confirm that the administrative record is already

complete and that Treasury did not consider or rely on any other non-privileged materials

leading up to its decision to grant access systems maintained by the Bureau of the Fiscal

Service to employees implementing Executive Order 14,158.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 3/11 / 25                    Signed: _____

Daniel Katz
Chief of Staff
U.S. Department of the Treasury

3

# Supplemental AR Tab 1

| From: | Jonathan Greenstein (Volunteer) |
|---|---|
| To: | TreasuryExecutiveResources; Michael Friedman |
| Cc: | ███████████; Hampton, Ravin; ███████ |
| Subject: | RE: [EXTERNAL] White House Liaison - Meet and Greet |
| Date: | Thursday, January 9, 2025 1:21:43 PM |
| Attachments: | Tom_Krause.pdf |

** **Caution:** External email from: [**JonathanG.Volunteer@47transition.com**] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

CONFIDENTIAL / SUBJECT TO PRESIDENTIAL MOU

███████████████████████████████████████████████████████

**From:** Jonathan Greenstein (Volunteer)
**Sent:** Wednesday, January 8, 2025 10:42 PM
**To:** TreasuryExecutiveResources@treasury.gov; Michael Friedman <michaelf@47transition.com>; David Eisner (Volunteer) <DavidE.Volunteer@47transition.com>
**Cc:** ████████████ @treasury.gov; Ravin.Hampton@treasury.gov; ████████ @treasury.gov
**Subject:** RE: [EXTERNAL] White House Liaison - Meet and Greet

CONFIDENTIAL / SUBJECT TO PRESIDENTIAL MOU

Sherri and Kim –

Please find attached and below the contact information of another member we would like to have on the day 1 team, to lead on Fiscal Services modernization efforts. Resume attached. Happy to discuss on the call tomorrow at 1pm ET.

- Tom Krause ████████████████

Jonathan

Supp_25-cv-00313_DDC_UST_0001

# EXHIBIT 50

**25-cv-469-CJN**

| | |
|---|---|
| **From:** | Matthew.Garber2@treasury.gov |
| **To:** | Timothy E. Gribben |
| **Cc:** | Matthew J. Miller; Susan Robinson; Lillian Cheng; Joseph Gioeli III; Nathaniel Reboja |
| **Subject:** | Confirmation to Proceed |
| **Date:** | Sunday, January 26, 2025 5:42:08 PM |

---

<div style="background:#0061A0;color:#fff;text-align:center">This message was sent securely using Zix®</div>

Tim,

Please consider this note your approval/direction to move forward with the process outlined below.

Thanks to the DDM and ISS teams for actioning against the request over the weekend.

Matt

---

**From:** Katz, Daniel <Daniel.Katz@treasury.gov>
**Sent:** Sunday, January 26, 2025 6:34 PM
**To:** Garber, Matthew <Matthew.Garber2@treasury.gov>

Thanks Matt for actioning this so quickly. The below process looks good and appropriate to me.  Let me know if you need any help getting State working with this protocol - I'm happy to reach out to them again.

Appreciate the work over the weekend as well.

Dan Katz

███████████

---

**From:** Garber, Matthew <Matthew.Garber2@treasury.gov>
**Sent:** Sunday, January 26, 2025 4:31:02 PM
**To:** Katz, Daniel <Daniel.Katz@treasury.gov>

Dan,

We've successfully set up the technical and process adjustments at Fiscal to support this request within the appropriate bounds.  A reminder of the process we discussed and will execute against beginning Monday:

- **Fiscal will intercept USAID payments files prior to ingestion into our PAM/SPS systems** *(this is in place now and can begin immediately)*
    - We developed a process to intercept the file, and additional flags to ensure we catch all USAID payment requests through our systems
    - Fiscal will manually pull an unredacted and unmodified copy to share with State officials
    - Individual ITS payment requests will be flagged and shared for review as needed

- ○ <u>NOTE</u>: Fiscal will not provide any preliminary review or determination on the payments, and will not edit or modify the file at any point in this process
- **Fiscal will deliver the USAID payment file to the designated State officials for review**
  - ○ Fiscal has set up a secure portal where the designated officials will be able to access the files *(this will have encryption and MFA, and has completed third party pen testing)*
  - ○ We developed a user guide and instructions to support State officials in using the portal
    - ▪ We can provide additional technical support as needed
  - ○ We will deliver the file once-a-day according to the normal USAID payment schedule
- **State officials will review and provide a determination to Fiscal on whether or not to release the file into our normal payment processes**
  - ○ We will provide a template for State officials to provide the determination back to Fiscal
  - ○ Files that are determined by State as able to move forward will be released by Fiscal into PAM/SPS or ITS systems
  - ○ Files that are determined by State as unable to move forward will be returned to USAID for correction
    - ▪ *State will work directly with USAID to provide any necessary corrections prior to resubmission.*
- **Payment files that are cleared by State and released into our normal payment processes will continue to be certified by USAID certifying officers prior to payment**


While we will begin intercepting the USAID files prior to ingestion immediately on Monday, we will not transmit files to State until **we receive confirmation from the appropriate security officers (likely in the CIO office) that:**

- ○ the individuals at State accessing and reviewing the information have the appropriate clearances, etc
- ○ the necessary data security methods are in place at State and those standards have been communicated and agreed to by the individuals accessing the files
- ○ <u>NOTE:</u> We are still working to connect with the appropriate IT/Security/Technical individuals at State, which we believe will happen as soon as Monday morning.

