# EXHIBIT 87

**25-cv-469-CJN**



# MEMORANDUM

**DATE:**       March 2, 2021

**TO:**         Michele Sumilas, Acting Chief of Staff

**FROM:**       Justin H. Brown, Counselor /s/

**SUBJECT:**    Lessons From USAID's FY 2019 Budget Process Highlight Interagency
                Constraints and Areas that Require Continued Attention

The process of executing the foreign assistance budget is central to USAID's ability to deliver on its mandate and involves many levels of review and steps, some of which occur outside of the Agency. The fiscal year (FY) 2019 foreign assistance budget execution process was particularly challenging, effectively representing a stress test of the system that provides useful lessons for the future. The U.S. Government shutdown in FY 2019 impacted staff availability, and in the final 2 months of FY 2019, the White House Office of Management and Budget (OMB) ordered a temporary freeze on USAID foreign assistance funds while publicly discussing the possibility of a rescission and eventually ordering a reapportionment of funds. As a result, USAID budget execution processes were significantly disrupted, and budget staff reported working considerable amounts of time to respond to related constraints. We noted this in our 2020 Top Management Challenges memo as a leading expression of the challenge USAID faces in reconciling interagency priorities and functions.[1]

After noting this issue in our Top Management Challenges memo and learning of stakeholder interest in the subject, we sought to better understand how USAID managed the process for executing foreign assistance funds and adapted to external factors. We examined USAID's budget execution processes during FY 2019, paying specific attention to Agency adaptations to the reapportionment—which impacted FY 2018 funds that were set to expire—and the FY 2019 653(a) process.[2] This memo provides information on the impact of external parties on USAID's budget process, remaining challenges, and resulting risks to the Agency if proper attention is not given to ensuring that improvements are sustained, particularly during a period

---

[1] USAID OIG, "Top Management Challenges Facing USAID in Fiscal Year 2020," November 20, 2019.
[2] Section 653(a) reports are due to Congress 30 days after an appropriations bill has been enacted and require the President notify Congress of the countries and organizations that will receive foreign assistance funds.

of transition, when priorities and interests may change. The conclusions are based on review of relevant documentation and interviews with USAID and State Department budget staff.

## Many Parts of the Budget Execution Process Are Outside of USAID's Control

USAID has 2 years from the beginning of the fiscal year to obligate the bulk of its congressionally appropriated funding before it expires, but in practice, parts of the process that occur outside of USAID or in coordination with other parts of the U.S. Government substantially limit the time that the Agency has to obligate the funds. Figure 1 shows USAID's budget execution process and the flow of funds.

**Figure 1. Flow of Federal Funds to USAID, From Appropriation to Obligation**



**Appropriation**
Each year, Congress must pass appropriations bills to fund the Federal Government for the next fiscal year. Appropriations are rarely enacted on time.



**Apportionment**
Once Congress passes the budget funds, OMB apportions the amount of funds that the State Department (State) and USAID may use for a given time period, project, or activity.



**653(a) Report to OMB and Congress**
Due 30 days after Congress appropriates funds, this report outlines funding allocations by foreign country and category of assistance. State, in coordination with USAID, makes decisions on how to allocate the funds.



**Allotment**
State and USAID allot funds to bureaus, then pre-obligation requirements are completed and USAID can allow funds to missions.



**Availability**
Funds are made available to USAID program offices, awards are selected, and funds are then obligated into activities.

Note: According to the USAID Office of Budget and Resource Management (BRM), pre-obligation requirements may include: operational plans, country check list requirements, Section 7076(b) spend plans, congressional notifications, consultations with Congress, environmental compliance, terrorism risk-based assessments, Government-to-Government certification, and certification of nontaxation assistance. Mission requirements can include activity-level checklists and amendments to agreements with the host government.
Source: ForeignAssistance.gov, Foreign Assistance Act of 1961, and BRM.

Although the period of availability of funds for obligation begins at the start of the fiscal year, the appropriation of these funds often lags. In FY 2018, appropriations came 174 days after the fiscal year began. In FY 2019, this occurred 138 days after the fiscal year began.

After the President signs the appropriations act, responsibility for executing appropriated funds shifts to the executive branch. OMB apportions funds to both USAID and State's Office of Foreign Assistance (State/F)—a joint office supported by personnel from State and USAID. USAID bureaus then provide allowances to USAID missions. State has the delegated authority to approve the programming of foreign assistance funds; however, State and USAID have shared responsibility for administering certain foreign assistance accounts (for a listing of the accounts for which USAID has responsibility, see the appendix).

Section 653(a) of the Foreign Assistance Act of 1961 requires the President to notify Congress of the countries and organizations that will receive foreign assistance funding. State/F and BRM work to determine 653(a) budget levels for foreign assistance accounts based on a number of variables, including historic funding levels, request levels, technical group recommendations, remaining funds available by sector and the expenditure rate for remaining funds, policy decisions, directives, and administration priorities.

Section 653(a) reports are due to Congress 30 days after an appropriations bill has been enacted. In recent years, 653(a) reports have been issued at a substantially later date. A recent study by the U.S. Government Accountability Office (GAO) noted that 653(a) reports were provided to Congress between 110 and 260 days after the enactment of appropriations from FY 2015 to 2018.[3] In addition, program funds are approved by State through operational plans, which describe how the funds align with country strategies, administration priorities, and congressional directives. According to BRM, USAID must then submit Congressional Notifications for funds not notified through the Congressional Budget Justification or requiring special notification, representing the bulk of its development assistance funding. Congressional Notifications expire 15 days after transmission, barring any holds placed by committees, which can further delay the availability of funds for obligation. Once clear of congressional requirements, OMB apportions funds, specifying the amount of funds that USAID may use according to a time period, program, project, or activity. USAID then takes action to implement programs, projects, or activities to make use of the appropriated funds, ensuring all pre-obligation requirements are met.

USAID typically implements activities through external organizations enlisted through a contract, grant, or cooperative agreement, depending on the type of work, the purpose of the funding, and the nature of the relationship between the Agency and the implementer. After the type of obligating instrument (assistance or contract) is determined and documented, USAID can obligate funds. This process can involve project design, solicitation, selection, and documentation of assistance award decisions in a negotiation memorandum.

USAID had approximately 12 and 11 months remaining of the 2-year period to obligate in FYs 2018 and 2019, respectively, before 2-year funds appropriated for those fiscal years expired. Notwithstanding these time constraints, OIG found that USAID has been successful in

---

[3] GAO, "State Department Should Take Steps to Improve Timeliness of Required Budgetary Reporting," September 9, 2019.

ensuring that very little appropriated funding expires prior to obligation. OIG found that from FY 2010 to 2017, USAID received $28.1 billion in appropriated funds that had statutory expiration between FYs 2016 and 2018. Of this amount, about $5.7 million expired prior to obligation—approximately 0.02 percent over the 3-year period.[4] In FY 2019, USAID reported that less than $400,000 expired. However, historically much of the obligation activity occurred in the last quarter of the fiscal year, with 25-30 percent in September.

