**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PERSONAL SERVICES CONTRACTOR ASSOCIATION, | |
| Plaintiff, | |
| v. | Civil Action No. 1:25-cv-00469 |
| PRESIDENT DONALD TRUMP, *et al.*, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.     STATUTORY BACKGROUND ................................................................... 2

II.    FACTUAL BACKGROUND ......................................................................... 4

III.   PROCEDURAL HISTORY ........................................................................... 6

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ..................................................................................................................... 7

I.     PLAINTIFF IS NOT LIKELY TO PREVAIL ON THE MERITS OF ITS
CLAIMS. ...................................................................................................... 7

     A.      THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER
ALL OF PLAINTIFF'S CLAIMS. ................................................... 7

          1.     PSCs Must Pursue the Contractual Claims Advanced Here
Through Established Agreement-Specific Procedures. ............... 8

          2.     Plaintiff Lacks Article III Standing to Assert Claims of PSCs. ............... 15

     B.      PLAINTIFF'S APA CLAIMS ARE UNREVIEWABLE. ........................ 17

          1.     USAID's Pertinent Funding Decisions Are Committed to the
Agency's Discretion by Law. .................................................... 17

          2.     The Terms of the PSC Contracts Authorize the Disputed
Terminations. ............................................................................. 19

          3.     Plaintiff Does Not Allege Any Agency Action. ........................ 21

          4.     Plaintiff Does Not Allege Any Final Action. ............................ 23

          5.     The APA Does Not Provide a Cause of Action Because an
Alternative Adequate Remedy Is Available to PSCs. ............... 24

     C.      PLAINTIFF IS NOT LIKELY TO SUCCEED ON ITS
ADMINISTRATIVE PROCEDURE ACT CLAIMS. ........................ 25

          1.     Defendants Have Not Acted Contrary to Law. .......................... 26

          2.     Defendants Have Not Acted Arbitrarily and Capriciously. ....... 32

     D.      PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE NOT LIKELY TO
SUCCEED. ...................................................................................... 35

          1.     The Challenged Actions Are Supported by the President's Article
II Authority, Numerous Statutes, and Historical Practice, and Do
Not Violate the Separation of Powers. ...................................... 35

2.    The Take Care Clause Cannot Be Used to Obtain Affirmative
Relief......................................................................................................... 37

E.    DEFENDANTS DID NOT ACT *ULTRA VIRES*........................................................39

II.    PLAINTIFF FAILS TO DEMONSTRATE THAT IRREPARABLE HARM
WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION. .......... 40

III.    THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST)
DOES NOT FAVOR A PRELIMINARY INJUNCTION. .............................................. 41

IV.    ANY PRELIMINARY INJUNCTION SHOULD BE NARROWLY TAILORED. ....... 43

CONCLUSION............................................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Am. Foreign Serv. Ass'n v. Trump* ,
No. 1:25-cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025) ....................................... 14, 23, 42

*Am. Forest Res. Council v. United States*,
144 S. Ct. 1110 (2024) ................................................................................................... 22

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
698 F.3d 171 (4th Cir. 2012)..................................................................................... 13, 21, 34

*A & S Council Oil Co. v. Lader*,
56 F.3d 234 (D.C. Cir. 1995) ...................................................................................... 10, 11

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ....................................................................................... 7, 37

*Air Transp. Ass'n of Am. v. Reno*,
80 F.3d 477 (D.C. Cir. 1996) ........................................................................................... 16

*Alabama-Coushatta Tribe of Tex. v. United States*,
757 F.3d 484 (5th Cir. 2014).......................................................................................... 22

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) .................................................................................... 22, 23

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ...................................................................................................... 36

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,
801 F. Supp. 2d 383 (D. Md. 2011) .......................................................................... 21, 34

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ...................................................................................................... 44

*Axon Enterprise, Inc. v. Federal Trade Commission*,
598 U.S. 175 (2023) ................................................................................................. 13, 14

*Baker v. Carr*,
369 U.S. 186 (1962) ...................................................................................................... 38

*Bancoult v. McNamara*,
445 F.3d 427 (D.C. Cir. 2006) ....................................................................................... 36

*Bennett v. Spear*,
520 U.S. 154 (1997) ...................................................................................................... 23

*Blankson v. USAID*,
CBCA 8256, 2025 WL 67136 (Jan. 2, 2025)................................................................. 20

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) ..................................................................................... 11

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ...................................................................................................... 24

*Cemex Inc. v. Department of the Interior*,
  560 F. Supp. 3d 268 (D.D.C. 2021) ................................................................. 13

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ........................................................................ 21

*Changji Esquel Textile Co. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) ........................................................................ 39

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ....................................................................... 40

*Chi. & S. Air Lines v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ....................................................................................... 36

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) ....................................................................... 31

*City of New York v. Dep't of Def.*,
  913 F.3d 423 (4th Cir. 2019) .......................................................................... 37

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ................................................................................. 26, 27

*Coggeshall Dev. Corp. v. Diamond*,
  884 F.2d 1 (1st Cir. 1989) ......................................................................... 11, 12

*Collins v. Yellen*,
  594 U.S. 220 (2021) ....................................................................................... 15

*Crowley Gov't Servs., Inc. v. GSA*,
  38 F.4th 1099 (D.C. Cir. 2022) ................................................................. 12, 13

*Ctr. for Sustainable Econ. v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015) ....................................................................... 16

*Dabney v. Reagan*,
  542 F. Supp. 756 (S.D.N.Y. 1982) ................................................................ 30

*Dai Glob. v. Adm'r of,*
  *USAID*, 945 F.3d 1196 (Fed. Cir. 2019) ......................................................... 9

*Dalton v. Specter*,
  511 U.S. 462 (1994) ........................................................................... 35, 37, 38

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) ....................................................................... 39

*Dep't of Educ. v. California*,
  145 S. Ct. 966 (2025) ....................................................................... 10, 11, 15

*Detroit Int'l Bridge Co. v. Canada*,
  189 F. Supp. 3d 85 (D.D.C. 2016) ................................................................ 21

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  883 F.3d 895 (D.C. Cir. 2018) ................................................................. 18, 22

*DHS v. New York*,
   140 S. Ct. 599 (2020) ................................................................................. 43

*Doe 2 v. Trump*,
   319 F. Supp. 3d 539 (D.D.C. 2018) ........................................................ 45

*Elm 3DS Innovations, LLC v. Lee*,
   No. 1:16–cv–1036, 2016 WL 8732315 (E.D. Va. Dec. 2, 2016) ............. 25

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................................. 32

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ......................................................................... 17, 43

*FDA v. Wages & White Lion Invs., LLC*,
   145 S. Ct. 898 (2025) .............................................................................. 25

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ........................................................... 39, 40

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..................................................................... 21, 34, 44

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ................................................................................. 39

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ............................................................. 22, 23

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ................................................................ 24

*Gen. Land Off. v. Biden*,
   722 F. Supp. 3d 710 (S.D. Tex. 2024) ................................................... 30

*Gill v. Whitford*,
   585 U.S. 48 (2018) ............................................................................ 15, 43

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ................................................................................. 11

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ................................................................................. 44

*Gulf Oil Corp. v. Brock*,
   778 F.2d 834 (D.C. Cir. 1985) ................................................................ 43

*Haitian Refugee Ctr. v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ................................................................ 35

*Hartz Mountain Corp. v. Dotson*,
   727 F.2d 1308 (D.C. Cir. 1984) .............................................................. 39

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................. 17

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................................ 18

*Hi-Tech Pharmacal Co. v. FDA*,
    587 F. Supp. 2d 1 (D.D.C. 2008) ............................................................................ 40

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) .................................................................................................... 42

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002) .................................................................... 42, 43

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) ................................................................................ 42

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................................................ 15

*Immigr. & Naturalization Serv. v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*,
    510 U.S. 1301 (1993) .............................................................................................. 27

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) .................................................................................. 11

*J.C. Prods., Inc. v. United States*,
    608 F. Supp. 92 (W.D. Mich. 1984) ....................................................................... 11

*Johnson v. Eisentrager*,
    339 U.S. 763 (1950) ................................................................................................ 36

*Kansas Health Care Ass'n Inc. v. Kansas Dep't of Social & Rehab. Serv.*,
    958 F.2d 1018 (10th Cir. 1992) ............................................................................... 17

*K-Con, Inc. v. Sec'y of Army*,
    908 F.3d 719 (Fed. Cir. 2018) ................................................................................ 20

*Khadr v. United States*,
    529 F.3d 1112 (D.C. Cir. 2008) ................................................................................ 9

*Kim v. Fin. Indus. Regul. Auth., Inc.*,
    698 F. Supp. 3d 147 (D.D.C. 2023) ........................................................................ 42

*Kim v. Fin. Indus. Regul. Auth., Inc.*,
    No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025) ...................................... 42

*Lee v. United States*,
    127 Fed. Cl. 734 (2016) ............................................................................................ 9

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................................ 43

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .......................................................................................... 26, 28

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................................ 18

*Louisiana v. United States,*
  948 F.3d 317 (5th Cir. 2020) ................................................................... 22

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................ 38

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ......................................................................... *passim*

*M. Steinthal & Co. v. Seamans,*
  455 F.2d 1289 (D.C. Cir. 1971) .............................................................. 20

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ................................................................................ 44

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ................................................................. 38

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ......................................................................... *passim*

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) .......................................................... 12, 13

*Milk Train, Inc. v. Veneman,*
  310 F.3d 747 (D.C. Cir. 2002) .......................................................... 18, 19

*Mississippi v. Johnson,*
  71 U.S. (4 Wall) 475 (1866) .............................................................. 38, 44

*Missouri v. Yellen,*
  538 F. Supp. 3d 906 (E.D. Mo. 2021) ....................................................... 7

*Missouri v. Yellen,*
  39 F.4th 1063 (8th Cir. 2022) ................................................................... 7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................................ 25, 32

*Munaf v. Geren,*
  553 U.S. 674 (2008) .................................................................................. 6

*Nat. Resources Def. Council, Inc. v. Hodel,*
  865 F.2d 288 (D.C. Cir. 1988) ................................................................ 29

*Nat'l Treasury Emps. Union v. Nixon,*
  492 F.2d 587 (D.C. Cir. 1974) ................................................................ 44

*Newdow v. Roberts, ,*
  603 F.3d 1002 (D.C. Cir. 2010) .............................................................. 44

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982) ................................................................................ 44

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................ 7, 41

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ........................................................................................... 22

*O'Hair v. White*,
   675 F.2d 680 (5th Cir. 1982) .......................................................................... 17

*Pa. Dep't of Pub. Welfare v. United States*,
   48 Fed. Cl. 785 (2001) .................................................................................... 20

*People for Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ..................................................................... 15

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ....................................................................... 25

*Pub. Citizen v. Stockman*,
   528 F. Supp. 824 (D.D.C. 1981) .................................................................... 30

*Ramirez v. USAID*,
   CBCA 8210, 2025 WL 293628 (Jan. 15, 2025) ............................................ 20

*Reform, Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) ......................................................................... 27

*S.J. Amoroso Constr. Co. v. United States*,
   12 F.3d 1072 (Fed. Cir. 1993) ....................................................................... 20

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) ....................................................................................... 18

