## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERSONAL SERVICES CONTRACTOR ASSOCIATION,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>DONALD TRUMP, *et al.*,<br><br>　　　　　　　　Defendants. | Civil Action No. 25-469-CJN |

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR
## PRELIMINARY INJUNCTION

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Miriam Becker-Cohen (DC Bar No. 1616670)
Anna K. Jessurun (DC Bar No. 90021022)
Nargis Aslami (DC Bar No. 90033495)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF *AMICUS CURIAE* ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

ARGUMENT ................................................................................. 4

    I.   Congress Has the Sole Authority to Create, Restructure, and Abolish Federal Departments and Agencies ........................................................ 4

    II.  As Historical Practice Demonstrates, When Congress Wants to Give the President Authority to Reorganize the Executive Branch, It Does So Through Legislation ...... 11

    III.  USAID Is a Statutorily Mandated Agency, and President Trump Does Not Have the Power to Abolish It Unilaterally ............................................. 15

CONCLUSION ............................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ........................................................................................................... 2

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ............................................................................................................... 5

*Free Ent. Fund v. PCAOB,*
  561 U.S. 477 (2010) ..................................................................................................... 1, 4

*INS v. Chadha,*
  462 U.S. 919 (1983) ................................................................................................... 10, 14

*Kendall v. United States ex rel. Stokes,*
  37 U.S. 524 (1838) ........................................................................................................... 19

*La. Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986) ........................................................................................................... 7

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ......................................................................................................... 10

*Myers v. United States,*
  272 U.S. 52 (1926) ............................................................................................................. 5

*Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.,*
  462 U.S. 810 (1983) ........................................................................................................... 9

*NFIB v. OSHA,*
  595 U.S. 109 (2022) ...................................................................................................... 5, 7

*NLRB v. Noel Canning,*
  573 U.S. 513 (2014) ......................................................................................................... 10

*The Pocket Veto Case,*
  279 U.S. 655 (1929) ......................................................................................................... 10

*United States v. Midwest Oil Co.,*
  236 U.S. 459 (1915) ......................................................................................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ........................................................................................... 4, 10, 19-21

## TABLE OF AUTHORITIES – cont'd

Page(s)

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ........................................................................................ 4, 20

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 1 .................................................................................... 2, 4

U.S. Const. art. I, § 7, cl. 2 .......................................................................... 4, 17, 19

U.S. Const. art. I, § 8, cl. 18 ........................................................................ 5

U.S. Const. art. II, § 2, cl. 2 ........................................................................ 5

U.S. Const. art. II, § 3 ................................................................................. 3, 16, 19

LEGISLATIVE MATERIALS

Act of July 27, 1789, ch. 4, 1 Stat. 28 ......................................................... 5, 6

Act of Aug. 7, 1789, ch. 7, 1 Stat. 49 .......................................................... 5, 6

Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 ........................................................ 5, 6

Act of Sept. 11, 1789, ch. 13, 1 Stat. 67 ...................................................... 6

Act of Sept. 15, 1789, ch. 14, 1 Stat. 68 ...................................................... 7

Act of Apr. 25, 1812, ch. 68, 2 Stat. 716 ..................................................... 8

Act of July 4, 1836, ch. 352, 5 Stat. 107 ...................................................... 8

Act of July 4, 1836, ch. 357, 5 Stat. 117 ...................................................... 8

Act of Mar. 3, 1849, ch. 108, 9 Stat. 395 ..................................................... 6, 8

Act of June 22, 1870, ch. 150, 16 Stat. 162 ................................................. 6

Act of June 30, 1932, Pub. L. No. 72-212, 47 Stat. 382 .............................. 12

Act of Mar. 3, 1933, Pub. L. No. 72-428, tit. IV, 47 Stat. 1489 .................. 13

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Act of Oct. 19, 1984, Pub. L. 98-532, 98 Stat. 2705 ............................................. 14

Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) ..................................... 6

75 Cong. Rec. (1932) ............................................................................................. 12

83 Cong. Rec. (1938) ............................................................................................. 13

Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, tit. II, 108
Stat. 3178 ......................................................................................................... 9

Department of State, Foreign Operations, and Related Programs Appropriations Act,
2024, Div. F, Pub. L. No. 118-47, 138 Stat. 460 ............................................. 21

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, tit.
III, 124 Stat. 1520 (2010) ................................................................................ 9

Energy Reorganization Act of 1974, Pub. L. No. 93-438, 88 Stat. 1233 .............. 10

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G,
112 Stat. 2681-761 ................................................................................. 2, 17, 18

Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424 ................... 2, 16

Full-Year Continuing Appropriations Act, 2025, Div. A, Pub. L. No. 119-4, 139 Stat. 9 .... 21

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ................. 9

H.R. 1561, 104th Cong. ......................................................................................... 17

H.R. 1757, 105th Cong. ......................................................................................... 17

H.R. Rep. No. 91-1104 (1970) ............................................................................... 9

ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 903 ........................ 8

Postal Reorganization Act, Pub. L. 91-375, 84 Stat. 719 (1970) .......................... 9

Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561 .......................... 13, 14

Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613 ............................. 14

Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 ............................. 14

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29.................................................. 14, 17

Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192..................... 14

5 U.S.C. § 104.................................................................................................................... 2, 18

5 U.S.C. § 901.................................................................................................................... 3, 14

5 U.S.C. § 902.................................................................................................................... 3, 14

5 U.S.C. § 903.................................................................................................................... 3, 14

5 U.S.C. § 904.................................................................................................................... 3, 14

5 U.S.C. § 905.................................................................................................................... 3, 14

5 U.S.C. § 906.................................................................................................................... 3, 14

