**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **PERSONAL SERVICES CONTRACTOR ASSOCIATION,** | ) ) ) ) | |
| *Plaintiff* | ) ) | **Case No. 1:25-cv-469-CJN** |
| **v.** | ) ) | |
| **DONALD TRUMP, et al.,** | ) ) | |
| *Defendants.* | ) ) | |

**PLAINTIFF PSC ASSOCIATION'S CORRECTED
REPLY MEMORANDUM  SUPPORTING ITS MOTION FOR
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

I.  Congress has not stripped this court or jursidction by enacting the Tucker Act or the
Contract Disputes Act ................................................................................ 3

    A.  Defendants' caselaw on jurisdiction is off point. ................................. 3

    B.  There is neither binding nor persuasive authority supporting denying
preliminary relief here for lack of jurisdiction. ...................................... 6

II.  The PSC Association has both associational standing to assert its members' claims
and organizational standing to sue in its own right. ....................................... 7

III.  Plaintiff's APA claims are reviewable. ........................................................ 9

    A.  Defendants' assertions of boundless, "unreviewable," and unilateral discretion to
eliminate USAID and impound and cancel foreign aid appropriations are
meritless. ............................................................................................. 9

    B.  Dismantling USAID and impounding billions in appropriated funds constitute
reviewable "agency" action. .............................................................. 12

    C.  Shuttering an agency, terminating employees en masse, and impounding
billions are "final" and reviewable agency actions. ............................. 13

    D.  The PSC Association is challenging discrete, reviewable agency actions ........... 14

    E.  Plaintiff is well within the zone-of-interests test for APA claims. ....... 15

IV.  Plaintiff is likely to succeed on its APA claims. .......................................... 16

    A.  Plaintiff has sufficiently demonstrated, at this stage, that Defendants' actions
destroying USAID and refusing to obligate appropriated funds are arbitrary
and capricious. .................................................................................. 17

    B.  Plaintiff is also very likely to prevail in proving that Defendants' destruction
of USAID and their refusals to obligate funds are contrary to law. ...... 18

V.  Plaintiff is likely to succeed on its Constitutional claims. ............................. 20

VI.  Plaintiff is likely to succeed on its ultra vires claim. .................................... 22

VII.  Plaintiff has sufficiently demonstrated irreparable harm. ............................. 23

VIII.  The equities heavily favor a preliminary injunction. ................................... 24

IX.    The proposed preliminary injunction is appropriately tailored to Defendants'
       conduct...................................................................................................................... 24

CONCLUSION.............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & S Council Oil Co., Inc. v. Lader*,
    56 F.3d 234 (D.C. Cir. 1995) ............................................................................................3, 4

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ...........................................................................................................14

*AFL-CIO v. Trump*,
    No. 25-cv-03698, 2025 WL 1358477 (N.D. Cal. May 9, 2025) ........................................23

*AFSA v. Trump*,
    No. 25-cv-352-CJN, 2025 WL 573762 (D.D.C. 2025) .......................................................1

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
    321 F.3d 116 (D.C. Cir. 2006) ..........................................................................................22

*AIDS Vaccine Advoc. Coalition v. Dep't of State*,
    No. 25-cv-400-AHA (D.D.C.) ....................................................................................3, 4, 6

*Albrecht v. Comm. On. Emp. Benefits*,
    357 F.3d 62, 69 (D.C. Cir. 2004) ........................................................................................5

*Alexander v. Gardner-Denver Co.*,
    415 U.S. 36 (1974) ...........................................................................................................7, 8

*Amgen, Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004) ..........................................................................................16

*Andrade v. Lauer*,
    729 F.2d 1475 (D.C. Cir. 1984) ..........................................................................................2

*Aviel v. Gor*,
    No. 25-778-LLA, 2025 WL 1009035 (D.D.C. April 4, 2025) ...........................................23

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023) .........................................................................................................2, 7

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...........................................................................................................13

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) .........................................................................................................1, 6

iii

*Califano v. Yamasaki*,
442 U.S. 682 (1979)...........................................................................................25

*Carr v. Saul*,
593 U.S. 83 (2021).............................................................................................6

*\*Cemex v. Dep't of Interior*,
560 F. Supp.3d 268 (D.D.C. 2021)...............................................................2, 5, 6

*Chamber of Com. of the U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)......................................................................12, 13

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)...........................................................................................13

*City of New Haven v. United States*,
809 F.2d 901 (D.C. Cir. 1987)............................................................................19

*\*Clinton v. City of New York*,
524 U.S. 417 (1998)........................................................................................2, 21

*\*Collins v. Yellen*,
594 U.S. 220 (2021)...........................................................................................15

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022).........................................................................5, 6

*CSL Plasma, Inc. v. U.S. Customs and Border Protection*,
33 F.4th 584 ....................................................................................................16

*Dalton v. Specter*,
511 U.S. 462 (1994)...........................................................................................22

*Dep't of Com. v. New York*,
588 U.S. 752, 785 (2019) ..............................................................................13, 14

*Dep't of Educ. v. California*,
145 S.Ct. 966 (2025).......................................................................................3, 4

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)...............................................................................................17

*Dep't of State v. AIDS Vaccine Adv. Coalition*,
145 S. Ct. 753 (Mar. 5, 2025) ..................................................................... *passim*

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
189 F. Supp.3d 85 (D.D.C. 2016) ...................................................................12, 13

*Doe v. Musk*,
    No. 25-cv-0462-TDC, 2025 WL 840574 (D. Md. Mar. 18, 2025)......................10, 14, 22, 23

*Env't Def. Fund v. Regan*,
    No. 20-cv-762 (LLA), 2024 WL 3887383 (D.D.C. Aug. 20, 2024)........................................14

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................................................8, 24

*Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996) ...............................16

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)........................................................................................................12, 13

*Gomez v. Trump*,
    485 F. Supp.3d 145 (D.D.C. 2020) .........................................................................................12

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)....................................................................................................................6

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985)................................................................................................3, 4

*Immigr. & Naturaliz. Serv. v. Legaliz. Assist. Project of L.A. Cnty. Fed'n of Lab.*,
    510 U.S. 1301 (1993)................................................................................................................16

*Kendall v. United States*,
    37 U.S. 524 (1838)....................................................................................................................11

*League of Women Voters of United States v. Newby*,
    671 Fed. Appx. 820 (D.C. Cir. 2016) .....................................................................................18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)............................................................................................................15, 16

*Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*,
    358 F. Supp. 60 (D.D.C. 1973) ...............................................................................................10

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990)..................................................................................................................14

*Marbury v. Madison*,
    1 Cranch 137, 177 (1803) ........................................................................................................11

*Match-E-B-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)............................................................................................................15, 16

*Megapulse Inc. v. Lewis,
  672 F.2d 959 (D.C. Cir. 1982) ...................................................................5, 6

Merrill v. Milligan,
  142 S. Ct. 879 (2022) ..................................................................................3

Mitchell v. Robert DeMario Jewelry,
  361 U.S. 288 (1960) .....................................................................................7

Myers v. United States,
  272 U.S. 52 (1926) ................................................................................10, 19

Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,
  26 F.4th 960 (D.C. Cir. 2022) ....................................................................22

Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,
  522 U.S. 479 (1998) ...................................................................................16

Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA,
  752 F.3d 999 (D.C. Cir. 2014) ...................................................................14

Nat'l Treasury Emps. Union v. Vought,
  No. 25-cv-381-ABJ, 2025 WL 942772 (D.D.C. Mar. 28, 2025) ................... passim

RFE/RL, Inc. v. Lake,
  No. 25-5158 (Doc. #2114884, May 7, 2025) ...............................................2

Rhode Island v. Trump,
  No. 25-cv-128-JJM, 2025 WL 1303868 (D.R.I. May 6, 2025) ..................2, 4, 13

Sackett v. E.P.A,
  566 U.S. 120 (2012) ...................................................................................14

Sherley v. Sebelius,
  689 F.3d 776 (D.C. Cir. 2012) ...................................................................12

Sys. Application & Techs., Inc. v. United States,
  26 F.4th 163 (4th Cir. 2022) .....................................................................3, 5

Tate v. Pompeo,
  513 F. Supp.3d 132 (D.D.C. 2021) .............................................................12

Texas v. United States,
  809 F.3d 134 (5th Cir. 2015), aff'd, 579 U.S. 545 (2016) (per curiam) ................25

*Train v. City of New York,
  420 U.S. 35 (1975) .....................................................................................11

*Transohio Sav. Bank v. Dir., Off. Of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) ........................................................................1, 5

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ...........................................................................15

*Turlock Irrigation Dist. v. FERC*,
    786 F.3d 18 (D.C. Cir. 2015) ...............................................................................8

*U.S. Army Corp. v. Hawkes Co.*,
    578 U.S. 590 (2016) ..........................................................................................13

*\*Webster v. Doe*,
    486 U.S. 592 (1988) ............................................................................................7

*White Coat Waste Project, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    No. 22-cv-00006-CJN, 2023 WL 4930093 (D.D.C. Aug. 2, 2023).....................16

*Widakuswara v. Lake*,
    2025 WL 1288817 (D.C. Cir. May 3, 2025)............................................. *passim*

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..........................................................................................10

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012)...........................................................................................11

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)...............................................................................................10

**Statutes**

2 U.S.C. 684(b) ......................................................................................................20, 24

22 U.S.C. § 2392(a & b) ................................................................................................18

28 U.S.C. § 1331 .............................................................................................................7

31 U.S.C. § 1531(a) ..................................................................................................18, 19

Administrative Procedure Act.................................................................................. *passim*

Antideficiency Act ............................................................................................15, 16, 20

Foreign Assistance Act of 1961 .................................................................................15, 16

Foreign Affairs Restructing Act of 1988 ....................................................................15, 16

Further Consolidated Appropriations Act (2024) ...................................................... *passim*

Impoundment Control Act ............................................................................... *passim*

Tucker Act ........................................................................................................3, 4, 6, 8

Contract Disputes Act (CDA) ...........................................................................3,6,7,8

**Other Authorities**

*Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive &*
   *Administer Funds Under Foreign Aid Legis.*, 9 U.S. Op. O.L.C. 76, 1985 WL 185394 ........10

*The President's Veto Power*,
   12 U.S. Op. Off. Legal Counsel 128, 1988 WL 391011 ........................................................21

Daniella Cavalcanti, *Evaluating the Comprehensive Impact of Two Decades of*
   *USAID Interventions and Forecasting the Effects of Defunding on Mortality*
   *up to 2030*, available at [https://perma.cc/V8DE-65NF] ........................................................23

Henry B. Hogue, Cong. Rsch. Serv., R44909, *Executive Branch Reorganization* (2017)..........21

Ronald C. Moe, Cong. Rsch. Serv., RL31446, *Reorganizing the Executive Branch*
   *in the 20th Century: Landmark Commissions* (2002) ..........................................................19

119 Cong. Rec. S. 3808 (Daily ed. Mar. 1, 1973) ........................................................21

H.R. Rep. No. 100–313 (1987) ........................................................................................20

S. Rep. No. 93–688 ........................................................................................................20

U.S. Const. Art. I, § 8 ................................................................................................9, 22

# GLOSSARY

| | |
|---|---|
| *AFSA v. Trump* | Case No. 25-cv-352 (CJN) |
| ADA | Antideficiency Act, 31 U.S.C. § 1341 |
| APA | Administrative Procedure Act, 5 U.S.C. § 1001 et seq. |
| CDA | Contract Disputes Act. 41 U.S.C. § 601 et seq. |
| CFC | Court of Federal Claims |
| FARRA | Foreign Affairs Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (1998) |
| FCAA | Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024) |
| ICA | Impoundment Control Act, 2 U.S.C. § 681 et seq. |
| O.L.C | DOJ Office of Legal Counsel |
| PSC | personal services contractor, 48 C.F.R. 37.104 |
| PSC Association | the plaintiff in this case |
| RIF | reduction in force |
| TRO | temporary restraining order |

---

| | |
|---|---|
| Brief | ECF 39-1<br>Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction (April 23, 2025) |
| Def. Brief | ECF 45<br>Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction (May 7, 2025) |

## INTRODUCTION

Defendants appear to pin their hopes on the outcome of this motion being foreordained. See Def. Brief at 1 ("Just as this Court denied Plaintiff's earlier motion …" and "As the Court has [already] recognized …"); *id.* at 14–15 ("[I]n denying Plaintiff's motion for a temporary restraining order, this Court has already concluded ..."); *id.* at 14 ("As this Court [already] similarly ruled ..." in *AFSA v. Trump,* 2025 WL 573762 (D.D.C. 2025)"); *id.* at 23 ("As this Court has already determined ..." in *AFSA v. Trump*); *id.* at 25 ("After all, as this Court has already ruled ..."); *id.* at 41 ("This Court rejected similar arguments in denying a temporary restraining order ..."). Missing from Defendants' brief, however, is any acknowledgment that the factual record before the Court now is vastly different than on March 6, when it ruled on the TRO motion, or on February 21, when it denied preliminary relief in *AFSA v. Trump*. The current motion is supported by more than 90 exhibits, very few of which were before the Court when it made those rulings. Defendants contest none of this evidence, which establishes that they have issued termination notices to the entire global USAID workforce, RIF'ing "100% of the Agency"[1]; terminated more than 86% of all USAID awards, with plans to shut down all USAID programmatic work by July 1[2]; and eliminated, in all but name, a federal agency Congress established.

The legal arguments before the Court are also substantially more developed now. For example, at the TRO stage, this Court:

• **Was not asked** to address several cases, including *Bowen v. Massachusetts*, 487 U.S. 879 (1988), *Transohio Sav. Bank v. Dir., Off. Of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992),

---

[1] See ECF 39-3 (Ex. 1, Ex. 2 at 7–8); ECF 39-4 (Exs. 3, 13 ¶ 32, and 16); ECF 39-15 (Ex. 47); ECF 39-5 (Ex. 92 at 30).

[2] ECF 30-3 (Ex. 2 at 1); ECF 39-4 (Ex. 13 ¶ 32).

and *Cemex v. Dep't of Interior*, 560 F. Supp.3d 268 (D.D.C. 2021).