<u>Additional note:</u>
- As mentioned, these files are mixed and contain a variety of payments. We recommend State ensures they can review these files and provide a determination <u>same-day</u> to avoid any unintended downstream issues.


Please confirm we are still good to execute this plan beginning Monday. Happy to hop on a call if needed.

Thanks,

Matt

| From: | Personnel Security Team |
|-------|-------------------------|
| To: | Iraheta, Oscar; ███████@gmail.com; Satcher, Eva |
| Cc: | SecurityPrograms; Security Support; Mencl, Kari; Daque, Jaimie; Macey, Christopher |
| Subject: | Final Adjudication Approval [Krause, Thomas, Federal Employee, Initial-New Hire] |
| Date: | Tuesday, January 21, 2025 12:00:27 PM |

Greetings,

Your background investigation has been favorably adjudicated for 4N - Special Sensitive/4 - SCI Intel Community Directive 704 pursuant to the Department of the Treasury Security Manual, Treasury Directive P 15-71, Chapter II, Personnel Security Investigations for Federal Employees, Contractors, Subcontractors, Experts, Consultants and Paid / Unpaid Interns.

On 01-21-2025, you were found eligible for employment by the Department of the Treasury. Should you require additional security briefings, you will be contacted by ████████ @treasury.gov, otherwise there is no further action required on your part.

Thank you,

Office of Security Programs
Office of Intelligence and Analysis
U.S. Department of the Treasury

Unsubscribe | Notification Preferences
Ref:MSG5499350_MSU2SCm0vLSskInPT1Hl

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

**To**:        Tom Krause
              ███████@gmail.com

**From**:      ███████████

**Date**:      1/10/25

**Subject**:   Potential Hire Vetting Checklist[1]

---

Please respond to the questions below.  Indent your response as a sub-bullet or change the text color to signal your response.

1.  Do you (as applicable, or your spouse, minor child, or general partner) hold significant financial investments in the financial services industry (e.g., J.P. Morgan Chase common stock or stock in a sector fund concentrating in the financial industry); or in the software sector?  Also, do you (as applicable, or your spouse, minor child, or general partner) hold investments in companies that contract with the government?
    o   If yes, is there a willingness/ability to divest if necessary

    Attached is a list of my equity holdings based on GICS classifications for Financials (includes banks, capital markets firms, consumer finance, insurance, and asset managers), Software, and Aerospace & Defense (which is the closest approximation among the GICS classifications for "companies that contract with the government").  I would be willing and able to divest any of these holdings if necessary.

    I also have a ████ commitment as a Limited Partner (LP) in GTM Fund, a software venture capital fund, but have no control or discretion over it.  It would be a challenge to divest myself of that commitment.

    Finally, I have stock options in my current employer, Cloud Software Group (www.cloud.com), which sells products to commercial and government users.

    Note that these investments are held by me directly or in trust where I am either grantor, trustee, or beneficiary.

2.  Do you currently hold any investments that restrict your ability to divest of the holding (e.g., hedge funds, private equity holdings, stock options, other plans that do not allow divestiture or trust arrangements that cannot be exited)?

---

[1] PLEASE NOTE:  This checklist contains broad parameters that may be used as one helpful tool in an initial vetting process.  If a potential candidate answers "yes" to any of these questions, it does NOT necessarily mean they have unalterable conflicts and cannot be hired to work for Treasury.  It only means that an ethics official should be consulted concerning the possibility of a conflict.

In addition to GTM Fund and my stock options in Cloud Software Group described above, I am a minority shareholder or LP – with no control or discretion – in the following private investments which would also be challenging to divest:

Private Equity
- ███ commitment to Vista Capital Solution Fund LP (Private Credit Fund)
- ███ investment in KKR Private Equity Conglomerate LLC (Private Equity)

Private Credit
- ███ investment in Blackstone Private Credit (Private Credit Fund)
- ███ investment in Apollo Debt Solutions (Private Credit Fund)

Private Real Estate
- ███ investment in Blackstone Private Real Estate Investment Trust
- ███ commitment to Bridge Workforce and Affordable Housing II
- ███ investment in Starwood Private Real Estate Investment Trust

Hedge Funds
- ███ investment in Millennium
- ███ investment in Schonfeld Fundamental Equity
- ███ investment in The Children's Investment Fund

Note that these investments are held by me directly or in trust where I am either grantor, trustee, or beneficiary.

3. Do you (or your spouse or minor child) currently own or are you invested in any financial business or business that you would be unable or unwilling to divest?

See responses above.

4. Were you employed by or a consultant to a financial services entity the past year?

I have a consulting contract with Elliott Investment Management – an alternative investment manager – to provide advice regarding software/technology investments.