During FY 2019, USAID conducted two large-scale budget execution efforts simultaneously: finalizing 653(a) levels for FY 2019 funds for future obligation and finalizing obligation of FY 2018 funds before they expired. The following pages and figure 2 address these concurrent efforts and show how USAID personnel are simultaneously working on the budget process for four different fiscal years.

**Figure 2. USAID's Budget Activities During FY 2019**

| Executing the **FY 2018** Budget | Executing the **FY 2019** Budget | Justifying the **FY 2020** Budget | Formulating the **FY 2021** Budget |
|---|---|---|---|
| • Obligating funds expiring by September 30, 2019 | • Participating in the Strategic Sector Reviews and technical earmark work group<br>• Submitting 653(a) to Congress<br>• Preparing operational plans and congressional notifications | • Defending the President's budget<br>• Testifying at Congressional hearings to justify budget | • Developing the FY 2021 budget request |

Source: OIG analysis of BRM documents.

## Differences on the Direction of Foreign Assistance Programming Complicated Budget Execution

USAID dedicates substantial time and resources to the budget formulation process. This work is based on USAID and State technical recommendations and Administration priorities and can aid in the execution of funds after appropriation.

The budget formulation process culminates with request levels for USAID funding that are consistent with the Administration's priorities. These are, however, sometimes at odds with congressional priorities and levels. In recent years, these differences have been pronounced. The Administration's budget request for State, Foreign Operations accounts for FY 2019, for example, ended up being approximately 22 percent less than the actual appropriation. Such discrepancies require budget staff to modify plans after an appropriation passes. For example, while the Administration did not request any funding for programming to address climate change, Congress applied directives for climate change programming in its appropriation,

---

[4] USAID OIG, "USAID's Use of Appropriated Funds Prior to Expiration and Cancellation," July 27, 2020.

requiring Agency staff to develop plans to fund related activities after the formulation, justification, and appropriation processes had concluded.

In addition, Congress may apply earmarks, or conditions in the appropriation that direct the use of the funds provided. These spending requirements vary in specificity and affect agencies' ability to complete the 653(a) process in a timely fashion. GAO reported that such directives have become more detailed over time in the State, Foreign Operations appropriation, and noted that they are significant in volume, with 668 directives in FY 2017 and 657 in FY 2018. Complexities surrounding the authority to administer funding accounts further complicate the process of applying earmarks. For example, some earmarks apply globally and are met by multiple accounts administered by both State and USAID; in these cases, USAID and State must coordinate closely to ensure that earmark requirements are met.[5]

To ensure that Presidential- and Secretary-level strategy and policy directly inform final resource allocations, State/F developed a strategic sector review process with associated guidance. This guidance outlines three steps: (1) defining leadership initiatives and priorities, (2) holding sector-based roundtables, and (3) developing resulting technical budget recommendations. In FY 2019, roundtable sessions held in October and November generated priorities for countries based on trends and progress toward strategic goals. Meanwhile, November 2018 technical recommendations informed the FY 2019 653(a) process, as well as the budget formulation process for FY 2021. In FY 2018, the plenary and sector-specific roundtables extended from October 23 to November 16, with multiple sessions per day.

Despite this extensive process, USAID staff reported that over time it has become less clear how technical recommendations are considered in the budget allocation process in light of Administration priorities and earmarks. For example, staff said that to meet all directives with available funding, country earmarks must be overlaid with sector earmarks. Technical recommendations provided in many cases must be set aside to meet earmark requirements. USAID staff provided examples where country earmarks conflicted with the Agency's technical recommendations. Staff also noted instances where technical recommendations greatly exceeded countries' 653(a) allocations.

For planning, BRM reported it uses spreadsheets, PowerPoint, and the USAID budget system to track the previous year's 653(a) allocation, technical and regional bureau recommendations, and the current request.[6] The 2019 strategic sector review and resulting technical recommendations for the FY 2020 653(a) allocations for the education sector provide an example of these differences.

BRM data show how some countries' requests match or differ from the technical recommendations. The previous year 653(a) levels for basic education in Jordan and Pakistan were more than double the levels recommended, whereas the 653(a) level for education in

---

[5] For example, the Prevention of Failed States Through Public-Private Partnerships in section 7071(c) was a new $10 million directive that requires State and USAID to submit a joint report to the committees on appropriations prior to the obligation of funds.

[6] For FY 2021, BRM reported development of a new process that allows for automation of data into Tableau to expedite and streamline the review process.

Malawi was less than half the level recommended. Meanwhile, according to USAID staff, overall technical recommendations for Ethiopia were three times greater than 653(a) funding levels.

These constraints and competing priorities make it difficult for USAID to advance funding levels that reflect its assessment of what is most needed in a country. USAID's Journey to Self-Reliance aimed to combat some of these challenges and mitigate the need for future foreign assistance by helping countries solve their own development challenges through results-based interventions. USAID OIG issued an audit on USAID's self-reliance metrics and challenges USAID faces in implementing development activities as envisioned under this initiative. The audit found that missions in Ethiopia, Ukraine, and Zambia reported that 99, 68, and 93 percent, respectively, of obligations made in FY 2019 were done in line with various earmarks.[7] These figures demonstrate how little discretion USAID has in how it obligates its funds.

## USAID and State Reported Addressing Shortcomings in the FY 2019 653(a) Process

The interagency development of 653(a) reports for Congress on country- and sector-level allocations has played out over a number of months in recent years, rather than the maximum period of 30 days required by Congress. GAO examined the 653(a) process for State, Foreign Operations accounts during FYs 2015-18. As shown in figure 3, the FY 2019 653(a) process played out over a longer period than any other fiscal year since 2014, extending over 265 days.

---

[7] USAID OIG, "USAID Updated Guidance to Address Inconsistent Use of Journey to Self-Reliance Metrics and Misalignment of Missions' Budgets," December 23, 2020.

**Figure 3. Timeline of FY 2019 653(a) Process**



FEB

15 | Appropriations Bill enacted.

MAR

26 | USAID submitted Agency-approved proposed 653(a) allocations to State/F (39 days).

APR

MAY

22 | State/F provided USAID its initial proposed allocations for review.

JUN

04 | USAID submitted consolidated reclama to State/F.

JUL

17 | State/F provided USAID with updated proposed allocations. 18 | USAID submitted second reclama to State/F for allocation shifts. 29 | State/F sent revised proposed allocations to State and USAID bureaus. 31 | USAID submitted final reclama.

AUG

09 | State/F submitted final proposed 653(a) allocations to OMB.

SEP

OCT

21 | OMB cleared 653(a) allocations.
29 | Summary 653(a) tables sent to Congress.