*Sampson v. Murray*,
   415 U.S. 61 (1974) ................................................................................... 36, 40

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ....................................................................... 36

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ......................................................................... 7

*Sierra Club v. Peterson*,
   228 F.3d 559 (5th Cir. 2000) .......................................................................... 22

*Slattery v. United States*,
   635 F.3d 1298 (Fed. Cir. 2011) ..................................................................... 15

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ....................................................................... 45

*Sys. Application & Techs., Inc. v. United States*,
   26 F.4th 163 (4th Cir. 2022) ....................................................................... 9, 12

*Tanner-Brown v. Haaland*,
   105 F.4th 437 (D.C. Cir. 2024) ................................................................ 15, 16

*Thompson v. N. Am. Stainless, LP*,
   562 U.S. 170 (2011) ....................................................................................... 26

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ........................................................................................... 13

*Thurston v. United States*,
  696 F. Supp. 680 (1988) .................................................................................... 32

*Todd Constr., L.P. v. United States*,
  656 F.3d 1306 (Fed. Cir. 2011) ......................................................................... 12

*Tolliver Group, Inc. v. United States*,
  20 F.4th 771 (Fed. Cir. 2021) ............................................................................ 12

*Trauma Serv. Grp. v. United States*,
  104 F.3d 1321 (Fed. Cir. 1997) ........................................................................... 9

*Travelers United, Inc. v. Hyatt Hotels Corp.*,
  No. 23-cv-2776, 2025 WL 27162 (D.D.C. Jan. 3, 2025) .................................... 16

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006) ........................................................................... 40

*Trump v. Sierra Club*,
  140 S. Ct. 1 (2019) ...................................................................................... 27, 30

*Tulare Cnty. v. Bush*,
  185 F. Supp. 2d 18 (D.D.C. 2001) ..................................................................... 21

*Tulare Cnty. v. Bush*,
  306 F.3d 1138 (D.C. Cir. 2002) ......................................................................... 21

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ............................................................................. 17

*Twin Rivers Paper Co. v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019) ..................................................................... 26, 27

*U.S. ex rel. McLennan v. Wilbur*,
  283 U.S. 414 (1931) ........................................................................................... 44

*United Aeronautical Corp. v. U.S. Air Force*,
  80 F.4th 1017 (9th Cir. 2023) .............................................................................. 9

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996) ........................................................................................... 16

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ........................................................................................... 36

*United States v. Intrados/Int'l Mgmt. Grp.*,
  277 F. Supp. 2d 55 (D.D.C.2003) ........................................................................ 9

*United States v. Kellogg Brown & Root Servs., Inc.*,
  856 F. Supp. 2d 176 (D.D.C. 2012) ..................................................................... 9

*United States v. Louisiana*,
  363 U.S. 1 (1960) ............................................................................................... 18

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996) ............................................................................ 12, 21

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) .................................................................................... 35

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ...................................................................... 22

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................... 16

*Weingarten v. Devos*,
   468 F. Supp. 3d 322 (D.D.C. 2020) ............................................................ 16

*Widakuswara v. Lake*,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ........................... *passim*

*Wilbur v. U.S. ex rel. Kadrie*,
   281 U.S. 206 (1930) .................................................................................... 44

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................... 7

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) .................................................................... 40

*Worthy v. Herter*,
   270 F.2d 905 (D.C. Cir. 1959) .................................................................... 36

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .................................................................................... 36

**Constitution**

U.S. Const. art. II, § 3 .................................................................................. 37, 38

**Statutes**

2 U.S.C. § 683(b) ............................................................................................ 30

2 U.S.C. § 684 ................................................................................................ 31

2 U.S.C. §§ 682–688 ...................................................................................... 30

5 U.S.C. § 104 .................................................................................................. 3

5 U.S.C. § 104(1) ............................................................................................ 29

5 U.S.C. § 701(a)(2) ....................................................................................... 17

5 U.S.C. § 702 .............................................................................................. 8, 21

5 U.S.C. § 704 ...................................................................................... 21, 23, 24

5 U.S.C. § 706(2)(A) ...................................................................................... 25

22 U.S.C. § 2151b(c)(1) ................................................................................... 2

22 U.S.C. § 2151t(a) ...................................................................................... 44

22 U.S.C. § 2291(a)(4) ......................................................................................... 2

22 U.S.C. § 2346 ............................................................................................... 2, 3

22 U.S.C. § 2347 ................................................................................................. 2

22 U.S.C. § 2348 ................................................................................................. 2

22 U.S.C. § 2349aa .............................................................................................. 2

22 U.S.C. § 2381 ................................................................................................. 3

22 U.S.C. § 2382(c) ............................................................................................. 3

22 U.S.C. § 2392(a) ........................................................................................... 28

22 U.S.C. § 2392(b) ........................................................................................... 28

22 U.S.C. § 6563 ............................................................................................ 3, 29

22 U.S.C. § 6592 ............................................................................................ 3, 30

28 U.S.C. § 1491(a)(2) ......................................................................................... 9

31 U.S.C. § 1512(c)(1) .................................................................................... 31, 32

31 U.S.C. § 1531(a) .......................................................................................... 4, 28

41 U.S.C. § 605(a) ............................................................................................. 10

41 U.S.C. § 7102(a)(1) ......................................................................................... 9

41 U.S.C. § 7102(a)(2) ......................................................................................... 9

41 U.S.C. § 7103(a)(1) ................................................................................. 9, 10, 12

41 U.S.C. § 7104(b) ........................................................................................... 10

41 U.S.C. § 7104(b)(1) ..................................................................................... 9, 12

41 U.S.C. § 7105(e)(1)(B) ................................................................................... 10

41 U.S.C. § 7104(a) ............................................................................................. 9

Contract Disputes Act, 41 U.S.C. §§ 7101–09 ..................................................... *passim*

Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),
    Pub. L. No. 105-277, 112 Stat. 2681 ................................................................. 3

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, 138 Stat. 460 ................................................................. 4, 19

Impoundment Control Act of 1974,
    Pub. L. No. 93-344, 88 Stat. 297 ................................................................... 30

**Rules**

Federal Rule of Civil Procedure 12 ....................................................................... 7

**Regulations**

2 C.F.R. § 200.343 ............................................................................................. 20

48 C.F.R. § 49.201 ......................................................................................................... 20

48 C.F.R. § 52.249-1 ..................................................................................................... 20

48 C.F.R. §§ 42.1305(a) ................................................................................................ 20

Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*,
   90 Fed. Reg. 8,619 (Jan. 20, 2025) ........................................................................ *passim*

Exec. Order No. 10,973 § 102,
   26 Fed. Reg. 10,469 (Nov. 3, 1961) ............................................................................. 3

**Other Authorities**

Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025),
   http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause .......................... 4

## INTRODUCTION

Plaintiff Personal Services Contractor Association ("PSCA"), a professional association of U.S. citizen personal services contractors ("PSCs") who perform services for the United States Agency for International Development ("USAID"), challenges the policy decisions of the Executive Branch regarding the allocation of foreign aid.  PSCA alleges that the Defendants are "dismantling . . . USAID."  But as the D.C. Circuit recently held, "[t]he 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'"  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (order granting stay pending appeal) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990)).

Just as this Court denied Plaintiff's earlier motion for a temporary restraining order, the Court should deny Plaintiff's motion for a preliminary injunction.  First and foremost, the Court lacks subject-matter jurisdiction over all of the claims.  As the Court has recognized, "this case presents as essentially a federal contract dispute, that is a dispute about the government's efforts to change the nature of its contractual relationships with PSCs."  Tr. at 11:25–12:3 (Mar. 6, 2025), ECF No. 23 (hereinafter "Tr. Mar. 6").  As such, these claims are precluded in light of the Contract Disputes Act ("CDA").  Moreover, Plaintiff has not established a cognizable Article III injury-in-fact to demonstrate associational or organizational standing.

Even if Plaintiff had established subject-matter jurisdiction (and it has not), Plaintiff is still not likely to succeed on the merits.  Plaintiff's APA claims are not reviewable because the statutes Plaintiff invokes give the agencies discretion to make the disputed choices without articulating a judicially manageable standard for a court to reassess those choices, and because the PSC contracts that form a basis for Plaintiff's claims are subject to termination for convenience to the agency.  Additionally, Plaintiff does not challenge discrete or final agency actions, and even if it had done

so, its PSC members would have adequate alternative remedies via the CDA.  And even if those actions were reviewable in this Court, the claims are still not likely to succeed because Defendants have not acted contrary to law or arbitrarily and capriciously.  Plaintiff fares no better in attempting to invoke the Constitution.  The Separation of Powers claim fails because the President's powers in the realm of foreign affairs are vast and Defendants have acted within their constitutional and statutory authority.  And Plaintiff cannot obtain affirmative relief through the Take Care Clause.

Finally, although Plaintiff argues that its members will suffer irreparable harm, its claimed injuries are either economic in nature or generalized grievances not specific to Plaintiff or its members.  And because the public has an interest in the President taking decisive action in the realm of foreign affairs, the public interest and balance of the equities tip in Defendants' favor.  As such, Plaintiff has not established the criteria necessary for this Court to enter the extraordinary remedy of a preliminary injunction.

## BACKGROUND

### I.    STATUTORY BACKGROUND

The President has broad discretion to set the terms and conditions on which the United States provides foreign assistance.  Many of the authorities provided under the Foreign Assistance Act of 1961 ("FAA"), and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine."  *See, e.g.*, section 104(c)(1) of the FAA (22 U.S.C. § 2151b(c)(1)) (health assistance); section 481(a)(4) of the FAA (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-crime assistance); section 531 of the FAA (22 U.S.C. § 2346) (assistance to promote economic or political stability); section 541(a) of the FAA (22 U.S.C. § 2347) (International Military Education and Training assistance); section 551 of the FAA (22 U.S.C. § 2348) (Peacekeeping Operations); section 571 of the FAA (22 U.S.C. § 2349aa) (anti-terrorism assistance).  And the FAA generally provides that "[t]he President may exercise any

functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct."  Section 621 of the FAA (22 U.S.C. § 2381).  The FAA delegates some of this authority.  For example, Section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . . to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby."  22 U.S.C. § 2382(c).

In 1961, President Kennedy issued Executive Order No. 10,973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development."  Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961).  Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, 112 Stat. 2681 (1998), recognized USAID as an "independent establishment."  *See* 22 U.S.C. § 6563; 5 U.S.C. § 104 ("For the purpose of this title, 'independent establishment' means (1) an establishment in the executive branch . . . which is not an Executive department, military department, Government corporation, or part thereof, or part of an independent establishment . . . .").  Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State."  22 U.S.C. § 6592.  And several types of foreign assistance are jointly administered by the Department of State and USAID.  *See*, *e.g.*, *id.* § 6563; *id.* § 2346(b) (economic support funds).

Upon taking office on January 20, 2025, President Trump instituted a ninety-day pause in United States foreign assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid is consistent with United States foreign policy.  *See* Exec. Order No. 14,169, *Reevaluating and Realigning United States Foreign Aid*, 90 Fed. Reg. 8,619 (Jan. 20, 2025).  Secretary of State Marco Rubio implemented this Executive Order on January 24, 2025.