5 U.S.C. § 907.................................................................................................................... 3, 14

5 U.S.C. § 908.................................................................................................................... 3, 14

5 U.S.C. § 909.................................................................................................................... 3, 14

5 U.S.C. § 910.................................................................................................................... 3, 14

5 U.S.C. § 911.................................................................................................................... 3, 14

5 U.S.C. § 912.................................................................................................................... 3, 14

6 U.S.C. § 111..................................................................................................................... 7

6 U.S.C. § 291..................................................................................................................... 9

12 U.S.C. § 5413................................................................................................................. 9

20 U.S.C. § 3411................................................................................................................. 7

20 U.S.C. § 3441................................................................................................................. 11

20 U.S.C. § 3508................................................................................................................. 11

21 U.S.C. § 393................................................................................................................... 7

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

22 U.S.C. § 2151 ................................................................................................. 2, 16

22 U.S.C. § 6563 ............................................................................................. 2, 18, 20

22 U.S.C. § 6601 ............................................................................................. 2, 18, 20

42 U.S.C. § 901 ....................................................................................................... 7

51 U.S.C. § 20111 ................................................................................................... 7

## EXECUTIVE BRANCH MATERIALS

*Administration of Foreign Assistance and Related Functions*, Exec. Order 10973,
26 Fed. Reg. 10469 (Nov. 3, 1961) ................................................................. 17

*Administration of Foreign Assistance and Related Functions*, Exec. Order 12163,
44 Fed. Reg. 56673 (Sept. 29, 1979) .............................................................. 17

William J. Clinton, Veto Message Regarding H.R. 1561, 104th Cong. (Apr. 15, 1996),
H.R. Doc. 104-197 ......................................................................................... 17

William J. Clinton, Veto Message Regarding H.R. 1757, 105th Cong. (Oct. 21, 1998),
H.R. Doc. 105-329 ......................................................................................... 17

John F. Kennedy, Special Message to the Congress on Foreign Aid (Mar. 22, 1961),
https://www.presidency.ucsb.edu/documents/special-message-the-congress-foreign-
aid-1 ......................................................................................................... 15, 16

John F. Kennedy, Urgent National Needs—Address of the President of the United States
(May 25, 1961), *in* 107 Cong. Rec. 8878 ...................................................... 15

Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631 .............................................. 11

Reorganization Plan No. 3 of 1970, *in* 84 Stat. 2086 ............................................ 11

Reorganization Plan No. 3 of 1978, *in* 92 Stat. 3788 ............................................ 11

Reorganization Plan No. 2 of 1979, *in* 93 Stat. 1378 ............................................ 17

Reorganization Plan and Report Submitted by President Clinton to Congress, Pursuant to
Section 1601 of FARRA (Dec. 30, 1998), https://1997-2001.state.gov/global/gen-
eral_foreign_policy/rpt_981230_reorg2.html ........................................... 2, 18-20

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

Statement About Congressional Action on Reorganization of the Executive Branch (Feb.
24, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* 74
(U.S. Gov't Printing Off., Wash. 1977)...........................................................................     12

Statement About Signing the "Economy Act" (June 30, 1932), *in Public Papers of the
Presidents of the United States: Herbert Hoover* 283 (U.S. Gov't Printing Off., Wash.
1977) .................................................................................................................................     12

<u>BOOKS, ARTICLES, AND OTHER AUTHORITIES</u>

Paul Stephen Dempsey, *The Rise and Fall of the Interstate Commerce Commission: The
Torturous Path from Regulation to Deregulation of America's Infrastructure*,
95 Marq. L. Rev. 1151 (2012) .........................................................................................     6-8

Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority:
History, Recent Initiatives, and Options for Congress* (2012)........................................     11-15

Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The
Interstate Commerce Commission* (2024) ......................................................................     7, 8

Robert L. Rabin, *Federal Regulation in Historical Perspective*,
38 Stan. L. Rev. 1189 (1986)...........................................................................................     6, 7

2 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911).............................     5

Dianne E. Rennack, *Cong. Rsch. Serv., R40089, Foreign Assistance Act of 1961:
Authorization and Corresponding Appropriations* (2023) .............................................     16

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case and the questions it raises about our Constitution's separation of powers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

When Congress establishes an agency, that agency is required by law to exist. Only Congress—not the President—has "plenary control over the . . . existence of executive offices." *Free Ent. Fund v. PCAOB*, 561 U.S. 477, 500 (2010). Thus, any action to create, restructure, or eliminate a federal agency must stem from an act of Congress. Though Congress may temporarily delegate this authority to the President—subject, of course, to appropriate restraints—in the absence of such a delegation, the President lacks the power to unilaterally dismantle an executive agency.

The history of USAID illustrates this principle. At the height of the Cold War, Congress concluded that the way to prevent developing nations from falling to communism was to empower those countries to prosper politically and economically through the provision of immediate humanitarian aid and long-term development assistance. But the executive-branch structures in place to provide such assistance were bureaucratically unwieldy and unsuited to the task at hand. Thus, at President Kennedy's urging, Congress passed the Foreign Assistance Act of 1961, which

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. Plaintiff consents to the filing of this brief. Defendants do not oppose its filing.

delegated to Kennedy the authority to establish USAID to help "strengthen friendly foreign countries by encouraging the development of their free economic institutions and productive capabilities." Pub. L. No. 87-195, § 102, 75 Stat. 424, 424 (codified at 22 U.S.C. §§ 2151 *et seq.*). That is precisely what Kennedy did.