• **Could not have been asked** to address several rulings that did not yet exist, including *Dep't of State v. AIDS Vaccine Adv. Coalition (AVAC)*, 145 S. Ct. 753 (Mar. 5, 2025); the D.C. Circuit's en banc order in *RFE/RL, Inc. v. Lake*, No. 25-5158 (Doc. #2114884, May 7, 2025); *Nat'l Treasury Emps. Union v. Vought (NTEU)*, No. 25-cv-381-ABJ, 2025 WL 942772 (D.D.C. Mar. 28, 2025); and *Rhode Island v. Trump*, No. 25-cv-128-JJM, 2025 WL 1303868 (D.R.I. May 6, 2025).

• **Did not explicitly address** several cases, including *Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023), *Clinton v. City of New York*, 524 U.S. 417 (1998), and *Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984). Defendants do not even mention, much less distinguish, *Clinton* or *Andrade.*

In short, since this Court last ruled, both the factual record and the legal arguments have changed materially and decisively. On the current record, the PSC Association is very likely to succeed on its claims that:

• **At its essence, this is not a contracts case.** It is about profound constitutional questions—whether the Executive Branch can unilaterally eliminate a Congressionally created agency and impound appropriated funds.

• **Congress has not stripped this Court of jurisdiction** to hear this case.

• **Defendants' actions are arbitrary, capricious, illegal, and unconstitutional**, violating the APA, several other statutes, and fundamental separation of powers principles. If Defendants' actions do not qualify as arbitrary and capricious, as improper executive usurpation of Congress's authority, as the unconstitutional and illegal destruction of a Congressionally created agency, and as unconstitutional impoundments, then nothing would.

Defendants are trying to outrun the judiciary. They have instructed USAID employees that

"litigation is over; just get on with it," proclaimed that "come hell or high water" USAID will no longer exist "by July," and asserted that "Congressional earmarks for programs will not be honored." ECF 39-4 (Ex. 15 ¶3). Without judicial intervention now, the damage to USAID will be irreparable.

## ARGUMENT

### I.    Congress has not stripped this Court of jurisdiction over this case by enacting the Tucker Act or the Contract Disputes Act.

Defendants rest their challenge to subject matter jurisdiction mainly on five cases, none of them apposite, while ignoring binding and on-point authority.

### A.  Defendants' caselaw on jurisdiction is inapposite.

Defendants' jurisdictional argument rests primarily on five cases, *Widawkuswara v. Lake, Dep't of Educ. v. California, A & S Council Oil Co., Inc. v. Lader, Ingersoll-Rand Co. v. United States,* and *Sys. Application & Techs., Inc. v. United States.* Def. Brief at 7-15. All of them are inapposite.

1. ***Widakusara v. Lake***, 2025 WL 1288817 (D.C. Cir. May 3, 2025), granted a stay pending appeal of part of a district court injunction ordering payment of appropriated funds. But the case carries little, if any, continuing weight after the en banc D.C. Circuit administratively stayed it in part while it considers the plaintiffs' petition for full en banc review. See Appeal No. 25-5144, Doc. Nos. 2114884 and 2115063. See also *AVAC,* 25-cv-400-AHA (D.D.C.), ECF 91 at 7-8 (May 13, 2025) (rejecting reliance on *Widakuswara*).

2. ***Dep't of Educ. v. California***, 145 S.Ct. 966 (2025), is a four-paragraph order granting a stay of an injunction that required payment of certain grants. Defendants' reliance on it avails them nothing. *First*, rulings on stay applications do not set precedent. *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, concurring) ("To reiterate: The Court's stay order is not a decision

on the merits" and "does not make or signal any change" in existing law). *Second*, the order focused narrowly on whether the CFC likely has jurisdiction over claims asserting the government's *contractual* obligation to pay money, 145 S. Ct. at 966, not on statutory or constitutional violations, rendering it inapposite here. The PSC Association asserts no contractual breach. See *AVAC,* ECF  91 at 6-7 (rejecting government's reliance on *Dep't of Educ.* because USAID award recipients' claims were directed at the blanket suspension of foreign aid and not based on the terms of their individual awards); *Rhode Island v. Trump*, 2025 WL 1303868, at *6-7 ("[N]owhere are the parties quibbling over ... the terms or conditions of ... underlying agreements as to transform this action into one sounding in contract. ... [B]ecause [plaintiffs'] challenges are based on alleged statutory and constitutional violations and the relief they seek is equitable, the essence of their claims are *not* contractual, so they are not subject to the exclusive jurisdiction of the Court of Claims under the Tucker Act.") *Third*, only a month earlier, in a case similar to this one, challenging Defendants' dismantling an agency and impounding funds, the Supreme Court refused to stay a district court's order granting preliminary relief. *AIDS Vaccine Advoc. Coalition v. U.S. Dep't of State,* 145 S. Ct. 753 (2005).

3.  ***A & S Council Oil Co., Inc. v. Lader***, 56 F.3d 234 (D.C. Cir. 1995), involved three companies with contracts with the Small Business Administration suing for "money damages" and complaining that "contract prices failed to guarantee them a reasonable profit." *Id.* at 236. Their claims arose from a combination of "pre-contract behavior" and performance, and they sought a "prototypical contract remedy." *Id.* at 240. Here, by contrast, the PSC Association is neither complaining about anything specific to a contract nor seeking a contract remedy.

4.  ***Ingersoll-Rand Co. v. United States***, 780 F.2d 74 (D.C. Cir. 1985), involved a defense contractor complaining, after a termination for convenience, that the Air Force could not legally

re-solicit bids. As the D.C. Circuit noted, the contractor's claim was, at its essence, indistinguishable from a claim about "whether *the contract* forbids terminations under these conditions." *Id.* at 78 (emphasis added). Resolving that claim called "for knowledge of the government contracting process." *Id.* And the case was thus appropriate for "the unique expertise of the Court of Claims." *Id.* The D.C. Circuit also noted that, "unlike" Ingersoll's claim, cases with civil rights, constitutional, or other non-contractual claims—in other words, cases like this case— are "easily distinguished" and fall within the jurisdiction of district courts, not the CFC. *Id.* at n.8.

5. *Sys. Application & Techs., Inc. v. United States*, 26 F.4th 163, 172 (4th Cir. 2022), is an out-of-circuit decision, cited by Defendants to support their mistaken argument that Congress granted the CFC exclusive jurisdiction over all claims with "some relationship" to the terms or performance of any government contract. But that case involved whether a contractor had properly exhausted its administrative remedies, *id.* at 180, and offers no guidance here. Moreover, binding authority in this Circuit, including *Megapulse Inc. v. Lewis,* 672 F.2d 959, 968 (D.C. Cir. 1982), and *Transohio Sav. Bank v. Dir., Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), are to the contrary: The district court has jurisdiction unless the case "turns *entirely* on the terms of a contract." *Cemex*, 560 F. Supp.3d at 276 (quoting *Albrecht v. Comm. On. Emp. Benefits*, 357 F.3d 62, 69 (D.C. Cir. 2004) (emphasis in *Albrecht*). See also *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) ("[W]e have explicitly rejected the broad notion that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.")[3]

---

[3] Unless otherwise noted, all internal quotation marks, citations, and alterations are omitted from quoted material throughout this brief.