5. Does your current employment, or did your employment within the last year, result in the representation of any financial services firms?

No

6. (If applicable) Does your spouse and/or dependent child work for a financial institution; a financial services firm; or represent clients who do?

No

25-cv-00313_DDC_UST_0046

7. Does any other member of your household (adult children, significant other, and housemates) work for a company in the financial sector or represent clients in the financial sector (e.g., as a lawyer or accountant for J.P. Morgan Chase)?

   No

8. Do any close relatives work for a company that contracts with the financial sector or represent clients in the financial sector?

   No

9. Are you currently seeking a business, contractual, or other financial relationship (other than a routine commercial transaction) with an entity in the financial sector?

   No

10. Are you currently the party to any book contract or teaching or speaking agreement?

    No

11. Are you an active participant in any organization that has significant involvement with the financial sector?

    No

12. Are you a member of the board of directors of any organization?

    Yes.  In addition to being CEO of Cloud Software Group, I am a member of the company's board of directors.

3

25-cv-00313_DDC_UST_0047

 **Bureau of the Fiscal Service** | Payment Process Engagement - Kansas City Site Visit
January 2025

| | |
|---|---|
| **MEETING** | Payment Process Engagement – Kansas City Site Visit |
| **DATE/TIME** | Tuesday January 28 – Thursday January 30, 2025 |
| **LOCATION** | **Fiscal Service Kansas City:** 4241 NE 34th Street Kansas City, MO 64117<br>**Point of Contact**: Joe Gioeli, ▮▮▮▮▮ |
| **PARTICIPANTS** | Fiscal Service, Federal Reserve, SAIC, and Treasury organization personnel are participating. Final list of names to be added next week. |
| **PURPOSE** | As part of the ongoing Payment Process Engagement, conduct in-person technical and user deep dive sessions with applicable support teams. This agenda is designed to provide some general structure so that we can plan accordingly but can and will be **adjusted as needed** to ensure we address questions and associated conversations. |

| TIME | TOPIC | PARTICIPANTS(S) | NOTES |
|---|---|---|---|
| *Monday January 27, 2025– All Times CT* | | | |
| *Travel to Kansas City* | | | |
| *Tuesday January 28, 2025 – All Times CT* | | | |
| *9:00am CT* | **Arrive at Fiscal Service KC facility** | | Call Joe Gioeli upon arrival (Backup: Susan Robinson) |
| *9:05am – 9:30am* | **Tom & Joe Daily Sync (Tom)**<br>**IT Appointment for BFS GFE (Marko)** | Fiscal Service, Treasury | |
| *9:30am-10:00am* | **Meet and Greet with BFS Payments team** | Fiscal Service, Treasury | |
| *10:00am-10:30am* | **Tour of Check Printing Operations** | Fiscal Service, Treasury | |
| *10:30am-12:00pm* | **SPS Deep Dive and Demo** | Fiscal Service, Treasury, SAIC | |
| *12:00pm-1:00pm* | *Lunch Break (to be ordered in; please use supplied Order Form)* | | |
| *1:00pm-2:30pm* | **PAM Deep Dive and Demo** | Fiscal Service, Treasury | |
| *2:30pm-3:30pm* | **ASAP Deep Dive and Demo** | Fiscal Service, Treasury | |
| *3:30pm-4:00pm* | **Next Steps & Closing** | Fiscal Service, Treasury | |
| *Wednesday, January 29, 2025 – All Times CT* | | | |
| *9:00am CT* | **Arrive at Fiscal Service KC facility** | | Call Joe Gioeli upon arrival (Backup: Susan Robinson) |
| *9:05am-9:30am* | **Meet and Greet with FRB leadership team** | Fiscal Service, Treasury, FRB | |
| *9:30am-10:30am* | **PAM Product Team** – technical discussion | Fiscal Service, Treasury, FRB | |
| *10:30am-10:45am* | *Break* | | |
| *10:45am-11:45am* | **ASAP Product Team –** technical discussion | Fiscal Service, Treasury, FRB | |
| *11:45am-12:00pm* | **Next Steps & Closing** | Fiscal Service, Treasury, FRB | |
| *12:00pm-1:30pm* | *Lunch Break* | | |
| *1:30pm-3:30pm* | **Additional Follow ups/Discussions as needed;** Plan for Thursday if needed | Fiscal Service, Treasury | |
| *3:30pm-4:00pm* | **Next Steps & Closing** | Fiscal Service, Treasury | |
| *Thursday, January 30, 2025 – All Times CT* | | | |
| *Buffer for any remaining necessary conversations* | | | |

 **US Department of the Treasury | Fiscal Service |** Payment Process Engagement Plan
January 24, 2025

Fiscal Service is supporting the USDS/DOGE team during their 4–6-week engagement to understand payment processes and opportunities to advance payment integrity and fraud reduction goals.