NOV

07 | Detailed 653(a) report sent to Congress.

Source: OIG analysis of BRM documentation.

External reviews beyond USAID's control accounted for a significant portion of the FY 2019 653(a) process. For example, after State/F submitted the FY 2019 allocations, OMB clearance took 73 days; USAID staff said that OMB clearance averaged around a week or two in previous years. State/F took 53 days to provide BRM with initial allocations for review—reportedly due to the complexity of the allocations and the requirement to demonstrate that all earmarks and legislative requirements were met—and an additional 43 days to provide BRM with updated allocations after receiving its initial consolidated reclama. BRM had 16 days with the 653(a) report and 39 days when the report was with both State and USAID. In other words, the 653(a) report was not with USAID for 210 of the 265 days—or 79 percent—of the total time the process took to complete. Figure 4 shows the timeline for the FY 2019 report.

**Figure 4. Number of Days the FY 2019 Report Was With USAID, State, and Other Stakeholders During the 653(a) Process**



| 16 | 39 | 210 |
|---|---|---|

■ Days with USAID/BRM   ■ Days with State and USAID   ■ Days with other stakeholders

Source: OIG analysis of BRM documents.

According to State/F, much of the delay in the FY 2019 653(a) process was due to a change in coordination procedures between State/F and BRM. In prior years, State/F developed and sent draft allocations to BRM for comment. For FY 2019, BRM and State/F each developed its own separate proposed allocations that required significant time to reconcile. While State/F reported that it was expecting BRM priorities and a list of changes they could make, as done in previous years, State/F instead received a complete set of new proposed allocations for the Economic Support Fund and Development Assistance allocations.

According to BRM, it assumed the lead, consistent with the prior year in developing the initial draft allocations for core USAID funds such as Development Assistance and Global Health funding, based on USAID's technical expertise. BRM staff also noted that the extended government shutdown in late 2018 and early 2019 limited staff availability to work on draft allocations.

For FY 2020, BRM developed initial 653(a) figures and took the lead for some funds and worked jointly with State/F to develop the final allocation. According to the Director of State/F, process reforms such as this one resulted in the submission of the FY 2020 653(a) report to Congress more than 70 days earlier than the FY 2019 report. In addition, BRM reported that it participated in an after-action review of the FY 2019 653(a) process jointly with State/F. USAID also reported participating in work groups across State/F and BRM to streamline the operational plan review process. Given the tight deadlines, competing interests in foreign assistance, and USAID's lack of ownership in the budget process and reliance on State/F to make decision on core USAID funding, the Agency will need to continue to work closely with State while advocating for USAID's equities.

## USAID's Response to Reapportionment Highlighted the Need for Process Improvements

From August 3 to August 9, 2019, OMB froze USAID foreign assistance funds until OMB received an accounting of outstanding unobligated resources. According to USAID, at the time it had more than $3 billion in unobligated balances of expiring FY 2018 funds. After the freeze was lifted, OMB ordered a reapportionment of these funds, in which USAID could only spend approximately 2 percent of remaining funds each day for the rest of the fiscal year.[8]

The usual obligation process is decentralized, with leadership restricted to monitoring high-level obligation figures; however, to ensure that the 2 percent threshold was not exceeded, BRM led a central process to coordinate weekly obligations across missions and bureaus. Without guidance to address this circumstance, USAID budget staff reviewed each individual action. USAID reported that it was able to obligate nearly all FY 2018 funds, with the exception of a few thousand dollars. However, the reapportionment process did significantly impact BRM and budget staff in regional and technical bureaus. These staff reported that the reapportionment process was very time-consuming, and in some instances may have resulted in less-than-ideal decision making.

USAID leadership can normally monitor topline budget execution, obligation, and pipeline financial information through its enterprise reporting dashboard, and portfolios are tracked at the bureau and office level. According to Agency budget staff, because the Agency's budget and financial systems do not track individual activity obligations or plans across the Agency and overseas missions, USAID manually balanced all Agency obligations in large spreadsheets to review and track every planned obligation. According to BRM, this measure was taken to avoid an Anti-Deficiency Act violation resulting from OMB's imposed restrictions on obligations.

Another complicating factor was that the Agency lacks a tool to track planned centrally managed obligations and associated transfers of funds from different bureaus and missions.[9] These fund transfers are tracked by the individual bureau or by email and resulted in delays for decision making and obligations. In addition, technical bureau-based obligations and overseas mission-based obligations were being inadvertently double-counted in the spreadsheets, according to staff. As a result, the Chief of Staff, heads of bureaus, and the BRM Director met daily about obligations against individual awards.

USAID staff said that the daily review of spreadsheets to validate that individual decisions had been executed, along with the additional meetings, were extremely time-consuming steps that affected morale. The time pressures were reportedly felt across all bureaus and missions. Missions that traditionally obligate funds unilaterally were required to update the spreadsheet on any obligation they had made. Meanwhile, technical bureaus needing to obligate funds were held up because of the daily validation process.

According to staff, decisions were made based on which office or mission would have the best chance to obligate funds, or which mechanism would be easiest to obligate against, rather than

---

[8] Some funds were not affected by the reapportionment, such as USAID's International Disaster Assistance and Complex Crises funds.
[9] A centrally managed award is a mechanism that other bureaus and missions can buy into.

the best programmatic approach. In other instances, decisions were reportedly based on ensuring that political priorities were met, sometimes delaying obligations in support of other programs that were further developed and ready to be obligated against.

According to BRM, the 2 percent per day obligation limitation also resulted in the anomalous and inefficient practice of breaking out awards into subparts. For example, this was the case with the development agreement with the Government of Afghanistan—if it had been awarded at one time, as is the usual practice, it would have exceeded OMB's restrictions on Agency obligations for a full week.

At the end of FY 2019, and after responding to the reapportionment, USAID/BRM conducted an internal after-action review to examine processes and identify challenges affecting timely obligations.[10] BRM developed a draft report with conclusions and recommendations for improving USAID's related processes and began taking some steps to address the identified issues:

- *Transparency of apportionments*. The FY 2019 process highlighted a lack of transparency in the apportionment process because BRM and USAID regional bureaus maintain responsibility for allocating funds, but State/F submitted all apportionments to OMB with the USAID Chief Financial Officer's (CFO) clearance. To improve visibility for regional bureaus and BRM, and to increase the accuracy of budget data, BRM created and filled a position to assist with the review of apportionments.
- *Allotment holder roles and responsibilities*. BRM reported that the after-action review revealed the lack of a central list of official allotment holders, or heads of each bureau, and that these individuals were not aware of the responsibilities of the role. As a result, BRM reported that a list of USAID allotment holders has been created and is maintained by the CFO. Additionally, USAID policy was updated to state that "only obligating officials can sub-obligate funds." BRM noted that in a future reapportionment, this step will help ensure accountability of allotments and prioritize approval of obligations at a top level rather than at the individual activity level.
- *Program-funded operational costs*. BRM found that many operating units were not adhering to the definition for program-funded operational costs, and that due to system limitations, enforcing correct accounting for costs was a manual process.[11] USAID's budget planning system does not require program-funded operational costs to be itemized; therefore, it is difficult to track and cross-reference related costs. To address this issue, BRM stood up a new Integration Team to align budget and strategy and to better integrate the formulation and execution of program and operational expense funds for operational costs.