Decl. of Pete Marocco, Feb. 10, 2025, ¶ 3, ECF No. 13-1. Secretary Rubio also approved waivers, including waivers for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, and legitimate expenses incurred before the pause went into effect, *id.* ¶ 10, as well as a waiver for life-saving humanitarian assistance, *see* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025), http://state.gov/emergency-humanitarian-waiver-to-foreign-assistance-pause.

The Further Consolidated Appropriations Act, 2024 (the "FCAA") also gives the President and the Secretary of State broad discretion to use appropriated funds. The FCAA appropriated to the President $1,695,000,000 for "necessary expenses to carry out the provisions of section 667 of the [FAA.]" Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 739. It further provided that the Secretary of State may transfer certain appropriated funds to USAID's operating expenses account under sections 610 and 109 of the FAA. *Id.* Finally, the FCAA allows for the reprogramming of funds pursuant to prior notice to the Committees on Appropriations. *Id.* at 766. Similarly, elsewhere, Congress generally has authorized the transfer of funds from one agency to another "to finance or discharge a function or activity transferred or assigned under law . . . from one executive agency to another." 31 U.S.C. § 1531(a).

## II.    FACTUAL BACKGROUND

On January 30, 2025, President Trump appointed Secretary Marco Rubio to act as the Acting Administrator of USAID. Decl. of Pete Marocco, Feb. 10, 2025, ¶ 8, ECF No. 13-1. The Secretary, in line with the views of the President, concluded that USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of the programs funded by USAID neither substantially benefit the American people, nor reflect the priorities of the President and Secretary. *Id.* ¶ 7. Thus, the Secretary sent a letter to Congress on February 3, stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and would

"begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest."  *Id.* ¶ 8.

In line with those objectives, and to thoroughly review the operations of the agency and align its functions to the President's and Secretary's priorities, USAID leadership began placing employees on paid administrative leave and terminating contracts with PSCs.  *Id.* ¶¶ 9, 15.  USAID had approximately 1,230 PSCs stationed in both the United States and overseas.  Decl. of Pete Marocco, Feb. 24, 2025, ¶ 3, ECF No. 13-2.  On February 2, 2025, the agency terminated 791 PSCs, representing 814 total contracts, in high and middle-income countries like the United States, Moldova and Thailand.  *Id.* ¶ 4.  PSC contracts were terminated consistent with contractual and other notice periods.  *Id.* ¶¶ 5–6 ("PSCs are being given 15 days of notice of intent to terminate, as required by their contracts.").

In March 2025, Secretary Rubio notified Congress of the Department of State and USAID's intent to undertake a reorganization that would involve realigning certain USAID functions and discontinuing other USAID functions that do not align with Administration priorities.  Pl.'s Mot. Ex. 2, at 1, ECF No. 39-3; *see also* Am. Compl. ¶ 43–44.  As part of the reorganization and transfer of functions process, the Department of State intends to eliminate substantially all non-statutory positions at USAID.  Pl.'s Mot. Ex. 13 (Second Decl. of Gregory Doe), Ex. A, at 1, ECF No. 39-4.  Consistent with applicable laws and regulations, beginning on March 28, 2025, USAID personnel globally were notified of a consolidated agency-wide Reduction-In-Force ("RIF") action.  *Id.* at 1–2.  In connection with the reorganization and global RIF, USAID has authorized the termination of USAID's remaining PSC contracts, effective July 1, 2025, or September 2, 2025.  *Id.*  PSC contracts will be terminated consistent with all contractual and other notice periods, and PSCs will receive any travel and other repatriation accommodations to which they are generally entitled.  *See id.* at 2; Decl. of Pete Marocco, Feb. 24, 2025, ¶ 6, ECF

No. 13-2.  As discussed in the Congressional notification, the Department of State intends to contractually engage or employ certain current or former USAID PSC contractors.  *See* Pl.'s Mot. Ex. 2, at 6, ECF No. 39-3.

### III.    PROCEDURAL HISTORY

On February 18, 2025, Plaintiff PSCA filed its Complaint alleging that Defendants were violating the Constitution and APA by eliminating foreign aid and "the federal agencies, employees, and contractors who provide it."  Compl. ¶ 30, ECF No. 1.  The following day, on February 19, Plaintiff filed a motion for a temporary restraining order.  Pl. Mot. for TRO at 17, ECF No. 6.  Following briefing and argument, the Court denied Plaintiff's motion on March 6, 2025.  Tr. Mar. 6, at 16:25–17:1. The Court determined Plaintiff's case was "essentially a federal contract dispute, that is, a dispute about the government's efforts to change the nature of its contractual relationships with PSCs."  *Id.* at 11:25–12:3.  The Court decided "Plaintiff's efforts to broaden the case into one about structural constitutional powers" did not work because the PSCs' "Article III injuries, including, . . . any alleged irreparable injuries, are all directly traceable to their contracts with USAID."  *Id.* at 12:3–10.  The Court found this "critical because, under the Contract Disputes Act, federal courts lack jurisdiction to adjudicate certain types of cases involving federal contracts[,] . . . including federal contracts for the procurement of services."  *Id.* at 12:11–16.  In sum, the Court concluded it likely lacked subject matter jurisdiction under the Contracts Dispute Act, and so Plaintiff had not established a likelihood of success on the merits.  *Id.* at 15:3–9.  On April 17, 2025, Plaintiff filed an Amended Complaint, ECF No. 37.  And on April 23, 2025, Plaintiff filed its Motion for Preliminary Injunction, ECF No. 39.

### LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary and drastic remedy" that should "never [be] awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted).  To

warrant relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Injunctive relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

## ARGUMENT

## I.    PLAINTIFF IS NOT LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS.

Plaintiff's motion for a preliminary injunction fails to establish a likelihood of success on the merits of its claims.  Plaintiff has not demonstrated that this Court has subject-matter jurisdiction.  Plaintiff's APA claims are unreviewable and in any event fail on the merits.  And Plaintiff's constitutional claims fail because the President has acted pursuant to his vast authority over foreign affairs and consistent with applicable statutes.

### A. THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER ALL OF PLAINTIFF'S CLAIMS.

The Court lacks subject-matter jurisdiction over Plaintiff's claims.[1]  *First*, those claims are channeled under the Contract Disputes Act and this Court lacks subject-matter jurisdiction over

---

[1] While Defendants will respond to Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12 in due course, if the Court agrees that it lacks Article III jurisdiction over Plaintiff's claims, it may *sua sponte* dismiss the lawsuit. *See Missouri v. Yellen*, 538 F. Supp. 3d 906, 914 (E.D. Mo. 2021) (finding, in response to a preliminary injunction motion, that the plaintiff lacked standing and *sua sponte* dismissing the case for lack of jurisdiction), *aff'd*, 39 F.4th 1063 (8th Cir. 2022).  Doing so may be particularly appropriate in this case because the Court already

them.  *Second*, as an *association*, the sole Plaintiff—PSCA—lacks Article III standing to litigate the asserted injuries absent the PSCs.

### 1.  PSCs Must Pursue the Contractual Claims Advanced Here Through Established Agreement-Specific Procedures.

The APA provides a limited waiver of sovereign immunity for claims "seeking relief other than monetary damages."  5 U.S.C. § 702.  But that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).  That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes."  *Id.*  Here, in seeking to have any termination-of-contract notices sent to PSCs rescinded, *see* Pl.'s Mot. at 1–2; *see also* Am. Compl. (Prayer for Relief), Plaintiff is attempting that type of evasion.  Such contractual disputes can *only* be brought through the procedures of the Contract Disputes Act, 41 U.S.C. §§ 7101–09 ("CDA"), over which this Court would lack subject-matter jurisdiction.  Indeed, the D.C. Circuit for similar reasons recently stayed an injunction in a case brought by, among other parties, contractors of the U.S. Agency for Global Media claiming that the termination of contracts was part of an unlawful dismantling of that agency.  *See Widakuswara*, 2025 WL 1288817, at *3–4.  The D.C. Circuit ruled, as this Court should, that the district court likely lacked jurisdiction under different channeling provisions, including that PSCs could only challenge their terminations pursuant to the CDA.  *See id.* at *2–3, 5 (citing the CDA as likely providing the "exclusive procedures" for contractors challenging their termination as part of broader efforts to "dismantl[e] an entire federal agency").

---

denied Plaintiff's motion for a temporary restraining order on the ground that the Court likely lacked jurisdiction, and Plaintiff has not remedied this defect in its Amended Complaint or Motion for Preliminary Injunction.

The CDA applies to certain types of contracts with the Federal Government, including contracts for "the procurement of services."  41 U.S.C. § 7102(a)(2); *see, e.g.*, *Sys. Application & Techs., Inc. v. United States*, 26 F.4th 163, 170 (4th Cir. 2022) (applying CDA to a services contractor); *Lee v. United States*, 127 Fed. Cl. 734, 736 (2016) (personal service contract dispute heard in the Court of Federal Claims).[2]  The CDA provides a procedure for resolving any "claim by a contractor . . . relating to a [procurement] contract."  41 U.S.C. § 7103(a)(1); *see also* 41 U.S.C. § 7102(a)(1) (defining covered contracts); *see, e.g.*, *Dai Glob. v. Adm'r of USAID*, 945 F.3d 1196, 1199–200 (Fed. Cir. 2019).  "The CDA serves two related functions. First, it establishes an administrative system for disputes relating to federal procurement contracts . . . ."  *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023).  "Second, it waives sovereign immunity over actions 'arising under' that administrative system and vests exclusive jurisdiction over such claims in only two venues: (1) the Court of Federal Claims, 28 U.S.C. § 1491(a)(2); 41 U.S.C. § 7104(b)(1), and (2) agency boards of contract appeals.  41 U.S.C. §§ 7104(a), 7105."  *Id.*  Under the CDA, the "contractor [must] take recourse against the government's alleged breach by submitting *a written claim to the contracting officer* for a final decision prior to commencing suit."  *United States v. Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d 176, 183 (D.D.C. 2012) (quoting *United States v. Intrados/Int'l Mgmt. Grp.*, 277 F. Supp. 2d 55, 63

---

[2] Categorization as a contract for purposes of the CDA hinges not on the label the parties assigned to the document but rather on the terms of the document itself and the context in which the award arose.  "[A]ny agreement can be a contract . . . provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).  Whether PSCs' claims would be jurisdictionally barred hinges on the precise terms of each individual's contracts.  Yet Plaintiff does not attach those contracts or even quote the provisions of those documents to rebut the CDA's jurisdictional bar.  It is Plaintiff's burden to establish this Court's jurisdiction.  *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  In light of those omissions, Plaintiff cannot establish a likelihood of success on the merits.

(D.D.C.2003) (citing, *inter alia*, 41 U.S.C. § 605(a), now 41 U.S.C. § 7103(a)(1)) (emphasis added).

After a properly submitted CDA claim has been exhausted, the proper forum is either the Civilian Board of Contract Appeals, which has jurisdiction to decide any appeal from a decision of a contracting officer on a contract made by USAID or the Department of State, *see* 41 U.S.C. § 7105(e)(1)(B), or the United States Court of Federal Claims, 41 U.S.C. § 7104(b). In that regard, the D.C. Circuit has "recognized a congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes," such that "the Claims Court has exclusive jurisdiction except to the extent that Congress has granted any other court authority to hear the claims that may be decided by the Claims Court." *See A & S Council Oil Co. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (cleaned up).