Decades later, in 1998, Congress cemented USAID as a statutorily mandated agency outside the State Department when it passed the Foreign Affairs Reform and Restructuring Act (FARRA). *See* Pub. L. No. 105-277, Div. G, 112 Stat. 2681-761. FARRA mandated USAID's continued existence as an "independent establishment," 5 U.S.C. § 104, "within the Executive branch of Government," 22 U.S.C. § 6563(a), unless the President abolished or restructured the agency within sixty days of FARRA's enactment, *id.* § 6601(a), (d). On December 30, 1998, President Clinton submitted a report to Congress determining that "[e]ffective April 1, 1999, [USAID] shall continue as an independent establishment in the Executive Branch." Reorganization Plan and Report Submitted by President Clinton to Congress, Pursuant to Section 1601 of FARRA (Dec. 30, 1998), https://1997-2001.state.gov/global/general_foreign_policy/rpt_981230_reorg2.html [hereinafter 1998 Reorganization Plan & Report]. That was the President's final word on the matter—after the sixty-day period expired, Congress alone retained the authority to abolish or restructure USAID through the lawmaking process and consistent with the "structural protections against abuse of power [that are] critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

Indeed, the Constitution vests "[a]ll legislative Powers" in Congress, U.S. Const. art. I, § 1, and with these powers, Congress has created, restructured, and eliminated executive departments and agencies since the Founding. Among Congress's first statutes were those creating the Departments of Treasury, War, and Foreign Affairs. As the nation grew and faced new challenges,

Congress established different departments, agencies, and offices to address them. And in response to changing conditions, Congress, often in partnership with the President, has at times reorganized and eliminated executive agencies to ensure that the executive branch can meet the needs of the American people in an efficient manner. Critically, all of these actions to restructure the executive branch have been accomplished through legislation passed by Congress and signed into law by the President.

That the power to reorganize the executive branch belongs to Congress alone is underscored by the fact that when Presidents have reorganized the executive branch, they have always done so pursuant to congressional delegations of that power—delegations made through legislation and subject to appropriate restraints. President Kennedy's initial establishment of USAID in 1961 was accomplished through such a delegation. And throughout the twentieth century, Congress also passed laws called Reorganization Acts. *See, e.g.*, 5 U.S.C. §§ 901-12. These Acts, which always had expiration dates, authorized the President to make substantial changes to the executive branch (absent congressional disapproval), ranging from creating to consolidating to abolishing certain agencies. The history of the Reorganization Acts demonstrates that when Congress wants to give the President the power to reorganize the executive branch or abolish agencies, it knows how to do so. But absent such authorization, that power remains solely with Congress.

The creation of USAID is a quintessential example of Congress and the executive working together in their respective constitutional lanes to structure the federal government so that it best serves the American people. When Kennedy saw the need for a new agency to consolidate foreign aid functions, he knew he could not create it unilaterally. Instead, he exercised his authority to "recommend" to Congress that it pass a law creating such an agency or delegating the authority to create it to him. U.S. Const. art. II, § 3. Years later, President Carter also exercised his duly

delegated authority to relocate USAID within the executive branch. And when Congress passed laws respecting the structure of USAID that President Clinton disfavored, he vetoed them, as the Constitution empowered him to do, U.S. Const. art. I, § 7, cl. 2. No President—until today—ever asserted that his foreign affairs power authorized the unilateral abolition of the nation's foreign aid apparatus. After all, the "Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015).

The "President's power, if any, to issue [an] order" abolishing USAID "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). And "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Id.* at 637 (Jackson, J., concurring). Here, President Trump's effort to unilaterally dismantle USAID defies the express will of Congress, as expressed in FARRA and reaffirmed in recent appropriations statutes, that USAID exist as an independent establishment in the executive branch. In short, Defendants lack the power to do what only Congress can do—fundamentally restructure the federal government by shuttering an agency.

This Court should thus grant Plaintiff's Motion for Preliminary Injunction.

## ARGUMENT

**I.    Congress Has the Sole Authority to Create, Restructure, and Abolish Federal Departments and Agencies.**

**A.** The Constitution provides that "[a]ll legislative Powers," U.S. Const. art. I, § 1, including "plenary control over the . . . existence of executive offices," *Free Ent. Fund*, 561 U.S. at 500, "shall be vested in a Congress of the United States," U.S. Const. art. I, § 1. It also grants Congress the exclusive power to "carr[y] into Execution" not only the "foregoing Powers" under Article I,

Section 8, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. By referencing the Vesting Clauses of Article II and Article III, this affirmative textual grant of congressional power "undoubtedly" authorizes Congress to pass laws creating executive departments, agencies, and offices. *Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *see* U.S. Const. art. II, § 2, cl. 2 (granting Congress the authority to establish offices "by Law"); *Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction."). Agencies are thus "creatures of statute," *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam), and Congress has plenary authority over the structure of the federal government.

With that plenary authority comes substantial flexibility. Indeed, the Framers rejected a plan to delineate in the Constitution the specific departments of the executive branch and their duties, choosing instead to give Congress the power to create those departments through the legislative process. *See* 2 *Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911). The First Congress promptly exercised that power, recognizing that executive departments would be essential to a functional government. Thus, some of the first statutes Congress passed were those establishing executive departments, including the Department of Treasury, Act of Sept. 2, 1789, ch. 12, § 1, 1 Stat. 65, 65; the Department of War, Act of Aug. 7, 1789, ch. 7, § 1, 1 Stat. 49, 49-50; and the Department of Foreign Affairs, Act of July 27, 1789, ch. 4, § 1, 1 Stat. 28, 28-29.