**B. There is neither binding nor persuasive authority supporting denying preliminary relief here for lack of jurisdiction.**

As the PSC Association explained in its opening brief (at 18–23), this Court has no discretion to withhold jurisdiction here because:

**1. This case is not "'at its essence' a contract action."** *Megapulse,* 672 F.2d at 968; *Cemex*, 560 F. Supp.3d at 276; *AVAC*, ECF 91 at 6-7. The CFC has exclusive jurisdiction only when *both* the source of the rights asserted and the relief sought are contractual. *Megapulse,* 672 F.2d at 1106-07 & n.6. But here, neither the rights nor the remedies are contractual. Instead, Plaintiff's claims are grounded in statutes and the Constitution, and Plaintiff seeks equitable relief. *See* ECF 37 at 21-22 and ECF 39. Additionally, Plaintiff itself has no contract with any defendant, and its members have contracts only with USAID. *Cf. Crowley,* 38 F.4th at 1110 (finding that the CDA did not apply where the defendant agency was not the contracting party).

**2. The CFC has no power to grant the equitable relief the PSC Association seeks.** *Bowen,* 487 U.S. at 905. Channeling this case to that forum would thus border on the Kafkaesque. *Carr v. Saul,* 593 U.S. 83, 93 (2021) ("It makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested.")[5]

**3. The CFC is an Article I tribunal, ill-suited to addressing the constitutional claims here.** Defendants never grapple with the central issue in channeling cases: "whether the particular claims brought were of the type Congress intended to be reviewed within this statutory structure." *Axon*, 598 U.S. at 186. The CFC specializes in bid protests, vaccine cases, and contractual disputes with the government, areas in which it has considerable expertise. But like other Article I tribunals,

---

[5] The decision in *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), does not change *Bowen*'s rule. *Knudson* was not brought under the APA and interpreted neither the CDA, the Tucker Act, nor the APA's Section 702.

it knows "nothing special about … separation of powers" claims and is "ill suited" to address them. *Id.* at 194–95. It strains credulity to claim that Congress intended to funnel the "fundamental, even existential" separation of powers questions presented here, *id.* at 180, exclusively to the CFC.

**4.  Resolving constitutional issues is "a primary responsibility" of Article III courts.**

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 57 (1974). As the Supreme Court has made clear, the "comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid command." *Mitchell v. Robert DeMario Jewelry*, 361 U.S. 288, 291 (1960). "Unless a statute in so many words, or by a necessary or inescapable inference, restricts the court's jurisdiction in equity," the "full scope" of district courts' jurisdiction under 28 U.S.C. § 1331 "is to be recognized and applied." *Id.* "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). See also *Axon,* 598 U.S. at 208 (Gorsuch, J., concurring) ("[J]urisdiction conferred by 28 U.S.C. § 1331, in particular, should hold firm against mere implications from other laws.") Neither the Tucker Act, the CDA, nor the creation of the CFC remotely satisfies that demanding standard and, therefore, cannot foreclose federal district court "resolution of statutory and constitutional issues," which are a "primary responsibility" of such courts. *Gardner-Denver Co.*, 415 U.S. at 57.

**II.  The PSC Association has both associational standing to assert its members' claims and organizational standing to sue in its own right.**

Defendants ground their cursory attack on the PSC Association's standing on two arguments. *First*, they argue that the "extent of the harm" to the Association's members hinges on "individualized proof," purportedly requiring member-specific evidence and participation, therefore precluding "associational" standing. Def. Brief at 15–16. For that argument, Defendants cite no relevant case authority, and ample recent authority from this district rejects that view. See *Widakuswara*, 2025 WL 1288817, at *7–8 (finding probable associational standing for three

unions based on many of these same defendants' similar en masse terminations of the unions' members and dissolution of their agency); *NTEU*, 2025 WL 942772, at *15 (finding probable associational standing for the CFPB Employee Association based on many of these same defendants' similar acts, terminating en masse that association's members and dissolving their agency). It is undisputed that Defendants terminated the PSC Association's members en masse, using generic termination notices. ECF 10-2 at ¶¶ 3-6; ECF 20-3 at ¶6; ECF 20-10 at ¶¶ 3- 5. There was nothing individualized about the terminations; they were indiscriminate. There will be nothing individualized about the proof. And because the Association seeks only equitable relief, not money damages, no individualized proof is required to establish either liability or remedies.

*Second*, Defendants challenge the PSC Association's organizational standing, and that challenge is even weaker. Citing *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024), and *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18 (D.C. Cir. 2015), Defendants argue that the PSC Association must show injuries to its "'*core business* activities' distinct from its advocacy activities" and also that Defendants' actions have "perceptibly impaired the organization's *ability* to provide services." Def. Brief at 17 (emphasis in original). If so, Defendants' actions here easily meet that standard. As explained in the Association's opening brief, Defendants have disrupted the Association's ability to communicate with its members and forced it to divert already scarce resources to respond to an existential threat. See Brief at 24. That showing is more than sufficient to establish a likelihood of success on the question of standing, as other courts in this district have recently held. See *Widakuswara,* 2025 WL 1288817, at *8-10 ("[B]riefing and accompanying declarations show that the public-sector unions are 'expending significant resources to counteract [Defendants'] obstruction of their ability to perform their core services [such as] advising members about the terms of their employment and the implications of Defendants' actions …. The Court

finds these representations sufficient to show a 'substantial likelihood' of organizational standing"); *NTEU*, 2025 WL 942772, at *5 ("Given that the association's existence depends on the existence of an agency workforce, the actions by defendants to eliminate the [agency] would undoubtedly make it more difficult for the association to accomplish [its] primary mission. This is enough to demonstrate an injury in fact to support organizational standing.")

### III.   Plaintiff's APA claims are reviewable.

Swinging for the fences, Defendants raise four over-the-top objections to the reviewability of Plaintiff's APA claims. They contend that: (1) Executive Branch officials enjoy "unreviewable discretion" over whether and how to spend foreign aid appropriations, Def. Brief at 18; (2) *no* "agency" action has occurred in the course of dismantling USAID and impounding tens of billions in funds, *id.* at 21; (3) even if agency action has occurred, there has been no reviewable "final" agency action, *id.* at 23–24; and (4) regardless, Plaintiff's claims amount to a prohibited "programmatic challenge" to agency policies rather than a request for review of "discrete" agency action, *id.* at 22. Accepting any one of these arguments would substantially gut the APA—the basic charter governing judicial review of agency action—upend foundational separation of powers principles, and disregard decades of contrary precedent.

### A.   Defendants' assertions of boundless, "unreviewable," and unilateral discretion to eliminate USAID and impound and cancel foreign aid appropriations are meritless.

Defendants suggest that the Executive Branch has exclusive and "unreviewable discretion" to eliminate USAID and cancel foreign aid appropriations as part of its asserted plenary power over all aspects of any issue relating to foreign affairs. *Id.* at 18-19. Not so. *First*, power over foreign affairs is shared. Article I, Section 8 of the Constitution gives Congress legislative authority related to U.S. foreign relations in fifteen of its eighteen clauses. *Second,* the Supreme Court has flatly rejected Defendants' position: "The Executive is not free from the ordinary controls and

checks of Congress [or the courts] merely because foreign affairs are at issue." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). See also *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (illustrating that executive action with a nexus to foreign policy is judicially reviewable).