Given the Fiscal Service's authorities and role in enabling federal government financial operations, we must engage in a way that is secure and minimizes the likelihood of disruptions to ensure daily operations occur seamlessly.  This is especially critical for those operations that support the facilitation of the 2025 tax season and the Debt Issuance Suspension Period. Disruptive impacts to technical operations, especially to payment systems such as the Payment Automation Manager (PAM) and Secure Payment System (SPS), could have catastrophic consequences that can range from debilitating U.S. economic security (and necessitating increases to the debt ceiling and defaults on U.S. Government financial obligations), endangering U.S. interests abroad, jeopardizing the delivery of lifeline payments to millions of constituents, and delaying or denying access to thousands of federal agency assets which would all erode public confidence. As such, ensuring operational excellence and resiliency remains the top priority for the Fiscal Service.

So that we can streamline communication, ensure clarity and alignment, and achieve the most optimal outcome for all parties, we have outlined our expectations for the duration of this engagement below.

## ENGAGEMENT SCOPE

**Objective**: Gain insight on money-in/money-out through the Fiscal Service payment systems while identifying efficiencies in the overall payment flow

**Timeframe:** 4-6 weeks

**Focus Area**: Payment Processing, to include Payment Automation Manager (PAM), Secure Payment System (SPS), and Automated Standard Application for Payments (ASAP)

**Deliverable**: Report to the Secretary of the Treasury outlining recommendations for greater efficiencies and potential improvements to the existing payment processes and associated technology and policies in support of payment integrity and fraud prevention.

**Key Points of Contact:**

- **Treasury Department**: Matt Garber, PDO Fiscal Assistant Secretary
- **Bureau of the Fiscal Service:** Joe Gioeli, Deputy Commissioner for Transformation and Modernization

## ENGAGEMENT PROCESS

- **Central Management and Coordination with Treasury**: Matt Garber will serve as the Departmental executive point of contact to provide policy insights, and oversight/guidance of the Fiscal Service engagement. Joe Gioeli will serve as the main point of contact for information related to Fiscal Service systems, organizational structure, and business processes.  Together, they will ensure Fiscal Service is being responsive within the bounds

1

 **US Department of the Treasury | Fiscal Service |** Payment Process Engagement Plan
January 24, 2025

of the law, Treasury policy, and Fiscal Service security protocols. All requests will be prioritized, actioned as quickly as feasible, and centrally managed and tracked accordingly. Preferably, requests should be sent via email to joseph.gioeli@fiscal.treasury.gov.

- **Status Meetings**: A meeting cadence will be established for the duration of the effort for a minimum of at least once per week and will include Tom Krause, Matt Garber, Joe Gioeli and other relevant stakeholder parties to ensure requests are being addressed. Additionally, a daily standup will be established between Tom Krause and Joe Gioeli to ensure alignment on the prioritization of activities, share status, and to discuss mitigation of any challenges that arise. The frequency of this meeting series can be adjusted based on need.

- **Access to and Management of Pertinent Artifacts**: Access will be granted to pertinent artifacts via a shared folder hosted on the Treasury Enterprise Content Manager (ECM) and permissioned to only necessary individuals. Proper handling of artifacts consistent with their labelling is required. Code will be shared and controlled via an alternate method.

- **Access to and Management of In Scope Systems and Data**: Fiscal Service will provision and issue the designated technical team member with a Fiscal Service laptop (i.e., government furnished equipment (GFE)) during Day 1 (i.e., January 28) of the Week 2 Site Visit to Kansas City. This will accelerate your ability to obtain access to the in-scope systems and code repositories you are seeking while also providing the Fiscal Service with a greater level of assurance that our risk posture is being managed in accordance with our established security protocols and existing control architecture.

- **Adherence to Fiscal Service Security Control Requirements**: To adhere to the Fiscal Service's established security protocols and existing control architecture, below are our required actions (including those already completed as of 1/24/2025).

  1) *Vetting*: Fiscal Service confirmed with the Treasury Department Security office the (2) individuals requesting access have been properly vetted with signed Nondisclosure Agreements (NDAs) and confirmed their access to Treasury and Fiscal Service information.

  2) *Use of FS GFE*: USDS/DOGE confirmed that only (1) individual (i.e., the designated technical team member) requires access to Fiscal Service systems and data at this time. This designated individual will be provisioned to a Fiscal Service provided workstation. The Fiscal Service GFE must be connected to the Fiscal Service VPN network at all times while work is performed with this engagement.

  3) *Data Handling*: Fiscal Service will provide USDS/DOGE safeguarding and handling instructions of Fiscal Service data for the duration of this engagement. USDS/DOGE confirmed Fiscal Service data will not leave the workstation during this engagement and will only be reviewed by cleared and authorized Treasury personnel.

  4) *System Access*: USDS/DOGE will be provided access to in scope payment systems source code via a secure code repository. USDS/DOGE will be provided Development access to the in scope payment systems. Any recommended changes to the payments source code will be appropriately tested by security and change management controls per Fiscal Service processes and procedures.

25-cv-00313_DDC_UST_0058



**US Department of the Treasury | Fiscal Service |** Payment Process Engagement Plan
January 24, 2025

5) ***Payment Processing User Access***: USDS/DOGE requested to be granted "over the shoulder" access to monitor Fiscal Service personnel conducting payment processing roles, which was approved by Fiscal Service on 1/23/25. Any additional system level access (i.e. application end user access and sysadmin privileged access) will be provisioned according to Fiscal Service processes and procedures.