BRM has taken steps to address gaps highlighted in the after-action report, and the Acting Deputy Administrator issued guidance on the importance of obligating funds in a timely fashion to ensure efficient use of resources. Despite these notable actions, there are additional actions

---

[10] BRM gathered feedback through an internal focus group and online survey of USAID bureaus and missions. After compiling challenge areas, BRM conducted separate sessions to discuss the challenges.

[11] Program-funded operational costs support positions that are not funded by operational expense funds, such as foreign service limited appointments, foreign service nationals, and personal services contractors, as well as associated administrative expenses, such as portions of ICASS bills at overseas missions and travel.

in the after-action report that should be considered, including standard operating procedures for central obligations and transfers, and improved Agency guidance and controls surrounding program-funded operational costs. Additionally, USAID should determine how to address limitations in Agency systems that led to manual tracking through spreadsheets.

**CASE STUDY: AFGHANISTAN**
**2-Year Funds Mitigated the Impact of Delays in the Obligation Process for FY 2019 Funds**

After OMB distributed appropriations to State and USAID, the two agencies allotted funds to the Office of Afghanistan and Pakistan Affairs (OAPA), which allows funds to the Afghanistan mission.[12] USAID/Afghanistan had a liaison with OAPA supporting the process and praised the coordination between the mission, State/F, and BRM. Budget staff noted that 2-year funds enabled USAID to obligate all FY 2019 funds 2 months before they expired. No programs were delayed, and once funds were obligated, an additional 4-5 year window began for the funds to be used. Given that funds had previously been allocated from FY 2018 and in prior years, there were sufficient funds to sustain programs during the obligation process in FY 2019.

## Future Risks and Continuing Challenges

Budget execution is a fundamental process to ensure that aid is available and spent responsibly in support of foreign policy objectives and national security priorities. USAID expressed concern that an FY 2019 rescission would undermine the Agency's ability to support critical foreign policy and national security priorities, and the chairmen and ranking members of the Senate Committee on Foreign Relations and the House Committee on Foreign Affairs told OMB that cutting this programming would harm national security and undermine Congress' intentions for these funds.

While many of USAID's budget processes are outside of its control and influenced by competing priorities, wide stakeholder interest in foreign policy objectives will continue, as demonstrated by an abundance of directives and inquiries. USAID should ensure that BRM and budget staff have adequate resources to plan for future challenges and to address identified vulnerabilities.

BRM has taken steps to improve processes internally and with State to address weaknesses identified in the review of the FY 2019 653(a) process; however, we did not assess whether the improvements were appropriately codified or operationalized. USAID leadership must ensure that all corrective actions identified in the after-action report are evaluated, implemented as appropriate, and properly resourced.

---

[12] Bureaus and offices receiving allotments distribute the funds to lower levels by allowing the funds to specific organizational units within the bureau or office. See ADS 634.3.3.4

# Appendix. USAID's Foreign Assistance Appropriations Accounts in the Fiscal Year 2018 Appropriations Act

This advisory focuses on select program funding accounts available for USAID's use. As indicated in the table below, several such accounts are available until expended. The scope of this advisory is limited to accounts provided in the form of 2-year funds: Assistance for Europe, Eurasia, and Central Asia; Democracy Fund; Development Assistance; Economic Support Fund; and Global Health Programs-USAID.

| Appropriations account | Purpose | Period of availability for new obligations |
|---|---|---|
| Assistance for Europe, Eurasia, and Central Asia | For assistance to the independent states of the former Soviet Union in areas of urgent humanitarian needs, such as democracy and rule of law, and for assistance to eastern European countries that have taken substantive steps toward institutionalizing political democracy and economic pluralism. | 2 years |
| Democracy Fund | For the promotion of democracy globally. | 2 years |
| Development Assistance | For agriculture, rural development, and nutrition programs; American schools and hospitals abroad; and the Development Fund for Africa, among others. | 2 years |
| Economic Support Fund | For the promotion of economic or political stability. | 2 years |
| Global Health Programs | For USAID, generally used for assistance to build the capacity of public health institutions and organizations in developing countries, and family planning/reproductive health. For State, for the prevention, treatment, control, and research on HIV/AIDS. | 2 years for funds apportioned to USAID; 5 years for funds apportioned to State |
| Complex Crises Fund | For supporting programs and activities to prevent or respond to emerging or unforeseen foreign challenges and complex crises overseas. | Until expended |
| International Disaster Assistance | For international disaster relief, rehabilitation, and reconstruction assistance. | Until expended |
| Transition Initiatives | For international disaster rehabilitation and reconstruction assistance to support transition to democracy and long-term development of countries in crisis. | Until expended |

Source: GAO.

# EXHIBIT 88

**25-cv-469-CJN**



# MEMORANDUM

DATE:        July 27, 2020

TO:          USAID Chief Financial Officer, Reginald W. Mitchell

FROM:        Assistant Inspector General for Audit, Thomas E. Yatsco /s/

SUBJECT:     USAID's Use of Appropriated Funds Prior to Expiration and
             Cancellation

In response to direction from the House Committee on Appropriations, the Office of Inspector General (OIG) assessed USAID's use of appropriated funds prior to expiration and cancellation.[1] OIG reviewed whether the Agency was using the funds that it received within the deadlines of the appropriations and whether it was complying with the Federal requirements for obligations using expired funds.

While planning an audit, we identified preliminary observations and are providing the results of our work. In short, USAID used most of its funds within required deadlines. From fiscal years 2010 to 2017, USAID received $28.1 billion in appropriated funds that had statutory expiration between fiscal years 2016 and 2018. Of this amount, approximately $5.7 million expired prior to obligation—approximately .02 percent over the 3-year period.[2] From fiscal years 2005 to 2012, USAID received $21.8 billion in appropriated funds that had statutory cancellation between fiscal years 2016 and 2018. USAID used approximately $21.6 billion of the $21.8 billion appropriated to the Agency during this period.[3] The difference of about $114.8 million between these two amounts was canceled in fiscal years 2016 through 2018 based on required deadlines. Considering the low percentage of funds that expired or canceled, we do not believe that additional work on this engagement would provide significant insight into weaknesses in USAID's financial management policies and practices. Therefore, we are closing out the engagement with this memorandum. USAID provided technical comments to the draft, and we made changes where appropriate.