To attempt to remain in this Court, Plaintiff depicts its claims as ones for injunctive relief under the APA. The APA waives sovereign immunity for certain claims "seeking relief other than money damages," although that waiver "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (quoting 5 U.S.C. § 702). But, as with the suit over Department of Education grants in which the Supreme Court recently granted a stay, *see id.*, Plaintiff's superficial effort to invoke the APA fails, *see also Widakuswara*, 2025 WL 1288817, at *4 ("[T]he injunction in substance orders specific performance of the grant agreements—a quintessentially contractual remedy."). Plaintiff's own requested relief exposes this dispute as one seeking money allegedly owed under contracts: Plaintiff demands an order that Defendants "refrain from . . . enforcing and giving effect to termination notices sent to USAID personal services contractors" and ordering Defendants to "[a]pportion to USAID the full amount of funds that Congress appropriated to USAID and maintain that apportionment to USAID—so that USAID can obligate

those funds for: . . . contracts, grants, awards, and projects overseen by USAID." *See* Pl.'s Mot. at 1–2; *see also* Am. Compl., Prayer for Relief A(a), (e) (similar).  And even where "plaintiffs cloak the[ir] claims in" APA "language," such claims likely "are in fact contract claims covered by" the CDA, which "provides the exclusive avenue for relief for all such contract claims against the United States." *A & S Council Oil Co.*, 56 F.3d at 236.  When assessing whether the CDA governs, "plaintiffs' labelling is of little importance," given that "a plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions rather than breach of contract." *Id.* at 241 (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)); *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 4 (1st Cir. 1989) ("this is an action for breach of contract, irrespective of how it is packaged").

That principle controls here.  Plaintiff's claims that its members' personal services contracts were unlawfully terminated fall squarely within the CDA.  *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77–78 (D.C. Cir. 1985) ("essential rights at stake" in claim that "termination of the contract violated two federal regulations" were "contractual," citing, *e.g.*, *J.C. Prods., Inc. v. United States*, 608 F. Supp. 92, 94 (W.D. Mich. 1984), for proposition that "cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations" where "plaintiff was awarded contract and government terminated for convenience").  Similarly, where claimants "simply seek to receive the amount [an agency] promised," "the true nature of the" claim is "for compensatory money damages and not equitable relief." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).  For, as the Supreme Court has recently underscored, "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of" a district court order restraining a Government agency from terminating grants and requiring the Government to pay "past-due" obligations. *California*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*,

534 U.S. 204, 212 (2002)). For their claims, PSCs must first obtain a final agency decision on their post-termination monetary claim, and they may also have access to judicial review in the Court of Federal Claims. 41 U.S.C. §§ 7104(b)(1), 7103(g); *see Tolliver Group, Inc. v. United States*, 20 F.4th 771, 775–76 (Fed. Cir. 2021) ("[O]btaining a final decision on a claim is a jurisdictional prerequisite to adjudication of that claim in the Claims Court.").

Importantly, "damages are always the default remedy for breach of contract." *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996). "Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Coggeshall*, 884 F.2d at 3. But that is precisely the relief Plaintiff's motion seeks by asking for an order to enforce the terms of the PSCs' contracts.

Relevant here, the CDA generally governs "disputes concerning 'any express or implied contract . . . made by an executive agency for . . . the procurement of services.'" *Sys. Application*, 26 F.4th at 168 (quoting 41 U.S.C. § 7102(a)); *see also* 41 U.S.C. § 7103(a)(1) (requiring exhaustion for claims "relating to a contract"). "[T]o be a claim 'relating to a contract,'" and therefore covered by the CDA, the "claim 'must [only] have some relationship to the terms or performance of a government contract.'" *Sys. Application*, 26 F.4th at 172 (quoting *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1312 (Fed. Cir. 2011)). The claims at issue here meet this standard because they relate to the terms and performance of the PSCs' contracts.

Even apart from those CDA provisions, subject-matter jurisdiction is lacking in this Court. "[A]n action against the United States which is *at its essence* a contract claim lies within the [exclusive jurisdiction of the Court of Federal Claims under the] Tucker Act and . . . a district court has no power to grant injunctive relief in such a case." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). "Whether a claim is 'at its essence' contractual . . . 'depends both on the source of the

rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Id.* (quoting *Megapulse*, 672 F.2d at 968). In *Crowley*, the D.C. Circuit held that the Tucker Act did not preclude jurisdiction in the district court where the plaintiff did not have a contract with the Government-agency defendant and had asserted tortious interference claims against the defendant agency regarding the plaintiff's contract with another party. *See id.* at 1108–13. The source of the right sounded in tort, not a contract dispute, *id.* at 1108, and the type of relief sought, a court order for the defendant to halt the interfering conduct, was also not contract-specific, *id.* at 1102, 1111, so the court of appeals concluded that the case was not about a contract claim at its essence, *id.* 1113. Here, in contrast, the source of the right (the PSC contracts) and the type of relief sought (reinstatement of those contracts, among other things, *see* Pl.'s Mot. at 2) both point toward this action raising a contract claim at its essence, and this Court therefore lacks jurisdiction over the case. This Court appears to have agreed, noting in its oral ruling that "the logic of *Crowley* [does not] appl[y] here, where the PSCA has sued the contracting entity itself, USAID, and it cannot be said that its asserted right exists independently of the contract with USAID." Tr. Mar. 6, at 14:12–15.

Cemex Inc. v. Department of the Interior, relied on by Plaintiff, is not to the contrary. 560 F. Supp. 3d 268 (D.D.C. 2021) (Nichols, J.). The Court there noted that a plaintiff cannot "elude the Court of Federal Claims' exclusive jurisdictional purview by 'disguising' contract claims as something else." *Id.* at 276 n.4 (quoting *Megapulse*, 672 F.2d at 968). That is precisely what Plaintiff attempts to do here. *See Widakuswara*, 2025 WL 1288817, at *3 (holding that plaintiffs could not "package[] together" "a collection of 'many individual actions'" "for wholesale correction under the APA" (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 893)).

Plaintiff's reliance on *Axon Enterprise, Inc. v. Federal Trade Commission* is also misplaced. 598 U.S. 175 (2023). In *Axon*, the Court applied the factors of *Thunder Basin Coal*

*Co. v. Reich*, 510 U.S. 200 (1994), in determining that the Securities Exchange Act and Federal Trade Commission Act did not preclude district court review over certain "structural constitutional claims." 598 U.S. at 190–96. But those factors lead to a different result here under the CDA. As this Court similarly ruled in a case brought by USAID employees, it is likely "that Congress intended" for Plaintiff's claims "to proceed exclusively through" the "statutory scheme of administrative and judicial review" for contractor claims because "(i) 'such intent is fairly discernible in the statutory scheme,' and (ii) the [asserted] claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Am. Foreign Serv. Ass'n v. Trump* ("*AFSA*"), No. 1:25-cv-352 (CJN), 2025 WL 573762, at *8 (D.D.C. Feb. 21, 2025) (citations omitted). And Plaintiff has not shown that "a finding of preclusion might foreclose all meaningful judicial review" or that "the claim[s are] wholly collateral to the statutory review provisions" or that "the claims are beyond the expertise of the agency." *Id.* at *9.

In short, Plaintiff cannot meet its burden to establish that its claims fall within an applicable waiver of sovereign immunity such that this Court has subject-matter jurisdiction. Although Plaintiff superficially invokes the APA, which waives sovereign immunity as to non-monetary claims, Plaintiff's motion shows that it seeks contract-based remedies. *See* Tr. Mar. 6, at 15:19–24 ("[T]hose injuries that give me jurisdiction in the first place, would be the restoration of [PSCs'] contracts and contractual rights as they existed on January 19th, 2025; that is the remedy that would redress the injury that creates Article III standing here."). Hence, the PSCs have not established that sovereign immunity is waived in this Court on their claims.[3] Indeed, in denying

---

[3] Insofar as PSCs assert they are employees of USAID, *see, e.g.*, Pl.'s Br. at 20; Am. Compl. ¶ 19, this Court would lack subject-matter jurisdiction to hear their claims for the reasons set forth in *AFSA*, 2025 WL 573762, at *7. Moreover, even if the contracts at issue were determined not to be CDA contracts, any suit seeking more than $10,000 still could proceed, if appropriate, only in the Court of Federal Claims. The Tucker Act provides for judicial review of breach claims for express or implied contracts over $10,000 with the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by

Plaintiff's motion for a temporary restraining order, this Court already concluded "that the PSCA has not carried its burden of . . . establishing the Court's subject matter jurisdiction over the claims here, which appear likely to be stripped and must be adjudicated elsewhere by the Contracts Dispute Act." *Id.* at 15:3–7. For this reason, Plaintiff is unlikely to succeed on the merits.

### 2. Plaintiff Lacks Article III Standing to Assert Claims of PSCs.

Alternatively, Plaintiff lacks Article III standing to challenge any actions taken to implement Executive Order No. 14,169 or Secretary Rubio's January 24, 2025 Memorandum, 25 STATE 6828 (Jan. 24, 2025), given Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Here, that is at most each PSC's "pocketbook injury" from individual contract-specific agency decisions. *Collins v. Yellen*, 594 U.S. 220, 243 (2021). Plaintiff PSCA is not itself a USAID contractor— instead, it is the members of this association that receive funding through their contracts. The membership association has no Article III standing at all. Such membership-based associations like Plaintiff can establish standing in one of two ways: they can assert "associational standing" to sue on behalf of their members, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or "organizational standing" to sue on behalf of themselves, *see People for Ethical Treatment of Animals v. U.S. Dep't of Agric. (PETA)*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). PSCA fails on both counts.

*First*, as to *associational* standing: Precedent requires an association to show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither *the claim asserted* nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (quoting *Hunt*, 432 U.S. at 343) (emphasis added).

---

statute . . . ." *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (en banc); *see also California*, 145 S. Ct. at 968.

At issue here is the third, or "member-participation," prong. *Travelers United, Inc. v. Hyatt Hotels Corp.*, No. 23-cv-2776, 2025 WL 27162, at *12 (D.D.C. Jan. 3, 2025).  It is unsatisfied when "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 483 (D.C. Cir. 1996) (quoting *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975)).  The member-participation prong thus concentrates on "whether the claim asserted and relief requested require individualized determinations," an inquiry that "is prudential and reflects a 'judicially self-imposed limit on the exercise of federal jurisdiction' rather than a 'constitutional mandate,' focusing instead on 'matters of administrative convenience and efficiency.'" *Tanner-Brown*, 105 F.4th at 447 (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996) (cleaned up)).  Here, the Plaintiff's claims, albeit purportedly for injunctive and declaratory relief, require "consideration of the individual circumstances of any aggrieved member of the organization," *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015), namely, individualized findings concerning the employment conditions and contract terms of specific PSCs and the amount of monetary relief sought by each PSC as a remedy for changes in those conditions, *see* Pl.'s Mot. at 1–2; *see also* Am. Compl., Prayer for Relief A(d), (e).