To ensure that these departments functioned as envisioned, the First Congress gave some of them specifically delineated responsibilities, while it instructed others simply to execute the duties the President assigned them. For example, Congress required the Treasury Secretary to

"digest and prepare plans for the improvement and management of the revenue . . . ; to prepare and report estimates of the public revenue, and the public expenditures . . . and generally to perform all such services relative to . . . finances." Act of Sept. 2, 1789, § 2, 1 Stat. at 65-66. By contrast, Congress authorized the Secretaries of War and Foreign Affairs to "perform and execute such duties as shall from time to time be enjoined on or intrusted to him by the President." Act of July 27, 1789, § 1, 1 Stat. at 29; *see* Act of Aug. 7, 1789, §1, 1 Stat. at 50 (similar). And whatever the scope of their statutorily designated responsibilities, Congress ensured that these departments could hire the staff they needed to accomplish their work. *See* Act of Sept. 11, 1789, ch. 13, § 2, 1 Stat. 67, 68 ("the heads of the [Treasury, State, and War] departments . . . shall appoint such clerks therein respectively as they shall find necessary"). Over the next several decades, Congress created additional executive departments to meet the fledgling nation's new needs. *See, e.g.*, Act of Mar. 3, 1849, ch. 108, § 1, 9 Stat. 395, 395 (Interior Department); Act of June 22, 1870, ch. 150, § 1, 16 Stat. 162, 162 (Justice Department).

Congress's power over the structure of the federal government extends beyond the establishment of executive departments to the creation of agencies to address the nation's most pressing problems. In 1887, Congress created the first regulatory agency: the Interstate Commerce Commission (ICC). *See* Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887). Railroads were "central[] . . . to the national economy in the post-Civil War period," Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 Stan. L. Rev. 1189, 1197 (1986), but with this booming industry came considerable challenges, including "[r]uinous rate wars," "price fixing and pooling agreements," and "onerous" working conditions, Paul Stephen Dempsey, *The Rise and Fall of the Interstate Commerce Commission: The Torturous Path from Regulation to Deregulation of America's Infrastructure*, 95 Marq. L. Rev. 1151, 1155-56, 1159 (2012). Because states were

unable to address these problems themselves, a national solution was needed. *See* Rabin, *supra*, at 1206. Congress thus created the ICC to "regulate the rates and practices of the railroads," Dempsey, *supra*, at 1152, giving it the power to receive and investigate complaints about rail carriers and issue orders if it found rates to be unjust or unreasonable, *see* Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The Interstate Commerce Commission* 4 (2024) [hereinafter Hogue, *ICC*].

In the years since, Congress has repeatedly created other agencies and departments, including the Department of Education, 20 U.S.C. § 3411; the Department of Homeland Security, 6 U.S.C. § 111(a); the Food and Drug Administration, 21 U.S.C. § 393(a); the Social Security Administration, 42 U.S.C. § 901(a); and the National Aeronautics and Space Administration (NASA), 51 U.S.C. § 20111(a). The creation of each of these departments and agencies reflected Congress's judgment about the proper means to respond to a unique moment in history, provide a public service, or effectuate a policy. Each agency's powers are prescribed by "the authority that Congress has provided" through statute. *NFIB*, 595 U.S. at 665. In other words, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). But once Congress mandates certain functions for an agency, those duties are nondiscretionary.

**B.** Congress also has the power to restructure and abolish agencies as it finds necessary, including by renaming federal agencies, subsuming one federal agency or office within another, changing an agency's functions, or eliminating an agency altogether. Indeed, Congress has exercised this power since its earliest days. *See, e.g.*, Act of Sept. 15, 1789, ch. 14, § 1, 1 Stat. 68, 68 (renaming the Department of Foreign Affairs the Department of State).

In the early nineteenth century, Congress also began creating new offices that were housed within executive departments and, as necessary, began reassigning and reorganizing their functions and supervision. *See, e.g.*, Act of Apr. 25, 1812, ch. 68, § 1, 2 Stat. 716, 716 (establishing the General Land Office (GLO) within the Treasury Department); Act of July 4, 1836, ch. 352, §§ 1-5, 5 Stat. 107, 107-11 ("reorganiz[ing]" the GLO); Act of July 4, 1836, ch. 357, § 1, 5 Stat. 117, 117-18 (establishing the Patent Office within the State Department). Later, when Congress created the Department of the Interior, it transferred the GLO and the Patent Office from their original departments to the new Department. Act of Mar. 3, 1849, §§ 2-3, 9 Stat. at 395. Congress also reassigned certain powers previously exercised by the Secretaries of Treasury, War, and State to the new Secretary of the Interior. *See id.* §§ 4-7, 9 Stat. at 395-96.

Even when past Presidents have called for agencies to be abolished, they have always recognized that Congress retains the ultimate power to eliminate agencies and transfer their functions. Consider the history of the ICC. Beginning in the 1970s, as the importance of railways waned due to cars and interstate highways, railroads became less profitable, and "regulation . . . took the blame." Dempsey, *supra*, at 1172. In a series of statutes, Congress began limiting the ICC's powers, *see id.* at 1173, and Presidents Carter and Reagan appointed ICC Commissioners "fervently dedicated to deregulation," *id.* at 1183. Notably, President Reagan pushed to abolish the ICC and proposed legislation to do so, but Congress did not pass it, so the ICC remained. Hogue, *ICC*, *supra*, at 18. Then, in 1995, President Clinton and Congress agreed to abolish the ICC. *See id.* at 19. Congress eliminated the agency by enacting the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 903, which transferred some of its functions to a newly created Surface Transportation Board and the Department of Transportation, Hogue, *ICC*, *supra*, at 22.