*Second,* because the claims here "relate largely to the structure of and resources made available to a federal agency, not to the direct conduct of foreign policy or engagement with foreign governments"—to closing USAID headquarters, terminating its entire workforce and at least 86% of its awards, and abolishing a Congressionally created agency—those actions "cannot be justified based solely on the President's foreign affairs powers." *Doe v. Musk*, No. 25-cv-0462-TDC, 2025 WL 840574, at *24 (D. Md. Mar. 18, 2025).

*Third,* Congress, not the President, created USAID, and only Congress can dissolve it or move its remnants to the State Department. *Myers v. United States*, 272 U.S. 52, 116, 129 (1926) ("If there is any point in which the separation of the legislative and executive powers ought to be maintained with great caution, it is that which relates to officers and offices …. To Congress under its legislative power is given the establishment of offices …. [and] the determination of their functions"); *Loc. 2677, Am. Fed'n of Gov't Emps. V. Phillips,* 358 F. Supp. 60, 64, 77 (D.D.C. 1973) (enjoining the "dismantlement" of the Office of Economic Opportunity); *Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 U.S. Op. O.L.C. 76, 78 (O.L.C.), 1985 WL 185394 (relying on the "Executive Branch's acquiescence in the need for reorganization legislation in order to restructure or consolidate agencies within the Executive Branch").

*Fourth,* whatever range of discretion the Executive Branch might have were Congress to "merely appropriate[] funds for broad purposes," Def. Brief at 19, *that is not what Congress has*

*done here*. Congress has appropriated and directed the apportionment of funds to USAID to spend for *specific* purposes. See, e.g., FCAA, 183 Stat. at 740 ($3,985,450,000 … shall be apportioned directly to [USAID]" for global health activities); *id*. at 742 ($3,931,000,000 … shall be apportioned to [USAID]" for development assistance); *id*. ($4,779,000,000 … "shall be apportioned to [USAID]" for international disaster assistance").

*Fifth,* the claims here are not about "when and how" Defendants will spend appropriated funds. They are about Defendants' *refusal* to spend *tens of billions* of dollars of appropriated funds. Defendants have unconstitutionally cancelled over 86% of all USAID programs (more than 5,800 awards terminated at the end of the "review," plus additional terminations after that, see ECF 39-4 (Ex. 16)), usurping Congress's power of the purse. Brief at 29–31. There is no evidence of Defendants' intention to obligate those impounded billions, let alone for the purposes for which Congress appropriated them, beyond counsel's foundationless, speculative ipse dixit about "the anticipated expenditure" of appropriated funds. Def. Brief at 18.

*Sixth,* Defendants' claims to broad and unreviewable discretion are breathtaking. Policing the boundaries between Executive and Congressional power—and either branch's usurpations of the other's powers—has been a core Article III responsibility dating back at least to *Kendall v. United States,* 37 U.S. 524 (1838) (rejecting the argument that the Take Care Clause "implies a power to forbid" execution of laws). See also *Train v. City of New York*, 420 U.S. 35, 41 (1975) (unanimously rejecting President Nixon's claim of discretion to withhold appropriated funding for municipal sewer and water treatment projects). As the Supreme Court has observed, the "duty" to say what the law is "will sometimes involve the resolution of litigation challenging the constitutional authority of one of the three branches." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (citing *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

**B. Dismantling USAID and impounding billions in appropriated funds constitute reviewable "agency" action.**

Defendants suggest that *Franklin v. Massachusetts,* 505 U.S. 788 (1992), and *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp.3d 85 (D.D.C. 2016), mean that actions taken by agency officials "on behalf of the President" are "not reviewable under the APA." Def. Brief at 21. That's wrong. *First*, courts regularly review agency actions carrying out presidential directives for compliance with the APA. See *Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012) (conducting APA review of the Secretary of Health and Human Services' adoption of Guidelines for Human Stem Cell Research, implementing a Presidential Executive Order); *Chamber of Com. Of the U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA.") See also *Tate v. Pompeo*, 513 F. Supp.3d 132 (D.D.C. 2021) (rejecting the argument that claims were barred from APA review as an attack on the President's power); *Gomez v. Trump*, 485 F. Supp.3d 145, 176–77 (D.D.C. 2020) ("To the extent Defendants contend that the court is foreclosed from reviewing agency actions taken to implement Proclamations, they are wrong.")

*Second*, Defendants overread *Franklin* and *Detroit Int'l Bridge.* The D.C. Circuit has made clear that *Franklin's* denial of APA review of presidential action "is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties," *Chamber of Com.*, 74 F.3d at 1327, and *Detroit Bridge* stands for no more than that the President's own actions, committed by law to his discretion, are sheltered from APA review. If the rule were different, any President could immunize any agency action from APA review merely by issuing an Executive Order calling for that agency action. That would eviscerate the APA.

### C. Shuttering an agency, terminating employees en masse, and impounding billions are "final" and reviewable agency actions.

Defendants deny that shuttering USAID and impounding billions in appropriated funds are "final" agency actions. Def. Brief at 23–24. But ending nearly all USAID programs, evicting it from its offices, firing a global workforce of more than 12,000 employees, repatriating thousands of employees from overseas, shuttering dozens of overseas missions, and impounding tens of billions of dollars in appropriated funds are neither tentative nor interlocutory acts, and legal consequences have flowed from them. Therefore, they are "final" agency actions. *U.S. Army Corp. v. Hawkes Co.*, 578 U.S. 590, 597 (2016); *Bennett v. Spear*, 520 U.S. 154, 178 (1997). See also *Rhode Island v. Trump*, 2025 WL 1303868, at *9 (Defendants have "made it explicitly clear in various memoranda, grant terminations letters, and other documents that they were terminating grants, staff and programs … [L]egal consequences flow from these decisions …. Accordingly, the Court finds [defendants] have taken final agency actions subject to the Court's review.")

 Plaintiff chronicled Defendants' statements and their destruction of USAID in its opening brief (at 7-16). Defendants have been emphatic, including stating that Congressional earmarks "will not be honored," and announcing that USAID is being "shut down" and has performed its "Final Mission." ECF 39-3 (Ex. 3); ECF 39-4 (Ex. 15); ECF 39-19 (Exs. 76-78). See *Doe*, 2025 WL 840574, at *18-20. ("These facts support the conclusion that USAID has been effectively eliminated."). Against this uncontested evidence, unsupported speculation by Defendants' counsel that it might be "anticipated" that funds might still be spent, Def. Brief at 18, or that USAID might "continue to exist" (in name only) until legislation is enacted to eliminate it, *id.* at 30, are plainly "incongruent with what the record reveals." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Such conjecture cannot shield Defendants' actions from "thorough, probing, in-depth" APA review. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

13

Even if some "details" remain to be worked out, that does not immunize agency actions from APA review. Judicial review of agency action is presumptively available, *Dep't of Com.*, 588 U.S. at 771, such that limitations on it must be considered "in a pragmatic way," *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). And "final" agency action is not the same thing as action set in stone. "The mere possibility that an agency might reconsider" does not make agency action nonfinal. *Sackett v. E.P.A*, 566 U.S. 120, 127 (2012); *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA,* 752 F.3d 999, 1006 (D.C. Cir. 2014) ("An agency action may be final even if the agency's position is subject to change in the future."); *Env't Def. Fund v. Regan*, No. 20-cv-762 (LLA), 2024 WL 3887383, at *11 (D.D.C. Aug. 20, 2024) ("If an interim step itself determines a right or obligation, it is 'final' agency action for purposes of APA review.") Defendants' actions have had direct effects and legal consequences. That's enough. *Abbott*, 387 U.S. at 149–50. If the rule were different, agencies could evade APA review by claiming they might change course.