6) ***Attestation***: USDS/DOGE agreed to provide Fiscal Service an attestation statement (template to be provided by the Fiscal Service) at the end of the engagement that confirms:

   a. The provided Fiscal Service information has been properly destroyed.

   b. Confirmation that no known suspicious or unauthorized access to Fiscal Service provided GFE and data occurred during this engagement.

- **Review of Recommendations**: Fiscal Service will be provided the report deliverable, have the opportunity to clarify any technical or process inaccuracies, and provide any necessary policy feedback or context before finalization.

## ENGAGEMENT TIMELINE AND KEY ACTIVITIES

| Week 1<br>*Jan 21-24* | Week 2<br>*Jan 27-31* | Week 3<br>*Feb 3-7* | Week 4<br>*Feb 10-14* | Weeks 5-6<br>*Feb 17-28* |
|---|---|---|---|---|
| ✓ Introductory Meetings<br>✓ Establish Status Meeting(s)<br>✓ Establish shared folder on Treasury ECM | *Meetings in Kansas City, MO*<br>• Issue FS laptop to designated technical team member (1/28)<br>• Conduct technical deep dives and user deep dives | • Address follow-ups identified during deep dives as needed/feasible<br>• Develop report deliverable *(Engagement team)* | • Continue development of report deliverable<br>• Address questions as needed/feasible<br>• Conduct review of recommendations<br>• Complete Attestation activities | • Submit final report |

3

**Preliminary Work Plan for IT Accesses**

GAO has found inconsistent reporting, lack of traceability, and need for improved controls with the Treasury's Cash Accounting Reporting System (CARS). (Link and summary below.) Mandating agencies (via Certifying Officers – COs) to use TAS / BETC for all payments at the time of payment certification as well as requiring COs to provide a short plain English reason why the payment is being requested would dramatically:

1) improve financial reporting auditability, accuracy and transparency
2) reduce the risk of improper payments
3) ensure all payments are supported by an appropriation, receipt, or other fund account

For background, TAS (Treasury Account Symbol) / BETC (Business Event Type Code) (Account Symbol (also known as the Treasury Account Symbol or TAS) | TFX: Treasury Financial Experience) is used to classify financial transactions across all federal government agencies and is the backbone for CARS (Central Accounting Reporting System) Central Accounting Reporting System.  Today, Treasury has three primary payments systems (PAM, ASAP, ITS.gov) that support payments on behalf of ~250 agencies. These payment systems (as well all other payment systems not managed by Treasury) feed into CARS. PAM is the most widely used. Within PAM, there are two types of payments (Type A and Type B). Type A is for high value, low volume and typically uses Fedwire. Type B is lower value, higher volume payments and typically uses ACH. We understand (but have not verified) that COs are required to input the TAS / BETC for every payment except for Type B payments in PAM. As a result, a significant percentage of payments are re-classified by agency CFO organizations in CARS well AFTER payments have been certified and processed. In fact, CARS operators use "default" accounts because they cannot tie many of the payments that BFS processes to an appropriation, receipt, or other fund account at the time of the payment.

System access as well as on-going discussions with subject matter experts are critical to understanding and verifying how these payment and accounting systems work.  Without this, common sense recommendations such as this one as well as detailed plans to implement these recommendations are not possible. My discussions with both the disbursement team in Kansas City as well as the CARS team in Parkersburg, WV suggest this mandate would be widely welcomed by the operating teams at BFS. I would also submit that OMB and the White House would strongly support this mandate. The mandate would require a code change to PAM whereby a submitted payment file would be sent back to the CO prior to processing if the TAS/BETC and the reason for payment are not filled out. Based on initial discussions with the PAM technical team (from the FED KC office), this is a very modest code change and can be executed quickly.

# EXHIBIT 51

**25-cv-469-CJN**

# – 3 –

# Category 3:  Decision to shut down USAID Headquarters on January 31, 2025



**U.S. General Services Administration**

February 7, 2025

Dear Mr. Jackson,

We are contacting you today regarding the following three U.S. Agency for International Development (USAID) occupancies at the Ronald Reagan Building and International Trade Center in Washington, DC:

| OA Number | Building Name | Location | City | State | USF | RSF | Structured Parking |
|-----------|---------------|----------|------|-------|-----|-----|--------------------|
| ADC00178 | Reagan Building FOB | 1300 Pennsylvania Ave NW | Washington | D.C. | 388,418 | 552,788 | 0 |
| ADC07435 | Reagan Building Garage | 1300 Pennsylvania Ave NW | Washington | D.C. | 0 | 0 | 375 |
| ADC00376 | Reagan Building Trade Center | 1300 Pennsylvania Ave NW | Washington | D.C. | 13,033 | 18,549 | 0 |

In accordance with §41 CFR 102-85.75, as of today, February 7, 2025, these occupancies are cancelled and will be repurposed for other government needs. GSA will secure the space today, and coordinate with your agency for the retrieval of any personal property or other belongings that currently remain there.