---

[1] *See* House Report 115-829, (H. Rpt. 115-829 at 102 (2018)) accompanying H.R. 6385, State, Foreign Operations, and Related Programs Appropriations Bill, 2019. The explanatory statement, accompanying the Consolidated Appropriations Act, 2019 (Pub. L. 116-6, February 15, 2019), incorporated this direction by reference to the House Report.
[2] Our scope for expired funds consisted of USAID funds received during fiscal years 2010 through 2017. Once expired, funds may be adjusted and disbursed to fulfill an existing obligation but cannot be used for a new obligation.
[3] Our scope for canceled funds consisted of USAID funds received during fiscal years 2005 through 2012.

To conduct our work, we interviewed USAID officials, including officials with the Bureau for Management, Office of the Chief Financial Officer (CFO) in Washington, DC. We reviewed financial data from the CFO for fiscal years 2016 through 2018. We also reviewed the relevant Federal laws, regulations, and Agency policies and procedures that determine when USAID funds become available for use, and when USAID funds expire or cancel.

## BACKGROUND

House Report 115-829, accompanying H.R. 6385, State, Foreign Operations, and Related Programs Appropriations Bill, 2019, directed USAID OIG to determine whether USAID "used appropriated funds within the deadlines of the appropriations [and] whether obligations using expired funds were made in accordance with Federal requirements."[4]

USAID's Automated Directives System (ADS) 621, "Obligations," incorporates statutory requirements and Federal guidelines related to the obligation and management of funds. The majority of funds under a new appropriation have an initial period of availability of 2 years—meaning they need to be obligated or committed in that period to pay for orders placed, contracts awarded, or services rendered.[5] USAID's annual appropriations acts contain a provision that funds appropriated for the purposes identified in section 7011 remain available for an additional 4 years from the date on which the availability of the funds would otherwise have expired (initial period of availability), provided that the funds are initially obligated by the end of the initial period of availability.[6] After the additional 4 years of availability, the funds expire and remain available only for expenditures and upward adjustments for another 5-year period. On September 30 of the 5th fiscal year after expiration, funds cancel. They are no longer available to obligate or disburse and are returned to the U.S. Treasury. See figure 1.

### *Figure 1. Life Cycle of a USAID Fund*



Source: Graphic created by OIG, June 2020.
Note: Upward adjustments can be made throughout the life cycle of the funds provided certain criteria are met.

---

[4] H. Rpt. 115-829 at 102.
[5] Operating expenses under new appropriations generally have a shorter life cycle than program funds because of their initial period of availability of 1 year.
[6] ADS 634.3.3, "Funds Availability."

2

## APPROXIMATELY $5.7 MILLION OUT OF $28.1 BILLION IN USAID FUNDS EXPIRED DURING FISCAL YEARS 2016 THROUGH 2018

Out of the approximately $28.1 billion that had statutory expiration during fiscal years 2016 through 2018, $5.7 million expired prior to obligation—approximately .02 percent over the 3-year period.

When the funds are broken out by type, $25.6 billion (91 percent) represented program funds and $2.5 billion represented operating expense funds (9 percent). Program funds made up 62 percent ($3.55 million) and operating expense funds made up 38 percent ($2.18 million) of the total $5.7 million in expired funds.

The three bureaus with the highest dollar value of expired funds were the Bureau for Africa, Bureau for the Middle East, and Bureau for Asia ($1.5 million, $1.2 million, and $693,537, respectively), while the Office of the General Counsel, the Bureau for Foreign Assistance, and Office of Faith-based and Community Initiatives had the highest percentages of expired funds (16.80 percent, .95 percent, and .64 percent, respectively). See tables 1 and 2 below.

### Table 1. Bureaus With the Highest Dollars Expired Relative to Appropriations Received, Fiscal Years 2016-2018

| Bureau | Total Amount Appropriated for Funds Subject to Expiration ($) | Amount of Funds that Expired ($) | Expired of Total Appropriated (%) |
|---|---|---|---|
| Bureau for Africa | 5,523,697,547 | 1,496,681 | 0.03 |
| Bureau for the Middle East | 4,428,413,305 | 1,167,890 | 0.03 |
| Bureau for Asia | 1,966,735,827 | 693,537 | 0.04 |

Source: USAID OIG generated from data provided by USAID's Bureau for Management/Office of the Chief Financial Officer/Financial Systems Division.

### Table 2. Bureaus or Independent Offices With the Highest Percentages of Funds Expired Relative to Appropriations Received, Fiscal Years 2016-2018

| Bureau/Independent Office | Total Amount Appropriated for Funds Subject to Expiration ($) | Amount of Funds that Expired ($) | Expired of Total Appropriated (%) |
|---|---|---|---|
| Office of the General Counsel | 1,853,831 | 311,446 | 16.80 |
| Bureau for Foreign Assistance | 6,052,729 | 57,636 | 0.95 |
| Office of Faith-based and Community Initiatives | 1,243,997 | 7,985 | 0.64 |

Source: USAID OIG generated from data provided by USAID's Bureau for Management/Office of the Chief Financial Officer/Financial Systems Division.

3

Once funds expire, they are no longer available for obligation. Rather, they can only be used for limited purposes. However, during fiscal years 2016 through 2018, USAID identified two transactions that used expired funds: one was a new obligation using expired funds for employee travel for $184, and a second transaction was for a credit card purchase order of $19,965. USAID said that the second transaction could have been an upward adjustment and not a new obligation. OIG could not make a determination of this transaction because USAID did not provide additional supporting documentation on this matter. Both were from operating expense funds, which are used for administrative support for the Agency. This issue was brought to the attention of the CFO.

## APPROXIMATELY $114.8 MILLION IN USAID FUNDS WERE CANCELED FOR FISCAL YEARS 2016 THROUGH 2018

Of the $21.8 billion having a statutory cancellation during fiscal years 2016 through 2018, approximately $114.8 million were canceled. During that period, the percentage of canceled funds out of the appropriated funds subject to cancellation was .53 percent. This accounts for all program funds and operational expense funds. Across the 3 fiscal years, the percentage of canceled funds remained consistent at around half a percent per year.

For fiscal years 2016 through 2018, program funds made up about 93 percent ($20.2 billion) and operating expense funds made up 7 percent ($1.6 billion) of the total $21.8 billion in funds that could potentially be canceled. Of the approximate $114.8 million in funds canceled, program funds made up 89 percent ($102.2 million) with operating expense funds comprising the remaining 11 percent ($12.6 million).

The three bureaus/independent offices with the highest dollar value of canceled funds were the Bureau for Africa, Bureau for the Middle East, and the Office of Afghanistan and Pakistan Affairs ($26.8 million, $15.2 million, and $14.6 million, respectively). The Office of Small and Disadvantaged Business Utilization, the Bureau for Foreign Assistance, and the Bureau for Policy and Program Coordination had the highest percentage of canceled funds (8.66 percent, 7.10 percent, and 5.04 percent, respectively). See tables 3 and 4 below.