The real focus (rather than the rhetorical one) of the claims is a contract remedy, and the "extent of the harm" to the members of PSCA would hinge on "individualized proof."  Hence, PSCA lacks associational standing.  Plaintiff's mere styling of the relief sought as equitable does not obviate the need to analyze whether the claim asserted requires member participation because of the necessity for "individualized determinations."  In *Tanner-Brown*, for example, the D.C. Circuit concluded the member-participation prong was not satisfied because the association sought the equitable remedy of accounting, which could not issue "without making individualized findings."  105 F.4th at 447; *see Weingarten v. Devos*, 468 F. Supp. 3d 322, 335–36 (D.D.C. 2020)

(member-participation prong unsatisfied for due process claim where union relied on member-specific evidence to prove asserted deficiencies despite purported character of relief sought); *see also O'Hair v. White*, 675 F.2d 680, 692 (5th Cir. 1982); *Kansas Health Care Ass'n Inc. v. Kansas Dep't of Social & Rehab. Serv.*, 958 F.2d 1018, 1021–22 (10th Cir. 1992).

Second, as to *organizational* standing: PSCA has not established that the challenged conduct has concretely injured the organization (as distinct from its members). "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). The pause in foreign aid or termination of PSC contracts does not injure PSCA itself. *See id.* at 395 (rejecting organizations' assertion that "standing exists when an organization diverts its resources in response to a defendant's actions," and instead explaining that in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), standing was sufficient because the realty defendant's "actions directly affected and interfered with" the organization plaintiff's "core business activities" distinct from its advocacy activities—"not dissimilar," the Supreme Court added, "to a retailer who sues a manufacturer for selling defective goods to the retailer"). Nor does Plaintiff meet the requirement in D.C. Circuit cases predating *Alliance* under which the organization plaintiff "must allege that the defendant's conduct perceptibly impaired the organization's *ability* to provide services." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quotations omitted) (emphasis added). As Plaintiff has not made such a showing, its claims fail for lack of Article III standing.

## B. PLAINTIFF'S APA CLAIMS ARE UNREVIEWABLE.

### 1. USAID's Pertinent Funding Decisions Are Committed to the Agency's Discretion by Law.

Plaintiff's claims are unlikely to succeed because Plaintiff challenges funding decisions by USAID that are committed to the agency's discretion by law. *See* 5 U.S.C. § 701(a)(2); Pl.'s Br.

at 4; Am. Compl. ¶¶ 1, 28, 43, 50.  In authorizing foreign aid programs and appropriating funds

for foreign aid, Congress conferred broad discretion on the Executive Branch to decide when and

how to spend funds.  *See supra* Bkgd. Section I.  Those statutes provide no standards "against

which to judge the agency's exercise of discretion" in making the many choices the agency must

make concerning how to spend those funds.  *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Consistent with Congress's broad mandate, *see infra* Section I.C.1, agency leadership is

conducting necessary planning activities in connection with the anticipated expenditure of

appropriated funds, as recently described by agency leadership in the notification to Congress, *see*

Pl.'s Mot. Ex. 2, at 1–3, ECF No. 39-3.  The agency has unreviewable discretion to make those

choices:  Decisions about how best to spend FAA funds "requires 'a complicated balancing of a

number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped

than the courts to deal with the many variables involved in the proper ordering of its priorities."

*Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting *Heckler*, 470 U.S. at 831–32).  That teaching

applies with special force in this case, which concerns the distribution of *foreign* assistance funds,

therefore implicating the President's responsibilities "[i]n the foreign affairs arena," where "the

court lacks a standard to review the agency action."  *Cf. Detroit Int'l Bridge Co. v. Gov't of

Canada*, 883 F.3d 895, 903 (D.C. Cir. 2018).  Of course, in this setting, as "the constitutional

representative of the United States in its dealings with foreign nations," *United States v. Louisiana*,

363 U.S. 1, 35 (1960), the President has "unique responsibility" for the conduct of

"foreign . . . affairs."  *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993).

   *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), underscores the Executive's

discretion over appropriated funds.  There, the D.C. Circuit considered a challenge to the Secretary

of Agriculture's implementation of a subsidy program for milk producers, where the agency

received an appropriation "to provide assistance directly to . . . dairy producers, in a manner

determined appropriate by the Secretary" "to compensate dairy producers 'for economic losses incurred during 1999.'" *Id.* at 750, 751. Plaintiffs challenged the agency's method for calculating how much money a milk producer should receive, but the court held that the statutory appropriations language "left to the Secretary the decision about how the moneys for 1999 economic losses could best be distributed," and that decision was unreviewable. *Id.* at 751–52. The court also ruled that plaintiffs could challenge the Secretary's calculation insofar as it compensated dairy producers for the wrong year. But that was because Congress had specified that compensation must be for "economic losses incurred *during 1999*." *Id.* at 752 (emphasis added). In that limited regard, "Congress limited the Secretary's authority to disburse funds." *Id.*

No similar limitation exists here: Congress merely appropriated funds for broad purposes, including for the expenses of USAID operations, without requiring the Government to provide particular funds to particular private persons, including to the members of PSCA. *See, e.g.* 138 Stat. 460, 740, 742 (providing that certain funds "to enable the President to carry out the provisions of the Foreign Assistance Act of 1961, and for other purposes," for, *inter alia*, "global health activities" and "international disaster relief, rehabilitation, and reconstruction assistance"). How those funds "could best be distributed" is not, as in *Milk Train*, a judicially reviewable question, but instead is left to agency discretion.

### 2. The Terms of the PSC Contracts Authorize the Disputed Terminations.

Plaintiff is also unlikely to succeed on the merits because its claims arise from its PSC members' contracts that allow for termination upon "convenience to the agency."[4] *See* Pl.'s Mot. Ex. 57, at 1, ECF No. 39-16. Those terms confer on agencies contractual authority to make the challenged terminations. In particular, most of USAID's PSC contracts authorize the agency to

---

[4] PSCA's original Complaint explicitly concedes that the PSC contracts include "convenience to the agency" clauses. *See* Compl. ¶ 32. The Amended Complaint omits this reference but does not disavow the fact that the contracts include this term.

"terminate performance of work under this contract in whole or, from time to time in part . . . [f]or the convenience of USAID, by giving not less than 15 calendar days advance written notice to the contractor." *Blankson v. USAID*, CBCA 8256, 2025 WL 67136 (Jan. 2, 2025); *accord Ramirez v. USAID*, CBCA 8210, 2025 WL 293628 (Jan. 15, 2025).

Indeed, substantially all USAID contracts are terminable by the agency for convenience, pursuant to the Federal Acquisition Regulation ("FAR") and USAID regulations. *See* 48 C.F.R. § 52.249-1 (authorizing termination for convenience when termination is "in the Government's interest"); *id*. §§ 49.502(a)–(b), 52.249-4, 52.249-6(a)(1). Termination for convenience terms are mandatory for procurement contracts and are implied when not included explicitly. *See K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018); *S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993); *cf. M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1304 (D.C. Cir. 1971). Likewise, applicable FAR regulations also authorize contract suspension in certain circumstances. 48 C.F.R. §§ 42.1305(a)–(b), 52.242-14, 52.242-15.

The remedy for the claims at issue here are properly found in the PSCs' contracts, not in the Constitution or the APA. For example, there is an established mechanism for counterparties to submit disputes for resolution to USAID spelled out in agency guidance (in particular, ADS ch. 303 MAB § M10(e) & M13). If counterparties believe they have claims that the resolution process does not vindicate, established mechanisms are available for them to pursue any claims, including through settlement and in certain cases through judicial review in the Civilian Board of Contract Appeals or the United States Court of Federal Claims. *See, e.g.*, 48 C.F.R. § 49.201 (providing rules for settlement of certain contract claims); 2 C.F.R. § 200.343 (effects of suspension and termination); *cf. Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 790 (2001) (discussing Tucker Act jurisdiction). As noted above, *supra* Section I.A.1, money "damages are

always the default remedy for breach of contract," *Winstar*, 518 U.S. at 885, and the agreements at issue provide the procedures available to seek those money damages.

### 3. Plaintiff Does Not Allege Any Agency Action.

Review under the APA is available only for "agency action." 5 U.S.C. § 704. It is "well-settled" that Presidential action is not subject to review under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). Because the President is not an "agency" under the APA, his actions cannot meet the APA's requirement of a "final agency action." *Franklin*, 505 U.S. at 796; *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001).

Because an executive order is a presidential action, and not an agency action, Plaintiff's challenges to Executive Order No. 14,169 under the APA are not reviewable, irrespective of whether they bring those claims against the President, as a technicality. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (finding a cause of action under the APA is not available to challenge an executive order because the APA applies only to a "person suffering legal wrong because of *agency* action." (quoting 5 U.S.C. § 702)). Thus, Plaintiff's claim that the President lacked authority to issue the executive order is non-cognizable under the APA. *See id.*; Am. Compl. ¶ 61.

Plaintiff's challenge to the implementation of the executive order likewise fails. First, where the Amended Complaint is effectively seeking review of the President's action by suing an agency acting on behalf of the President, the agency actions are not reviewable under the APA. *See Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 402 (D. Md. 2011) (concluding that where the Department of State was acting on behalf of the President, their actions were not reviewable under the APA), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *Detroit Int'l Bridge Co. v. Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (noting that "several cases have

concluded that an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA" and concluding that the action by the Department of State on behalf of the President was unreviewable under the APA), *aff'd on other grounds*, 883 F.3d 895 (D.C. Cir. 2018).

Second, Plaintiff does not even identify a discrete action that the defendant agencies have taken that is subject to APA review.  A plaintiff must plead "an identifiable action or event." *Lujan*, 497 U.S. at 899.  The only agency actions that can properly be challenged under the APA are those that are "circumscribed [and] discrete."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).  By contrast, the APA does not provide for "general judicial review of" agency conduct, *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (cited approvingly in *Louisiana v. United States*, 948 F.3d 317, 321 n.13 (5th Cir. 2020)), or making a budget request, *see Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).  The APA thus contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree."  *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (quoting *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000)); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023) (rejecting a "blunderbuss challenge" in which the plaintiffs "complain not that the Secretary failed to take a *specific* action but rather that she failed to carry out the . . . Act's general directives"), *cert. denied*, 144 S. Ct. 1110 (2024) (mem.).

Here, Plaintiff does not challenge a discrete agency action.  Rather, Plaintiff argues that "Defendants' destruction of USAID and their impoundment of funds appropriated to USAID" are final agency actions.  Pl.'s Br. at 33; *see also* Am. Compl. ¶ 67 (claiming that Defendants' "dismantling of USAID and termination of federal foreign assistance" are final agency actions

because these alleged actions "are causing immediately devastating and potentially irreversible effects.").[5]  This is the exact type of broad programmatic or "blunderbuss" challenge seeking Article III supervision of an agency's day-to-day activities that courts have repeatedly ruled is impermissible under the APA.  *See Fund for Animals*, 460 F.3d at 20; *see also Am. Forest Res. Council*, 77 F.4th at 805.  As the D.C. Circuit recently held in addressing the alleged "dismantling" of a different federal agency, "[t]he 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'"  *Widakuswara*, 2025 WL 1288817, at *3 (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 893).