The creation of today's Postal Service is another example of a past President—one hardly remembered for his submissiveness to Congress—recognizing that the proper means to seek elimination of an agency is through legislation. In 1970, postal service reform was urgently needed because, at the time, the nation's "vast sprawling postal complex [was] heavily overburdened and in deep trouble," and struggled to "[keep] pace with the advances of the national economy." H.R. Rep. No. 91-1104, at 3652-53 (1970). After extensive negotiations about how to change the postal system, "President Nixon transmitted the proposed legislation to" Congress, *id.* at 3652, and the reorganization was implemented when "Congress enacted the Postal Reorganization Act." *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 813 (1983) (citing Pub. L. 91-375, 84 Stat. 719 (1970)). "The Act abolished the Post Office Department, which since 1789 had administered the nation's mails. In its place, the Act established the United States Postal Service as an independent agency." *Id.* (citations omitted).

Congress has abolished agencies through legislation more recently as well, often with the goal of increasing agency efficiency. For instance, when Congress created the Department of Homeland Security in 2002 in response to 9/11, it abolished the Immigration and Naturalization Service and transferred its functions to the new Department. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified at 6 U.S.C. § 291). And when Congress reformed federal oversight of financial institutions in the wake of the 2008 recession and sought to "streamline and rationalize the supervision of depository institutions and [their] holding companies," Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, tit. III, § 301, 124 Stat. 1520, 1520 (2010), it abolished the Office of Thrift Supervision, *id.* § 313, 124 Stat. at 1523 (codified at 12 U.S.C. § 5413). Other examples abound. *See, e.g.*, Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, tit. II, §§ 202, 211, 108 Stat. 3178,

3209 (transferring most of the functions of offices within the Agriculture Department to the Secretary of Agriculture "to achieve greater, efficiency, effectiveness, and economies"); Energy Reorganization Act of 1974, Pub. L. No. 93-438, §§ 101, 104(a), 88 Stat. 1233, 1234, 1237 (abolishing the Atomic Energy Commission and transferring certain functions to a new agency).

**C.** This "[l]ong settled and established practice" of Congress using the lawmaking process to reorganize or eliminate agencies, and receiving due deference from the President, underscores that the authority to create, restructure, and abolish federal agencies lies with Congress as the nation's lawmaking body. *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) ("[l]ong settled and established practice" is entitled to "great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President" (alteration in original) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929))); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." (quotation marks omitted)). And that lawmaking process must "be exercised in accord with [the] single, finely wrought and exhaustively considered, procedure" of bicameralism and presentment that the Framers selected. *INS v. Chadha*, 462 U.S. 919, 951 (1983). Pursuant to that process, the President can recommend that Congress create an executive agency, and he can veto a congressional effort to create one, but he has no power to create or destroy an agency on his own. *See Youngstown*, 343 U.S. at 587 ("The Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad."). The Constitution simply "does not confer upon him any power to enact laws or to suspend or repeal such as the Congress enacts." *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915).

And that is why even congressional delegations to the executive branch of the authority to reorganize or abolish an agency still require the passage of legislation, as the next Section explains.

## II.    As Historical Practice Demonstrates, When Congress Wants to Give the President Authority to Reorganize the Executive Branch, It Does So Through Legislation.

From 1932 to 1984, Congress gave the President reorganization authority by passing and renewing a series of laws known as the Reorganization Acts. As the history of these laws demonstrates, when Congress believes that delegating its reorganization power to the President will promote efficiency in government, it knows how to make such a delegation while at the same time limiting the scope of that delegation to protect against presidential overreach.

Broadly speaking, the Reorganization Acts authorized the President to reorganize executive agencies by submitting a Reorganization Plan to Congress. Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* 1 (2012) [hereinafter Hogue, *Presidential Reorganization*]. If Congress consented to the plan (by either inaction or express approval), then the plan became law. *Id.* at 1-2.

Some of today's major agencies were created by Reorganization Plans. For example, the Department of Health, Education, and Welfare (HEW)—the predecessor to the Department of Health and Human Services (HHS) and Department of Education—was established by President Eisenhower through a Reorganization Plan. *See* Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631; 20 U.S.C. § 3441 (transferring the educational functions of the HEW Secretary to the new Secretary of Education); *id.* § 3508 (changing HEW's name to HHS). The Environmental Protection Agency (EPA) and the Federal Emergency Management Agency (FEMA) were similarly created by Reorganization Plans. *See* Reorganization Plan No. 3 of 1970, *in* 84 Stat. 2086 (creating the EPA); Reorganization Plan No. 3 of 1978, *in* 92 Stat. 3788 (creating FEMA).

Congress passed the first iteration of expressly delegated reorganization authority in 1932 at the urging of President Hoover. In a statement to Congress on "[t]he need for reorganization," President Hoover emphasized that the "gradual growth" of the executive branch had led to "overlapping and waste," and he believed that "the number of agencies can be reduced." 75 Cong. Rec. 4181 (1932). He recommended that the "[a]uthority under proper safeguards . . . to effect these transfers and consolidations" should "be lodged in the President" via executive orders subject to Congress's review. *Id.* at 4182; *see* Statement About Congressional Action on Reorganization of the Executive Branch (Feb. 24, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* 74, 74 (U.S. Gov't Printing Off., Wash. 1977) ("It is a most unpleasant task to abolish boards and bureaus and to consolidate others. . . . [Reorganization] should be lodged with the Executive with the right of Congress to review the actions taken."). Congress subsequently passed legislation to permit the President to transfer the functions of one agency to another and consolidate the functions of agencies or departments but did not allow the President to abolish agencies or departments. *See* An Act of June 30, 1932, Pub. L. No. 72-212, §§ 403, 406, 47 Stat. 382, 413-15. Hoover lamented this limit on his authority. *See* Statement About Signing the "Economy Act" (June 30, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover*, *supra*, at 283, 283 ("the bill is so framed as to render abolition or consolidation of the most consequential commissions and bureaus impossible of consummation").