**D.  The PSC Association is challenging discrete, reviewable agency actions.**

Defendants mischaracterize Plaintiff's claims as the kind of "programmatic challenge" to an agency that the Supreme Court deemed improper in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). There, the plaintiffs challenged 1,250 individual decisions about particular pieces of land made by the Bureau of Land Management while implementing a statute, characterizing them as a single program. *Id.* at 890. The Supreme Court held that these actions, some of which might not even have occurred yet, could not "be laid before the courts for wholesale correction under the APA" simply by describing them collectively as a "program." *Id.* at 893. That's nothing like this case. The PSC Association does not challenge a host of individual decisions implementing a statute. It challenges "the decision to shut down the agency completely—which is not within the executive's authority." *NTEU,* 2025 WL 942772, at *12. Defendants "can hardly complain" that

relief will broadly affect the agency when their actions have staggeringly broad effects. They "chose to paint with a broad brush, not plaintiff." *Id.* (rejecting the same argument that shutting down an agency was not subject to APA review).

### E. Plaintiff is well within the zone-of-interests test for APA claims.

As their last argument against the justiciability of Plaintiff's APA claims, Defendants assert that "[i]n seeking to enforce appropriations laws, FARRA, and other statutes, Plaintiff faces a threshold problem: It does not fall within the zone of interests protected by the [statutes] invoked." Def. Brief at 26. But that argument fails:

*First*, zone-of-interest tests do not apply to separation of powers claims, which in part underly Plaintiff's claim that Defendants violated the APA by acting contrary to law. *See Collins v. Yellen*, 594 U.S. 220, 245 (2021) (acknowledging the right of any aggrieved party to file a separation of powers constitutional challenge). More generally, the zone-of-interest test should not apply to any equitable claims seeking to enforce constitutional provisions: the Court's power to enjoin unconstitutional acts by the other branches does not depend on Congressional intent; it is "inherent in the Constitution itself." *Trudeau v. FTC*, 456 F.3d 178, 190 n.22 (D.C. Cir. 2006).

*Second,* the only zone-of-interest issue the Court need even consider involves Plaintiff's claims that Defendants' actions are arbitrary and capricious or contrary to law because they are contrary to FARRA, the FCAA, the FAA, the ICA, and the ADA. But the zone-of-interest analysis is easily met here. "[I]n keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable," *Match-E-B-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012), "in the APA context … the [zone of interests] test is not especially demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). "The benefit of any doubt goes to the plaintiff.". And as required, the PSC

Association's members' interests here are "congruent with" with the interests protected by FARRA, the FCAA, the FAA, the ICA, and the ADA. *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004). PSCs' missions "align" with the statutes' purposes: overseeing and administering the obligation and expenditure of foreign aid appropriations; making sure they are carried out effectively, efficiently, and consistent with FARRA and the FAA; and for purposes, in amounts, and in areas of the world required by Congressional appropriations; and in amounts neither greater nor less than appropriated, as required by the ICA and the ADA. Therefore, PSCs, through the PSC Association, are "suitable challengers"—"parties whose interests are sufficiently congruent with the statute and its intended beneficiaries that they are more likely to further than frustrate the statutes' objectives." *White Coat Waste Project, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 22-cv-00006-CJN, 2023 WL 4930093, at *7 (D.D.C. Aug. 2, 2023).[6] See also *CSL Plasma, Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 ("The zone of interests test does not require that the statute directly regulate the plaintiff, nor does it require specific congressional intent to benefit the plaintiff.")

## IV.  Plaintiff is likely to succeed on its APA claims.

At this stage, the PSC Association has more than sufficiently shown a likelihood of prevailing on its claims that Defendants have acted arbitrarily and capriciously and contrary to law and, therefore, violated the APA.

---

[6] Zone-of-interest analysis has substantially relaxed over the last 25 years due to the Supreme Court's rulings in *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479 (1998), *Patchak* (2012), and *Lexmark* (2014), all of which rejected zone-of-interest objections to plaintiffs' standing or right of action, rendering obsolete Defendants' reliance on the single-justice, in-chambers ruling in *Immigr. & Naturaliz. Serv. v. Legaliz. Assist. Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301 (1993) (O'Connor, J., in chambers), and the D.C. Circuit's 1996 decision in *Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996). Def. Brief at 27.

### A. Plaintiff has sufficiently demonstrated, at this stage, that Defendants' actions destroying USAID and refusing to obligate appropriated funds are arbitrary and capricious.

The evidence of Defendants' arbitrary and capricious conduct is overwhelming, and their response on this point is weak. Their actions—abruptly freezing all spending, followed by terminating nearly all of USAID's programs and "100%" of the agency's workforce, ECF 39-4 (Ex. 13 ¶32)—are so wildly disproportionate to the stated justification (ensuring that USAID programs are "aligned with [unspecified] American interests") as to epitomize arbitrary and capricious agency action. Nor did Defendants consider the reliance interests of USAID employees and contractors, much less the recipients of foreign aid. See *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30-31 (2020) (detailing the types of reliance interests an agency must consider when it "changes course").

Defendants dispute none of the material facts. They do not deny abruptly freezing funds. They do not deny their sweeping termination of virtually all USAID programs, based on superficially "reviewing" a spreadsheet with a single-line per award—perhaps five or six cells, listing merely the recipient, the amount, and "the subject matter"—without examining the underlying agreements, consulting with contract or agreement officers, or attempting to understand project context. ECF 39-25 (Ex. 93 ¶ 5). They do not dispute their en masse firings that eliminated the entire agency workforce. They offer no evidence they considered reliance interests. In sum, they scarcely defend their actions as not arbitrary and capricious. Instead, as if the APA did not exist, they argue that "requiring a federal agency to articulate a rationale for its action—"beyond simple compliance with the President's directives"—shouldn't be the law. Def. Brief at 34. This argument implicitly challenges the constitutionality of the APA. Defendants are thus arguing to overturn decades of settled precedent. They are exceedingly unlikely to succeed in that effort.