Your cooperation with this matter is appreciated. If you have any questions, please contact
████████████████████████████

Thank you,

Michael Peters
Commissioner
Public Buildings Service

Cc:
Dr. Deborah Schneider
Office of Operations
Bureau of Administration
U.S. Department of State

# EXHIBIT 52

**25-cv-469-CJN**

# – 4 –

# Category 4: Decision to transfer USAID headquarters to U.S. Customs and Border Protection

## Temporary License to Occupy Government Space

This License Agreement ("License") is entered into on this 7th day of February, 2025, by and between the United States General Services Administration ("GSA"), to be referred to as "Licensor" and U.S Customs and Border Protection ("CBP"), to be referred to as "Licensee."

1. **Premises:**
   GSA hereby grants to the Licensee a non-exclusive right to use and occupy the space located at 1300 Pennsylvania Avenue, NW, Washington, DC. Further defined:

| Building Name | Location | City | State | USF | RSF | Structured Parking |
|---|---|---|---|---|---|---|
| Reagan Building FOB | 1300 Pennsylvania Ave NW | Washington | D.C. | 388,418 | 552,788 | 0 |
| Reagan Building Garage | 1300 Pennsylvania Ave NW | Washington | D.C. | 0 | 0 | 375 |
| Reagan Building Trade Center | 1300 Pennsylvania Ave NW | Washington | D.C. | 13,033 | 18,549 | 0 |

2. **Term:**
   This license shall commence on February 7, 2025, and shall continue for a period of ninety (90) days, ending on May 8, 2025, unless sooner terminated or extended by mutual agreement in writing.

3. **Rent:**
   No rent or other payments shall be due from the Licensee to GSA for the use of the Premises during the term of this License.

4. **Purpose:**
   The Premises shall be used by the Licensee solely for administrative offices and for no other use without the prior written consent of the GSA.

5. **Condition of the Premises:**
   The Licensee accepts the Premises in its current "as-is" condition. No alterations or improvements may be made without GSA's prior written consent.

6. **Negotiations for Permanent Agreement:**
   During the term of this License, GSA and the Licensee agree to negotiate in good faith towards a permanent Occupancy Agreement. This includes, but is not limited to, confirming the exact square footage to be occupied, establishing the rent, and agreeing to all other applicable terms and conditions.

7. **Termination:**
   This license may be terminated by either party upon thirty (30) days written notice. Upon termination, the Licensee shall vacate the Premises and restore it to its original condition, normal wear and tear.

8. **Compliance with Laws:**
   The Licensee shall comply with all applicable federal, state and local laws, regulations, and ordinances during the occupancy of the Premises.

9. **Indemnification:**
   The Licensee shall indemnify, defend, and hold harmless GSA from and against any and all claims, damages, losses, and expenses arising out of or resulting from the Licensee's use or occupancy of the Premises.

10. **No Warranty:**
    GSA makes no warranties, express or implied, regarding the suitability of the Premises for the Licensee's use.

11. **Governing Law:**
    This License shall be governed by the laws of the United States of America.

12. **Entire Agreement:**
    This document constitutes the entire agreement between the parties regarding the subject matter hereof and supersedes all prior or contemporaneous agreements, written or oral.

**IN WITNESS WHEREOF, the parties hereto have executed this License on the date first above written.**

**GSA/Licensor:**

Michael P. Peters
Commissioner, PBS

**CBP/Licensee:**

YVONNE R
MEDINA
Digitally signed by
YVONNE R MEDINA
Date: 2025.02.07 14:29:46
-05'00'

Yvonne R. Medina, Assistant Commissioner
Office of Facilities and Asset Management
U.S. Customs and Border Protection

RYAN L
BRUCE
Digitally signed by
RYAN L BRUCE
Date: 2025.02.07
13:12:07 -06'00'

Ryan L. Bruce, Lease Contracting Officer
Office of Facilities and Asset Management
U.S. Customs and Border Protection

# EXHIBIT 53

**25-cv-469-CJN**

# – 5 –

# Category 5: Decision to take USAID's website offline on February 1, 2025

## USAID.gov is offline



r/g
**G. P. Your**
**Acting Deputy Assistant Administrator for Program Operations/**
**Director of Web Management**
**Bureau of Legislative and Public Affairs (LPA)**
**U. S. Agency for International Development**
**cell**

# EXHIBIT 54

## 25-cv-469-CJN

# – 7 –

# Category 7: Decision to put USAID employees on administrative leave on February 4, 2025



INTERNAL MEMORANDUM | PII SENSITIVE – NOT FOR EXTERNAL DISTRIBUTION

Date:          February 3, 2025

To:            William Malyszka, Chief Human Capital Officer;
               Ken Jackson, Assistant to the Administrator for Management and Resources

From:          Pete Marocco
               Acting Deputy Administrator for Policy and Planning and Acting Deputy
               Administrator for Management and Resources

Subject:       PERSONNEL PLACED ON ADMINISTRATIVE LEAVE

Today, pursuant to ADS 480, I am placing the following 1412 USAID personnel on excused absence (also known as administrative leave) with pay, effective immediately. These personnel will remain on paid administrative leave until otherwise notified.