### Table 3. Bureaus or Independent Offices With the Highest Dollars Canceled Relative to Appropriations Received, Fiscal Years 2016-2018

| Bureau/Independent Office | Total Amount Appropriated for Funds Subject to Cancellation ($) | Amount of Funds that Canceled ($) | Canceled of Total Appropriated (%) |
|---|---|---|---|
| Bureau for Africa | 3,505,773,072 | 26,775,017 | 0.76 |
| Bureau for the Middle East | 4,477,993,179 | 15,215,287 | 0.34 |
| Office of Afghanistan and Pakistan Affairs | 4,743,556,714 | 14,553,499 | 0.31 |

Source: USAID OIG generated from data provided by USAID's Bureau for Management/Office of the Chief Financial Officer/Financial Systems Division.

*Table 4. Bureaus or Independent Offices With the Highest Percentage of Funds Canceled Relative to Appropriations Received, Fiscal Years 2016-2018*

| Bureau/Independent Office | Total Amount Appropriated for Funds Subject to Cancellation ($) | Amount of Funds that Canceled ($) | Canceled of Total Appropriated (%) |
|---|---|---|---|
| Office of Small and Disadvantaged Business Utilization | 174,231 | 15,088 | 8.66 |
| Bureau for Foreign Assistance | 2,044,525 | 145,226 | 7.10 |
| Bureau for Policy and Program Coordination | 19,968,859 | 1,006,657 | 5.04 |

Source: USAID OIG generated from data provided by USAID's Bureau for Management/Office of the Chief Financial Officer/Financial Systems Division.

We hope this information provides insight into USAID's use of appropriated funds prior to expiration and cancellation. We will continue to carefully monitor USAID's management of financial resources through other audit work, including the annual audit of USAID's financial statements. We appreciate the assistance you and your staff extended to us during this engagement. If you have any questions, please feel free to contact Nathan Lokos, OIG's Deputy Assistant Inspector General for Audit, at 202-712-1150.

# EXHIBIT 89

## 25-cv-469-CJN



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

# Decision

**Matter of:**   Office of Management and Budget—Withholding of Ukraine Security
Assistance

**File:**   B-331564

**Date:**   January 16, 2020

---

### DIGEST

In the summer of 2019, the Office of Management and Budget (OMB) withheld from
obligation funds appropriated to the Department of Defense (DOD) for security
assistance to Ukraine.  In order to withhold the funds, OMB issued a series of nine
apportionment schedules with footnotes that made all unobligated balances
unavailable for obligation.

Faithful execution of the law does not permit the President to substitute his own
policy priorities for those that Congress has enacted into law.  OMB withheld funds
for a policy reason, which is not permitted under the Impoundment Control Act (ICA).
The withholding was not a programmatic delay.  Therefore, we conclude that OMB
violated the ICA.

---

### DECISION

In the summer of 2019, OMB withheld from obligation approximately $214 million
appropriated to DOD for security assistance to Ukraine.  *See* Department of Defense
Appropriations Act, 2019, Pub. L. No. 115-245, div. A, title IX, § 9013, 132 Stat.
2981, 3044–45 (Sept. 28, 2018).  OMB withheld amounts by issuing a series of nine
apportionment schedules with footnotes that made all unobligated balances for the
Ukraine Security Assistance Initiative (USAI) unavailable for obligation.  *See* Letter
from General Counsel, OMB, to General Counsel, GAO (Dec. 11, 2019) (OMB
Response), at 1–2.  Pursuant to our role under the ICA, we are issuing this decision.
Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344,
title X, § 1015, 88 Stat. 297, 336 (July 12, 1974), *codified at* 2 U.S.C. § 686.  As
explained below, we conclude that OMB withheld the funds from obligation for an

unauthorized reason in violation of the ICA.[1]  *See* 2 U.S.C. § 684.   We also question actions regarding funds appropriated to the Department of State (State) for security assistance to Ukraine.

OMB removed the footnote from the apportionment for the USAI funds on September 12, 2019.  OMB Response, at 2.  Prior to their expiration, Congress then rescinded and reappropriated the funds.  Continuing Appropriations Act, 2020, Pub. L. No. 116-59, div. A, § 124(b), 133 Stat. 1093, 1098 (Sept. 27, 2019).

In accordance with our regular practice, we contacted OMB, the Executive Office of the President, and DOD to seek factual information and their legal views on this matter.  GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* www.gao.gov/products/GAO-06-1064SP; Letter from General Counsel, GAO, to Acting Director and General Counsel, OMB (Nov. 25, 2019); Letter from General Counsel, GAO, to Acting Chief of Staff and Counsel to the President, Executive Office of the President (Nov. 25, 2019); Letter from General Counsel, GAO, to Secretary of Defense and General Counsel, DOD (Nov. 25, 2019).

OMB provided a written response letter and certain apportionment schedules for security assistance funding for Ukraine.  OMB Response (written letter); OMB Response, Attachment (apportionment schedule).  The Executive Office of the President responded to our request by referring to the letter we had received from OMB and providing that the White House did not plan to send a separate response. Letter from Senior Associate Counsel to the President, Executive Office of the President, to General Counsel, GAO (Dec. 20, 2019).  We have contacted DOD regarding its response several times.  Letter from General Counsel, GAO, to Secretary of Defense and General Counsel, DOD (Dec. 10, 2019); Telephone Conversation with Deputy General Counsel for Legislation, DOD (Dec. 12, 2019); Telephone Conversation with Office of General Counsel Official, DOD (Dec. 19, 2019).  Thus far, DOD officials have not provided a response or a timeline for when we will receive one.

---

[1] On October 30, 2019, Senator Chris Van Hollen asked the Comptroller General about this matter during a hearing before the Senate Committee on the Budget. *Chief Financial Officers Act of 1990: Achieving the Vision: Hearing Before the Senate Committee on the Budget,* 116th Cong. (2019), (statement of Sen. Van Hollen), *available at* https://www.budget.senate.gov/chief-financial-officers-act-of-1990-achieving-the-vision (last visited Jan. 13, 2020).  We also received a letter from Senator Van Hollen regarding this matter.  Letter from Senator Chris Van Hollen to Comptroller General (Dec. 23, 2019).