### 4.  Plaintiff Does Not Allege Any Final Action.

Agency action must be "final" to be reviewable under the APA.  5 U.S.C. § 704.  Agency action is final only if two requirements are met.  The agency action "must mark the consummation of the agency's decisionmaking process," and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  As this Court has already determined in a related case, "at present," USAID "is still standing."  *AFSA*, 2025 WL 573762, at *7.  And although Secretary Rubio has informed Congress of the intent to transfer certain USAID functions to State, it remains to be determined exactly how these actions will be carried out, meaning they are plainly not final for purposes of APA review.  *See* Pl.'s Mot. Ex. 2, at 1, ECF No. 39-3.

On its face, the Executive Order's "pause" of operations to permit "reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order," Exec. Order No. 14,169 §3(a), was not a final decision.

---

[5] To the extent Plaintiff argues that the termination of any particular PSC contract is a final agency action, such claims cannot be aggregated into a single claim brought by PSCA, *see supra* Section I.A.2, and in any event cannot be brought in the district court under the CDA, *see supra* Section I.A.1.

Indeed, "[t]he responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State." *Id.* §3(c). And given that the reorganization of USAID outlined in the March 2025 notification to Congress indicates only what the Department intends to do, *see* Pl.'s Mot. Ex. 2, at 1, ECF No. 39-3, and thus requires many more decisions before that reorganization is final, that reorganization also cannot be characterized as a "final" agency action for APA purposes. Even if the reorganization one day manifested in a final agency action, Plaintiff cannot maintain this suit now by speculating about the contours of that future action.

Furthermore, the consequences to the PSC members of the plaintiff association are not ones involving the determination of rights or obligations with respect to the association. As explained above in describing Plaintiff's lack of Article III standing, the sole plaintiff before the Court does not hold a terminated contract and thus cannot obtain APA review of such a termination. Plainly, there is no final agency action here so far as the instant Plaintiff is concerned. And with respect to PSCA's members, as discussed above, the only rights or obligations that have been determined relate to their specific contracts, and those claims are subject to the CDA's channeling provisions.

### 5. The APA Does Not Provide a Cause of Action Because an Alternative Adequate Remedy Is Available to PSCs.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in a court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). "[T]he alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). Further, a remedy may be adequate even if "the arguments which can be

raised [in the alternative proceeding] are not identical to those available in an APA suit." *Elm 3DS Innovations, LLC v. Lee*, No. 1:16–cv–1036, 2016 WL 8732315, at *6 (E.D. Va. Dec. 2, 2016). If there exists an alternative adequate judicial remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017).

As already described above in Section I.A.1, the instant suit is, in essence, a contract dispute. Given that the Contract Disputes Act provides specified remedies for such contractual claims, that statute remains potentially available to PSCs as an adequate alternative. Plaintiff is therefore barred from bringing this as an APA claim. After all, as this Court has already ruled, the claims of Plaintiff's members "must be adjudicated elsewhere [under] the Contracts Dispute Act." Tr. Mar. 6, at 15:6–7. Given the adequate alternative remedy the Court has already determined is available, Plaintiff is unlikely to succeed on the merits of its APA claim.

## C. PLAINTIFF IS NOT LIKELY TO SUCCEED ON ITS ADMINISTRATIVE PROCEDURE ACT CLAIMS.

Even if Plaintiff was able to properly assert APA claims, those claims are not likely to succeed. Under the APA, a court may set aside an agency action if it finds that challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Court's role is to "ensure[] that an administrative agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "The scope of this review 'is narrow,' and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *Id.* (quoting *State Farm*, 463 U.S. at 43). Here, Defendants have not acted contrary to law or acted arbitrarily and capriciously.

### 1. Defendants Have Not Acted Contrary to Law.

Plaintiff asserts that "Defendants' disabling and destruction of USAID" and "continuing impoundment of billions in appropriated funds" are "contrary to law" because they are "in violation of § 7063 of SFOPS appropriations bills, the APA, FARRA, and Article I of the Constitution." Pl.'s Br. at 33–34, 36. These arguments are unfounded. As explained below, *infra* Section I.D, and in this section, Defendants have not violated the Constitution or the APA, respectively. And Defendants have also not acted contrary to the other statutes that Plaintiff cites.

### a. Plaintiff's Claims Do Not Fall Within the Zone of Interests Protected by the Statutes It Invokes.

In seeking to enforce appropriations laws, FARRA, and other statutes, Plaintiff faces a threshold problem, *see supra* Section I.A: It does not "fall within the zone of interests protected by the [statutes] invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–30 (2014) (citation omitted). That limitation reflects the common-sense intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011). When a plaintiff brings an APA cause of action to challenge the Government's compliance with another statute, the "interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (citation omitted). But where a plaintiff's "interests are so marginally related to . . . the purposes implicit in the statute," it "cannot reasonably be assumed that Congress intended to permit" the plaintiff's suit. *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)); *see also Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) ("Protected interests are ones asserted either by 'intended beneficiaries' of the statute at issue or

by other 'suitable challengers'—*i.e.*, parties whose interests coincide 'systemically, not fortuitously' with those of intended beneficiaries." (citation omitted)).

Plaintiff here is not a proper party to enforce appropriations laws, FARRA, or the other referenced statutes. Plaintiff is not itself subject to these laws. When Justice O'Connor confronted a challenge brought by "organizations that provide legal help to immigrants," she concluded that the relevant provisions of immigration law were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect." *Immigr. & Naturalization Serv. v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers); *see Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 900–04 (D.C. Cir. 1996) (similarly rejecting organization's zone-of-interest argument).

Nothing in the text or "the purposes implicit" in the statutes Plaintiff invokes, *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399), indicates that Congress sought to protect private party interests besides those of USAID, State, and Congress. There is no basis to conclude that Congress contemplated suits seeking to advance the interests of a private party who asserts, for example, that federal spending decisions harm it.

To the contrary, in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.), the Supreme Court held that "the Government ha[d] made a sufficient showing" that the parties challenging the Department of Defense's border-barrier spending "have no cause of action to obtain review" of actions taken under that department's appropriations statute, and accordingly stayed the district court's permanent injunction pending the Government's appeal. And *Patchak* further weighs against Plaintiff's apparent assumption that it can enforce the appropriations laws, which nowhere specify Plaintiff as the "intended beneficiaries" of the foreign aid appropriations. *Twin Rivers*

*Paper*, 934 F.3d at 616; *see Patchak*, 567 U.S. at 224 (plaintiff must fall within zone of interests of the statute "that he says was violated"). Hence, Plaintiff does not satisfy the zone-of-interests test for the statutes it seeks to enforce through the APA, which "is a 'requirement of general application'" that "*always* applies and is never negated." *See Lexmark*, 572 U.S. at 129.

### b. Defendants Have Not Violated the Further Consolidated Appropriations Act of 2024.

Contrary to Plaintiff's contention, Congress did not foreclose USAID's reorganization by appropriating specific funds to USAID in the 2024 appropriations provisions of the FCAA.[6] As noted above, Congress appropriated those funds *to the President*, not USAID, for purposes of carrying out the FAA. That appropriation reflects the President's authority under the FAA to decide which agencies to task with the FAA's administration.

Moreover, while the 2024 Act provided that certain funds were to be apportioned to USAID, Congress separately authorized the transfer of those funds to the State Department or other agencies to implement programs for which USAID is responsible. *See, e.g.*, FAA § 632(a) (22 U.S.C. § 2392(a)) (authorizing the President to "allocate or transfer to any agency of the United States Government any part of any funds available for carrying out the purposes of [the FAA] . . . ."); FAA § 632(b) (22 U.S.C. § 2392(b)) (authorizing "any officer of the United States Government carrying out functions under [the FAA to] utilize the services . . . and facilities of, or procure commodities, defense articles, or military education and training from, any agency of the United States Government as the President shall direct, or with the consent of the head of such agency"); *see also* 31 U.S.C. § 1531(a) (authorizing the transfer of funds from one agency to another "to finance or discharge a function or activity transferred or assigned under law . . . from

---

[6] Plaintiff states without elaboration that Defendants' actions are "in violation of § 7063 of SFOPS appropriations bills." Pl.'s Br. at 33–34; *see also* Am. Compl. ¶ 70. For purposes of this brief, Defendants address the FCAA, as the contemporary appropriations law.

one executive agency to another"). Accordingly, the FAA authorizes USAID to transfer funds to the State Department to perform any FAA functions.

In any event, the issue of whether Defendants complied with congressional notification requirements set forth in the 2024 Act is a political question. *See Nat. Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988). The provisions at issue are for the benefit of Congress, and it is up to Congress to determine whether they are satisfied—not the courts. If they are not, Congress has constitutional tools at its disposal to push back on the Executive Branch. But the federal courts have no role in that back-and-forth; and this Court should not inject itself, superintending Congress's judgment about these matters. Instead, this is the precise sort of statutory condition that is not privately enforceable.

### c. Defendants Have Not Violated the Foreign Affairs Reform and Restructuring Act of 1998.

Plaintiff is also incorrect that Defendants have violated FARRA by reorganizing USAID. As an initial matter, Plaintiff's Amended Complaint does not rely on FARRA in asserting an APA claim, *see* Am. Compl. ¶ 70 (citing several other statutes but not FARRA), and so preliminary injunctive relief is not appropriate on this basis.

Plaintiff's motion is unclear about how it believes Defendants have violated FARRA, but the background section of its brief recites Section 1413 of FARRA, which established USAID as an "independent establishment." *See* Pl.'s Br. at 2; 22 U.S.C. § 6563. An "independent establishment" is defined, in relevant part, as an entity "in the executive branch" that is "not an Executive department" or "part thereof." 5 U.S.C. § 104(1). In other words, USAID is "independent" in the sense that it is not part of another executive branch agency, but it is still firmly within Executive Branch control. This status does not say anything about what functions or personnel the agency must retain. Nor does this status require USAID to remain independent of State Department control. To the contrary, FARRA expressly placed the USAID Administrator

"under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592. USAID thus is still an "independent establishment" consistent with FARRA. USAID retains personnel who carry out the agency's remaining functions. And even after the reorganization outlined in the March 28, 2025 notification to Congress, that notice further anticipates that USAID will continue to exist until legislation is enacted to eliminate the agency. *See* Pl.'s Mot. Ex. 2, at 3, ECF No. 39-3 ("The Department anticipates . . . proposing legislation to abolish USAID as an independent establishment.").

### d. Defendants Have Not Violated the Impoundment Control Act.

Plaintiff's motion also suggests, albeit without arguing explicitly, that Defendants have violated the Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297, 333 (codified as amended at 2 U.S.C. §§ 682–688). *See* Pl.'s Br. at 6 (stating in the background section that the Impoundment Control Act "restrains the Executive"); *see also* Am. Compl. ¶ 70. Plaintiff is incorrect. Under the Impoundment Control Act, appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b). But the Impoundment Control Act enforces Congress's power over the purse in relation to the Executive. *See Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982). It provides for enforcement by the Comptroller General (an official in the Legislative Branch), not for private enforcement. Thus, that statute is generally not enforceable through an APA suit. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 734–35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981); *cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.).