Hoover thus continued to push for the expansion of reorganization authority. Hogue, *Presidential Reorganization*, *supra*, at 7-8. In 1933, with the Act set to expire in two years, Congress acquiesced in part, amending the Act to allow the President to abolish an executive agency (defined as "any commission, independent establishment, board, bureau, division, service or office in the executive branch of the Government"), but still prohibiting the abolition of an executive

department. *See* Act of Mar. 3, 1933, Pub. L. No. 72-428, tit. IV, §§ 402, 403, 409, 47 Stat. 1489, 1517-19. At the same time, Congress explained that it was delegating this power to the President only on a temporary basis due to the "serious emergency [that] exists by reason of the general economic depression" and an "imperative to reduce drastically governmental expenditures." *Id.* § 401, 47 Stat. at 1517. After Hoover left office, President Roosevelt used the power to, among other things, consolidate agency functions into newly-designated agencies such as the Office of National Parks, Buildings, and Reservations, and the Division of Territories and Insular Possessions in the Department of the Interior, and abolish the United States Shipping Board and the Board of Indian Commissioners. *See* Hogue, *Presidential Reorganization*, *supra*, at 9.

In 1937, after the authority granted in 1933 expired, Roosevelt requested renewed reorganization authority from Congress and pushed for even greater powers. *Id.* at 10. One of the proposed bills would have allowed the President to reorganize the executive branch without any involvement from Congress and without an expiration date. *See id.* This proposal sparked sharp rebukes from members of Congress who were deeply concerned about giving away their powers over departments and agencies in such a sweeping fashion. *See, e.g.*, 83 Cong. Rec. 4190 (1938) ("[L]eave final authority for changes in the Congress, where it belongs.") (Sen. Brown); *id.* at 4195 ("If the President could abolish or consolidate these agencies without authority of Congress you may rest assured he would not be here asking for authority. He cannot act [unless] we give him power which belongs to Congress.") (Sen. Borah); *id.* at 4196 ("The powers which are proposed to be given by the bill . . . are yet the greatest legislative powers which exist in the Congress of the United States.") (Sen. Johnson).

The next year, Congress passed the Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561, a narrower version of the bills proposed the year before—indeed narrower still than the

reorganization authority Congress had granted in 1933. The purpose of the Act was, among other things, to "increase the efficiency of the operations of the Government" and "to abolish such agencies as may not be necessary." *Id.* § 1(a)(2), (4), 53 Stat. at 561. The Act permitted the President to reorganize federal agencies and departments through the submission of a Reorganization Plan (rather than executive order) to Congress, which would become law absent a concurrent resolution rejecting the Plan. *Id.* §§ 4-5, 57 Stat. at 562-63. This time, however, Congress prohibited the President from creating or abolishing executive departments or abolishing independent agencies in whole or in part. *See id.* § 3, 57 Stat. at 561-62. This Reorganization Act expired in 1941. *Id.* § 12, 57 Stat. at 564.

Over the ensuing decades, Congress passed additional Reorganization Acts, each with sunset dates, and at times modified the scope of the delegation of its reorganization power. Hogue, *Presidential Reorganization*, *supra*, at 22; *see, e.g.*, Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613 (prohibiting the President from limiting the independence of an independent agency); Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 (allowing the President to create departments); Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 (prohibiting the President from creating or abolishing departments or abolishing an independent agency).

Congressionally authorized presidential reorganization power came to an end in the 1980s. President Reagan requested the authority in 1981, but Congress did not renew the Act until 1984. *See* Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192 (codified at 5 U.S.C. §§ 901-12).[2] The 1984 Act expired on December 31, 1984, *see* 5 U.S.C. § 905(b), and

---

[2] Most significantly, in light of the Supreme Court's then-recent decision holding the legislative veto unconstitutional, *Chadha*, 462 U.S. at 959, the 1984 Act changed how reorganization plans became law by requiring a joint resolution by Congress to approve the plans, *see* 5 U.S.C. § 906(a). Congress also passed a law to ratify all the previous reorganization plans that had become law through the previous procedure. Act of Oct. 19, 1984, Pub. L. 98-532, 98 Stat. 2705.

since then, the reorganization authority has not been renewed, despite requests from President George W. Bush and President Obama, Hogue, *Presidential Reorganization*, *supra*, at 31-32, 34.

In sum, the history of the Reorganization Acts and longstanding practice demonstrate that the President does not have the power to create, restructure, or abolish federal departments or agencies—such as USAID—absent congressional legislation authorizing him to do so.

**III.    USAID Is a Statutorily Mandated Agency, and President Trump Does Not Have the Power to Abolish It Unilaterally.**

**A.**  The history of USAID itself is part and parcel of this story of the executive branch and Congress working together to restructure federal agencies while respecting their constitutional roles.  At the height of the Cold War, President Kennedy recognized the need for a marked shift in the nation's foreign aid policy.  Amidst the threat of communism and totalitarianism in developing countries around the world, Kennedy determined that the ability of these nations "to resist imperialism from without and subversion from within depends in large measure upon their capacity for orderly political and economic growth."  John F. Kennedy, Urgent National Needs—Address of the President of the United States (May 25, 1961), *in* 107 Cong. Rec. 8878.  Military intervention, in Kennedy's view, simply would not be an effective means of combatting those risks.  *Id.*  Instead, he sought to prioritize providing immediate aid and long-term development assistance with the ultimate goal of achieving stability and freedom in those countries in line with American ideals of democracy.  *Id.* at 8878-79.