**B. Plaintiff is also very likely to prevail in proving that Defendants' destruction of USAID and their refusals to obligate funds are contrary to law.**

There is no constitutional or statutory authority—and Defendants have cited none—for their actions unilaterally abolishing USAID, an agency Congress created, or for impounding billions of dollars of appropriated funds. And Plaintiff's evidence showing Defendants' destruction of USAID and their impoundments more than suffices to establish a basis for preliminary injunctive relief, the purpose of which is to "restore the status quo ante pending a determination on the merits." *League of Women Voters of United States v. Newby*, 671 Fed. Appx. 820, 821 (D.C. Cir. 2016). The case that Defendants have acted contrary to law is very strong:

**1. Executive action that unilaterally abolishes an agency Congress created is contrary to law.** Belatedly scampering to find some basis for executive authority to unilaterally "*reorganize*" USAID, Defendants cite 31 U.S.C. § 1531(a) and FAA §§ 632(a) and (b) (codified as 22 U.S.C. § 2392(a) and (b)). Def. Brief at 28. But none of these provisions speaks to what's happening here: executive action unilaterally *demolishing* an agency. Instead, FAA § 632(b) allows one agency to use the services and facilities of or to procure commodities or training from another, while FAA § 632(a) and 31 U.S.C. § 1531(a) allow transfers of funds between agencies, provided the funds are still used for the purposes for which Congress appropriated them. Neither provision authorizes the Executive to unilaterally abolish a Congressionally created agency or to impound funds.

Furthermore, even if any of these provisions did speak to unilaterally abolishing—or even merely to "reorganizing"—an agency, they would be trumped here by §§ 7063 (a & b) of the FCAA, which are more specific, later in time, and categorically state that without prior notification to *and consultation with* the appropriate Congressional committees, funds appropriated by "any Act" may not be used to:

> *expand, eliminate, consolidate, or downsize* covered departments, agencies,
> or organizations … *including the transfer to other agencies* of the authorities
> and responsibilities of such bureaus and offices [or] expand *or reduce the size
> of the ... workforce of ... USAID* from the staffing levels previously justified
> to the Committees on Appropriations for fiscal year 2024.

FCAA, Pub. L. 118-47, 138 Stat. 460, §7063 (emphasis added).

Since the Founding, federal courts have recognized that federal agencies are not created by the President: "To Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction." *Myers*, 272 U.S. at 129. That's why when Presidents have wanted to restructure the government by reorganizing both between and within federal agencies, they have obtained Congressional authorization. See Ronald C. Moe, Cong. Rsch. Serv., RL31446, *Reorganizing the Executive Branch in the 20th Century: Landmark Commissions* (2002). Defendants' unilateral steps to abolish USAID violate both FCAA §§ 7063 (a & b) and the Constitution.

**2. Executive action unilaterally impounding appropriated funds is action contrary to law.** Defendants' impounding of billions of dollars appropriated by Congress to USAID is a statutory violation (of the ICA, the ADA, and multiple appropriations laws) and it is unconstitutional (usurping Congress's exclusive power of the purse and refusing to take care to execute the laws). Defendants' attempt to rebrand their actions as a mere "pause" rather than an impoundment, citing *City of New Haven v. United States,* 809 F.2d 901 (D.C. Cir. 1987), is remarkable. Def. Brief at 30–31. *First, New Haven* draws a "critical distinction between 'programmatic' and 'policy' deferrals," *id.* at 901, emphasizing that "Congress most certainly did not mean to suggest that impoundments designed to negate congressional budgetary *policies* would be 'presumptively valid.' It is precisely this sort of impoundment that Congress was determined to forestall." *Id.* at 908 (emphasis in original). Here, by Defendants' own admission, they have

impounded funds for policy reasons. *New Haven* in no way condones their actions.

*Second,* Defendants' characterization of their actions as "a deferral of budget authority," Def. Brief at 31, is a grave misstatement. Defendants have canceled almost all of USAID's programs, with no evidence of any intent to revive them. Instead, all evidence is to the contrary. See, e.g., ECF 39-3 (Ex. 2) (State will take over only "ongoing" USAID programs), ECF 9-4 (Ex. 15) (terminated programs will not be restarted), *id.* (Ex. 16) (additional program terminations after March 28). Defendants are canceling, not deferring, budget authority. Moreover, under the ICA, "deferrals" must be *consistent with legislative* policy, not negations of it, and therefore are permissible "only" for narrow statutorily specified reasons. 2 U.S.C. 684(b). Here, the so-called "review" Defendants claim to have undertaken is exactly the kind forbidden by the ICA: reviews "undertaken to ensure compliance with presidential policy prerogatives," are impoundments with "no basis in law." ECF  39-22 (Ex. 89) at 7. Indeed, the ICA's legislative history reflects that Congress explicitly contemplated and rejected the idea that the President may defer funds to advance his own policies at the expense of those enacted by Congress. See generally, H.R. Rep. No. 100–313, at 66–67 (1987); see also S. Rep. No. 93–688, at 75, 1974 U.S.S.C.A.N. 3504, 3575 (explaining that the objective of the amendments was to ensure that "the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress"). The ICA was enacted and amended to bar the Executive from refusing to obligate or spend appropriated funds for policy reasons.

## V.    Plaintiff is likely to succeed on its Constitutional claims.

Defendants have very little to say in defense of the constitutionality of their actions. Def. Brief at 35–39. They say nothing about the constitutionality of impounding billions in appropriations, with good reason. For decades before this Administration took office, the

Executive Branch has consistently rejected any notion that the President has constitutional authority to decline to spend appropriated funds, deeming it a proposition "supported by neither reason nor precedent." 119 Cong. Rec. S. 3808 (Daily ed. Mar. 1, 1973) (reprinting a 1969 OLC memo by William Rehnquist). See also 12 U.S. Op. Off. Legal Counsel 128, 1988 WL 391011 ("There is no textual source in the Constitution for any inherent authority to impound."). See also ECF 39-22 (Ex. 89) at 5 ("The Constitution grants the President no unilateral authority to withhold funds from obligation," "[a]n appropriations act is a law like any other," and "once [an appropriations law is] enacted, the President must 'take care that the laws be faithfully executed'"). And the Supreme Court has made it crystal clear that the President cannot cancel or eliminate spending; rather, Congress must use its lawmaking power. *Clinton*, 524 U.S. at 438-40.

Defendants also say very little about the constitutionality of unilateral executive action to abolish a Congressionally created agency. Def. Brief at 35–37. They emphasize the President's power over foreign affairs. But Congress and the President *share* that power, U.S. Const. Art. I, § 8, and only Congress has the power of the purse—including for foreign aid. The issues here are whether the President can unilaterally dismantle an agency Congress created and impound Congressional foreign aid appropriations. Defendants claim that "Plaintiff identifies no statute that bars USAID's restructuring." *Id.* at 36. But that's both false, see, e.g., FCAA § 7063, and backwards: without a statute *granting* the President authority to eliminate USAID, he has none. *Youngstown*, 343 U.S. at 585.[7] And contrary to Defendants' assertion that "historical practice" supports the President's authority to eliminate agencies, the *opposite* is true. Henry B. Hogue, Cong. Rsch. Serv., R44909, *Executive Branch Reorganization* (2017).

---

[7] Since there is no act of Congress that empowers the President to shut down USAID, *Dalton v. Specter*, 511 U.S. 462 (1994), does not apply. See Def. Brief at 35, 37, 38. See also *NTEU*, 2029 WL 942772, at *9 (rejecting Defendants' reliance on *Dalton* for the same reason).