Accordingly, I am authorizing the restriction of their access to enter any USAID premises, access any USAID systems, or otherwise attempt to use their position or authority with USAID in any way without my prior permission.

Sincerely,

Pete Marocco

| Bureau | Name | Clearance Status |
|---|---|---|
| GSA/A | AID/A | ███████ | Drafted & Clear |
| STATE/F | AID/A | Pete Marocco | Clear |
|  |  |  |
|  |  |  |

1



**Employees Placed on Administrative Leave**

    **A.** **DC-Based Bureau of Democracy, Human Rights and Governance Staff**











**B. DC-Based Bureau for Resilience, Environment and Food Security**























**C. DC-Based Bureau of Management (ex. IT)**

























**D. Management Bureau IT Staff**











**E. Office of Civil Rights & Office of Small and Disadvantaged Business Utilization (Key Staff Remain for Statutory Obligations)**







**F. Bureau of Humanitarian Assistance DC-Based (Ex. Field Operations and Mission-Critical Staff)**















































**G. DC-Based Bureau of Global Health (ex. most of Infectious Disease, some of HIV & Other Mission Critical)**































**H. Executive Secretary**



**I. HTCM**















**J.  OGC**





MEMORANDUM

DATE:          February 4, 2025

FROM:          Pete Marocco
               Acting Deputy Administrator for Policy and Planning and Acting Deputy
               Administrator for Management and Resources

SUBJECT:       PLACEMENT ON ADMINISTRATIVE LEAVE


        The purpose of this memorandum is to inform you that you are being placed on excused
absence (also known as administrative leave) with pay effective immediately, pursuant to ADS
480. You will remain on administrative leave with pay until otherwise notified.

        While you are on administrative leave with pay, you must be available by telephone and
e-mail during normal business hours, as it may be necessary for Agency officials to contact you.
To that end, as soon as possible from your personal email, please email ███████████████
your personal contact information, including your phone number, email and mailing address.

        You also must remain available to report to work if directed to do so. If you wish to
request other leave (annual, sick or leave without pay) during this period, you should contact
me to make your request.

        During the period that you are on administrative leave you are not to enter USAID
premises, access USAID systems, or attempt to use your position or authority with USAID in any
way without my prior permission or prior permission of a supervisor in your chain of command.

        The agency's Staff Care Program is available to you during this time for free, confidential
counseling and assistance. You can obtain assistance by calling 1-877-988-7243. Participation in
this program is voluntary.

        Any questions regarding the above information should be directed to me.

# EXHIBIT 55

**25-cv-469-CJN**

# – 8 –

# Category 8: Decision to put USAID employees on administrative leave on February 7, 2025

**From:**     Marocco, Peter W
**To:**       ███████ (HCTM/AA); ███████ (M/CIO)
**Subject:**  Re: Admin Leave Letters
**Date:**     Tuesday, February 4, 2025 4:47:01 PM

███████ , please issue the administrative leave orders immediately.

Thank you.

Get Outlook for iOS





⬛⬛⬛⬛⬛⬛ @usaid.gov>

---

**The Path Forward**

**USAID Internal Communications** <internalcomms@subscribe.usaid.gov>
To: ⬛⬛ @usaid.gov

Tue, Feb 4, 2025 at 9:04 PM



On Friday, February 7, 2025, at 11:59 p.m. (EST) all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs. Essential personnel expected to continue working will be informed by Agency leadership by Thursday, February 6, at 3:00 p.m. (EST).

For USAID personnel currently posted outside the United States, the Agency, in coordination with missions and the Department of State, is currently preparing a plan, in accordance with all applicable requirements and laws, under which the Agency would arrange and pay for return travel to the United States within 30 days and provide for the termination of PSC and ISC contracts that are not determined to be essential. The Agency will consider case-by-case exceptions and return travel extensions based on personal or family hardship, mobility or safety concerns, or other reasons. For example, the Agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. Further guidance on how to request an exception will be forthcoming.


Thank you for your service.

---

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

This service is provided to you at no charge by United States Agency for International Development.

This email was sent to ███████████ using govDelivery Communications Cloud on behalf of: United States Agency for International Development    1300 Pennsylvania Avenue NW    Washington, DC    20004

**govDELIVERY**

# EXHIBIT 56

**25-cv-469-CJN**

# – 9 –

# Category 9: Decision to terminate certain USAID personal service contractors

**From:** Marocco, Peter W
**To:** ███████ @eop.omb.gov; ████████████ (AID/A); ████████████ (AID/A); ███████
█████████ (M/CIO); ██, ████████████ (M/CIO/ICIO); ███████ (LPA)
**Subject:** FW: Action Memo to Secretary Regarding USAID Personal Services Contractors (JPL 2-2 345pm)
**Date:** Sunday, February 2, 2025 4:21:12 PM

Please immediately execute the comprehensive option of termination of both level of PSC contracts.
Please let me know any additional information you need from me.

████, we will quickly discuss messaging.