BACKGROUND

For fiscal year 2019, Congress appropriated $250 million for the Ukraine Security Assistance Initiative (USAI).  Pub. L. No. 115-245, § 9013, 132 Stat. at 3044–45.  The funds were available "to provide assistance, including training; equipment; lethal assistance; logistics support, supplies and services; sustainment; and intelligence support to the military and national security forces of Ukraine."  *Id.* § 9013, 132 Stat. at 3044.  The appropriation made the funds available for obligation through September 30, 2019.  *Id.*

DOD was required to notify Congress 15 days in advance of any obligation of the USAI funds.  *Id.* § 9013, 132 Stat. at 3045.  In order to obligate more than fifty percent of the amount appropriated, DOD was also required to certify to Congress that Ukraine had taken "substantial actions" on "defense institutional reforms." John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, div., A, title XII, § 1246, 132 Stat. 1636, 2049 (Aug. 13, 2018) (amending National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, div. A, title XII, § 1250, 129 Stat. 726, 1068 (Nov. 25, 2015)).  On May 23, 2019, DOD provided this certification to Congress.  Letter from Under Secretary of Defense for Policy, to Chairman, Senate Committee on Foreign Relations (May 23, 2019) (DOD Certification) (noting that similar copies had been provided to the congressional defense committees and the House Committee on Foreign Affairs).  In its certification, DOD included descriptions of its planned expenditures, totaling $125 million.  *Id.*

On July 25, 2019, OMB issued the first of nine apportionment schedules with footnotes withholding USAI funds from obligation.  OMB Response, 1–2.  This footnote read:

> "Amounts apportioned, but not yet obligated as of the date of this reapportionment, for the Ukraine Security Assistance Initiative (Initiative) are not available for obligation until August 5, 2019, to allow for an interagency process to determine the best use of such funds. Based on OMB's communication with DOD on July 25, 2019, OMB understands from the Department that this brief pause in obligations will not preclude DOD's timely execution of the final policy direction. DOD may continue its planning and casework for the Initiative during this period."

*Id.*; *see id.*, Attachment.  On both August 6 and 15, 2019, OMB approved additional apportionment actions to extend this "pause in obligations," with footnotes that, except for the dates, were identical to the July 25, 2019 apportionment action.[2]  *Id.*,

---

[2] The initial apportionment footnote made USAI funds unavailable for obligation until August 5, 2019.  OMB Response, Attachment.  OMB did not sign the next

(continued…)

at 2 n. 2.  OMB approved additional apportionment actions on August 20, 27, and 31, 2019; and on September 5, 6, and 10, 2019.[3]  *Id.*  The footnotes from these additional apportionment actions were, except for the dates, otherwise identical to one another.  *Id.*, Attachment.  They nevertheless differed from those of July 25 and August 6 and 15, 2019, in that they omitted the second sentence that appeared in the earlier apportionment actions regarding OMB's understanding that the pause in obligation would not preclude timely obligation.  *Id.*  The apportionment schedule issued on August 20 read as follows:

> "Amounts apportioned, but not yet obligated as to the date of this reapportionment, for the Ukraine Security Assistance Initiative (Initiative) are not available for obligation until August 26, 2019, to allow for an interagency process to determine the best use of such funds.  DOD may continue its planning and casework for the Initiative during this period."

*Id.*, Attachment.  The apportionment schedules issued on August 27 and 31, 2019; and on September 5, 6, and 10, 2019 were identical except for the dates.  *Id.*  On September 12, 2019, OMB issued an apportionment that removed the footnote that previously made the USAI funds unavailable for obligation.  OMB Response, at 2; *id.,* Attachment.  According to OMB, approximately $214 million of the USAI appropriation was withheld as a result of these footnotes.  OMB Response, at 2.  OMB did not transmit a special message proposing to defer or rescind the funds.

DISCUSSION

At issue in this decision is whether OMB had authority to withhold the USAI funds from obligation.

---

(...continued)

apportionment until August 6, 2019.  *See id.*  On August 6, 2019, the amounts were made unavailable for obligation until August 12, 2019.  *Id.*  While the next footnote was issued on August 15, 2019 it stated that funds were unavailable for obligation "until August 12, 2019."  *Id.*  Despite the dates listed in each apportionment footnote, OMB provided that the "pause in obligations was *extended*" on both August 6, 2019 and August 15, 2019.  *See* OMB Response, at 2, fn. 2 (emphasis added).

[3] The apportionment footnote issued on August 20, 2019 made USAI funds unavailable for obligation until August 26, 2019.  OMB Response, Attachment.  OMB did not sign the next apportionment until August 27, 2019.  *See id.*  Despite the date listed in the apportionment footnote, OMB provided that the "pause in obligations was *extended*" on August 20, 2019.  *See* OMB Response, at 2, fn. 2 (emphasis added).

The Constitution specifically vests Congress with the power of the purse, providing that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Constitution also vests all legislative powers in Congress and sets forth the procedures of bicameralism and presentment, through which the President may accept or veto a bill passed by both Houses of Congress, and Congress may subsequently override a presidential veto. *Id.*, art. I, § 7, cl. 2, 3. The President is not vested with the power to ignore or amend any such duly enacted law. *See Clinton v. City of New York,* 524 U.S. 417, 438 (1998) (the Constitution does not authorize the President "to enact, to amend, or to repeal statutes"). Instead, he must "faithfully execute" the law as Congress enacts it. U.S. Const., art. II, § 3.

An appropriations act is a law like any other; therefore, unless Congress has enacted a law providing otherwise, the President must take care to ensure that appropriations are prudently obligated during their period of availability. *See* B-329092, Dec. 12, 2017 (the ICA operates on the premise that the President is required to obligate funds appropriated by Congress, unless otherwise authorized to withhold). In fact, Congress was concerned about the failure to prudently obligate according to its Congressional prerogatives when it enacted and later amended the ICA. *See generally,* H.R. Rep. No. 100-313, at 66–67 (1987); *see also* S. Rep. No. 93-688, at 75 (1974) (explaining that the objective was to assure that "the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress").

The Constitution grants the President no unilateral authority to withhold funds from obligation. *See* B-135564, July 26, 1973. Instead, Congress has vested the President with strictly circumscribed authority to impound, or withhold, budget authority only in limited circumstances as expressly provided in the ICA. *See* 2 U.S.C. §§ 681–688. The ICA separates impoundments into two exclusive categories—deferrals and rescissions. The President may temporarily withhold funds from obligation—but not beyond the end of the fiscal year in which the President transmits the special message—by proposing a "deferral."[4] 2 U.S.C. § 684. The President may also seek the permanent cancellation of funds for fiscal policy or other reasons, including the termination of programs for which Congress has provided budget authority, by proposing a "rescission."[5] 2 U.S.C. § 683.

In either case, the ICA requires that the President transmit a special message to Congress that includes the amount of budget authority proposed for deferral or

---

[4] Budget authority proposed for deferral must be prudently obligated before the end of its period of availability. 2 U.S.C. § 684; B-329092, Dec. 12, 2017.

[5] Budget authority proposed for rescission must be made available for obligation unless, within 45 calendar days of continuous congressional session, Congress has completed action on a rescission bill rescinding all or part of the amount proposed for rescission. 2 U.S.C. § 683.

rescission and the reason for the proposal. 2 U.S.C. §§ 683–684. These special messages must provide detailed and specific reasoning to justify the withholding, as set out in the ICA. *See* 2 U.S.C. §§ 683–684; B-237297.4, Feb. 20, 1990 (vague or general assertions are insufficient to justify the withholding of budget authority). The burden to justify a withholding of budget authority rests with the executive branch.