Plaintiff appears to believe Defendants have violated laws that appropriate money to agencies for certain purposes. But Plaintiff does not claim that any statute requires Defendants to contract with PSCs specifically. And as the D.C. Circuit has explained, a pause does not qualify

30

as an impoundment or a failure to make funds "available for obligation" under the statute.  *See City of New Haven v. United States*, 809 F.2d 900, 901, 907 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from the "normal and orderly operation of the government" (quoting H.R. Rep. No. 93-658, at 41 (1973), *reprinted in* 1974 U.S.C.C.A.N. 3462, 3486–87)).  Therefore, any challenge that Plaintiff might bring under the Impoundment Control Act is, at best, not ripe.  Moreover, in any event, even if Plaintiff's Impoundment Control Act theory had merit, it still could not obtain the broad relief sought in its Motion for Preliminary Injunction.  At most, Plaintiff would have established that the Defendants' actions constituted a deferral of budget authority for which the requisite "special message" was not communicated to Congress.  *See* 2 U.S.C. § 684.  In that scenario, the remedy would be a directive to communicate the special message—not a broad injunction interfering with the Executive's lawful discretion to review and reevaluate existing funding.

### e. Defendants Have Not Violated the Anti-Deficiency Act.

Plaintiff also suggests, without arguing explicitly, that Defendants have violated the Anti-Deficiency Act, 31 U.S.C. § 1512(c)(1), which states that, "[i]n apportioning or reapportioning an appropriation, a reserve may be established only . . . to provide for contingencies; . . . to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or . . . as specifically provided by law."  *See* Pl.'s Br. at 6 (stating in the background section that the Anti-Deficiency Act "restrains the Executive"); *see also* Am. Compl. ¶ 70.  As explained, the President's actions are not "final agency action" for purposes of APA review, and in any event, the pause on foreign assistance does not create a funding reserve in violation of the Anti-Deficiency Act.  Even if the pause on foreign assistance was considered a funding reserve under the Anti-Deficiency Act, Plaintiff has not shown that an exception to the general rule does not

31

apply, such as whether the reserve was established "to achieve savings made possible by or through changes in requirements or greater efficiency of operations" or "as specifically provided by law." 31 U.S.C. § 1512(c)(1).  And regardless, the Anti-Deficiency Act "explicitly sets forth procedures for reporting violations of the Act and enforcing its provisions."  *Thurston v. United States*, 696 F. Supp. 680, 683 (1988).

### 2.    Defendants Have Not Acted Arbitrarily and Capriciously.

Plaintiff further errs in arguing that Defendants' "disabling and destruction of USAID" and "continuing impoundment of billions in appropriated funds" are arbitrary and capricious.  Pl.'s Br. at 34, 36; *see also* Am. Compl. ¶ 68.  As already explained, Plaintiff has not identified discrete, reviewable, final agency actions to form the basis of such a challenge.  *See Widakuswara*, 2025 WL 1288817, at *3.  In any event, Defendants adequately explained the actions that they have taken thus far.

Ultimately, the court's review under the APA is "narrow," and the court "is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  Under that "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (citation omitted).  No relief is available where, as here, Plaintiff simply disagrees with an agency's reasonable weighing of the different considerations involved in a policy decision.

Plaintiff errs by arguing that Defendants failed to articulate a rational connection between the facts and the choices they made.  The pause of foreign assistance was neither comprehensive nor undifferentiated:  Secretary Rubio approved waivers, including a waiver on the pause for life-saving humanitarian assistance during the review.  *See* Office of Inspector General, USAID, *Oversight  of  USAID-Funded  Humanitarian  Assistance  Programming  Impacted  by  Staffing*

*Reductions and Pause on Foreign Assistance* (Feb, 10, 2025), https://oig.usaid.gov/node/7439

[https://perma.cc/8TAV-SS3S] (incorporated by reference in Am. Compl. ¶ 28). And Plaintiff has

not alleged that every PSC contract has been terminated without exception. In any event, President

Trump's Executive Order did explain that he had instituted a ninety-day pause in United States

foreign development assistance to allow his administration to assess programmatic efficiencies,

and to ensure that all foreign aid is consistent with United States foreign policy and values to

promote world peace. *See* Exec. Order No. 14,169. That Order explains that the reason for the

pause in activity at USAID is to permit "reviews of such programs for programmatic efficiency

and consistency with United States foreign policy, to be conducted within 90 days of this order"

and "[t]he responsible department and agency heads, in consultation with the Director of OMB,

will make determinations within 90 days of this order on whether to continue, modify, or cease

each foreign assistance program based upon the review recommendations, with the concurrence

of the Secretary of State." *Id.* § 3(a), (c). Moreover, Secretary Rubio similarly explained:

> Across the United States government, it is currently impossible to access sufficient
> information in one place to determine whether the foreign assistance policies and
> interests supported by appropriations are not duplicated, are effective, and are
> consistent with President Trump's foreign policy. The Department needs a
> centralized repository from which senior Department, USAID officials,
> Ambassadors, missions and others can draw sufficiently detailed information from
> which the Secretary can make judgments. Further guidance regarding a new or
> updated repository and mandatory bureau submissions to it will be forthcoming.

Sec'y of State Mem. ¶ 2, attached as Ex. B to Decl. of Pete Marocco, Feb. 10, 2025, ECF No. 13-

1, also available at ECF No. 6-4. President Trump and Secretary Rubio exercised their discretion

to determine that it would not be possible to consider the consequences of various approaches in

the absence of a temporary pause because it was impossible to access sufficient information in one

place to determine whether foreign assistance policies and interests supported by appropriations

are not duplicated, are effective, and are consistent with the President's foreign policy.

Defendants have provided more than enough explanation, particularly given that the President's powers in the realm of foreign affairs are vast as they relate to funding for various State and USAID initiatives. *See infra* Section I.D.1. Requiring a federal agency to articulate a rationale for its action—beyond simple compliance with the President's directives—would, in essence, subject the President's directive to arbitrary and capricious review, contrary to the principle that the President is not an agency under the APA. *Franklin*, 505 U.S. at 800–01; *cf. Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 403 ("[T]he State Department and Assistant Secretary were acting on behalf of the President, and therefore their actions are not reviewable under the APA."), *aff'd*, 698 F.3d 171 (4th Cir. 2012). These are not actions reviewable under the APA in the first place, much less are they arbitrary and capricious.

Plaintiff is similarly wrong that Defendants failed to consider alternative courses of action. President Trump and Secretary Rubio ultimately exercised their discretion to determine that it would not be possible to consider the consequences of various approaches in the absence of a temporary pause and reorganization. Sec'y of State Mem. ¶ 2, attached as Ex. B to Decl. of Pete Marocco, Feb. 10, 2025, ECF No. 13-1, also available at ECF No. 6-4. Similarly, Plaintiff contends that Defendants failed to consider the "reliance interests" of contractors and other parties. Pl.'s Br. at 35. Plaintiff does not attach any of the relevant contracts, which by their terms may be terminated for convenience to the agency, *see supra* Section I.B.2, and thus could not support a reasonable reliance on their continuation. And in any event, there is no evidence that Defendants did not consider the supposed reliance interests of PSCs, rather than that Defendants considered them and determined that they were outweighed by other policy considerations. That Plaintiff does not agree with Defendants' preferred policy approach does not mean that Defendants acted arbitrarily and capriciously in forming that policy. To put it succinctly, policy disagreements cannot form the basis of an APA arbitrary and capricious claim.

### D. PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE NOT LIKELY TO SUCCEED.

At the outset, as with their statutory claims, Plaintiff cannot satisfy the zone-of-interests requirement for those constitutional claims. As explained above, Plaintiff has predicated its challenges not on asserted direct harms to itself, but on harms to its members who are not parties. But Plaintiff has not met the traditional Article III and prudential standing requirements to proceed. *See supra* Section I.A.2; *cf. Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 (D.C. Cir. 1987) ("If the litigant asserts both his own rights and those of third parties, then he must satisfy the zone of interests test with respect to both his own interests and those of the third parties whose rights he has standing to assert.").  Whatever the prospects any individual PSC may have for meeting the zone-of-interests test for a constitutional claim, there is no basis for allowing Plaintiff to assert the claims of those independent nonparties.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (Plaintiffs' complaint must "fall within 'the zone of interests to be protected or regulated by the statute *or constitutional* guarantee in question.'") (emphasis added) (citation omitted).

Moreover, Plaintiff's claims are statutory, not constitutional.  Plaintiff claims that "Defendants have neither constitutional nor statutory authority to" take the challenged actions. Pl.'s Br. at 29, 31.  The Supreme Court has rejected Plaintiff's position "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine."  *Dalton v. Specter*, 511 U.S. 462, 471 (1994); *see Widakuswara*, 2025 WL 1288817, at *5.  Plaintiff's "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Id.* at 473.

### 1. The Challenged Actions Are Supported by the President's Article II Authority, Numerous Statutes, and Historical Practice, and Do Not Violate the Separation of Powers.

The separation of powers does not generally constrain how the President organizes the Executive Branch, reflecting "the well-established rule that the Government has traditionally been

granted the widest latitude in the 'dispatch of its own internal affairs.'" *See Sampson v. Murray*, 415 U.S. 61, 83 (1974) (citation omitted). Article II of the Constitution gives the President a "vast share of responsibility for the conduct of our foreign relations," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). The President exercises that authority by, among other things, ensuring that the Executive Branch is well organized to properly administer foreign aid. Such actions are intertwined with diplomacy and foreign relations, which fall within the "plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936).

Plaintiff identifies no statute that bars USAID's restructuring. To the contrary, Congress has recognized and reinforced the President's authority in this area, enacting myriad statutes that authorize the President to organize the administration of foreign aid. *See supra* Bkgd. Section I; *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot . . . be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."); *Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("[A]n extensive list of constitutional provisions . . . entrusted foreign affairs and national security powers to the political branches."); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("[T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.''); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (noting that the President is "exclusively responsible" for "conduct of diplomatic and foreign affairs" (citation omitted)); *Worthy v. Herter*, 270 F.2d 905, 911 (D.C. Cir. 1959) ("The President is the nation's organ in and for foreign affairs.").

In essence, Plaintiff challenges a general policy initiated by the President—and implemented by his subordinates—to pause general aid to confirm that those initiatives were within the national interest. That fits comfortably within the Executive Branch's unique expertise and constitutional role; and it is the sort of conduct that a federal court should be loath to disrupt, absent a valid and binding direction to the contrary. Indeed, Plaintiff creates its own constitutional problem: It asks a court to superintend an agency by declaring the sum of agency actions unconstitutional, which would itself create separation of powers concerns by effectively authorizing a "broad programmatic attack" and the kind of "day-to-day oversight of the executive's administrative practices" for which courts are "ill-suited." *City of New York v. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019). Plaintiff simply cannot make the "extraordinarily strong showing" required for injunctive relief related to foreign affairs, which would "deeply intrude[] into the core concerns of the executive branch." *Adams*, 570 F.2d at 954–55.