At the same time, Kennedy worried that existing foreign aid programs in place since World War II were "[b]ureacratically fragmented, awkward and slow."  John F. Kennedy, Special Message to the Congress on Foreign Aid § 1 (Mar. 22, 1961) [hereinafter Special Message], https://www.presidency.ucsb.edu/documents/special-message-the-congress-foreign-aid-1;  *see id.* ("The program is based on a series of legislative measures and administrative procedures

conceived at different times and for different purposes, many of them now obsolete, inconsistent and unduly rigid and thus unsuited for our present needs and purposes.").  He noted the declining prestige of the United States' foreign aid apparatus and determined that an overhaul of the government offices supplying foreign aid would be necessary.  *See* Dianne E. Rennack, Cong. Rsch. Serv., R40089, *Foreign Assistance Act of 1961: Authorization and Corresponding Appropriations* 1 (2023).

But Kennedy also recognized the limits of his power—he knew that he could not effectuate this restructuring of the government's foreign aid apparatus unilaterally.  Thus, consistent with his limited authority to "recommend" to Congress for its "[c]onsideration such Measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3, Kennedy transmitted a special message to Congress outlining a detailed proposal for a "single [foreign aid] agency . . . equipped with a flexible set of tools," Special Message § 3, and "strongly urg[ing] its enactment by the Congress," *id.* § 9.

Congress responded by passing the Foreign Assistance Act of 1961 (FAA), declaring it "the policy of the United States to strengthen friendly foreign countries by encouraging the development of their free economic institutions and productive capabilities."  Pub. L. No. 87-195, § 102, 75 Stat. at 424 (codified at 22 U.S.C. §§ 2151 *et seq.*).  The FAA authorized the President to "exercise any functions conferred upon him by this Act through such agency or officer of the United States Government as he shall direct," *id.* § 621(a), 75 Stat. at 445; *see also id.* § 624, 75 Stat. at 447 (authorizing the President to appoint officers to the agency); *id.* § 211, 75 Stat. at 427 (authorizing the President to "furnish assistance on such terms and conditions as he may determine in order to promote the economic development of less developed friendly countries and areas").

Exercising this congressionally delegated authority, Kennedy issued an executive order in 1961 establishing USAID as a hub within the Department of State for the delivery and oversight of humanitarian foreign aid. *See Administration of Foreign Assistance and Related Functions*, Exec. Order 10973, § 102(a), 26 Fed. Reg. 10469, 10469 (Nov. 3, 1961). USAID remained within the Department of State until 1979 when President Carter, pursuant to his own delegated authority from the Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29, established the United States International Development Cooperation Agency (IDCA) as an independent agency within the executive branch, *see* Reorganization Plan No. 2 of 1979, *in* 93 Stat. 1378, and ordered the IDCA Director to "continue within IDCA the Agency for International Development [USAID], heretofore established in the Department of State," *Administration of Foreign Assistance and Related Functions*, Exec. Order 12163, § 1-103, 44 Fed. Reg. 56673, 56674 (Sept. 29, 1979). Thus, USAID found a new home within IDCA beginning in 1979.

Starting in 1995, Congress made several attempts to abolish USAID and transfer its function back to the State Department, citing the need for budget cuts and inefficiencies in the foreign aid structure. *See* H.R. 1561, 104th Cong., § 601 (mandating the abolition of USAID, the Arms Control and Disarmament Agency, or the U.S. Information Agency); H.R. 1757, 105th Cong., § 511 (mandating the transfer of certain USAID functions to the Department of State). President Clinton vehemently opposed these efforts, and exercised his veto power to prevent them from becoming law. *See* U.S. Const. art. I, § 7, cl. 2; *see also* William J. Clinton, Veto Message Regarding H.R. 1561, 104th Cong. (Apr. 15, 1996), H.R. Doc. 104-197; William J. Clinton, Veto Message Regarding H.R. 1757, 105th Cong. (Oct. 21, 1998), H.R. Doc. 105-329.

Finally, in 1998, Congress passed a bill called the Foreign Affairs Reform and Restructuring Act of 1998 that met Clinton's approval and which he signed into law. *See* Pub. L. No. 105-

277, Div. G, 112 Stat. at 2681-761.  In order to "consolidate and reinvigorate" the United States'

foreign affairs functions, FARRA "abolish[ed] the United States Arms Control and Disarmament

Agency, the United States Information Agency, and [IDCA], and transferr[ed] the functions of

these agencies to the Department of State." *Id.* § 1102(2)(A), 112 Stat. at 2681-766.  FARRA also

transferred certain discrete USAID functions to the Department of State, *id.* § 1511, 112 Stat. at

2681-793, but critically, all the other functions remained with USAID, which FARRA made an

"independent establishment" housed outside of the State Department, *id.* § 1413, 112 Stat. at 2681-

791 (codified at 22 U.S.C. § 6563); *see also id.* (stating that USAID shall be "an entity described

in section 104 of title 5, United States Code); 5 U.S.C. § 104 (labeling such entities "independent

establishment[s]," and defining them as "establishment[s] in the executive branch (other than the

United States Postal Service or the Postal Regulatory Commission) which [are] not an Executive

department, military department, Government corporation, or part thereof, or part of an independ-

ent establishment").