In similar cases in this district, including one involving USAID, other judges have found a likelihood of success on the merits of similar separation of powers claims. See *AVAC*, 2025 WL 752378, at *18 ("Plaintiffs are likely to succeed on their separation of powers claims and [the Court] rejects Defendants' unbridled understanding of the President's foreign policy power, which would put the Executive above Congress in an area where it is firmly established that the two branches share power.") See also *NTEU*, 2025 WL 942772, at *23 ("[T]he Court finds that it is likely that plaintiffs will succeed on the merits. The evidence reveals that: the defendants were in fact engaged in a concerted, expedited effort to shut the agency down …. While the President is free to propose legislation to Congress to accomplish this aim, the defendants are not free to eliminate an agency created by statute on their own.") See also *Doe*, 2025 WL 840574, at *25 ("Defendants' present actions to dismantle USAID violate the Separation of Powers because they contravene congressional authority relating to the establishment of an agency.")

## VI.  Plaintiff is likely to succeed on its ultra vires claim.

Plaintiff is likely to succeed on its ultra vires claim for the same reasons it is likely to succeed on its constitutional and statutory claims: Defendants' actions are outside their authority. *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) ("Review for *ultra vires* acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law and the courts generally have jurisdiction to grant relief.") Further, judicial review of ultra vires acts is available even if a statutory claim, such as an APA claim, is not. *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 116, 1172-73 (D.C. Cir. 2006) ("It does not matter …. whether traditional APA review is foreclosed …. [the APA] does not repeal the review of ultra vires action that was recognized long before.")

**VII.  Plaintiff has sufficiently demonstrated irreparable harm.**

Defendants dismiss Plaintiff's evidence of irreparable harm as merely (a) loss of income and employment or (b) "policy disagreements." Def. Brief at 40, 41. Several other judges, finding irreparable harm from shutting down an agency, have rejected such arguments. See *AFL-CIO v. Trump*, No. 25-cv-03698, 2025 WL 1358477, at * 22 (N.D. Cal. May 9, 2025) (noting as relevant competent evidence of irreparable harm that agency employees "will lose their wages and health benefits and, in some cases may need to relocate," and "the widespread termination of salaries and benefits for individuals, families, and communities"); *Widakuswara*, 2025 WL 1166400, at *16 (finding irreparable harm from "shutting down necessary systems, laying off personnel, and terminating contracts, even ones that might be .... eventually reinstated ... [because these actions] threaten the efficacy of the agency in the long term"); *Aviel v. Gor*, No. 25-778-LLA, 2025 WL 1009035, at *19 (D.D.C. April 4, 2025) ("mere loss" of employment is not "normally" enough but loss of employment implicating the "very survival" of an organization is); *NTEU*, 2025 WL 942772, at *41-43 ("once the agency is gone, there will be no opportunity to afford relief at a later point," terminated contracts "cannot just be turned back on," and terminated employees "will not have health coverage," none of which are harms "that can be paid for later"); *Doe*, 2025 WL 840574, at *26-27 (noting terminated USAID employees' reputational injuries, disclosure of their personal information, and overseas' employees physical security risks). As Plaintiff demonstrated in its opening brief, this Court should do the same. Brief at 37–42. The morbidity and mortality caused by Defendants' actions is also irreparable. See Brief at 17; see also Daniella Cavalcanti, *Evaluating the Comprehensive Impact of Two Decades of USAID Interventions and Forecasting the Effects of Defunding on Mortality up to 2030*, available at [https://perma.cc/V8DE-65NF] (forecasting models predict that USAID funding cuts could result in more than 14 million deaths,

including 4.5 million under-age-five deaths by 2030).

## VIII. The equities heavily favor a preliminary injunction.

Defendants argue, in error, that the equities weigh in their favor. They note that "Plaintiff's members voluntarily entered contracts ... they knew contained clauses" allowing terminations for convenience. Def. Brief at 42. But that's irrelevant: Plaintiff's members did not enter contracts consenting to terminations carried out arbitrarily, capriciously, or in violation of law or the Constitution. Next, Defendants argue that the Court must give deference to "the President's decision and process" and the public's interest in "ensuring that ... foreign aid programs are properly and efficiently administered." *Id.* at 42. But that argument mistakes the balance-of-equities determination for the merits. The proper question at this stage is not "Which side is right about judicial review of Presidential action?" It's "Which side suffers the greater harm from continuing the status quo pending a decision on the merits?" And that question is not a close call here: the damage to the PSC Association and its members far outweighs the harm to Defendants of being preliminarily restrained from further destroying USAID before any court can reach the question of the constitutionality of their actions. Brief at 42–43. Deflecting from the proper question, Defendants also suggest that they are "undertaking a thorough review," which "a preliminary injunction would displace and frustrate." Brief at 41–42. Yet they've previously admitted repeatedly that they've *finished* that review, see ECF 39-5, Ex. 36, para. 1; ECF 39-3 (Ex. 2 at 3), which, in any event, as a policy review, violated 2 U.S.C. § 684(b).

## IX. The proposed preliminary injunction is appropriately tailored to Defendants' conduct.

Adopting a position staked out solely by a single justice, in a lone concurrence urging abandoning associational standing, Defendants contend that if the Court enters a preliminary injunction its terms should be limited to "identified members" of the PSC Association and address

"only the contract-specific decision concerning each PSC's contract." Def. Brief at 44 (citing *FDA v. Alliance*, 602 U.S. at 398-405 (Thomas, J. concurring)). That is not the law. A judgment entered in favor of an association suing on its members' behalf runs to all members, and it is not beyond a court's power to issue even a nationwide injunction, under appropriate circumstances, even at the preliminary stage. See *Texas v. United States,* 809 F.3d 134, 188 & n.211 (5th Cir. 2015), *aff'd*, 579 U.S. 545, 547 (2016) (per curiam). Defendants' position is also factually wrong: the actions here are not "contract-specific decisions"; PSCs have been terminated en masse, indiscriminately, under blanket directives, not individualized assessments. And the appropriate "scope of injunctive relief is dictated by the extent of the violation," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), which here includes illegally abolishing USAID and impounding tens of billions of dollars.

## CONCLUSION

For all the reasons stated above and in the PSC Association's opening brief, the Court should grant its motion for a preliminary injunction.

Dated: May 15, 2025                  Respectfully submitted,


                                     */s/ Joshua Karsh*

Carolyn E. Shapiro
Schnapper-Casteras PLLC
200 E. Randolph St., Ste 5100
Chicago, IL 60601
cshapiro@schnappercasteras.com
773-520-7533

*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.*

Marni Willenson
D.C. USDC Bar No. IL0011
Illinois Bar No. 6238365
Willenson Law, LLC
3420 W. Armitage Ave., Ste 200
Chicago, IL 60647
marni@willensonlaw.com
312-546-4910

Joshua Karsh
Mehri & Skalet PLLC
1237 Judson Ave.
Evanston, IL 60202
jkarsh@findjustice.com
773-505-7533

*Member of the Illinois bar with a D.C. practice limited to federal litigation. Not a member of the District of Columbia bar.*

*Counsel for Plaintiff*