SENSITIVE BUT UNCLASSIFIED

**From:** Needham, Michael A ████████ @state.gov>
**Sent:** Sunday, February 2, 2025 4:19 PM
**To:** Marocco, Peter W ████████ @state.gov>; ████████ ██████ @state.gov>; ████
████ ████████ @state.gov>
**Cc:** ████████ (AID/A) ████████ @usaid.gov>; ████████ @gsa.gov
**Subject:** Re: Action Memo to Secretary Regarding USAID Personal Services Contractors (JPL 2-2
345pm)

Approved for both options.

Get Outlook for iOS





United States Department of State

Washington, DC   20520

CLASSIFICATION//SBU                          February 2, 2025

**Action Memo for Secretary of State Rubio, also Performing the Duties and Functions of the Administrator of the U.S. Agency for International Development**

> THROUGH:    STATE/F – Senior Bureau Official and Advisor to the Secretary for Foreign Assistance, Pete Marocco, Office of Foreign Assistance

FROM:          AID/D-PP/D-MR – Performing the Duties and Functions of Deputy Administrator Pete Marocco, U.S. Agency for International Development (USAID)

SUBJECT:       (SBU) Decision to Terminate or Pause all USAID Personal Service Contracts (PSC) in high income and medium income countries.

**(SBU) Recommendation 1:** That you instruct USAID to terminate all Personal Service Contracts (PSC) in *high-income* countries that do not meet a waiverable threshold determined by State F.
(Approve/Disapprove by 02/07/2025)

**Decision:** ☐ **Approve** ☐ **Disapprove** ☐ **Discuss**

**(SBU) Recommendation 2:** That you instruct USAID to terminate all Personal Service Contracts (PSC) in *high-income and medium-income* countries that do not meet a waiverable threshold determined by State F.
(Approve/Disapprove by 02/07/2025)

**Decision:** ☐ **Approve** ☐ **Disapprove** ☐

CLASSIFICATION//SENSITIVE BUT UNCLASSIFIED (SBU)
-2-

## Background

USAID's mandate is to assist primarily in low-income countries and these contracts appear to be inconsistent with the mission of USAID and diverts resources away from helping people progress beyond the need for aid. Pursuant to ADS 309.3.1.20, USAID has the authority to terminate a personal services contract with an individual providing services to USAID for convenience on the basis of changing agency priorities. USAID recommends exercising its authority to terminate these contracts for convenience in this instance, unless after further review, there are compelling reasons to keep these particular contracts active.

(SBU) Option 1 has the financial impact of saving up to **$89,517,116.51** in obligated Funds across approximately 641 affected PSCs, while Option 2 has the financial impact of saving up to **$127,746,565** in obligated funds across approximately 731 affected PSCs. USAID will create a waiver process for USAID staff to request a waiver for each PSC contract that is requested to continue. Those waivers for approved PSCs will be approved by State/F.

(SBU) USAID recommends Option 2.

## Attachment

Tab 1 – Personal Service Contracts (PSC) in high-income and medium-income countries as defined by the World Bank.

CLASSIFICATION//SENSITIVE BUT UNCLASSIFIED (SBU)

Approved: Office of the Administrator – Pete Marocco, Acting Deputy Administrator [PM]

**I confirm** the drafter received guidance on this paper's intent, objectives, topics, scope, and structure.  **X Yes**  ☐  **No**

Drafted:     USAID, AID/A – Kenneth Jackson, ███████ @usaid.gov, ███████, and cell: ███████.

Cleared:

| Bureau | Name | | Clearance Status |
|---|---|---|---|
| AID/A: DCoS | ███████ | | Clear |
| AID/A: CoS | ███████ | | Clear |
| STATE/F | ███████ | | OK |
| USAID/A+L | ███████ | | OK |

2/19/25, 3:50 PM    USAID Mail - For Official Use Only – Termination of Personal Services Contracts

Case 1:25-cv-00469-CJN    Document 89-15    Filed 04/23/25    Page 95 of 96
Case 8:25-cv-00462-TDC    Document 70-9    Filed 03/13/25    Page 6 of 7



## For Official Use Only – Termination of Personal Services Contracts

**Jami Rodgers** <████@usaid.gov>                                                    Wed, Feb 19, 2025 at 3:27 PM
To:



Dear Colleagues,

We have received a list of Personal Services Contracts (PSCs) that have been reviewed and identified for termination by Secretary Rubio. The cited basis for these terminations is that they are inconsistent with the mission of USAID, and divert resources from helping people progress beyond the need for aid.

Pursuant to ADS 309.3.1.20 and the termination clause in each contract, USAID has the authority to terminate a personal services contract with an individual providing services to USAID for convenience on the basis of changing agency priorities. The PSCs are given a 15-day notice that their contract with USAID will be terminated per the terms and conditions of their contract.

Based on this rationale and the stated authorities, we request your support in terminating the PSCs listed on the PSC tracker. We will be sharing individual sheets with each Mission/Bureau with the specific names. Once you have taken the termination action, please note this on **column A of the PSC tracker**.

For your convenience, a PSC termination template is ████████

Please let us know if you have any questions or require further guidance. We request that you complete this action within the next day. Thank you all for your continued support.

Jami

Sensitive But Unclassified (SBU)