There is no assertion or other indication here that OMB intended to propose a rescission. Not only did OMB not submit a special message with such a proposal, the footnotes in the apportionment schedules, by their very terms, established dates for the release of amounts withheld. The only other authority, then, for withholding amounts would have been a deferral.

The ICA authorizes the deferral of budget authority in a limited range of circumstances: to provide for contingencies; to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or as specifically provided by law. 2 U.S.C. § 684(b). No officer or employee of the United States may defer budget authority for any other purpose. *Id.*

Here, OMB did not identify—in either the apportionment schedules themselves or in its response to us—any contingencies as recognized by the ICA, savings or efficiencies that would result from a withholding, or any law specifically authorizing the withholding. Instead, the footnote in the apportionment schedules described the withholding as necessary "to determine the best use of such funds." *See* OMB Response, at 2; Attachment. In its response to us, OMB described the withholding as necessary to ensure that the funds were not spent "in a manner that could conflict with the President's foreign policy." OMB Response, at 9.

The ICA does not permit deferrals for policy reasons. *See* B-237297.3, Mar. 6, 1990; B-224882, Apr. 1, 1987. OMB's justification for the withholding falls squarely within the scope of an impermissible policy deferral. Thus, the deferral of USAI funds was improper under the ICA.

When Congress enacts appropriations, it has provided budget authority that agencies must obligate in a manner consistent with law. The Constitution vests lawmaking power with the Congress. U.S. Const., art. I, § 8, cl. 18. The President and officers in an Administration of course may consider their own policy objectives as they craft policy proposals for inclusion in the President's budget submission. *See* B-319488, May 21, 2010, at 5 ("Planning activities are an essential element of the budget process."). However, once enacted, the President must "take care that the laws be faithfully executed." *See* U.S. Const., art. II, § 3. Enacted statutes, and not the President's policy priorities, necessarily provide the animating framework for all actions agencies take to carry out government programs. *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (a federal agency is "a creature of

statute" and "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress").

Faithful execution of the law does not permit the President to substitute his own policy priorities for those that Congress has enacted into law. In fact, Congress was concerned about exactly these types of withholdings when it enacted and later amended the ICA. *See* H.R. Rep. No. 100-313, at 66–67 (1987); *see also* S. Rep. No. 93-688, at 75 (1974) (explaining that the objective was to assure that "the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress").

OMB asserts that its actions are not subject to the ICA because they constitute a programmatic delay. OMB Response, at 7, 9. It argues that a "policy development process is a fundamental part of program implementation," so its impoundment of funds for the sake of a policy process is programmatic. *Id.*, at 7. OMB further argues that because reviews for compliance with statutory conditions and congressional mandates are considered programmatic, so too should be reviews undertaken to ensure compliance with presidential policy prerogatives. *Id.*, at 9.

OMB's assertions have no basis in law. We recognize that, even where the President does not transmit a special message pursuant to the procedures established by the ICA, it is possible that a delay in obligation may not constitute a reportable impoundment. *See* B-329092, Dec. 12, 2017; B-222215, Mar. 28, 1986. However, programmatic delays occur when an agency is taking necessary steps to implement a program, but because of factors external to the program, funds temporarily go unobligated. B-329739, Dec. 19, 2018; B-291241, Oct. 8, 2002; B-241514.5, May 7, 1991. This presumes, of course, that the agency is making reasonable efforts to obligate. B-241514.5, May 7, 1991. Here, there was no external factor causing an unavoidable delay. Rather, OMB on its own volition explicitly barred DOD from obligating amounts.

Furthermore, at the time OMB issued the first apportionment footnote withholding the USAI funds, DOD had already produced a plan for expending the funds. *See* DOD Certification, at 4–14. DOD had decided on the items it planned to purchase and had provided this information to Congress on May 23, 2019. *Id.* Program execution was therefore well underway when OMB issued the apportionment footnotes. As a result, we cannot accept OMB's assertion that its actions are programmatic.

The burden to justify a withholding of budget authority rests with the executive branch. Here, OMB has failed to meet this burden. We conclude that OMB violated the ICA when it withheld USAI funds for a policy reason.

Foreign Military Financing

We also question actions regarding funds appropriated to State for security assistance to Ukraine.  In a series of apportionments in August of 2019, OMB withheld from obligation some foreign military financing (FMF) funds for a period of six days.  These actions may have delayed the obligation of $26.5 million in FMF funds.  *See* OMB Response, at 3.  An additional $141.5 million in FMF funds may have been withheld while a congressional notification was considered by OMB.  *See* E-mail from GAO Liaison Director, State, to Staff Attorney, GAO, *Subject:  Response to GAO on Timeliness of Ukraine Military Assistance* (Jan. 10, 2020) (State's Additional Response).  We have asked both State and OMB about the availability of these funds during the relevant period.  Letter from General Counsel, GAO, to Acting Director and General Counsel, OMB (Nov. 25, 2019); Letter from General Counsel, GAO, to Secretary of State and Acting Legal Adviser, State (Nov. 25, 2019).  State provided us with limited information.  E-mail from Staff Attorney, GAO, to Office of General Counsel, State, *Subject: RE: Response to GAO on Timeliness of Ukraine Military Assistance* (Dec. 18, 2019) (GAO's request for additional information); E-mail from GAO Liaison Director, State, to Assistant General Counsel for Appropriations Law, GAO, *Subject: Response to GAO on Timeliness of Ukraine Military Assistance* (Dec. 12, 2019) (State's response to GAO's November 25, 2019 letter); State's Additional Response.  OMB's response to us contained very little information regarding the FMF funds.  *See generally* OMB Response, at 2–3.

As a result, we will renew our request for specific information from State and OMB regarding the potential impoundment of FMF funds in order to determine whether the Administration's actions amount to a withholding subject to the ICA, and if so, whether that withholding was proper.  We will continue to pursue this matter.

CONCLUSION

OMB violated the ICA when it withheld DOD's USAI funds from obligation for policy reasons.  This impoundment of budget authority was not a programmatic delay.

OMB and State have failed, as of yet, to provide the information we need to fulfill our duties under the ICA regarding potential impoundments of FMF funds.  We will continue to pursue this matter and will provide our decision to the Congress after we have received the necessary information.

We consider a reluctance to provide a fulsome response to have constitutional significance.  GAO's role under the ICA—to provide information and legal analysis to Congress as it performs oversight of executive activity—is essential to ensuring respect for and allegiance to Congress' constitutional power of the purse.  All federal officials and employees take an oath to uphold and protect the Constitution and its core tenets, including the congressional power of the purse.  We trust that State and OMB will provide the information needed.

Thomas H. Armstrong
General Counsel