### 2. The Take Care Clause Cannot Be Used to Obtain Affirmative Relief.

Plaintiff also argues that the President and the agency Defendants are not fulfilling their obligations under the Take Care Clause, U.S. Const. art. II, § 3. *See* Pl.'s Br. at 34; *see also* Am. Compl. ¶¶ 64–65. The Government is not aware of any case that has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief. The Take Care Clause does not provide a cause of action against the President or any other Defendant, and this Court, in any event, has no jurisdiction to issue declaratory or injunctive relief against the President in his official capacity based on constitutional claims. *See Dalton*, 511 U.S. at 473–74. Moreover, even if the Clause could furnish a basis for affirmative relief, Plaintiff seeks to rely on violations of purported duties that are found nowhere in statutes concerning USAID or foreign aid programs, but rather, are based on Plaintiff's subjective views about how to best implement and administer USAID.

Through the Take Care Clause, the Constitution vests broad, discretionary authority to "take Care that the Laws be faithfully executed" by the President.  U.S. Const. art. II, § 3.  Inevitably, the Laws that the President executes are those enacted by Congress.  But the Take Care Clause does not open the door to any plaintiff seeking to challenge the way the President executes Congress's laws.  Rather, the duty of the President when exercising his power to see that the laws are faithfully executed is "purely executive and political," and not subject to judicial direction.  *Mississippi v. Johnson,* 71 U.S. (4 Wall) 475, 499 (1866); *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803) ("[T]he President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character.").  To hold otherwise would upset our constitutional scheme of separation of powers and allow judicial superintendence over the exercise of Executive power that the Clause commits to the President alone.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (courts lack jurisdiction over a claim where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department."); *see also Dalton*, 511 U.S. at 474–75 (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed" (quoting U.S. Const. art. II, § 3)); *Marbury*, 5 U.S. (1 Cranch) at 170 ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.").

Nor does the Take Care Clause provide a basis to review the actions of subordinate Executive Branch officials.  The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and

directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id.* at 495–97. A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiff seeks to challenge the other Federal Defendants' alleged attempt to undermine the statutes recognizing USAID, it cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiff.

### E.  DEFENDANTS DID NOT ACT *ULTRA VIRES*.

Plaintiff argues that Defendants acted outside their constitutional and statutory authority and asserts a non-statutory right to enjoin *ultra vires* action. *See* Pl.'s Br. at 36–37; *see also* Am. Compl. ¶¶ 72–73. *Ultra vires* review is "extraordinarily narrow," *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1312 (D.C. Cir. 1984), covering only "'extreme' agency error," *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (citation omitted). *Ultra vires* claims are generally limited to circumstances where a plaintiff is completely deprived of a means of vindicating its statutory rights and lacks any other mechanism for judicial review. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) ("To prevail on an *ultra vires* claim, the plaintiff must establish . . . there is no alternative procedure for review of the statutory claim . . . ." (citation omitted)); *see also Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (explaining *ultra vires* review's "demanding standard" is necessary because it is based on the assumption Congress has not statutorily barred judicial review of agency action).

That is not the case here. Plaintiff can, and does, seek review under the APA. Hence, the Court can only reach the merits of the *ultra vires* claims if it concludes that APA review is unavailable, and even then, the claim fails for the same reasons as those described above as to the APA: "[I]f the plaintiff's claims would have failed under the APA, then those same claims

necessarily 'could not succeed under' *ultra vires* review, which has an even 'narrower scope.'"

*See id.* (quoting *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)).

## II.    PLAINTIFF FAILS TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

Plaintiff has likewise failed to establish that it or its members will suffer irreparable harm

absent a preliminary injunction.  To demonstrate irreparable harm, Plaintiff must meet a "high

standard"—they must show that they face injuries that are "certain, great, actual, and imminent,"

*Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that

are "beyond remediation."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297

(D.C. Cir. 2006).  Making that showing requires "proof" that the harm they identify "is certain to

occur in the near future."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiff first claims that the "termination notices" that Defendants issued "to all PSCs"

constitutes irreparable harm.  Pl.'s Br. at 38. As the Supreme Court has made clear, loss of

employment is only irreparable in "genuinely extraordinary situation[s]."  *Sampson*, 415 U.S. at

92 n.68.  Plaintiff argues that Defendants' actions will make it difficult for PSCs who have built a

career in foreign assistance to find employment elsewhere.  *See* Pl.'s Br. at 38–39.  But loss of

income—even combined with "insufficiency of savings or *difficulties in immediately obtaining*

*other employment* . . . however severely they may affect a particular individual"—does not qualify

as such an extraordinary situation.  *Sampson*, 415 U.S. at 92 n.68 (emphasis added).  Plaintiff's

alleged injuries do not meet the "high standard" for irreparable harm.  *Chaplaincy of Full Gospel*

*Churches*, 454 F.3d at 297.  "Mere injuries, however substantial, in terms of money, time and

energy necessarily expended in the absence of a stay are not enough."  *Id.* (quoting *Wisc. Gas Co.*,

758 F.2d at 674).  And as discussed above, *see supra* Section I.A.1, PSCs' economic injuries are reparable through the CDA channel for contract disputes concerning monetary payments.

Plaintiff's remaining arguments all amount to claims that Defendants' actions will make it more difficult for the government to provide foreign assistance in the future if the Court does not issue an injunction now.  *See* Pl.'s Br. at 39–42.  But none of Plaintiff's arguments presents a harm to Plaintiff specifically, or to its members.  This Court rejected similar arguments in denying a temporary restraining order, stating that "it is not clear how alleged harms to our constitutional democracy affect plaintiff's members in particular, as needed to surmount the ban on generalized litigating grievances."  Tr. Mar. 6, at 7:21–24.  Plaintiff's policy disagreements about how the government should be able to provide foreign assistance are not a proper basis for granting injunctive relief.

### III.  THE BALANCE OF EQUITIES (INCLUDING THE PUBLIC INTEREST) DOES NOT FAVOR A PRELIMINARY INJUNCTION.

A preliminary injunction also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor.  *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party").  The public has an interest in ensuring that tax dollars are not spent on foreign aid projects that are not "aligned with American interests and in many cases antithetical to American values," and that "serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries."  *See* Exec. Order No. 14,169, § 1.  The government thus has been undertaking a thorough review of USAID's operations in order "to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda."  State Dep't Memo, ECF No. 6-4.  The reorganization of USAID is likewise intended to ensure that all USAID functions "align with Administration priorities."  Pl.'s Mot. Ex. 2, at 1, ECF No. 39-3.

A preliminary injunction would displace and frustrate the President's decision and process about how best to administer foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). Defendants are acting quickly and decisively to ensure that "appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." State Dep't Memo, ECF No. 6-4. By contrast, Plaintiff's members voluntarily entered contracts with USAID that they knew contained clauses or were controlled by relevant regulations and law that permitted Defendants to withdraw from them. Any pecuniary harm they now have allegedly suffered is because of their taking on that risk, and in any event, such pecuniary harm can later be remedied should they prevail on the merits.

Because the public has an interest in the executive branch effectuating foreign affairs and ensuring that the Nation's foreign aid programs are properly and efficiently administered, this final factor tips in favor of Defendants. At minimum, the harms to the public counterbalance any irreparable harm to Plaintiff, making a preliminary injunction improper. As this Court recognized in *AFSA* in declining to issue a preliminary injunction against a different aspect of USAID's and State's operations, "[w]here one side claims that USAID's operations are essential to human flourishing and the other side claims they are presently at odds with it, it simply is not possible for the Court to conclude, as a matter of law or equity, that the public interest favors or disfavors an injunction." *AFSA*, 2025 WL 573762, at *11; *see also* Tr. Mar. 6, at 15:19–21 ("[T]his factor, at a minimum is in equipoise and perhaps favors the government as well."). The Court should accordingly deny Plaintiff's requested preliminary injunction. *See Kim v. Fin. Indus. Regul. Auth.,*

*Inc.*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023), *appeal dismissed*, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).

## IV.    ANY PRELIMINARY INJUNCTION SHOULD BE NARROWLY TAILORED.

For all the foregoing reasons, it would be inappropriate for the Court to issue any preliminary injunction in any form.  However, should the Court choose to do so, "an injunction must be narrowly tailored to remedy the harm shown."  *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 842 (D.C. Cir. 1985).  Here, any injunction should apply no more broadly than to those PSCs' contract-specific terminations that are challenged.  Judicial remedies "must be tailored to redress the plaintiff's particular injury."  *Gill*, 585 U.S. at 73.  A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury."  *Id.* at 66 (citation omitted).  Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice."  *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

The presence of an associational plaintiff (PSCA) does not change those principles and cannot justify awarding relief to nonparties to this case who are "not the proper object of th[e court's] remediation."  *Lewis v. Casey*, 518 U.S. 343, 358 (1996).  Instead, at a minimum, equitable principles preclude granting relief to any member who has not been identified in Plaintiff's filings and agreed to be bound by the judgment.  *Alliance*, 602 U.S. at 401–02 (Thomas, J., concurring) (noting that "[u]niversal injunctions" as a means of granting relief to an entire association's members are "legally and historically dubious" (citation omitted)).  Moreover, providing relief to any *unidentified* members of the associational plaintiff in these circumstances undermines basic principles of preclusion and claim splitting.  *See id.* at 402 (Thomas, J., concurring) (noting that

broad associational standing "subverts the class-action mechanism" by allowing an organization to "effectively bring a class action without satisfying any of the ordinary requirements").

Any relief extending beyond the identified members of PSCA would also cause harm to the government and would be inconsistent with the teaching that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Any relief awarded therefore should be properly narrowed to address only the contract-specific decisions concerning each PSCs' contract—not to the conduct of any Defendants concerning other parties or other decisions. The burdens on Defendants that would result from overly broad relief are especially serious in these actions because the challenged foreign assistance funding determinations stem from the President's exercise of his Article II authorities over foreign affairs—authorities that Congress has confirmed, not undermined, through various provisions of the foreign assistance statutes conferring marked discretion on Executive Branch agencies in such funding determinations. *See, e.g.*, 22 U.S.C. § 2151t(a).[7]

---

[7] Moreover, the requested equitable and declaratory relief is categorically unavailable against the President, named as a Defendant. Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). There is no such tradition of equitable relief against the President. To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi*, 71 U.S. at 501. The Supreme Court reaffirmed that principle more recently in *Franklin*, where the Court declined to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President." 505 U.S. at 800–01. That tradition properly respects the President's "unique position in the constitutional scheme." *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749–50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States"); *see also Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment). The narrow exception potentially left open for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here because the challenged actions entail exercise of the President's discretion in supervising and directing the Executive Branch. *See Mississippi*, 71 U.S. at 498; *Nat'l Treasury Emps. Union v.*

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

Dated: May 7, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director
Federal Programs Branch

LAUREN A. WETZLER
Deputy Director
Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

*/s/ Michael P. Clendenen*
MICHAEL P. CLENDENEN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 305-0693
Email: michael.p.clendenen@usdoj.gov

*Counsel for Defendants*

---

*Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974); *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931). Declaratory relief is similarly unavailable against the President. *See Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment). Although, for the reasons explained above, no relief at all is proper here, if the Court were to conclude otherwise, relief could only be directed at subordinate officials. *See Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party").