FARRA mandated USAID's existence as an independent entity, *see* 22 U.S.C. § 6563(a)

("there is within the Executive branch of Government the United States Agency for International

Development"), subject to a single time-limited exception: within sixty days of the law's passage,

President Clinton could submit a "reorganization plan and report" for USAID, which could "pro-

vide for the abolition" of USAID, transfer its functions to the State Department, or propose the

"transfer to and consolidation" of certain USAID functions and "additional consolidation, reor-

ganization, and streamlining" of USAID, *id.* § 6601(a), (d).  On December 30, 1998, President

Clinton submitted a report to Congress determining that "[e]ffective April 1, 1999, [USAID] shall

continue as an independent establishment in the Executive Branch."  1998 Reorganization Plan &

Report.    Retaining USAID as a "distinct agency with a separate appropriation," whose

Administrator would work "[u]nder the direct authority and foreign policy guidance of the Secretary [of State]," would, in Clinton's view, "enhance the cohesiveness of our foreign policy and sustainable development and humanitarian programs, which promote reform and conflict resolution and help vulnerable people in many areas of the world." *Id.*

Thus, the timeframe during which USAID could be lawfully abolished, transferred to the Department of State, or fundamentally restructured ended in 1998. Congress could, of course, pass legislation today newly authorizing the President to abolish USAID or transfer its functions to the State Department. But to date, Congress has not done so. Without an act of Congress abolishing USAID or authorizing the President to do so, Defendants have no power to dismantle the agency. To hold otherwise would be to "assert[] a principle, which if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 525 (1838).

**B.** Not only does the President lack the power to legislate, but his "power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. The history of USAID demonstrates how prior Presidents have abided by that fundamental structural constitutional principle, even at times when they were displeased with the current foreign aid structure. Kennedy, recognizing that he could not unilaterally legislate but instead could only "recommend" to Congress for its "[c]onsideration such Measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3, strongly urged Congress to pass a law delegating to him the authority to create USAID. And he ordered the establishment of the agency only after Congress had done precisely that. Carter similarly relied on express congressional delegations of reorganization authority before moving USAID to IDCA. And Clinton exercised his veto power, *see id.* art. I, § 7, cl. 2, to prevent Congress from eliminating USAID. Clinton later

declared that USAID would remain a "distinct agency with a separate appropriation" only after FARRA delegated him the time-limited authority to determine the fate of the agency. 1998 Reorganization Plan & Report.

President Trump, in contrast, has not even attempted to exercise his constitutionally granted authority to recommend legislation to Congress abolishing USAID. Rather than respect his limited constitutional role and work with Congress to pass legislation respecting the future of USAID, he seeks to abolish USAID by executive fiat, claiming his general foreign affairs powers under Article II authorize him to unilaterally dismantle the agency. History proves him wrong. As the Supreme Court has emphasized, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotofsky*, 576 U.S. at 21; *see Youngstown*, 343 U.S. at 587 ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."). If restructuring or abolishing USAID were authorized by the President's foreign affairs power, then Presidents Kennedy, Carter, and Clinton went to a lot of trouble for nothing.

Nor has Congress delegated its authority over the structure of USAID to Trump. To the contrary, in FARRA, Congress made it exceptionally clear that it expects USAID to persist as an independent agency "within the Executive branch of Government." 22 U.S.C. § 6563(a); *see id.* § 6601(a) (delegating time-limited authority to restructure or abolish USAID, which expired at the end of 1998). More recently, and in response to President Trump's efforts to defund aspects of USAID during his first term, Congress included language in the statute appropriating funds for the Department of State and other foreign operations making explicit that the funds appropriated by that Act "may not" be used to reorganize, redesign, or eliminate the State Department, USAID, or any other "Federal department, agency, or organization funded by this Act" absent "prior

consultation . . . with the appropriate congressional committees" and a "detailed justification for any proposed action."  Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, Div. F, Pub. L. No. 118-47, § 7063(a), 138 Stat. 460, 843-44; *see* Full-Year Continuing Appropriations Act, 2025, Div. A, Pub. L. No. 119-4, § 1101(a), 139 Stat. 9, 10 (appropriating funds for USAID "under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024").  These statutes are plainly *prohibitions* on the Presidents' authority to manipulate federal funding to dismantle USAID and, in any event, as detailed in Plaintiffs' Motion for Summary Judgment, Dkt. 51-1, at 26-27, Defendants have attempted to shutter USAID without any "prior consultation" or the submission to Congress of a "detailed justification."

Accordingly, Defendants' efforts to abolish USAID are "incompatible with the expressed or implied will of Congress," putting their authority "at its lowest ebb."  *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  Because the power to create and abolish executive branch agencies belongs exclusively to Congress, President Trump cannot unilaterally shut down USAID.

**CONCLUSION**

For the foregoing reasons, this Court should grant Plaintiff's Motion for Preliminary Injunction.


Dated:  May 2, 2025                              Respectfully submitted,

                                                 /s/ Brianne J. Gorod
                                                 Brianne J. Gorod

                                                 Elizabeth B. Wydra (DC Bar No. 483298)
                                                 Brianne J. Gorod (DC Bar No. 982075)
                                                 Miriam Becker-Cohen (DC Bar No. 1616670)
                                                 Anna K. Jessurun (DC Bar No. 90021022)
                                                 Nargis Aslami (DC Bar No. 90033495)
                                                 CONSTITUTIONAL ACCOUNTABILITY CENTER
                                                      1200 18th Street NW, Suite 501
                                                 Washington, D.C. 20036
                                                 (202) 296-6889
                                                 brianne@theusconstitution.org

                                                 *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages.

I further certify that the attached *amicus* brief complies with the typeface and type style requirements of Local Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word and 12-point Times New Roman font.

Executed this 2nd day of May, 2025.

<u>/s/ Brianne J. Gorod</u>
Brianne J. Gorod

*Counsel for Amicus Curiae*